# EXHIBIT B

*21st/3/2023*

**CERTIFIED TRUE COPY**
.......................
SECRETARY
PRESIDENTIAL ELECTION PETITION
COURT 2023

J.J EKPEROBE ESQ

# IN THE COURT OF APPEAL
## (IN THE PRESIDENTIAL ELECTION PETITION COURT)
## HOLDEN AT ABUJA

## IN THE MATTER OF THE ELECTION TO THE OFFICE OF THE PRESIDENT OF THE FEDERAL REPUBLIC OF NIGERIA HELD ON 25TH FEBRUARY 2023

*CA/PEPC/05/2023*

**PETITION No: PEPC/A/    /2023**

**BETWEEN:**

1. ABUBAKAR ATIKU
2. PEOPLES DEMOCRATIC PARTY (PDP)          **PETITIONERS**

   **AND**

1. INDEPENDENT NATIONAL ELECTORAL
   COMMISSION (INEC)
2. TINUBU BOLA AHMED                        **RESPONDENTS**
3. ALL PROGRESSIVES CONGRESS (APC)

# PETITION

Petition — ₦1,000
Hearingfees — ₦2,000
Publication — ₦100
              — ₦500
F/S           — ₦6,600
Oath          — ₦2,230
CTC           — ₦12,430



PAID
DATE
5 SEP 23

**DATED THIS 20TH DAY OF MARCH, 2023.**

Atiku & Anor. v INEC & Ors    *RRR 2808-0805-8246*

**IN THE COURT OF APPEAL**
**(IN THE PRESIDENTIAL ELECTION PETITION COURT)**
**HOLDEN AT ABUJA**

**IN THE MATTER OF THE ELECTION TO THE OFFICE OF THE**
**PRESIDENT OF THE FEDERAL REPUBLIC OF NIGERIA**
**HELD ON 25TH FEBRUARY 2023**

**PETITION No: PEPC/A/    /2023**

**BETWEEN:**

**1. ABUBAKAR ATIKU**
**2. PEOPLES DEMOCRATIC PARTY (PDP)**     **PETITIONERS**

    **AND**

**1. INDEPENDENT NATIONAL ELECTORAL**
   **COMMISSION (INEC)**
**2. TINUBU BOLA AHMED**     **RESPONDENTS**
**3. ALL PROGRESSIVES CONGRESS (APC)**

# <u>THE PETITION</u>

**THE PETITION OF ABUBAKAR ATIKU, OF PLOT 121 ADETOKUNBO ADEMOLA CRESCENT, WUSE 2, ABUJA AND PEOPLES DEMOCRATIC PARTY OF WADATA PLAZA, PLOT 1970, MICHAEL OKPARA STREET, WUSE ZONE 5, ABUJA, AND WHOSE NAMES ARE SUBSCRIBED.**

**(A). <u>PARTIES:</u>**

1.    The 1st Petitioner, ABUBAKAR ATIKU, was a candidate at the election to the office of the President of the Federal Republic of Nigeria, which election held on Saturday, 25th February 2023 across the Federation of Nigeria. The



1st Petitioner, who had a right to vote and be voted for in the Election, was sponsored by the 2nd Petitioner and contested for the Election.

2. The Petitioners state that the 1st Petitioner has a right to be returned as duly elected at the Election.

3. The 2nd Petitioner, Peoples Democratic Party (PDP) is a duly registered political party in Nigeria and participated in the Election by sponsoring the 1st Petitioner as its Presidential candidate. The 2nd Petitioner is a corporate body, and for the Election, acted through and by means of its agents, State Coordinators and officials, who were reporting amongst themselves.

4. For the purposes of the Election, the Petitioners had agents in all the Polling Units, Ward Collation Centres, Local Government Collation Centres, and the State Collation Centres, in all the States of the Federation and the Federal Capital Territory as well as the National Collation Centre.

5. The Petitioners have the right to present this Petition, having participated in the Election.

6. The 1st Respondent is the body constitutionally and statutorily vested with the responsibility of organising and conducting elections in Nigeria, and was the body that conducted the Election, the subject matter of this Petition. All, each and every person who acted as Presiding Officers, Assistant Presiding Officers, Supervisory Presiding Officers, *ad-hoc* Staff in all the polling units/stations/points, Ward Collation Officers in all the Ward Collation Centres, Local Government Collation Officers in all the Local Government Area Collation Centres, all the State Collation Officers in all the State Collation Centres, the State Resident Electoral Commissioners, FCT Resident Electoral Commissioner, the Chief Returning Officer, and any other person(s) who acted in any capacity on behalf of the 1st Respondent



at the Election, including Information Communication Technology (ICT) Technical Election Officials, acted as agents of the 1st Respondent.

7.   The 2nd Respondent was a candidate in the Election and sponsored by the 3rd Respondent.

8.   The 3rd Respondent is a registered political party in Nigeria and is the political party that sponsored the 2nd Respondent as its candidate at the Election.

9.   The Petitioners and the Respondents hereinabove specified are the parties interested in this Petition.

## (B). <u>HOLDING OF THE ELECTION, SCORES OF CANDIDATES, PERSON RETURNED</u>

10.  The Petitioners state that the Election took place on **Saturday, 25th February 2023**.

11.  Four (4) days after the Election, specifically on Wednesday, **1st March 2023**, the 1st Respondent announced the following as the purported scores of the candidates for the Election, namely: -

| S/No. | CANDIDATE | PARTY | SCORES |
|---|---|---|---|
| 1. | IMUMOLEN IRENE CHRISTOPHER | A | 61,014 |
| 2. | AL MUSTAPHA HAMZA | AA | 14,542 |
| 3. | SOWORE OMOYELE STEPHEN | AAC | 14,608 |
| 4. | KACHIKWU DUMEBI | ADC | 81,919 |
| 5. | SANI YABAGI YUSUF | ADP | 43,924 |

Atiku & Anor. v INEC & Ors.                    -3-



| 6. | **TINUBU BOLA AHMED** | **APC** | **8,794, 726** |
|---|---|---|---|
| 7. | UMEADI PETER NNANNA CHUKWUDI | APGA | 61,966 |
| 8. | OJEI PRINCESS CHICHI | APM | 25,961 |
| 9. | NNAMDI CHARLES OSITA | APP | 12,839 |
| 10. | ADENUGA SUNDAY OLUWAFEMI | BP | 16,156 |
| 11. | OBI PETER GREGORY | LP | 6,101, 533 |
| 12. | MUSA MOHAMMED RABIU KWANKWASO | NNPP | 1,496, 687 |
| 13. | OSAKWE FELIX JOHNSON | NRM | 24,869 |
| 14. | **ABUBAKAR ATIKU** | **PDP** | **6,984, 520** |
| 15. | ABIOLA LATIFU KOLAWOLE | PRP | 72,144 |
| 16. | ADEBAYO ADEWOLE EBENEZER | SDP | 80,267 |
| 17. | ADO-IBRAHIM ABDULMALIK | YPP | 60,600 |
| 18. | NWANYANWU DANIEL DABERECHUKWU | ZLP | 77,665 |

12. The Petitioners state that the 1st Respondent wrongly returned the 2nd Respondent as the winner of the Election, allocating to him **8, 794, 726** votes while ascribing to the 1st Petitioner **6, 984, 520** votes.

13. The 1st Respondent also declared the following as its summary of the purported results:



| | | |
|---|---|---|
| A. | TOTAL NUMBER OF REGISTERED VOTERS | 93,469,008 |
| B. | TOTAL NUMBER OF ACCREDITED VOTERS | 25,286,616 |
| C. | TOTAL NUMBER OF VALID VOTES | 24,025,940 |
| D. | TOTAL NUMBER OF REJECTED VOTES | 939,278 |
| E. | TOTAL NUMBER OF VOTES CAST | 24,965,218 |
| F. | PERCENTAGE TURN OUT | 27.05% |

14.    The Petitioners hereby plead and shall rely on **Form EC8D(A)** (being the summary of final collation of results) and **Form EC8E** (being the final declaration of result) issued by the 1st Respondent, not only to show the purported scores as recorded by the 1st Respondent, but also to show the invalidity of the scores as recorded therein. Notice is hereby given to the 1st Respondent to produce the original copies of these documents at the hearing of this Petition. The Petitioners further state that on the face of the Form EC8D(A), there are calculation errors as shown and contained in the Report of the Statisticians which the Petitioners shall rely upon, and which is herein pleaded.

15.    The Petitioners plead and also rely on the Reports and evidence by their Experts, including Statisticians, Forensic Examiners and other Experts pursuant to the Orders for Inspection, Examination and Production of election materials granted to the Petitioners by this Honourable Court.



**(C).  GROUNDS OF THE PETITION**:

16.  The Petitioners state that the grounds upon which this Petition is based are as follows:

(a).  The election of the 2nd Respondent is invalid by reason of non-compliance with the provisions of the Electoral Act, 2022.

(b).  The election of the 2nd Respondent is invalid by reason of corrupt practices.

(c).  The 2nd Respondent was not duly elected by majority of lawful votes cast at the Election.

(d).  The 2nd Respondent was at the time of the Election not qualified to contest the Election.

**(D).  FACTS OF THE PETITION:**

**GROUND ONE: THE ELECTION OF THE 2ND RESPONDENT IS INVALID BY REASON OF NON-COMPLIANCE WITH THE PROVISIONS OF THE ELECTORAL ACT, 2022.**

**(1).  FAILURE BY THE 1ST RESPONDENT TO ELECTRONICALLY TRANSMIT THE ELECTION RESULTS:**

17.  The Petitioners aver that the Election was not conducted in accordance with the provisions of the Electoral Act 2022, and other extant laws and that the non-compliance substantially affected the result of the Election, in that the 2nd Respondent ought not to have been declared or returned as the winner of the Election.

18.  The Petitioners state that the Election was not conducted in compliance with the provisions of Sections 47(2) & (3), 60(1), (2) & (5), 64(4)(a) & (b), 64(5), (6), (7) & (8), 71 and 73 of the Electoral Act, Paragraphs 3.3.0 and 3.4.0 of the 1st Respondent's published Manual for Election Officials



2023 ("INEC Manual" or "Manual"), and Paragraphs 19, 35, 38, 40, 41, 42, 43, 47, 48, 50, and 62 of the 1st Respondent's published Regulations and Guidelines for the Conduct of Elections 2022 ("INEC Regulations" or "Regulations" or "Regulations and Guidelines").

19. The Petitioners state that several months and weeks leading to the Election, the 1st Respondent through its Chairman Mahmood Yakubu, had repeatedly assured the general public that the February 2023 general election would be the best election ever, with the guaranteed use of the Bi-Modal Voters' Accreditation System ("BVAS") and real-time and direct uploading of the polling unit results to INEC's electronic collation system and Results Viewing Portal ("IReV") which were technological innovations in the electoral system that would ensure the transparency of the elections against all forms of manipulation. The 1st Respondent's Chairman and its other principal officers including Mr. Festus Okoye, the National Commissioner for Information and Voters Enlightenment, at various times and fora, gave serial undertakings, representations and assurances that the results from the polling units shall be transmitted real time via the BVAS to the electronic collation system and the IReV for public viewing and that such transmission shall be the basis for collation at the various collation levels up to the national collation and return at the Election.

20. The Petitioners state that contrary to the undertakings, representations and assurances made by the 1st Respondent, the 1st Respondent proceeded on the 1st day of March 2023 to wrongly return the 2nd Respondent as the winner of the Election when the outcome (herein being challenged) and the results from the polling units including the total number of accredited voters in the respective polling units were yet to be transmitted to the 1st Respondent's Electronic Collation System and the 1st



Respondent's Result Viewing Portal (IReV) as stipulated by the Electoral Act, 2022 and the INEC Guidelines and Manuals and expressly guaranteed to the electorate by the 1st Respondent.

21. The Petitioners aver that the 1st Respondent had received generous funding from the Federal Government of Nigeria, having informed the public that the 2023 election cost the country the sum of N355 billion. The 1st Respondent had submitted a budget of N305 billion, out of which a whopping sum of N117 billion was earmarked for the procurement of electronic accreditation and transmission devices, including the Bi-Modal Voters' Accreditation System (BVAS) a new voter enrolment and voter accreditation device designed to combine the functions of the Direct Data Capture Machine, the Z-Pad, the Smart Card Reader and the portal, IReV a world-wide web portal designed for real time viewing of election results uploaded from polling units. The 1st Respondent and its Chairman irrevocably committed the 1st Respondent to the deployment and use of the BVAS technology in both accreditation and transmission of the accreditation data and election results from the polling units to the electronic collation system and IRev Portal. Meanwhile, the 1st Respondent had touted the BVAS machine as the election "game changer".

22. The Petitioners further state that the 1st Respondent had prescribed through its various Regulations, Guidelines and Manual, the manner of accreditation, collation and transmission vide its technological device, the BVAS, pursuant to the Electoral Act. The Petitioners shall contend at the hearing of this Petition, that the mandatory requirements of the 1st Respondent in relation to electronic accreditation, collation, and transmission are as set out below:

CERTIFIED TRUE COPY

(1). Accreditation of voters shall be by way of Bimodal Voter Accreditation System (BVAS).

(2). To electronically transmit or transfer the results and the accreditation data from polling units direct to the electronic collation system as prescribed by the 1st Respondent.

(3). Uploading of results shall be with the BVAS to the 1st Respondent's results Viewing Portal (IReV) directly and in real-time, as prescribed by the 1st Respondent.

(4). Collation and authentication of the results and accreditation data from the polling units at the various collation levels up to the national collation centre shall be with the aid of the Results Verification System.

23. The Petitioners shall lead oral and documentary evidence at the hearing in proof of the fact that (a) the result of the Election as announced by the 1st Respondent and especially the votes wrongly allocated to the 2nd Respondent do not represent the lawful valid votes cast; and (b) lawful votes were deliberately and massively deducted from the 1st Petitioner's scores by the 1st Respondent to facilitate the return of the 2nd Respondent.

24. The Petitioners state that the 1st Respondent failed to comply with its own Guidelines and representations to transmit results and accreditation data directly and real-time to the IReV and its electronic collation system/storage device before the hasty return and announcement of the 2nd Respondent as the winner of the Election on the 1st day of March 2023.

CERTIFIED TRUE COPY

25. The Petitioners contend that by the combined provisions of the Electoral Act, the INEC Regulations and Guidelines and the INEC Manual, the votes collated at the polling units are to be electronically transmitted with the Bimodal Voter Accreditation System (BVAS) directly and real-time to the INEC electronic collation system and IReV portal.

26. To underscore the relevance of real-time electronic transmission of the results and accreditation data from the polling units to the IReV Portal and the INEC electronic collation system, the 1st Respondent itself stated thus in its Manual for Election Officials 2023 (paragraph 2.9.0):

> **"Electronic Transmission/Upload of Election Result and Publishing to The INEC Result Viewing (IReV) Portal:**
>
> **"One of the problems noticed in the electoral process is the irregularities that take place between the Polling Units (PUs) after the announcement of results and the point of result collation. Sometimes results are hijacked, exchanged, or even destroyed at the PU, or on the way to the Collation Centers. It becomes necessary to apply technology to transmit the data from the Polling Units such that the results are collated up to the point of result declaration.**
>
> **"The real-time publishing of polling unit-level results on IReV Portal and transmission of results using the BVAS demonstrates INEC's commitment to transparency in results management. This commitment is backed by Sections 47(2), 60(1, 2 & 5), 64(4a & 4b) and 64(5) of the Electoral Act 2022, which confers INEC with the power to transmit election results electronically. The system minimizes human errors and delays in results collation and improves the accuracy, transparency, and credibility of the results collation process."**

Atiku & Anor. v INEC & Ors.                    -10-



27.    In furtherance of the commitment to real-time electronic transmission of the polling units results to the electronic collation system and the IReV portal, the 1st Respondent in its Regulations and Guidelines for the Conduct of Elections, 2022 (paragraph 38), provided thus:-

> *"On completion of all the Polling Unit voting and results procedures, the Presiding Officer shall:*
>
> *(i). Electronically transmit or transfer the result of the Polling Unit, direct to the collation system as prescribed by the Commission.*
>
> *(ii). Use the BVAS to upload a scanned copy of the EC8A to the INEC Result Viewing Portal (IReV), as prescribed by the Commission."*

28.    The Petitioners state that Section 47(2) of the Electoral Act, makes it mandatory for the Presiding Officer appointed by the 1st Respondent to use technological device (in this case, the BVAS device) for the accreditation of voters at the polling unit. In compliance with the foregoing, the 1st Respondent in paragraph 18(a) of its Regulations and Guidelines, applicable to the conduct of the election, prescribed that a person intending to vote shall be verified to be the same person on the Register of Voters by the use of the Bimodal Voter Accreditation System (BVAS). The Petitioners aver that it is the same BVAS device deployed by the 1st Respondent for accreditation of voters at the polling units during the conduct of the said Election, that was to be used by the 1st Respondent to electronically transmit from the polling units, the result of the election at the polling units together with the accreditation data including the total number of accredited voters in the respective polling units.

29.    The Petitioners further state that Section 64(4) & (5) of the Electoral Act 2022 makes it mandatory for any Collation Officer or the Returning Officer

at the various collation levels for any election to collate and announce the result of an election, subject to his or her verification and confirmation that the (a). number of accredited voters stated on the collated result are correct and consistent with the number of accredited voters recorded and transmitted directly from the polling units; and (b). the voters stated on the collated result are correct and consistent with the votes recorded and transmitted directly from polling units.

30.    The 1st Respondent in acknowledgment of the foregoing provisions of Section 64(4) of the Electoral Act, provided in paragraph 48(a) of its aforesaid election to the effect that an election result shall only be collated if the Collation Officer ascertains that the number of accredited voters tallies with the number recorded in the BVAS and that the votes scored by the political parties on the result sheet are correct and agree with the result that was electronically transmitted or transferred directly from the polling unit. By Section 64(5) of the Electoral Act, a collation officer or returning officer shall use the "data of accreditation" (which includes the number of accredited voters) "recorded and transmitted directly from each polling unit" and "the votes and results of the election recorded and transmitted directly from each polling unit" to collate and announce the result of an election if a collated result at his or a lower level of collation is disputed or correct to be incorrect.

31.    The Petitioners further state that in paragraph 48(b) of its aforesaid Guidelines and Regulations, the 1st Respondent provided in similar vein, that if a Collation or Returning Officer determines that a result from a lower level of collation is not correct, he/she shall use the result that was electronically transmitted or transferred directly from that lower level to collate and announce the result. Further, Sections 64(6), (7) and (8) of

CERTIFIED TRUE COPY

the Electoral Act 2022, made it mandatory that disputes as to the result of the election being collated, can only be resolved by the Collation Officer or Returning Officer by reference to the polling unit results and the accreditation data (which includes the number of accredited voters) electronically transmitted from the polling units.

32. The Petitioners contend that notwithstanding the foregoing, the uploading and transmission to the electronic collation system and the IReV portal by the 1st Respondent of the results of the Senate and House of Representatives took place seamlessly while that of the Presidential Election did not.

33. The Petitioners contend and shall lead evidence to show that contrary to the original design of the BVAS machine to upload data directly to the electronic collation system and the IReV portal, the 1st Respondent contrived and installed an intervening third-party device (Device Management System) which, in its ordinary usage, is meant to secure and administer the 1st Respondent's technological ecosystem for the elections but as it relates to the Presidential Election, was used to intercept the results, quarantine and warehouse same, and filter them before releasing same to the IReV Portal. The 1st Respondent used the said Device Management System to manipulate the Election results in favour of the 2nd and 3rd Respondents.

34. The Petitioners state and shall lead expert evidence to show the critical components of the 1st Respondent's Information and Communications Technology (ICT), including but not limited to the Bimodal Voter Accreditation System (BVAS) which is an Android Device manufactured by Emperor Technologies China and supplied to the 1st Respondent by Activate Nigeria Limited. The Voter Accreditation System (VAS) which is

CERTIFIED TRUE COPY

the software that is used on the BVAS was previously designed and configured in-house and installed on the BVAS by the ICT Team of the 1st Respondent headed by Mr. Chidi Nwafor. The VAS was subsequently handed over to Emperor Technology China prior to the Presidential Election and they then preconfigured and installed the software on the BVAS before supplying the devices to the 1st Respondent through Activate Nigeria Limited. As it relates to the IReV, the INEC Result Viewing Portal (IReV) is a web-based data entry and aggregation portal designed also by Chidi Nwafor's team and is hosted on Amazon Web Service (AWS). The server system for the device and the portal are hosted on Amazon Web Service (AWS) URL:dashboard.ivasportal.com/dash.

35.   The Petitioners contend that some months proximate to the Elections, the 1st Respondent caused to be transferred its in-house ICT expert, Chidi Nwafor, from its ICT Department to the 1st Respondent's office in Enugu as an "Administrative Secretary", and brought in an IT Consultant, Mr. Suleiman Farouk, who introduced a third-party mechanism that was installed and made to intermediate between the BVAS and the IRev Portal, known as Device Management System (DMS). The DMS is a software that allows INEC's IT Security Consultant, Mr. Suleiman Farouk, to remotely control, monitor and filter data that is transmitted from the BVAS devices to the electronic collation system and the IRev platform. Meanwhile, the 1st Respondent engaged an appointee of the 2nd Respondent to man and oversee the sensitive ICT Department of the 1st Respondent for the purpose of the Election.

36.   The Petitioners aver strongly that the 1st Respondent, having set the parameters, did not ensure compliance with the electronic transmission of

Atiku & Anor. v INEC & Ors.                    -14-



accreditation data and results in this Election to create opportunity for manipulation of figures to the advantage of the 2nd and 3rd Respondents.

37. The Petitioners will lead evidence at the hearing to show that there were no technical "glitches" that prevented the upload and transmission of the polling units results and the accreditation data of the Presidential Election to the electronic collation system and the IReV portal but what happened was the non-adherence to the system through a command and control element activated by a pre-programmed design to limit user-privileges of the front-end users of the BVAS machines at the polling units with respect to Presidential Election results while releasing user privileges in respect of the National Assembly election windows, by selectively withholding correct passwords and/or issuing wrong passwords through the use of the Device Management System equipment aforesaid.

38. The 1st Respondent had admitted its failure to electronically transmit the polling units results of the Election and the total number of accredited voters in the respective polling units to the electronic collation system and the IReV platform but surprisingly attributed same to "glitches".

39. The Petitioners contend that there was no failure of "server", as the "server" was cloud-based and virtual and was hosted on and by Amazon Web Service (AWS). The Petitioners shall call evidence to show that the "server" being cloud-based, in the event of any unlikely challenge, Amazon Web Service would have seamlessly switched to another server without hitch, being autoscaling groups with multiple network reception and offline upload options.

40. The Petitioners contend that the technology system deployed by the 1st Respondent underwent Quality Assurance Tests ("QAT") before acquisition



and deployment. The 1st Respondent is hereby given notice to produce the QAT Report that was prepared by PricewaterhouseCoopers (PWC) as well as the Report of Vulnerability Assessment & Penetration Testing (VAPT) by Consultant Suleiman Farouk of Sulfman Consulting Limited and all other subsequent and related reports on the system. The Petitioners contend that the so-called "glitch" was a bypass to tilt and switch the results of the Presidential Election in favour of the 2nd and 3rd Respondents.

41.    The Petitioners shall subpoena PricewaterhouseCoopers (PWC) to produce Quality Assurance Report and to testify; subpoena Activate Technologies Limited - BVAS Supplier and Emperor Technology Limited (also known as Shenzhen Emperor Technology Company Limited) - the BVAS Manufacturers to produce relevant supply documents and to testify. The Petitioners shall also subpoena Sulfman Consulting Ltd to produce the Vulnerability Assessment & Penetration Testing (VAPT) Report and to testify. The Petitioners shall also subpoena expert witnesses in respect of the electronic collation system and the IReV portal.

42.    The Petitioners shall also subpoena Kaspersky Endpoint Security (of Thurhill Office Park, Bekker Road, Midrand, South Africa) that provided the system security for the BVAS and e-transmission system deployed by the 1st Respondent to produce relevant documents and data as well as testify on the system security. The Petitioners shall also subpoena Globacom Nigeria Limited, the internet provider for the system deployed by the 1st Respondent which internet was disconnected from the BVAS machines before transmission. The Petitioners shall further subpoena Infrastructure Concession Regulatory Commission (ICRC), with office at FCDA, Area 11, Abuja, which conducted due diligence on the e-transmission system deployed by the 1st Respondent using full business case that had inputs

CERTIFIED TRUE COPY

from Emperor Technology Limited and issued "Certificate of No Objection" for the system to be deployed. The Petitioners shall further subpoena National Institute of Technology Development Agency (NITDA), with office at Gimibiya Street, Area 11, Abuja, the government agency which tested the technology in issue before deployment in Nigeria and issued relevant permits, certifications, and licences for its deployment.

43.  The Petitioners further state that as of 1st March 2023, when the 1st Respondent returned the 2nd Respondent as the winner of the Election, the entire results and accreditation data from the polling units had not been transmitted and uploaded to the 1st Respondent's electronic collation system/storage device, created/acquired by the 1st Respondent itself for the purpose of electronically collating the results of the Election.

44.  The Petitioners state that for more than 18 days after the Election, and as of the date of filing this Petition, the 1st Respondent's IReV Portal showed that the 1st Respondent had failed to upload the entire accreditation data and polling units results of the Presidential Election. The Petitioners have applied to the 1st Respondent for and shall rely on certified true copies of the BVAS Reports and the data and logs of and from the electronic collation system, and same shall be relied upon at the hearing. The Petitioners plead and rely on the Reports of Forensic Experts and ICT Experts on the BVAS Report, the logs, and data from the electronic collation system and the IRev Report and all data arising from and connected with the Election. The Petitioners shall rely on the evidence of Statisticians, Forensic Examiners, and other Experts, detailing the data analysis on the votes on all levels of collations, from the polling units to the final return.

45.  The Petitioners shall also call evidence of statisticians, forensic examiners, fingerprint and ICT experts at the hearing of the Petition to establish that


CERTIFIED TRUE COPY

the figures/scores awarded the 2nd Respondent were not the product of valid votes actually cast but were mere allocation by the 1st Respondent, and the summation of the result declared is inconsistent with and cannot be reconciled with the number of duly accredited voters. The Petitioners plead and shall rely on BVAS reports, the results sheets of the polling units, wards, local governments, States and the national manually collated results and electronic video recordings of several acts of infractions of the electoral process by the Respondents.

46. The Petitioners state that Section 47(3) of the Electoral Act makes it mandatory for the 1st Respondent to cancel and reschedule an election in any polling unit where the BVAS or other technological device deployed for accreditation of voters fails to function, but notwithstanding, the 1st Respondent concluded the said Election, purported to collate the result of the Election and declared the 2nd Respondent wrongly as the winner of the said election without the prescribed electronic transmission of the results of the Election at and from the various polling units and the accreditation data from the respective polling units (including the number of accredited voters in the said polling units), to the INEC Electronic Collation System and to the INEC Result Viewing Portal (IReV).

47. The Petitioners contend that the 1st Respondent's inability to utilize the technological device (BVAS) deployed by the 1st Respondent for the electronic transmission of the polling units results of the Election along with the accreditation data, amounts to a programmed failure of the said technological device to function which failure is attributable to the Respondents. The Petitioners contend that the 1st Respondent in the face of the obvious failure of the BVAS to function at the respective polling

CERTIFIED TRUE COPY

units, ought to have cancelled the election and reschedule same to take place within 24 hours as required by Section 47(3) of the Electoral Act.

48.    The Petitioners further aver that by reason of the non-electronic transmission of the polling units results of the election and accreditation data from the respective polling units at the time of the collation of the results of the Election, all the Collation Officers at the various levels of collation of the results including the 1st Respondent's Chairman who as the Returning Officer for the said Presidential Election conducted the final collation of the results of the Election, failed to carry out the mandatory verification and confirmation that was incumbent on them pursuant to the provisions of Section 64(4) of the Electoral Act.

49.    The Petitioners contend that by reason of the foregoing, there could not have been any valid and lawful collation and announcement of the result of the Election under the Electoral Act, without the prior electronic transmission from the polling units to the INEC Electronic Collation System and IReV portal using the BVAS, of the results of the election at the respective polling units together with the accreditation data therefrom which includes the total number of accredited voters in the polling units. The Petitioners shall therefore contend during the hearing of the Petition that the collation of the Election result and announcement of same without the prior electronic transmission of the results of the Election at and from the respective polling units, and the incorrect manual collation of the results without the use of and authentication with the electronic collation system at the various collation levels up to the national collation center, are invalid, unlawful, and null and void.

50.    The Petitioners contend that the 1st Respondent is in clear breach of the provisions of the law under Sections 60 and 64(4) and (5) of the Electoral



Act 2022 by failing to use the BVAS to transmit the Election results at the polling units and the accreditation data therefrom to the electronic collation system and the IRev Portal. Despite the failure to so transmit and several complaints for review, the 1st Respondent's Chairman refused all entreaties and applications for the suspension of the collation exercise and a review of the complaints before declaring a winner of the Election and repeatedly off-handedly dared the Petitioners to go to Court.

51. The Petitioners contend that contrary to the provisions of the 1st Respondent's Regulations and Manual which stipulate the transmission of both accreditation data and the polling units results from the BVAS directly and real-time to the electronic collation system and the IReV portal, the 1st Respondent introduced a device manager called Collation Support and Results Verification System (CSRVS), with which the results from the polling units were quarantined prior to transmission to the IReV portal, leaving room for the 1st Respondent to upload wrong results.

52. The Petitioners shall vehemently contend during the hearing of the Petition that the entire Presidential Election conducted on the 25th day of February, 2023 together with the collation of the results of the said Election and the announcement and declaration and return of the 2nd Respondent as the winner of the said Election are unlawful, illegal, wrongful, null and void by reason of the failure of the 1st Respondent to comply with the aforesaid conditions precedent for the conduct of valid election.

53. The Petitioners plead and shall rely on the CTC of the Press Release issued by the 1st Respondent dated the 11th day of November, 2022, wherein INEC as a public institution stated thus:

CERTIFIED TRUE COP

> *"Our attention has been drawn to reports in a section of the media of alleged plans by the Commission to rig the 2023 General Election by abandoning the direct and real-time electronic upload of Polling Unit results to the INEC Result Viewing (IReV) Portal by the Registration Area Technical Support Staff (RATECHSS). The claim is patently false. The Commission has repeatedly reassured Nigerians that it will transmit results directly from the Polling Unit as we witnessed in Ekiti and Osun. ...The public is advised to ignore the reports. The Bimodal Voter Accreditation System (BVAS) and IReV have come to stay for voter accreditation and uploading of Polling Unit results in real-time in Nigeria."*

54. The Petitioners state that the Election failed the integrity test stipulated by the Electoral Act and does not reflect the will of the electorate. The Election has been rated nationally and internationally as the worst election in the history of Nigeria given the failure by the 1st Respondent, *inter alia*, to transmit and upload in real-time and directly to the 1st Respondent's electronic collation system and IReV portal the scores of the parties from the polling units before the announcement of final results by the 1st Respondent on Wednesday, 1st day of March 2023. The Petitioners hereby plead reports of international bodies and accredited observers in respect of the Election.

CERTIFIED TRUE COPY

55. The Petitioners plead and rely on the 1st Respondent's Manual for Election Officials 2023 and the data and logs from the electronic collation system, and notice is hereby given to the 1st Respondent to produce same at the trial. The Petitioners plead and shall rely on and play at the trial, the video demonstration by the 1st Respondent of the deployment of BVAS machine for authentication of accreditation and for transmission of data.

56. The Petitioners hereby plead and shall rely on the entire report, logs, and data from the BVAS as stored in the 1st Respondent's electronic collation system and servers as of 1st March 2023, notice to produce whereof is hereby given to the 1st Respondent. The Petitioners also will rely on the data in the 1st Respondent's central server for the period between 25th February 2023 and 1st March 2023 and hereby also give notice to the 1st Respondent to produce same before this Honourable Court at the hearing of this Petition.

57. Before the Election, the 1st Respondent had previously conducted three governorship elections successfully, in Anambra, Ekiti and Osun States and Area Council Elections in the FCT, Abuja. In the three States the 1st Respondent uploaded results directly and real-time from the polling units to the IReV. In the FCT Area Council election the 1st Respondent uploaded the results within an hour of the close of election. In Osun State, by midnight of the day of the governorship election the 1st Respondent had uploaded all the results from the polling units to the IReV. In all these instances, the 1st Respondent deployed the BVAS for the accreditation of the voters and transmission of the results.



58. The Petitioners state that in the Presidential Election of 25th February 2023, the 1st Respondent failed to transmit the results and accreditation data directly and real-time from the polling units to the electronic collation system and the IReV portal. Twelve hours after the conclusion of the Election at the respective polling units, there was no uploading whatsoever of the results and accreditation data therefrom by the 1st Respondent from the BVAS to the electronic collation system and the IReV.

59. The Petitioners aver that the 1st Respondent belatedly claimed that there was a "glitch" that made the BVAS to fail to transmit results of the Presidential Election from the polling units to its electronic collation system and IReV portal. The Petitioners hereby plead, and the 1st Respondent is hereby put on notice to produce at the trial the event logs/time stamps, as they relate to the Presidential Election, of (a) the BVAS; and (b) the electronic collation system.

60. The Petitioners state that the National Assembly election and the Presidential election were conducted simultaneously on 25th February 2023 at the same locations using the same BVAS machines for both accreditation of voters and transmission of the respective polling unit results of both elections.

61. The Petitioners further state that while the polling units results of the National Assembly were transmitted directly and real-time to the IReV from the BVAS, the purported results of the Presidential Election were not transmitted directly and real-time to the electronic collation system and the IReV portal. The 1st Respondent did not commence the transmission of the polling unit results for the Presidential election until the declaration of results.



62.   The Petitioners further aver that, unlike the instant Election, the off-cycle elections that were conducted by the 1st Respondent in Anambra, Ekiti and Osun States and the Area Council Elections in the FCT, Abuja, did not suffer any "glitch" and the results from the polling unit in those elections were not quarantined prior to being uploaded to the electronic collation system and the IReV.

63.   The Petitioners state that as at the 20th day of March 2023 the 1st Respondent was yet to fully upload the polling unit results for the Presidential election from the polling units to its electronic collation system and IReV portal. The Petitioners hereby plead and shall rely and found upon the data and logs from the electronic collation system and BVAS and notice is hereby given to the 1st Respondent to produce the said data and logs at the hearing of this Petition.

64.   The Petitioners state that the 1st Respondent wrongly quarantined the Election results from the polling units to enable interference with the results contrary to the repeated representations made by the officials of the 1st Respondent that the results would be transmitted directly and real-time to the 1st Respondent's electronic collation system and IReV portal. The 1st Respondent had earlier made representations through its officers that the device manager was procured to ensure that the information in the BVAS is in synchronisation with the 1st Respondent's electronic collation system/storage device.

65.   The Petitioners contend that the failure of the BVAS to transmit the results and accreditation data from the polling units directly and in real-time to the 1st Respondent's electronic collation system and IReV portal made it impossible for the Petitioners to challenge timeously, at the earliest

Atiku & Anor. v INEC & Ors.                    -24-



opportunity, notably during the collation of the results at various collation levels, the irregularities in the Election such as, incidents of over-voting.

66. The Petitioners further state that as at 1st March 2023, when the 1st Respondent wrongly returned the 2nd Respondent as the winner of the Election, less than 50% of the results from the polling units had been transmitted and uploaded to the 1st Respondent's electronic collation system/storage device, created/acquired by the 1st Respondent itself for the purpose of electronically collating the results of the Election. The Petitioners hereby plead and shall rely and found upon the data and logs from the electronic collation system and BVAS and notice is hereby given to the 1st Respondent to produce the said data and logs at the hearing of this Petition.

67. The Petitioners state that in the subsequent Governorship and States Houses of Assembly elections, held on 18th March 2023, the 1st Respondent allowed the BVAS to function properly transmitting polling unit results and accreditation data directly and in real-time, and reliance shall be placed on extracts of the BVAS reports in respect of the Governorship and States Houses of Assembly elections. Same is hereby pleaded and notice given to the 1st Respondent to produce same at the hearing of this Petition.

68. The 1st Respondent's refusal to transmit the results of the polling units in the Presidential Election led to the judgment in Suit No. FHC/ABJ/CS/334/2023 wherein the Federal High Court ordered the 1st Respondent to ensure transmission of the results in accordance with the Electoral Act 2022 and the Clause 38 of the Guidelines which mandates the presiding officers of all polling units to electronically transmit results direct to the collation system and use the BVAS to upload the scanned copies of the Forms EC8As to the IReV immediately upon completion of

CERTIFIED TRUE COPY

the polling units voting and result procedures. The Court held that the 1st Respondent has a legal duty to act in accordance with the law. The Petitioners plead and rely on the certified true copy of the said judgment.

69. The 1st Respondent had by its Regulations and Guidelines, made pursuant to the Electoral Act, provided for the mandatory use of the **BVAS** and the electronic collation system for the said Election.

70. To make an undue return in favour of the 2nd and 3rd Respondents, the 1st Respondent wrongfully bypassed all the checkpoints for election integrity introduced by the new Electoral Act 2022 which include several technological devices and multiple checkpoints at the Polling Unit, Ward, Local Government, Area Councils, State, and Federal collation centres, as the case may be, including the requirement to "transmit directly" the polling units accreditation data and election results from the BVAS machines to the electronic collation system and the IReV portal.

71. The Petitioners state that the bypass and non-use of the BVAS machines in the transmission of the accreditation data and polling unit results of the Election fundamentally and substantially affected the integrity of the results announced by the 1st Respondent for the 2nd and 3rd Respondents and thoroughly discredited the process of the Election.

## (2). <u>CONSTITUTIONAL GEOGRAPHICAL SPREAD:</u>

72. The Petitioners state that the 1st Respondent failed to comply with the provisions of Section 66 of the Electoral Act which incorporated Section 134 of the Constitution of the Federal Republic of Nigeria 1999 (as amended) (the "Constitution" or "1999 Constitution") in wrongfully, unlawfully, illegally and unconstitutionally returning the 1st Respondent as winner of the Election.

CERTIFIED TRUE COPY

73. By Section 134(2) of the Constitution, in a Presidential Election with more than two candidates, for a candidate to be deemed to be the winner of the election, he must:-

   (a). have the highest number of votes cast at the election;

   (b). have not less than one quarter of the votes cast at the election in at least two thirds of all the States in the Federation; and

   (c). have not less than one quarter of the votes cast at the election in the Federal Capital Territory, Abuja.

74. The Petitioners contend that the 2nd Respondent who contested on the platform of the 3rd Respondent, did not secure at least one quarter of the votes cast in the said Presidential Election in the Federal Capital Territory, Abuja. Out of the total votes of 478,652 cast in the Federal Capital Territory, Abuja the 2nd Respondent was ascribed only 90,902 (18.99%) of those votes. The Petitioners shall contend that to be declared duly elected, a candidate, in addition to obtaining not less than a quarter (25%) of the votes cast in at least two-thirds of all the States, **must** also receive at least one quarter (25%) of the votes cast in the Federal Capital Territory, Abuja, this being an additional requirement introduced by the Constitution of the Federal Republic of Nigeria 1999 (as amended), the said Constitution having clearly distinguished the Federal Capital Territory, Abuja as a separate entity by specific and express mention.

75. The Petitioners shall further contend that for any candidate to be declared winner of the presidential election in which more than two candidates are contesting, such a candidate **must have the highest number of votes cast at the election, and he must have not less than one-quarter of the votes cast at the election in each of at least two-thirds of all the States in the Federation and at least one quarter (25%) of**


CERTIFIED TRUE COPY

**the votes cast in the Federal Capital Territory, Abuja.** The 2nd Respondent having not scored 25% of the votes cast in the Federal Capital Territory, Abuja ought not to have been declared winner of the Election by the 1st Respondent.

76.    The Petitioners shall contend at the hearing that the word **"AND"** in Section 134 of the said Constitution before Federal Capital Territory, Abuja is a word of addition, as is the clear intendment of the provision and the intention of the framers of the Constitution. The Petitioners shall rely on the relevant Hansards of the Constitution Review Committee, 1998, and that of earlier Constituent Assemblies and of the National Assembly to establish the mischief the said Section 134(2)(b) of the said Constitution sought to cure.

77.    The Petitioners contend that the clear intention of the framers of the Constitution is that for a presidential candidate to be deemed duly elected, he must meet the 25% constitutional requirement in at least 24 States of the Federation and the same 25% constitutional requirement in respect of the Federal Capital Territory, Abuja.

78.    The Petitioners plead the Particulars of the Votes as declared by the 1st Respondent in respect of the Federal Capital Territory, Abuja.

**<u>Particulars:</u>**

(a).    The total number of votes cast in the Election in the Federal Capital Territory, Abuja as declared by the 1st Respondent was 478, 652.

(b).    The 2nd Respondent as declared by the 1st Respondent, purportedly secured 90,902 votes, amounting to 18.99% percentage of the votes cast in the Election in the Federal Capital Territory, Abuja.

(c).    One quarter (25%) of the total votes cast in the Federal Capital Territory, Abuja is 119,663 votes.


CERTIFIED TRUE COPY

79.   The Petitioners aver that the 2nd Respondent consequently failed to score at least one quarter (25%) of the votes cast in the Federal Capital Territory, Abuja as mandatorily required by the 1999 Constitution of the Federal Republic of Nigeria (as amended).

80.   The Petitioners state that the 1st Respondent ought not have declared the 1st Respondent as the winner of the Election.

81.   The Petitioners shall also rely on the electoral Forms EC8D and EC8D(A) issued by the 1st Respondent, as well as the reports of the Statisticians/Data Analysts in this regard, which said reports are hereby pleaded.

## (3).   **MARGIN OF LEAD:**

82.   The Petitioners shall further contend that the return of the 2nd Respondent as duly elected to the office of the President given the margin of lead and the Permanent Voters Cards (PVCs) collected is undue and wrongful.

83.   The Petitioners further contend that the votes ascribed to the 2nd Respondent by the 1st Respondent in the final declaration made is **8,794,726** while the votes credited to the Petitioners is **6,984,520** resulting in a margin of lead of **1,810,206** votes.

84.   The Petitioners state that the Permanent Voters Cards (PVCs) collected in the polling units where elections were cancelled and did not hold across the Country is over and above **1,810,206** which is the margin of lead between the 1st Petitioner and the 2nd Respondent, and in consequence, the return of the 2nd Respondent was hasty, premature and wrongful.



85.   The Petitioners hereby plead Form EC8B series, that is, the Ward Collated Results, and the records of the Permanent Voters Cards PVCS collected in the respective polling units where elections were not held or were cancelled.

86.   The Petitioners shall further rely on the provisions of the Electoral Act 2022 and paragraph 62 of INEC Regulations and Guidelines 2022.

## GROUND TWO: THE ELECTION OF THE 2ND RESPONDENT IS INVALID BY REASON OF CORRUPT PRACTICES:

87.   The Petitioners state that the Election conducted by the 1st Respondent is invalid by reason of corrupt practices.

88.   The Petitioners state that the collation of election results in all the States of the Federation, was manipulated by the 1st Respondent through the deliberate suppression and discounting of the lawful votes of the Petitioners while inflating the scores of the 2nd and 3rd Respondents. The particulars of corrupt practices before and during the disputed election include but not limited to the following, viz, Compromised Printing/Production of electoral materials, manipulation of election material delivery, and compromised printing/production of election materials.

89.   The 1st Respondent manipulated and deliberately "managed" the votes emanating from the polling units in that the 1st Respondent through its officials, suppressed votes of the Petitioners and wrongly credited the 2nd Respondent and 3rd Respondents with the said votes.



90.   The Election is invalid on account of corrupt practices. The particulars of corrupt practices before and during the disputed election include but are not limited to the following:

(a).   Suppression of votes.

(b).   Manipulation of the ballots and ballot boxes.

(c).   Manipulation of BVAS machines.

(d).   Manipulation of accreditation and collation.

(e).   Manipulation of Election Material Delivery.

(f).   Manipulation of Election Material Reverse logistics.

(g).   Intimidation and harassment of voters.

(h).   Massive Thumb-printing of Ballot Papers.

(i).   Destruction of electoral materials.

(j).   Hijack of electoral materials.

(k).   Mutilations, cancellations and overwritings on result sheets.

(l).   Inflation, Deflation of Scores, and Wrong Entries in Result Sheets.

91.   There was massive suppression of votes of the Petitioners by the 1st Respondent in several States, as shown in the Report of the Statisticians relied upon by the Petitioners.

92.   In Sokoto State, the 1st Respondent cancelled results from 241 polling units but went ahead to declare results for the Presidential Election while declaring the National Assembly elections in the same Sokoto State that were conducted simultaneously with the Presidential Election, as inconclusive. The cancellation which affected 301,499 registered voters in 471 polling units occurred in the following LGAs, as shown below:



(a). Gudu - Results were cancelled in 3 polling units affecting 1,685 registered voters.

(b). Gwandu - Results were cancelled in 4 polling units affecting 3,020 registered voters.

(c). Ilela - Results were cancelled in 2 polling units affecting 3,904 registered voters.

(d). Kware - Results were cancelled in 21 polling units affecting 10,939 registered voters.

(e). Kebbe - Results were cancelled in 15 polling units affecting 8,475 registered voters.

(f). Rabah - Results were cancelled in 52 polling units affecting 26,362 registered voters.

(g). Shagari - Results were cancelled in 18 polling units affecting 9,854 registered voters.

(h). Silame - Results were cancelled in 18 polling units affecting 23,442 registered voters.

(i). Sokoto North - Results were cancelled in 42 polling units affecting 31,566 registered voters.

(j). Sokoto South - Results were cancelled in 50 polling units affecting 39,693 registered voters.

(k). Wurno- Results were cancelled in 8 polling units affecting 4,862 registered voters.

(l). Binji - Results were cancelled in 15 polling units affecting 2,042 registered voters.

(m). Tangaza - Results were cancelled in 8 polling units affecting 10,033 registered voters.

(n). Danje Shuni - Results were cancelled in 47 polling units affecting 26,966 registered voters.

(o). Bodinga - Results were cancelled in 14 polling units affecting 7,010 registered voters.

Atiku & Anor. v INEC & Ors.                    -32-



(p). Tureta - Results were cancelled in 20 polling units, affecting 3,050 registered voters.

(q). Yabo - Results were cancelled in 8 polling units, affecting 5,567 registered voters.

(r). Wamakko - Results were cancelled in 27 polling units, affecting 16,642 registered voters.

(s). Ngada - Results were cancelled in 6 polling units, affecting 3,633 registered voters.

(t). Goronye - Results were cancelled in 40 polling units affecting 22,123 registered voters.

(u). Isa - Results were cancelled in 1 polling unit affecting 935 registered voters.

(v). Sabon Birni - Results were cancelled in 16 polling units affecting 8,427 registered voters.

(w). Tambuwal – Results were cancelled in 51 polling units affecting 31,268 registered voters.

The details of the affected polling units are set out in the Statistician's report pleaded and relied upon by the Petitioners.

93. The Petitioners further aver that, in Kano State, the 1st respondent's officials, at the conclusion of the Election, failed to properly fill in the polling unit booklets containing Forms EC25B – which is the electoral materials/reverse logistics, which is the mode of cross-checking the deployment and accounting, at the end of the Election, the electoral materials that had been used in each polling unit by the officials of the 1st Respondent.

94. The 1st Respondent through its officials also failed to properly fill the Form EC40A, which is the ballot paper accounting and verification statements, nor did they properly fill the Form EC40B, which is the statement of



rejected and spoilt ballot papers, and the Form EC40G which is the summary of polling units where elections were cancelled or did not hold. These failures occurred in Kano State in the polling units in the following Local Government Areas of the State, namely:- Ajingi; Albasu; Bagwai; Bebeji; Bichi; Bunkure; Dala; Dambatta; Dawakin Kudu; Dawakin Tofa; Doguwa; Fagge; Gabasawa; Garko; Garum Mallam; Gaya; Gezawa; Gwale; Gwarzo; Kabo; Kano Municipal; Karaye; Kibiya; Kiru; Kumbotso; Kunchi; Kura; Madobi; Makoda; Minjibir; Nasarawa; Rano; Rimin Gado; Rogo; Shanono; Sumaila; Takai; Tarauni; Tofa; Tsanyawa; Tudun Wada; Ungogo; Warawa and Wudil.

95. These infractions enabled the results of the polling units in those LGAs to be manipulated through and by the inflation of the 2nd Respondent's votes and depletion of the Petitioners' votes. The 1st Respondent is hereby put on notice to produce at the hearing hereof the polling unit booklets containing all the Forms for the polling units in the said LGAs.

96. The Petitioners futher contend that the elections in Kogi State, specifically in Adavi Local Government Areas were disrupted by agents of the 2nd and 3rd Respondents with the result that the votes scored were not accurately recorded as ballot papers were torn by the said agents of the 2nd and 3rd Respondents. Video recording evidence shall be led of the agents of the 3rd Respondent who were seen destroying ballot papers in the presence of the 1st Respondent's agents.

97. The Petitioners further contend that to avoid the holding of the elections, the 2nd and 3rd Respondents' agents acting with the full knowledge and authority of the 2nd and 3rd Respondents cut off access roads into Okehi Local Government Area to stop the holding of the Election in those Local Governments by ensuring that election materials could not be supplied to



the affected Local Governments. The Election was thus disrupted in Okehi Local Government Area and evidence shall be led in proof of that fact.

98. In Okehi Local Government Area election was disrupted in 10 (ten) polling units and there were no results from these polling units. The Petitioners will rely on the IReV data in proof of that fact and the 1st Respondent is hereby put on notice to produce at the hearing the IREV-published results for Okehi Local Government Area. The 1st Respondent is also hereby put on notice to produce the Form EC40G for the affected 10 polling units.

99. In Adavi Local Government Area, the election was disrupted by the agents of the 2nd and 3rd Respondents who led their supporters round the whole Local Government, to hijack and destroy election materials including already thumbprinted ballot papers. In proof of this, the Petitioners will rely on video recordings of the said agents and supporters of the 3rd Respondents, disrupting the elections and destroying election materials.

100. In Okene Local Government Area, elections were disrupted by agents of the 2nd and 3rd Respondents who snatched ballot boxes and BVAS machines and took them to locations where they were wrongly used to generate false results in favour of the 2nd and 3rd respondents. During these malpractices, *ad hoc* staff of the 1st respondent were abducted. The Petitioners state that a scrutiny of Form EC8A generated by the persons who disrupted the Election will show that the said results are not products of a properly conducted election. The results will also show over-voting when compared with the data in the backend electronic storage device.

101. The Petitioners also aver that in Kogi State, the 1st Respondent's officials, at the close of the election, failed to properly fill in the polling unit booklets containing forms EC25B – which is the electoral materials/reverse logistics,

CERTIFIED TRUE COPY

which is the mode of cross-checking the deployment and accounting at the end of the Election, the electoral materials that had been used in each polling unit by the officials of the 1st Respondent. The 1st Respondent through its officials also failed to properly fill the Form EC40A, which is the ballot paper accounting and verification statements, nor did they properly fill the Form EC40B, which is the statement of rejected and spoilt ballot papers, and the Form EC40G which is the summary of polling units where elections were cancelled or did not hold.

102. These infractions occurred in the polling units in the following Local Government Areas of Kogi State, namely:- Adavi, Ajaokuta, Ankpa, Bassa, Dekina, Ibaji, Idah, Igalamela-Odolu, Ijumu, Kabba/Bunu, Koton Karfe, Lokoja, Mopa-Muro, Ofu, Ogori/Magongo, Okehi, Okene, Olamaboro, Omala, Yagba East and Yagba West. These failures enabled the results of the polling units in the said LGAs to be manipulated through and by the inflation of the 2nd Respondent's votes and the depletion of the Petitioners' votes. The 1st Respondent is hereby put on notice to produce at the hearing of this Petition the polling unit booklets containing the said Forms for the polling units in the said LGAs.

103. The Petitioners contend that the 1st Respondent wrongfully entered incorrect results for the Petitioners in Borno State. The Petitioners contend that the 1st Respondent wrongfully made various unlawful entries and inscriptions not being record of lawful votes cast at the polling units which votes are liable to be voided.

104. In respect of Borno State, there was a deliberate by-pass of the use of the BVAS machines, notwithstanding the representations of the 1st Respondent's agents based on the provisions of the Electoral Act and the INEC Manual and Guidelines.

Atiku & Anor. v INEC & Ors.                    -36-



## GROUND THREE: NOT DULY ELECTED BY MAJORITY OF LAWFUL VOTES CAST:

105. The Petitioners state that the 2nd Respondent was not duly elected by majority of the lawful votes cast at the Election.

106. The Petitioners shall lead evidence at the hearing to show that:-

(a) the result of the Election as announced by the 1st Respondent and especially the votes allocated to the 2nd Respondent do not represent the lawful valid votes cast at the Election; and

(b) the lawful votes cast at the Election were deliberately and massively deducted from the 1st Petitioner's scores by the 1st Respondent in order to return the 2nd Respondent.

107. The Petitioners shall give evidence to show the Election results as purportedly declared by the 1st Respondent in respect of each State of the Federation, including the Federal Capital Territory, the details of which are contained in the Table following, are wrong:

| STATE | CODE | REGISTERED VOTERS | ACCREDITED VOTERS (INEC) | ABUBAKAR ATIKU (INEC) | BOLA AHMED TINUBU (INEC) |
|---|---|---|---|---|---|
| ABIA | 01 | 2,120,808 | 384,468 | 22,676 | 8,914 |
| ADAMAWA | 02 | 2,196,566 | 764,834 | 417,611 | 182,881 |
| AKWA IBOM | 03 | 2,357,418 | 594,450 | 214,012 | 160,620 |
| ANAMBRA | 04 | 2,656,437 | 628,590 | 9,036 | 5,111 |
| BAUCHI | 05 | 2,749,268 | 899,769 | 426,607 | 316,694 |
| BAYELSA | 06 | 1,056,862 | 177,368 | 68,818 | 42,572 |
| BENUE | 07 | 2,777,727 | 804,189 | 130,081 | 310,468 |
| BORNO | 08 | 2,513,281 | 499,543 | 190,921 | 252,282 |
| CROSS RIVER | 09 | 1,766,466 | 444,880 | 95,425 | 130,520 |
| DELTA | 10 | 3,221,697 | 667,149 | 161,500 | 90,183 |
| EBONYI | 11 | 1,597,646 | 337,887 | 13,503 | 42,402 |
| EDO | 12 | 2,501,081 | 603,894 | 89,585 | 144,471 |



CERTIFIED TRUE COPY

| | | | | | |
|---|---|---|---|---|---|
| EKITI | 13 | 987,647 | 315,058 | 84,554 | 201,494 |
| ENUGU | 14 | 2,112,793 | 482,990 | 15,794 | 4,772 |
| GOMBE | 15 | 1, 575, 794 | 542,997 | 319,123 | 146,977 |
| IMO | 16 | 2, 419, 992 | 485,150 | 30,234 | 66,406 |
| JIGAWA | 17 | 2, 351, 298 | 961,670 | 386,587 | 421,390 |
| KADUNA | 18 | 4, 335, 208 | 1,418, 046 | 554,360 | 399,293 |
| KANO | 19 | 5, 921, 370 | 1,769, 525 | 131,716 | 506,412 |
| KATSINA | 20 | 3, 516, 719 | 1,097, 663 | 489,045 | 482,283 |
| KEBBI | 21 | 2, 032, 041 | 599, 201 | 288,175 | 248,088 |
| KOGI | 22 | 1, 932, 654 | 484, 884 | 145,104 | 240,751 |
| KWARA | 23 | 1, 695, 927 | 497, 519 | 136,909 | 263,572 |
| LAGOS | 24 | 7, 060, 195 | 1,347,152 | 75,750 | 572,606 |
| NASARAWA | 25 | 1,899,244 | 562,464 | 47,093 | 192,922 |
| NIGER | 26 | 2,689,344 | 827,416 | 384,898 | 375,183 |
| OGUN | 27 | 2,688,305 | 612,341 | 123,831 | 341,554 |
| ONDO | 28 | 1,991,344 | 571,402 | 115,463 | 369,924 |
| OSUN | 29 | 1,954,800 | 759,362 | 354,366 | 343,945 |
| OYO | 30 | 2,276,675 | 854,439 | 82,977 | 449,884 |
| PLATEAU | 31 | 2,789,528 | 1,139,393 | 246,808 | 307,195 |
| RIVERS | 32 | 3,537,190 | 605,055 | 88,468 | 231,591 |
| SOKOTO | 33 | 2,172,056 | 619,492 | 288,679 | 285,444 |
| TARABA | 34 | 2,022,374 | 521,442 | 189,017 | 135,165 |
| YOBE | 35 | 1,485,146 | 398,874 | 98,567 | 151,459 |
| ZAMFARA | 36 | 1,926,870 | 327,137 | 193,970 | 298,396 |
| FCT | 37 | 1,570,307 | 478,923 | 74,194 | 90,902 |
| **TOTAL** | | **93,469,008** | **25,286,616** | **6,984,520** | **8,794,726** |

CERTIFIED TRUE COPY

108. The Petitioners further state that the 2nd Respondent did not score one-quarter (25%) of the lawful votes cast at the Election in each of at least two-thirds of all the States in the Federation **and** the Federal Capital Territory, Abuja as required by the Constitution.

109. The Petitioners state that the 1st Respondent is mandated by law to be guided by the provisions of Section 134(2)(b) of the Constitution and Section 66 of the Electoral Act 2022 and the extant Regulations, Guidelines and Manual for Election in making any return or declaration as to who the winner of the Election is.

110. The Petitioners aver that by the provisions of Section 134(2)(b) of the Constitution and Section 66 of the Electoral Act 2022, a return and declaration can only be made in favour of the 2nd Respondent where and if the 2nd Respondent scored 25% of the total votes in the Federal Capital Territory, Abuja. The 2nd Respondent did not score 25% of the total votes cast in the Federal Capital Territory, Abuja before the 1st Respondent wrongly returned the 2nd Respondent as the winner of the Election and arrogantly dared the Petitioners to go to Court, notwithstanding the protests by the Petitioners and other stakeholders.

111. The Petitioners aver that the purported scores of the respective parties as declared by the 1st Respondent for the Federal Capital Territory, Abuja, are as set out below:

| No. | POLITICAL PARTIES | SCORE | PERCENTAGE |
|-----|-------------------|-------|------------|
| 1. | A | 490 | 0.102% |
| 2. | AA | 506 | 0.105% |
| 3. | AAC | 215 | 0.044% |
| 4. | ADC | 768 | 0.160% |
| 5. | ADP | 583 | 0.121% |

CERTIFIED TRUE COPY

| 6. | **APC** | **90,902** | **18.991%** |
|---|---|---|---|
| 7. | APGA | 1,362 | 0.284% |
| 8. | APM | 297 | 0.062% |
| 9. | APP | 146 | 0.030% |
| 10. | BP | 748 | 0.156% |
| 11. | LP | 281,717 | 58.856% |
| 12. | NNPP | 4,517 | 0.943% |
| 13. | NRM | 294 | 0.061% |
| 14. | PDP | 74,194 | 15.500% |
| 15. | PRP | 131 | 0.027% |
| 16. | SDP | 233 | 0.048% |
| 17. | YPP | 335 | 0.069% |
| 18. | ZLP | 2,631 | 0.549% |

112. The Petitioners aver that the 2nd Respondent scored only **18.99%** of the votes cast in the FCT which falls short of the **25%** required to enable the 1st Respondent validly to declare him as duly elected.

113. The Petitioners also aver that the declaration of the 2nd Respondent by the 1st Respondent as duly elected is unconstitutional, null, void and of no legal effect.

114. The Petitioners state that the purported results from **19,702 Polling Units** across 36 States and Federal Capital Territory contain various forms of infractions.

115. The Petitioners state that a total of **4,307 polling units** are without stamp on the respective Form EC8A therefrom. Details of the States and number of polling units in each State affected are as shown in the Statisticians Report herein pleaded.

116. The Petitioners further state that results from **1,300 polling units** do not have signatures of the Presiding Officers on the respective Forms EC8A.

CERTIFIED TRUE COPY

Details of the States and polling units affected are as shown in the Statisticians Report herein pleaded.

117. The Petitioners state that the purported results from **6,418 polling units** have and indicate zero accreditation. The polling units and States affected are as shown in the Statisticians Report herein pleaded.

118. The Petitioners state that critically **9,463 polling units** across 30 States have shown that the votes returned are in excess of accredited voters.

119. The Petitioners further contend that given the number of registered voters in polling units where elections did not take place, in addition to those polling units where elections were cancelled, (the details of which are set out in the Statisticians Report pleaded by the Petitioners), the return of the 2nd Respondent as the winner of the Election in the circumstance was hasty and undue as the margin of lead is less than the number of disenfranchised voters.

120. The Petitioners state that the return of the 2nd Respondent by the 1st Respondent as the winner of the Election in the above circumstances is unlawful and wrongful as the said return was made in violation of the provisions of the Electoral Act 2022 and the Constitution of the Federal Republic of Nigeria, 1999 (as amended).

121. The Petitioners state that as part of the irregularities which were prevalent in the conduct of the Election, the Presiding Officers failed to properly fill and countersign alterations in election forms including forms EC8A, EC8B, EC8C and EC8D in over 40,000 polling units shown in the Statisticians Report relied upon by the Petitioners.

122. The Petitioners shall further contend that the mandatory requirements of the Electoral Act, INEC Regulations and INEC Manual that stipulate for the



recording of the quantity, serial numbers and other particulars of result sheets, ballot papers and other sensitive electoral materials to be used in conducting the Election were not complied with before and after the Election as the 1st Respondent and its officers failed to effect the required entries.

123. The Petitioners shall rely on the evidence of Statisticians, Forensic Examiners, and other Experts, detailing the data analysis of the votes at all levels of collations, from the polling units to the final return.

124. The Petitioners state that upon a proper collation and summation, the correct and proper scores of the candidates are as contained in the Statisticians Report pleaded by the Petitioners.

125. The Petitioners hereby plead and shall rely on the extract of data from the BVAS as contained in the 1st Respondent's electronic collation system/storage device, the notice to produce of which is hereby given to the 1st Respondent.  The Petitioners shall also rely on the data in the 1st Respondent's electronic collation system and storage device for the period covering 25th February 2023 and 1st March 2023 as well as the period 18th March 2023 to 20th March 2023, and the 1st Respondent is hereby also given notice to produce same before this Honourable Court.

126. The Petitioners further aver that all over Nigeria there were manifest cases of over-voting. The total of the affected polling units in the various States are set out in the Statisticans Report pleaded and relied upon by the Petitioners.

127. The Petitioners further state that in respect of manual collation of results, the 1st Respondent's officials and agents did not authenticate the collation with the data from the electronic collation system to correctly collate votes

CERTIFIED TRUE COPY

from the polling units in all the afore mentioned States. The Petitioners shall rely on the reports and pieces of evidence of their Statisticians and the Election results as announced by the 1st Respondent and the election materials herein pleaded in proof thereof.

128. The Petitioners aver that the 3rd Respondent's agents disrupted election and compelled 1st Respondent's officials to change results in polling units in many States, particularly Kogi, Lagos, Rivers and Kano.

129. In Kogi State, in Olamaboro LGA: RA2 PU003, PU005, PU006, PU007, PU009 - Five polling units with total votes of 3,892 were affected. When it was discovered that the 2nd Petitioner had the majority votes at those polling units, the LG Council Chairman (APC) Hon. Friday Adejoh came with thugs at gunpoint and forced the Electoral Officials to declare the concluded election cancelled at the risk of their lives, and thereafter destroyed all the electoral materials and carted them away.

130. In Ofu LGA, thugs of the 3rd Respondent came to the Electoral Officers in RA5 PU005, 006, 009, 010, 011, 014 and 027 totaling 5,574 votes; In RA04 PU 008 total 510 votes In RA07 PU 007, 010 total 2,016 votes In the 10 polling units affected involving 7,590 votes, the thugs destroyed all electoral materials at gunpoint forcing them to declare a cancellation when PDP was already coasting to victory.

131. In Omalla LGA, a similar trend with gun wielding thugs from the APC stormed RA8 - Icheke ward PU 015, PU 016, 004, 005 and RA01 - Abejukolo PU 007, 009, 014, PU 018, 019, 023 and PU 024. There were similar situations in RA2, RA4, RA9 and RA10. Total votes affected are 9,758 and this is home to the former Governor of Kogi State, Alhaji Ibrahim Idris another PDP stronghold.

CERTIFIED TRUE COPY

132. In Okehi LGA, home to PDP Senatorial Candidate Natasha Akpoti, another PDP stronghold, a total of 22 PU in 4 RAs totaling 11,452 votes were affected due to intimidation, harassment and threat to life of INEC officials. They are: RA 6 PU 002, PU 004, PU 008, PU 012 total 2,364 votes RA 10 PU 001, 002 totaling 1,450 votes. RA 11 PU 003, 004, 007, 009, 010 and 012 totaling 2,904 votes RA 5 PU 001, 002, 003, 004, 005, 006, 007, 010 and 015 totaling 4,734 votes.

133. In Ajaokuta LGA, heavily armed thugs of the 3rd Respondent scared INEC Electoral Officials from conducting election in 19 PUs in Geregu RA 14 affecting 28,981 registered voters were disenfranchised from voting. But unfortunately, Governor Yahaya Bello, a member of the 3rd Respondent personally went to prevent the election from holding but election results eventually surfaced from there at the collection center on Monday, 27th February, 2023.

134. The Petitioners hereby plead and shall rely on a copy of the Petition dated 27th February 2023 written by the Petitioners' Kogi State Collation Officer to the Chairman of the 1st Respondent through the 1st Respondent's State Collation Officer, Kogi State Presidential Elections. **Notice is hereby given to the 1st Respondent to produce THE PETITION at the hearing.**

135. The Petitioners further state that, in Lagos State, the 1st Respondent's officials, did not at the end of the Election, properly fill in the polling unit booklets containing forms EC25B – which is the electoral materials/reverse logistics, which is the mode of cross-checking the deployment and accounting at the end of the election, the electoral materials that had been used in each polling unit by the officials of the 1st Respondent. The 1st Respondent through its officials also failed to properly fill the Form EC40A,



which is the ballot paper accounting and verification statements, nor did they properly fill the Form EC40B, which is the statement of rejected and spoilt ballot papers, and the Form EC40G which is the summary of polling units where elections were cancelled or did not hold. These infractions occurred in the polling units in the following Local Government Areas of Lagos State, namely:- Lagos Island, Lagos Mainland, Surulere, Apapa and Eti-Osa, as well as eight Local Council Development Areas which include: Lagos Island East, Yaba, Itire-Ikate, Coker-Aguda, Ikoyi-Obalende, Apapa-Iganmu, Eti-Osa East and Iru/Victoria Island. These failures enabled the results of the polling units in the said LGAs to be manipulated through and by inflation of the 2nd Respondent's votes and the depletion of the Petitioners' votes. The 1st Respondent is hereby put on notice to produce at the hearing of this Petition the polling unit booklets containing the said Forms for the polling units in the said LGAs and LCDAs.

136.  The Petitioners state in respect of Rivers State, the votes returned from Obio-Akpor and Port Harcourt Local Government Areas ("LGA") did not reflect the actual votes scored in the said LGAs for the Election in consequence whereof those votes are liable to be voided. The figures on the IReV do not tally with the figures declared by the 1st Respondent.

137.  The Petitioners aver that in the 20 Local Government Areas in Lagos State, the 2nd and the 3rd Respondents through their agents and on their full instructions, unleashed mayhem and violence in a manner never seen in the history of elections in the State. The Petitioners shall lead evidence of indiscriminate shooting of guns, physical attack on voters, destruction of electoral materials, disruption of voting process and intimidation of voters. The total inputted votes in Lagos State are 1,335,729 for all the political parties that took part in the elections. Out of this figure, the 2$^{nd}$and 3rd

CERTIFIED TRUE COPY

Respondents were credited with 572,606 purported votes, while Labour Party (one of the political parties that took part in the elections) was credited with 582,454 purported votes. The Petitioners contend that these votes are liable to be voided.

138. In respect of Rivers State which comprises 23 Local Government Areas, elections were disrupted and marred by unprecedented violence and intimidation unleashed by the 2nd and 3rd Respondents through their agents and officials in each of those local government areas. Notwithstanding the violence and widespread intimidation of voters, the 1st Respondent returned a total of 553,944 votes for all the political parties out of which the 2nd and 3rd Respondents were credited with 231,591 purported votes and Labour Party (which participated in the election) was credited with 175,071 purported votes. All the votes returned in Rivers State are liable to be voided.

139. The Petitioners further aver that in Rivers State, the 1st Respondent's officials, did not at the end of the Election, properly fill in the polling unit booklets containing forms EC25B – which is the electoral materials/reverse logistics, which is the mode of cross-checking the deployment and accounting at the end of the election, the electoral materials that had been used in each polling unit by the officials of the 1st Respondent. The 1st Respondent through its officials also failed to properly fill the Form EC40A, which is the ballot paper accounting and verification statements, nor did they properly fill the Form EC40B, which is the statement of rejected and spoilt ballot papers, and the Form EC40G which is the summary of polling units where elections were cancelled or did not hold. These infractions occurred in the polling units in the following Local Government Areas of Rivers State, namely:- Abua/Odual, Ahoada West, Akuku Toru, Andoni,

CERTIFIED TRUE COPY

Asari Toru, Bonny, Degema, Eleme, Emohua, Etche, Gokana, Ikwerre, Oyigbo, Khana, Obio/Akpor, Ogba Egbema/Ndoni, Ogu/Bolo, Okrika, Omumma, Opobo/Nkoro, Port Harcourt and Tai. These failures enabled the results of the polling units in the said LGAs to be manipulated by inflation of the 2nd Respondent's votes and depletion of the Petitioners' votes. The 1st Respondent is hereby put on notice to produce at the hearing of this Petition, the polling unit booklets containing the said Forms for the polling units in the LGAs.

140. The Petitioners state that the votes that were returned in the State for all the political parties exceeded the number of voters accredited in the State for the Election through the BVAS machines. The 1st Respondent is put on notice to produce the reports of accreditation of the BVAS machines in Rivers State and the results issued by the 1st Respondent in respect of the entire 23 (twenty-three) LGAs of Rivers State.

141. The 1st Respondent is put on notice to produce certified true copies of BVAS reports, EC8As, EC8Bs, EC8Cs and EC8D for Rivers State.

142. The Petitioners aver that in the 44 Local Government Areas that make up Kano State, the 2nd and 3rd Respondents through their agents who, had been provided with machetes, unleashed violence on voters, disrupting the voting process which led to the destruction of electoral materials. The total votes credited to the parties is 1,401,376. Whereas the 2nd and 3rd Respondents were credited with 506,412 purported votes, New Nigerian Peoples Party (NNPP), one of the parties that took part in the Elections was credited with 977,279 purported votes, while Labour Party was credited with 28,513 purported votes. The Petitioners state that all these votes are liable to be voided.

Atiku & Anor. v INEC & Ors.          -47-



143. The Petitioners further aver that the 1st Respondent and its agents wrongly and deliberately entered wrong scores/results for the under-listed 22 (twenty-two) States, namely:

(a). Abia

(b). Anambra

(c). Bauchi

(d). Delta

(e). Ebonyi

(f). Edo

(g). Enugu

(h). Gombe

(i). Imo

(j). Jigawa

(k). Kano

(l). Katsina

(m). Kebbi

(n). Kogi

(o). Lagos

(p). Nasarawa

(q). Niger

(r). Ogun

(s). Ondo

(t). Plateau

(u). Rivers

(v). Taraba


CERTIFIED TRUE COPY

144. The Petitioners aver that there were discrepancies on very large scales at the various levels of recording and collation of results, particularly between the polling units and the Ward Collation Centres.

145. The Petitioners shall also call evidence of statisticians, forensic examiners, finger-print and ICT experts at the hearing of the Petition to establish that the figures/scores awarded the 2nd Respondent were not the product of valid votes actually cast but were mere allocation by the 1st Respondent, and the summation of the result declared is inconsistent with and cannot be reconciled with the number of duly accredited voters.

## GROUND FOUR: NON-QUALIFICATION:

146. The Petitioners aver that the 2nd Respondent was at the time of the election, not qualified to contest the election, not having the constitutional threshold.

## DOCUMENTS TO BE RELIED UPON IN THIS PETITION:

147. At the hearing of this Petition, the Petitioners shall rely on all necessary and relevant documents, including the following, namely:

(1). BVAS CTC Reports

(2). IRV CTC Reports

(3). Statisticians Reports

(4). Forensic Experts Reports

(5). All INEC Certified Result Sheets and Electoral Materials

(6). (Form EC8 Series), EC8A, EC8B, EC8C, EC8D, EC8D(A) and EC8E - Certificate of Return received by Petitioners' agents at the Election

(7). PDP Party Membership Cards, as necessary

(8). INEC Voters' Cards, as necessary



(9). Witnesses' party membership cards, as necessary

(10). Witnesses' Voters Cards, as necessary

(11). All Forms EC1A(1)

(12). All Forms EC17

(13). All Forms EC25A

(14). All Forms EC25A(1)

(15). All Forms EC25B

(16). All Forms EC25B(1)

(17). All Forms EC25D

(18). Forms EC25G Series used in the conduct of the Election

(19). All Forms EC40s, EC40G(1), EC40G(2), EC40G(3), EC40J, EC40A

(20). All Forms EC40H/EC40H(1)-(5)

(21). All the Forms EC40B, that is, all the Spoilt and Rejected Ballot Paper Forms used in all the polling units spanning all the Local Governments of all the States of Nigeria and the FCT Abuja

(22). All the Form EC40C, that is, all the statement of unused Ballot Paper Form used in all the Local Governments of all the States of Nigeria and the FCT Abuja

(23). All the Form EC40J, that is, all the Statement of Unused Ballot Paper Forms used in all the Local Governments of all the States of Nigeria.

(24). All the Envelopes EC50B, that is, all the Envelopes for Register of Voters used in all the polling units of all the Local Governments of the States of Nigeria and the FCT Abuja

(25). All the Envelopes of EC5OC, that is, all the Envelopes of for unused Ballot Papers used in all the Local Governments of the States of Nigeria and the FCT Abuja

(26). Actual ballot papers used and thumb-printed and counted as valid in all the polling units of the Local Governments of all the States of Nigeria and the FCT Abuja

(27). Actual ballot papers recorded as spoilt in the results in all the polling units of the Local Governments of all the States of Nigeria and the FCT Abuja



(28). Actual ballot papers recorded as unused in the results of all the polling units of the Local Governments of all the States of Nigeria and the FCT Abuja

(29). Certified true copy of all the voters' registers in all the polling units spanning all the Local Governments of all the States of Nigeria and the FCT Abuja

(30). Certified true copy of extant INEC list of polling units and voters as at 25th day of February, 2023 in all the polling units spanning all the Local Governments of all the States of Nigeria and the FCT Abuja

(31). Certified true copies of the printout of record of accreditation as captured by BVAS machines used for the conduct of the Election in all the polling units spanning all the Local Governments of all the States of Nigeria and the FCT Abuja

(32). A certified true copy of a list of all INEC officers and ad hoc staff used for the Election in all the polling units spanning all the Local Governments of all the States of Nigeria and the FCT Abuja

(33). Extant Guidelines and Regulations for the Conduct of the Election

(34). Circulars/corrigenda/Manuals issued by INEC for the conduct of the Presidential Election held on 23 February 2019

(35). Polling Unit Materials Checklist

(36). Summary of total registered voters on units' basis

(37). Summary of PVCs collected on units' basis

(38). Voters' Registers

(39). Letters of complaints over irregularities and malpractices during the election addressed to the INEC/Police/other relevant agencies/institutions

(40). Security reports relating to the Election

(41). Video/Audio recordings/DVD/CD relating to the Election

(42). Election Observers' or Observers' Reports

(43). 2nd Respondent's INEC FORM CF001 for Lagos State 1999 Governorship Election



(44). Lagos State House of Assembly Report of the Ad-Hoc Committee set up on Tuesday, September 21, 1999, to investigate the allegations of Perjury and Forgery levelled against the Executive Governor of Lagos State

(45). 2nd Respondent's Affidavit in respect of lost certificate dated 29th of December, 1998

(46). 2nd Respondent's INEC FORM EC9 for the 2023 Presidential election

(47). Newspaper/Television/ Radio reports and news

(48). Appointment Letters and tags of PDP agents

(49). Expert reports and analysis

(50). Photographs and GSM and other phone outputs

(51). Computer-generated and cyberspace evidence

(52). Forensic and other reports by experts and non-experts

(53). Receipts issued by INEC for certification of its documents

(54). Identity cards of witnesses

(55). Data and logs from INEC Electronic Storage Devices including but not limited to its Electronic Collation System and the AWS servers.

(56). Data and Event logs from all BVAS machines used in the Election

(57). PVC collection records

(58). Petition Written by the Petitioners' Kogi State Collation Officer dated 27th February 2023.

(59). Certified True Copy of Judgment in Suit No: FHC/ABJ/CS/334/2023.

(60). Any other document(s) relevant to the Petition.

148. The 1st Respondent is hereby given notice to produce at the hearing the original copies of documents in its custody/made by it, which are pleaded in this Petition.

149. The electronic evidence pleaded in this Petition were downloaded and printed from the computers/printers linked to the internet, and the Petitioners aver that the computers and printers were, at the time of



producing the electronic evidence, being used regularly to store and/or process information; that throughout that period, there was supplied to the computer in the ordinary course of those activities information of the kind contained in the electronic evidence hereto attached; that throughout the material part of that period, the computer and printer were operating properly; and that the information contained in the attached documents was derived from information supplied to the computer and the printer in the ordinary course of those activities.

150. **WHEREFORE the Petitioners pray against the Respondents jointly and severally for the following reliefs:**

(a). That it may be determined that the 2nd Respondent was not duly elected by a majority of lawful votes cast in the Election and therefore the declaration and return of the 2nd Respondent by the 1st Respondent as the winner of the Presidential Election conducted on the 25th day of February, 2023 is unlawful, wrongful, unconstitutional, undue, null and void and of no effect whatsoever.

(b). That it may be determined that the return of the 2nd Respondent by the 1st Respondent was wrongful, unlawful, undue, null and void having not satisfied the requirements of the Electoral Act 2022 and the Constitution of the Federal Republic of Nigeria, 1999 (as amended) which mandatorily requires the 2nd Respondent to score not less than one quarter (25%) of the lawful votes cast at the Election in each of at least two-thirds of all the States in the Federation **AND** the Federal Capital Territory, Abuja.

(c). That it may be determined that the 2nd Respondent was at the time of the election not qualified to contest the said election.



CERTIFIED TRUE COPY

(d). That it may be determined that the 1st Petitioner having scored the majority of lawful votes cast at the Presidential election of Saturday, 25th February 2023, be returned as the winner of the said election and be sworn in as the duly elected President of the Federal Republic of Nigeria.

IN THE ALTERNATIVE:

(e). An Order directing the 1st Respondent to conduct a second election (run-off) between the 1st Petitioner and the 2nd Respondent.

IN THE FURTHER ALTERNATIVE:

(f). That the election to the office of the President of Nigeria held on 25th February 2023 be nullified and a fresh election (re-run) ordered.

(g). Any such further relief(s) as the Honourable Court may deem fit to make in the interest of justice.

## DATED THIS 20TH DAY OF MARCH 2023

SIGNED:

**1. ABUBAKAR ATIKU**

**2. PEOPLES DEMOCRATIC PARTY**

**Petitioners' Address for Service:**
Plot 121 Adetokunbo Ademola Crescent,
Wuse 11, Abuja
Occupied by the 1st Petitioner,
(Atiku Abubakar).

**SIGNED BEFORE THE SECRETARY**

SECRETARY
PRESIDENTIAL ELECTION
PETITION COURT
2023

-54-


CERTIFIED TRUE COPY

## THE NAMES OF THE PETITIONERS' COUNSEL ARE:-



**CHIEF JOE-KYARI GADZAMA**, OFR, MFR, FNIALS, FCIArb, C.Arb., SAN

**CHIEF CHRIS UCHE**, FCArb, SAN

**PAUL USORO**, FCIArb, SAN

**SAKA ABIMBOLA ISAU**, SAN

**EYITAYO JEGEDE**, SAN

**PROF. MIKE OZEKHOME**, CON, OFR, FCIArb, Ph.D. D.Litt., SAN

**NELLA ANDEM-EWA RABANA**, FCI Arb, SAN

**KEN E. MOZIA**, SAN

**DR. GARBA USMAN TETENGI**, MDRI, mni, SAN

**MAHMUD ABUBAKAR MAGAJI**, SAN

**JOE ABRAHAMS**, SAN

**CHUKWUMA MACHUKWU UME**, SAN

**EMEKA ETIABA**, FCIArb, SAN

**PROF. MAXWELL M. GIDADO**, OON, SAN

**CHIEF GORDY UCHE**, FcArb. SAN

**EDWARD ASHIEKAA**, SAN

**A. K AJIBADE**, FCIM, FICMC, SAN

**ABDUL A. IBRAHIM**, SAN

**OLALEKAN OJO**, SAN

**CHIEF PAUL HARRIS OGBOLE**, SAN

**OLUSEGUN O. JOLAAWO**, SAN

**O. M. ATOYEBI**, FCIArb(U.K), SAN

**NUREINI S. JIMOH**, FCArb, FICMC, SAN

**KEMASUODE WODU**, SAN

**YAKUBU MAIKASUWA**, SAN

**ANDREW M. MALGWI**, SAN

IFEANYI IBOKO, ESQ.

PROF YUSUF DANKOFA, ESQ.

M. S. ATOLAGBE, ESQ.

O. A. DADA, ESQ.

ABDULAZEEZ A. IBRAHIM, ESQ.

JAMIU OLABODE MAKINDE, ESQ.

AHMED .T. UWAIS, ESQ.

ADEDAMOLA FANOKUN, ESQ.

SILAS ONU, ESQ.

BASHIR FAISAL FOLORUNSHO, ESQ.

Atiku & Anor. v INEC & Ors.  -55-



JACOB OCHAI OTOKPA, ESQ.
PRISCILLA EJEH, ESQ.
FALILAT OLAJUMOKE OLAWOYIN, ESQ.
NHEOMA NDU ASOBINUANWU, ESQ.
**PETITIONERS' COUNSEL,**
c/o The Peoples Democratic Institute,
No. 3 Justice Roseline Ukeje Close,
Asokoro, Abuja.
E: pdplegalteam@gmail.com; gadzama@nigerianbar.ng
T: +234 (0) 816 021 9077

**FOR SERVICE ON:**

**1.** **1st Respondent:**
INEC Headquarters,
Plot 416 Zambezi Crescent,
Maitama, Abuja.

**2.** **2nd Respondent:**
c/o APC National Secretariat,
40 Blantyre Street,
Off Adetokunbo Ademola Crescent,
Wuse 11, Abuja.

**3.** **3rd Respondent:**
APC National Secretariat,
40 Blantyre Street,
Off Adetokunbo Ademola Crescent,
Wuse 11, Abuja.



**FOR SERVICE ON:**

**1.      1st Respondent:**
           INEC Headquarters,
           Plot 416 Zambezi Crescent,
           Maitama, Abuja.

**2.      2nd Respondent:**
           c/o APC National Secretariat,
           40 Blantyre Street,
           Off Adetokunbo Ademola Crescent,
           Wuse 11, Abuja.

**3.      3rd Respondent:**
           APC National Secretariat,
           40 Blantyre Street,
           Off Adetokunbo Ademola Crescent,
           Wuse 11, Abuja.



## IN THE COURT OF APPEAL
## (IN THE PRESIDENTIAL ELECTION PETITION COURT)
## HOLDEN AT ABUJA

## IN THE MATTER OF THE ELECTION TO THE OFFICE OF THE
## PRESIDENT OF THE FEDERAL REPUBLIC OF NIGERIA
## HELD ON 25TH FEBRUARY 2023

**PETITION No: PEPC/A/ /2023**

BETWEEN:

1. **ABUBAKAR ATIKU**
2. **PEOPLES DEMOCRATIC PARTY (PDP)**       **PETITIONERS**

     **AND**

1. **INDEPENDENT NATIONAL ELECTORAL COMMISSION (INEC)**
2. **TINUBU BOLA AHMED**      **RESPONDENTS**
3. **ALL PROGRESSIVES CONGRESS (APC)**

### PETITIONERS' LIST OF WITNESSES

1. PDP NCA
2. DM
3. PDPC
4. AB
5. ICT
6. ABCA
7. AMCA
8. BNCA
9. BOCA
10. EBCA
11. EDCA
12. EKCA
13. ENCA
14. FCTCA
15. FCTPDPC
16. KGCA
17. KNCA

Atiku & Anor. v INEC & Ors



18. LSCA
19. NGCA
20. NSCA
21. OGSA
22. RSCA
23. **Any other witness(es) as may be called by leave of Court or as may be subpoenaed.**

**Dated this 20th day of March, 2023.**



**CHIEF JOE-KYARI GADZAMA**, OFR, MFR, FNIALS, FCIArb, C.Arb., SAN
**CHIEF CHRIS UCHE**, FCArb, SAN
**PAUL USORO**, FCIArb, SAN
**SAKA ABIMBOLA ISAU**, SAN
**EYITAYO JEGEDE**, SAN
**PROF. MIKE OZEKHOME**, CON, OFR, FCIArb, Ph.D. D.Litt., SAN
**NELLA ANDEM-EWA RABANA**, FCI Arb, SAN
**KEN E. MOZIA**, SAN
**DR. GARBA USMAN TETENGI**, MDRI, mni, SAN
**MAHMUD ABUBAKAR MAGAJI**, SAN
**JOE ABRAHAMS**, SAN
**CHUKWUMA MACHUKWU UME**, SAN
**EMEKA ETIABA**, FCIArb, SAN
**PROF. MAXWELL M. GIDADO**, OON, SAN
**CHIEF GORDY UCHE**, FcArb. SAN
**EDWARD ASHIEKAA**, SAN
**A. K AJIBADE**, FCIM, FICMC, SAN
**ABDUL A. IBRAHIM**, SAN
**OLALEKAN OJO**, SAN
**CHIEF PAUL HARRIS OGBOLE**, SAN
**OLUSEGUN O. JOLAAWO**, SAN
**O. M. ATOYEBI**, FCIArb(U.K), SAN
**NUREINI S. JIMOH**, FCArb, FICMC, SAN
**KEMASUODE WODU**, SAN
**YAKUBU MAIKASUWA**, SAN
**ANDREW M. MALGWI**, SAN

Atiku & Anor. v INEC & Ors.          -59-

CERTIFIED TRUE COPY

IFEANYI IBOKO, ESQ.
PROF YUSUF DANKOFA, ESQ.
M. S. ATOLAGBE, ESQ.
O. A. DADA, ESQ.
ABDULAZEEZ A. IBRAHIM, ESQ.
JAMIU OLABODE MAKINDE, ESQ.
AHMED .T. UWAIS, ESQ.
ADEDAMOLA FANOKUN, ESQ.
SILAS ONU, ESQ.
BASHIR FAISAL FOLORUNSHO, ESQ.
JACOB OCHAI OTOKPA, ESQ.
PRISCILLA EJEH, ESQ.
FALILAT OLAJUMOKE OLAWOYIN, ESQ.
NHEOMA NDU ASOBINUANWU, ESQ.
**PETITIONERS' COUNSEL,**
c/o The Peoples Democratic Institute,
No. 3 Justice Roseline Ukeje Close,
Asokoro, Abuja.
E: pdplegalteam@gmail.com; gadzama@nigerianbar.ng
T: +234 (0) 816 021 9077

**FOR SERVICE ON:**

1.  **1ˢᵗ Respondent:**
    INEC Headquarters,
    Plot 416 Zambezi Crescent,
    Maitama, Abuja.

2.  **2ⁿᵈ Respondent:**
    c/o APC National Secretariat,
    40 Blantyre Street,
    Off Adetokunbo Ademola Crescent,
    Wuse 11, Abuja.

3.  **3ʳᵈ Respondent:**
    APC National Secretariat,
    40 Blantyre Street,
    Off Adetokunbo Ademola Crescent,
    Wuse 11, Abuja.



# IN THE COURT OF APPEAL
## (IN THE PRESIDENTIAL ELECTION PETITION COURT)
### HOLDEN AT ABUJA

## IN THE MATTER OF THE ELECTION TO THE OFFICE OF THE PRESIDENT OF THE FEDERAL REPUBLIC OF NIGERIA HELD ON 25TH FEBRUARY 2023

**PETITION No: PEPC/A/ /2023**

**BETWEEN:**

1. **ABUBAKAR ATIKU**
2. **PEOPLES DEMOCRATIC PARTY (PDP)** ⎫ **PETITIONERS**

**AND**

1. **INDEPENDENT NATIONAL ELECTORAL COMMISSION (INEC)**
2. **TINUBU BOLA AHMED** ⎫ **RESPONDENTS**
3. **ALL PROGRESSIVES CONGRESS (APC)**

## <u>WITNESS STATEMENT ON OATH OF PDPNCA</u>

I, **PDPNCA**, Nigerian Citizen, Adult and Male of the Peoples Democratic Party Headquarters, Wadata Plaza, Wuse Zone 5, Abuja, do hereby make oath and state as follows:

1.  I am a member of the Peoples Democratic Party, the 2nd Petitioner.

2.  I acted as one of the National Collation Agent for the Petitioners at the Presidential election held on 25th February 2023.

3.  By virtue of my position, I am very conversant with the facts deposed to herein, being facts known personally by me or related to me by my subordinates in the course of carrying out my assignment.

4.  That my responsibilities as one of the National Collation Agent of the Petitioners included receiving all electoral results and reports from my subordinates, as well as scrutinizing and analysing electoral results and documents used in the election.

5.  All the facts deposed herein are with the consent of the Petitioners and derived from my personal knowledge and where otherwise, I have stated the source of my information and belief.


CERTIFIED TRUE COPY

6.  I know that the 1st Petitioner, ABUBAKAR ATIKU, was a candidate at the election to the office of the President of the Federal Republic of Nigeria, which election held on Saturday, 25th February 2023 across the Federation of Nigeria.

7.  I know that the 1st Petitioner, who had a right to vote and be voted for in the Election, was sponsored by the 2nd Petitioner and contested for the Election.

8.  I know that the 1st Petitioner has a right to be returned as duly elected at the Election.

9.  The 2nd Petitioner, Peoples Democratic Party (PDP) is a duly registered political party in Nigeria and participated in the Election by sponsoring the 1st Petitioner as its Presidential candidate.

10. The 2nd Petitioner is a corporate body, and for the Election, acted through and by means of its agents, State Coordinators and officials, who were reporting amongst themselves.

11. I know for the purposes of the Election, the Petitioners had agents in all the Polling Units, Ward Collation Centres, Local Government Areas, and the State Collation Centres, in all the States of the Federation and the Federal Capital Territory as well as the National Collation Centre.

12. I know that the Petitioners have the right to present this Petition, having participated in the Election.

13. The 1st Respondent is the body constitutionally and statutorily vested with the responsibility of organising and conducting elections in Nigeria, and was the body that conducted the Election, the subject matter of this Petition.

14. I know that all, each and every person who acted as Presiding Officers, Assistant Presiding Officers, Supervisory Presiding Officers, *ad-hoc* Staff in all the polling units/stations/points, Ward Collation Officers in all the Ward Collation Centres, Local Government Collation Officers in all the Local Government Area Collation Centres, all the State Collation Officers in all the State Collation Centres, the State Resident Electoral Commissioners, FCT Resident Electoral Commissioner, the Chief Returning Officer, and any other person(s) who acted in any capacity on behalf of the 1st Respondent at the Election, including Information Communication Technology (ICT) Technical Election Officials, acted as agents of the 1st Respondent.

15. The 2nd Respondent was a candidate in the Election and sponsored by the 3rd Respondent.



16. The 3rd Respondent is a registered political party in Nigeria and is the political party that sponsored the 2nd Respondent as its candidate at the Election.

17. The Petitioners and the Respondents hereinabove specified are the parties interested in this Petition.

## (A). HOLDING OF THE ELECTION, SCORES OF CANDIDATES, PERSON RETURNED

18. I know that the Election took place on **Saturday, 25th February 2023**.

19. Four (4) days after the Election, specifically on Wednesday, **1st March 2023**, the 1st Respondent announced the following as the purported scores of the candidates for the Election, namely: -

| S/No. | CANDIDATE | PARTY | SCORES |
|-------|-----------|-------|--------|
| 1. | IMUMOLEN IRENE CHRISTOPHER | A | 61,014 |
| 2. | AL MUSTAPHA HAMZA | AA | 14,542 |
| 3. | SOWORE OMOYELE STEPHEN | AAC | 14,608 |
| 4. | KACHIKWU DUMEBI | ADC | 81,919 |
| 5. | SANI YABAGI YUSUF | ADP | 43,924 |
| 6. | **TINUBU BOLA AHMED** | **APC** | **8,794, 726** |
| 7. | UMEADI PETER NNANNA CHUKWUDI | APGA | 61,966 |
| 8. | OJEI PRINCESS CHICHI | APM | 25,961 |
| 9. | NNAMDI CHARLES OSITA | APP | 12,839 |
| 10. | ADENUGA SUNDAY OLUWAFEMI | BP | 16,156 |
| 11. | OBI PETER GREGORY | LP | 6,101, 533 |
| 12. | MUSA MOHAMMED RABIU KWANKWASO | NNPP | 1,496, 687 |
| 13. | OSAKWE FELIX JOHNSON | NRM | 24,869 |
| 14. | **ABUBAKAR ATIKU** | **PDP** | **6,984, 520** |
| 15. | ABIOLA LATIFU KOLAWOLE | PRP | 72,144 |
| 16. | ADEBAYO ADEWOLE EBENEZER | SDP | 80,267 |
| 17. | ADO-IBRAHIM ABDULMALIK | YPP | 60,600 |
| 18. | NWANYANWU DANIEL DABERECHUKWU | ZLP | 77,665 |

CERTIFIED TRUE COPY

20. The 1st Respondent wrongly returned the 2nd Respondent as the winner of the Election, allocating to him **8, 794, 726** votes while ascribing to the 1st Petitioner **6, 984, 520** votes.

21. The 1st Respondent also declared the following as its summary of the purported results:

| A. | TOTAL NUMBER OF REGISTERED VOTERS | 93,469,008 |
|----|-----------------------------------|------------|
| B. | TOTAL NUMBER OF ACCREDITED VOTERS | 25,286,616 |
| C. | TOTAL NUMBER OF VALID VOTES | 24,025,940 |
| D. | TOTAL NUMBER OF REJECTED VOTES | 939,278 |
| E. | TOTAL NUMBER OF VOTES CAST | 24,965,218 |
| F. | PERCENTAGE TURN OUT | 27.05% |

22. I know that the Petitioners shall rely on **Form EC8D(A)** (being the summary of final collation of results) and **Form EC8E** (being the final declaration of result) issued by the 1st Respondent, not only to show the purported scores as recorded by the 1st Respondent, but also to show the invalidity of the scores as recorded therein.

23. I know that on the face of the Form EC8D(A), there are calculation errors as shown and contained in the Report of the Statisticians which the Petitioners shall rely upon.

24. I also know that Petitioners shall rely on the Reports and evidence by their Experts, including Statisticians, Forensic Examiners and other Experts pursuant to the Orders for Inspection, Examination and Production of election materials granted to the Petitioners by this Honourable Court.

## (B). <u>GROUNDS OF THE PETITION</u>:

25. I know that the grounds upon which the Petitioners presented this Petition are as follows:

(a). The election of the 2nd Respondent is invalid by reason of non-compliance with the provisions of the Electoral Act, 2022.

(b). The election of the 2nd Respondent is invalid by reason of corrupt practices.

(c). The 2nd Respondent was not duly elected by majority of lawful votes cast at the Election.



## (C). **FACTS OF THE PETITION:**

**GROUND ONE:** THE ELECTION OF THE 2ND RESPONDENT IS INVALID BY REASON OF NON-COMPLIANCE WITH THE PROVISIONS OF THE ELECTORAL ACT, 2022.

### (1). **FAILURE BY THE 1ST RESPONDENT TO ELECTRONICALLY TRANSMIT ELECTION RESULTS:**

26. The Election was not conducted in accordance with the provisions of the Electoral Act 2022, and other extant laws and the non-compliance substantially affected the result of the Election, in that the 2nd Respondent ought not to have been declared or returned as the winner of the Election.

27. The Election was not conducted in compliance with the provisions of Sections 47(2) & (3), 60(1), (2) & (5), 64(4)(a) & (b), 64(5), (6), (7) & (8), 71 and 73 of the Electoral Act, Paragraphs 3.3.0 and 3.4.0 of the 1st Respondent's published Manual for Election Officials 2023 ("INEC Manual" or "Manual"), and Paragraphs 19, 35, 38, 40, 41, 42, 43, 47, 48, 50, and 62 of the 1st Respondent's published Regulations and Guidelines for the Conduct of Elections 2022.

28. Several months and weeks leading to the Election, the 1st Respondent through its Chairman Mahmood Yakubu, had repeatedly assured the general public that the February 2023 general election would be the best election ever, with the guaranteed use of the Bi-Modal Voters' Accreditation System ("BVAS") and real-time and direct uploading of the polling unit results to INEC's electronic collation system and Results Viewing Portal ("IReV") which were technological innovations in the electoral system that would ensure the transparency of the elections and foolproof the elections against all forms of manipulation.

29. The 1st Respondent's Chairman and its other principal officers including Mr. Festus Okoye, the National Commissioner for Information and Voters Enlightenment, at various times and fora, gave serial undertakings, representations and assurances that the results from the polling units shall be transmitted real time via the BVAS to the electronic collation system and the IReV for public viewing and that such transmission shall be the basis for collation at the various collation levels up to the national collation and return at the Election.

30. Contrary to the undertakings, representations and assurances made by the 1st Respondent, the 1st Respondent proceeded on the 1st day of March 2023 to wrongly return the 2nd Respondent as the winner of the Election when the outcome (herein being challenged) and the results from the polling units including the total number of accredited voters in the respective polling units were yet to be transmitted to the 1st Respondent's Electronic Collation System and the 1st Respondent's Result Viewing Portal (IReV) as

CERTIFIED TRUE COPY

stipulated by the Electoral Act, 2022 and the INEC Guidelines and Manuals and expressly guaranteed to the electorate by the 1st Respondent.

31.  The 1st Respondent had received generous funding from the Federal Government of Nigeria, having informed the public that the 2023 election cost the country the sum of N355 billion.

32.  The 1st Respondent had submitted a budget of N305 billion, out of which a whopping sum of N117 billion was earmarked for the procurement of electronic accreditation and transmission devices, including the Bi-Modal Voters' Accreditation System (BVAS) a new voter enrolment and voter accreditation device designed to combine the functions of the Direct Data Capture Machine, the Z-Pad, the Smart Card Reader and the portal, IReV a world-wide web portal designed for real time viewing of election results uploaded from polling units.

33.  The 1st Respondent and its Chairman irrevocably committed the 1st Respondent to the deployment and use of the BVAS technology in both accreditation and transmission of the accreditation data and election results from the polling units to the electronic collation system and IRev Portal. Meanwhile, the 1st Respondent had touted the BVAS machine as the election "game changer".

34.  The 1st Respondent had prescribed through its various Regulations, Guidelines and Manual, the manner of accreditation, collation and transmission vide its technological device, the BVAS, pursuant to the Electoral Act.

35.  I know that the mandatory requirements of the 1st Respondent in relation to electronic accreditation, collation, and transmission are as set out below:

(1).  Accreditation of voters shall be by way of Bimodal Voter Accreditation System (BVAS).

(2).  To electronically transmit or transfer the results and the accreditation data from polling units direct to the electronic collation system as prescribed by the 1st Respondent.

(3).  Uploading of results shall be with the BVAS to the 1st Respondent's results Viewing Portal (IReV) directly and in realtime, as prescribed by the 1st Respondent.

(4).  Collation and authentication of the results and accreditation data from the polling units at the various collation levels up to the national collation centre shall be with the aid of the Results Verification System.


CERTIFIED TRUE COPY

36. The result of the Election as announced by the 1st Respondent and especially the votes wrongly allocated to the 2nd Respondent do not represent the lawful valid votes cast.

37. Lawful votes were deliberately and massively deducted from the 1st Petitioner's scores by the 1st Respondent to facilitate the return of the 2nd Respondent.

38. The 1st Respondent failed to comply with its own Guidelines and representations to transmit results and accredit data <u>directly</u> and real-time to the IReV and its electronic collation system/storage device before the hasty return and announcement of the 2nd Respondent as the winner of the Election on the 1st day of March 2023.

39. By the combined provisions of the Electoral Act, the INEC Regulations and Guidelines and the INEC Manual, the votes collated at the polling units are to be electronically transmitted with the Bimodal Voter Accreditation System (BVAS) directly and real-time to the INEC electronic collation system and IReV portal.

40. To underscore the relevance of real-time electronic transmission of the results and accreditation data from the polling units to the IReV Portal and the INEC electronic collation system, the 1st Respondent itself stated thus in its Manual for Election Officials 2023 (paragraph 2.9.0):

> *"Electronic Transmission/Upload of Election Result and Publishing to The INEC Result Viewing (IReV) Portal:*
>
> *"One of the problems noticed in the electoral process is the irregularities that take place between the Polling Units (PUs) after the announcement of results and the point of result collation. Sometimes results are hijacked, exchanged, or even destroyed at the PU, or on the way to the Collation Centers. It becomes necessary to apply technology to transmit the data from the Polling Units such that the results are collated up to the point of result declaration.*
>
> *"The real-time publishing of polling unit-level results on IReV Portal and transmission of results using the BVAS demonstrates INEC's commitment to transparency in results management. This commitment is backed by Sections 47(2), 60(1, 2 & 5), 64(4a & 4b) and 64(5) of the Electoral Act 2022, which confers INEC with the*

CERTIFIED TRUE COPY

*power to transmit election results electronically. The system minimizes human errors and delays in results collation and improves the accuracy, transparency, and credibility of the results collation process."*

41. I know that in furtherance of the commitment to real-time electronic transmission of the polling units results to the electronic collation system and the IReV portal, the 1ˢᵗ Respondent in its Regulations and Guidelines for the Conduct of Elections, 2022 (paragraph 38), provided thus:-

> *"On completion of all the Polling Unit voting and results procedures, the Presiding Officer shall:*
>
> *(i). Electronically transmit or transfer the result of the Polling Unit, direct to the collation system as prescribed by the Commission.*
>
> *(ii). Use the BVAS to upload a scanned copy of the EC8A to the INEC Result Viewing Portal (IReV), as prescribed by the Commission."*

42. I know that it is mandatory for the Presiding Officer appointed by the 1ˢᵗ Respondent to use technological device (in this case, the BVAS device) for the accreditation of voters at the polling unit.

43. In compliance with the foregoing, the 1ˢᵗ Respondent in paragraph 18(a) of its Regulations and Guidelines, applicable to the conduct of the election, prescribed that a person intending to vote shall be verified to be the same person on the Register of Voters by the use of the Bimodal Voter Accreditation System (BVAS).

44. It is the same BVAS device deployed by the 1ˢᵗ Respondent for accreditation of voters at the polling units during the conduct of the said Election, that was to be used by the 1ˢᵗ Respondent to electronically transmit from the polling units, the result of the election at the polling units together with the accreditation data including the total number of accredited voters in the respective polling units.

45. I also that it is mandatory for any Collation Officer or the Returning Officer at the various collation levels for any election to collate and announce the result of an election, subject to his or her verification and confirmation that the (a). number of accredited voters stated on the collated result are



correct and consistent with the number of accredited voters recorded and transmitted directly from the polling units; and (b). the voters stated on the collated result are correct and consistent with the votes recorded and transmitted directly from polling units.

46. The 1st Respondent in acknowledgment of the foregoing provisions of Section 64(4) of the Electoral Act, provided in paragraph 48(a) of its aforesaid election to the effect that an election result shall only be collated if the Collation Officer ascertains that the number of accredited voters tallies with the number recorded in the BVAS and that the votes scored by the political parties on the result sheet are correct and agree with the result that was electronically transmitted or transferred directly from the polling unit.

47. By Section 64(5) of the Electoral Act, a collation officer or returning officer shall use the "data of accreditation" (which includes the number of accredited voters) "recorded and transmitted directly from each polling unit" and "the votes and results of the election recorded and transmitted directly from each polling unit" to collate and announce the result of an election if a collated result at his or a lower level of collation is disputed or correct to be incorrect.

48. That in paragraph 48(b) of its aforesaid Guidelines and Regulations, the 1st Respondent provided in similar vein, that if a Collation or Returning Officer determines that a result from a lower level of collation is not correct, he/she shall use the result that was electronically transmitted or transferred directly from that lower level to collate and announce the result.

49. I also know that further, Sections 64(6), (7) and (8) of the Electoral Act 2022, it is mandatory that disputes as to the result of the election being collated, can only be resolved by the Collation Officer or Returning Officer by reference to the polling unit results and the accreditation data (which includes the number of accredited voters) electronically transmitted from the polling units.

50. Notwithstanding the foregoing, the uploading and transmission to the electronic collation system and the IReV portal by the 1st Respondent of the results of the Senate and House of Representatives took place seamlessly while that of the Presidential Election did not.

51. Contrary to the original design of the BVAS machine to upload data directly to the electronic collation system and the IReV portal, the 1st Respondent contrived and installed an intervening third-party device (Device Management System) which, in its ordinary usage, is meant to secure and administer the 1st Respondent's technological ecosystem for the elections but as it relates to the Presidential Election, was used to intercept the

CERTIFIED TRUE COPY

results, quarantine and warehouse same, and filter them before releasing same to the IReV Portal.

52. The 1st Respondent used the said Device Management System to manipulate the Election results in favour of the 2nd and 3rd Respondents

53. I know that the critical components of the 1st Respondent's Information and Communications Technology (ICT), includes but not limited to the Bimodal Voter Accreditation System (BVAS) which is an Android Device manufactured by Emperor Technologies China and supplied to the 1st Respondent by Activate Nigeria Limited.

54. The Voter Accreditation System (VAS) which is the software that is used on the BVAS was previously designed and configured in-house and installed on the BVAS by the ICT Team of the 1st Respondent headed by Mr. Chidi Nwafor.

55. The BVAS was subsequently handed over to Emperor Technology China prior to the Presidential Election and they then reconfigured and installed a software on the BVAS before supplying the devices to the 1st Respondent through Activate Nigeria Limited.

56. That I know as it relates to the IReV, the INEC Result Viewing Portal (IReV) is a web-based data entry and aggregation portal designed also by Chidi Nwafor's team and is hosted on Amazon Web Service (AWS). The server system for the device and the portal are hosted on Amazon Web Service (AWS) URL:dashboard.ivasportal.com/dash.

57. That some months proximate to the Elections, the 1st Respondent caused to be transferred its in-house ICT expert, Chidi Nwafor, from its ICT Department to the 1st Respondent's office in Enugu as an "Administrative Secretary", and brought in an IT Consultant, Mr. Suleiman Farouk, who introduced a third-party mechanism that was installed and made to intermediate between the BVAS and the IRev Portal, known as Device Management System (DMS).

58. The DMS is a software that allows INEC's IT Security Consultant, Mr. Suleiman Farouk, to remotely control, monitor and filter data that is transmitted from the BVAS devices to the electronic collation system and the IRev platform. Meanwhile, the 1st Respondent engaged an appointee of the 2nd Respondent to man and oversee the sensitive ICT Department of the 1st Respondent for the purpose of the Election.

59. The 1st Respondent, having set the parameters, did not ensure compliance with the electronic transmission of accreditation data and results in this Election to create opportunity for manipulation of figures to the advantage of the 2nd and 3rd Respondents.



- 71 -

60. There were no technical "glitches" that prevented the upload and transmission of the polling units results and the accreditation data of the Presidential Election to the electronic collation system and the IReV portal but what happened was the non-adherence to the system through a command and control element activated by a pre-programmed design to limit user-privileges of the front-end users of the BVAS machines at the polling units with respect to Presidential Election results while releasing user privileges in respect of the National Assembly election windows, by selectively withholding correct passwords and/or issuing wrong passwords through the use of the Device Management System equipment aforesaid.

61. The 1st Respondent had admitted its failure to electronically transmit the polling units results of the Election and the total number of accredited voters in the respective polling units to the electronic collation system and the IReV platform but surprisingly attributed same to "glitches".

62. There was no failure of "server", as the "server" was cloud-based and virtual and was hosted on and by Amazon Web Service (AWS) "server" being cloud-based, does not suffer disruption on the event of any unlikely challenge, Amazon Web Service would have seamlessly switched to another server without hitch, being autoscaling groups with multiple network reception and offline upload options.

63. The technology system deployed by the 1st Respondent underwent Quality Assurance Tests ("QAT") before acquisition and deployment. The so-called "glitch" was a bypass to tilt and switch the results of the Presidential Election in favour of the 2nd and 3rd Respondents.

64. I know that as of 1st March 2023, when the 1st Respondent returned the 2nd Respondent as the winner of the Election, the entire results and accreditation data from the polling units had not been transmitted and uploaded to the 1st Respondent's electronic collation system/storage device, created/acquired by the 1st Respondent itself for the purpose of electronically collating the results of the Election.

65. I also know that more than 18 days after the Election, and as of the date of filing this Petition, the 1st Respondent's IReV Portal showed that the 1st Respondent had failed to upload the entire accreditation data and polling units results of the Presidential Election.

66. I also know that the figures/scores awarded the 2nd Respondent were not the product of valid votes actually cast but were mere allocation by the 1st Respondent, and the summation of the result declared is inconsistent with and cannot be reconciled with the number of duly accredited voters.

67. I know that Section 47(3) of the Electoral Act makes it mandatory for the 1st Respondent to cancel and reschedule an election in any polling unit where the BVAS or other technological device deployed for accreditation of

CERTIFIED TRUE COPY

voters fails to function, but notwithstanding, the 1st Respondent concluded the said Election, purported to collate the result of the Election and declared the 2nd Respondent wrongly as the winner of the said election without the prescribed electronic transmission of the results of the Election at and from the various polling units and the accreditation data from the respective polling units (including the number of accredited voters in the said polling units), to the INEC Electronic Collation System and to the INEC Result Viewing Portal (IReV).

68.  The 1st Respondent's inability to utilize the technological device (BVAS) deployed by the 1st Respondent for the electronic transmission of the polling units results of the Election along with the accreditation data, amounts to a programmed failure of the said technological device to function which failure is attributable to the Respondents.

69.  The 1st Respondent in the face of the obvious failure of the BVAS to function at the respective polling units, ought to have cancelled the election and reschedule same to take place within 24 hours as required by Section 47(3) of the Electoral Act.

70.  That by reason of the non-electronic transmission of the polling units results of the election and accreditation data from the respective polling units at the time of the collation of the results of the Election, all the Collation Officers at the various levels of collation of the results including the 1st Respondent's Chairman who as the Returning Officer for the said Presidential Election conducted the final collation of the results of the Election, failed to carry out the mandatory verification and confirmation that was incumbent on them pursuant to the provisions of Section 64(4) of the Electoral Act.

71.  I know that by reason of the foregoing, there could not have been any valid and lawful collation and announcement of the result of the Election under the Electoral Act, without the prior electronic transmission from the polling units to the INEC Electronic Collation System and IReV portal using the BVAS, of the results of the election at the respective polling units together with the accreditation data therefrom which includes the total number of accredited voters in the polling units.

72.  The collation of the purported Election result and announcement of same without the prior electronic transmission of the results of the Election at and from the respective polling units, and the incorrect manual collation of the results without the use of and authentication with the electronic collation system at the various collation levels up to the national collation center, are invalid, unlawful, and null and void.

73.  The 1st Respondent is in clear breach of the provisions of the law under Sections 60 and 64(4) and (5) of the Electoral Act by failing to use the

- 73 -

CERTIFIED TRUE COPY

BVAS to transmit the Election results at the polling units and the accreditation data therefrom to the electronic collation system and the IRev Portal.

74. Despite the failure to so transmit and several complaints for review, the 1st Respondent's Chairman refused all entreaties and applications for the suspension of the collation exercise and a review of the complaints before declaring a winner of the Election and repeatedly off-handedly dared the Petitioners to go to Court.

75. Contrary to the provisions of the 1st Respondent's Regulations and Manual which stipulate the transmission of both accreditation data and the polling units results from the BVAS directly and realtime to the electronic collation system and the IReV portal, the 1st Respondent introduced a device manager called Collation Support and Results Verification System (CSRVS), with which the real results from the polling units were quarantined prior to transmission to the IReV portal, leaving room for the 1st Respondent to upload wrong results.

76. The entire Presidential Election conducted on the 25th day of February, 2023 together with the collation of the results of the said Election and the announcement and declaration and return of the 2nd Respondent as the winner of the said Election are unlawful, illegal, wrongful, null and void by reason of the failure of the 1st Respondent to comply with the aforesaid conditions precedent for the conduct of valid election.

77. By a Press Release issued by the 1st Respondent dated the 11th day of November, 2022, INEC as a public institution stated thus:

> ***"Our attention has been drawn to reports in a section of the media of alleged plans by the Commission to rig the 2023 General Election by abandoning the direct and real-time electronic upload of Polling Unit results to the INEC Result Viewing (IReV) Portal by the Registration Area Technical Support Staff (RATECHSS). The claim is patently false. The Commission has repeatedly reassured Nigerians that it will transmit results directly from the Polling Unit as we witnessed in Ekiti and Osun. ...The public is advised to ignore the reports. The Bimodal Voter Accreditation System (BVAS) and IReV have come to stay for voter accreditation and uploading of Polling Unit results in real-time in Nigeria."***

78. The Election failed the integrity test stipulated by the Electoral Act and does not reflect the will of the electorate.

79. The Election has been rated nationally and internationally as the worst election in the history of Nigeria given the failure by the 1st Respondent,

CERTIFIED TRUE COPY

*inter alia*, to transmit and upload in realtime and directly to the 1st Respondent's electronic collation system and IReV portal the scores of the parties from the polling units before the announcement of final results by the 1st Respondent on Wednesday, 1st day of March 2023.

80.   Before the Election, the 1st Respondent had previously conducted four governorship elections successfully, in Anambra, Ekiti, Edo and Osun States and Area Council election in the FCT, Abuja.

81.   In the four States the 1st Respondent uploaded results directly and realtime from the polling units to the IReV.

82.   In the FCT Area Council election the 1st Respondent uploaded the results within an hour of the close of election.

83.   In Osun State, by midnight of the day of the governorship election the 1st Respondent had uploaded all the results from the polling units to the IReV.

84.   In all these instances, the 1st Respondent deployed the BVAS for the accreditation of the voters and transmission of the results.

85.   In the Presidential Election of 25th February 2023, the 1st Respondent failed to transmit the results and accreditation data directly and realtime from the polling units to the electronic collation system and the IReV portal.

86.   Twelve hours after the conclusion of the Election at the respective polling units, there was no uploading whatsoever of the results and accreditation data therefrom by the 1st Respondent from the BVAS to the electronic collation system and the IReV.

87.   The 1st Respondent belatedly claimed that there was a "glitch" that made the BVAS to fail to transmit results of the Presidential Election from the polling units to its electronic collation system and IReV portal.

88.   The Petitioners state that the National Assembly election and the Presidential election were conducted simultaneously on 25th February 2023 at the same locations using the same BVAS machines for both accreditation of voters and transmission of the respective polling unit results of both elections.

89.   That while the polling units results of the National Assembly were transmitted directly and realtime to the IReV from the BVAS, the purported results of the Presidential Election were not transmitted directly and realtime to the electronic collation system and the IReV portal.

90.   The 1st Respondent did not commence the transmission of the polling units results directly for the Presidential election until the results were withheld by 1st Respondent for hours on end.



91. That unlike the instant Election, the off-cycle elections that were conducted by the 1st Respondent in Anambra, Ekiti, Edo, and Osun States, did not suffer any "glitch" and the results from the polling units in those elections were not quarantined prior to being uploaded to the electronic collation system and the IReV.

92. I know that as of the 20th day of March 2023 the 1st Respondent was yet to fully upload the polling units results for the Presidential election from the polling units to its electronic collation system and IReV portal.

93. The 1st Respondent wrongly quarantined the Election results from the polling units to enable interference with the results contrary to the repeated representations made by the officials of the 1st Respondent that the results would be transmitted directly and realtime to the 1st Respondent's electronic collation system and IReV portal.

94. The failure of the BVAS to transmit the results and accreditation data from the polling units directly and in realtime to the 1st Respondent's electronic collation system and IReV portal made it impossible for the Petitioners to challenge timeously, at the earliest opportunity, notably during the collation of the results at various collation levels, the irregularities in the Election such as, incidents of over-voting.

95. I know as a fact that as of 1st March 2023, when the 1st Respondent wrongly returned the 2nd Respondent as the winner of the Election, less than 50% of the results from the polling units had been transmitted and uploaded to the 1st Respondent's electronic collation system/storage device, created/acquired by the 1st Respondent itself for the purpose of electronically collating the results of the Election.

96. In the subsequent Governorship and States Houses of Assembly elections, held on 18th March 2023, the 1st Respondent allowed the BVAS to function properly transmitting polling units results and accreditation data directly and in real-time.

97. The 1st Respondent's refusal to transmit the results of the polling units in the Presidential Election led to the judgment in Suit No. FHC/ABJ/CS/334/2023 wherein the Federal High Court ordered the 1st Respondent to ensure transmission of the results in accordance with the Electoral Act 2022 and the Clause 38 of the Guidelines which mandates the presiding officers of all polling units to electronically transmit results direct to the collation system and use the BVAS to upload the scanned copies of the Forms EC8As to the IReV immediately upon completion of the polling units voting and result procedures.

98. That I know that the Court in the above case held that the 1st Respondent has a legal duty to act in accordance with the law.

CERTIFIED TRUE COPY

99. I know that the 1st Respondent had by its Regulations and Guidelines, made pursuant to the Electoral Act, provided for the mandatory use of the **BVAS** and the electronic collation system for the said Election.

100. To make an undue return in favour of the 2nd and 3rd Respondents, the 1st Respondent wrongfully bypassed all the checkpoints for election integrity introduced by the new Electoral Act 2022 which include several technological devices and multiple checkpoints at the Polling Unit, Ward, Local Government, Area Councils, State, and Federal collation centres, as the case may be, including the requirement to "transmit directly" the polling units accreditation data and election results from the BVAS machines to the electronic collation system and the IReV portal.

101. The bypass of the use of the BVAS machines in the transmission of any real or unreal polling units results of the Election fundamentally and substantially affected the integrity of the results announced by the 1st Respondent for the 2nd and 3rd Respondents and thoroughly discredited the process of the Election.

## (2). **CONSTITUTIONAL GEOGRAPHICAL SPREAD:**

102. The 1st Respondent failed to comply with the provisions of Section 66 of the Electoral Act which incorporated section 134 of the Constitution of the Federal Republic of Nigeria 1999 (as amended) (the "Constitution" or "1999 Constitution") in wrongfully, unlawfully, illegally and un-constitutionally returning the 1st Respondent as winner of the Election.

103. That by virtue of my experience as a Federal Lawmaker and the provision of Section 134(2) of the Constitution, in a Presidential Election with more than two candidates, for a candidate to be deemed to be the winner of the election, he must:-

   (a). have the highest number of votes cast at the election;

   (b). have not less than one quarter of the votes cast at the election in at least two thirds of all the States in the Federation: and

   (c). have not less than one quarter of the votes cast at the election in the Federal Capital Territory, Abuja.

104. The 2nd Respondent who contested on the platform of the 3rd Respondent, did not secure one–quarter of the votes cast in the said Presidential Election in the Federal Capital Territory, Abuja.

105. That out of the total votes of 478,652 cast in the Federal Capital Territory, Abuja the 2nd Respondent was ascribed only 90,902 (18.99%) of those votes.



CERTIFIED TRUE COPY

106. That to be declared duly elected, a candidate, in addition to obtaining not less than a quarter (25%) of the votes cast in at least two-thirds of all the States, **must** also receive at least one-quarter (25%) of the votes cast in the Federal Capital Territory, Abuja, this being an additional requirement introduced by the Constitution of the Federal Republic of Nigeria 1999 (as amended), the said Constitution having clearly distinguished the Federal Capital Territory, Abuja as a separate entity by specific and express mention.

107. That I know as a fact that all previous winners of the Nigerian presidential elections from 1999 secured at least 25% of the votes cast for the Federal Capital Territory.

108. That for any candidate to be declared winner of the presidential election in which more than two candidates are contesting, such a candidate **must have the highest number of votes cast at the election, and he must have not less than one-quarter of the votes cast at the election in each of at least two-thirds of all the States in the Federation and at least one quarter (25%) of the votes cast in the Federal Capital Territory, Abuja.**

109. The 2nd Respondent having not scored 25% of the votes cast in the Federal Capital Territory, Abuja ought not to have been declared winner of the Election by the 1st Respondent.

110. I know that the word **"AND"** in Section 134 of the said Constitution before Federal Capital Territory, Abuja is a word of addition, as is the clear intendment of the provision and the intention of the framers of the Constitution.

111. That for a presidential candidate to be deemed duly elected, he must meet the 25% constitutional requirement in at least 24 States of the Federation and the same 25% constitutional requirement in respect of the Federal Capital Territory, Abuja.

### Particulars:

(a). The total number of votes cast in the Election in the Federal Capital Territory, Abuja as declared by the 1st Respondent was 478, 652.

(b). The 2nd Respondent as declared by the 1st Respondent, purportedly secured 90,902 votes, amounting to 18.99% percentage of the votes cast in the Election in the Federal Capital Territory, Abuja.

(c). One quarter (25%) of the total votes cast in the Federal Capital Territory, Abuja is 119,663 votes.



112. The 2nd Respondent failed to score at least one-quarter (25%) of the votes cast in the Federal Capital Territory, Abuja as mandatorily required by the Constitution of the Federal Republic of Nigeria (as amended).

113. The 1st Respondent ought not have declared the 2nd Respondent as the winner of the Election.

114. That I also know as a fact that the return of the 2nd Respondent as duly elected to the office of the President given the margin of lead and the Permanent Voters Cards (PVCs) collected is undue and wrongful.

115. The votes ascribed to the 2nd Respondent by the 1st Respondent in the final declaration made is **8, 794, 726** while the votes credited to the Petitioners is **6, 984, 520** resulting in a margin of lead of **1, 810, 206** votes.

116. I know that the Permanent Voters Cards (PVCs) collected in the polling units where elections were cancelled across the Country in the election is over and above **1, 810, 206** which is the margin of lead between the 1st Petitioner and the 2nd Respondent, and in consequence, the return of the 2nd Respondent was hasty, premature and wrongful.

## GROUND TWO: THE ELECTION OF THE 2ND RESPONDENT IS INVALID BY REASON OF CORRUPT PRACTICES:

117. The Election conducted by the 1st Respondent is invalid by reason of corrupt practices.

118. The collation of election results in all the States of the Federation, was manipulated by the 1st Respondent through the deliberate suppression and discounting of the lawful votes of the Petitioners while inflating the scores of the 2nd and 3rd Respondents.

119. The particulars of corrupt practices before and during the disputed election include but not limited to the following, viz, Compromised Printing/Production of electoral materials, manipulation of election material delivery, and compromised printing/production of election materials.

120. The 1st Respondent manipulated and deliberately "managed" the votes emanating from the polling units in that the 1st Respondent through its officials, suppressed votes of the Petitioners and wrongly credited the 2nd Respondent and 3rd Respondents with the said votes.

121. The Election is invalid on account of corrupt practices. The particulars of corrupt practices before and during the disputed election include but are not limited to the following:

(a). Suppression of votes

(b). Manipulation of the ballots and ballot boxes

- 79 -

    (c).    Manipulation of BVAS machines

    (d).    Manipulation of accreditation and collation

    (e).    Manipulation of Election Material Delivery

    (f).    Manipulation of Election Material Reverse logistics

    (g).    Intimidation and harassment of voters

    (h).    Massive Thumb-printing of Ballot Papers

    (i).    Destruction of electoral materials

    (j).    Hijack of electoral materials

    (k).    Mutilations, cancellations and overwritings on result sheets.

    (l).    Inflation, Deflation of Scores, and Wrong Entries in Result Sheets.

122. There was massive suppression of votes of the Petitioners by the 1st Respondent in several States, which will be shown in the Report of the Statisticians relied upon by the Petitioners.

123. In Sokoto State, the 1st Respondent cancelled results from 241 polling units but went ahead to declare results for the Presidential Election while declaring the National Assembly elections in the same Sokoto State that were conducted simultaneously with the Presidential Election, as inconclusive. The cancellation which affected 301,499 registered voters in 471 polling units occurred in the following LGAs, as shown below:

    (a).    Gudu - Results were cancelled in 3 polling units affecting 1,685 registered voters.

    (b).    Gwandu - Results were cancelled in 4 polling units affecting 3,020 registered voters.

    (c).    Ilela - Results were cancelled in 2 polling units affecting 3,904 registered voters.

    (d).    Kware - Results were cancelled in 21 polling units affecting 10,939 registered voters.

    (e).    Kebbe - Results were cancelled in 15 polling units affecting 8,475 registered voters.

    (f).    Rabah - Results were cancelled in 52 polling units affecting 26,362 registered voters.

    (g).    Shagari - Results were cancelled in 18 polling units affecting 9,854 registered voters.



(h). Silame - Results were cancelled in 18 polling units affecting 23,442 registered voters.

(i). Sokoto North - Results were cancelled in 42 polling units affecting 31,566 registered voters.

(j). Sokoto South - Results were cancelled in 50 polling units affecting 39,693 registered voters.

(k). Wurno- Results were cancelled in 8 polling units affecting 4,862 registered voters.

(l). Binji - Results were cancelled in 15 polling units affecting 2,042 registered voters.

(m). Tangaza - Results were cancelled in 8 polling units affecting 10,033 registered voters.

(n). Danje Shuni - Results were cancelled in 47 polling units affecting 26,966 registered voters.

(o). Bodinga - Results were cancelled in 14 polling units affecting 7,010 registered voters.

(p). Tureta - Results were cancelled in 20 polling units, affecting 3,050 registered voters.

(q). Yabo - Results were cancelled in 8 polling units, affecting 5,567 registered voters.

(r). Wamakko - Results were cancelled in 27 polling units, affecting 16,642 registered voters.

(s). Ngada - Results were cancelled in 6 polling units, affecting 3,633 registered voters.

(t). Goronye - Results were cancelled in 40 polling units affecting 22,123 registered voters.

(u). Isa - Results were cancelled in 1 polling unit affecting 935 registered voters.

(v). Sabon Birni - Results were cancelled in 16 polling units affecting 8,427 registered voters.

(w). Tambuwal – Results were cancelled in 51 polling units affecting 31,268 registered voters.

The details of the affected polling units are set out in the Statistician's report.

CERTIFIED TRUE COPY

124. In Kano State, the 1st respondent's officials, at the conclusion of the Election, failed to properly fill in the polling unit booklets containing Forms EC25B – which is the electoral materials/reverse logistics, which is the mode of cross-checking the deployment and accounting, at the end of the Election, the electoral materials that had been used in each polling unit by the officials of the 1st Respondent.

125. The 1st Respondent through its officials also failed to properly fill the Form EC40A, which is the ballot paper accounting and verification statements, nor did they properly fill the Form EC40B, which is the statement of rejected and spoilt ballot papers, and the Form EC40G which is the summary of polling units where elections were cancelled or did not hold.

126. These failures occurred in Kano State in the polling units in the following Local Government Areas of the State, namely:- Ajingi; Albasu; Bagwai; Bebeji; Bichi; Bunkure; Dala; Dambatta; Dawakin Kudu; Dawakin Tofa; Doguwa; Fagge; Gabasawa; Garko; Garum Mallam; Gaya; Gezawa; Gwale; Gwarzo; Kabo; Kano Municipal ; Karaye; Kibiya; Kiru; Kumbotso; Kunchi; Kura; Madobi; Makoda; Minjibir; Nasarawa; Rano; Rimin Gado; Rogo; Shanono; Sumaila; Takai; Tarauni; Tofa; Tsanyawa; Tudun Wada; Ungogo; Warawa and Wudil.

127. These infractions enabled the results of the polling units in those LGAs to be manipulated through and by the inflation of the 2nd Respondent's votes and depletion of the Petitioners' votes.

128. That in Kogi State, specifically in Adavi Local Government Areas were disrupted by agents of the 2nd and 3rd Respondents with the result that the votes scored were not accurately recorded as ballot papers were torn by the said agents of the 2nd and 3rd Respondents.

129. That to avoid the holding of the elections, the 2nd and 3rd Respondents' agents acting with the full knowledge and authority of the 2nd and 3rd Respondents cut off access roads into Okehi Local Government Area to stop the holding of the Election in those Local Governments by ensuring that election materials could not be supplied to the affected Local Governments.

130. The Election was thus disrupted in Okehi Local Government Area.

131. In Okehi Local Government Area, election was disrupted in 10 (ten) polling units and there were no results from these polling units.

132. In Adavi Local Government Area, the election was disrupted by the agents of the 2nd and 3rd Respondents who led their supporters round the whole Local Government, to hijack and destroy election materials including already thumbprinted ballot papers.

133. In Okenne Local Government Area, elections were disrupted by agents of the 2nd and 3rd Respondents who snatched ballot boxes and BVAS machines

CERTIFIED TRUE COPY

and took them to locations where they were wrongly used to generate false results in favour of the 2nd and 3rd respondents.

134. During these malpractices, *ad hoc* staff of the 1st respondent were abducted.

135. The scrutiny of Form EC8A generated by the persons who disrupted the Election will show that the said results are not products of a properly conducted election. The results will also show over-voting when compared with the data in the backend electronic storage device.

136. That in Kogi State, the 1st Respondent's officials, at the close of the election, failed to properly fill in the polling unit booklets containing forms EC25B – which is the electoral materials/reverse logistics, which is the mode of cross-checking the deployment and accounting at the end of the Election, the electoral materials that had been used in each polling unit by the officials of the 1st Respondent.

137. The 1st Respondent through its officials also failed to properly fill the Form EC40A, which is the ballot paper accounting and verification statements, nor did they properly fill the Form EC40B, which is the statement of rejected and spoilt ballot papers, and the Form EC40G which is the summary of polling units where elections were cancelled or did not hold.

138. These infractions occurred in the polling units in the following Local Government Areas of Kogi State, namely:- Adavi, Ajaokuta, Ankpa, Bassa, Dekina, Ibaji, Idah, Igalamela-Odolu, Ijumu, Kabba/Bunu, Koton Karfe, Lokoja, Mopa-Muro, Ofu, Ogori/Magongo, Okehi, Okene, Olamaboro, Omala, Yagba East and Yagba West.

139. These failures enabled the results of the polling units in the said LGAs to be manipulated through and by the inflation of the 2nd Respondent's votes and the depletion of the Petitioners' votes.

140. The 1st Respondent wrongfully entered incorrect results for the Petitioners in Borno State.

141. The 1st Respondent wrongfully made various unlawful entries and inscriptions not being record of lawful votes cast at the polling units which votes are liable to be voided.

142. In respect of Borno State, there was a deliberate by-pass of the use of the BVAS machines, notwithstanding the representations of the 1st Respondent's agents based on the provisions of the Electoral Act and the INEC Manual and Guidelines.


CERTIFIED TRUE COPY

## GROUND THREE: NOT DULY ELECTED BY MAJORITY OF LAWFUL VOTES CAST:

143. I know that the 2nd Respondent was not duly elected by majority of the lawful votes cast at the Election.

144. I also know as follows:-

(a) the result of the Election as announced by the 1st Respondent and especially the votes allocated to the 2nd Respondent do not represent the lawful valid votes cast at the Election; and

(b) the lawful votes cast at the Election were deliberately and massively deducted from the 1st Petitioner's scores by the 1st Respondent in order to return the 2nd Respondent.

145. The Election results as purportedly declared by the 1st Respondent in respect of each State of the Federation, including the Federal Capital Territory, the details of which are contained in the Table following, are wrong:

| STATE | CODE | REGISTERED VOTERS | ACCREDITED VOTERS (INEC) | ABUBAKAR ATIKU (INEC) | BOLA AHMED TINUBU (INEC) |
|-------|------|-------------------|--------------------------|------------------------|--------------------------|
| ABIA | 01 | 2,120,808 | 384,468 | 22,676 | 8,914 |
| ADAMAWA | 02 | 2,196,566 | 764,834 | 417,611 | 182,881 |
| AKWA IBOM | 03 | 2,357,418 | 594,450 | 214,012 | 160,620 |
| ANAMBRA | 04 | 2,656,437 | 628,590 | 9,036 | 5,111 |
| BAUCHI | 05 | 2,749,268 | 899,769 | 426,607 | 316,694 |
| BAYELSA | 06 | 1,056,862 | 177,368 | 68,818 | 42,572 |
| BENUE | 07 | 2,777,727 | 804,189 | 130,081 | 310,468 |
| BORNO | 08 | 2,513,281 | 499,543 | 190,921 | 252,282 |
| CROSS RIVER | 09 | 1,766,466 | 444,880 | 95,425 | 130,520 |
| DELTA | 10 | 3,221,697 | 667,149 | 161,500 | 90,183 |
| EBONYI | 11 | 1,597,646 | 337,887 | 13,503 | 42,402 |
| EDO | 12 | 2,501,081 | 603,894 | 89,585 | 144,471 |
| EKITI | 13 | 987,647 | 315,058 | 84,554 | 201,494 |
| ENUGU | 14 | 2,112,793 | 482,990 | 15,794 | 4,772 |
| GOMBE | 15 | 1, 575, 794 | 542,997 | 319,123 | 146,977 |
| IMO | 16 | 2, 419, 992 | 485,150 | 30,234 | 66,406 |
| JIGAWA | 17 | 2, 351, 298 | 961,670 | 386,587 | 421,390 |
| KADUNA | 18 | 4, 335, 208 | 1,418, 046 | 554,360 | 399,293 |
| KANO | 19 | 5, 921, 370 | 1,769, 525 | 131,716 | 506,412 |
| KATSINA | 20 | 3, 516, 719 | 1,097, 663 | 489,045 | 482,283 |
| KEBBI | 21 | 2, 032, 041 | 599, 201 | 288,175 | 248,088 |

- 84 -

CERTIFIED TRUE COPY

| | | | | | |
|---|---|---|---|---|---|
| KOGI | 22 | 1, 932, 654 | 484, 884 | 145,104 | 240,751 |
| KWARA | 23 | 1, 695, 927 | 497, 519 | 136,909 | 263,572 |
| LAGOS | 24 | 7, 060, 195 | 1,347,152 | 75,750 | 572,606 |
| NASARAWA | 25 | 1,899,244 | 562,464 | 47,093 | 192,922 |
| NIGER | 26 | 2,689,344 | 827,416 | 384,898 | 375,183 |
| OGUN | 27 | 2,688,305 | 612,341 | 123,831 | 341,554 |
| ONDO | 28 | 1,991,344 | 571,402 | 115,463 | 369,924 |
| OSUN | 29 | 1,954,800 | 759,362 | 354,366 | 343,945 |
| OYO | 30 | 2,276,675 | 854,439 | 82,977 | 449,884 |
| PLATEAU | 31 | 2,789,528 | 1,139,393 | 246,808 | 307,195 |
| RIVERS | 32 | 3,537,190 | 605,055 | 88,468 | 231,591 |
| SOKOTO | 33 | 2,172,056 | 619,492 | 288,679 | 285,444 |
| TARABA | 34 | 2,022,374 | 521,442 | 189,017 | 135,165 |
| YOBE | 35 | 1,485,146 | 398,874 | 98,567 | 151,459 |
| ZAMFARA | 36 | 1,926,870 | 327,137 | 193,970 | 298,396 |
| FCT | 37 | 1,570,307 | 478,923 | 74,194 | 90,902 |
| **TOTAL** | | **93,469,008** | **25,286,616** | **6,984,520** | **8,794,726** |

146. The 2nd Respondent did not score one-quarter (25%) of the lawful votes cast at the Election in each of at least two-thirds of all the States in the Federation **and** the Federal Capital Territory, Abuja as required by the Constitution.

147. The 1st Respondent is mandated by law to be guided by the provisions of Section 134(2)(b) of the Constitution and Section 66 of the Electoral Act 2022 and the extant Regulations, Guidelines and Manual for Election in making any return or declaration as to who the winner of the Election is.

148. I know that by the provisions of Section 134(2)(b) of the Constitution and Section 66 of the Electoral Act 2022, a return and declaration can only be made in favour of the 2nd Respondent where and if the 2nd Respondent scored 25% of the total votes in the Federal Capital Territory, Abuja.

149. The 2nd Respondent did not score 25% of the total votes cast in the Federal Capital Territory, Abuja before the 1st Respondent wrongly returned the 2nd Respondent as the winner of the Election and arrogantly dared the Petitioners to go to Court, notwithstanding the protests by the Petitioners and other stakeholders.

150. The purported scores of the respective parties as declared by the 1st Respondent for the Federal Capital Territory, Abuja, are as set out below:



| No. | POLITICAL PARTIES | SCORE | PERCENTAGE |
|---|---|---|---|
| 1. | A | 490 | 0.102% |
| 2. | AA | 506 | 0.105% |
| 3. | AAC | 215 | 0.044% |
| 4. | ADC | 768 | 0.160% |
| 5. | ADP | 583 | 0.121% |
| 6. | **APC** | **90,902** | **18.991%** |
| 7. | APGA | 1,362 | 0.284% |
| 8. | APM | 297 | 0.062% |
| 9. | APP | 146 | 0.030% |
| 10. | BP | 748 | 0.156% |
| 11. | LP | 281,717 | 58.856% |
| 12. | NNPP | 4,517 | 0.943% |
| 13. | NRM | 294 | 0.061% |
| 14. | PDP | 74,194 | 15.500% |
| 15. | PRP | 131 | 0.027% |
| 16. | SDP | 233 | 0.048% |
| 17. | YPP | 335 | 0.069% |
| 18. | ZLP | 2,631 | 0.549% |

151. The 2nd Respondent scored only **18.99%** of the votes cast in the FCT which falls short of the **25%** required to enable the 1st Respondent validly to declare him as duly elected.

152. The declaration of the 2nd Respondent by the 1st Respondent as duly elected is unconstitutional, null, void and of no legal effect.

CERTIFIED TRUE COPY

153. The purported results from **19,702 Polling Units** across 36 States and Federal Capital Territory contain various forms of infractions.

154. The total of **4,307 polling units** are without stamp on the respective Form EC8A therefrom. Details of the States and number of polling units in each State affected are as shown in the Statisticians Report.

155. The results from **1,300 polling units** do not have signatures of the Presiding Officers on the respective Forms EC8A. Details of the States and polling units affected are as shown in the Statisticians Report.

156. That the 1st Respondent and/or its agents ought not to have made a return or declare the 2nd Respondent as the winner of the election as the margin of lead between the 2nd Respondent and the 1st Petitioner is less than number of the PVCs collected in the polling units where elections did not take place or where elections was cancelled.

157. Given the number of those who collected their Permanent Voters' Cards (PVCs) in polling units where elections did not take place or where elections were cancelled, (the details of which are set out in the Statisticians Report), the return of the 2nd Respondent as the winner of the Election in the circumstance was hasty and undue.

158. The return of the 2nd Respondent by the 1st Respondent as the winner of the Election in the above circumstances is unlawful and wrongful as the said return was made in violation of the provisions of the Electoral Act 2022 and the Constitution of the Federal Republic of Nigeria, 1999 (as amended).

159. That as part of the irregularities which were prevalent in the conduct of the Election, the Presiding Officers failed to properly fill and countersign alterations in election forms including forms EC8A, EC8B, EC8C and EC8D in over 40,000 polling units shown in the Statisticians Report relied upon by the Petitioners.

160. The mandatory requirements of the Electoral Act, INEC Regulations and INEC Manual that stipulate for the recording of the quantity, serial numbers and other particulars of result sheets, ballot papers and other sensitive electoral materials to be used in conducting the Election were not complied with before and after the Election as the 1st Respondent and its officers failed to effect the required entries.

161. Upon a proper collation and summation, the correct and proper scores of the candidates are as contained in the Statisticians Report.

162. All over Nigeria there were manifest cases of over-voting. The total of the affected polling units in the various States are set out in the Statisticians Report.



163. In respect of manual collation of results, the 1st Respondent's officials and agents did not authenticate the collation with the data from the electronic collation system to correctly collate votes from the polling units in all the afore mentioned States.

164. The 3rd Respondent's agents disrupted election and compelled 1st Respondent's officials to change results in polling units in many States, particularly Kogi, Lagos, Rivers and Kano.

165. In Kogi State, in Olamaboro LGA: RA2 PU003, PU005, PU006, PU007, PU009 - Five polling units with total votes of 3,892 were affected. When it was discovered that the 2nd Petitioner had the majority votes at those polling units, the LG Council Chairman (APC) Hon. Friday Adejoh came with thugs at gunpoint and forced the Electoral Officials to declare the concluded election cancelled at the risk of their lives, and thereafter destroyed all the electoral materials and carted them away.

166. In Ofu LGA, thugs of the 3rd Respondent came to the Electoral Officers in RA5 PU005, 006, 009, 010, 011, 014 and 027 totaling 5,574 votes; In RA04 PU 008 total 510 votes In RA07 PU 007, 010 total 2,016 votes In the 10 polling units affected involving 7,590 votes, the thugs destroyed all electoral materials at gunpoint forcing them to declare a cancellation when PDP was already coasting to victory.

167. In Omalla LGA, a similar trend with gun wielding thugs from the APC stormed RA8 - Icheke ward PU 015, PU 016, 004, 005 and RA01 - Abejukolo PU 007, 009, 014, PU 018, 019, 023 and PU 024. There were similar situations in RA2, RA4, RA9 and RA10. Total votes affected is 9,758 and this is home to the former Governor of Kogi State, Alhaji Ibrahim Iris another PDP stronghold.

168. In Okehi LGA, home to PDP Senatorial Candidate Natasha Akpoti, another PDP stronghold, a total of 22 PU in 4 RAs totaling 11,452 votes were affected due to intimidation, harassment and threat to life of INEC officials. They are: RA 6 PU 002, PU 004, PU 008, PU 012 total 2,364 votes RA 10 PU 001, 002 totaling 1,450 votes. RA 11 PU 003, 004, 007, 009, 010 and 012 totaling 2,904 votes RA 5 PU 001, 002, 003, 004, 005, 006, 007, 010 and 015 totaling 4,734 votes.

169. In Ajaokuta LGA heavily armed thugs of the 3rd Respondent scared INEC Electoral Officials from conducting election in 19 Pi's in Geregu RA 14 affecting 28,981registered voters were disenfranchised from voting. But unfortunately, Governor Yahaya Bello personally went to prevent the election from holding but election results eventually surfaced from there at the collection center on Monday, 27 Feb. 2023.

170. In Lagos State, the 1st Respondent's officials, did not at the end of the Election, properly fill in the polling unit booklets containing forms EC25B –

CERTIFIED TRUE COPY

which is the electoral materials/reverse logistics, which is the mode of cross-checking the deployment and accounting at the end of the election, the electoral materials that had been used in each polling unit by the officials of the 1st Respondent.

171. The 1st Respondent through its officials also failed to properly fill the Form EC40A, which is the ballot paper accounting and verification statements, nor did they properly fill the Form EC40B, which is the statement of rejected and spoilt ballot papers, and the Form EC40G which is the summary of polling units where elections were cancelled or did not hold.

172. These infractions occurred in the polling units in the following Local Government Areas of Lagos State, namely:- Lagos Island, Lagos Mainland, Surulere, Apapa and Eti-Osa, as well as eight Local Council Development Areas which include: Lagos Island East, Yaba, Itire-Ikate, Coker-Aguda, Ikoyi-Obalende, Apapa-Iganmu, Eti-Osa East and Iru/Victoria Island.

173. These failures enabled the results of the polling units in the said LGAs to be manipulated through and by inflation of the 2nd Respondent's votes and the depletion of the Petitioners' votes.

174. In Rivers State, the votes returned from Obio-Akpor and Port Harcourt Local Government Areas ("LGA") did not reflect the actual votes scored in the said LGAs for the Election in consequence whereof those votes are liable to be voided. The figures on the IReV do not tally with the figures declared by the 1st Respondent.

175. In the 20 Local Government Areas in Lagos State, the 2nd and the 3rd Respondents through their agents and on their full instructions, unleashed mayhem and violence in a manner never seen in the history of elections in the State.

176. The total inputted votes in Lagos State are 1,335,729 for all the political parties that took part in the elections. Out of this figure, the 2nd and 3rd Respondents were credited with 572,606 purported votes, while Labour Party (one of the political parties that took part in the elections) was credited with 582,454 purported votes.

177. In respect of Rivers State which comprises 23 Local Government Areas, elections were disrupted and marred by unprecedented violence and intimidation unleashed by the 2nd and 3rd Respondents through their agents and officials in each of those local government areas.

178. Notwithstanding the violence and widespread intimidation of voters, the 1st Respondent returned a total of 553,944 votes for all the political parties out of which the 2nd and 3rd Respondents were credited with 231,591 purported votes and Labour Party (which participated in the election) was credited with 175,071 purported votes.



179. In Rivers State, the 1st Respondent's officials, did not at the end of the Election, properly fill in the polling unit booklets containing forms EC25B – which is the electoral materials/reverse logistics, which is the mode of cross-checking the deployment and accounting at the end of the election, the electoral materials that had been used in each polling unit by the officials of the 1st Respondent.

180. The 1st Respondent through its officials also failed to properly fill the Form EC40A, which is the ballot paper accounting and verification statements, nor did they properly fill the Form EC40B, which is the statement of rejected and spoilt ballot papers, and the Form EC40G which is the summary of polling units where elections were cancelled or did not hold.

181. These infractions occurred in the polling units in the following Local Government Areas of Rivers State, namely:- Abua/Odual, Ahoada West, Akuku Toru, Andoni, Asari Toru, Bonny, Degema, Eleme, Emohua, Etche, Gokana, Ikwerre, Oyigbo, Khana, Obio/Akpor, Ogba Egbema/Ndoni, Ogu/Bolo, Okrika, Omumma, Opobo/Nkoro, Port Harcourt and Tai.

182. These failures enabled the results of the polling units in the said LGAs to be manipulated by inflation of the 2nd Respondent's votes and depletion of the Petitioners' votes. The 1st Respondent is hereby put on notice to produce at the hearing of this Petition, the polling unit booklets containing the said Forms for the polling units in the LGAs.

183. The Petitioners state that the votes that were returned in the State for all the political parties exceeded the number of voters accredited in the State for the Election through the BVAS machines.

184. That in the 44 Local Government Areas that make up Kano State, the 2nd and 3rd Respondents through their agents who, had been provided with machetes, unleashed violence on voters, disrupting the voting process which led to the destruction of electoral materials.

185. The total votes credited to the parties is 1,401,376. Whereas the 2nd and 3rd Respondents were credited with 506,412 purported votes, New Nigerian Peoples Party (NNPP), one of the parties that took part in the Elections was credited with 977,279 purported votes, while Labour Party was credited with 28,513 purported votes. The Petitioners state that all these votes are liable to be voided.

186. The 1st Respondent and its agents wrongly and deliberately entered wrong scores/results in the under-listed 17 (Seventeen) States, namely:

  (a). Abia

  (b). Anambra

  (c). Delta



(d). Ebonyi

(e). Edo

(f). Enugu

(g). Imo

(h). Jigawa

(i). Kano

(j). Kogi

(k). Lagos

(l). Nasarawa

(m). Niger

(n). Ogun

(o). Ondo

(p). Plateau

(q). Rivers

187. There were discrepancies on very large scales at the various levels of recording and collation of results, particularly between the polling units and the Ward Collation Centres.

188. The figures/scores awarded the 2nd Respondent were not the product of valid votes actually cast but were mere allocation by the 1st Respondent, and the summation of the result declared is inconsistent with and cannot be reconciled with the number of duly accredited voters.

## DOCUMENTS TO BE RELIED UPON IN THIS PETITION:

189. That I know that the Petitioners shall at the hearing of this Petition, rely on all necessary and relevant documents, including the following, namely:

1. BVAS CTC Reports

2. IRV CTC Reports

3. Statisticians Reports

4. Forensic Experts Reports

5. All INEC Certified Result Sheets and Electoral Materials



6. (Form EC8 Series), EC8A, EC8B, EC8C, EC8D, EC8D(A) and EC8E - Certificate of Return received by Petitioners' agents at the Election

7. PDP Party Membership Cards, as necessary

8. INEC Voters' Cards, as necessary

9. Witnesses' party membership cards, as necessary

10. Witnesses' Voters Cards, as necessary

11. All Forms EC1A(1)

12. All Forms EC17

13. All Forms EC25A

14. All Forms EC25A(1)

15. All Forms EC25B

16. All Forms EC25B(1)

17. All Forms EC25D

18. Forms EC25G Series used in the conduct of the Election

19. All Forms EC40s, EC40G(1), EC40G(2), EC40G(3), EC40J, EC40A

20. All Forms EC40H/EC40H(1)-(5)

21. All the Forms EC40B, that is, all the Spoilt and Rejected Ballot Paper Forms used in all the polling units spanning all the Local Governments of all the States of Nigeria and the FCT Abuja

22. All the Form EC40C, that is, all the statement of unused Ballot Paper Form used in all the Local Governments of all the States of Nigeria and the FCT Abuja

23. All the Form EC40J, that is, all the Statement of Unused Ballot Paper Forms used in all the Local Governments of all the States of Nigeria.

24. All the Envelopes EC50B, that is, all the Envelopes for Register of Voters used in all the polling units of all the Local Governments of the States of Nigeria and the FCT Abuja

25. All the Envelopes of EC5OC, that is, all the Envelopes of for unused Ballot Papers used in all the Local Governments of the States of Nigeria and the FCT Abuja

26. Actual ballot papers used and thumb-printed and counted as valid in all the polling units of the Local Governments of all the States of Nigeria and the FCT Abuja


CERTIFIED TRUE COPY

27. Actual ballot papers recorded as spoilt in the results in all the polling units of the Local Governments of all the States of Nigeria and the FCT Abuja

28. Actual ballot papers recorded as unused in the results of all the polling units of the Local Governments of all the States of Nigeria and the FCT Abuja

29. Certified true copy of all the voters' registers in all the polling units spanning all the Local Governments of all the States of Nigeria and the FCT Abuja

30. Certified true copy of extant INEC list of polling units and voters as at 25th day of February, 2023 in all the polling units spanning all the Local Governments of all the States of Nigeria and the FCT Abuja

31. Certified true copies of the printout of record of accreditation as captured by BVAS machines used for the conduct of the Election in all the polling units spanning all the Local Governments of all the States of Nigeria and the FCT Abuja

32. A certified true copy of a list of all INEC officers and ad hoc staff used for the Election in all the polling units spanning all the Local Governments of all the States of Nigeria and the FCT Abuja

33. Extant Guidelines and Regulations for the Conduct of the Election

34. Circulars/corrigenda/Manuals issued by INEC for the conduct of the Presidential Election held on 23 February 2019

35. Polling Unit Materials Checklist

36. Summary of total registered voters on units' basis

37. Summary of PVCs collected on units' basis

38. Voters' Registers

39. Letters of complaints over irregularities and malpractices during the election addressed to the INEC/Police/other relevant agencies/institutions

40. Security reports relating to the Election

41. Video/Audio recordings/DVD/CD relating to the Election

42. Election Observers' or Observers' Reports

43. 2nd Respondent's INEC FORM CF001 for Lagos State 1999 Governorship Election

44. Lagos State House of Assembly Report of the Ad-Hoc Committee set up on Tuesday, September 21, 1999, to investigate the allegations of



Perjury and Forgery levelled against the Executive Governor of Lagos State

45. 2nd Respondent's Affidavit in respect of lost certificate dated 29th of December, 1998

46. 2nd Respondent's INEC FORM EC9 for the 2023 Presidential election

47. Newspaper/Television/ Radio reports and news

48. Appointment Letters and tags of PDP agents

49. Expert reports and analysis

50. Photographs and GSM and other phone outputs

51. Computer-generated and cyberspace evidence

52. Forensic and other reports by experts and non-experts

53. Receipts issued by INEC for certification of its documents

54. Identity cards of witnesses

55. Data and logs from INEC Electronic Storage Devices including but not limited to its Electronic Collation System and the AWS servers.

56. Data and Event logs from all BVAS machines used in the Election

57. PVC collection records

58. Petition Written by the Petitioners' Kogi State Collation Officer dated 27th February 2023.

59. Certified True Copy of Judgment in Suit No: FHC/ABJ/CS/334/2023.

60. Any other document(s) relevant to the Petition.

190. That I know as a fact that the electronic evidence in this Petition were downloaded and printed from the computers/printers linked to the internet, and the Petitioners aver that the computers and printers were, at the time of producing the electronic evidence, being used regularly to store and/or process information; that throughout that period, there was supplied to the computer in the ordinary course of those activities information of the kind contained in the electronic evidence hereto attached; that throughout the material part of that period, the computer and printer were operating properly; and that the information contained in the attached documents was derived from information supplied to the computer and the printer in the ordinary course of those activities.



191. I want this Honourable Court to grant the following reliefs against the Respondents jointly and severally as contained in the Petition:

    (a). That it may be determined that the 2nd Respondent was not duly elected by a majority of lawful votes cast in the Election and therefore the declaration and return of the 2nd Respondent by the 1st Respondent as the winner of the Presidential Election conducted on the 25th day of February 2023 is unlawful, undue, null, void and of no effect.

    (b). That it may be determined that the return of the 2nd Respondent by the 1st Respondent was wrongful, unlawful, undue, null and void having not satisfied the requirements of the Electoral Act 2022 and the Constitution of the Federal Republic of Nigeria 1999 (as amended) which mandatorily requires the 2nd Respondent to score one-quarter of the lawful votes cast at the Election in each of at least two-thirds of all the States in the Federation **AND** the Federal Capital Territory, Abuja.

    (c). That it may be determined that the 1st Petitioner having scored the majority of lawful votes at the Presidential election of Saturday, 25th February 2023, be returned as the winner of the said election and be sworn in as the duly elected President of the Federal Republic of Nigeria.

## IN THE ALTERNATIVE:

    (d). An Order directing the 1st Respondent to conduct a second election (run-off) between the 1st Petitioner and the 2nd Respondent.

## IN THE FURTHER ALTERNATIVE:

    (e). That the election of the 2nd Respondent to the office of the President of Nigeria held on 25th February 2023 be nullified and a fresh election (re-run) ordered.

192. That it is in the interest of justice to grant the prayers sought by the Petitioners.

CERTIFIED TRUE COPY

193. That I swear to this Affidavit conscientiously believing the contents to be true and correct to the best of my knowledge, and in accordance with the Oaths Act 2004.

HY

**DEPONENT**

Sworn to at The Court of Appeal Registry, Abuja.

This 21st day of March 2023.

**BEFORE ME**

SECRETARY
PRESIDENTIAL ELECTION
PETITION COURT
2023

**COMMISSIONER FOR OATHS**



CERTIFIED TRUE COPY

# IN THE COURT OF APPEAL
## (IN THE PRESIDENTIAL ELECTION PETITION COURT)
## HOLDEN AT ABUJA

## IN THE MATTER OF THE ELECTION TO THE OFFICE OF THE PRESIDENT OF THE FEDERAL REPUBLIC OF NIGERIA HELD ON 25TH FEBRUARY 2023

**PETITION No: PEPC/A/　/2023**

BETWEEN:

**1. ABUBAKAR ATIKU**
**2. PEOPLES DEMOCRATIC PARTY (PDP)** ⎤ **PETITIONERS**

**AND**

**1. INDEPENDENT NATIONAL ELECTORAL**
　　**COMMISSION (INEC)**
**2. TINUBU BOLA AHMED** ⎱ **RESPONDENTS**
**3. ALL PROGRESSIVES CONGRESS (APC)** ⎦

### WITNESS STATEMENT ON OATH OF DM

I, **DM**, Nigerian Citizen, Adult and Male of the Peoples Democratic Party Headquarters, Wadata Plaza, Wuse Zone 5, Abuja, do hereby make oath and state as follows:

1.　I am a member of the Peoples Democratic Party, the 2nd Petitioner.

2.　I acted as one of the National Collation Agent for the Petitioners at the Presidential election held on 25th February 2023.

3.　By virtue of my position, I am very conversant with the facts deposed to herein, being facts known personally by me or related to me by my subordinates in the course of carrying out my assignment.

4.　That my responsibilities as one of the National Collation Agent of the Petitioners included receiving all electoral results and reports from my subordinates, as well as scrutinizing and analysing electoral results and documents used in the election.

5.　All the facts deposed herein are with the consent of the Petitioners and derived from my personal knowledge and where otherwise, I have stated the source of my information and belief.

6.　I know that the 1st Petitioner, ABUBAKAR ATIKU, was a candidate at the election to the office of the President of the Federal Republic of Nigeria,

- 97 -



which election held on Saturday, 25th February 2023 across the Federation of Nigeria.

7. I know that the 1st Petitioner, who had a right to vote and be voted for in the Election, was sponsored by the 2nd Petitioner and contested for the Election.

8. I know that the 1st Petitioner has a right to be returned as duly elected at the Election.

9. The 2nd Petitioner, Peoples Democratic Party (PDP) is a duly registered political party in Nigeria and participated in the Election by sponsoring the 1st Petitioner as its Presidential candidate.

10. The 2nd Petitioner is a corporate body, and for the Election, acted through and by means of its agents, State Coordinators and officials, who were reporting amongst themselves.

11. I know for the purposes of the Election, the Petitioners had agents in all the Polling Units, Ward Collation Centres, Local Government Areas, and the State Collation Centres, in all the States of the Federation and the Federal Capital Territory as well as the National Collation Centre.

12. I know that the Petitioners have the right to present this Petition, having participated in the Election.

13. The 1st Respondent is the body constitutionally and statutorily vested with the responsibility of organising and conducting elections in Nigeria, and was the body that conducted the Election, the subject matter of this Petition.

14. I know that all, each and every person who acted as Presiding Officers, Assistant Presiding Officers, Supervisory Presiding Officers, *ad-hoc* Staff in all the polling units/stations/points, Ward Collation Officers in all the Ward Collation Centres, Local Government Collation Officers in all the Local Government Area Collation Centres, all the State Collation Officers in all the State Collation Centres, the State Resident Electoral Commissioners, FCT Resident Electoral Commissioner, the Chief Returning Officer, and any other person(s) who acted in any capacity on behalf of the 1st Respondent at the Election, including Information Communication Technology (ICT) Technical Election Officials, acted as agents of the 1st Respondent.

15. The 2nd Respondent was a candidate in the Election and sponsored by the 3rd Respondent.

16. The 3rd Respondent is a registered political party in Nigeria and is the political party that sponsored the 2nd Respondent as its candidate at the Election.

- 98 -



17.  The Petitioners and the Respondents hereinabove specified are the parties interested in this Petition.

## (A). HOLDING OF THE ELECTION, SCORES OF CANDIDATES, PERSON RETURNED

18.  I know that the Election took place on **Saturday, 25th February 2023**.

19.  Four (4) days after the Election, specifically on Wednesday, **1st March 2023**, the 1st Respondent announced the following as the purported scores of the candidates for the Election, namely: -

| S/No. | CANDIDATE | PARTY | SCORES |
|---|---|---|---|
| 1. | IMUMOLEN IRENE CHRISTOPHER | A | 61,014 |
| 2. | AL MUSTAPHA HAMZA | AA | 14,542 |
| 3. | SOWORE OMOYELE STEPHEN | AAC | 14,608 |
| 4. | KACHIKWU DUMEBI | ADC | 81,919 |
| 5. | SANI YABAGI YUSUF | ADP | 43,924 |
| 6. | **TINUBU BOLA AHMED** | **APC** | **8,794, 726** |
| 7. | UMEADI PETER NNANNA CHUKWUDI | APGA | 61,966 |
| 8. | OJEI PRINCESS CHICHI | APM | 25,961 |
| 9. | NNAMDI CHARLES OSITA | APP | 12,839 |
| 10. | ADENUGA SUNDAY OLUWAFEMI | BP | 16,156 |
| 11. | OBI PETER GREGORY | LP | 6,101, 533 |
| 12. | MUSA MOHAMMED RABIU KWANKWASO | NNPP | 1,496, 687 |
| 13. | OSAKWE FELIX JOHNSON | NRM | 24,869 |
| 14. | **ABUBAKAR ATIKU** | **PDP** | **6,984, 520** |
| 15. | ABIOLA LATIFU KOLAWOLE | PRP | 72,144 |
| 16. | ADEBAYO ADEWOLE EBENEZER | SDP | 80,267 |
| 17. | ADO-IBRAHIM ABDULMALIK | YPP | 60,600 |
| 18. | NWANYANWU DANIEL DABERECHUKWU | ZLP | 77,665 |

20.  The 1st Respondent wrongly returned the 2nd Respondent as the winner of the Election, allocating to him **8, 794, 726** votes while ascribing to the 1st Petitioner **6, 984, 520** votes.

CERTIFIED TRUE COPY

21.  The 1st Respondent also declared the following as its summary of the purported results:

| A. | TOTAL NUMBER OF REGISTERED VOTERS | 93,469,008 |
|----|-----------------------------------|-----------|
| B. | TOTAL NUMBER OF ACCREDITED VOTERS | 25,286,616 |
| C. | TOTAL NUMBER OF VALID VOTES | 24,025,940 |
| D. | TOTAL NUMBER OF REJECTED VOTES | 939,278 |
| E. | TOTAL NUMBER OF VOTES CAST | 24,965,218 |
| F. | PERCENTAGE TURN OUT | 27.05% |

22.  I know that the Petitioners shall rely on **Form EC8D(A)** (being the summary of final collation of results) and **Form EC8E** (being the final declaration of result) issued by the 1st Respondent, not only to show the purported scores as recorded by the 1st Respondent, but also to show the invalidity of the scores as recorded therein.

23.  I know that on the face of the Form EC8D(A), there are calculation errors as shown and contained in the Report of the Statisticians which the Petitioners shall rely upon.

24.  I also know that Petitioners shall rely on the Reports and evidence by their Experts, including Statisticians, Forensic Examiners and other Experts pursuant to the Orders for Inspection, Examination and Production of election materials granted to the Petitioners by this Honourable Court.

## (B). GROUNDS OF THE PETITION:

25.  I know that the grounds upon which the Petitioners presented this Petition are as follows:

(a).  The election of the 2nd Respondent is invalid by reason of non-compliance with the provisions of the Electoral Act, 2022.

(b).  The election of the 2nd Respondent is invalid by reason of corrupt practices.

(c).  The 2nd Respondent was not duly elected by majority of lawful votes cast at the Election.

CERTIFIED TRUE COPY

**(c)** **FACTS OF THE PETITION:**

**GROUND ONE: THE ELECTION OF THE 2ND RESPONDENT IS INVALID BY REASON OF NON-COMPLIANCE WITH THE PROVISIONS OF THE ELECTORAL ACT, 2022.**

**(1). FAILURE BY THE 1ST RESPONDENT TO ELECTRONICALLY TRANSMIT ELECTION RESULTS:**

26.   The Election was not conducted in accordance with the provisions of the Electoral Act 2022, and other extant laws and the non-compliance substantially affected the result of the Election, in that the 2nd Respondent ought not to have been declared or returned as the winner of the Election.

27.   The Election was not conducted in compliance with the provisions of Sections 47(2) & (3), 60(1), (2) & (5), 64(4)(a) & (b), 64(5), (6), (7) & (8), 71 and 73 of the Electoral Act, Paragraphs 3.3.0 and 3.4.0 of the 1st Respondent's published Manual for Election Officials 2023 ("INEC Manual" or "Manual"), and Paragraphs 19, 35, 38, 40, 41, 42, 43, 47, 48, 50, and 62 of the 1st Respondent's published Regulations and Guidelines for the Conduct of Elections 2022.

28.   Several months and weeks leading to the Election, the 1st Respondent through its Chairman Mahmood Yakubu, had repeatedly assured the general public that the February 2023 general election would be the best election ever, with the guaranteed use of the Bi-Modal Voters' Accreditation System ("BVAS") and real-time and direct uploading of the polling unit results to INEC's electronic collation system and Results Viewing Portal ("IReV") which were technological innovations in the electoral system that would ensure the transparency of the elections and foolproof the elections against all forms of manipulation.

29.   The 1st Respondent's Chairman and its other principal officers including Mr. Festus Okoye, the National Commissioner for Information and Voters Enlightenment, at various times and fora, gave serial undertakings, representations and assurances that the results from the polling units shall be transmitted real time via the BVAS to the electronic collation system and the IReV for public viewing and that such transmission shall be the basis for collation at the various collation levels up to the national collation and return at the Election.

30.   Contrary to the undertakings, representations and assurances made by the 1st Respondent, the 1st Respondent proceeded on the 1st day of March 2023 to wrongly return the 2nd Respondent as the winner of the Election when the outcome (herein being challenged) and the results from the polling units including the total number of accredited voters in the respective polling units were yet to be transmitted to the 1st Respondent's Electronic Collation System and the 1st Respondent's Result Viewing Portal (IReV) as

CERTIFIED TRUE COPY

stipulated by the Electoral Act, 2022 and the INEC Guidelines and Manuals and expressly guaranteed to the electorate by the 1st Respondent.

31. The 1st Respondent had received generous funding from the Federal Government of Nigeria, having informed the public that the 2023 election cost the country the sum of N355 billion.

32. The 1st Respondent had submitted a budget of N305 billion, out of which a whopping sum of N117 billion was earmarked for the procurement of electronic accreditation and transmission devices, including the Bi-Modal Voters' Accreditation System (BVAS) a new voter enrolment and voter accreditation device designed to combine the functions of the Direct Data Capture Machine, the Z-Pad, the Smart Card Reader and the portal, IReV a world-wide web portal designed for real time viewing of election results uploaded from polling units.

33. The 1st Respondent and its Chairman irrevocably committed the 1st Respondent to the deployment and use of the BVAS technology in both accreditation and transmission of the accreditation data and election results from the polling units to the electronic collation system and IRev Portal. Meanwhile, the 1st Respondent had touted the BVAS machine as the election "game changer".

34. The 1st Respondent had prescribed through its various Regulations, Guidelines and Manual, the manner of accreditation, collation and transmission vide its technological device, the BVAS, pursuant to the Electoral Act.

35. I know that the mandatory requirements of the 1st Respondent in relation to electronic accreditation, collation, and transmission are as set out below:

(1). Accreditation of voters shall be by way of Bimodal Voter Accreditation System (BVAS).

(2). To electronically transmit or transfer the results and the accreditation data from polling units direct to the electronic collation system as prescribed by the 1st Respondent.

(3). Uploading of results shall be with the BVAS to the 1st Respondent's results Viewing Portal (IReV) directly and in realtime, as prescribed by the 1st Respondent.

(4). Collation and authentication of the results and accreditation data from the polling units at the various collation levels up to the national collation centre shall be with the aid of the Results Verification System.


CERTIFIED TRUE COPY

36. The result of the Election as announced by the 1st Respondent and especially the votes wrongly allocated to the 2nd Respondent do not represent the lawful valid votes cast.

37. Lawful votes were deliberately and massively deducted from the 1st Petitioner's scores by the 1st Respondent to facilitate the return of the 2nd Respondent.

38. The 1st Respondent failed to comply with its own Guidelines and representations to transmit results and accredit data <u>directly</u> and real-time to the IReV and its electronic collation system/storage device before the hasty return and announcement of the 2nd Respondent as the winner of the Election on the 1st day of March 2023.

39. By the combined provisions of the Electoral Act, the INEC Regulations and Guidelines and the INEC Manual, the votes collated at the polling units are to be electronically transmitted with the Bimodal Voter Accreditation System (BVAS) directly and real-time to the INEC electronic collation system and IReV portal.

40. To underscore the relevance of real-time electronic transmission of the results and accreditation data from the polling units to the IReV Portal and the INEC electronic collation system, the 1st Respondent itself stated thus in its Manual for Election Officials 2023 (paragraph 2.9.0):

> ***"Electronic Transmission/Upload of Election Result and Publishing to The INEC Result Viewing (IReV) Portal:***
>
> ***"One of the problems noticed in the electoral process is the irregularities that take place between the Polling Units (PUs) after the announcement of results and the point of result collation. Sometimes results are hijacked, exchanged, or even destroyed at the PU, or on the way to the Collation Centers. It becomes necessary to apply technology to transmit the data from the Polling Units such that the results are collated up to the point of result declaration.***
>
> ***"The real-time publishing of polling unit-level results on IReV Portal and transmission of results using the BVAS demonstrates INEC's commitment to transparency in results management. This commitment is backed by Sections 47(2), 60(1, 2 & 5), 64(4a & 4b) and 64(5) of the Electoral Act 2022, which confers INEC with the power to transmit election results electronically. The system minimizes human errors and delays in results collation and improves the accuracy,***

- 103 -

CERTIFIED TRUE COPY

**transparency, and credibility of the results collation process."**

41.  I know that in furtherance of the commitment to real-time electronic transmission of the polling units results to the electronic collation system and the IReV portal, the 1st Respondent in its Regulations and Guidelines for the Conduct of Elections, 2022 (paragraph 38), provided thus:-

> **"On completion of all the Polling Unit voting and results procedures, the Presiding Officer shall:**
>
> **(i). Electronically transmit or transfer the result of the Polling Unit, direct to the collation system as prescribed by the Commission.**
>
> **(ii). Use the BVAS to upload a scanned copy of the EC8A to the INEC Result Viewing Portal (IReV), as prescribed by the Commission."**

42.  I know that it is mandatory for the Presiding Officer appointed by the 1st Respondent to use technological device (in this case, the BVAS device) for the accreditation of voters at the polling unit.

43.  In compliance with the foregoing, the 1st Respondent in paragraph 18(a) of its Regulations and Guidelines, applicable to the conduct of the election, prescribed that a person intending to vote shall be verified to be the same person on the Register of Voters by the use of the Bimodal Voter Accreditation System (BVAS).

44.  It is the same BVAS device deployed by the 1st Respondent for accreditation of voters at the polling units during the conduct of the said Election, that was to be used by the 1st Respondent to electronically transmit from the polling units, the result of the election at the polling units together with the accreditation data including the total number of accredited voters in the respective polling units.

45.  I also that it is mandatory for any Collation Officer or the Returning Officer at the various collation levels for any election to collate and announce the result of an election, subject to his or her verification and confirmation that the (a). number of accredited voters stated on the collated result are correct and consistent with the number of accredited voters recorded and transmitted directly from the polling units; and (b). the voters stated on the collated result are correct and consistent with the votes recorded and transmitted directly from polling units.

46.  The 1st Respondent in acknowledgment of the foregoing provisions of Section 64(4) of the Electoral Act, provided in paragraph 48(a) of its aforesaid election to the effect that an election result shall only be collated if the Collation Officer ascertains that the number of accredited voters

CERTIFIED TRUE COPY

tallies with the number recorded in the BVAS and that the votes scored by the political parties on the result sheet are correct and agree with the result that was electronically transmitted or transferred directly from the polling unit.

47. By Section 64(5) of the Electoral Act, a collation officer or returning officer shall use the "data of accreditation" (which includes the number of accredited voters) "recorded and transmitted directly from each polling unit" and "the votes and results of the election recorded and transmitted directly from each polling unit" to collate and announce the result of an election if a collated result at his or a lower level of collation is disputed or correct to be incorrect.

48. That in paragraph 48(b) of its aforesaid Guidelines and Regulations, the 1st Respondent provided in similar vein, that if a Collation or Returning Officer determines that a result from a lower level of collation is not correct, he/she shall use the result that was electronically transmitted or transferred directly from that lower level to collate and announce the result.

49. I also know that further, Sections 64(6), (7) and (8) of the Electoral Act 2022, it is mandatory that disputes as to the result of the election being collated, can only be resolved by the Collation Officer or Returning Officer by reference to the polling unit results and the accreditation data (which includes the number of accredited voters) electronically transmitted from the polling units.

50. Notwithstanding the foregoing, the uploading and transmission to the electronic collation system and the IReV portal by the 1st Respondent of the results of the Senate and House of Representatives took place seamlessly while that of the Presidential Election did not.

51. Contrary to the original design of the BVAS machine to upload data directly to the electronic collation system and the IReV portal, the 1st Respondent contrived and installed an intervening third-party device (Device Management System) which, in its ordinary usage, is meant to secure and administer the 1st Respondent's technological ecosystem for the elections but as it relates to the Presidential Election, was used to intercept the results, quarantine and warehouse same, and filter them before releasing same to the IReV Portal.

52. The 1st Respondent used the said Device Management System to manipulate the Election results in favour of the 2nd and 3rd Respondents

53. I know that the critical components of the 1st Respondent's Information and Communications Technology (ICT), includes to the Bimodal Voter Accreditation System (BVAS) which is an Android Device manufactured by Emperor Technologies China and supplied to the 1st Respondent by Activate Nigeria Limited.

- 105 -

CERTIFIED TRUE COPY

54. The Voter Accreditation System (VAS) which is the software that is used on the BVAS was previously designed and configured in-house and installed on the BVAS by the ICT Team of the 1st Respondent headed by Mr. Chidi Nwafor.

55. The BVAS was subsequently handed over to Emperor Technology China prior to the Presidential Election and they then reconfigured and installed a software on the BVAS before supplying the devices to the 1st Respondent through Activate Nigeria Limited.

56. That I know as it relates to the IReV, the INEC Result Viewing Portal (IReV) is a web-based data entry and aggregation portal designed also by Chidi Nwafor's team and is hosted on Amazon Web Service (AWS). The server system for the device and the portal are hosted on Amazon Web Service (AWS) URL:dashboard.ivasportal.com/dash.

57. That some months proximate to the Elections, the 1st Respondent caused to be transferred its in-house ICT expert, Chidi Nwafor, from its ICT Department to the 1st Respondent's office in Enugu as an "Administrative Secretary", and brought in an IT Consultant, Mr. Suleiman Farouk, who introduced a third-party mechanism that was installed and made to intermediate between the BVAS and the IRev Portal, known as Device Management System (DMS).

58. The DMS is a software that allows INEC's IT Security Consultant, Mr. Suleiman Farouk, to remotely control, monitor and filter data that is transmitted from the BVAS devices to the electronic collation system and the IRev platform. Meanwhile, the 1st Respondent engaged an appointee of the 2nd Respondent to man and oversee the sensitive ICT Department of the 1st Respondent for the purpose of the Election.

59. The 1st Respondent, having set the parameters, did not ensure compliance with the electronic transmission of accreditation data and results in this Election to create opportunity for manipulation of figures to the advantage of the 2nd and 3rd Respondents.

60. There were no technical "glitches" that prevented the upload and transmission of the polling units results and the accreditation data of the Presidential Election to the electronic collation system and the IReV portal but what happened was the non-adherence to the system through a command and control element activated by a pre-programmed design to limit user-privileges of the front-end users of the BVAS machines at the polling units with respect to Presidential Election results while releasing user privileges in respect of the National Assembly election windows, by selectively withholding correct passwords and/or issuing wrong passwords through the use of the Device Management System equipment aforesaid.

CERTIFIED TRUE COPY

61.    The 1st Respondent had admitted its failure to electronically transmit the polling units results of the Election and the total number of accredited voters in the respective polling units to the electronic collation system and the IReV platform but surprisingly attributed same to "glitches".

62.    There was no failure of "server", as the "server" was cloud-based and virtual and was hosted on and by Amazon Web Service (AWS) the "server" being cloud-based, does not suffer any disruption on the event of any unlikely challenge, Amazon Web Service would have seamlessly switched to another server without hitch, being autoscaling groups with multiple network reception and offline upload options.

63.    The technology system deployed by the 1st Respondent underwent Quality Assurance Tests ("QAT") before acquisition and deployment. The so-called "glitch" was a bypass to tilt and switch the results of the Presidential Election in favour of the 2nd and 3rd Respondents.

64.    I know that as of 1st March 2023, when the 1st Respondent returned the 2nd Respondent as the winner of the Election, the entire results and accreditation data from the polling units had not been transmitted and uploaded to the 1st Respondent's electronic collation system/storage device, created/acquired by the 1st Respondent itself for the purpose of electronically collating the results of the Election.

65.    I also know that more than 18 days after the Election, and as of the date of filing this Petition, the 1st Respondent's IReV Portal showed that the 1st Respondent had failed to upload the entire accreditation data and polling units results of the Presidential Election.

66.    I also know that the figures/scores awarded the 2nd Respondent were not the product of valid votes actually cast but were mere allocation by the 1st Respondent, and the summation of the result declared is inconsistent with and cannot be reconciled with the number of duly accredited voters.

67.    I know that Section 47(3) of the Electoral Act makes it mandatory for the 1st Respondent to cancel and reschedule an election in any polling unit where the BVAS or other technological device deployed for accreditation of voters fails to function, but notwithstanding, the 1st Respondent concluded the said Election, purported to collate the result of the Election and declared the 2nd Respondent wrongly as the winner of the said election without the prescribed electronic transmission of the results of the Election at and from the various polling units and the accreditation data from the respective polling units (including the number of accredited voters in the said polling units), to the INEC Electronic Collation System and to the INEC Result Viewing Portal (IReV).

68.    The 1st Respondent's inability to utilize the technological device (BVAS) deployed by the 1st Respondent for the electronic transmission of the

- 107 -

CERTIFIED TRUE COPY

polling units results of the Election along with the accreditation data, amounts to a programmed failure of the said technological device to function which failure is attributable to the Respondents.

69. The 1st Respondent in the face of the obvious failure of the BVAS to function at the respective polling units, ought to have cancelled the election and reschedule same to take place within 24 hours as required by Section 47(3) of the Electoral Act.

70. That by reason of the non-electronic transmission of the polling units results of the election and accreditation data from the respective polling units at the time of the collation of the results of the Election, all the Collation Officers at the various levels of collation of the results including the 1st Respondent's Chairman who as the Returning Officer for the said Presidential Election conducted the final collation of the results of the Election, failed to carry out the mandatory verification and confirmation that was incumbent on them pursuant to the provisions of Section 64(4) of the Electoral Act.

71. I know that by reason of the foregoing, there could not have been any valid and lawful collation and announcement of the result of the Election under the Electoral Act, without the prior electronic transmission from the polling units to the INEC Electronic Collation System and IReV portal using the BVAS, of the results of the election at the respective polling units together with the accreditation data therefrom which includes the total number of accredited voters in the polling units.

72. The collation of the purported Election result and announcement of same without the prior electronic transmission of the results of the Election at and from the respective polling units, and the incorrect manual collation of the results without the use of and authentication with the electronic collation system at the various collation levels up to the national collation center, are invalid, unlawful, and null and void.

73. The 1st Respondent is in clear breach of the provisions of the law under Sections 60 and 64(4) and (5) of the Electoral Act by failing to use the BVAS to transmit the Election results at the polling units and the accreditation data therefrom to the electronic collation system and the IRev Portal.

74. Despite the failure to so transmit and several complaints for review, the 1st Respondent's Chairman refused all entreaties and applications for the suspension of the collation exercise and a review of the complaints before declaring a winner of the Election and repeatedly off-handedly dared the Petitioners to go to Court.

75. Contrary to the provisions of the 1st Respondent's Regulations and Manual which stipulate the transmission of both accreditation data and the polling

CERTIFIED TRUE COPY

units results from the BVAS directly and realtime to the electronic collation system and the IReV portal, the 1st Respondent introduced a device manager called Collation Support and Results Verification System (CSRVS), with which the real results from the polling units were quarantined prior to transmission to the IReV portal, leaving room for the 1st Respondent to upload wrong results.

76. The entire Presidential Election conducted on the 25th day of February, 2023 together with the collation of the results of the said Election and the announcement and declaration and return of the 2nd Respondent as the winner of the said Election are unlawful, illegal, wrongful, null and void by reason of the failure of the 1st Respondent to comply with the aforesaid conditions precedent for the conduct of valid election.

77. By a Press Release issued by the 1st Respondent dated the 11th day of November, 2022, INEC as a public institution stated thus:

> **"Our attention has been drawn to reports in a section of the media of alleged plans by the Commission to rig the 2023 General Election by abandoning the direct and real-time electronic upload of Polling Unit results to the INEC Result Viewing (IReV) Portal by the Registration Area Technical Support Staff (RATECHSS). The claim is patently false. The Commission has repeatedly reassured Nigerians that it will transmit results directly from the Polling Unit as we witnessed in Ekiti and Osun. ...The public is advised to ignore the reports. The Bimodal Voter Accreditation System (BVAS) and IReV have come to stay for voter accreditation and uploading of Polling Unit results in real-time in Nigeria."**

78. The Election failed the integrity test stipulated by the Electoral Act and does not reflect the will of the electorate.

79. The Election has been rated nationally and internationally as the worst election in the history of Nigeria given the failure by the 1st Respondent, *inter alia*, to transmit and upload in realtime and directly to the 1st Respondent's electronic collation system and IReV portal the scores of the parties from the polling units before the announcement of final results by the 1st Respondent on Wednesday, 1st day of March 2023.

80. Before the Election, the 1st Respondent had previously conducted four governorship elections successfully, in Anambra, Ekiti, Edo and Osun States and Area Council election in the FCT, Abuja.



81. In the four States the 1st Respondent uploaded results directly and realtime from the polling units to the IReV.

82. In the FCT Area Council election the 1st Respondent uploaded the results within an hour of the close of election.

83. In Osun State, by midnight of the day of the governorship election the 1st Respondent had uploaded all the results from the polling units to the IReV.

84. In all these instances, the 1st Respondent deployed the BVAS for the accreditation of the voters and transmission of the results.

85. In the Presidential Election of 25th February 2023, the 1st Respondent failed to transmit the results and accreditation data directly and realtime from the polling units to the electronic collation system and the IReV portal.

86. Twelve hours after the conclusion of the Election at the respective polling units, there was no uploading whatsoever of the results and accreditation data therefrom by the 1st Respondent from the BVAS to the electronic collation system and the IReV.

87. The 1st Respondent belatedly claimed that there was a "glitch" that made the BVAS to fail to transmit results of the Presidential Election from the polling units to its electronic collation system and IReV portal.

88. The Petitioners state that the National Assembly election and the Presidential election were conducted simultaneously on 25th February 2023 at the same locations using the same BVAS machines for both accreditation of voters and transmission of the respective polling unit results of both elections.

89. That while the polling units results of the National Assembly were transmitted directly and realtime to the IReV from the BVAS, the purported results of the Presidential Election were not transmitted directly and realtime to the electronic collation system and the IReV portal.

90. The 1st Respondent did not commence the transmission of the polling units results directly for the Presidential election until the results were withheld by the 1st Respondent for hours on end.

91. That unlike the instant Election, the off-cycle elections that were conducted by the 1st Respondent in Anambra, Ekiti, Edo, and Osun States and the Area Council election in the FCT, Abuja, did not suffer any "glitch" and the results from the polling units in those elections were not quarantined prior to being uploaded to the electronic collation system and the IReV.

92. I know that as of the 20th day of March 2023 the 1st Respondent was yet to fully upload the polling units results for the Presidential election from the polling units to its electronic collation system and IReV portal.



93. The 1st Respondent wrongly quarantined the Election results from the polling units to enable interference with the results contrary to the repeated representations made by the officials of the 1st Respondent that the results would be transmitted directly and realtime to the 1st Respondent's electronic collation system and IReV portal.

94. The failure of the BVAS to transmit the results and accreditation data from the polling units directly and in realtime to the 1st Respondent's electronic collation system and IReV portal made it impossible for the Petitioners to challenge timeously, at the earliest opportunity, notably during the collation of the results at various collation levels, the irregularities in the Election such as, incidents of over-voting.

95. I know as a fact that as of 1st March 2023, when the 1st Respondent wrongly returned the 2nd Respondent as the winner of the Election, less than 50% of the results from the polling units had been transmitted and uploaded to the 1st Respondent's electronic collation system/storage device, created/acquired by the 1st Respondent itself for the purpose of electronically collating the results of the Election.

96. In the subsequent Governorship and States Houses of Assembly elections, held on 18th March 2023, the 1st Respondent allowed the BVAS to function properly transmitting polling units results and accreditation data directly and in real-time.

97. The 1st Respondent's refusal to transmit the results of the polling units in the Presidential Election led to the judgment in Suit No. FHC/ABJ/CS/334/2023 wherein the Federal High Court ordered the 1st Respondent to ensure transmission of the results in accordance with the Electoral Act 2022 and the Clause 38 of the Guidelines which mandates the presiding officers of all polling units to electronically transmit results direct to the collation system and use the BVAS to upload the scanned copies of the Forms EC8As to the IReV immediately upon completion of the polling units voting and result procedures.

98. That I know that the Court in the above case held that the 1st Respondent has a legal duty to act in accordance with the law.

99. I know that the 1st Respondent had by its Regulations and Guidelines, made pursuant to the Electoral Act, provided for the mandatory use of the **BVAS** and the electronic collation system for the said Election.

100. To make an undue return in favour of the 2nd and 3rd Respondents, the 1st Respondent wrongfully bypassed all the checkpoints for election integrity introduced by the new Electoral Act 2022 which include several technological devices and multiple checkpoints at the Polling Unit, Ward, Local Government, Area Councils, State, and Federal collation centres, as the case may be, including the requirement to "transmit directly" the polling

- 111 -

CERTIFIED TRUE COPY

units accreditation data and election results from the BVAS machines to the electronic collation system and the IReV portal.

101. The bypass of the use of the BVAS machines in the transmission of any real or unreal polling units results of the Election fundamentally and substantially affected the integrity of the results announced by the 1st Respondent for the 2nd and 3rd Respondents and thoroughly discredited the process of the Election.

## (3). CONSTITUTIONAL GEOGRAPHICAL SPREAD:

102. The 1st Respondent failed to comply with the provisions of Section 66 of the Electoral Act which incorporated section 134 of the Constitution of the Federal Republic of Nigeria 1999 (as amended) (the "Constitution" or "1999 Constitution") in wrongfully, unlawfully, illegally and un-constitutionally returning the 1st Respondent as winner of the Election.

103. That by virtue of my experience as a Federal Lawmaker and the provision of Section 134(2) of the Constitution, in a Presidential Election with more than two candidates, for a candidate to be deemed to be the winner of the election, he must:-

(a). have the highest number of votes cast at the election;

(b). have not less than one quarter of the votes cast at the election in at least two thirds of all the States in the Federation: and

(c). have not less than one quarter of the votes cast at the election in the Federal Capital Territory, Abuja.

104. The 2nd Respondent who contested on the platform of the 3rd Respondent, did not secure one–quarter of the votes cast in the said Presidential Election in the Federal Capital Territory, Abuja.

105. That out of the total votes of 478,652 cast in the Federal Capital Territory, Abuja the 2nd Respondent was ascribed only 90,902 (18.99%) of those votes.

106. That to be declared duly elected, a candidate, in addition to obtaining not less than a quarter (25%) of the votes cast in at least two-thirds of all the States, **must** also receive at least one-quarter (25%) of the votes cast in the Federal Capital Territory, Abuja, this being an additional requirement introduced by the Constitution of the Federal Republic of Nigeria 1999 (as amended), the said Constitution having clearly distinguished the Federal Capital Territory, Abuja as a separate entity by specific and express mention.



107. That I know as a fact that all previous winners of the Nigerian presidential elections from 1999 secured at least 25% of the votes cast for the Federal Capital Territory.

108. That for any candidate to be declared winner of the presidential election in which more than two candidates are contesting, such a candidate **must have the highest number of votes cast at the election, and he must have not less than one-quarter of the votes cast at the election in each of at least two-thirds of all the States in the Federation and at least one quarter (25%) of the votes cast in the Federal Capital Territory, Abuja.**

109. The 2nd Respondent having not scored 25% of the votes cast in the Federal Capital Territory, Abuja ought not to have been declared winner of the Election by the 1st Respondent.

110. I know that the word **"AND"** in Section 134 of the said Constitution before Federal Capital Territory, Abuja is a word of addition, as is the clear intendment of the provision and the intention of the framers of the Constitution.

111. That for a presidential candidate to be deemed duly elected, he must meet the 25% constitutional requirement in at least 24 States of the Federation and the same 25% constitutional requirement in respect of the Federal Capital Territory, Abuja.

## Particulars:

(a). The total number of votes cast in the Election in the Federal Capital Territory, Abuja as declared by the 1st Respondent was 478, 652.

(b). The 2nd Respondent as declared by the 1st Respondent, purportedly secured 90,902 votes, amounting to 18.99% percentage of the votes cast in the Election in the Federal Capital Territory, Abuja.

(c). One quarter (25%) of the total votes cast in the Federal Capital Territory, Abuja is 119,663 votes.

112. The 2nd Respondent failed to score at least one-quarter (25%) of the votes cast in the Federal Capital Territory, Abuja as mandatorily required by the Constitution of the Federal Republic of Nigeria (as amended).

113. The 1st Respondent ought not have declared the 2nd Respondent as the winner of the Election.

114. That I also know as a fact that the return of the 2nd Respondent as duly elected to the office of the President given the margin of lead and the Permanent Voters Cards (PVCs) collected is undue and wrongful.



115. The votes ascribed to the 2nd Respondent by the 1st Respondent in the final declaration made is **8, 794, 726** while the votes credited to the Petitioners is **6, 984, 520** resulting in a margin of lead of **1, 810, 206** votes.

116. I know that the Permanent Voters Cards (PVCs) collected in the polling units where elections were cancelled across the Country in the election is over and above **1, 810, 206** which is the margin of lead between the 1st Petitioner and the 2nd Respondent, and in consequence, the return of the 2nd Respondent was hasty, premature and wrongful.

## GROUND TWO: THE ELECTION OF THE 2ND RESPONDENT IS INVALID BY REASON OF CORRUPT PRACTICES:

117. The Election conducted by the 1st Respondent is invalid by reason of corrupt practices.

118. The collation of election results in all the States of the Federation, was manipulated by the 1st Respondent through the deliberate suppression and discounting of the lawful votes of the Petitioners while inflating the scores of the 2nd and 3rd Respondents.

119. The particulars of corrupt practices before and during the disputed election include but not limited to the following, viz, Compromised Printing/Production of electoral materials, manipulation of election material delivery, and compromised printing/production of election materials.

120. The 1st Respondent manipulated and deliberately "managed" the votes emanating from the polling units in that the 1st Respondent through its officials, suppressed votes of the Petitioners and wrongly credited the 2nd Respondent and 3rd Respondents with the said votes.

121. The Election is invalid on account of corrupt practices. The particulars of corrupt practices before and during the disputed election include but are not limited to the following:

(a). Suppression of votes

(b). Manipulation of the ballots and ballot boxes

(c). Manipulation of BVAS machines

(d). Manipulation of accreditation and collation

(e). Manipulation of Election Material Delivery

(f). Manipulation of Election Material Reverse logistics

(g). Intimidation and harassment of voters

(h). Massive Thumb-printing of Ballot Papers



(i).    Destruction of electoral materials

(j).    Hijack of electoral materials

(k).    Mutilations, cancellations and overwritings on result sheets.

(l).    Inflation, Deflation of Scores, and Wrong Entries in Result Sheets.

122. There was massive suppression of votes of the Petitioners by the 1st Respondent in several States, which will be shown in the Report of the Statisticians relied upon by the Petitioners.

123. In Sokoto State, the 1st Respondent cancelled results from 241 polling units but went ahead to declare results for the Presidential Election while declaring the National Assembly elections in the same Sokoto State that were conducted simultaneously with the Presidential Election, as inconclusive. The cancellation which affected 301,499 registered voters in 471 polling units occurred in the following LGAs, as shown below:

(a).    Gudu - Results were cancelled in 3 polling units affecting 1,685 registered voters.

(b).    Gwandu - Results were cancelled in 4 polling units affecting 3,020 registered voters.

(c).    Ilela - Results were cancelled in 2 polling units affecting 3,904 registered voters.

(d).    Kware - Results were cancelled in 21 polling units affecting 10,939 registered voters.

(e).    Kebbe - Results were cancelled in 15 polling units affecting 8,475 registered voters.

(f).    Rabah - Results were cancelled in 52 polling units affecting 26,362 registered voters.

(g).    Shagari - Results were cancelled in 18 polling units affecting 9,854 registered voters.

(h).    Silame - Results were cancelled in 18 polling units affecting 23,442 registered voters.

(i).    Sokoto North - Results were cancelled in 42 polling units affecting 31,566 registered voters.

(j).    Sokoto South - Results were cancelled in 50 polling units affecting 39,693 registered voters.

(k).    Wurno- Results were cancelled in 8 polling units affecting 4,862 registered voters.

CERTIFIED TRUE COPY

(l). Binji - Results were cancelled in 15 polling units affecting 2,042 registered voters.

(m). Tangaza - Results were cancelled in 8 polling units affecting 10,033 registered voters.

(n). Danje Shuni - Results were cancelled in 47 polling units affecting 26,966 registered voters.

(o). Bodinga - Results were cancelled in 14 polling units affecting 7,010 registered voters.

(p). Tureta - Results were cancelled in 20 polling units, affecting 3,050 registered voters.

(q). Yabo - Results were cancelled in 8 polling units, affecting 5,567 registered voters.

(r). Wamakko - Results were cancelled in 27 polling units, affecting 16,642 registered voters.

(s). Ngada - Results were cancelled in 6 polling units, affecting 3,633 registered voters.

(t). Goronye - Results were cancelled in 40 polling units affecting 22,123 registered voters.

(u). Isa - Results were cancelled in 1 polling unit affecting 935 registered voters.

(v). Sabon Birni - Results were cancelled in 16 polling units affecting 8,427 registered voters.

(w). Tambuwal – Results were cancelled in 51 polling units affecting 31,268 registered voters.


The details of the affected polling units are set out in the Statistician's report.


124. In Kano State, the 1st respondent's officials, at the conclusion of the Election, failed to properly fill in the polling unit booklets containing Forms EC25B – which is the electoral materials/reverse logistics, which is the mode of cross-checking the deployment and accounting, at the end of the Election, the electoral materials that had been used in each polling unit by the officials of the 1st Respondent.

125. The 1st Respondent through its officials also failed to properly fill the Form EC40A, which is the ballot paper accounting and verification statements,



nor did they properly fill the Form EC40B, which is the statement of rejected and spoilt ballot papers, and the Form EC40G which is the summary of polling units where elections were cancelled or did not hold.

126. These failures occurred in Kano State in the polling units in the following Local Government Areas of the State, namely:- Ajingi; Albasu; Bagwai; Bebeji; Bichi; Bunkure; Dala; Dambatta; Dawakin Kudu; Dawakin Tofa; Doguwa; Fagge; Gabasawa; Garko; Garum Mallam; Gaya; Gezawa; Gwale; Gwarzo; Kabo; Kano Municipal ; Karaye; Kibiya; Kiru; Kumbotso; Kunchi; Kura; Madobi; Makoda; Minjibir; Nasarawa; Rano; Rimin Gado; Rogo; Shanono; Sumaila; Takai; Tarauni; Tofa; Tsanyawa; Tudun Wada; Ungogo; Warawa and Wudil.

127. These infractions enabled the results of the polling units in those LGAs to be manipulated through and by the inflation of the 2nd Respondent's votes and depletion of the Petitioners' votes.

128. That in Kogi State, specifically in Adavi Local Government Areas were disrupted by agents of the 2nd and 3rd Respondents with the result that the votes scored were not accurately recorded as ballot papers were torn by the said agents of the 2nd and 3rd Respondents.

129. That to avoid the holding of the elections, the 2nd and 3rd Respondents' agents acting with the full knowledge and authority of the 2nd and 3rd Respondents cut off access roads into Okehi Local Government Area to stop the holding of the Election in those Local Governments by ensuring that election materials could not be supplied to the affected Local Governments.

130. The Election was thus disrupted in Okehi Local Government Area.

131. In Okehi Local Government Area, election was disrupted in 10 (ten) polling units and there were no results from these polling units.

132. In Adavi Local Government Area, the election was disrupted by the agents of the 2nd and 3rd Respondents who led their supporters round the whole Local Government, to hijack and destroy election materials including already thumb printed ballot papers.

133. In Okenne Local Government Area, elections were disrupted by agents of the 2nd and 3rd Respondents who snatched ballot boxes and BVAS machines and took them to locations where they were wrongly used to generate false results in favour of the 2nd and 3rd respondents.

134. During these malpractices, *ad hoc* staff of the 1st respondent were abducted.

135. The scrutiny of Form EC8A generated by the persons who disrupted the Election will show that the said results are not products of a properly


CERTIFIED TRUE COPY

conducted election. The results will also show over-voting when compared with the data in the backend electronic storage device.

136. That in Kogi State, the 1st Respondent's officials, at the close of the election, failed to properly fill in the polling unit booklets containing forms EC25B – which is the electoral materials/reverse logistics, which is the mode of cross-checking the deployment and accounting at the end of the Election, the electoral materials that had been used in each polling unit by the officials of the 1st Respondent.

137. The 1st Respondent through its officials also failed to properly fill the Form EC40A, which is the ballot paper accounting and verification statements, nor did they properly fill the Form EC40B, which is the statement of rejected and spoilt ballot papers, and the Form EC40G which is the summary of polling units where elections were cancelled or did not hold.

138. These infractions occurred in the polling units in the following Local Government Areas of Kogi State, namely:- Adavi, Ajaokuta, Ankpa, Bassa, Dekina, Ibaji, Idah, Igalamela-Odolu, Ijumu, Kabba/Bunu, Koton Karfe, Lokoja, Mopa-Muro, Ofu, Ogori/Magongo, Okehi, Okene, Olamaboro, Omala, Yagba East and Yagba West.

139. These failures enabled the results of the polling units in the said LGAs to be manipulated through and by the inflation of the 2nd Respondent's votes and the depletion of the Petitioners' votes.

140. The 1st Respondent wrongfully entered incorrect results for the Petitioners in Borno State.

141. The 1st Respondent wrongfully made various unlawful entries and inscriptions not being record of lawful votes cast at the polling units which votes are liable to be voided.

142. In respect of Borno State, there was a deliberate by-pass of the use of the BVAS machines, notwithstanding the representations of the 1st Respondent's agents based on the provisions of the Electoral Act and the INEC Manual and Guidelines.

## GROUND THREE: NOT DULY ELECTED BY MAJORITY OF LAWFUL VOTES CAST:

143. I know that the 2nd Respondent was not duly elected by majority of the lawful votes cast at the Election.

144. I also know as follows:-



- 118 -

(a) the result of the Election as announced by the 1st Respondent and especially the votes allocated to the 2nd Respondent do not represent the lawful valid votes cast at the Election; and

(b) the lawful votes cast at the Election were deliberately and massively deducted from the 1st Petitioner's scores by the 1st Respondent in order to return the 2nd Respondent.

145. The Election results as purportedly declared by the 1st Respondent in respect of each State of the Federation, including the Federal Capital Territory, the details of which are contained in the Table following, are wrong:

| STATE | CODE | REGISTERED VOTERS | ACCREDITED VOTERS (INEC) | ABUBAKAR ATIKU (INEC) | BOLA AHMED TINUBU (INEC) |
|---|---|---|---|---|---|
| ABIA | 01 | 2,120,808 | 384,468 | 22,676 | 8,914 |
| ADAMAWA | 02 | 2,196,566 | 764,834 | 417,611 | 182,881 |
| AKWA IBOM | 03 | 2,357,418 | 594,450 | 214,012 | 160,620 |
| ANAMBRA | 04 | 2,656,437 | 628,590 | 9,036 | 5,111 |
| BAUCHI | 05 | 2,749,268 | 899,769 | 426,607 | 316,694 |
| BAYELSA | 06 | 1,056,862 | 177,368 | 68,818 | 42,572 |
| BENUE | 07 | 2,777,727 | 804,189 | 130,081 | 310,468 |
| BORNO | 08 | 2,513,281 | 499,543 | 190,921 | 252,282 |
| CROSS RIVER | 09 | 1,766,466 | 444,880 | 95,425 | 130,520 |
| DELTA | 10 | 3,221,697 | 667,149 | 161,500 | 90,183 |
| EBONYI | 11 | 1,597,646 | 337,887 | 13,503 | 42,402 |
| EDO | 12 | 2,501,081 | 603,894 | 89,585 | 144,471 |
| EKITI | 13 | 987,647 | 315,058 | 84,554 | 201,494 |
| ENUGU | 14 | 2,112,793 | 482,990 | 15,794 | 4,772 |
| GOMBE | 15 | 1, 575, 794 | 542,997 | 319,123 | 146,977 |
| IMO | 16 | 2, 419, 992 | 485,150 | 30,234 | 66,406 |
| JIGAWA | 17 | 2, 351, 298 | 961,670 | 386,587 | 421,390 |
| KADUNA | 18 | 4, 335, 208 | 1,418, 046 | 554,360 | 399,293 |
| KANO | 19 | 5, 921, 370 | 1,769, 525 | 131,716 | 506,412 |
| KATSINA | 20 | 3, 516, 719 | 1,097, 663 | 489,045 | 482,283 |
| KEBBI | 21 | 2, 032, 041 | 599, 201 | 288,175 | 248,088 |
| KOGI | 22 | 1, 932, 654 | 484, 884 | 145,104 | 240,751 |
| KWARA | 23 | 1, 695, 927 | 497, 519 | 136,909 | 263,572 |
| LAGOS | 24 | 7, 060, 195 | 1,347,152 | 75,750 | 572,606 |
| NASARAWA | 25 | 1,899,244 | 562,464 | 47,093 | 192,922 |
| NIGER | 26 | 2,689,344 | 827,416 | 384,898 | 375,183 |

CERTIFIED TRUE COPY

| OGUN | 27 | 2,688,305 | 612,341 | 123,831 | 341,554 |
| ONDO | 28 | 1,991,344 | 571,402 | 115,463 | 369,924 |
| OSUN | 29 | 1,954,800 | 759,362 | 354,366 | 343,945 |
| OYO | 30 | 2,276,675 | 854,439 | 82,977 | 449,884 |
| PLATEAU | 31 | 2,789,528 | 1,139,393 | 246,808 | 307,195 |
| RIVERS | 32 | 3,537,190 | 605,055 | 88,468 | 231,591 |
| SOKOTO | 33 | 2,172,056 | 619,492 | 288,679 | 285,444 |
| TARABA | 34 | 2,022,374 | 521,442 | 189,017 | 135,165 |
| YOBE | 35 | 1,485,146 | 398,874 | 98,567 | 151,459 |
| ZAMFARA | 36 | 1,926,870 | 327,137 | 193,970 | 298,396 |
| FCT | 37 | 1,570,307 | 478,923 | 74,194 | 90,902 |
| **TOTAL** | | **93,469,008** | **25,286,616** | **6,984,520** | **8,794,726** |

146. The 2nd Respondent did not score one-quarter (25%) of the lawful votes cast at the Election in each of at least two-thirds of all the States in the Federation **and** the Federal Capital Territory, Abuja as required by the Constitution.

147. The 1st Respondent is mandated by law to be guided by the provisions of Section 134(2)(b) of the Constitution and Section 66 of the Electoral Act 2022 and the extant Regulations, Guidelines and Manual for Election in making any return or declaration as to who the winner of the Election is.

148. I know that by the provisions of Section 134(2)(b) of the Constitution and Section 66 of the Electoral Act 2022, a return and declaration can only be made in favour of the 2nd Respondent where and if the 2nd Respondent scored 25% of the total votes in the Federal Capital Territory, Abuja.

149. The 2nd Respondent did not score 25% of the total votes cast in the Federal Capital Territory, Abuja before the 1st Respondent wrongly returned the 2nd Respondent as the winner of the Election and arrogantly dared the Petitioners to go to Court, notwithstanding the protests by the Petitioners and other stakeholders.

150. The purported scores of the respective parties as declared by the 1st Respondent for the Federal Capital Territory, Abuja, are as set out below:

| No. | POLITICAL PARTIES | SCORE | PERCENTAGE |
|-----|-------------------|-------|------------|
| 19. | A | 490 | 0.102% |
| 20. | AA | 506 | 0.105% |
| 21. | AAC | 215 | 0.044% |

- 120 -



| 22. | ADC | 768 | 0.160% |
|-----|-----|-----|--------|
| 23. | ADP | 583 | 0.121% |
| 24. | **APC** | **90,902** | **18.991%** |
| 25. | APGA | 1,362 | 0.284% |
| 26. | APM | 297 | 0.062% |
| 27. | APP | 146 | 0.030% |
| 28. | BP | 748 | 0.156% |
| 29. | LP | 281,717 | 58.856% |
| 30. | NNPP | 4,517 | 0.943% |
| 31. | NRM | 294 | 0.061% |
| 32. | PDP | 74,194 | 15.500% |
| 33. | PRP | 131 | 0.027% |
| 34. | SDP | 233 | 0.048% |
| 35. | YPP | 335 | 0.069% |
| 36. | ZLP | 2,631 | 0.549% |

151. The 2nd Respondent scored only **18.99%** of the votes cast in the FCT which falls short of the **25%** required to enable the 1st Respondent validly to declare him as duly elected.

152. The declaration of the 2nd Respondent by the 1st Respondent as duly elected is unconstitutional, null, void and of no legal effect.

153. The purported results from **19,702 Polling Units** across 36 States and Federal Capital Territory contain various forms of infractions.

154. The total of **4,307 polling units** are without stamp on the respective Form EC8A therefrom. Details of the States and number of polling units in each State affected are as shown in the Statisticians Report.

CERTIFIED TRUE COPY

155. The results from **1,300 polling units** do not have signatures of the Presiding Officers on the respective Forms EC8A. Details of the States and polling units affected are as shown in the Statisticians Report.

156. That the 1st Respondent and/or its agents ought not to have made a return or declare the 2nd Respondent as the winner of the election as the margin of lead between the 2nd Respondent and the 1st Petitioner is less than number of the PVCs collected in the polling units where elections did not take place or where elections was cancelled.

157. Given the number of those who collected their Permanent Voters' Cards (PVCs) in polling units where elections did not take place or where elections were cancelled, (the details of which are set out in the Statisticians Report), the return of the 2nd Respondent as the winner of the Election in the circumstance was hasty and undue.

158. The return of the 2nd Respondent by the 1st Respondent as the winner of the Election in the above circumstances is unlawful and wrongful as the said return was made in violation of the provisions of the Electoral Act 2022 and the Constitution of the Federal Republic of Nigeria, 1999 (as amended).

159. That as part of the irregularities which were prevalent in the conduct of the Election, the Presiding Officers failed to properly fill and countersign alterations in election forms including forms EC8A, EC8B, EC8C and EC8D in over 40,000 polling units shown in the Statisticians Report relied upon by the Petitioners.

160. The mandatory requirements of the Electoral Act, INEC Regulations and INEC Manual that stipulate for the recording of the quantity, serial numbers and other particulars of result sheets, ballot papers and other sensitive electoral materials to be used in conducting the Election were not complied with before and after the Election as the 1st Respondent and its officers failed to effect the required entries.

161. Upon a proper collation and summation, the correct and proper scores of the candidates are as contained in the Statisticians Report.

162. All over Nigeria there were manifest cases of over-voting. The total of the affected polling units in the various States are set out in the Statisticians Report.

163. In respect of manual collation of results, the 1st Respondent's officials and agents did not authenticate the collation with the data from the electronic collation system to correctly collate votes from the polling units in all the afore mentioned States.

164. The 3rd Respondent's agents disrupted election and compelled 1st Respondent's officials to change results in polling units in many States, particularly Kogi, Lagos, Rivers and Kano.

CERTIFIED TRUE COPY

165. In Kogi State, in Olamaboro LGA: RA2 PU003, PU005, PU006, PU007, PU009 - Five polling units with total votes of 3,892 were affected. When it was discovered that the 2nd Petitioner had the majority votes at those polling units, the LG Council Chairman (APC) Hon. Friday Adejoh came with thugs at gunpoint and forced the Electoral Officials to declare the concluded election cancelled at the risk of their lives, and thereafter destroyed all the electoral materials and carted them away.

166. In Ofu LGA, thugs of the 3rd Respondent came to the Electoral Officers in RA5 PU005, 006, 009, 010, 011, 014 and 027 totaling 5,574 votes; In RA04 PU 008 total 510 votes In RA07 PU 007, 010 total 2,016 votes In the 10 polling units affected involving 7,590 votes, the thugs destroyed all electoral materials at gunpoint forcing them to declare a cancellation when PDP was already coasting to victory.

167. In Omalla LGA, a similar trend with gun wielding thugs from the APC stormed RA8 - Icheke ward PU 015, PU 016, 004, 005 and RA01 - Abejukolo PU 007, 009, 014, PU 018, 019, 023 and PU 024. There were similar situations in RA2, RA4, RA9 and RA10. Total votes affected is 9,758 and this is home to the former Governor of Kogi State, Alhaji Ibrahim Iris another PDP stronghold.

168. In Okehi LGA, home to PDP Senatorial Candidate Natasha Akpoti, another PDP stronghold, a total of 22 PU in 4 RAs totaling 11,452 votes were affected due to intimidation, harassment and threat to life of INEC officials. They are: RA 6 PU 002, PU 004, PU 008, PU 012 total 2,364 votes RA 10 PU 001, 002 totaling 1,450 votes. RA 11 PU 003, 004, 007, 009, 010 and 012 totaling 2,904 votes RA 5 PU 001, 002, 003, 004, 005, 006, 007, 010 and 015 totaling 4,734 votes.

169. In Ajaokuta LGA heavily armed thugs of the 3rd Respondent scared INEC Electoral Officials from conducting election in 19 Pi's in Geregu RA 14 affecting 28,981registered voters were disenfranchised from voting. But unfortunately, Governor Yahaya Bello personally went to prevent the election from holding but election results eventually surfaced from there at the collection center on Monday, 27 Feb. 2023.

170. In Lagos State, the 1st Respondent's officials, did not at the end of the Election, properly fill in the polling unit booklets containing forms EC25B – which is the electoral materials/reverse logistics, which is the mode of cross-checking the deployment and accounting at the end of the election, the electoral materials that had been used in each polling unit by the officials of the 1st Respondent.

171. The 1st Respondent through its officials also failed to properly fill the Form EC40A, which is the ballot paper accounting and verification statements, nor did they properly fill the Form EC40B, which is the statement of rejected

CERTIFIED TRUE COPY

and spoilt ballot papers, and the Form EC40G which is the summary of polling units where elections were cancelled or did not hold.

172. These infractions occurred in the polling units in the following Local Government Areas of Lagos State, namely:- Lagos Island, Lagos Mainland, Surulere, Apapa and Eti-Osa, as well as eight Local Council Development Areas which include: Lagos Island East, Yaba, Itire-Ikate, Coker-Aguda, Ikoyi-Obalende, Apapa-Iganmu, Eti-Osa East and Iru/Victoria Island.

173. These failures enabled the results of the polling units in the said LGAs to be manipulated through and by inflation of the 2nd Respondent's votes and the depletion of the Petitioners' votes.

174. In Rivers State, the votes returned from Obio-Akpor and Port Harcourt Local Government Areas ("LGA") did not reflect the actual votes scored in the said LGAs for the Election in consequence whereof those votes are liable to be voided. The figures on the IReV do not tally with the figures declared by the 1st Respondent.

175. In the 20 Local Government Areas in Lagos State, the 2nd and the 3rd Respondents through their agents and on their full instructions, unleashed mayhem and violence in a manner never seen in the history of elections in the State.

176. The total inputted votes in Lagos State are 1,335,729 for all the political parties that took part in the elections. Out of this figure, the 2nd and 3rd Respondents were credited with 572,606 purported votes, while Labour Party (one of the political parties that took part in the elections) was credited with 582,454 purported votes.

177. In respect of Rivers State which comprises 23 Local Government Areas, elections were disrupted and marred by unprecedented violence and intimidation unleashed by the 2nd and 3rd Respondents through their agents and officials in each of those local government areas.

178. Notwithstanding the violence and widespread intimidation of voters, the 1st Respondent returned a total of 553,944 votes for all the political parties out of which the 2nd and 3rd Respondents were credited with 231,591 purported votes and Labour Party (which participated in the election) was credited with 175,071 purported votes.

179. In Rivers State, the 1st Respondent's officials, did not at the end of the Election, properly fill in the polling unit booklets containing forms EC25B – which is the electoral materials/reverse logistics, which is the mode of cross-checking the deployment and accounting at the end of the election, the electoral materials that had been used in each polling unit by the officials of the 1st Respondent.

CERTIFIED TRUE COPY

180. The 1st Respondent through its officials also failed to properly fill the Form EC40A, which is the ballot paper accounting and verification statements, nor did they properly fill the Form EC40B, which is the statement of rejected and spoilt ballot papers, and the Form EC40G which is the summary of polling units where elections were cancelled or did not hold.

181. These infractions occurred in the polling units in the following Local Government Areas of Rivers State, namely:- Abua/Odual, Ahoada West, Akuku Toru, Andoni, Asari Toru, Bonny, Degema, Eleme, Emohua, Etche, Gokana, Ikwerre, Oyigbo, Khana, Obio/Akpor, Ogba Egbema/Ndoni, Ogu/Bolo, Okrika, Omumma, Opobo/Nkoro, Port Harcourt and Tai.

182. These failures enabled the results of the polling units in the said LGAs to be manipulated by inflation of the 2nd Respondent's votes and depletion of the Petitioners' votes. The 1st Respondent is hereby put on notice to produce at the hearing of this Petition, the polling unit booklets containing the said Forms for the polling units in the LGAs.

183. The Petitioners state that the votes that were returned in the State for all the political parties exceeded the number of voters accredited in the State for the Election through the BVAS machines.

184. That in the 44 Local Government Areas that make up Kano State, the 2nd and 3rd Respondents through their agents who, had been provided with machetes, unleashed violence on voters, disrupting the voting process which led to the destruction of electoral materials.

185. The total votes credited to the parties is 1,401,376. Whereas the 2nd and 3rd Respondents were credited with 506,412 purported votes, New Nigerian Peoples Party (NNPP), one of the parties that took part in the Elections was credited with 977,279 purported votes, while Labour Party was credited with 28,513 purported votes. The Petitioners state that all these votes are liable to be voided.

186. The 1st Respondent and its agents wrongly and deliberately entered wrong scores/results in the under-listed 17 (Seventeen) States, namely:

   (a). Abia

   (b). Anambra

   (c). Delta

   (d). Ebonyi

   (e). Edo

   (f). Enugu

   (g). Imo

 CERTIFIED TRUE COPY

    (h).   Jigawa

    (i).   Kano

    (j).   Kogi

    (k).   Lagos

    (l).   Nasarawa

    (m).   Niger

    (n).   Ogun

    (o).   Ondo

    (p).   Plateau

    (q).   Rivers

187. There were discrepancies on very large scales at the various levels of recording and collation of results, particularly between the polling units and the Ward Collation Centres.

188. The figures/scores awarded the 2nd Respondent were not the product of valid votes actually cast but were mere allocation by the 1st Respondent, and the summation of the result declared is inconsistent with and cannot be reconciled with the number of duly accredited voters.

**DOCUMENTS TO BE RELIED UPON IN THIS PETITION:**

189. That I know that the Petitioners shall at the hearing of this Petition, rely on all necessary and relevant documents, including the following, namely:

    1.    BVAS CTC Reports

    2.    IRV CTC Reports

    3.    Statisticians Reports

    4.    Forensic Experts Reports

    5.    All INEC Certified Result Sheets and Electoral Materials

    6.    (Form EC8 Series), EC8A, EC8B, EC8C, EC8D, EC8D(A) and EC8E - Certificate of Return received by Petitioners' agents at the Election

    7.    PDP Party Membership Cards, as necessary

    8.    INEC Voters' Cards, as necessary

    9.    Witnesses' party membership cards, as necessary

    10.   Witnesses' Voters Cards, as necessary



11.   All Forms EC1A(1)

12.   All Forms EC17

13.   All Forms EC25A

14.   All Forms EC25A(1)

15.   All Forms EC25B

16.   All Forms EC25B(1)

17.   All Forms EC25D

18.   Forms EC25G Series used in the conduct of the Election

19.   All Forms EC40s, EC40G(1), EC40G(2), EC40G(3), EC40J, EC40A

20.   All Forms EC40H/EC40H(1)-(5)

21.   All the Forms EC40B, that is, all the Spoilt and Rejected Ballot Paper Forms used in all the polling units spanning all the Local Governments of all the States of Nigeria and the FCT Abuja

22.   All the Form EC40C, that is, all the statement of unused Ballot Paper Form used in all the Local Governments of all the States of Nigeria and the FCT Abuja

23.   All the Form EC40J, that is, all the Statement of Unused Ballot Paper Forms used in all the Local Governments of all the States of Nigeria.

24.   All the Envelopes EC50B, that is, all the Envelopes for Register of Voters used in all the polling units of all the Local Governments of the States of Nigeria and the FCT Abuja

25.   All the Envelopes of EC5OC, that is, all the Envelopes of for unused Ballot Papers used in all the Local Governments of the States of Nigeria and the FCT Abuja

26.   Actual ballot papers used and thumb-printed and counted as valid in all the polling units of the Local Governments of all the States of Nigeria and the FCT Abuja

27.   Actual ballot papers recorded as spoilt in the results in all the polling units of the Local Governments of all the States of Nigeria and the FCT Abuja

28.   Actual ballot papers recorded as unused in the results of all the polling units of the Local Governments of all the States of Nigeria and the FCT Abuja


CERTIFIED TRUE COPY

29. Certified true copy of all the voters' registers in all the polling units spanning all the Local Governments of all the States of Nigeria and the FCT Abuja

30. Certified true copy of extant INEC list of polling units and voters as at 25th day of February, 2023 in all the polling units spanning all the Local Governments of all the States of Nigeria and the FCT Abuja

31. Certified true copies of the printout of record of accreditation as captured by BVAS machines used for the conduct of the Election in all the polling units spanning all the Local Governments of all the States of Nigeria and the FCT Abuja

32. A certified true copy of a list of all INEC officers and ad hoc staff used for the Election in all the polling units spanning all the Local Governments of all the States of Nigeria and the FCT Abuja

33. Extant Guidelines and Regulations for the Conduct of the Election

34. Circulars/corrigenda/Manuals issued by INEC for the conduct of the Presidential Election held on 23 February 2019

35. Polling Unit Materials Checklist

36. Summary of total registered voters on units' basis

37. Summary of PVCs collected on units' basis

38. Voters' Registers

39. Letters of complaints over irregularities and malpractices during the election addressed to the INEC/Police/other relevant agencies/institutions

40. Security reports relating to the Election

41. Video/Audio recordings/DVD/CD relating to the Election

42. Election Observers' or Observers' Reports

43. 2nd Respondent's INEC FORM CF001 for Lagos State 1999 Governorship Election

44. Lagos State House of Assembly Report of the Ad-Hoc Committee set up on Tuesday, September 21, 1999, to investigate the allegations of Perjury and Forgery levelled against the Executive Governor of Lagos State

45. 2nd Respondent's Affidavit in respect of lost certificate dated 29th of December, 1998

46. 2nd Respondent's INEC FORM EC9 for the 2023 Presidential election



47. Newspaper/Television/ Radio reports and news

48. Appointment Letters and tags of PDP agents

49. Expert reports and analysis

50. Photographs and GSM and other phone outputs

51. Computer-generated and cyberspace evidence

52. Forensic and other reports by experts and non-experts

53. Receipts issued by INEC for certification of its documents

54. Identity cards of witnesses

55. Data and logs from INEC Electronic Storage Devices including but not limited to its Electronic Collation System and the AWS servers.

56. Data and Event logs from all BVAS machines used in the Election

57. PVC collection records

58. Petition Written by the Petitioners' Kogi State Collation Officer dated 27th February 2023.

59. Certified True Copy of Judgment in Suit No: FHC/ABJ/CS/334/2023.

60. Any other document(s) relevant to the Petition.

190. That I know as a fact that the electronic evidence in this Petition were downloaded and printed from the computers/printers linked to the internet, and that the computers and printers were, at the time of producing the electronic evidence, being used regularly to store and/or process information; that throughout that period, there was supplied to the computer in the ordinary course of those activities information of the kind contained in the electronic evidence hereto attached; that throughout the material part of that period, the computer and printer were operating properly; and that the information contained in the attached documents was derived from information supplied to the computer and the printer in the ordinary course of those activities.

191. I want this Honourable Court to grant the following reliefs against the Respondents jointly and severally as contained in the Petition:

(a). That it may be determined that the 2nd Respondent was not duly elected by a majority of lawful votes cast in the Election and therefore the declaration and return of the 2nd Respondent by the 1st Respondent as the winner of the Presidential Election conducted on the 25th day of February 2023 is unlawful, undue, null, void and of no effect.



(b). That it may be determined that the return of the 2nd Respondent by the 1st Respondent was wrongful, unlawful, undue, null and void having not satisfied the requirements of the Electoral Act 2022 and the Constitution of the Federal Republic of Nigeria 1999 (as amended) which mandatorily requires the 2nd Respondent to score one-quarter of the lawful votes cast at the Election in each of at least two-thirds of all the States in the Federation **AND** the Federal Capital Territory, Abuja.

(c). That it may be determined that the 1st Petitioner having scored the majority of lawful votes at the Presidential election of Saturday, 25th February 2023, be returned as the winner of the said election and be sworn in as the duly elected President of the Federal Republic of Nigeria.

**IN THE ALTERNATIVE:**

(d). An Order directing the 1st Respondent to conduct a second election (run-off) between the 1st Petitioner and the 2nd Respondent.

**IN THE FURTHER ALTERNATIVE:**

(e). That the election of the 2nd Respondent to the office of the President of Nigeria held on 25th February 2023 be nullified and a fresh election (re-run) ordered.

192. That it is in the interest of justice to grant the prayers sought by the Petitioners.

193. That I swear to this Affidavit conscientiously believing the contents to be true and correct to the best of my knowledge, and in accordance with the Oaths Act 2004.

$\bar{\Delta}\Lambda\cap$

**DEPONENT**

Sworn to at The Court of Appeal Registry, Abuja.

This _21st_ day of _March,_ 2023.

**BEFORE ME**

> ᴄ ᴛᴀʀʏ
> PRESIDENTIAL ELECTION
> PETITION COURT
> 2023

**COMMISSIONER FOR OATHS**

CERTIFIED TRUE COPY

- 130 -

## IN THE COURT OF APPEAL
## (IN THE PRESIDENTIAL ELECTION PETITION COURT)
## HOLDEN AT ABUJA

## IN THE MATTER OF THE ELECTION TO THE OFFICE OF THE PRESIDENT OF THE FEDERAL REPUBLIC OF NIGERIA HELD ON 25TH FEBRUARY 2023

**PETITION No: PEPC/A/    /2023**

**BETWEEN:**

**1. ABUBAKAR ATIKU**
**2. PEOPLES DEMOCRATIC PARTY (PDP)** ⎤⎰ **PETITIONERS**

**AND**

**1. INDEPENDENT NATIONAL ELECTORAL COMMISSION (INEC)**
**2. TINUBU BOLA AHMED** ⎱ **RESPONDENTS**
**3. ALL PROGRESSIVES CONGRESS (APC)**

### WITNESS STATEMENT ON OATH OF PDPC

I, **PDPC**, Nigerian Citizen, Adult and Male of the Peoples Democratic Party Headquarters, Wadata Plaza, Wuse Zone 5, Abuja, do hereby make oath and state as follows:

1.　　I am a member of the Peoples Democratic Party, the 2nd Petitioner.

2.　　I acted as one of the National Coordinator for the Petitioners at the Presidential election held on 25th February 2023.

3.　　By virtue of my aforesaid position, I am very conversant with the facts deposed to herein, being facts known personally by me or related to me by my subordinates in the course of carrying out my assignment.

4.　　That my responsibilities as one of the National Coordinator of the Petitioners included liaising with the Agents and other officials of the 2nd Petitioner and superintending over election matters and specifically over the elections of 25th February 2023.

5.　　All the facts deposed herein are with the consent of the Petitioners and derived from my personal knowledge and where otherwise, I have stated the source of my information and belief.

6.　　I know that the 1st Petitioner, ABUBAKAR ATIKU, was a candidate at the election to the office of the President of the Federal Republic of Nigeria,



which election held on Saturday, 25th February 2023 across the Federation of Nigeria.

7. I know that the 1st Petitioner, who had a right to vote and be voted for in the Election, was sponsored by the 2nd Petitioner and contested for the Election.

8. I know that the 1st Petitioner has a right to be returned as duly elected at the Election.

9. The 2nd Petitioner, Peoples Democratic Party (PDP) is a duly registered political party in Nigeria and participated in the Election by sponsoring the 1st Petitioner as its Presidential candidate.

10. The 2nd Petitioner is a corporate body, and for the Election, acted through and by means of its agents, State Coordinators and officials, who were reporting amongst themselves.

11. I know for the purposes of the Election, the Petitioners had agents in all the Polling Units, Ward Collation Centres, Local Government Areas, and the State Collation Centres, in all the States of the Federation and the Federal Capital Territory as well as the National Collation Centre.

12. I know that the Petitioners have the right to present this Petition, having participated in the Election.

13. The 1st Respondent is the body constitutionally and statutorily vested with the responsibility of organising and conducting elections in Nigeria, and was the body that conducted the Election, the subject matter of this Petition.

14. I know that all, each and every person who acted as Presiding Officers, Assistant Presiding Officers, Supervisory Presiding Officers, *ad-hoc* Staff in all the polling units/stations/points, Ward Collation Officers in all the Ward Collation Centres, Local Government Collation Officers in all the Local Government Area Collation Centres, all the State Collation Officers in all the State Collation Centres, the State Resident Electoral Commissioners, FCT Resident Electoral Commissioner, the Chief Returning Officer, and any other person(s) who acted in any capacity on behalf of the 1st Respondent at the Election, including Information Communication Technology (ICT) Technical Election Officials, acted as agents of the 1st Respondent.

15. The 2nd Respondent was a candidate in the Election and sponsored by the 3rd Respondent.

16. The 3rd Respondent is a registered political party in Nigeria and is the political party that sponsored the 2nd Respondent as its candidate at the Election.


CERTIFIED TRUE COPY

17. The Petitioners and the Respondents hereinabove specified are the parties interested in this Petition.

## (A). HOLDING OF THE ELECTION, SCORES OF CANDIDATES, PERSON RETURNED

18. I know that the Election took place on **Saturday, 25th February 2023**.

19. Four (4) days after the Election, specifically on Wednesday, **1st March 2023**, the 1st Respondent announced the following as the purported scores of the candidates for the Election, namely: -

| S/No. | CANDIDATE | PARTY | SCORES |
|---|---|---|---|
| 1. | IMUMOLEN IRENE CHRISTOPHER | A | 61,014 |
| 2. | AL MUSTAPHA HAMZA | AA | 14,542 |
| 3. | SOWORE OMOYELE STEPHEN | AAC | 14,608 |
| 4. | KACHIKWU DUMEBI | ADC | 81,919 |
| 5. | SANI YABAGI YUSUF | ADP | 43,924 |
| 6. | **TINUBU BOLA AHMED** | **APC** | **8,794, 726** |
| 7. | UMEADI PETER NNANNA CHUKWUDI | APGA | 61,966 |
| 8. | OJEI PRINCESS CHICHI | APM | 25,961 |
| 9. | NNAMDI CHARLES OSITA | APP | 12,839 |
| 10. | ADENUGA SUNDAY OLUWAFEMI | BP | 16,156 |
| 11. | OBI PETER GREGORY | LP | 6,101, 533 |
| 12. | MUSA MOHAMMED RABIU KWANKWASO | NNPP | 1,496, 687 |
| 13. | OSAKWE FELIX JOHNSON | NRM | 24,869 |
| 14. | **ABUBAKAR ATIKU** | **PDP** | **6,984, 520** |
| 15. | ABIOLA LATIFU KOLAWOLE | PRP | 72,144 |
| 16. | ADEBAYO ADEWOLE EBENEZER | SDP | 80,267 |
| 17. | ADO-IBRAHIM ABDULMALIK | YPP | 60,600 |
| 18. | NWANYANWU DANIEL DABERECHUKWU | ZLP | 77,665 |

CERTIFIED TRUE COPY

20. The 1st Respondent wrongly returned the 2nd Respondent as the winner of the Election, allocating to him **8, 794, 726** votes while ascribing to the 1st Petitioner **6, 984, 520** votes.

21. The 1st Respondent also declared the following as its summary of the purported results:

| A. | TOTAL NUMBER OF REGISTERED VOTERS | 93,469,008 |
|----|-----------------------------------|-----------|
| B. | TOTAL NUMBER OF ACCREDITED VOTERS | 25,286,616 |
| C. | TOTAL NUMBER OF VALID VOTES | 24,025,940 |
| D. | TOTAL NUMBER OF REJECTED VOTES | 939,278 |
| E. | TOTAL NUMBER OF VOTES CAST | 24,965,218 |
| F. | PERCENTAGE TURN OUT | 27.05% |

22. I know that the Petitioners shall rely on **Form EC8D(A)** (being the summary of final collation of results) and **Form EC8E** (being the final declaration of result) issued by the 1st Respondent, not only to show the purported scores as recorded by the 1st Respondent, but also to show the invalidity of the scores as recorded therein.

23. I know that on the face of the Form EC8D(A), there are calculation errors as shown and contained in the Report of the Statisticians which the Petitioners shall rely upon.

24. I also know that Petitioners shall rely on the Reports and evidence by their Experts, including Statisticians, Forensic Examiners and other Experts pursuant to the Orders for Inspection, Examination and Production of election materials granted to the Petitioners by this Honourable Court.

## (B). **GROUNDS OF THE PETITION**:

25. I know that the grounds upon which the Petitioners presented this Petition are as follows:

   (a). The election of the 2nd Respondent is invalid by reason of non-compliance with the provisions of the Electoral Act, 2022.

   (b). The election of the 2nd Respondent is invalid by reason of corrupt practices.



(c). The 2nd Respondent was not duly elected by majority of lawful votes cast at the Election.

26. The facts of this Petition as known to me are set out in the following paragraphs on the issue of non-compliance with the provisions of the Electoral Act 2022.

27. I know as a matter of fact that the 1st Respondent herein, even though required by its representations made by its Chairman and other senior officers did not transmit all the results from the polling units into the IReV directly and in realtime as contained in its Guidelines and Regulations.

28. The Election was not conducted in accordance with the provisions of the Electoral Act 2022, and other extant laws and the non-compliance substantially affected the result of the Election, in that the 2nd Respondent ought not to have been declared or returned as the winner of the Election.

29. The Election was not conducted in compliance with the provisions of Sections 47(2) & (3), 60(1), (2) & (5), 64(4)(a) & (b), 64(5), (6), (7) & (8), 71 and 73 of the Electoral Act, Paragraphs 3.3.0 and 3.4.0 of the 1st Respondent's published Manual for Election Officials 2023 ("INEC Manual" or "Manual"), and Paragraphs 19, 35, 38, 40, 41, 42, 43, 47, 48, 50, and 62 of the 1st Respondent's published Regulations and Guidelines for the Conduct of Elections 2022.

30. The non-compliance consists of refusal to authenticate all the intending voters in the election using the technological/electronic device prescribed by the 1st Respondent in addition to failure of the 1st Respondent to transfer the outcome of the election directly into the portal of the 1st Respondent created for the viewing of the public as a means to ensure the integrity of the elections at the polling unit and the electronical collation system before the declaration as to who is the winner of the election.

31. The use of the electronic device is to ensure that disputed results from the polling units are subjected to a resolution that accords with transparency and integrity of the entire election.

32. The intention is to avoid interference with the results of the election by either the presiding officer at the polling unit and the collation officers at the Ward, Local Government, State and the National level.

33. That the 1st Respondent has clearly prescribed electronic transmission of results from the polling units directly into INEC Result Viewing Portal (IReV) through the public pronouncement of its Chairman, Prof. Mahmood Yakubu and other senior officials including Barr. Festus Okoye (National Commissioner), Rose Oriaran-Anthony (Secretary to the Commission) in addition to specifically stipulating the same process of transmission in its Guidelines and Manual for Election Officials.

CERTIFIED TRUE COPY

34. That I am aware that the judgment of courts have confirmed this position.

35. Indeed, several months and weeks leading to the Election, the 1st Respondent through its Chairman Mahmood Yakubu, had repeatedly assured the general public that the February 2023 general election would be the best election ever, with the guaranteed use of the Bi-Modal Voters' Accreditation System ("BVAS") and real-time and direct uploading of the polling unit results to INEC's electronic collation system and Results Viewing Portal ("IReV") which were technological innovations in the electoral system that would ensure the transparency of the elections and foolproof the elections against all forms of manipulation.

36. Specifically, the 1st Respondent's Chairman and its other principal officers including Mr. Festus Okoye, the National Commissioner for Information and Voters Enlightenment, at various times and fora, gave serial undertakings, representations and assurances that the results from the polling units shall be transmitted real time via the BVAS to the electronic collation system and the IReV for public viewing and that such transmission shall be the basis for collation at the various collation levels up to the national collation and return at the Election.

37. However, contrary to the undertakings, representations and assurances made by the 1st Respondent, the 1st Respondent proceeded on the 1st day of March 2023 to wrongly return the 2nd Respondent as the winner of the Election when the outcome (herein being challenged) and the results from the polling units including the total number of accredited voters in the respective polling units were yet to be transmitted to the 1st Respondent's Electronic Collation System and the 1st Respondent's Result Viewing Portal (IReV) as stipulated by the Electoral Act, 2022 and the INEC Guidelines and Manuals and expressly guaranteed to the electorate by the 1st Respondent.

38. To underscore the commitment of the 1st Respondent to this mode of electoral process especially the need to conduct an electronically driven election, the 1st Respondent had received generous funding from the Federal Government of Nigeria, having informed the public that the 2023 election cost the country the sum of N355 billion.

39. Against a budget of N305 billion initially submitted by the 1st Respondent, and out of which a whopping sum of N117 billion was earmarked for the procurement of electronic accreditation and transmission devices, including the Bi-Modal Voters' Accreditation System (BVAS) a new voter enrolment and voter accreditation device designed to combine the functions of the Direct Data Capture Machine, the Z-Pad, the Smart Card Reader and the portal, IReV a world-wide web portal designed for real time viewing of election results uploaded from polling units.


CERTIFIED TRUE COPY

40. The 1st Respondent and its Chairman irrevocably committed the 1st Respondent to the deployment and use of the BVAS technology in both accreditation and transmission of the accreditation data and election results from the polling units to the electronic collation system and IReV Portal. Meanwhile, the 1st Respondent had touted the BVAS machine as the election "game changer".

41. The 1st Respondent had prescribed through its various Regulations, Guidelines and Manual, the manner of accreditation, collation and transmission vide its technological device, the BVAS, pursuant to the Electoral Act.

42. I know that the mandatory requirements of the 1st Respondent in relation to electronic accreditation, collation, and transmission are as set out below:

(1). Accreditation of voters shall be by way of Bimodal Voter Accreditation System (BVAS).

(2). To electronically transmit or transfer the results and the accreditation data from polling units direct to the electronic collation system as prescribed by the 1st Respondent.

(3). Uploading of results shall be with the BVAS to the 1st Respondent's results Viewing Portal (IReV) directly and in realtime, as prescribed by the 1st Respondent.

(4). Collation and authentication of the results and accreditation data from the polling units at the various collation levels up to the national collation centre shall be with the aid of the Results Verification System.

43. The result of the Election as announced by the 1st Respondent and especially the votes wrongly allocated to the 2nd Respondent do not represent the lawful valid votes cast.

44. The 1st Respondent failed to comply with its own Guidelines and representations to transmit results and accredit data directly and real-time to the IReV and its electronic collation system/storage device before the hasty return and announcement of the 2nd Respondent as the winner of the Election on the 1st day of March 2023.

45. By the combined provisions of the Electoral Act, the INEC Regulations and Guidelines and the INEC Manual, the votes collated at the polling units are to be electronically transmitted with the Bimodal Voter Accreditation System (BVAS) directly and real-time to the INEC electronic collation system and IReV portal.

46. To underscore the relevance of real-time electronic transmission of the results and accreditation data from the polling units to the IReV Portal and

CERTIFIED TRUE COPY

the INEC electronic collation system, the 1st Respondent itself stated thus in its Manual for Election Officials 2023 (paragraph 2.9.0):

> *"Electronic Transmission/Upload of Election Result and Publishing to The INEC Result Viewing (IReV) Portal:*

> *"One of the problems noticed in the electoral process is the irregularities that take place between the Polling Units (PUs) after the announcement of results and the point of result collation. Sometimes results are hijacked, exchanged, or even destroyed at the PU, or on the way to the Collation Centers. It becomes necessary to apply technology to transmit the data from the Polling Units such that the results are collated up to the point of result declaration.*

> *"The real-time publishing of polling unit-level results on IReV Portal and transmission of results using the BVAS demonstrates INEC's commitment to transparency in results management. This commitment is backed by Sections 47(2), 60(1, 2 & 5), 64(4a & 4b) and 64(5) of the Electoral Act 2022, which confers INEC with the power to transmit election results electronically. The system minimizes human errors and delays in results collation and improves the accuracy, transparency, and credibility of the results collation process."*

47. I know that in furtherance of the commitment to real-time electronic transmission of the polling units results to the electronic collation system and the IReV portal, the 1st Respondent in its Regulations and Guidelines for the Conduct of Elections, 2022 (paragraph 38), provided thus:-

> *"On completion of all the Polling Unit voting and results procedures, the Presiding Officer shall:*

> *(i). Electronically transmit or transfer the result of the Polling Unit, direct to the collation system as prescribed by the Commission.*

- 138 -


CERTIFIED TRUE COPY

> **(ii). Use the BVAS to upload a scanned copy of the EC8A to the INEC Result Viewing Portal (IReV), as prescribed by the Commission."**

48.   I know that it is mandatory for the Presiding Officer appointed by the 1st Respondent to use technological device (in this case, the BVAS device) for the accreditation of voters at the polling unit as a condition precedent to the actual voting and in the same vein the use of the same device as a condition precedent for collation to safe guard the integrity of the entire election.

49.   In compliance with the foregoing, the 1st Respondent in paragraph 18(a) of its Regulations and Guidelines, applicable to the conduct of the election, prescribed that a person intending to vote shall be verified to be the same person on the Register of Voters by the use of the Bimodal Voter Accreditation System (BVAS).

50.   It is the same BVAS device deployed by the 1st Respondent for accreditation of voters at the polling units during the conduct of the said Election, that was to be used by the 1st Respondent to electronically transmit from the polling units, the result of the election at the polling units together with the accreditation data including the total number of accredited voters in the respective polling units.

51.   Ironically, it is the same 1st Respondent and its most senior officials including the National Electoral Commissioner/Chairman that brazenly breached this mandatory requirement.

52.   I also know that it is mandatory for any Collation Officer or the Returning Officer at the various collation levels for any election to collate and announce the result of an election, subject to his or her verification and confirmation that the (a). number of accredited voters stated on the collated result are correct and consistent with the number of accredited voters recorded and transmitted directly from the polling units; and (b). the voters stated on the collated result are correct and consistent with the votes recorded and transmitted directly from polling units.

53.   The 1st Respondent in acknowledgment of the foregoing provisions of Section 64(4) of the Electoral Act, provided in paragraph 48(a) of its aforesaid election to the effect that an election result shall only be collated if the Collation Officer ascertains that the number of accredited voters tallies with the number recorded in the BVAS and that the votes scored by the political parties on the result sheet are correct and agree with the result that was electronically transmitted or transferred directly from the polling unit.

CERTIFIED TRUE COPY

54. By Section 64(5) of the Electoral Act, a collation officer or returning officer shall use the "data of accreditation" (which includes the number of accredited voters) "recorded and transmitted directly from each polling unit" and "the votes and results of the election recorded and transmitted directly from each polling unit" to collate and announce the result of an election if a collated result at his or a lower level of collation is disputed or correct to be incorrect.

55. That in paragraph 48(b) of its aforesaid Guidelines and Regulations, the 1st Respondent provided in similar vein, that if a Collation or Returning Officer determines that a result from a lower level of collation is not correct, he/she shall use the result that was electronically transmitted or transferred directly from that lower level to collate and announce the result.

56. I also know that further, Sections 64(6), (7) and (8) of the Electoral Act 2022, it is mandatory that disputes as to the result of the election being collated, can only be resolved by the Collation Officer or Returning Officer by reference to the polling unit results and the accreditation data (which includes the number of accredited voters) electronically transmitted from the polling units.

57. Notwithstanding the foregoing, the uploading and transmission to the electronic collation system and the IReV portal by the 1st Respondent of the results of the Senate and House of Representatives took place seamlessly while that of the Presidential Election did not as a result of deliberate interference by the 1st Respondent's agents for the sole purpose of interfering with the will of the electorate.

58. Contrary to the original design of the BVAS machine to upload data directly to the electronic collation system and the IReV portal, the 1st Respondent contrived and installed an intervening third-party device (Device Management System) which, in its ordinary usage, is meant to secure and administer the 1st Respondent's technological ecosystem for the elections but as it relates to the Presidential Election, was used to intercept the results, quarantine and warehouse same, and filter them before releasing same to the IReV Portal.

59. The 1st Respondent used the said Device Management System to manipulate the Election results in favour of the 2nd and 3rd Respondents

60. I know that the critical components of the 1st Respondent's Information and Communications Technology (ICT), is the Bimodal Voter Accreditation System (BVAS) which is an Android Device manufactured by Emperor Technologies China and supplied to the 1st Respondent by Activate Nigeria Limited with a software that is designed and configured in-house and installed on the BVAS by the ICT Team of the 1st Respondent headed by Mr. Chidi Nwafor.

CERTIFIED TRUE COPY

61. The BVAS was subsequently handed over to Emperor Technology China prior to the Presidential Election, who then reconfigured and installed additional software on the BVAS before supplying the devices to the 1st Respondent through Activate Nigeria Limited.

62. That I know as it relates to the IReV, the INEC Result Viewing Portal (IReV) is a web-based data entry and aggregation portal designed also by Chidi Nwafor's team and is hosted on Amazon Web Service (AWS). The server system for the device and the portal are hosted on Amazon Web Service (AWS) URL:dashboard.ivasportal.com/dash.

63. That proximate to the Elections, the 1st Respondent caused to be transferred its in-house ICT expert, Chidi Nwafor, from its ICT Department to the 1st Respondent's office in Enugu as an "Administrative Secretary", and brought in an IT Consultant, Mr. Suleiman Farouk, who introduced a third-party mechanism that was installed and made to intermediate between the BVAS and the IRev Portal, known as Device Management System (DMS).

64. The DMS is a software that allows 1st Respondent's IT Security Consultant, Mr. Suleiman Farouk, to remotely control, monitor and filter data that is transmitted from the BVAS devices to the electronic collation system and the IRev platform. Meanwhile, the 1st Respondent engaged an appointee of the 2nd Respondent to man and oversee the sensitive ICT Department of the 1st Respondent for the purpose of the Election.

65. The 1st Respondent, having set the parameters, did not ensure compliance with the electronic transmission of accreditation and thus created an opportunity for manipulation of figures to the advantage of the 2nd and 3rd Respondents.

66. There were no technical "glitches" that prevented the upload and transmission of the polling units results and the accreditation data of the Presidential Election to the electronic collation system and the IReV portal but what happened was the non-adherence to the system through a command and control element activated by a pre-programmed design to limit user-privileges of the front-end users of the BVAS machines at the polling units with respect to Presidential Election results while releasing user privileges in respect of the National Assembly election windows, by selectively withholding correct passwords and/or issuing wrong passwords through the use of the Device Management System equipment aforesaid.

67. The 1st Respondent had admitted its failure to electronically transmit the polling units results of the Election and the total number of accredited voters in the respective polling units to the electronic collation system and the IReV platform but surprisingly attributed same to "glitches".



68. There was no failure of "server", as the "server" was cloud-based and virtual and was hosted on and by Amazon Web Service (AWS). I know that the Petitioners shall call evidence to show that the "server" being cloud-based, in the event of any unlikely challenge, Amazon Web Service would have seamlessly switched to another server without hitch, being autoscaling groups with multiple network reception and offline upload options.

69. The technology system deployed by the 1st Respondent underwent Quality Assurance Tests ("QAT") before acquisition and deployment. The so-called "glitch" was a bypass to tilt and switch the results of the Presidential Election in favour of the 2nd and 3rd Respondents.

70. I know that as of 1st March 2023, when the 1st Respondent returned the 2nd Respondent as the winner of the Election, the entire results and accreditation data from the polling units had not been transmitted and uploaded to the 1st Respondent's electronic collation system/storage device, created/acquired by the 1st Respondent itself for the purpose of electronically collating the results of the Election.

71. I also know that more than 18 days after the Election, and as of the date of filing this Petition, the 1st Respondent's IReV Portal showed that the 1st Respondent had failed to upload the entire accreditation data and polling units results of the Presidential Election.

72. I know that Section 47(3) of the Electoral Act makes it mandatory for the 1st Respondent to cancel and reschedule an election in any polling unit where the BVAS or other technological device deployed for accreditation of voters fails to function, but notwithstanding, the 1st Respondent concluded the said Election, purported to collate the result of the Election and declared the 2nd Respondent wrongly as the winner of the said election without the prescribed electronic transmission of the results of the Election at and from the various polling units and the accreditation data from the respective polling units (including the number of accredited voters in the said polling units), to the INEC Electronic Collation System and to the INEC Result Viewing Portal (IReV).

73. The 1st Respondent's inability to utilize the technological device (BVAS) deployed by the 1st Respondent for the electronic transmission of the polling units results of the Election along with the accreditation data, amounts to a programmed failure of the said technological device to function which failure is attributable to the Respondents.

74. The 1st Respondent in the face of the obvious failure of the BVAS to function at the respective polling units, ought to have cancelled the election and reschedule same to take place within 24 hours as required by Section 47(3) of the Electoral Act.

CERTIFIED TRUE COPY

75. That by reason of the non-electronic transmission of the polling units results of the election and accreditation data from the respective polling units at the time of the collation of the results of the Election, all the Collation Officers at the various levels of collation of the results including the 1st Respondent's Chairman who as the Returning Officer for the said Presidential Election conducted the final collation of the results of the Election, failed to carry out the mandatory verification and confirmation that was incumbent on them pursuant to the provisions of Section 64(4) of the Electoral Act.

76. I know that by reason of the foregoing, there could not have been any valid and lawful election, collation and announcement of the result of the Election under the Electoral Act, without the prior electronic accreditation and transmission from the polling units to the INEC Electronic Collation System and IReV portal using the BVAS, of the results of the election at the respective polling units together with the accreditation data therefrom which includes the total number of accredited voters in the polling units.

77. The collation of the Election result and announcement of same without the prior electronic transmission of the results of the Election at and from the respective polling units, and the incorrect manual collation of the results without the use of and authentication with the electronic collation system at the various collation levels up to the national collation center, are invalid, unlawful, and null and void.

78. The 1st Respondent is in clear breach of the provisions of the law under Sections 60 and 64(4) and (5) of the Electoral Act by failing to use the BVAS to transmit the Election results at the polling units and the accreditation data therefrom to the electronic collation system and the IRev Portal.

79. Despite the failure to so transmit and several complaints for review, the 1st Respondent's Chairman, before and on the 1st of March 2023 refused all entreaties and applications for the suspension of the collation exercise and a review of the complaints before declaring a winner of the Election and repeatedly off-handedly dared the Petitioners to go to Court.

80. Contrary to the provisions of the 1st Respondent's Regulations and Manual which stipulate the transmission of both accreditation data and the polling units results from the BVAS directly and realtime to the electronic collation system and the IReV portal, the 1st Respondent introduced a device manager called Collation Support and Results Verification System (CSRVS), with which the results from the polling units were quarantined prior to transmission to the IReV portal, leaving room for the 1st Respondent to upload wrong results.



- 143 -

81. The entire Presidential Election conducted on the 25th day of February, 2023 together with the collation of the results of the said Election and the announcement and declaration and return of the 2nd Respondent as the winner of the said Election are unlawful, illegal, wrongful, null and void by reason of the failure of the 1st Respondent to comply with the aforesaid conditions precedent for the conduct of valid election.

82. By a Press Release issued by the 1st Respondent dated the 11th day of November, 2022, INEC as a public institution stated thus:

> **"Our attention has been drawn to reports in a section of the media of alleged plans by the Commission to rig the 2023 General Election by abandoning the direct and real-time electronic upload of Polling Unit results to the INEC Result Viewing (IReV) Portal by the Registration Area Technical Support Staff (RATECHSS). The claim is patently false. The Commission has repeatedly reassured Nigerians that it will transmit results directly from the Polling Unit as we witnessed in Ekiti and Osun. …The public is advised to ignore the reports. The Bimodal Voter Accreditation System (BVAS) and IReV have come to stay for voter accreditation and uploading of Polling Unit results in real-time in Nigeria."**

83. The Election failed the integrity test stipulated by the Electoral Act and does not reflect the will of the electorate.

84. The Election has been rated nationally and internationally as the worst election in the history of Nigeria given the failure by the 1st Respondent, *inter alia*, to transmit and upload in realtime and directly to the 1st Respondent's electronic collation system and IReV portal the scores of the parties from the polling units before the announcement of final results by the 1st Respondent on Wednesday, 1st day of March 2023.

85. Before the Election, the 1st Respondent had previously conducted four governorship elections successfully, in Anambra, Ekiti, Edo and Osun States and Area Council election in the FCT, Abuja.

86. In the four States the 1st Respondent uploaded results directly and realtime from the polling units to the IReV.

87. In the FCT Area Council election the 1st Respondent uploaded the results within an hour of the close of election.

88. In Osun State, by midnight of the day of the governorship election the 1st Respondent had uploaded all the results from the polling units to the IReV.

CERTIFIED TRUE COPY

89. In all these instances, the 1st Respondent deployed the BVAS for the accreditation of the voters and transmission of the results.

90. In the Presidential Election of 25th February 2023, the 1st Respondent failed to transmit the purported results and accreditation data directly and realtime from the polling units to the electronic collation system and the IReV portal.

91. The 1st Respondent belatedly claimed that there was a "glitch" that made the BVAS to fail to transmit results of the Presidential Election from the polling units to its electronic collation system and IReV portal.

92. The Petitioners state that the National Assembly election and the Presidential election were conducted simultaneously on 25th February 2023 at the same locations using the same BVAS machines for both accreditation of voters and transmission of the respective polling unit results of both elections.

93. That while the polling units results of the National Assembly were transmitted directly and realtime to the IReV from the BVAS, the purported results of the Presidential Election were not transmitted directly and realtime to the electronic collation system and the IReV portal.

94. That unlike the instant Election, the off-cycle elections that were conducted by the 1st Respondent in Anambra, Ekiti, Edo, and Osun States, did not suffer any "glitch" and the results from the polling units in those elections were not quarantined prior to being uploaded to the electronic collation system and the IReV.

95. I know that as of the 20th day of March 2023 the 1st Respondent was yet to fully upload the polling units results for the Presidential election from the polling units to its electronic collation system and IReV portal.

96. The 1st Respondent wrongly quarantined the Election results from the polling units to enable interference with the results contrary to the repeated representations made by the officials of the 1st Respondent that the results would be transmitted directly and realtime to the 1st Respondent's electronic collation system and IReV portal.

97. The failure of the BVAS to transmit the results and accreditation data from the polling units directly and in realtime to the 1st Respondent's electronic collation system and IReV portal made it impossible for the Petitioners to challenge timeously, at the earliest opportunity, notably during the collation of the results at various collation levels, the irregularities in the Election such as, incidents of over-voting.

98. I know as a fact that as of 1st March 2023, when the 1st Respondent wrongly returned the 2nd Respondent as the winner of the Election, less than 50% of the results from the polling units had been transmitted and uploaded to

CERTIFIED TRUE COPY

the 1st Respondent's electronic collation system/storage device, created/acquired by the 1st Respondent itself for the purpose of electronically collating the results of the Election.

99.    In the subsequent Governorship and States Houses of Assembly elections, held on 18th March 2023, the 1st Respondent allowed the BVAS to function properly transmitting polling units results and accreditation data directly and in real-time.

100.    The 1st Respondent's refusal to transmit the results of the polling units in the Presidential Election led to the judgment in Suit No. FHC/ABJ/CS/334/2023 wherein the Federal High Court ordered the 1st Respondent to ensure transmission of the results in accordance with the Electoral Act 2022 and the Clause 38 of the Guidelines which mandates the presiding officers of all polling units to electronically transmit results direct to the collation system and use the BVAS to upload the scanned copies of the Forms EC8As to the IReV immediately upon completion of the polling units voting and result procedures.

101.    That I know that the Court in the above case held that the 1st Respondent has a legal duty to act in accordance with the law.

102.    I know that the 1st Respondent had by its Regulations and Guidelines, made pursuant to the Electoral Act, provided for the mandatory use of the **BVAS** and the electronic collation system for the said Election.

103.    To make an undue return in favour of the 2nd and 3rd Respondents, the 1st Respondent wrongfully  bypassed all the checkpoints for election integrity introduced by the new Electoral Act 2022 which include several technological devices and multiple checkpoints at the Polling Unit, Ward, Local Government, Area Councils, State, and Federal collation centres, as the case may be, including the requirement to "transmit directly" the polling units accreditation data and election results from the BVAS machines to the electronic collation system and the IReV portal.

104.    The bypass of the use of the BVAS machines in the transmission of the polling units results of the Election fundamentally and substantially affected the integrity of the results announced by the 1st Respondent for the 2nd and 3rd Respondents and thoroughly discredited the process of the Election.

## (2).  <u>CONSTITUTIONAL GEOGRAPHICAL SPREAD:</u>

105.    The 1st Respondent failed to comply with the provisions of Section 66 of the Electoral Act which incorporated section 134 of the Constitution of the Federal Republic of Nigeria 1999 (as amended) (the "Constitution" or "1999 Constitution") in wrongfully, unlawfully, illegally and un-constitutionally returning the 1st Respondent as winner of the Election.

CERTIFIED TRUE COPY

106. I know that by the provision of Section 134(2) of the Constitution, in a Presidential Election with more than two candidates, for a candidate to be deemed to be the winner of the election, he must:-

(a). have the highest number of votes cast at the election;

(b). have not less than one quarter of the votes cast at the election in at least two thirds of all the States in the Federation: and

(c). have not less than one quarter of the votes cast at the election in the Federal Capital Territory, Abuja.

107. The 2nd Respondent who contested on the platform of the 3rd Respondent, did not secure one–quarter of the votes cast in the said Presidential Election in the Federal Capital Territory, Abuja.

108. That out of the total votes of 478,652 cast in the Federal Capital Territory, Abuja the 2nd Respondent was ascribed only 90,902 (18.99%) of those votes.

109. That to be declared duly elected, a candidate, in addition to obtaining not less than a quarter (25%) of the votes cast in at least two-thirds of all the States, **must** also receive at least one-quarter (25%) of the votes cast in the Federal Capital Territory, Abuja, this being an additional requirement introduced by the Constitution of the Federal Republic of Nigeria 1999 (as amended), the said Constitution having clearly distinguished the Federal Capital Territory, Abuja as a separate entity by specific and express mention.

110. That I know as a fact that all previous winners of the Nigerian presidential elections from 1999 secured at least 25% of the votes cast for the Federal Capital Territory.

111. That for any candidate to be declared winner of the presidential election in which more than two candidates are contesting, such a candidate **must have the highest number of votes cast at the election, and he must have not less than one-quarter of the votes cast at the election in each of at least two-thirds of all the States in the Federation and at least one quarter (25%) of the votes cast in the Federal Capital Territory, Abuja.**

112. The 2nd Respondent having not scored 25% of the votes cast in the Federal Capital Territory, Abuja ought not to have been declared winner of the Election by the 1st Respondent.

113. I know that the word **"AND"** in Section 134 of the said Constitution before Federal Capital Territory, Abuja is a word of addition, as is the clear intendment of the provision and the intention of the framers of the Constitution.

CERTIFIED TRUE COPY

114. That for a presidential candidate to be deemed duly elected, he must meet the 25% constitutional requirement in at least 24 States of the Federation and the same 25% constitutional requirement in respect of the Federal Capital Territory, Abuja.

**Particulars:**

(a). The total number of votes cast in the Election in the Federal Capital Territory, Abuja as declared by the 1st Respondent was 478, 652.

(b). The 2nd Respondent as declared by the 1st Respondent, purportedly secured 90,902 votes, amounting to 18.99% percentage of the votes cast in the Election in the Federal Capital Territory, Abuja.

(c). One quarter (25%) of the total votes cast in the Federal Capital Territory, Abuja is 119,663 votes.

115. The 2nd Respondent failed to score at least one-quarter (25%) of the votes cast in the Federal Capital Territory, Abuja as mandatorily required by the Constitution of the Federal Republic of Nigeria (as amended).

116. The 1st Respondent ought not have declared the 2nd Respondent as the winner of the Election.

117. Further, the votes ascribed to the 2nd Respondent by the 1st Respondent in the final declaration made is **8, 794, 726** while the votes credited to the Petitioners is **6, 984, 520** resulting in a margin of lead of **1, 810, 206** votes, and in the circumstance, the entire election of 25th February 2023 was inconclusive, this is because the Permanent Voters Cards (PVCs) collected in the polling units where elections did not take place or where elections were cancelled across the Country is over and above **1, 810, 206** which is the margin of lead between the 1st Petitioner and the 2nd Respondent, and in consequence, the return of the 2nd Respondent was hasty, premature and wrongful.

118. That I also do know, that the Election conducted by the 1st Respondent in respect of the office of the President of the Federal Republic of Nigeria, subject of the instant Petition is invalid by reason of corrupt practices.

119. The particulars of corrupt practices before and during the disputed election include but not limited to the following, viz, Compromised Printing/Production of electoral materials, manipulation of election material delivery, and compromised printing/production of election materials.

120. The Election is invalid on account of corrupt practices. The particulars of corrupt practices before and during the disputed election include but are not limited to the following:

CERTIFIED TRUE COPY

(a). Suppression of votes

(b). Manipulation of the ballots and ballot boxes

(c). Manipulation of BVAS machines

(d). Manipulation of accreditation and collation

(e). Manipulation of Election Material Delivery

(f). Manipulation of Election Material Reverse logistics

(g). Intimidation and harassment of voters

(h). Massive Thumb-printing of Ballot Papers

(i). Destruction of electoral materials

(j). Hijack of electoral materials

(k). Mutilations, cancellations and overwritings on result sheets.

(l). Inflation, Deflation of Scores, and Wrong Entries in Result Sheets.

121. In Sokoto State, the 1st Respondent cancelled results from 241 polling units but went ahead to declare results for the Presidential Election while declaring the National Assembly elections in the same Sokoto State that were conducted simultaneously with the Presidential Election, as inconclusive. The cancellation which affected 301,499 registered voters in 471 polling units occurred in the following LGAs, as shown below:

(a). Gudu - Results were cancelled in 3 polling units affecting 1,685 registered voters.

(b). Gwandu - Results were cancelled in 4 polling units affecting 3,020 registered voters.

(c). Ilela - Results were cancelled in 2 polling units affecting 3,904 registered voters.

(d). Kware - Results were cancelled in 21 polling units affecting 10,939 registered voters.

(e). Kebbe - Results were cancelled in 15 polling units affecting 8,475 registered voters.

(f). Rabah - Results were cancelled in 52 polling units affecting 26,362 registered voters.

(g). Shagari - Results were cancelled in 18 polling units affecting 9,854 registered voters.

(h). Silame - Results were cancelled in 18 polling units affecting 23,442 registered voters.

CERTIFIED TRUE COPY

(i). Sokoto North - Results were cancelled in 42 polling units affecting 31,566 registered voters.

(j). Sokoto South - Results were cancelled in 50 polling units affecting 39,693 registered voters.

(k). Wurno- Results were cancelled in 8 polling units affecting 4,862 registered voters.

(l). Binji - Results were cancelled in 15 polling units affecting 2,042 registered voters.

(m). Tangaza - Results were cancelled in 8 polling units affecting 10,033 registered voters.

(n). Danje Shuni - Results were cancelled in 47 polling units affecting 26,966 registered voters.

(o). Bodinga - Results were cancelled in 14 polling units affecting 7,010 registered voters.

(p). Tureta - Results were cancelled in 20 polling units, affecting 3,050 registered voters.

(q). Yabo - Results were cancelled in 8 polling units, affecting 5,567 registered voters.

(r). Wamakko - Results were cancelled in 27 polling units, affecting 16,642 registered voters.

(s). Ngada - Results were cancelled in 6 polling units, affecting 3,633 registered voters.

(t). Goronye - Results were cancelled in 40 polling units affecting 22,123 registered voters.

(u). Isa - Results were cancelled in 1 polling unit affecting 935 registered voters.

(v). Sabon Birni - Results were cancelled in 16 polling units affecting 8,427 registered voters.

(w). Tambuwal – Results were cancelled in 51 polling units affecting 31,268 registered voters.

The details of the affected polling units are set out in the Statistician's report.



122. In Kano State, the 1st respondent's officials, at the conclusion of the Election, failed to properly fill in the polling unit booklets containing Forms EC25B – which is the electoral materials/reverse logistics, which is the mode of cross-checking the deployment and accounting, at the end of the Election, the electoral materials that had been used in each polling unit by the officials of the 1st Respondent.

123. The 1st Respondent through its officials also failed to properly fill the Form EC40A, which is the ballot paper accounting and verification statements, nor did they properly fill the Form EC40B, which is the statement of rejected and spoilt ballot papers, and the Form EC40G which is the summary of polling units where elections were cancelled or did not hold.

124. These failures occurred in Kano State in the polling units in the following Local Government Areas of the State, namely:- Ajingi; Albasu; Bagwai; Bebeji; Bichi; Bunkure; Dala; Dambatta; Dawakin Kudu; Dawakin Tofa; Doguwa; Fagge; Gabasawa; Garko; Garum Mallam; Gaya; Gezawa; Gwale; Gwarzo; Kabo; Kano Municipal ; Karaye; Kibiya; Kiru; Kumbotso; Kunchi; Kura; Madobi; Makoda; Minjibir; Nasarawa; Rano; Rimin Gado; Rogo; Shanono; Sumaila; Takai; Tarauni; Tofa; Tsanyawa; Tudun Wada; Ungogo; Warawa and Wudil.

125. These infractions enabled the results of the polling units in those LGAs to be manipulated through and by the inflation of the 2nd Respondent's votes and depletion of the Petitioners' votes.

126. That in Kogi State, specifically in Adavi Local Government Areas were disrupted by agents of the 2nd and 3rd Respondents with the result that the votes scored were not accurately recorded as ballot papers were torn by the said agents of the 2nd and 3rd Respondents.

127. That to avoid the holding of the elections, the 2nd and 3rd Respondents' agents acting with the full knowledge and authority of the 2nd and 3rd Respondents cut off access roads into Okehi Local Government Area to stop the holding of the Election in those Local Governments by ensuring that election materials could not be supplied to the affected Local Governments.

128. The Election was thus disrupted in Okehi Local Government Area.

129. In Okehi Local Government Area, election was disrupted in 10 (ten) polling units and there were no results from these polling units.

130. In Adavi Local Government Area, the election was disrupted by the agents of the 2nd and 3rd Respondents who led their supporters round the whole Local Government, to hijack and destroy election materials including already thum bprinted ballot papers.

131. In Okenne Local Government Area, elections were disrupted by agents of the 2nd and 3rd Respondents who snatched ballot boxes and BVAS machines

CERTIFIED TRUE COPY

and took them to locations where they were wrongly used to generate false results in favour of the 2nd and 3rd respondents.

132. That in Kogi State, the 1st Respondent's officials, at the close of the election, failed to properly fill in the polling unit booklets containing forms EC25B – which is the electoral materials/reverse logistics, which is the mode of cross-checking the deployment and accounting at the end of the Election, the electoral materials that had been used in each polling unit by the officials of the 1st Respondent.

133. The 1st Respondent through its officials also failed to properly fill the Form EC40A, which is the ballot paper accounting and verification statements, nor did they properly fill the Form EC40B, which is the statement of rejected and spoilt ballot papers, and the Form EC40G which is the summary of polling units where elections were cancelled or did not hold.

134. These infractions occurred in the polling units in the following Local Government Areas of Kogi State, namely:- Adavi, Ajaokuta, Ankpa, Bassa, Dekina, Ibaji, Idah, Igalamela-Odolu, Ijumu, Kabba/Bunu, Koton Karfe, Lokoja, Mopa-Muro, Ofu, Ogori/Magongo, Okehi, Okene, Olamaboro, Omala, Yagba East and Yagba West.

135. These failures enabled the results of the polling units in the said LGAs to be manipulated through and by the inflation of the 2nd Respondent's votes and the depletion of the Petitioners' votes.

136. In respect of Borno State, there was a deliberate by-pass of the use of the BVAS machines, notwithstanding the representations of the 1st Respondent's agents based on the provisions of the Electoral Act and the INEC Manual and Guidelines.

137. As to whether or not the 2nd Respondent was duly elected by majority of the lawful votes cast at the Election, I know as a matter of fact that the votes credited to the 2nd Respondent was wrongful and the 2nd Respondent was not duly elected by the majority of lawful votes.

138. I also know as that the result of the Election as announced by the 1st Respondent and especially the votes allocated to the 2nd Respondent do not represent the lawful valid votes cast at the Election.

139. The Election results as purportedly declared by the 1st Respondent in respect of each State of the Federation, including the Federal Capital Territory, the details of which are contained in the Table following, are wrong:

CERTIFIED TRUE COPY

| STATE | CODE | REGISTERED VOTERS | ACCREDITED VOTERS (INEC) | ABUBAKAR ATIKU (INEC) | BOLA AHMED TINUBU (INEC) |
|---|---|---|---|---|---|
| ABIA | 01 | 2,120,808 | 384,468 | 22,676 | 8,914 |
| ADAMAWA | 02 | 2,196,566 | 764,834 | 417,611 | 182,881 |
| AKWA IBOM | 03 | 2,357,418 | 594,450 | 214,012 | 160,620 |
| ANAMBRA | 04 | 2,656,437 | 628,590 | 9,036 | 5,111 |
| BAUCHI | 05 | 2,749,268 | 899,769 | 426,607 | 316,694 |
| BAYELSA | 06 | 1,056,862 | 177,368 | 68,818 | 42,572 |
| BENUE | 07 | 2,777,727 | 804,189 | 130,081 | 310,468 |
| BORNO | 08 | 2,513,281 | 499,543 | 190,921 | 252,282 |
| CROSS RIVER | 09 | 1,766,466 | 444,880 | 95,425 | 130,520 |
| DELTA | 10 | 3,221,697 | 667,149 | 161,500 | 90,183 |
| EBONYI | 11 | 1,597,646 | 337,887 | 13,503 | 42,402 |
| EDO | 12 | 2,501,081 | 603,894 | 89,585 | 144,471 |
| EKITI | 13 | 987,647 | 315,058 | 84,554 | 201,494 |
| ENUGU | 14 | 2,112,793 | 482,990 | 15,794 | 4,772 |
| GOMBE | 15 | 1, 575, 794 | 542,997 | 319,123 | 146,977 |
| IMO | 16 | 2, 419, 992 | 485,150 | 30,234 | 66,406 |
| JIGAWA | 17 | 2, 351, 298 | 961,670 | 386,587 | 421,390 |
| KADUNA | 18 | 4, 335, 208 | 1,418, 046 | 554,360 | 399,293 |
| KANO | 19 | 5, 921, 370 | 1,769, 525 | 131,716 | 506,412 |
| KATSINA | 20 | 3, 516, 719 | 1,097, 663 | 489,045 | 482,283 |
| KEBBI | 21 | 2, 032, 041 | 599, 201 | 288,175 | 248,088 |
| KOGI | 22 | 1, 932, 654 | 484, 884 | 145,104 | 240,751 |
| KWARA | 23 | 1, 695, 927 | 497, 519 | 136,909 | 263,572 |
| LAGOS | 24 | 7, 060, 195 | 1,347,152 | 75,750 | 572,606 |
| NASARAWA | 25 | 1,899,244 | 562,464 | 47,093 | 192,922 |
| NIGER | 26 | 2,689,344 | 827,416 | 384,898 | 375,183 |
| OGUN | 27 | 2,688,305 | 612,341 | 123,831 | 341,554 |
| ONDO | 28 | 1,991,344 | 571,402 | 115,463 | 369,924 |
| OSUN | 29 | 1,954,800 | 759,362 | 354,366 | 343,945 |
| OYO | 30 | 2,276,675 | 854,439 | 82,977 | 449,884 |
| PLATEAU | 31 | 2,789,528 | 1,139,393 | 246,808 | 307,195 |
| RIVERS | 32 | 3,537,190 | 605,055 | 88,468 | 231,591 |
| SOKOTO | 33 | 2,172,056 | 619,492 | 288,679 | 285,444 |
| TARABA | 34 | 2,022,374 | 521,442 | 189,017 | 135,165 |
| YOBE | 35 | 1,485,146 | 398,874 | 98,567 | 151,459 |
| ZAMFARA | 36 | 1,926,870 | 327,137 | 193,970 | 298,396 |
| FCT | 37 | 1,570,307 | 478,923 | 74,194 | 90,902 |
| **TOTAL** | | **93,469,008** | **25,286,616** | **6,984,520** | **8,794,726** |

CERTIFIED TRUE COPY

140. The 2nd Respondent did not score one-quarter (25%) of the lawful votes cast at the Election in each of at least two-thirds of all the States in the Federation **and** the Federal Capital Territory, Abuja as required by the Constitution.

141. The 1st Respondent is mandated by law to be guided by the provisions of Section 134(2)(b) of the Constitution and Section 66 of the Electoral Act 2022 and the extant Regulations, Guidelines and Manual for Election in making any return or declaration as to who the winner of the Election is.

142. I know that by the provisions of Section 134(2)(b) of the Constitution and Section 66 of the Electoral Act 2022, a return and declaration can only be made in favour of the 2nd Respondent where and if the 2nd Respondent scored 25% of the total votes in the Federal Capital Territory, Abuja.

143. The 2nd Respondent did not score 25% of the total votes cast in the Federal Capital Territory, Abuja before the 1st Respondent wrongly returned the 2nd Respondent as the winner of the Election and arrogantly dared the Petitioners to go to Court, notwithstanding the protests by the Petitioners and other stakeholders.

144. The purported scores of the respective parties as declared by the 1st Respondent for the Federal Capital Territory, Abuja, and the percentage of the said scores are set out below:

| No. | POLITICAL PARTIES | SCORE | PERCENTAGE |
|-----|-------------------|-------|------------|
| 37. | A | 490 | 0.102% |
| 38. | AA | 506 | 0.105% |
| 39. | AAC | 215 | 0.044% |
| 40. | ADC | 768 | 0.160% |
| 41. | ADP | 583 | 0.121% |
| 42. | **APC** | **90,902** | **18.991%** |
| 43. | APGA | 1,362 | 0.284% |
| 44. | APM | 297 | 0.062% |
| 45. | APP | 146 | 0.030% |
| 46. | BP | 748 | 0.156% |

CERTIFIED TRUE COPY

| 47. | LP | 281,717 | 58.856% |
|---|---|---|---|
| 48. | NNPP | 4,517 | 0.943% |
| 49. | NRM | 294 | 0.061% |
| 50. | PDP | 74,194 | 15.500% |
| 51. | PRP | 131 | 0.027% |
| 52. | SDP | 233 | 0.048% |
| 53. | YPP | 335 | 0.069% |
| 54. | ZLP | 2,631 | 0.549% |

145. The 2nd Respondent scored only **18.99%** of the votes cast in the FCT which falls short of the **25%** required to enable the 1st Respondent validly to declare him as duly elected.

146. The declaration of the 2nd Respondent by the 1st Respondent as duly elected is unconstitutional, null, void and of no legal effect.

147. That the 1st Respondent and/or its agents ought not to have made a return or declare the 2nd Respondent as the winner of the election as the margin of lead between the 2nd Respondent and the 1st Petitioner is less than number of the PVCs collected in the polling units where elections did not take place or where elections was cancelled.

148. The return of the 2nd Respondent by the 1st Respondent as the winner of the Election in the above circumstances is unlawful and wrongful as the said return was made in violation of the provisions of the Electoral Act 2022 and the Constitution of the Federal Republic of Nigeria, 1999 (as amended).

149. The 3rd Respondent's agents disrupted election and compelled 1st Respondent's officials to change results in polling units in many States, particularly Kogi, Lagos, Rivers and Kano.

150. In Kogi State, in Olamaboro LGA: RA2 PU003, PU005, PU006, PU007, PU009 - Five polling units with total votes of 3,892 were affected. When it was discovered that the 2nd Petitioner had the majority votes at those polling units, the LG Council Chairman (APC) Hon. Friday Adejoh came with thugs at gunpoint and forced the Electoral Officials to declare the concluded election cancelled at the risk of their lives, and thereafter destroyed all the electoral materials and carted them away.



151. In Ofu LGA, thugs of the 3rd Respondent came to the Electoral Officers in RA5 PU005, 006, 009, 010, 011, 014 and 027 totaling 5,574 votes; In RA04 PU 008 total 510 votes In RA07 PU 007, 010 total 2,016 votes In the 10 polling units affected involving 7,590 votes, the thugs destroyed all electoral materials at gunpoint forcing them to declare a cancellation when PDP was already coasting to victory.

152. In Omalla LGA, a similar trend with gun wielding thugs from the APC stormed RA8 - Icheke ward PU 015, PU 016, 004, 005 and RA01 - Abejukolo PU 007, 009, 014, PU 018, 019, 023 and PU 024. There were similar situations in RA2, RA4, RA9 and RA10. Total votes affected is 9,758 and this is home to the former Governor of Kogi State, Alhaji Ibrahim Iris another PDP stronghold.

153. In Okehi LGA, home to PDP Senatorial Candidate Natasha Akpoti, another PDP stronghold, a total of 22 PU in 4 RAs totaling 11,452 votes were affected due to intimidation, harassment and threat to life of INEC officials. They are: RA 6 PU 002, PU 004, PU 008, PU 012 total 2,364 votes RA 10 PU 001, 002 totaling 1,450 votes. RA 11 PU 003, 004, 007, 009, 010 and 012 totaling 2,904 votes RA 5 PU 001, 002, 003, 004, 005, 006, 007, 010 and 015 totaling 4,734 votes.

154. In Ajaokuta LGA heavily armed thugs of the 3rd Respondent scared INEC Electoral Officials from conducting election in 19 Pi's in Geregu RA 14 affecting 28,981registered voters were disenfranchised from voting. But unfortunately, Governor Yahaya Bello personally went to prevent the election from holding but election results eventually surfaced from there at the collection center on Monday, 27 Feb. 2023.

155. In Lagos State, the 1st Respondent's officials, did not at the end of the Election, properly fill in the polling unit booklets containing forms EC25B – which is the electoral materials/reverse logistics, which is the mode of cross-checking the deployment and accounting at the end of the election, the electoral materials that had been used in each polling unit by the officials of the 1st Respondent.

156. The 1st Respondent through its officials also failed to properly fill the Form EC40A, which is the ballot paper accounting and verification statements, nor did they properly fill the Form EC40B, which is the statement of rejected and spoilt ballot papers, and the Form EC40G which is the summary of polling units where elections were cancelled or did not hold.

157. These infractions occurred in the polling units in the following Local Government Areas of Lagos State, namely:- Lagos Island, Lagos Mainland, Surulere, Apapa and Eti-Osa, as well as eight Local Council Development Areas which include: Lagos Island East, Yaba, Itire-Ikate, Coker-Aguda, Ikoyi-Obalende, Apapa-Iganmu, Eti-Osa East and Iru/Victoria Island.

CERTIFIED TRUE COPY

158. These failures enabled the results of the polling units in the said LGAs to be manipulated through and by inflation of the 2nd Respondent's votes and the depletion of the Petitioners' votes.

159. In the 20 Local Government Areas in Lagos State, the 2nd and the 3rd Respondents through their agents and on their full instructions, unleashed mayhem and violence in a manner never seen in the history of elections in the State.

160. The total inputted votes in Lagos State are 1,335,729 for all the political parties that took part in the elections. Out of this figure, the 2nd and 3rd Respondents were credited with 572,606 purported votes, while Labour Party (one of the political parties that took part in the elections) was credited with 582,454 purported votes.

161. In respect of Rivers State which comprises 23 Local Government Areas, elections were disrupted and marred by unprecedented violence and intimidation unleashed by the 2nd and 3rd Respondents through their agents and officials in each of those local government areas.

162. In Rivers State, the votes returned from Obio-Akpor and Port Harcourt Local Government Areas ("LGA") did not reflect the actual votes scored in the said LGAs for the Election in consequence whereof those votes are liable to be voided. The figures on the IReV do not tally with the figures declared by the 1st Respondent.

163. Notwithstanding the violence and widespread intimidation of voters, the 1st Respondent returned a total of 553,944 votes for all the political parties out of which the 2nd and 3rd Respondents were credited with 231,591 purported votes and Labour Party (which participated in the election) was credited with 175,071 purported votes.

164. In Rivers State, the 1st Respondent's officials, did not at the end of the Election, properly fill in the polling unit booklets containing forms EC25B – which is the electoral materials/reverse logistics, which is the mode of cross-checking the deployment and accounting at the end of the election, the electoral materials that had been used in each polling unit by the officials of the 1st Respondent.

165. The 1st Respondent through its officials also failed to properly fill the Form EC40A, which is the ballot paper accounting and verification statements, nor did they properly fill the Form EC40B, which is the statement of rejected and spoilt ballot papers, and the Form EC40G which is the summary of polling units where elections were cancelled or did not hold.

166. These infractions occurred in the polling units in the following Local Government Areas of Rivers State, namely:- Abua/Odual, Ahoada West, Akuku Toru, Andoni, Asari Toru, Bonny, Degema, Eleme, Emohua, Etche,



Gokana, Ikwerre, Oyigbo, Khana, Obio/Akpor, Ogba Egbema/Ndoni, Ogu/Bolo, Okrika, Omumma, Opobo/Nkoro, Port Harcourt and Tai.

167. These failures enabled the results of the polling units in the said LGAs to be manipulated by inflation of the 2nd Respondent's votes and depletion of the Petitioners' votes. The 1st Respondent is hereby put on notice to produce at the hearing of this Petition, the polling unit booklets containing the said Forms for the polling units in the LGAs.

168. The Petitioners state that the votes that were returned in the State for all the political parties exceeded the number of voters accredited in the State for the Election through the BVAS machines.

169. That in the 44 Local Government Areas that make up Kano State, the 2nd and 3rd Respondents through their agents who, had been provided with machetes, unleashed violence on voters, disrupting the voting process which led to the destruction of electoral materials.

170. The total votes credited to the parties is 1,401,376. Whereas the 2nd and 3rd Respondents were credited with 506,412 purported votes, New Nigerian Peoples Party (NNPP), one of the parties that took part in the Elections was credited with 977,279 purported votes, while Labour Party was credited with 28,513 purported votes. The Petitioners state that all these votes are liable to be voided.

171. The 1st Respondent and its agents wrongly and deliberately entered wrong scores/results in the under-listed 17 (Seventeen) States, namely:

    (a). Abia

    (b). Anambra

    (c). Delta

    (d). Ebonyi

    (e). Edo

    (f). Enugu

    (g). Imo

    (h). Jigawa

    (i). Kano

    (j). Kogi

    (k). Lagos

    (l). Nasarawa

    (m). Niger


CERTIFIED TRUE COPY

(n). Ogun

(o). Ondo

(p). Plateau

(q). Rivers

172. There were discrepancies on very large scales at the various levels of recording and collation of results, particularly between the polling units and the Ward Collation Centres.

173. The figures/scores awarded the 2nd Respondent were not the product of valid votes actually cast but were mere allocation by the 1st Respondent, and the summation of the result declared is inconsistent with and cannot be reconciled with the number of duly accredited voters.

174. That I know as a fact that the electronic evidence in this Petition were downloaded and printed from the computers/printers linked to the internet, and that the computers and printers were, at the time of producing the electronic evidence, being used regularly to store and/or process information; that throughout that period, there was supplied to the computer in the ordinary course of those activities information of the kind contained in the electronic evidence hereto attached; that throughout the material part of that period, the computer and printer were operating properly; and that the information contained in the attached documents was derived from information supplied to the computer and the printer in the ordinary course of those activities.

175. I want this Honourable Court to grant the following reliefs against the Respondents jointly and severally as contained in the Petition:

    (a). That it may be determined that the 2nd Respondent was not duly elected by a majority of lawful votes cast in the Election and therefore the declaration and return of the 2nd Respondent by the 1st Respondent as the winner of the Presidential Election conducted on the 25th day of February 2023 is unlawful, undue, null, void and of no effect.

    (b). That it may be determined that the return of the 2nd Respondent by the 1st Respondent was wrongful, unlawful, undue, null and void having not satisfied the requirements of the Electoral Act 2022 and the Constitution of the Federal Republic of Nigeria 1999 (as amended) which mandatorily requires the 2nd Respondent to score one-quarter of the lawful votes cast at the Election in each of at least two-thirds of all the States in the Federation **AND** the Federal Capital Territory, Abuja.



CERTIFIED TRUE COPY

    (c).   That it may be determined that the 1st Petitioner having scored the majority of lawful votes at the Presidential election of Saturday, 25th February 2023, be returned as the winner of the said election and be sworn in as the duly elected President of the Federal Republic of Nigeria.

### IN THE ALTERNATIVE:

    (d).   An Order directing the 1st Respondent to conduct a second election (run-off) between the 1st Petitioner and the 2nd Respondent.

### IN THE FURTHER ALTERNATIVE:

    (e).   That the election of the 2nd Respondent to the office of the President of Nigeria held on 25th February 2023 be nullified and a fresh election (re-run) ordered.

176.   That it is in the interest of justice to grant the prayers sought by the Petitioners.

177.   That I swear to this Affidavit conscientiously believing the contents to be true and correct to the best of my knowledge, and in accordance with the Oaths Act 2004.

**DEPONENT**

Sworn to at The Court of Appeal Registry, Abuja.

This _21st_ day of _March,_ 2023.

**BEFORE ME**

SECRETARY
PRESIDENTIAL ELECTION
PETITION COURT
2023

**COMMISSIONER FOR OATHS**

CERTIFIED TRUE COPY

- 160 -

## IN THE COURT OF APPEAL
## (IN THE PRESIDENTIAL ELECTION PETITION COURT)
## HOLDEN AT ABUJA

## IN THE MATTER OF THE ELECTION TO THE OFFICE OF THE PRESIDENT
## OF THE FEDERAL REPUBLIC OF NIGERIA
## HELD ON 25TH FEBRUARY 2023

**PETITION No: PEPC/A/   /2023**

BETWEEN:

**1. ABUBAKAR ATIKU**
**2. PEOPLES DEMOCRATIC PARTY (PDP)**          **PETITIONERS**

AND

**1. INDEPENDENT NATIONAL ELECTORAL**
   **COMMISSION (INEC)**
**2. TINUBU BOLA AHMED**          **RESPONDENTS**
**3. ALL PROGRESSIVES CONGRESS (APC)**

## WRITTEN STATEMENT ON OATH OF AB

I, **AB**, Adult, Christian and Nigerian Citizen of Wadata Plaza, Plot 1970, Michael Okpara Street, Abuja, do hereby make oath and state as follows:

1. That I am a registered member of the Peoples Democratic Party (PDP) and voted during the presidential election held on 25th February 2023.

2. That in preparation for the 2023 general election, the 1st Respondent awarded the contract for the supply of electoral material to be used for the 2023 general election to Binani Printing Press Limited which is a company owned by Aisha Dalhatu also known as Aisha Binani.

3. That I know Aisha Dalhatu (Aisha Binani) is a card-carrying member of the 3rd Respondent and the gubernatorial Candidate of the All Progressives Congress (APC) for Adamawa State for the 2023 general election.

4. That due to the award of the contract for the supply of all electoral materials to be used for the 2023 general election to Binani Printing Press Limited, which is owned by Aishatu Dalhatu, a card-carrying member of the All Progressives Congress (APC), the 2nd and 3rd Respondents had illegal and unlawful access to the electoral materials used for the 2023 Presidential Election held on 25th February 2023.

5. That the 1st Respondent's Chairman was confronted with the above fact but claimed to be unaware that Aisha Dalhatu (Binani) was a member of

CERTIFIED TRUE COPY

the All Progressives Congress (APC) as at the time the contract was awarded to her company.

6. That the 1st Respondent was fully and its senior officials was fully aware that Aisha Dalhatu also known as Aisha Binani had been a Director of Binani Printing Press Limited well before the election of 2023, a company involved and engaged by the 1st Respondent for printing electoral materials used in the conduct of the elections of 25th February 2023.

7. That I also know that the 1st Respondent procured the BVAS machine used in the election of 25th February 2023 from a company known as Activate Technologies Limited, a company owned by Senator Mohammed Sani Musa, a member of the 3rd Respondent's political party.

8. That the said Director of Activate Technologies Limited contested for the Niger East Senatorial District and was declared winner by the 1st Respondent.

9. That the relationship between the 1st Respondent and Activate Technologies Limited, the suppliers of BVAS compromised the integrity of the election of 25th February 2023.

10. That having regards to my depositions above, the 3rd Respondent's leadership were involved in the supply of BVAS and all electoral materials to the 1st Respondent for the election of the 25th February 2023.

11. That I make this Witness Statement in good faith conscientiously believing the contents hereof to be true and correct to the best of my knowledge and in accordance with the Oaths Act.

*AB*
_____
DEPONENT

**SWORN TO** at the Registry of the Court of Appeal, Abuja, Nigeria.

This 21st day of _March_, 2023.

**BEFORE ME**

**COMMISSIONER FOR OATHS**

SECRETARY
PRESIDENTIAL ELECTION
PETITION COURT
2023


CERTIFIED TRUE COPY

- 162 -

## IN THE COURT OF APPEAL
## (IN THE PRESIDENTIAL ELECTION PETITION COURT)
## HOLDEN AT ABUJA

## IN THE MATTER OF THE ELECTION TO THE OFFICE OF THE PRESIDENT
## OF THE FEDERAL REPUBLIC OF NIGERIA
## HELD ON 25TH FEBRUARY 2023

**PETITION No: PEPC/A/ /2023**

**BETWEEN**:

**1. ABUBAKAR ATIKU**
**2. PEOPLES DEMOCRATIC PARTY (PDP)** ⎤ **PETITIONERS**

**AND**

**1. INDEPENDENT NATIONAL ELECTORAL**
   **COMMISSION (INEC)**
**2. TINUBU BOLA AHMED** ⎤ **RESPONDENTS**
**3. ALL PROGRESSIVES CONGRESS (APC)**

## WRITTEN STATEMENT ON OATH OF ICT

I, **ICT**, Adult, Nigerian Citizen of PDI, Asokoro, Abuja do hereby make Oath and state as follows:

1. That I am Information and Communications Technology Expert, working in the Situation Office of the 1st Petitioner and thus familiar with the workings of Bi-Modal Voting Accreditation System (BVAS) and other related technologies.

2. I am equally familiar with the facts of this case particularly as it relates to the overall functionality and application of the Bi-Modal Voting Accreditation System (BVAS), IReV and other related software applications, devices or programs used by the Independent National Electoral Commission (INEC) in the just concluded Presidential Election held on 25th February 2023.

3. I am also aware that the 1st Respondent's electronic accreditation and transmission devices – the Bi-Modal Voters' Accreditation System (BVAS) which is a new voter enrolment and voter accreditation device designed to combine the functions of the Direct Data Capture Machine, the Z-Pad, the Smart Card Reader and the IReV a world-wide web portal designed for real time viewing of election results uploaded from polling units.

4. That the 1st Respondent had through its various Regulations, Guidelines and Manual, prescribed the manner of accreditation, collation and



transmission vide its technological device, the BVAS, pursuant to the Electoral Act in the manner set out below:

(1). Accreditation of voters shall be by way of Bimodal Voter Accreditation System (BVAS).

(2). Transmission of the results from polling units shall be effected electronically and directly to the collation system as prescribed by the 1st Respondent.

(3). Uploading of results shall be with the BVAS to the 1st Respondent's results Viewing Portal (IReV) directly and in realtime, as prescribed by the 1st Respondent.

(4). Collation and authentication of the results from the polling units shall be with the aid of the Results Verification System.

5. The function and the capacity of the Bi-Modal Voter Accreditation System (BVAS) is captured in the Manual for Election Official 2023 in the following words:

> **"Electronic Transmission/Upload of Election Result and Publishing to The INEC Result Viewing (IReV) Portal:**
>
> **"One of the problems noticed in the electoral process is the irregularities that take place between the Polling Units (PUs) after the announcement of results and the point of result collation. Sometimes results are hijacked, exchanged, or even destroyed at the PU, or on the way to the Collation Centers. It becomes necessary to apply technology to transmit the data from the Polling Units such that the results are collated up to the point of result declaration.**
>
> **"The real-time publishing of polling unit-level results on IReV Portal and transmission of results using the BVAS demonstrates INEC's commitment to transparency in results management. This commitment is backed by Sections 47(2), 60(1, 2 & 5), 64(4a & 4b) and 64(5) of the Electoral Act 2022, which confers INEC with the power to transmit election results electronically. The system minimizes human errors and delays in results collation and improves the accuracy, transparency, and credibility of the results collation process."**



- 164 -

6. That in furtherance of 1st Respondent's the commitment to real-time electronic transmission of results, the 1st Respondent in its Regulations and Guidelines for the Conduct of Elections, 2022 provided thus:-

> **"On completion of all the Polling Unit voting and results procedures, the Presiding Officer shall:**
>
> **(i). Electronically transmit or transfer the result of the Polling Unit, direct to the collation system as prescribed by the Commission.**
>
> **(ii). Use the BVAS to upload a scanned copy of the EC8A to the INEC Result Viewing Portal (IReV), as prescribed by the Commission."**

7. I am aware that it is mandatory for the Presiding Officer appointed by the 1st Respondent to use technological device (in this case, the BVAS device) for the accreditation of voters at the polling unit. In compliance with the foregoing, the 1st Respondent in its Regulations and Guidelines, applicable to the conduct of the election, prescribed that a person intending to vote shall be verified to be the same person on the Register of Voters by the use of the Bimodal Voter Accreditation System (BVAS).

8. That it is the same BVAS device deployed by the 1st Respondent for accreditation of voters at the polling units during the conduct of the said Election, that was to be used by the 1st Respondent to electronically transmit from the polling units, the result of the election at the polling units together with the total number of accredited voters in the respective polling units.

9. That the Electoral Act 2022, makes it mandatory for any Collation Officer or the Returning Officer for any election to collate and announce the result of an election, subject to his or her verification and confirmation that the (a). number of accredited voters stated on the collated result are correct and consistent with the number of accredited voters recorded and transmitted directly from the polling units; and (b). the voters stated on the collated result are correct and consistent with the votes recorded and transmitted directly from polling units.

10. That the 1st Respondent corroborated the provisions of the Electoral Act, in the Guidelines and Regulations, to the effect that an election result shall only be collated if the Collation Officer ascertains that the number of accredited voters tallies with the number recorded in the BVAS and that the votes scored by the political parties on the result sheet are correct and

- 165 -



agree with the result that was electronically transmitted or transferred directly from the polling unit.

11. That a collation officer or returning officer shall use the number of accredited voters recorded and transmitted directly by the BVAS from the polling units and the votes or results recorded and transmitted directly from the polling units to collate and announce the result of an election if a collated result at his or a lower level of collation is not correct.

12. That I am aware from the provisions of the Electoral Act 2022 that if a Collation or Returning Officer determines that a result from a lower level of collation is not correct, he/she shall use the result electronically transmitted or transferred directly from that lower level to collate and announce the result.

13. That further to the above, the Electoral Act 2022, made it mandatory that disputes as to the result of the election being collated, can only be resolved by the Collation Officer or Returning Officer by reference to the polling unit results and the number of accredited voters electronically transmitted from the polling unit.

14. That the 1st Respondent deliberately undermined and sabotaged the true outcome of the Election by its selective blockade of the transmission by the BVAS the Presidential Election results from the polling units while allowing access for the uploading of the results of the National Assembly (i.e., Senate and House of Representatives) election results which took place simultaneously with the Presidential Election.

15. That the 1st Respondent deliberately failed to upload the Presidential Election results from the polling units in a deliberate sabotage of the electoral process, while very curiously, the National Assembly results were easily uploaded without any hitches or "glitches".

16. That contrary to the original design of the BVAS machine to upload data directly to the IReV, the 1st Respondent contrived and installed an intervening third party device (known as Device Management System) that would intercept the results, quarantine and warehouse same, clean and filter them before further releasing same to the IReV Portal, which intervening facility the 1st Respondent used to manipulate the results in favour of the 2nd and 3rd Respondents.

17. That the critical components of the 1st Respondent's Information and Communications Technology (ICT), including but not limited to the Bimodal Voter Accreditation System (BVAS) which is an Android Device manufactured by Emperor Technologies China and supplied to the 1st Respondent by Activate Nigeria Limited. The Voter Accreditation System (VAS) was previously designed in-house by the ICT Team of the 1st Respondent headed by Mr. Chidi Nwafor, but was subsequently handed

CERTIFIED TRUE COPY

over to Emperor Technologies China and supplied to the 1st Respondent by Activate Nigeria Limited. As it relates to the IReV, the INEC Result Viewing Portal (IReV) is a web-based data entry and aggregation portal designed also by Chidi Nwafor's team and is hosted on Amazon Web Service (AWS). The server system for the device and the portal are hosted on Amazon Web Service (AWS) URL:dashboard.ivasportal.com/dash.

18. That I am aware proximate to the Elections, the 1st Respondent posted its in-house ICT expert, Chidi Nwafor, from its ICT Department to the 1st Respondent's office in Enugu as an administrative secretary, and brought in an IT Consultant, Mr. Suleiman Farouk, who introduced a third-party mechanism that was installed and made to intermediate between the BVAS and the IRev Portal, known as Device Management System (DMS). The DMS is a software that allows INEC's IT Security Consultant, Mr. Suleiman Farouk, to remotely control, monitor and filter data that is transmitted from the BVAS devices to the IRev platform.

19. That the 1st Respondent engaged an appointee of the 2nd Respondent to man and oversee the sensitive ICT Department of the 1st Respondent for the purpose of the Election.

20. That the 1st Respondent, having set the parameters, deliberately compromised the electronic transmission of results in the Presidential Election to create opportunity for manipulation of figures to the advantage of the 2nd and 3rd Respondents.

21. That there were no technical "glitches" preventing the upload and transmission of the results of the Presidential Election but what happened was a sabotage of the system by a command and control issue activated by a pre-programmed design to limit user privileges of the users at the polling units with respect to Presidential Election results while releasing user privileges in respect of the National Assembly election windows, by selectively withholding correct passwords and/or issuing wrong passwords by the deliberate use of the Device Management System equipment aforesaid.

22. That I am aware the 1st Respondent admitted its failure to electronically transmit the polling units results of the Election and the total number of accredited voters in the respective polling units to the IReV platform but surprisingly attributed same to "glitches", claiming that its server was "down".

23. That from my experience as an ICT professional, there was no failure of "server", as the "server" was cloud-based and virtual and was hosted on and by Amazon Web Service (AWS).



- 167 -

24. That I am aware that the "server" being cloud-based, in the event of any unlikely challenge, Amazon Web Service would have seamlessly switched to another server without hitch, being autoscaling groups in configuration.

25. That from my experience as an ICT professional and knowledge of the general workings of the ICT technology, I am aware that the technology system deployed by the 1st Respondent underwent Quality Assurance Tests ("QAT") before acquisition and deployment.

26. That I am also aware that the 1st Respondent has in its custody the "QAT" Report prepared by PricewaterhouseCoopers (PWC) as well as the Report of Vulnerability Assessment & Penetration Testing (VAPT) by Consultant Suleiman Farouk of Sulfman Consulting Limited on the system to show that the so-called "glitch" was a deliberate bypass to sabotage and tilt and switch the results of the Presidential Election in favour of the 2nd and 3rd Respondents.

27. That as of 1st March 2023, when the 1st Respondent returned the 2nd Respondent as the winner of the Election, I am aware that less than 50% of the results from the polling units had been transmitted and uploaded to the 1st Respondent's electronic storage device, created/acquired by the 1st Respondent itself for the purpose of collating electronically the results of the Election.

28. That from my research, I am aware that for more than 18 days after the Election, and as of the date of making this deposition, the 1st Respondent's IReV Portal shows that the 1st Respondent had failed to complete the uploading of the entire accreditation data and polling units results of the Presidential Election. I shall be relying on certified true copies of the BVAS Reports from the 1st Respondent and my Forensic Reports on BVAS, IReV and other relevant data used in connection with the Presidential Election.

29. That I my Forensic Report aforementioned shall establish that the figures/scores awarded the 2nd Respondent were not the product of valid votes actually cast but were mere allocation by the 1st Respondent, and the summation of the result declared is inconsistent with and cannot be reconciled with the number of duly accredited voters.

30. That I am aware having read the provision of the Electoral Act 2022 that it is mandatory for the 1st Respondent to cancel and reschedule an election in any polling unit where the BVAS or other technological device deployed for accreditation of voters fails to function, but notwithstanding, the 1st Respondent concluded the said Election, purported to collate the result of the Election and declared the 2nd Respondent wrongly as the winner of the said election without the prescribed electronic transmission of the results of the Election at and from the various polling units including the number



of accredited voters in the respective polling units, to the INEC Collation System and to the INEC Result Viewing Portal (IReV).

31. That the 1st Respondent's inability to utilize the technological device (BVAS) deployed by the 1st Respondent for the electronic transmission of the polling units results of the Election along with the accreditation data, amounts to a programmed failure of the said technological device to function which failure is attributable to the Respondents. The 1st Respondent in the face of the obvious failure of the BVAS to function at the respective polling units, ought to have cancelled the election and reschedule same to take place within 24 hours as required by the Electoral Act.

32. That I am aware by reason of the non-electronic transmission of the polling units results of the election and accreditation data from the respective polling units at the time of the collation of the results of the Election, all the Collation Officers at the various levels of collation of the results including the 1st Respondent's Chairman who as the Returning Officer for the said Presidential Election conducted the final collation of the results of the Election, failed to carry out the mandatory verification and confirmation that was incumbent on them pursuant to the provisions of of the Electoral Act.

33. That by reason of the foregoing, I am aware that there could not have been any valid and lawful collation and announcement of the result of an election under the Electoral Act, without the prior electronic transmission from the polling units to the INEC Collation System and IReV using the BVAS, of the results of the election at the respective polling units together with the total number of accredited voters in the polling units.

34. That I am aware it the collation of Election results and announcement of same by the Chairman of the 1st Respondent without the prior electronic transmission of the results of the Election at and from the respective polling units, and the incorrect manual collation of the results are invalid, unlawful and null and void.

35. That the 1st Respondent is in clear breach of the provisions of the Electoral Act by failing to use the BVAS to transmit the Election results at the polling units to the IRev Portal.

36. I am also aware that despite the failure to electronically transmit and several complaints for review, the 1st Respondent's Chairman refused all entreaties and demands for the suspension of the collation exercise and a review of the complaints before declaring a winner of the Election.

37. That contrary to the provisions of the 1st Respondent's Regulations and Manual which stipulate the transmission of both accreditation data and the polling units results from the BVAS directly and in real-time to the IReV,

CERTIFIED TRUE COPY

the 1st Respondent introduced a device manager called Collation Support and Results Verification System (CSRVS), with which the results from the polling units were quarantined prior to transmission to the IReV, leaving room for the 1st Respondent to upload wrong results.

38. I am aware that before the Election, the 1st Respondent had previously conducted four governorship elections successfuly, in Anambra, Ekiti, Edo and Osun States and Area Council election in the FCT, Abuja. In the four States the 1st Respondent uploaded results directly and real-time from the polling units to the IReV. In the FCT Area Council election the 1st Respondent uploaded the results within an hour of the close of election. In Osun State, by midnight of the day of the governorship election the 1st Respondent had uploaded all the results from the polling units to the IReV. In all these instances, the 1st Respondent deployed the BVAS for the accreditation of the voters and transmission of the results.

39. That from my findings in the Presidential Election of 25th February 2023, the 1st Respondent failed to transmit the results directly and realtime from the polling units to the IReV. Twelve hours after the conclusion of the Election at the respective polling units, there was no uploading whatsoever of the results by the 1st Respondent from the BVAS to the IReV.

40. That the 1st Respondent's belated claim that there was a "glitch" that made the BVAS to fail to transmit results of the Presidential Election from the polling units to the IReV is untrue as that can only be proved upon provision of event logs/time stamps of BVAS used for the election.

41. That I am aware the National Assembly election and the Presidential election were conducted simultaneously on 25th February 2023 at the same locations using the same BVAS machines for both accreditation of voters and transmission of the respective polling unit results of both elections.

42. That while the polling units results of the National Assembly were transmitted directly and real-time to the IReV from the BVAS, the results of the Presidential Election were not transmitted directly and real-time to the IReV.

43. That the 1st Respondent did not complain of any "glitch" with respect to its transmission of the polling units results to the IReV in respect of the National Assembly elections.

44. That unlike the instant Election, I am aware the off-cycle elections that were conducted by the 1st Respondent in Anambra, Ekiti, Edo, and Osun States and the Area Council election in the FCT, Abuja, did not suffer any "glitch" and the results from the polling units in those elections were not quarantined prior to being uploaded to the IReV.



45. That as of the 20th day of March 2023 the 1st Respondent was yet to fully upload the polling units results for the Election to the IReV portal.

46. That the 1st Respondent wrongly quarantined the Election results from the polling units to enable interference with the results contrary to the repeated representations made by the officials of the 1st Respondent that the results would be transmitted directly and realtime to the IReV.

47. That the 1st Respondent had earlier made representations through its officers that the device manager was procured to ensure that the information in the BVAS are in synchronisation with the 1st Respondent's electronic storage device.

48. That as of 1st March 2023, when the 1st Respondent wrongly returned the 2nd Respondent as the winner of the Election, less than 50% of the results from the polling units had been transmitted and uploaded to the 1st Respondent's electronic storage device, created/acquired by the 1st Respondent itself for the purpose of collating electronically the results of the Election.

49. I am aware that the 1st Respondent had by its Regulations and Guidelines, made pursuant to the Electoral Act, provided for the mandatory use of the **BVAS** for the said Election.

50. I am aware from my findings that that the 1st Respondent deliberately and unlawfully bypassed all the checkpoints for election integrity introduced by the new Electoral Act 2022 which had provided for the use of card readers and other technological devices, with multiple checkpoints at the Polling Unit, Ward, Local Government, Area Councils, State, and Federal collation centres, as the case may be, including the requirement to "transmit directly" the data from the BVAS machines to make an undue return in favour of the 2nd and 3rd Respondents.

51. That the bypass of the use of the BVAS machines in the transmission of the results of the election makes the integrity of the election process flawed and discredits the result announced by the 1st Respondent for the 2nd and 3rd Respondent.

52. That I make this deposition in utmost good faith, believing the contents hereof to be true and correct to the best of my knowledge.

_____

DEPONENT


CERTIFIED TRUE COPY

Sworn to at the Court of Appeal Registry, Abuja.

This _21st_ day of _March_ 2023

**BEFORE ME**

SECRETARY
PRESIDENTIAL ELECTION
PETITION COURT
2023

**COMMISSIONER FOR OATHS**

CERTIFIED TRUE COPY

- 172 -

# IN THE COURT OF APPEAL
## (IN THE PRESIDENTIAL ELECTION PETITION COURT)
## HOLDEN AT ABUJA

## IN THE MATTER OF THE ELECTION TO THE OFFICE OF THE PRESIDENT OF THE FEDERAL REPUBLIC OF NIGERIA HELD ON 25TH FEBRUARY 2023

**PETITION No: PEPC/A/　/2023**

**BETWEEN:**

**1. ABUBAKAR ATIKU**
**2. PEOPLES DEMOCRATIC PARTY (PDP)**　**PETITIONERS**

**AND**

**1. INDEPENDENT NATIONAL ELECTORAL COMMISSION (INEC)**
**2. TINUBU BOLA AHMED**　**RESPONDENTS**
**3. ALL PROGRESSIVES CONGRESS (APC)**

## WRITTEN STATEMENT ON OATH OF ABCA

I, **ABCA**, Male, Adult, Nigerian Citizen of Peoples Democratic Party's State Secretariat, Umuahia, Abia State, do hereby make oath and state as follows:

1. I am a registered member of the 2nd Petitioner and I acted as the Petitioners' Collation Officer at Umuahia for the purpose of the Presidential Election held on the 25th February 2023.

2. I am very conversant with the facts deposed herein by virtue of my appointment on the election day and I have the consent of the Petitioners to make this statement on oath.

3. The 1st Petitioner contested the Presidential election of 25th February 2023 under the platform of the 2nd Petitioner and has a right to be returned as duly elected at the Election.

4. The 2nd Petitioner appointed agents at all levels who were reporting amongst themselves to ensure that their duties were carried out successfully. That the other agents and myself were issued with appointment letters as representatives of the 2nd Petitioner.

5. In Abia State, on the Election Day, the Local Government Collation agents report to me while I report to the National Collation Agent.



- 173 -

6.  At the Election, the Agents of the Petitioners performed several functions which included monitoring of the election, signing of result sheets, obtaining and forwarding duplicate copies of the result sheets to their superiors, and forwarding complaints to the 1st Respondent.

7.  The 1st Respondent announced the result of the Presidential Election with respect to Abia State and declared the following as scores of the candidates as follows:

    1st Petitioner        –     22,676

    2nd Respondent   –     8,914

    Labour Party        -     327,095

    (Took part in the elections)

8.  The Petitioners' Local Government Area Collation Agents handed over to me the duplicate copies of the Polling Units, Wards and Local Governments Collation Results sheets of Abia State.

9.  Upon receipt of the duplicate copies of the result sheets from the Petitioners' Local Government Collation Agents of the 17 Local Government Areas of Abia State as well as the certified true copies of the election results and BVAS Report issued by the 1st Respondent, myself and other members of the 2nd Petitioners scrutinized same.

10. The 1st Respondent failed to transmit the real results directly and real-time to the IReV portal and its electronic storage device before the hasty return and announcement of the winner of the election for Abia State.

11. The votes collated at the polling units are to be electronically transmitted with the Bimodal Voter Accreditation System (BVAS) directly and real-time to the INEC IReV same was not done by the 1st Respondent.

12. From the careful scrutiny of all the electoral results my team members and I analyzed, there is widespread of non-compliance with the provisions of the Electoral Act and Guidelines in several polling units of Abia State as well as mutilations of the results and over-voting.

13. In the State, the 1st Respondent wrongly and deliberately entered wrong scores/results, which negatively affected the scores of the Petitioners.

14. The 17 **Local Government Area** of Abia State, the 1st Respondent failed to comply with the mandatory provisions and requirement of the Electoral Act and Guidelines and Manual for Election Officials 2023 which failure affected the results of the said Polling Units.

15. The total numbers of votes as well as number of accredited voters recorded in the respective Forms EC8A for those polling units do not tally with the



numbers of accredited and verified voters on the record of the Bimodal Voter Accreditation System (BVAS) for the same polling units.

16. The cumulative results of the election credited to the 2nd and 3rd Respondents as announced by the 1st Respondent included unlawful, invalid and illegal results from Polling Units in Aba South, Ukwa East and Aba North Local Government Area of Abia State as there were unlawful, invalid and illegal results.

17. The 1st Respondent in carrying out its duties effected incorrect entry or entries of the scores of the 2nd Respondent as the scores contained in form EC8A and announced by the 1st Respondent are not the correct votes genuinely scored by the 2nd Respondent in the Presidential Election held on the 25th day of February 2023.

18. The 1st Respondents perpetrated irregularities and failed to comply with the provisions of the 1999 Constitution (as amended), or any other statute, Regulations & Guidelines for elections and Manuals for Election Officials.

19. The conduct of elections in the Polling Units in all the wards in all the Local Government Area of Abia State in the 2023 General Election did not substantially comply with all relevant provisions and requirements of the extant electoral laws.

20. Unlawful votes were collated by the 1st Respondent at the different levels of collation in Forms EC 8B, EC 8C and EC 8D(A).

21. The 1st Respondent refused and failed to conduct the Election in the manner that will ensure free and fair election.

22. That I make this Witness Statement in good faith conscientiously believing the contents hereof to be true and correct to the best of my knowledge and in accordance with the Oaths Act.

_CA_

DEPONENT

**SWORN TO** at the Registry of the Court of Appeal, Abuja, Nigeria.

This _21st_ day of _March_, 2023.

**BEFORE ME**

[stamp: ....... TARY PRESIDENTIAL ELECTION PETITION COURT 2023]

**COMMISSIONER FOR OATHS**

CERTIFIED TRUE COPY

- 175 -

# IN THE COURT OF APPEAL
## (IN THE PRESIDENTIAL ELECTION PETITION COURT)
## HOLDEN AT ABUJA

## IN THE MATTER OF THE ELECTION TO THE OFFICE OF THE PRESIDENT OF THE FEDERAL REPUBLIC OF NIGERIA HELD ON 25TH FEBRUARY 2023

**PETITION No: PEPC/A/     /2023**

BETWEEN:

**1. ABUBAKAR ATIKU**
**2. PEOPLES DEMOCRATIC PARTY (PDP)** ⎯ **PETITIONERS**

**AND**

**1. INDEPENDENT NATIONAL ELECTORAL**
   **COMMISSION (INEC)**
**2. TINUBU BOLA AHMED** ⎯ **RESPONDENTS**
**3. ALL PROGRESSIVES CONGRESS (APC)**

## WRITTEN STATEMENT ON OATH OF AMCA

I, **AMCA**, Adult, Nigerian Citizen of Peoples Democratic Party's State Secretariat, Awka, Anambra State, do hereby make oath and state as follows:

1.  I am a registered member of the 2nd Petitioner and the Anambra State Collation Agent for the 2nd Petitioner.

2.  By virtue of my aforesaid status, I am very conversant with the facts deposed herein and I have the consent and authority of the Petitioners to make this statement on oath and I do so on their behalf.

3.  The 1st Petitioner contested the Presidential election of 25th February 2023 under the platform of the 2nd Petitioner and has a right to be returned as duly elected at the Election.

4.  The 2nd Petitioner acted through its agents who were reporting amongst themselves for the said election. I was one of such agents and I worked with the local government collation Agents, state coordinators and constituency collation agents and in the course of my work.

5.  The Agents of the 2nd Petitioner performed several functions relating to the said election which included monitoring the election, signing of result sheets, obtaining and forwarding duplicate copies of the result sheets to their superiors, and forwarding complaints.

- 176 -

CERTIFIED TRUE COPY

6.  The results at the polling units are to be electronically transmitted with the Bimodal Voter Accreditation System (BVAS) directly and in real-time to the INEC IReV, but this was not complied with by the 1st Respondent.

7.  That I make this Witness Statement in good faith conscientiously believing the contents hereof to be true and correct to the best of my knowledge and in accordance with the Oaths Act.

MCA

DEPONENT

**SWORN TO** at the Registry of the Court of Appeal, Abuja, Nigeria.

This 21st day of March 2023.

**BEFORE ME**

SECRETARY
PRESIDENTIAL ELECTION
PETITION COURT
2023

**COMMISSIONER FOR OATHS**

CERTIFIED TRUE COPY

- 177 -

**IN THE COURT OF APPEAL
(IN THE PRESIDENTIAL ELECTION PETITION COURT)
HOLDEN AT ABUJA**

**IN THE MATTER OF THE ELECTION TO THE OFFICE OF THE PRESIDENT
OF THE FEDERAL REPUBLIC OF NIGERIA
HELD ON 25TH FEBRUARY 2023**

**PETITION No: PEPC/A/ /2023**

**BETWEEN:**

**1. ABUBAKAR ATIKU
2. PEOPLES DEMOCRATIC PARTY (PDP)** ⎤ **PETITIONERS**

**AND**

**1. INDEPENDENT NATIONAL ELECTORAL
   COMMISSION (INEC)
2. TINUBU BOLA AHMED** ⎤ **RESPONDENTS**
**3. ALL PROGRESSIVES CONGRESS (APC)**

## WRITTEN STATEMENT ON OATH OF BNCA

I, **BNCA,** Adult, Nigerian Citizen of Peoples Democratic Party's Secretariat, Benue State, do hereby make oath and state as follows:

1.  That I am a registered member of the 2nd Petitioner.

2.  I acted as the Petitioners' State Collation officer for the for the purpose of the Presidential Election that held on the 25th of February 2023 in Benue State.

3.  That by virtue appointment and responsibilities on the election day, I am very familiar with the facts deposed herein.

4.  I have the consent and permission of the Petitioners to make this statement on oath and I do so on their behalf.

5.  The 2nd Petitioner as a political party acted through its agents who were reporting amongst themselves from the bottom to the top in the hierarchy for the said election.

6.  That the Local Government Collation Agents report to me while I report to the National Collation Agents.



7. That the Petitioners had agents in all the Polling Units in Benue State as well as Ward and Local Government Agents in all the Wards and Local Government Collation Centres of Benue State.

8. The Agents of the Petitioners performed several functions relating to the said election which included monitoring of the election, signing of result sheets, obtaining and forwarding duplicate copies of the result sheets to their superiors, and forwarding complaints.

9. That the 1st Respondent in carrying out its duties inputed incorrect entry or entries of the scores of the 2nd Respondent as the scores contained in form EC8A and announced by the 1st Respondent are the not the correct votes genuinely scored by the 2nd Respondent in the Presidential Election held on the 25th day of February 2023.

10. That the conduct of elections in the Polling Units in all the wards in all the local government area of Benue State in the 2023 General Election did not substantially comply with all relevant provisions and requirements of the extant electoral laws. That the Petitioners' Local Government Area Collation Agents under my supervision handed over to me the duplicate copies of the Polling Units, Wards and Local Governments Collation Results sheets of Benue State.

11. That upon receipt of the duplicate copies of the result sheets from the Petitioners' Local Government Collation Agents of the Local Government Areas of Benue State as well as the certified true copies of the election results and BVAS Report issued by the 1st Respondent, myself and other members of the 2nd Petitioners scrutinized same.

12. That the 1st Respondent failed to comply with its own Guidelines and representations to transmit results directly and in real-time to the IReV and its electronic storage device before the hasty return and announcement of the winner of the election for Benue State.

13. That the votes collated at the polling units are to be electronically transmitted with the Bimodal Voter Accreditation System (BVAS) directly and in real-time to the IReV, but this was not complied with by the 1st Respondent.

14. That from the careful scrutiny of all the electoral results my team members and I analyzed, there is widespread non-compliance with the mandatory provisions of the Electoral Act and Guidelines in several polling units of Banue State.

15. That I am aware the officer of the 1st Respondent did not carry out their constitutional and statutory responsibilities of organizing and conducting the elections of 25th February 2023 properly.

CERTIFIED TRUE COPY

16. That the Respondents perpetrated irregularities and failed to comply with the provisions of the 1999 Constitution (as amended), or any other statute, Regulations & Guidelines for elections and Manuals for Election Officials.

17. That unlawful votes were collated by the 1st Respondent at the different levels of collation in Forms EC 8B, EC 8C and EC 8D.

18. That I make this Witness Statement in good faith conscientiously believing the contents hereof to be true and correct to the best of my knowledge and in accordance with the Oaths Act.

_NCA_

DEPONENT

**SWORN TO** at the Registry of the Court of Appeal, Abuja, Nigeria.

This _21st_ day of _March,_ 2023.

**BEFORE ME**

SECRETARY
PRESIDENTIAL ELECTION
PETITION COURT
2023

**COMMISSIONER FOR OATHS**

CERTIFIED TRUE COPY

**IN THE COURT OF APPEAL**
**(IN THE PRESIDENTIAL ELECTION PETITION COURT)**
**HOLDEN AT ABUJA**

**IN THE MATTER OF THE ELECTION TO THE OFFICE OF THE PRESIDENT**
**OF THE FEDERAL REPUBLIC OF NIGERIA**
**HELD ON 25TH FEBRUARY 2023**

**PETITION No: PEPC/A/    /2023**

**BETWEEN:**

**1. ABUBAKAR ATIKU**
**2. PEOPLES DEMOCRATIC PARTY (PDP)**   **PETITIONERS**

**AND**

**1. INDEPENDENT NATIONAL ELECTORAL**
   **COMMISSION (INEC)**
**2. TINUBU BOLA AHMED**   **RESPONDENTS**
**3. ALL PROGRESSIVES CONGRESS (APC)**

## WRITTEN STATEMENT ON OATH OF BOCA

I, **BOCA**, Adult, Nigerian Citizen of Peoples Democratic Party's State Secretariat, Maiduguri, Borno State, do hereby make oath and state as follows:

1.    I am a registered member of the 2nd Petitioner and the State Collation Agent for the 2nd Petitioner.

2.    By virtue of my aforesaid status, I am very conversant with the facts deposed herein and I have the consent and authority of the Petitioners to make this statement on oath and I do so on their behalf in Borno State.

3.    The 1st Petitioner contested the Presidential election of 25th February 2023 under the platform of the 2nd Petitioner and has a right to be returned as duly elected at the Election.

4.    The 2nd Petitioner acted through its agents who were reporting amongst themselves for the said election. I was one of such agents and I worked with the local government collation Agents, state coordinators and constituency collation agents and in the course of my work.

5.    The Agents of the 2nd Petitioner performed several functions relating to the said election which included monitoring the election, signing of result sheets, obtaining and forwarding duplicate copies of the result sheets to their superiors, and forwarding complaints.

- 181 -



6.      The results at the polling units are to be electronically transmitted with the Bimodal Voter Accreditation System (BVAS) directly and in real-time to the INEC IReV, but this was not complied with by the 1st Respondent.

7.      That I make this Witness Statement in good faith conscientiously believing the contents hereof to be true and correct to the best of my knowledge and in accordance with the Oaths Act.

_____
DEPONENT

**SWORN TO** at the Registry of the Court of Appeal, Abuja, Nigeria.

This _21st_ day of March 2023.

**BEFORE ME**

SECRETARY
PRESIDENTIAL ELECTION
PETITION COURT
2023

**COMMISSIONER FOR OATHS**

CERTIFIED TRUE COPY - 182 -

# IN THE COURT OF APPEAL
## (IN THE PRESIDENTIAL ELECTION PETITION COURT)
### HOLDEN AT ABUJA

## IN THE MATTER OF THE ELECTION TO THE OFFICE OF THE PRESIDENT OF THE FEDERAL REPUBLIC OF NIGERIA HELD ON 25TH FEBRUARY 2023

**PETITION No: PEPC/A/    /2023**

BETWEEN:

**1. ABUBAKAR ATIKU**
**2. PEOPLES DEMOCRATIC PARTY (PDP)** ⎤⎯ **PETITIONERS**

AND

**1. INDEPENDENT NATIONAL ELECTORAL COMMISSION (INEC)**
**2. TINUBU BOLA AHMED** ⎤⎯ **RESPONDENTS**
**3. ALL PROGRESSIVES CONGRESS (APC)**

## <u>WRITTEN STATEMENT ON OATH OF EBCA</u>

I, **EBCA**, Adult, Nigerian Citizen of Peoples Democratic Party's Secretariat, Abakaliki, Ebonyi State, do hereby make oath and state as follows:

1.     I am a registered member of the 2nd Petitioner and I acted as one of the Petitioners' State Collation officers for the purpose of the Presidential Election held on the 25th of February 2023 in Ebonyi State.

2.     By virtue of my aforesaid status, I am conversant with the facts deposed herein.

3.     I have the consent and authority of the Petitioners to make this statement on oath and I do so on their behalf.

4.     During the conduct of the presidential election, the Local Government Collation Agents of the Petitioners reported to me while I reported to the National Collation Agents.

5.     During and after the conduct of the presidential election, I received reports from the Petitioners agents at the Polling Units, Wards and Local Government Areas of Ebonyi State.

6.     I equally went around several polling units during the conduct of the presidential election on 25th February 2023 where I observed that the



results from each of the polling unit were not transmitted by the agents of the 1st Respondent to the IRev Portal.

7.   These infractions occurred in all the polling units of Ebonyi State and the 1st Respondent did not properly carry out its constitutional and statutory responsibilities of organizing and conducting the elections of 25th February 2023.

8.   The 1st Respondent also failed to comply with the mandatory provisions and requirements of the Electoral Act and Guidelines and Manual for Election Officials 2023, specifically with realtime transmission of results which failure affected the outcome of the election.

9.   The conduct of elections in the Polling Units in all the wards in all the local government area of Ebonyi State in the 2023 General Election did not substantially comply with all relevant provisions and requirements of the extant electoral laws.

10.  That I make this Witness Statement in good faith conscientiously believing the contents hereof to be true and correct to the best of my knowledge and in accordance with the Oaths Act.

_____

BCA

DEPONENT

**SWORN TO** at the Registry of the Court of Appeal, Abuja, Nigeria.

This _21st_ day of _March,_ 2023.

**BEFORE ME**

> *SECRETARY*
> *PRESIDENTIAL ELECTION*
> *PETITION COURT*
> *2023*

**COMMISSIONER FOR OATHS**

CERTIFIED TRUE COPY

- 184 -

# IN THE COURT OF APPEAL
## (IN THE PRESIDENTIAL ELECTION PETITION COURT)
### HOLDEN AT ABUJA

## IN THE MATTER OF THE ELECTION TO THE OFFICE OF THE PRESIDENT OF THE FEDERAL REPUBLIC OF NIGERIA HELD ON 25TH FEBRUARY 2023

**PETITION No: PEPC/A/    /2023**

**BETWEEN**:

1. **ABUBAKAR ATIKU**
2. **PEOPLES DEMOCRATIC PARTY (PDP)**        **PETITIONERS**

   **AND**

1. **INDEPENDENT NATIONAL ELECTORAL COMMISSION (INEC)**
2. **TINUBU BOLA AHMED**        **RESPONDENTS**
3. **ALL PROGRESSIVES CONGRESS (APC)**

## WRITTEN STATEMENT ON OATH OF EDCA

I, **EDCA**, Adult, Nigerian Citizen of Peoples Democratic Party's State Secretariat, Benin, Edo State, do hereby make oath and state as follows:

1.    I am a registered member of the 2nd Petitioner.

2.    I acted as the Petitioners' Edo State Collation Officer for the purpose of the Presidential Election held on the 25th February 2023.

3.    Upon my appointment at as the 2nd Petitioners' Edo State Collation Agent, I was issued with an appointment letter.

4.    By virtue of my aforesaid status, I am very conversant with the facts deposed herein.

5.    I have the consent and permission of the Petitioners to make this statement on oath and I do so on their behalf.

6.    The 1st Petitioner contested the Presidential election of 25th February 2023 under the platform of the 2nd Petitioner and has a right to be returned as duly elected at the Election.

7.    The 2nd Petitioner as a corporate body acted through its agents who were reporting amongst themselves from the bottom to the top in the hierarchy for the said election.

CERTIFIED TRUE COPY

8.  In Edo State, the Local Government Collation Agents report to me while I report to the National Collation Agents.

9.  The Petitioners had agents in all the Polling Units, Wards and Local Government Collation Centres of Edo State.

10. The 1st Respondent failed to comply with its own Guidelines and representations to transmit results directly and real-time to the IReV and its electronic storage device before the hasty return and announcement of the winner of the election for Edo State.

11. The votes collated at the polling units are to be electronically transmitted with the Bimodal Voter Accreditation System (BVAS) directly and real-time to the INEC IReV same was not done by the 1st Respondent.

12. The officials of the 1st Respondent did not carry out their constitutional and statutory responsibilities of properly organizing and conducting the elections of 25th February 2023.

13. I make this Witness Statement in good faith conscientiously believing the contents hereof to be true and correct to the best of my knowledge and in accordance with the Oaths Act.

DCA

DEPONENT

**SWORN TO** at the Registry of the Court of Appeal, Abuja, Nigeria.

This _21st_ day of March 2023.

**BEFORE ME**

SECRETARY
PRESIDENTIAL ELECTION
PETITION COURT
2023

**COMMISSIONER FOR OATHS**

CERTIFIED TRUE COPY

# IN THE COURT OF APPEAL
## (IN THE PRESIDENTIAL ELECTION PETITION COURT)
## HOLDEN AT ABUJA

## IN THE MATTER OF THE ELECTION TO THE OFFICE OF THE PRESIDENT OF THE FEDERAL REPUBLIC OF NIGERIA HELD ON 25TH FEBRUARY 2023

**PETITION No: PEPC/A/    /2023**

BETWEEN:

**1. ABUBAKAR ATIKU**
**2. PEOPLES DEMOCRATIC PARTY (PDP)**  **PETITIONERS**

AND

**1. INDEPENDENT NATIONAL ELECTORAL COMMISSION (INEC)**
**2. TINUBU BOLA AHMED**   **RESPONDENTS**
**3. ALL PROGRESSIVES CONGRESS (APC)**

## WRITTEN STATEMENT ON OATH OF EKCA

I, **EKCA**, Adult, Nigerian Citizen of Peoples Democratic Party's Secretariat, Ekiti, Ekiti State, do hereby make oath and state as follows:

1.  I am a registered member of the 2nd Petitioner and I acted as one of the Petitioners' State Collation officers for the purpose of the Presidential Election held on the 25th of February 2023 in Ekiti State

2.  By virtue of my aforesaid status, I am conversant with the facts deposed herein.

3.  I have the consent and authority of the Petitioners to make this statement on oath and I do so on their behalf.

4.  During the conduct of the presidential election, the Local Government Collation Agents of the Petitioners report to me while I report to the National Collation Agents.

5.  During and after the conduct of the presidential election, I received reports from the Petitioners agents at the Polling Units, Wards and Local Government Areas of Ebonyi State.

6.  I equally went around several polling units during the conduct of the presidential election on 25th February 2023 where I observed that the



results from each of the polling unit were not transmitted by the agents of the 1st Respondent to the IRev Portal.

7. That Bi-Modal Voters Accreditation Systems (BVAS) was not used for the accreditation of voters and transmission of result.

8. That as at the date of making this Statement on Oath, the 1st Respondent is yet to fully upload the outcome of the polling unit election on the IReV portal.

9. That the 1st Respondent did not comply with the undertaking and representation of its Chairman and other senior officers to transmit the results from the polling units to the IReV.

10. These infractions occurred in all the polling units of Ebonyi State and the 1st Respondent did not properly carry out its constitutional and statutory responsibilities of organizing and conducting the elections of 25th February 2023.

11. The 1st Respondent also failed to comply with the mandatory provisions and requirements of the Electoral Act and Guidelines and Manual for Election Officials 2023, specifically with realtime transmission of results which failure affected the outcome of the election.

12. The conduct of elections in the Polling Units in all the wards in all the local government area of Ebonyi State in the 2023 General Election did not substantially comply with all relevant provisions and requirements of the extant electoral laws.

13. That I make this Witness Statement in good faith conscientiously believing the contents hereof to be true and correct to the best of my knowledge and in accordance with the Oaths Act.

_K CA_

DEPONENT

**SWORN TO** at the Registry of the Court of Appeal, Abuja, Nigeria.

This _21st_ day of _March_ 2023.

**BEFORE ME**

SECRETARY
PRESIDENTIAL ELECTION
PETITION COURT
2023

**COMMISSIONER FOR OATHS**

CERTIFIED TRUE COPY

# IN THE COURT OF APPEAL
## (IN THE PRESIDENTIAL ELECTION PETITION COURT)
### HOLDEN AT ABUJA

## IN THE MATTER OF THE ELECTION TO THE OFFICE OF THE PRESIDENT OF THE FEDERAL REPUBLIC OF NIGERIA HELD ON 25TH FEBRUARY 2023

**PETITION No: PEPC/A/    /2023**

**BETWEEN:**

**1. ABUBAKAR ATIKU**
**2. PEOPLES DEMOCRATIC PARTY (PDP)**    **PETITIONERS**

**AND**

**1. INDEPENDENT NATIONAL ELECTORAL COMMISSION (INEC)**
**2. TINUBU BOLA AHMED**
**3. ALL PROGRESSIVES CONGRESS (APC)**    **RESPONDENTS**

## WRITTEN STATEMENT ON OATH OF ENCA

I, **ENCA,** Adult, Male, Christian, Nigerian Citizen of Peoples Democratic Party's Secretariat, Enugu State, do hereby make oath and state as follows:

1.    That I am a registered member 2nd Petitioner.

2.    That I acted as one of the Petitioners' Enugu State Co-ordinator for the purpose of the Presidential Election that held on the 25th of February 2023.

3.    That by virtue of my aforesaid status, I am very conversant with the facts deposed herein.

4.    That I have the permission of the Petitioners to make this statement on oath and I do so sincerely.

5.    That the 2nd Petitioner as a political party acted through its agents who were reporting amongst themselves from the bottom to the top in the hierarchy for the said election.

6.    That the Local Government Collation Agents liaise with me while I reported to the National Collation Agents.

7.    That I visited several polling units in my ward on the day of the election.



- 189 -

8.  That the 1st Respondent in carrying out its duties effected incorrect entry or entries of the scores of the 2nd Respondent as the scores contained in form EC8A and announced by the 1st Respondent are the not the correct votes genuinely scored by the 2nd Respondent in the Presidential Election held on the 25th day of February 2023.

9.  That the 1st Respondent failed to comply with its own Guidelines and representations to transmit results directly and in real-time to the IReV and its electronic storage device before the hasty return and announcement of the winner of the election.

10. That the votes collated at the polling units were to be electronically transmitted with the Bimodal Voter Accreditation System (BVAS) directly and in real-time to the INEC IReV, but this was not complied with by the 1st Respondent.

11. That I make this Witness Statement in good faith conscientiously believing the contents hereof to be true and correct to the best of my knowledge and in accordance with the Oaths Act.

ENC

DEPONENT

**SWORN TO** at the Registry of the Court of Appeal, Abuja, Nigeria.

This 21st day of March, 2023.

**BEFORE ME**

PRESIDENTIAL ELE......
PETITION COURT
2023

**COMMISSIONER FOR OATHS**

CERTIFIED TRUE COPY

- 190 -

# IN THE COURT OF APPEAL
## (IN THE PRESIDENTIAL ELECTION PETITION COURT)
## HOLDEN AT ABUJA

## IN THE MATTER OF THE ELECTION TO THE OFFICE OF THE PRESIDENT OF THE FEDERAL REPUBLIC OF NIGERIA
## HELD ON 25TH FEBRUARY 2023

**PETITION No: PEPC/A/    /2023**

**BETWEEN**:

**1. ABUBAKAR ATIKU**
**2. PEOPLES DEMOCRATIC PARTY (PDP)** —— **PETITIONERS**

**AND**

**1. INDEPENDENT NATIONAL ELECTORAL**
**   COMMISSION (INEC)**
**2. TINUBU BOLA AHMED** —— **RESPONDENTS**
**3. ALL PROGRESSIVES CONGRESS (APC)**

## WRITTEN STATEMENT ON OATH OF FCTCA

I, **FCTCA**, Adult, Nigerian Citizen of Peoples Democratic Party's Secretariat, Wadata Plaza, Wuse Zone 5, Abuja, do hereby make oath and state as follows:

1.    I am a registered member of the 2nd Petitioner.

2.    I acted as the Petitioners' Federal Capital Territory Collation Officer for the purpose of the Presidential Election held on the 25th February 2023.

3.    By virtue of my aforesaid status, I am very conversant with the facts deposed herein.

4.    I know that the 1st Petitioner contested the Presidential election of 25th February 2023 under the platform of the 2nd Petitioner and has a right to be returned as duly elected at the Election.

5.    That the 2nd Petitioner as a political party acted through its agents who were reporting amongst themselves from the bottom to the top in the hierarchy for the said election.

6.    In the Federal Capital Territory, the Area Council Collation Agents reported to me while I reported to the National Collation Agents.

7.    That the Petitioners had agents in all the Polling Units, Wards and Area Council Collation Centres of the Federal Capital Territory. Petitioners also had Co-ordinators for the Federal Capital Territory.

- 191 -

CERTIFIED TRUE COPY

8. The Federal Capital Territory consists of Six (6) Area Councils with Six-Two (62) Registration Areas (Wards) and a total of Two Thousand, Eight Hundred and Twenty-Two (2,822) Polling Units.

9. I was present at the Federal Capital Territory Collation Centre during the collation and announcement of the result of the Federal Capital Territory.

10. The 1st Respondent announced the result of the Presidential Election with respect to the Federal Capital Territory and declared the following as scores of the candidates in the Federal Capital Territory:

| No. | POLITICAL PARTIES | SCORE | PERCENTAGE |
|-----|-------------------|-------|------------|
| 1. | A | 490 | 0.102% |
| 2. | AA | 506 | 0.105% |
| 3. | AAC | 215 | 0.044% |
| 4. | ADC | 768 | 0.160% |
| 5. | ADP | 583 | 0.121% |
| 6. | **APC** | **90,902** | **18.991%** |
| 7. | APGA | 1,362 | 0.284% |
| 8. | APM | 297 | 0.062% |
| 9. | APP | 146 | 0.030% |
| 10. | BP | 748 | 0.156% |
| 11. | LP | 281,717 | 58.856% |
| 12. | NNPP | 4,517 | 0.943% |
| 13. | NRM | 294 | 0.061% |
| 14. | PDP | 74,194 | 15.500% |
| 15. | PRP | 131 | 0.027% |
| 16. | SDP | 233 | 0.048% |
| 17. | YPP | 335 | 0.069% |
| 18. | ZLP | 2,631 | 0.549% |

11. Upon receipt of the duplicate copies of the result sheets from the Petitioners' Area Collation Agents of the 6 Area Councils of the Federal Capital Territory as well as the certified true copies of the election results and BVAS Report issued by the 1st Respondent, myself and other members of the 2nd Petitioners scrutinized same and we found out that the 1st Respondent failed to comply with its own Guidelines and representations to transmit results directly and real-time to the IReV and its electronic storage device before the hasty return and announcement of the winner of the election for the Federal Capital Territory.

12. The 1st Respondent failed to transmit the polling units results electronically with the Bimodal Voter Accreditation System (BVAS) directly and real-time to the INEC IReV.

13. As of 19th March 2023, long after the Presidential election has been concluded and results announced, the 1st Respondent did not upload the polling unit results of the 10,295 polling units.

14. The officer of the 1st Respondent did not carry out their constitutional and statutory responsibilities of organizing and conducting the elections of 25th February 2023 properly.

15. The conduct of elections in the Polling Units in all the wards in all the Area Councils of the Federal Capital Territory in the 2023 Presidential General Election did not substantially comply with all relevant provisions and requirements of the extant electoral laws.

16. That unlawful votes were collated by the 1st Respondent at the different levels of collation in Forms EC 8B, EC 8C and EC 8D.

17. The 1st Respondent refused and failed to adhere to its Regulations and that the votes scored by and recorded for the 2nd and 3rd Respondents were vitiated.

18. I make this Witness Statement in good faith, believing the contents same to be true and correct to the best of my knowledge and in accordance with the Oaths Act.

_fe7_

DEPONENT

**SWORN TO** at the Registry of the Court of Appeal, Abuja, Nigeria.

This _21st_ day of March 2023.

**BEFORE ME**

**COMMISSIONER FOR OATHS**

CERTIFIED TRUE COPY

- 193 -

# IN THE COURT OF APPEAL
## (IN THE PRESIDENTIAL ELECTION PETITION COURT)
## HOLDEN AT ABUJA

## IN THE MATTER OF THE ELECTION TO THE OFFICE OF THE PRESIDENT OF THE FEDERAL REPUBLIC OF NIGERIA
## HELD ON 25TH FEBRUARY 2023

**PETITION No: PEPC/A/    /2023**

BETWEEN:

1. **ABUBAKAR ATIKU**
2. **PEOPLES DEMOCRATIC PARTY (PDP)** ⎫ **PETITIONERS**

AND

1. **INDEPENDENT NATIONAL ELECTORAL COMMISSION (INEC)**
2. **TINUBU BOLA AHMED** ⎫ **RESPONDENTS**
3. **ALL PROGRESSIVES CONGRESS (APC)**

## <u>WRITTEN STATEMENT ON OATH OF FCTPDPC</u>

I, **FCTPDPC**, Adult, Nigerian Citizen of Peoples Democratic Party's Secretariat, Wadata Plaza, Wuse Zone 5, Abuja, do hereby make oath and state as follows:

1. I am a registered member and Federal Capital Territory Chairman of the 2nd Petitioner.

2. As the FCT Chairman of the 2nd Petitioner, I was engaged in the coordination of the Petitioners' Agents in the Federal Capital Territory, received reports and results of the election.

3. By virtue of my aforesaid status, I am very conversant with the facts deposed herein.

4. The 1st Petitioner contested the Election of 25th February 2023 under the sponsorship of the 2nd Petitioner and I know that the 1st Petitioner has a right to be returned as duly elected at the Election.

5. The 2nd Petitioner is a political party which acted through its agents including State Co-ordinators who worked in concert with themselves.

6. The Petitioners appointed agents in all the Polling Units, Wards and Area Council Collation Centres of the Federal Capital Territory and these agents performed creditably well on election day.



- 194 -

7.    The Federal Capital Territory consists of Six (6) Area Councils, Six-Two (62) Registration Areas (Wards) and a total of Two Thousand, Eight Hundred and Twenty-Two (2,822) Polling Units.

8.    I participated in the collation at the Federal Capital Territory Collation Centre and I observed the collation of the result and the figures ascribed to all the candidates.

9.    The 1st Respondent announced the result of the Presidential Election and declared the following as scores of the candidates in the Federal Capital Territory:

| No. | POLITICAL PARTIES | SCORE | PERCENTAGE |
|-----|-------------------|-------|------------|
| 1. | A | 490 | 0.102% |
| 2. | AA | 506 | 0.105% |
| 3. | AAC | 215 | 0.044% |
| 4. | ADC | 768 | 0.160% |
| 5. | ADP | 583 | 0.121% |
| 6. | **APC** | **90,902** | **18.991%** |
| 7. | APGA | 1,362 | 0.284% |
| 8. | APM | 297 | 0.062% |
| 9. | APP | 146 | 0.030% |
| 10. | BP | 748 | 0.156% |
| 11. | LP | 281,717 | 58.856% |
| 12. | NNPP | 4,517 | 0.943% |
| 13. | NRM | 294 | 0.061% |
| 14. | PDP | 74,194 | 15.500% |
| 15. | PRP | 131 | 0.027% |
| 16. | SDP | 233 | 0.048% |
| 17. | YPP | 335 | 0.069% |
| 18. | ZLP | 2,631 | 0.549% |

10.    I received all the duplicate results of the polling units, Wards, Area Councils and I took time to scrutinized them.

11.    The 1st Respondent failed to transmit results directly and real-time to the IReV Portal and its electronic storage device before the hasty return and announcement of the winner of the election for the Federal Capital Territory.

12.    The votes collated at the polling units are to be electronically transmitted with the Bimodal Voter Accreditation System (BVAS) directly and real-time to the INEC IReV same was not done by the 1st Respondent.



13. As of 19th March 2023, long after the Presidential election has been concluded and results announced, the 1st Respondent did not upload the polling unit results of 10,295 polling units.

14. As a part condition for to be duly elected as the President of the Federal Republic of Nigeria, a presidential candidate is mandated to secure one quarter (25%) of the total valid votes cast in the Federal Capital Territory.

15. The total number of valid votes cast in the Federal Capital Territory is 460,071.

16. One quarter (25%) of the total valid votes cast in the Federal Capital Territory for the 2023 presidential election is 115,100 votes.

17. The 2nd and 3rd Respondents only secured 90,902 from the total valid votes cast for the Federal Capital Territory.

18. From the final presidential election result collated for the Federal Capital Territory as announced by the 1st Respondent, the 2nd and 3rd Respondents only secured 18.991% of the total valid votes cast for the Federal Capital Territory.

19. The 2nd and 3rd Respondents did not secure 25% of the total votes cast for the Federal Capital Territory.

20. The 2nd and 3rd Respondents did not satisfy the condition of securing 25% of the valid votes cast for the Federal Capital Territory to declared the winner of the 2023 Presidential Election.

21. I know as a fact that all previous winners of the presidential election of Nigeria from 1999 secured at least 25% of the total valid votes cast in the Federal Capital Territory.

22. In the 1999 Presidential election, President Olusegun Obasanjo who was declared winner of the said election secured 59,234 (59.8%) of the total valid votes cast in the Federal Capital Territory.

23. In the 2003 Presidential election, President Olusegun Obasanjo who was declared winner of the said election secured 130,234 (49.9%) of the total valid votes cast in the Federal Capital Territory.

24. In the 2007 Presidential elections, President Umaru Musa Yar'adua who was declared winner of the election secured more than 25% of the total valid votes cast in the Federal Capital Territory.

25. In the 2011 Presidential election, President Goodluck Ebele Jonathan who was declared winner of the said election secured 253, 444 (63.66%) of the total valid votes cast in the Federal Capital Territory.



- 196 -

26. In the 2015 Presidential election, President Muhammadu Buhari who was declared winner of the said election secured 146,399 (47.72%) of the total valid votes cast in the Federal Capital Territory.

27. In the 2019 Presidential election, President Muhammadu Buhari who was declared winner of the said election secured 152,224 (35.91%) of the total valid votes cast in the Federal Capital Territory.

28. I make this Witness Statement in good faith conscientiously believing the contents hereof to be true and correct to the best of my knowledge and in accordance with the Oaths Act.

DEPONENT

**SWORN TO** at the Registry of the Court of Appeal, Abuja, Nigeria.

This _21st_ day of March 2023.

**BEFORE ME**

SECRETARY
PRESIDENTIAL ELECTION
PETITION COURT
2023

**COMMISSIONER FOR OATHS**

CERTIFIED TRUE COPY

# IN THE COURT OF APPEAL
## (IN THE PRESIDENTIAL ELECTION PETITION COURT)
## HOLDEN AT ABUJA

## IN THE MATTER OF THE ELECTION TO THE OFFICE OF THE PRESIDENT OF THE FEDERAL REPUBLIC OF NIGERIA HELD ON 25TH FEBRUARY 2023

**PETITION No: PEPC/A/ /2023**

**BETWEEN:**

**1. ABUBAKAR ATIKU**
**2. PEOPLES DEMOCRATIC PARTY (PDP)** ⎤ **PETITIONERS**

**AND**

**1. INDEPENDENT NATIONAL ELECTORAL COMMISSION (INEC)**
**2. TINUBU BOLA AHMED** ⎱ **RESPONDENTS**
**3. ALL PROGRESSIVES CONGRESS (APC)**

## WRITTEN STATEMENT ON OATH OF KGCA

I, **KGCA**, Adult, Nigerian Citizen of Peoples Democratic Party's Secretariat, Lokoja, Kogi State, do hereby make oath and state as follows:

1. That I am a registered member of the Peoples Democratic Party (PDP) and I acted as one of the Petitioners' State Collation officers in Kogi State for the purpose of the Presidential Election that was held on the 25th of February 2023.

2. That by virtue of my aforesaid status, I am very conversant with the facts deposed herein.

3. That I have the consent and permission of the Petitioners to make this statement on oath and I do so on their behalf.

4. That the 2nd Petitioner as a corporate body acted through its agents who were reporting amongst themselves from the bottom to the top in the hierarchy for the said election.

5. That during the conduct of the presidential election, the Local Government Collation Agents of the Petitioners reported to me while I reported to the National Collation Agents.



- 198 -

6.  That during and after the conduct of the presidential election, I received reports from the Petitioners agents at the Polling Units, Wards and Local Government Areas of Kogi State.

7.  That from what I observed during the conduct of the election and from our analysis, we discovered various forms of non-compliance and corrupt practices such as suppression of votes, manipulation of the ballots and ballot boxes, manipulation of BVAS machines, manipulation of accreditation and collation, manipulation of Election Material Delivery, intimidation and harassment of voters, massive Thumb-printing of Ballot Papers and destruction of electoral materials

8.  That the 1st Respondent through its officials also failed to properly fill the Form EC40A, which is the ballot paper accounting and verification statements, nor did they properly fill the Form EC40B, which is the statement of rejected and spoilt ballot papers, and the Form EC40G which is the summary of polling units where elections were cancelled or did not hold.

9.  That the 1st Respondent also failed to comply with the mandatory provisions and requirements of the Electoral Act and Guidelines and Manual for Election Officials 2023 which failure affected the results of the said Polling Units.

10. That the cumulative results of the election credited to the 2nd and 3rd Respondents as announced by the 1st Respondent included unlawful, invalid and illegal results from the entire Polling Units of Kogi State as there were unlawful invalid and illegal results.

11. That the 1st Respondent in carrying out its duties effected incorrect entry or entries of the scores of the 2nd Respondent as the scores contained in form EC8A and announced by the 1st Respondent are not the correct votes genuinely scored by the 2nd Respondent in the Presidential Election held on the 25th day of February 2023.

12. That the Respondents perpetrated irregularities and failed to comply with the provisions of the 1999 Constitution (as amended), or any other statute, Regulations & Guidelines for elections and Manuals for Election Officials.

13. That the 1st Respondent refused and failed to adhere to its Regulations and that the votes scored by and recorded for the 3rd Respondent were vitiated.

14. That I make this Witness Statement in good faith conscientiously believing the contents hereof to be true and correct to the best of my knowledge and in accordance with the Oaths Act.

GCA

DEPONENT

CERTIFIED TRUE COPY

**SWORN TO** at the Registry of the Court of Appeal, Abuja, Nigeria.

This _21st_ day of March 2023.

**BEFORE ME**

**COMMISSIONER FOR OATHS**

## IN THE COURT OF APPEAL
## (IN THE PRESIDENTIAL ELECTION PETITION COURT)
## HOLDEN AT ABUJA

## IN THE MATTER OF THE ELECTION TO THE OFFICE OF THE PRESIDENT
## OF THE FEDERAL REPUBLIC OF NIGERIA
## HELD ON 25TH FEBRUARY 2023

**PETITION No: PEPC/A/     /2023**

**BETWEEN:**

**1. ABUBAKAR ATIKU**
**2. PEOPLES DEMOCRATIC PARTY (PDP)** ⎤ **PETITIONERS**

**AND**

**1. INDEPENDENT NATIONAL ELECTORAL**
   **COMMISSION (INEC)**
**2. TINUBU BOLA AHMED** ⎤ **RESPONDENTS**
**3. ALL PROGRESSIVES CONGRESS (APC)**

## <u>WRITTEN STATEMENT ON OATH OF KNCA</u>

I, **KNCA,** Adult, Nigerian Citizen of Peoples Democratic Party's Secretariat, Kano State, do hereby make oath and state as follows:

1.   That I am a registered member of the 2nd Petitioner.

2.   That I acted as the Petitioner's Kano State coordinator for the for the purpose of the Presidential Election that held on the 25th of February 2023.

3.   As a Coordinator, I was responsible for the co-ordination of all the Petitioners' polling agents, ward collation and local government collation agents in the Presidential election in Kano State. For the purpose of performing the duties assigned to me during the presidential election, the Petitioners issued an appointment letter to me. This letter was what enabled me to move around in Kano State for the purpose of monitoring the election.

4.   That by virtue of my aforesaid status, I am very conversant with the facts deposed herein.

5.   That I have the consent and authority of the Petitioners to make this statement on oath and I do so on their behalf.



6. That the 2nd Petitioner as a corporate body acted through its agents who were reporting amongst themselves from the bottom to the top in the hierarchy for the said election.

7. In all the 44 Local Governments that make up Kano State, the 2nd and 3rd Respondents through their agents who, had been provided with machetes, unleashed violence on voters, disrupting the voting process which led to the destruction of electoral materials. The total votes credited to the parties is 1,401,376. Whereas the 2nd and 3rd Respondents were credited with 506,412 purported votes, New Nigerian Peoples Party (NNPP) one of the parties that took part in the elections was credited with 977,279 purported votes, while Labour Party was credited with 28,513 purported votes. These votes are liable to be voided.

8. The agents of the 2nd and 3rd Respondents specifically threatened and physically stopped voters who they believed would not vote for them from voting especially in several areas in Fagge Local Government Area.

9. The agents of the 2nd and 3rd Respondents ensured by their threats that the presiding officers did not upload the polling units results. Having not uploaded the polling units results, they in concert with the presiding officers altered the votes of the parties as is visible on the face of the result sheets.

10. I saw that the 2nd and 3rd Respondents' agents ensured that there was violence in some parts of Kano State and these places include but are not limited to the following; Tudun, Fagge, Wada, Doguwa, Kano Municipal, Nasarawa, Tarauni, Dala, Dambata, Gaya, Madobi, Dawakin- Kudu. The disturbances ensured that residents/voters avoided the voting centres.

11. The 1st Respondent failed to transmit the polling units results electronically with the Bimodal Voter Accreditation System (BVAS) directly and real-time to the INEC IReV.

12. In the course of my work on the election day, I saw a lot of voters who were maimed and these were also captured in videos and news media.

13. That I make this Witness Statement in good faith conscientiously believing the contents hereof to be true and correct to the best of my knowledge and in accordance with the Oaths Act.

*KNCA*

DEPONENT



CERTIFIED TRUE COPY

**SWORN TO** at the Registry of the Court of Appeal, Abuja.

This _21st_ day of March 2023.

**BEFORE ME**

SECRETARY
PRESIDENTIAL ELECTION
PETITION COURT
2023

**COMMISSIONER FOR OATHS**

CERTIFIED TRUE COPY

- 203 -

## IN THE COURT OF APPEAL
## (IN THE PRESIDENTIAL ELECTION PETITION COURT)
## HOLDEN AT ABUJA

## IN THE MATTER OF THE ELECTION TO THE OFFICE OF THE PRESIDENT OF THE FEDERAL REPUBLIC OF NIGERIA HELD ON 25TH FEBRUARY 2023

**PETITION No: PEPC/A/     /2023**

BETWEEN:

**1. ABUBAKAR ATIKU**
**2. PEOPLES DEMOCRATIC PARTY (PDP)** ⎤ **PETITIONERS**

AND

**1. INDEPENDENT NATIONAL ELECTORAL**
   **COMMISSION (INEC)**
**2. TINUBU BOLA AHMED** ⎤ **RESPONDENTS**
**3. ALL PROGRESSIVES CONGRESS (APC)**

## <u>WRITTEN STATEMENT ON OATH OF LSCA</u>

I, **LSCA**, Adult, Christian, Nigerian Citizen of Peoples Democratic Party's Secretariat, Ikeja Lagos State, do hereby make oath and state as follows:

1.  That I am a registered member of the 2nd Petitioner and I acted as the Lagos State Co-ordinator for the purpose of the Presidential Election that was held on the 25th of February 2023.

2.  That by virtue of my appointed responsibilities on the election day, I am very conversant with the facts deposed herein that include but not limited to liaising with all agents of the 2nd Petitioner and attending to issues identified by them and myself.

3.  I have the consent and permission of the Petitioners to make this statement on oath.

4.  That the 2nd Petitioner through its agents who were reporting amongst themselves include the Presiding Officers, Ward Collation agents, Local Government Collating Officer, Constituency agents.

5.  During the conduct of the presidential election, the agents of the Petitioners reported to me while I liaised with the 1st Petitioner.



6.    The Petitioners had agents in all the Polling Units of Lagos State as well as Ward and Local Government Agents in all the Wards and Local Government Collation Centres of Lagos State.

7.    Co-ordinators of all Party agents were duly appointed vide letters of appointment (which enabled me to move around on election day).

8.    In the course of my duty on the election day, I noticed a lot of malpractices which include violence, threat of violence, vote suppression, failure to fill the election results, failure to fill Forms EC25B, EC40A, EC40B, EC40G, depletion of Petitioners votes. These infractures took place in several polling units at Lagos Island, Lagos Mainland,Surulere, Apapa, Eti- Osa, Coker-Aguda, Ikoyi- Oblande, Orile – Igamu, Itire, Ikate, Yaba, Lagos Island East, Iru –Victoria Island, Eti-Osa.

9.    No valid election took place in the whole of Lagos State on the 25th of February 2023.

10.   The presidential election was compromised and set up to fail even before the election began on 25th February 2023 as the contract for the distribution of electoral material was given to an entity headed by a chieftain of the All Progressives Congress (APC) by name M. C. Oluomo.

11.   Since the contract for the distribution of electoral materials was given to an entity headed by a chieftain of the All Progressives Congress, the said chieftain deliberately failed to supply electoral materials to the stronghold of the Petitioners in Lagos State or places he knew the 2nd and 3rd Respondents are likely not to get much votes.

12.   Prior to the holding of the presidential election, high-profile persons who are either members of the 3rd Respondent or loyal to the 3rd Respondents in Lagos State were going around threatening members of the 2nd Petitioners and its loyalists to either vote for the 2nd and 3rd Respondents or be dealt with.

13.   About two days before the holding of the election, the Baale of Gbara, Jakande, Lekki in Eti-Osa Local Government Area acting as agents of the 3rd Respondent, summoned all the Igbo traders to his palace and mandated them to either vote for the 2nd and 3rd Respondents or face the consequences.

14.   The 1st Respondent also set up several secret and hidden polling units throughout Lagos State which were never made known to the Petitioners and members of the public.

15.   The entire election in Apapa Local Government Area, Oshodi Local Government Area, Amuwo Odofin Local Government Area and Kosofe Local Government Area were characterized by ballot box snatching by thugs acting on behalf of the 2nd and 3rd Respondents.

- 205 -

CERTIFIED TRUE COPY

16. Despite the rampant cases of ballot box snatching, the 1st Respondent declared fictitious results for the polling units in the said local government areas.

17. I was at Ward K in Eti-Osa Local Government Area and I observed that, elections did not take place in Polling Units 002, 003, 006, 008, 015 and 016 but to my surprise, fictitious results were declared in the said polling units by the 1st Respondents.

18. I also know that in polling units 001, 002, 003, 004, 005, 014, 015, 016, 017, 047, 048, 049, 050, 051, 064, 013, 023, 057, 024, 029, 030 and 034 of Ward K2 of Eti-Osa Local Government Area, elections were cancelled either due to violence conduct such as ballot box snatching, voters' intimidation and attack on voters, yet results were miraculously declared for those polling units.

19. Many of the 1st Respondent's Presiding Officers could not use the BVAS machine as they were not properly trained and at a point, I had to educate them on the use of the BVAS machine.

20. In the polling units in Eti-Osa Local Government Area, the collation of results was done in darkness which led to several errors.

21. The cumulative results of the election credited to the 2nd and 3rd Respondents as announced by the 1st Respondent included unlawful, invalid and illegal results from the entire Polling Units of Lagos State as there were unlawful invalid and illegal results.

22. The 1st Respondent in carrying out its duties effected incorrect entry or entries of the scores of the 2nd Respondent as the scores contained in form EC8A and announced by the 1st Respondent are not the correct votes genuinely scored by the 2nd Respondent in the Presidential Election held on the 25th day of February 2023.

23. The conduct of elections in the Polling Units in all the wards in all the local government area of Lagos State in the 2023 General Election did not substantially comply with all relevant provisions and requirements of the extant electoral laws.

24. Unlawful votes were collated by the 1st Respondent at the different levels of collation in Forms EC 8B, EC 8C and EC 8D.

25. The 1st Respondent refused and failed to adhere to its Regulations and that the votes scored by and recorded for the 3rd Respondent were vitiated.


CERTIFIED TRUE COPY

26. I make this Witness Statement in good faith conscientiously believing the contents hereof to be true and correct to the best of my knowledge and in accordance with the Oaths Act.

LSC

DEPONENT

**SWORN TO** at the Registry of the Court of Appeal, Abuja, Nigeria.

This _21st_ day of March 2023.

**BEFORE ME**

~~~~~ TARY
PRESIDENTIAL ELECTION
PETITION COURT
2023

**COMMISSIONER FOR OATHS**

CERTIFIED TRUE COPY

- 207 -

**IN THE COURT OF APPEAL**
**(IN THE PRESIDENTIAL ELECTION PETITION COURT)**
**HOLDEN AT ABUJA**

**IN THE MATTER OF THE ELECTION TO THE OFFICE OF THE PRESIDENT**
**OF THE FEDERAL REPUBLIC OF NIGERIA**
**HELD ON 25TH FEBRUARY 2023**

**PETITION No: PEPC/A/    /2023**

**BETWEEN:**

**1. ABUBAKAR ATIKU**
**2. PEOPLES DEMOCRATIC PARTY (PDP)**          **PETITIONERS**

**AND**

**1. INDEPENDENT NATIONAL ELECTORAL**
**COMMISSION (INEC)**
**2. TINUBU BOLA AHMED**                     **RESPONDENTS**
**3. ALL PROGRESSIVES CONGRESS (APC)**

## <u>WRITTEN STATEMENT ON OATH FOR NGCA</u>

I, **NGCA**, Male, Adult, Nigerian Citizen and politician of Peoples Democratic Party's State Secretariat, Niger State, do hereby make oath and state as follows:

1.  I am a registered member and one of the State collation Agent of the 2nd Petitioner.

2.  I acted as one of the Petitioners' Niger State Collation Officer for the purpose of the Presidential Election held on the 25th February 2023.

3.  By virtue of my aforesaid status, I am conversant with the facts deposed herein.

4.  I have the consent and permission of the Petitioners to make this statement on oath and I do so on their behalf.

5.  The 1st Petitioner Atiku Abubakar who voted and has the right to be voted for contested the Presidential election of 25th February 2023 under the platform and sponsorship of the 2nd Petitioner and has a right to be returned as duly elected at the Election.

6.  The 2nd Petitioner the Peoples Democratic Party is a duly registered Political Party in Nigeria and sponsored the 1st Petitioner as its candidate to contest the office of the President of Nigeria, which election was held on the 25th day of February, 2023.

CERTIFIED TRUE COPY

7. In Niger State, the Local Government Collation Agents report to me while I report to the National Collation Agents.

8. In the Four thousand Nine Hundred and Forty-Seven (4,947) Polling unit, there were 2,689,344 Registered Voters, 827,416 Accredited voters.

9. The 1st Respondent announced the result of the Presidential Election with respect to Niger State and declared the following as purported scores of the candidates as follows:

| No. | POLITICAL PARTIES | SCORE |
|---|---|---|
| 1. | A | 463 |
| 2. | AA | 752 |
| 3. | AAC | 264 |
| 4. | ADC | 1,656 |
| 5. | ADP | 2,313 |
| 6. | **APC** | **375,183** |
| 7. | APGA | 2,539 |
| 8. | APM | 598 |
| 9. | APP | 302 |
| 10. | BP | 303 |
| 11. | LP | 80,452 |
| 12. | NNPP | 21,863 |
| 13. | NRM | 1,032 |
| 14. | PDP | 284,898 |
| 15. | PRP | 2,534 |
| 16. | SDP | 520 |
| 17. | YPP | 591 |
| 18. | ZLP | 2,432 |

10. That the votes collated at the polling units are to be electronically transmitted with the Bimodal Voter Accreditation System (BVAS) directly and real-time to the INEC IReV same was not done by the 1st Respondent.

11. That the 1st Respondent refused and failed to adhere to its Regulations and that the votes scored by and recorded for the 2nd and 3rd Respondents were vitiated as the actual results from the polling units were not transmitted directly to the IReV portal.



12. That I make this Witness Statement in good faith conscientiously believing the contents hereof to be true and correct to the best of my knowledge and in accordance with the Oaths Act.

_NGCA_
_____
DEPONENT

**SWORN TO** at the Registry of the Court of Appeal, Abuja, Nigeria.

This _21st_ day of March 2023.

**BEFORE ME**

SECRETARY
PRESIDENTIAL ELECTION
PETITION COURT
2023

**COMMISSIONER FOR OATHS**


CERTIFIED TRUE COPY

**IN THE COURT OF APPEAL**
**(IN THE PRESIDENTIAL ELECTION PETITION COURT)**
**HOLDEN AT ABUJA**

**IN THE MATTER OF THE ELECTION TO THE OFFICE OF THE PRESIDENT**
**OF THE FEDERAL REPUBLIC OF NIGERIA**
**HELD ON 25TH FEBRUARY 2023**

**PETITION No: PEPC/A/ /2023**

**BETWEEN**:

**1. ABUBAKAR ATIKU**
**2. PEOPLES DEMOCRATIC PARTY (PDP)** ⎤ **PETITIONERS**

**AND**

**1. INDEPENDENT NATIONAL ELECTORAL**
  **COMMISSION (INEC)**
**2. TINUBU BOLA AHMED** ⎤ **RESPONDENTS**
**3. ALL PROGRESSIVES CONGRESS (APC)**

## WRITTEN STATEMENT ON OATH OF NSCA

I, **NSCA**, Adult, Male, Muslim, Nigerian Citizen of Peoples Democratic Party's State Secretariat, Lafia, Nasarawa State, do hereby make oath and state as follows:

1. That I am a registered member of the 2nd Petitioner and acted as the Petitioners' Nasarawa State Collation Officer for the purpose of the Presidential Election held on the 25th February 2023.

2. That by virtue of my aforesaid status, I am very conversant with the facts deposed herein.

3. That the 1st Petitioner contested the Presidential election of 25th February 2023 under the platform of the 2nd Petitioner and has a right to be returned as duly elected at the Election.

4. That the 2nd Petitioner acted through its agents who were reporting amongst themselves for the said election. The 2nd Petitioner issued appointment letters to each of its agents.

5. That in Nasarawa State, the Local Government Collation Agents report to me while I report to the National Collation Agent.

6. That the Agents of the Petitioners performed several functions relating to the said election which included monitoring of the election, signing of result

CERTIFIED TRUE COPY

sheets, obtaining and forwarding duplicate copies of the result sheets to their superiors, and forwarding complaints.

7.  That the 1st Respondent failed to comply with its own Guidelines and representations to transmit results directly and real-time to the IReV and its electronic storage device before the hasty return and announcement of the winner of the election for Nasarawa State.

8.  That the votes collated at the polling units were to be electronically transmitted with the Bimodal Voter Accreditation System (BVAS) directly and real-time to the INEC IReV same was not done by the 1st Respondent.

9.  That in Nasarawa State, the total votes cast for the parties who participated in the Election was recorded by the 1st Respondent as 556,937, whereas the total voters accredited through the BVAS machines was 553,192.

10. That also, in the same Nasarawa State, the 1st Respondent wrongly and deliberately entered wrong scores/results for which negatively affected the scores of the Petitioners.

11. That the conduct of elections in the Polling Units in all the wards in all the local government area of Nasarawa State in the 2023 General Election was not in substantial compliance with all relevant provisions and requirements of the extant electoral laws.

12. That I make this Witness Statement in good faith conscientiously believing the contents hereof to be true and correct to the best of my knowledge and in accordance with the Oaths Act.

NSCA
DEPONENT

**SWORN TO** at the Registry of the Court of Appeal, Abuja, Nigeria.

This _21st_ day of March 2023.

**BEFORE ME**

SECRETARY
PRESIDENTIAL ELECTION
PETITION COURT
2023

**COMMISSIONER FOR OATHS**

CERTIFIED TRUE COPY

- 212 -

## IN THE COURT OF APPEAL
## (IN THE PRESIDENTIAL ELECTION PETITION COURT)
## HOLDEN AT ABUJA

## IN THE MATTER OF THE ELECTION TO THE OFFICE OF THE PRESIDENT
## OF THE FEDERAL REPUBLIC OF NIGERIA
## HELD ON 25TH FEBRUARY 2023

**PETITION No: PEPC/A/ /2023**

BETWEEN:

**1. ABUBAKAR ATIKU**
**2. PEOPLES DEMOCRATIC PARTY (PDP)** ⎬ **PETITIONERS**

AND

**1. INDEPENDENT NATIONAL ELECTORAL**
**COMMISSION (INEC)**
**2. TINUBU BOLA AHMED** ⎬ **RESPONDENTS**
**3. ALL PROGRESSIVES CONGRESS (APC)**

## WRITTEN STATEMENT ON OATH OF OGCA

I, **OGCA**, Male, Adult, Nigerian Citizen of Peoples Democratic Party's Secretariat, Abeokuta, Ogun State, do hereby make oath and state as follows:

1. That I am a registered member of the 2nd Petitioner and I acted as the Petitioners' Ogun State Collation officers for the purpose of the Presidential Election that was held on the 25th of February 2023.

2. I acted as the Petitioners' Ogun State Collation Officer for the purpose of the Presidential election held on the 25th of February, 2023.

3. That by virtue of my aforesaid status, I am very conversant with the facts deposed herein.

4. That I have the consent and authority of the Petitioners to make this statement on oath and I do so on their behalf.

5. That the 2nd Petitioner as a corporate body acted through its agents who were reporting amongst themselves from the bottom to the top in the hierarchy for the said election.

6. That during the conduct of the presidential election, the Local Government Collation Agents of the Petitioners reported to me while I reported to the National Collation Agents.



7. That during and after the conduct of the presidential election, I received reports from the Petitioners' agents at the Polling Units, Wards and Local Government Areas of Ogun State.

8. That I equally went around several polling units in my ward during the conduct of the presidential election on 25th February 2023 where I observed various corrupt practices.

9. That at the conclusion of the election, I and other members of the Petitioners carefully analysed the results of the election and other electoral documents.

10. That from what I observed during the conduct of the election and from analysis on the results, we discovered various forms of non-compliance and corrupt practices such as suppression of votes, manipulation of the ballots and ballot boxes, manipulation of BVAS machines, manipulation of accreditation and collation, manipulation of Election Material Delivery, intimidation and harassment of voters, massive Thumb-printing of Ballot Papers and destruction of electoral materials

11. That the 1st Respondent's officials, did not at the end of the Election, properly fill in the polling unit booklets containing forms EC25B – which is the electoral materials/reverse logistics, which is the mode of cross-checking the deployment and accounting at the end of the election, the electoral materials that had been used in each polling unit by the officials of the 1st Respondent.

12. That the 1st Respondent through its officials also failed to properly fill the Form EC40A, which is the ballot paper accounting and verification statements, nor did they properly fill the Form EC40B, which is the statement of rejected and spoilt ballot papers, and the Form EC40G which is the summary of polling units where elections were cancelled or did not hold.

13. That these infractions occurred in several polling units of Ogun State and these failures enabled the results of the polling units in Ogun State to be manipulated by inflation of the 2nd Respondent's votes and depletion of the Petitioners' votes.

14. That the officers of the 1st Respondent did not carry out their constitutional and statutory responsibilities of organizing and conducting the elections of 25th February 2023 properly.

15. That the 1st Respondent also failed to comply with the mandatory provisions and requirements of the Electoral Act and Guidelines and Manual for Election Officials 2023 which failure affected the results of the said Polling Units.



16. That the cumulative results of the election credited to the 2nd and 3rd Respondents as announced by the 1st Respondent included unlawful, invalid and illegal results from the entire Polling Units of Ogun State.

17. That the 1st Respondent in carrying out its duties effected incorrect entry or entries of the scores of the 2nd Respondent as the scores contained in form EC8A and announced by the 1st Respondent are not the correct votes genuinely scored by the 2nd Respondent in the Presidential Election held on the 25th day of February 2023.

18. That the Respondents perpetrated irregularities and failed to comply with the provisions of the 1999 Constitution (as amended), or any other statute, Regulations & Guidelines for elections and Manuals for Election Officials.

19. That the conduct of elections in the Polling Units in all the wards in all the local government areas of Ogun State in the 2023 General Election did not substantially comply with all relevant provisions and requirements of the extant electoral laws as the actual results from the polling units were not transmitted directly to the IReV portal of the 1st Respondent.

20. That unlawful votes were collated by the 1st Respondent at the different levels of collation in Forms EC 8B, EC 8C and EC 8D.

21. That the 1st Respondent refused and failed to adhere to its Regulations and that the votes scored by and recorded for the 3rd Respondent were vitiated.

22. That I make this Witness Statement in good faith conscientiously believing the contents hereof to be true and correct to the best of my knowledge and in accordance with the Oaths Act.

OGCA

DEPONENT

**SWORN TO** at the Registry of the Court of Appeal, Abuja, Nigeria.

This $21^{st}$ day of March 2023.

**BEFORE ME**

SECRETARY
PRESIDENTIAL ELECTION
PETITION COURT
2023

**COMMISSIONER FOR OATHS**



- 215 -

# IN THE COURT OF APPEAL
## (IN THE PRESIDENTIAL ELECTION PETITION COURT)
### HOLDEN AT ABUJA

## IN THE MATTER OF THE ELECTION TO THE OFFICE OF THE PRESIDENT OF THE FEDERAL REPUBLIC OF NIGERIA
### HELD ON 25TH FEBRUARY 2023

**PETITION No: PEPC/A/    /2023**

**BETWEEN:**

1. **ABUBAKAR ATIKU**
2. **PEOPLES DEMOCRATIC PARTY (PDP)** ⎤ **PETITIONERS**

**AND**

1. **INDEPENDENT NATIONAL ELECTORAL COMMISSION (INEC)**
2. **TINUBU BOLA AHMED** ⎤ **RESPONDENTS**
3. **ALL PROGRESSIVES CONGRESS (APC)**

## WRITTEN STATEMENT ON OATH OF RSCA.

I, **RSCA,** Adult, Nigerian Citizen of Peoples Democratic Party's Secretariat, Rivers State, do hereby make oath and state as follows:

1. That I am a registered member of the 2nd Petitioner.

2. That I acted as the Petitioners Rivers State co-ordinator for the purpose of the Presidential Election that held on the 25th of February 2023.

3. As a co-ordinator, I was responsible for the co-ordination of all the Petitioners' polling agents, ward collation and local government collation agents in the Presidential election in Rivers State. For the purpose of performing the duties assigned to me during the presidential election, the Petitioners issued an appointment letter to me. This letter was what enabled me to move around in Rivers State for the purpose of monitoring the election.

4. That by virtue of my aforesaid status, I am very conversant with the facts deposed herein.

5. That the 2nd Petitioner as a corporate body acted through its agents who were reporting amongst themselves from the bottom to the top in the hierarchy for the said election.



6.     In respect of Rivers State which comprises 23 Local Government Areas, elections were disrupted and marred by unprecedented violence and intimidation unleashed by the 2nd and 3rd Respondents through their agents and officials in each of those local government areas. Notwithstanding the violence and widespread intimidation of voters, the 1st Respondent returned a total of 553,944 votes for all the political parties out of which the 2nd and 3rd Respondents were credited with 231,591 purported votes and Labour Party (which participated in the election) was credited with 175,071 purported votes. All the votes returned in Rivers State are liable to voided.

7.     The agents of the 2nd and 3rd Respondents ensured by their threats that the presiding officers did not upload the polling units results.

8.     I observed that the 2nd and 3rd Respondents' agents ensured that there were disturbances in some parts of Rivers State and these places include but are not limited to the following; Obio-Akpor, Ahoada East, Ahoada West, Ikwerre, Emohua, Degema, Porthacourt, Etche. The disturbances ensured that residents/voters avoided the voting centres.

9.     I know that the actual polling unit results were not transmitted directly to the IReV portal of the 1st Respondent.

10.     That I make this Witness Statement in good faith conscientiously believing the contents hereof to be true and correct to the best of my knowledge and in accordance with the Oaths Act.

*Rs oA*

DEPONENT

**SWORN TO** at the Registry of the Court of Appeal, Abuja.

This *21st* day of March 2023.

**BEFORE ME**

**COMMISSIONER FOR OATHS**

SECRETARY
PRESIDENTIAL ELECTION
PETITION COURT
2023

CERTIFIED TRUE COPY

- 217 -

# IN THE COURT OF APPEAL
## (IN THE PRESIDENTIAL ELECTION PETITION COURT)
### HOLDEN AT ABUJA

## IN THE MATTER OF THE ELECTION TO THE OFFICE OF THE PRESIDENT OF THE FEDERAL REPUBLIC OF NIGERIA HELD ON 25TH FEBRUARY 2023

**PETITION No: PEPC/A/    /2023**

**BETWEEN:**

**1. ABUBAKAR ATIKU**
**2. PEOPLES DEMOCRATIC PARTY (PDP)** — **PETITIONERS**

**AND**

**1. INDEPENDENT NATIONAL ELECTORAL COMMISSION (INEC)**
**2. TINUBU BOLA AHMED** — **RESPONDENTS**
**3. ALL PROGRESSIVES CONGRESS (APC)**

## PETITIONERS' LIST OF DOCUMENTS TO BE RELIED UPON

1.   BVAS CTC Reports

2.   IRV CTC Reports

3.   Statisticians Reports

4.   Forensic Experts Reports

5.   All INEC Certified Result Sheets and Electoral Materials

6.   (Form EC8 Series), EC8A, EC8B, EC8C, EC8D, EC8D(A) and EC8E - Certificate of Return received by Petitioners' agents at the Election

7.   PDP Party Membership Cards, as necessary

8.   INEC Voters' Cards, as necessary

9.   Witnesses' party membership cards, as necessary

10.  Witnesses' Voters Cards, as necessary

11.  All Forms EC1A(1)

Atiku & Anor. v INEC & Ors



12. All Forms EC17

13. All Forms EC25A

14. All Forms EC25A(1)

15. All Forms EC25B

16. All Forms EC25B(1)

17. All Forms EC25D

18. Forms EC25G Series used in the conduct of the Election

19. All Forms EC40s, EC40G(1), EC40G(2), EC40G(3), EC40J, EC40A

20. All Forms EC40H/EC40H(1)-(5)

21. All the Forms EC40B, that is, all the Spoilt and Rejected Ballot Paper Forms used in all the polling units spanning all the Local Governments of all the States of Nigeria and the FCT Abuja

22. All the Form EC40C, that is, all the statement of unused Ballot Paper Form used in all the Local Governments of all the States of Nigeria and the FCT Abuja

23. All the Form EC40J, that is, all the Statement of Unused Ballot Paper Forms used in all the Local Governments of all the States of Nigeria.

24. All the Envelopes EC50B, that is, all the Envelopes for Register of Voters used in all the polling units of all the Local Governments of the States of Nigeria and the FCT Abuja

25. All the Envelopes of EC5OC, that is, all the Envelopes of for unused Ballot Papers used in all the Local Governments of the States of Nigeria and the FCT Abuja

26. Actual ballot papers used and thumb-printed and counted as valid in all the polling units of the Local Governments of all the States of Nigeria and the FCT Abuja

27. Actual ballot papers recorded as spoilt in the results in all the polling units of the Local Governments of all the States of Nigeria and the FCT Abuja

28. Actual ballot papers recorded as unused in the results of all the polling units of the Local Governments of all the States of Nigeria and the FCT Abuja



CERTIFIED TRUE COPY

29. Certified true copy of all the voters' registers in all the polling units spanning all the Local Governments of all the States of Nigeria and the FCT Abuja

30. Certified true copy of extant INEC list of polling units and voters as at 25th day of February, 2023 in all the polling units spanning all the Local Governments of all the States of Nigeria and the FCT Abuja

31. Certified true copies of the printout of record of accreditation as captured by BVAS machines used for the conduct of the Election in all the polling units spanning all the Local Governments of all the States of Nigeria and the FCT Abuja

32. A certified true copy of a list of all INEC officers and ad hoc staff used for the Election in all the polling units spanning all the Local Governments of all the States of Nigeria and the FCT Abuja

33. Extant Guidelines and Regulations for the Conduct of the Election

34. Circulars/corrigenda/Manuals issued by INEC for the conduct of the Presidential Election held on 23 February 2019

35. Polling Unit Materials Checklist

36. Summary of total registered voters on units' basis

37. Summary of PVCs collected on units' basis

38. Voters' Registers

39. Letters of complaints over irregularities and malpractices during the election addressed to the INEC/Police/other relevant agencies/institutions

40. Security reports relating to the Election

41. Video/Audio recordings/DVD/CD relating to the Election

42. Election Observers' or Observers' Reports

43. 2nd Respondent's INEC FORM CF001 for Lagos State 1999 Governorship Election

44. Lagos State House of Assembly Report of the Ad-Hoc Committee set up on Tuesday, September 21, 1999, to investigate the allegations of Perjury and Forgery levelled against the Executive Governor of Lagos State

45. 2nd Respondent's Affidavit in respect of lost certificate dated 29th of December, 1998

46. 2nd Respondent's INEC FORM EC9 for the 2023 Presidential election



47. Newspaper/Television/ Radio reports and news

48. Appointment Letters and tags of PDP agents

49. Expert reports and analysis

50. Photographs and GSM and other phone outputs

51. Computer-generated and cyberspace evidence

52. Forensic and other reports by experts and non-experts

53. Receipts issued by INEC for certification of its documents

54. Identity cards of witnesses

55. Data and logs from INEC Electronic Storage Devices including but not limited to its Electronic Collation System and the AWS servers.

56. Data and Event logs from all BVAS machines used in the Election

57. PVC collection records

58. Petition Written by the Petitioners' Kogi State Collation Officer dated 27th February 2023.

59. Certified True Copy of Judgment in Suit No: FHC/ABJ/CS/334/2023.

60. Any other document(s) relevant to the Petition.


**Dated this 20th day of March, 2023.**



_____

**CHIEF JOE-KYARI GADZAMA**, OFR, MFR, FNIALS, FCIArb, C.Arb., SAN
**CHIEF CHRIS UCHE**, FCArb, SAN
**PAUL USORO**, FCIArb, SAN
**SAKA ABIMBOLA ISAU**, SAN
**EYITAYO JEGEDE**, SAN
**PROF. MIKE OZEKHOME**, CON, OFR, FCIArb, Ph.D. D.Litt., SAN
**NELLA ANDEM-EWA RABANA**, FCI Arb, SAN
**KEN E. MOZIA**, SAN
**DR. GARBA USMAN TETENGI**, MDRI, mni, SAN
**MAHMUD ABUBAKAR MAGAJI**, SAN
**JOE ABRAHAMS**, SAN

Atiku & Anor. v INEC & Ors.      -221-

CERTIFIED TRUE COPY

**CHUKWUMA MACHUKWU UME**, SAN
**EMEKA ETIABA**, FCIArb, SAN
**PROF. MAXWELL M. GIDADO**, OON, SAN
**CHIEF GORDY UCHE**, FcArb. SAN
**EDWARD ASHIEKAA**, SAN
**A. K AJIBADE**, FCIM, FICMC, SAN
**ABDUL A. IBRAHIM**, SAN
**OLALEKAN OJO**, SAN
**CHIEF PAUL HARRIS OGBOLE**, SAN
**OLUSEGUN O. JOLAAWO**, SAN
**O. M. ATOYEBI**, FCIArb(U.K), SAN
**NUREINI S. JIMOH**, FCArb, FICMC, SAN
**KEMASUODE WODU**, SAN
**YAKUBU MAIKASUWA**, SAN
**ANDREW M. MALGWI**, SAN
IFEANYI IBOKO, ESQ.
PROF YUSUF DANKOFA, ESQ.
M. S. ATOLAGBE, ESQ.
O. A. DADA, ESQ.
ABDULAZEEZ A. IBRAHIM, ESQ.
JAMIU OLABODE MAKINDE, ESQ.
AHMED .T. UWAIS, ESQ.
ADEDAMOLA FANOKUN, ESQ.
SILAS ONU, ESQ.
BASHIR FAISAL FOLORUNSHO, ESQ.
JACOB OCHAI OTOKPA, ESQ.
PRISCILLA EJEH, ESQ.
FALILAT OLAJUMOKE OLAWOYIN, ESQ.
NHEOMA NDU ASOBINUANWU, ESQ.
**PETITIONERS' COUNSEL,**
c/o The Peoples Democratic Institute,
No. 3 Justice Roseline Ukeje Close,
Asokoro, Abuja.
E: pdplegalteam@gmail.com; gadzama@nigerianbar.ng
T: +234 (0) 816 021 9077

**FOR SERVICE ON:**
1.    **1st Respondent:**
      INEC Headquarters,
      Plot 416 Zambezi Crescent,
      Maitama, Abuja.
2.    **2nd Respondent:**
      c/o APC National Secretariat,

CERTIFIED TRUE COPY

40 Blantyre Street,
Off Adetokunbo Ademola Crescent,
Wuse 11, Abuja.

3.    **3rd Respondent:**
APC National Secretariat,
40 Blantyre Street,
Off Adetokunbo Ademola Crescent,
Wuse 11, Abuja.

21st/3/2023

CERTIFIED TRUE COPY
..........................................
SECRETARY
PRESIDENTIAL ELECTION PETITION
COURT 2023

J.J EKPEROBE Esq