# Exhibit 9

## IN THE PRESIDENTIAL ELECTION PETITION COURT
## HOLDEN AT ABUJA
## ON WEDNESDAY, THE 6TH DAY OF SEPTEMBER, 2023
## BEFORE THEIR LORDSHIPS:

| | |
|---|---|
| **HARUNA SIMON TSAMMANI** | **JUSTICE, COURT OF APPEAL** |
| **STEPHEN JONAH ADAH** | **JUSTICE, COURT OF APPEAL** |
| **MISITURA OMODERE BOLAJI-YUSUFF** | **JUSTICE, COURT OF APPEAL** |
| **BOLOUKUROMA MOSES UGO** | **JUSTICE, COURT OF APPEAL** |
| **ABBA BELLO MOHAMMED** | **JUSTICE, COURT OF APPEAL** |

### PETITION NO: CA/PEPC/03/2023

**BETWEEN**

1. **MR. PETER GREGORY OBI**
2. **LABOUR PARTY**

    **PETITIONERS**

    **AND**

1. **INDEPENDENT NATIONAL ELECTORAL COMMISSION**
2. **SENATOR BOLA AHMED TINUBU**
3. **SENATOR SHETTIMA KASHIM**
4. **ALL PROGRESSIVES CONGRESS**

    **RESPONDENTS**

### PETITION NO: CA/PEPC/04/2023

**BETWEEN**

1. **ALLIED PEOPLES MOVEMENT**     **PETITIONERS**

    **AND**

1. **INDEPENDENT NATIONAL ELECTORAL COMMISSION**
4. **ALL PROGRESSIVES CONGRESS**
2. **TINUBU BOLA AHMED**
3. **KASHIM SHETTIMA**
5. **KABIR MASARI**

    **RESPONDENTS**

CTC ₦1000

CA/PEPC/03/2023; CA/PEPC/04/2023; CA/PEPC/05/2023.

8th/9/2023

CERTIFIED TRUE COPY

Ajang

SECRETARY
PRESIDENTIAL ELECTION PETITION
COURT 2023

PAID
DATE 8th/9/23

2208 - 9574 - 6244

J.J EKPEROBE Esq

1

**PETITION NO: CA/PEPC/05/2023**

**BETWEEN**

    1. **ABUBAKAR ATIKU**

    2. **PEOPLES DEMOCRATIC PARTY (PDP)**     ⎤  **PETITIONERS**

    **AND**

    1. **INDEPENDENT NATIONAL ELECTORAL COMMISSION** ⎤

    2. **TINUBU BOLA AHMED**        ⎬ **RESPONDENTS**

    3. **ALL PROGRESSIVES CONGRESS** ⎦

**(CONSOLIDATED)**

# JUDGMENT

# DELIVERED BY HARUNA SIMON TSAMMANI

On the 25th of February, 2023, the Independent National Electoral Commission (INEC), (the 1st Respondent in all the above three Petitions), conducted the Presidential Elections in Nigeria. At the end of the elections the 1st Respondent declared Bola Ahmed Tinubu who was sponsored by the All Progressives Congress as the winner of the election and returned him as duly elected as the President of the Federal Republic of Nigeria. Arising from the outcome of the election, the above three Petitions were filed before this Court. During the Pre-hearing Session, the three Petitions were consolidated by the Court, even as the identity of each of the Petitions were preserved in line with the settled procedure relating to consolidation of actions. I shall proceed to deliver the

CA/PEPC/03/2023; CA/PEPC/04/2023; CA/PEPC/05/2023.

CERTIFIED TRUE COPY

judgments in the above three Petitions starting however, with Petition No. CA/PEPC/04/2023, then CA/PEPC/03/2023 and CA/PEPC/05/2023, in that order.

<u>**PETITION NO: CA/PEPC/03/2023**</u>

**BETWEEN**

1. **MR. PETER GREGORY OBI**
2. **LABOUR PARTY**          **PETITIONERS**

   **AND**

1. **INDEPENDENT NATIONAL ELECTORAL COMMISSION**
2. **SENATOR BOLA AHMED TINUBU**          **RESPONDENTS**
3. **SENATOR SHETTIMA KASHIM**
4. **ALL PROGRESSIVES CONGRESS**

On the 25th of February, 2023, the Independent National Electoral Commission (INEC), the 1st Respondent herein, conducted the Presidential and National Assembly Elections in Nigeria. The 1st Petitioner, who was sponsored by the 2nd Petitioner as its Presidential candidate, as well as the 2nd and 3rd Respondents, who were sponsored by the 4th Respondent as its Presidential and Vice-Presidential candidates, contested the Presidential election, along with other candidates. At the end of the election, the 1st Respondent returned the 2nd Respondent as the duly elected President of the Federal Republic of Nigeria, with 8,794,726 votes. The 1st Petitioner came third with

CA/PEPC/03/2023; CA/PEPC/04/2023; CA/PEPC/05/2023.                    3



6,101,533 votes, behind Abubakar Atiku of the Peoples Democratic Party (PDP) who came second with 6,984,520 votes. Dissatisfied with the result of the election, the Petitioners filed this Petition on the 20th of March, 2023 challenging the outcome of the election on the following three grounds, which are stated in paragraph 20 of the Petition:

(i) The 2nd Respondent was, at the time of the election, not qualified to contest the election.

(ii) The election of the 2nd Respondent was invalid by reason of corrupt practices or non-compliance with the provisions of the Electoral Act, 2022.

(iii) The 2nd Respondent was not duly elected by majority of the lawful votes cast at the election.

Based on the above grounds, the Petitioners then sought for the reliefs stated in paragraph 103 of the Petition, which I reproduce below:

103. On behalf of the Petitioners, I hereby:

1. First pray as follows:

(i) That it be determined that at the time of the Presidential Election held on 25th February, 2023, the 2nd and 3rd Respondents were not qualified to contest the election.



(ii)   That is be determined that all the votes recorded for the 2nd Respondent in the election are wasted votes, owing to the non-qualification/disqualification of the 2nd and 3rd Respondents.

(iii)  That it be determined that on the basis of the remaining votes (after discountenancing the votes credited to the 2nd Respondent) the 1st Petitioner scored a majority of the lawful votes cast at the election and had not less than 25% of the votes cast in each of at least $^2/_3$ of the States of the Federation and the Federal Capital Territory, Abuja, and satisfied the constitutional requirements to be declared the winner of the 25th February, 2023 Presidential election.

2.    That it be determined that the 2nd Respondent having failed to score one-quarter of the votes cast at the Presidential election in the Federal Capital Territory, Abuja, was not entitled to be declared and retuned as the winner of the Presidential election held on 25th February, 2023.

IN THE ALTERNATIVE TO 2 ABOVE:

CA/PEPC/03/2023; CA/PEPC/04/2023; CA/PEPC/05/2023.


CERTIFIED TRUE COPY

3. An order cancelling the election and compelling the 1st Respondent to conduct a fresh election at which the 2nd, 3rd and 4th Respondents shall not participate.

IN THE ALTERNATIVE TO 1, 2 AND 3 ABOVE:

4. (i) That it may be determined that the 2nd Respondent was not duly elected by a majority of the lawful votes cast in the election for the office of the President of the Federal Republic of Nigeria held on 25th February, 2023; and therefore, the declaration and return of the 2nd Respondent as the winner of the Presidential election are unlawful, unconstitutional and of no effect whatsoever.

(ii) That it be determined that based on the valid voted cast at the Presidential election of 25th February, 2023, the 1st Petitioner scored the highest number of votes cast at the election and not less than one quarter of the votes cast at the election in each of at least two-thirds of all the States of the Federation and the Federal Capital Territory, Abuja and ought to be declared and returned as the winner of the Presidential election.



   (iii)   An order directing the 1st Respondent to issue Certificate of Return to the 1st Petitioner as the duly elected President of the Federal Republic of Nigeria.

   (iv)   That it be determined that the Certificate of Return wrongly issued to the 2nd Respondent by the 1st Respondent is null and void and be set aside.

IN THE FURTHER ALTERNATIVE TO 1, 2, 3 AND 4 ABOVE:

5. (i) That the Presidential election conducted on 25th February, 2023 is void on the ground that the election was not conducted substantially in accordance with the provisions of the Electoral Act, 2022 and Constitution of the Federal Republic of Nigeria 1999, as amended.

   (ii)   An order cancelling the Presidential Election conducted on 25th February, 2023 and mandating the 1st Respondent to conduct a fresh election for the office of President of the Federal Republic of Nigeria.

Upon being served with the petition, the 1st Respondent filed its Reply to the Petition on the 10th of April, 2023. The 2nd and 3rd Respondents filed a joint Reply to the Petition on 12th April, 2023, while the 4th Respondent filed its Reply to the Petition on the 10th of April, 2023. On the 21st of April, 2023 the Petitioners responded by filing separate Replies to the


CERTIFIED TRUE COPY

Replies of the 1st, 2nd and 3rd, and the 4th Respondents. The 1st, 2nd and 3rd and the 4th Respondents also incorporated preliminary objections in their respective Replies to the Petition and also filed motions challenging the competence of the Petition and the Petitioners' Replies or in the alternative, some of the paragraphs of the Petition and the Petitioners' Replies.

The Pre-trial Session was held from the 8th of May, 2023 to the 22nd of May, 2023. At the pre-hearing session, this Petition was consolidated with two other Petitions challenging the same Presidential election, in line with Paragraph 50 of the 1st Schedule to the Electoral Act, 2022. The other petitions are:

   (i)    CA/PEPC/04/2022: ALLIED PEOPLES MOVEMENT v. INEC & 4 ORS; and

   (ii)   CA/PEPC/05/2022: ABUBAKAR ATIKU & ANOR v INEC & 2 ORS

During the pre-hearing session, the Court heard all pending motions and preliminary objections made by the Respondents. As mandated by Section 285(8) of the Constitution of the Federal Republic of Nigeria, 1999, the Court deferred rulings on those applications to be delivered at the stage of final judgment.

In line with the trite position of law as restated by the Supreme Court in **FIRST BANK v T.S.A. INDUSTRIES LTD (2010) LPELR-1283(SC) at page 13,**

CA/PEPC/03/2023; CA/PEPC/04/2023; CA/PEPC/05/2023.                                      8

CERTIFIED TRUE COPY

**paras. B – E,** I shall first consider and determine the Respondents' objections to the competence of the Petition and the Petitioners' Replies, or the listed paragraphs thereof, before determining the main Petition.

## THE RESPONDENTS' VARIOUS PRELMINARY OBJECTIONS:

The 1st Respondent represented by A. B. Mahmoud, SAN; the 2nd and 3rd Respondents represented by Chief Wole Olanipekun SAN; and the 4th Respondent represented by Prince L. O. Fagbemi, SAN, filed separate preliminary objections challenging the competence of the Petition and the Petitioners' Replies to the Respondents' respective Replies, or in the alternative, seeking to strike out some of the grounds and/or paragraphs of the Petition, as well as the Petitioners' Replies. The various objections of the Respondents fall into three categories. These are: (i) those seeking to strike out some paragraphs of the Petition for being vague, generic and nebulous; (ii) those seeking to strike out the Petition or some of its grounds; and (iii) those seeking to strike out the Petitioners' Replies or some paragraphs of the Replies.

## 1. OBJECTIONS TO VAGUE, GENERIC, IMPRECISE AND NEBULOUS AVERMENTS:

The first category consists of those applications seeking to strike out some paragraphs of the Petition. They are:

CA/PEPC/03/2023; CA/PEPC/04/2023; CA/PEPC/05/2023.                                      9

CERTIFIED TRUE COPY

**A:** **1st Respondent's Motion filed on 19th April, 2023 essentially sought the following reliefs:**

(i) Order striking out paragraphs 60 – 79, 83, 98 and 99 of the Petition for being vague, nebulous and imprecise and after striking out those paragraphs, strike out grounds of the Petition alleging corrupt practices and failure of the 2nd and 3rd Respondents to score majority of lawful votes.

(ii) Strike out paragraphs 57 and 58 of the Petition for being inconsistent with paragraphs 65, 67, 70 and 71 of the Petition.

(iii) Strike out prayers 3, 5(i) and (ii) in paragraph 102 of the Petition, as well as prayers 1(iii), 4(i), (ii), (iii), (iv) in paragraph 102 of the Petition, and thereafter dismiss the petition *in limine* for being academic and for being an abuse of court process.

**B:** **The 2nd and 3rd Respondents' Motion filed on 13th May, 2023 seeking for:**

(i) Order striking out paragraphs 9, 52 – 55, 60, 66 – 73, 75 – 78, 92, 95, 96 & 97 of the Petition for being vague, imprecise, generic and nebulous.



(ii)   Order striking out paragraphs 80 – 82, 84 – 98 for failure to disclose facts to support the ground that the 2nd and 3rd Respondents did not score majority of lawful votes.

(iii)   Order striking out paragraphs 80 – 82 and 84 – 98 on the failure to score 25% in the FCT which cannot be premised on the ground of failure to score majority of lawful votes.

**C:   4th Respondent's Motion filed on 8th May, 2023 seeking for:**

(i)   An order striking out this petition for being incompetent and in gross violation of paragraphs 4(1)(d), (2) and 7 of the First Schedule to the Electoral Act, 2022.

(ii)   An order of this Honourable Court striking out ground (ii) of the Petition and all associated facts contained in paragraphs 20(ii), 33 – 78 of the Petition for being incompetent.

(iii)   An order of this Honourable Court striking out paragraphs 20(ii), 33 – 78 of the Petition for not being in support of any valid ground in the Petition.

(iv)   An order of this Honourable Court striking out paragraphs 21 – 27, 29 – 100 of the Petition for being non-specific, lacking in clarity, generic, nebulous, vague, speculative and gold-

CA/PEPC/03/2023; CA/PEPC/04/2023; CA/PEPC/05/2023.


CERTIFIED TRUE COPY

digging in contravention of the 1st Schedule to the Electoral Act, 2022.

In their above applications, all the Respondents relied on the provisions of Paragraph 4(1)(d) and (2) of the First Schedule to the Electoral Act, 2022 and variously argued that the paragraphs of the Petition which they have listed are liable to be struck out for being vague, generic, imprecise and nebulous. In so arguing, the Respondents have relied on the cases of **AKPOTI v INEC (2022) 9 NWLR (Pt. 1836) 403 at 423; BELGORE v AHMED (2013) 8 NWLR (Pt. 1355) 60 at 95 – 96, paras. G – C; IKPEAZU v OTTI (2016) 8 NWLR (Pt. 1513) 38 at 97; PDP v INEC & 3 ORS (2012) 7 NWLR (Pt. 1300) 538 at 560; OGU v EKWEREMADU (2006) 1 NWLR (Pt. 961) 255 at 278; and OJUKWU v YAR'ADUA (2009) 12 NWLR (Pt. 1154) 50 at 110,** among several others.

Per contra, the Petitioners have submitted that the Respondents' objections that the listed paragraphs of the Petition are vague and nebulous, is defeated because the Petitioners have indicated in the Petition that they shall be relying on spreadsheets and forensic/expert evidence to prove the averred facts. The Petitioners have particularly argued that in paragraphs 61, 65, 67, 69, 70, 71, 72, 73, 83 and 100 of the Petition, they have pleaded the said spreadsheets and forensic reports by incorporation or reference, and that this means that the said



documents have not only been incorporated but have been sufficiently pleaded. On this point, the Petitioners have relied on the cases of **EFCC v REINL (2020) 9 NWLR (Pt. 1730) 489 at 517 – 519 (SC); EKPEMUPOLO v EDEREMODA (2009) 8 NWLR (Pt. 1142) 166 at 186F – 187C; MARINE MANAGEMENT ASSOCIATES INC. v N.M.A (2012) 18 NWLR (Pt. 1333) 506 at 535H – 537C; and DINGYADI v WAMAKKO (2008) 17 NWLR (Pt. 1116) 395 at 444 C – D.**

The Petitioners further argued that the facts in **BELGORE v AHMED; IKPEAZU v OTTI; OGU v EKWEREMADU; OJUKWU v YAR'ADUA; PDP v INEC & 3 ORS; ASOGWA v UGWUEDE**, and all other cases cited by the Respondents above, are not the same with the facts of this Petition, because documents were never pleaded by reference or incorporation in those cases. Additionally, the Petitioners have relied on Paragraph 17(2) of the 1st Schedule to the Electoral Act, 2022 and argued that the Respondents have joined issues with the Petitioners on those paragraphs, and having failed to seek for further particulars, they must be taken to have understood the said paragraphs. They placed reliance on **OMBUGADU v SULE (2021) 2 NWLR (Pt. 1759) 171 at 183E – F (SC)**, and argued that same constitutes binding precedent over **PDP v INEC & 3 ORS (supra),** which was decided in 2012.



I have carefully considered the submissions of the parties and the judicial authorities cited. It is trite that adversarial civil litigation is basically fought on pleadings. It is the foundation of the parties' respective cases. The general principle of law is that such pleadings must sufficiently and comprehensively set out material facts, so as to ascertain with certainty and clarity the matters or issues in dispute between the parties. This is because the purpose of pleadings is to give adequate notice to the adversary of the case he is to meet and to afford him the opportunity to properly respond to such case. Its aim is to bring to the knowledge of the opposite side and the court, all the essential facts. It is therefore a safeguard against the element of surprise. See: **SODIPO v LEMMINKAINEN OY & ANOR (1985) LPELR-3088(SC) at page 56, para. F, per Oputa, JSC; ODOM & ORS v PDP & ORS (2015) LPELR-24351(SC); ALHASSAN & ANOR v ISHAKU & ORS (2016) LPELR-40083(SC); and PDP v INEC & 3 ORS (supra).**

The requirements of pleadings in election petitions are primarily provided in Paragraph 4 of the 1st Schedule to the Electoral Act, 2022. Specifically, Paragraph 4(1)(d) mandates that "an election petition shall state clearly the facts of the election petition and the ground or grounds on which the petition is based and the reliefs sought by the Petitioner." Subparagraph (2) of the same paragraph further provides that "the election petition shall be divided into paragraphs each of which shall be



confined to a distinct issue or major facts of the election petition, and every paragraph shall be numbered consecutively."

In addition to the provision of Paragraph 4 of the 1st Schedule to the Electoral Act, Paragraph 54 of the same Schedule to the Act has made applicable to Election Petitions the Rules of Civil Procedure in the Federal High Court of 2019, subject to such modifications as would bring same in conformity with the provisions of the Act. By Order 13 Rule 4 of the Federal High Court (Civil Procedure) Rules, 2019, every party to an election petition shall ensure that averments in their pleadings "contain in a summary form the material facts on which the party pleading relies for his claim or defence, as the case may be, but not the evidence by which they are to be proved, and shall, when necessary, be divided into paragraphs, and numbered consecutively." By subparagraph (4) of that Rule, such facts contained in the pleading must "be alleged positively, precisely and distinctly, and as briefly as is consistent with a clear statement."

The aforementioned provisions contained in the 1st Schedule to the Electoral Act, 2022, as well as the Federal High Court Rules, 2019 state the mandatory requirements of pleadings in election petitions. The requirements for clarity and precision of fact required by Paragraph 4 of the 1st Schedule to the Act means that averments must not be vague,


CERTIFIED TRUE COPY

ambiguous or unclear, leaving room for speculation or conjecture, while the requirement of distinctiveness means that each averment must contain a clearly understandable allegation and there should be no confusion as to the linkages between facts contained in the averments in the petition in ascertaining the allegations being made in the Petition. In particular, Paragraph 4(1)(d) relating to the facts of the Petition, the grounds on which it is based, and the reliefs sought by the Petitioner, have been severally considered and interpreted by the appellate courts.

In **BELGORE v AHMED (supra),** the complaint against the averments in the petition was that they were unspecific, generic, speculative, vague, unreferable, omnibus and general in terms. In that case the Apex Court specifically held as follows:

> "Pleadings in an action are the written statements of the parties wherein they set forth the summary of the material facts on which each relied in proof of his claim or his defence as the case may be and by means of which the real matters was (sic) controversy between the parties and to be adjudicated upon are clearly identified. Although only material facts are required to be pleaded and in a summary form, they must nevertheless be sufficiently specific and comprehensive to elicit the necessary answers from the opponent. See *Ashiru Noibi v. Fikolati & Ors* (1987) 3 SC 105 at

CERTIFIED TRUE COPY

119, (1987) 1 NWLR (Pt. 52) 629 and *Omorhirihi v. Enetevwere* (1988) 1 NWLR (Pt. 73) 746. They must contain such details as to eliminate any element of surprise to the opposing party. In this case where the dispute involves the election in as many as 895 polling units, the pleading in the petition which alleged electoral malpractices, non-compliance and/or offences in "some polling units", "many polling units", "most polling units" or "several polling units" cannot be said to have met the requirements of pleadings as stipulated in paragraph 4(1)(d) of the 1st Schedule to the Electoral Act and/or Order 13 Rules 4(1), 5 and 6(1) of the Federal High Court (Civil Procedure) Rules, 2009."

Also, in **PDP v INEC (supra),** the Apex Court, was also categorical when it held thus:

"On whether the affected paragraphs were rightly struck out, I have read the affected paragraphs and found that they relate to allegations of non-voting in several polling points, disruption of election, non-conclusion of election, thumb-printing of ballot papers, falsification of election results, wide spread disruption, irregularities and malpractices without providing particulars or the polling units where the alleged malpractices took place. The lower court was therefore right when it held as follows: "The paragraphs

CA/PEPC/03/2023; CA/PEPC/04/2023; CA/PEPC/05/2023.                    17



> above in my view are too generic, vague and lacking in any
> particulars as they are not tied specifically to any particular polling
> unit or any particular number of people who were alleged to be
> disenfranchised. The fact that a party can file further particulars or
> deny in a reply the averment in the pleading must not be general,
> it must be specific as to facts. It is settled law that a petitioner's
> obligation to plead particulars of fraud or falsification without
> which the allegation is a non-starter." I have nothing to add to this
> statement of law as advanced above, and I adopt it as mine."

Indeed, on the provision of Paragraph 17(1) of the 1st Schedule to the
Electoral Act, relating to further particulars, the Apex Court held in **PDP
v INEC & ORS (supra),** that:

> "An application for an order for further particulars is merely a
> shield in the hand of a party who so desires and not a sword to be
> used by a party whose pleading is grossly inadequate, insufficient
> and devoid of necessary particulars as the appellant's petition was
> in the instant case."

A sober consideration of the decisions of the Supreme Court in relation
to the requirements of pleadings in Paragraphs 4(1)(d) of the 1st Schedule
to the Electoral Act, 2022 on the one hand, and the decisions of the
Supreme Court on the provision of Paragraph 17(1) and (2) of the 1st

CERTIFIED TRUE COPY

Schedule to the Electoral Act, 2022 relating to further particulars, on the other hand, shows that, whilst in cases such as **ABUBAKAR v YAR'ADUA (supra) and OMBUGADU v SULE (supra),** the Supreme Court had held that a Respondent who complains of vagueness of averments in an election petition should avail himself of the provision of paragraph 17(1) of the 1st Schedule to the Electoral Act to seek for further particulars or the direction of the Tribunal or Court, the decisions of the Apex Court especially in **PDP v INEC (supra) and BELGORE v AHMED (supra)**, have specifically held that where averments in a petition are grossly imprecise and generic, such averments will be incompetent and liable to be struck out. See also on this: **IKPEAZU v OTTI (2016) LPELR-40055(SC).**

It is therefore clear that the state of the law as could be deduced from the various decisions of the Apex Court, is that the provision for further particulars as stated in paragraph 17(1) of the 1st Schedule to the Electoral Act, 2022 will only come into play where the petition itself contains material or necessary particulars. In other words, Paragraph 17(1) of the 1st Schedule to the Electoral Act, 2022 does not bar a Respondent from applying under Paragraph 4(7) of the 1st Schedule to strike out averments in a petition which are grossly inadequate, insufficient and devoid of material or necessary particulars. This is because the operational words in paragraph 17(1) is "further particulars", and this means there must be some material particulars

CERTIFIED TRUE COPY

already pleaded in the Petition before further particulars can be sought by the Respondent.

As borne from the Apex Court decisions in **BELGORE v AHMED (supra); PDP v INEC & ORS (supra) and IKPEAZU v OTTI (supra),** the law is clearly settled that specifying the particular polling units or places where irregularities are alleged to have occurred are material particulars in an election petition, and averments in an election petition which allege irregularities and malpractices but fail to specify the polling units or places where the irregularities or malpractices occurred, are bereft of material particulars, and such averments are incompetent and liable to be struck out. As specifically stated in **PDP v INEC (supra),** a Petitioner who has failed to state such material particulars cannot invoke the provision relating to further particulars as a sword against a Respondent in order to cure the incompetence of such averments.

With respect, it is a misconceived argument on the part of the Senior Counsel for the Petitioners to state that the later decision of the Apex Court in **OMBUGADU v SULE (supra)**, which relates to further particulars under Paragraph 17(1) of the 1st Schedule has departed the specific decisions of the Apex Court in **BELGORE v AHMED (supra), PDP v INEC & ORS (supra); and IKPEAZU v OTTI (supra),** on the mandatory requirements for stating material facts as provided in Paragraph 4(1) of

CERTIFIED TRUE COPY

the same 1st Schedule to the Electoral Act. Contrary to the contention of the Petitioners, the decision of the Supreme Court in **OMBUGADU v SULE (supra)** has merely reiterated the legal position relating to further particulars as provided in Paragraph 17(1) of the 1st Schedule to the Electoral Act, 2022. It has not departed from the above specific decisions of the Apex Court on the materiality of specifying in an election petition the polling units or places where irregularities and malpractices are alleged to have occurred.

A look at the averments in the Petitioners' petition shows that the Petitioners have only alleged various irregularities and malpractices but failed to specify the particular polling units or specific places where the alleged irregularities and malpractices have occurred. For instance, in paragraph 9 of the Petition where the Petitioner averred that "in appropriate cases these Agents raised complaints about anomalies where they occurred and reported such complaints to designated officers of the 2nd Petitioner and the 1st Respondent", the Petitioners failed to specify the anomalies, the places where the anomalies occurred, the agents who complained, and the designated officers of the 2nd Petitioner and the 1st Respondent to whom the complaints were made. In paragraphs 60 and 61 of the Petition where the Petitioners alleged that the 1st Respondent "suppressed the actual scores obtained by the Petitioners by deliberately uploading blurred Form EC8As on the

CERTIFIED TRUE COPY

IReV in 18,088 (eighteen thousand and eighty eight) polling units, the Petitioners did not specify the polling units but only stated that they will rely on a Spread Sheet containing the polling unit codes and details of the 18,088 polling units, as well as the authentic results in the said polling units. In paragraphs 66 and 67 where the Petitioners alleged that the 1st Respondent embarked on "massive misrepresentation and manipulation by uploading fictitious results in polling units where there were no elections", they did not specify the polling units where they alleged there were no elections, the incorrect results that were uploaded and which are the correct results. Again, in paragraphs 68 – 71 where the Petitioners alleged that the scores obtained by them were "unlawfully reduced and added by the 1st Respondent to the scores of the 2nd Respondent", they failed to state their scores that were reduced and added to that of the 2nd Respondent by the 1st Respondent and the figures that shows that the Petitioners won the election. In paragraphs 72, 73, 76 – 78 where the Petitioners alleged over voting, they merely stated that they will "rely on the Forensic Reports of the election materials showing that the votes cast in the polling units in Ekiti State, Oyo State, Ondo State, Taraba State, Osun State, Kano State, Yobe State and Niger State exceeded the number of voters accredited on the BVAS in those States. The Petitioners failed to specify the polling units in those States where the over-voting occurred, the number of votes affected,

CERTIFIED TRUE COPY

margin of lead which they claim and the voters who ought to legitimately vote in those polling units. And in paragraph 73, the Petitioners only stated that they will "show that in the computation and declaration of results of the election, based on the uploaded results, the votes recorded for the 2nd Respondent did not comply with the legitimate process of computation of the result and disfavoured the Petitioners..." in Rivers, Lagos, Taraba, Benue, Adamawa, Imo, Bauchi, Borno, Kaduna and Plateau and other States of the Federation. The Petitioners neither specified the uploaded results nor the votes illegally recorded for the 2nd Respondents and how they were disfavoured. In paragraph 83 of the Petition where the Petitioners claimed that the 1st Petitioner scored the majority of the lawful votes cast at the election, they did not state the majority of the lawful votes they claimed to have scored, especially as elections and the determination of who won election is about figures. In paragraph 99 of the Petition where the Petitioners said they will rely on Form EC8As to establish that substantial votes were unlawfully credited to the 2nd Respondent, they failed to state the figures of the unlawful votes credited to the 2nd Respondent.

In the Petition, the Petitioners merely made generic allegations of various irregularities and malpractices against the Respondents without specifying the polling units, collation centres or specific places where the alleged irregularities and malpractices occurred. Rather, the Petitioners

CERTIFIED TRUE COPY

only stated that they will rely on Spread Sheets, Inspection Reports and Forensic/Expert Analysis, which they said they have incorporated in the Petition. But none of the Spread Sheets, Inspection Report and Forensic/Experts Analysis was attached and served along with the Petition on the Respondents. Rather, they were only listed as items 35 and 36 in the list of documents to be relied upon by the Petitioners.

It is only in paragraphs 62 and 64 of the Petition where the Petitioners alleged that the 1st Respondent suppressed the lawful votes of the Petitioners and inflated the votes of the 2nd and 4th Respondents in Rivers and Benue States, that the Petitioners gave figures of the votes suppressed for the Petitioners and those inflated for the 2nd and 4th Respondents and also stated what they claim to be the actual figures scored by them and by the 2nd and 4th Respondents. But all other paragraphs of the Petition where irregularities and malpractices were alleged are bereft of the material details of the polling units or places where they were alleged to have taken place, or the figures of votes alleged to have been suppressed, deflated or inflated.

It is also pertinent to observe that in paragraph 79 of the Petition where the Petitioners alleged corrupt practices, they merely stated that they are repeating their pleadings in support of the grounds of non-compliance to be in support of their allegations of corrupt practices. It

CERTIFIED TRUE COPY

should be noted however, that not every ground of non-compliance will amount to corrupt practice. In fact, the standard of proof of non-compliance differs from that of corrupt practice. While the standard of proof of non-compliance is on the balance of probabilities, that of corrupt practice is beyond reasonable doubt. See: **PDP v INEC (supra) at page 31, paras. A – B, per Rhodes-Vivour, JSC; MOHAMMED v WAMAKKO (2017) LPELR-42667(SC) at page 10, paras. D – F, per Nweze, JSC; and BOARD OF CUSTOMS & EXCISE v ALHAJI IBRAHIM BARAU (1982) LPELR-786(SC) at pages 41 – 43, paras. F – E, per Idigbe, JSC.**

It is instructive that in paragraph 3.2 – 3.21 of their submission in opposition to the 1st Respondent's Objection, the Petitioners appeared to have conceded that in the averments of the Petition they have not specified the particular polling units where the alleged irregularities and malpractices occurred, or specified the figures of the votes or scores which they alleged have been suppressed, deflated or inflated. Rather, they stated that the details of the polling units are contained in the Spreadsheets and Forensic Analysis Reports which they have incorporated and made part of their pleadings by reference. (See particularly paragraph 67 of the Petition). The Petitioners further argued that since the Respondents have failed to apply for further particulars under paragraph 17(1) and (2) of the 1st Schedule to the Electoral Act, 2022, they are deemed to have understood those averments.

CERTIFIED TRUE COPY

However, by Paragraph 15 of the 1st Schedule to the Electoral Act, 2022, when a Petitioner claims "…that he had the highest number of valid votes cast at the election, the party defending the election or return at the election shall set out clearly in his reply particulars of the votes, if any, which he objects to and the reasons for his objection against such votes, showing how he intends to prove at the hearing that the petitioner is not entitled to succeed." This provision presupposes that the Petitioner has a first duty to state clearly in his petition the particulars of such votes in respect of which he claims to have scored the highest number of valid votes and thus entitled to be returned as the winner. This also presupposes that it is only after the Petitioner has supplied the particulars of the votes in support of his claim that he scored the highest number of valid votes, that a Respondent will then have a duty to object to any of the particulars of such votes supplied by the Petitioner in order to show that the Petitioner is not entitled to succeed.

With regard to the Petitioners' contention that they have incorporated into the Petition by reference the Spread Sheets and Forensic Analysis Report containing details of the polling units where they alleged that irregularities and malpractices occurred, it is trite that for a document to be properly incorporated as part of pleadings by reference, the document must not only be referred to in the pleadings, but it must also be included as part of the pleadings to be served on the adverse party,

CERTIFIED TRUE COPY

so as to enable the adverse party to properly respond to same in his defence. Indeed, in all the cases of **EFCC v REINL (supra); EKPEMUPOLO v EDEREMODA (supra); MARINE MANAGEMENT ASSOCIATES INC. v N.M.A (2012) 18 NWLR (supra); and DINGYADI v WAMAKKO (supra)**, which were relied upon by the Petitioners, the documents which were incorporated as part of pleadings by reference were served along with the pleadings on the adverse party.

In considering a similar scenario, this Court, per Ayoola, JCA (as he then was) held in **NIGERIA MERCHANT BANK PLC v AIYEDUN INVESTMENT LTD (1997) LPELR-5951(CA),** thus:

> "Before I part with this appeal, it is pertinent to advert to one pleading question raised in this appeal in regard to the consequence of a party pleading that he would rely on certain unspecified documents at the trial. The plaintiff contended that such averment made the contents of such document part of the pleadings. In this case, the plaintiff in para. 30 of the statement of claim pleaded thus: "The plaintiff at the trial will rely on all letters and documents between the parties pertaining to this suit." Although the principle is established that "if an agreement in writing is referred to in a pleading, it becomes part of the pleading and it is open to the Court to give the agreement its true legal



effect, irrespective of the terms used in the pleading to indicate such effect", that proposition of law should not be used to cover such averment as shown above which lacks specificity. Besides, a report, such as Exhibit P. 22 in this case, prepared by a witness for the plaintiff and tendered at the trial by the witness, cannot be described as 'documents between the parties pertaining to the suit'. At the appropriate time and when the occasion arises the true ambit of the proposition of law in such cases such as *Banque Genevoise v. Spetsai Ltd.* (1962) 2 SCNLR 310; (1962) 1 All N.L.R. 570, ought to be defined."

In the instant case, the Spread Sheets and Forensic Reports which were documents prepared by the Petitioners' witnesses, were not served along with the Petition on the Respondents, but were only listed as documents to be relied upon at trial. We are not oblivious of the Petitioners' argument in relation to Paragraph 4(5)(c) of the 1st Schedule to the Electoral Act, 2022 which provides that the election petition shall be accompanied by "copies or list of every document to be relied on at the hearing of the petition." This provision undoubtedly only relates to front-loading of documents to be relied upon by the Petitioner as his evidence during trial. Contrary to the Petitioners' argument, it does not cover incorporation of documents into pleadings by reference.

CERTIFIED TRUE COPY

It is also noteworthy that the Spreadsheets and Forensic Reports which the Petitioners claim to be incorporating into the Petition by reference are actually documents prepared by the Petitioners' witnesses. In other words, the Spreadsheets and Forensic Reports are not documents which are outside the control of the Petitioners and which they have to obtain by subpoena. Being the Petitioners' own documents, they ought to have served those documents along with the Petition on the Respondents, so as to enable the Respondents to counter same by engaging their own experts to appropriately respond to same, if they so desire. That indeed is the essence of pleadings, so as to avoid taking the other party by surprise.

The Petitioners have also tried to argue that the Respondents having joined issues on the general allegations contained in the petition they are deemed to have understood same. With respect, this is also not a tenable argument in view of the grossly generic allegations made in the Petition. Faced with a similar scenario, this Court, per Ogunwumiju, JCA (as he then was, now JSC), held in **UDEAGHA & ANOR v OMEGARA & ORS (2010) LPELR-3856(CA),** as follows:

> "The argument of Appellants' counsel that the Respondents did not adequately traverse the petition is unfounded. The petition itself contained general complaints. There was no effort to pinpoint in

CERTIFIED TRUE COPY

the pleadings the various places where corrupt practices, non-voting, use of violence, thuggery, rigging in polling units, massive thumb-print of ballot papers, fictitious entry of election results took place. Therefore, there was a general corresponding reply denying the allegations in general terms from the Respondents. If the Petitioners did not plead particulars, how could the respondents traverse non-existent particulars? The averments in the Appellants' pleadings should have contained details of the allegations and complaints to which the Respondents could reply in detail in their own pleadings. The Appellants expected the Respondents to reply to the various specific allegations contained in the witness statements filed along with the petition. That is not the correct procedure. Those specific allegations should have been in the pleadings. The pleadings must show the facts disputed while the witnesses would give evidence of these facts. In election petitions, it has been held that there is need for particulars where required in order to prevent taking adverse party by surprise. See *Buhari v Obasanjo* (2005) 7 SCNJ 1. It is not the function of particulars to take the place of necessary averments in pleadings. See *Nwobodo v Onoh* (1984) 1 SC 201..."

Indeed, in a Presidential election like the one being challenged in this Petition, which was held in 176,846 polling units, 8,809 wards, 774 Local

CERTIFIED TRUE COPY

Government Areas, 36 States and the Federal Capital Territory, it is unimaginable that averments in a petition which merely allege irregularities and or malpractices without specifying the particular polling units or particular collation centres where the irregularities or malpractices have allegedly taken place, will be regarded as proper merely because the Respondent has not requested for further particulars. [**BELGORE v AHMED (supra) and PDP v INEC (supra)**]. Moreso, when an election petition is by nature a declaratory action in which the Petitioner succeeds only on the strength of his own case and not on the weakness of that of the Respondent. See: **BUSARI v ADEPOJU (2015) LPELR-41704(CA); OYETOLA v ADELEKE (2019) LPELR-47529(CA); ANAZONWU v ONUBOGU & ORS (2023) LPELR-59794(CA).** It is in this respect that a Petitioner has an obligation to set up a clear, unambiguous, precise and positive case in his pleadings, since pleadings is the foundation of a party's case, and it is to the pleadings that the parties to litigation as well as the court are all bound. See: **ENANG & ORS v ADU (1981) LPELR-1139(SC) at page 13, paras. C – D, per Nnamani, JSC.**

It is in the light of all the foregoing, that I find and hold that the motions of the Respondents listed above succeed. In consequence, paragraphs 9, 60, 61, 66, 67, 68, 69, 70, 71, 72, 73, 76, 77, 78, 83 and 99 of the Petition which have failed to state the specific polling units, collation centres, or



the specific places where the irregularities and malpractices are alleged to have occurred, or the figures of votes which are being claimed, are grossly vague, imprecise, nebulous and bereft of material particulars, and have thus failed to meet the requirements of Paragraph 4(1)(d) of the Electoral Act, 2022. In accordance with Paragraph 4(7) of the said Schedule, the said paragraphs are consequently hereby struck out.

On the 1st Respondent's prayer to strike out paragraphs 57 and 58 of the Petition for being inconsistent with paragraphs 65, 67, 70 and 71 of the Petition, the essential contention of the 1st Respondent is that whilst in paragraphs 57 and 58 the Petitioners have alleged that the 1st Respondent failed to comply with the order of inspection granted by the Court, the Petitioners have in paragraphs 65, 67, 70 and 71 stated that they would rely on the report of the inspection. Additionally, the 1st Respondent also argued that whilst the Petitioners have alleged that the election was marred by corrupt practices and was not conducted in substantial compliance with the Electoral Act 2022, they have also alleged that they have scored majority of lawful votes cast and should be declared the winner of the election. Relying on the cases of **INEC v YOUTH PARTY (2021) LPELR-54802(CA); and ABUBAKAR v YAR'ADUA (2008) 19 NWLR (Pt. 1120) 1 at 153 – 154, paras. H – A,** the 1st Respondent urged the Court to strike out the paragraphs, as well as


CERTIFIED TRUE COPY

prayers 1 – 4 on the one hand, and prayers 5(i) and 5(ii) on the other hand, for being inconsistent.

Conversely, the Petitioners contended that the law allows them to plead conflicting facts in so far as they have claimed alternative reliefs. They referred to the alternative reliefs at pages 35 – 37 of the Petition and relied on the cases of **ABIA STATE INDEPENDENT ELECTORAL COMMISSION v KANU (2013) 13 NWLR (Pt. 1370) 69 at 84 – 85 (SC); G.K.F.I. (NIG) LTD v NITEL (2009) 15 NWLR (Pt. 1164) 344 at 377 – 378 (SC); and NEWBREED ORG. LTD v ERHOMOSELE (2006) 5 NWLR (Pt. 974) 499 at 544 (SC),** as well as the ruling on similar objection by the 2019 Presidential Election Court in **CA/PEPC/002/2019 delivered on 11th September, 2019, per Garba, JCA (as he then was).**

As rightly submitted by the Petitioners, the reliefs in this Petition, which I have reproduced at the beginning of this judgment, are undoubtedly sought in the alternative. The settled law is that reliefs can be sought in the alternative and where so sought by a party, he is at liberty to plead conflicting facts in line with the alternative reliefs he has sought. In **ADIGHIJE v NWAOGU & ORS (2010) 12 NWLR (Pt. 1209) 419 at 545, paras. E – G; (2010) LPELR-4941(CA) at pages 14 – 16, paras. E - G,** this Court, per Ogunwumiju, JCA (as he then was, now JSC), held that:



"…in civil litigation and indeed in election matters, a party can make two seemingly contradictory pleadings leading to two different heads of claim. That is why a petitioner can claim that the election be annulled for reason of substantial non-compliance and in the same breath claim that he won the election by a majority of lawful notes. A petitioner may plead the same set of facts to ground alternative reliefs. Those pleadings are not ipso facto held to be self-contradictory. The Court can only grant one relief as the party must decide which relief is best supported by the evidence on record."

See also: **METAL CONSTRUCTION (W.A.) LTD v ABODERIN (1998) LPELR-1868(SC) at pages 26, paras. C – E.**

In any case, the 1st Respondent, which is the body that conducted the election, and to whom the 1st Petitioner's nomination documents were submitted by the 2nd Petitioner, admitted paragraph 4 of the Petition wherein the Petitioners averred that the 1st Petitioner was duly sponsored by the 2nd Petitioner on whose platform the 1st Petitioner contested the election.

I therefore have no hesitation in discountenancing this ground of the objection.

CERTIFIED TRUE COPY

2. **CHALLENGE TO THE COMPETENCE OF THE PETITION OR SOME OF ITS GROUNDS:**

The second category of the Respondents' applications that challenge some of the grounds of the Petition and or the competence of the Petition are as follows:

A: **1st Respondent's Motion filed on 19th April, 2023, seeking:**

    (i)    Order striking out ground 2, paragraphs 33 – 79 and reliefs 5(i) & (ii) of the Petition on transmission of election results for being caught by issue estoppel.

    (ii)    Order striking out paragraphs 20(i), 21, 23, 24, 25, 26 and 27 on nomination of the 2nd and 3rd Respondents for lack of jurisdiction.

B: **The 2nd and 3rd Respondents' Motion filed on 12th May, 2023 seeking:**

    (i)    Order striking out/dismissing the Petition for being incompetent and defective.

    (ii)    Order striking out grounds (i), (ii) and (iii) of the Petition.

    (iii)    Order striking out reliefs 1(i) – (iii), 2, 3, 4(i) – (iv), 5(i) & (ii) of the Petition.


CERTIFIED TRUE COPY

The above two motions are predicated upon several grounds. These include: (i) 1st Petitioner's locus standi to present the Petition; (ii) non joinder of necessary parties; (iii) the competence the ground 1 of the petition challenging the qualification of the 2nd Respondent to contest the election; (iv) the competence of ground 2 of the Petition alleging corrupt practices and non-compliance with the provisions of the Electoral Act, 2022; (v) issue estoppel against ground 2 of the Petition as it relates to electronic transmission of election results; (vi) the competence of the reliefs sought and whether or not they are grantable as couched by the Petitioners.

It is the view of this Court that the issue relating to ground 1 challenging the qualification of the 2nd Respondent to contest the election; the issue relating to the competence of ground 2 relating to allegations of corrupt practices and non-compliance with the Electoral Act, 2022 and the plea of estoppel in relation thereto; as well as the issue relating to competence of the reliefs sought in this Petition, are matters on which the parties have joined issues in the main Petition, the merits of which will be decided after considering the pleadings and evidence led in the Petition. It is the settled position of the law that a court should not comment on or decide at preliminary stage matters or issues which are supposed to be decided in the substantive case. See: **NWANKWO & ORS v YAR'ADUA & ORS (2010) LPELR-2109(SC), at page 71, paras. B – F, per**

CERTIFIED TRUE COPY

**Commassie, JSC; and OCHOLI ENOJO JAMES, SAN v INEC & ORS (2015) LPELR-24494(SC) at page 92, para. G, per Okoro, JSC.** Hence, while leaving those issues to be dealt with while considering the merit of the Petition, we shall determine at this stage the objections relating to the 1st Petitioner's locus standi; the non-joinder of necessary parties; and the objection to the competence of the Petitioners' Replies to the Respondents' Replies or to some of the paragraphs of the Petitioners' Replies.

I.     LACK OF LOCUS STANDI OF THE 1ST PETITIONER

The 2nd and 3rd Respondents and the 4th Respondents in their motion filed on 08/05/23 also objected to the 1st Petitioner's locus standi to bring this Petition. Their principal contention is that the 1st Petitioner was in contravention of Section 77(3) of the Electoral Act, 2022. They argued that the 1st Petitioner who was a member of the Peoples Democratic Party and who was screened as one of its aspirants for the Presidential election only resigned his membership of that party on 24th May, 2022 to join the 2nd Petitioner on 27th May, 2022. They contended that as at 30th April, 2022, the 1st Petitioner could not have been in the register of members of the 2nd Petitioner which it submitted to the 1st Respondent 30 days before its Presidential primary election as mandated by Section 77(3) of the Electoral Act, 2022, and since 1st Petitioner is not in the

CA/PEPC/03/2023; CA/PEPC/04/2023; CA/PEPC/05/2023.                    37



membership register submitted to the 1st Respondent by the 2nd Petitioner, the 1st Petitioner lacks the locus standi to challenge the outcome of the Presidential election.

Per contra, the Petitioners submitted that the issue of membership of a political party is a domestic affair of the political party concerned and the Court lacks the jurisdiction to entertain same. They relied on the cases of **AGI v PDP & ORS (2016) LPELR-42578(SC) at 48 – 50; UFOMBA v INEC (2017) LPELR-42079(SC); and APC v MOSES (2021) 14 NWLR (Pt. 1796) 278 at 320, paras. C – F.**

The courts have consistently held in a plethora of cases that the issue of membership of a political party is an internal affair of the political party. It is not justiciable and the courts have no jurisdiction to entertain same. See: **ENANG v ASUQUO & ORS (2023) LPELR-60042(SC) at pages 29 – 35, paras. D – A; SANI v GALADIMA & ORS (2023) LPELR-60183(SC) at pages 32 – 33, paras. D – A; and TUMBIDO v INEC & ORS (2023) LPELR-60004(SC) at pages 31 – 35, paras. D – C,** as well as all the cases cited above by the Petitioners.

The provision of Section 77(3) of the Electoral Act, 2022 which only mandates every political party to submit the register of its members 30 days before its party primaries cannot be invoked by the Respondents for the purpose of challenging the 1st Petitioner's membership of the 2nd



CERTIFIED TRUE COPY

Petitioner. It is only the 2nd Petitioner that has the sole prerogative of determining who are its members, and having sponsored the 1st Petitioner as its candidate for the Presidential election, the 1st Petitioner has satisfied the requirement of being a member of the 2nd Petitioner as provided for in Section 131(c) of the 1999 Constitution. It is not within the rights of the 2nd and 3rd Respondents and the 4th Respondent to question the 1st Petitioner's membership of the 2nd Petitioner. This ground of the objection is hereby overruled.

II.    NON-JOINDER OF NECESSARY PARTIES.

The 1st Respondent in its motion filed on 19th April, 2023, the 2nd and 3rd Respondents, as well as the 4th Respondent raised the issue of non-joinder of Abubakar Atiku and or the Peoples Democratic Party who came second in the Presidential election as Respondents to the Petition. The contention of the Respondents is that since by relief 1(iii), 4(iv) of the Petition, the Petitioners, who came third in the presidential election are seeking to be declared the winners of the election, the Petition cannot be effectually and completely determined without the joinder of Abubakar Atiku and or the Peoples Democratic Party, who came second in the election, as Respondents to the Petition. For that reason, the Respondents have contended that this Court lacks the jurisdiction to entertain the Petition as constituted. They placed reliance on **JEGEDE &**



**ANOR v INEC & ORS (2021) LPELR-55481(SC) at 62 – 63, para. C; and BUHARI & ORS v OBASANJO & ORS (2003) LPELR-24859(SC) at 54, para. A.**

In opposition however, the Petitioners relied on the cases of **OBASANJO v YAR'ADUA (2003) 17 NWLR (Pt. 850) 510 at 560H – 561C; BUHARI v YUSUF (2003) 14 NWLR (Pt. 841) 446 (SC); and AKPOTI v INEC (2022) 9 NWLR (Pt. 1836) 403 at 420 C – D (SC),** and contended that only statutory respondents provided in Section 133 of the Electoral Act, 2022 are necessary parties to a petition and the Petitioners are not under any obligation to join Abubakar Atiku and the Peoples Democratic Party.

By Section 133 of the Electoral Act, 2022, the statutory respondents to an election petition are: (i) the person whose election is being complained of; and (ii) the Independent National Electoral Commission which will also be deemed to be defending the Petition on behalf of its officers whose conduct is complained of. In the cases of **OBASANJO v YAR'ADUA (supra); and BUHARI v YUSUF (supra),** cited by the Petitioners, the Supreme Court categorically held that only the statutory respondents stated in Section 133 of the Electoral Act are necessary parties, and that losers at an election who are not statutory respondents are not necessary parties to an election petition.

 CERTIFIED TRUE COPY

By the import of Section 133 of the Electoral Act, 2022, the contest in an election petition is strictly between the Petitioner who challenges the outcome of the election, the person who was declared the winner of the election, and the Commission that conducted and declared the outcome of the election. This means that every candidate who lost the election and who is desirous of challenging the outcome of the election is expected to file his own petition against the winner of the election, and in so doing, he is not required to join any other candidate who lost the election like himself. It is in furtherance of this that Paragraph 50 of the 1st Schedule to the Electoral Act, 2022 requires an Election Tribunal or Court to consolidate two or more petitions which are presented in relation to the same election or return.

As rightly submitted by the Petitioners, the case of **JEGEDE v INEC (supra)**, cited by the 1st Respondent is clearly not applicable to this case, since the decision in that case is that Mai Mala Buni was a necessary party because by the provisions of Section 183 of the 1999 Constitution he would have ceased being the Governor of Yobe State if the case made out in the petition that he could not combine the offices of Governor of Yobe State and Acting Chairman of the All Progressives Congress, is sustained. In this case, Abubakar Atiku and Peoples Democratic Party who were only runners up in the presidential elections, are not necessary



parties as they are not statutory respondents to this Petition, and the Petitioners herein have no obligation to join them in this petition.

Again, in **BUHARI v OBASANJO (supra)** relied upon by the Respondents, the Supreme Court reconfirmed its decision in BUHARI v YUSUF (supra), that there is no obligation on a Petitioner to make a candidate who lost an election like himself a respondent to his petition.

More so, as Abubakar Atiku and the Peoples Democratic Party have filed a separate Petition No. CA/PEPC/05/2023 which, as mentioned in the earlier part of this judgment, this Court has consolidated with this Petition, in line with Paragraph 50 of the 1st Schedule to the Electoral Act, 2022. This ground of the objection to the competence of the Petition is unmeritorious. It is accordingly overruled.

On the arguments over the competence of the reliefs sought in this Petition, it is our view that the reliefs which the Court can grant in an election petition are statutory, as provided in Section 136(1), (2) and (3) of the Electoral Act, 2022. Therefore, the determination of whether the reliefs sought by a Petitioner are grantable can only be made after trial.

## 3.    **CHALLENGE TO COMPETENCE OF PETITIONERS' REPLIES.**

The third category of the applications of the Respondents seek to strike out the Petitioners' Replies or some paragraphs of the Replies. These are:

CERTIFIED TRUE COPY

**A:** **1ˢᵗ Respondent's Motion filed on 9ᵗʰ May, 2023 seeking:**

(i) Order striking out the Petitioners' Reply to the 1ˢᵗ Respondent's Reply for being incompetent.

(ii) In the alternative, order striking out paragraphs 15, 16(i) – (vii), 17 – 20, 22, 24, 25, 27 – 32, 34, 36, 37, 38, 40 and 41 of the Petitioners' Reply for offending the provisions of the 1ˢᵗ Schedule to the Electoral Act, 2022.

**B:** **2ⁿᵈ and 3ʳᵈ Respondents' Motion filed on 13ᵗʰ May, 2023 seeking:**

(i) Order striking out Petitioners' Reply of 21ˢᵗ April, 2023 for being incompetent.

(ii) In the alternative, order striking out paragraphs 8 – 17, 19 – 32, 34 – 42 of the Petitioners' Reply for introducing new facts.

**C:** **4ᵗʰ Respondent's Motion filed on 8ᵗʰ May, 2023 praying for:**

(i) Order striking out paragraphs 15 – 32 of the Petitioners' Reply to the 4ᵗʰ Respondent's Reply, as well as the witness statement on oath for failure to deny the 4ᵗʰ Respondent's allegations.

(ii) Order striking out paragraphs 5(i) – (ix), 15(i) – (vii), 16(i) – (vii), 17(i) – (vii), 18(i)(a) – (h), 18(ii)(a) – (e), 18(iii), (v), (vii)(a) & (b), (viii)(a) & (b), (ix), (xi), 20 – 25(a) – (d), 26(i), (ii), 27 – 31



of the Petitioners' Reply to the 4th Respondent's Reply for raising new issues.

All the Respondents challenged the competence of the Petitioners' Replies to their respective Replies or in the alternative, the paragraphs thereof which they have variously listed above. Their essential contention is that the Replies or in the alternative the paragraphs thereof have either raised and or introduced new facts aimed at substantially altering the grounds and reliefs in the Petition, or are a mere repetition or rehash of the facts already contained in the Petition, contrary to the provisions of Paragraph 16(1)(a) and (b) of the 1st Schedule to the Electoral Act, 2022. The Respondents relied on several judicial authorities, such as: **DINGYADI v WAMAKKO (2008) 17 NWLR (Pt. 1116) 395 at 443; AIRHIAVBERE v OSHIOMHOLE (2013) All FWLR (Pt. 687) 782 at 792; OGBORU v OKOWA (2016) 11 NWLR (Pt. 1522) 84 at 144-145; SYLVA v INEC (2018) 18 NWLR (Pt. 1651) 310 at 352; NGIGE v AKUNYILI (2012) 15 NWLR (Pt. 1323) 343 at 385; UDEACHARA v ONYEJEOCHA & ORS (2019) LPELR49547(CA); and STEPHEN & ANOR v MORO & ORS (2019) LPELR-47852(CA).**

In response, the Petitioners have argued that they have merely reacted to the fresh/new issues raised in the Replies of the Respondents which attempted to justify the grounds of non-qualification of the 2nd and 3rd



Respondents, as well as the non-compliance by the 1st Respondent with the Electoral Act, 2022. They relied on **SYLVIA v INEC (2018) 18 NWLR (Pt. 1651) 352; and PDP v EZEONWUKA (2017) LPELR-42563(SC),** and urged the Court to discountenance the objections of the Respondents and uphold the Petitioners' Replies.

Paragraph 16(1)(a) of the 1st Schedule to the Electoral Act, 2022 provides as follows:

> "16(1)    If a person in his reply to the election petition raises new issues of facts in defence of his case which the petition has not dealt with, the petitioner shall be entitled to file in the Registry, within five (5) days from the receipt of the respondent's reply a petitioner's reply in answers to the new issues of fact, so however that –
>
> (a)    the Petitioner shall not at this stage be entitled to bring in new facts, grounds, or prayers tending to amend or add to the contents of the Petition filed by him."

By the import of paragraph 16(1)(a) of the 1st Schedule, a Petitioner may in filing a Reply respond to allegations of new facts raised in a Respondent's reply to the Petition, provided he does not in so doing amend or add to the Petition. It is instructive to observe that the words used in Paragraph 16(1)(a) are "new facts, grounds or prayers tending to



CERTIFIED TRUE COPY

amend or add to the contents of the petition". The word "new" suggests something which is not there, while the word "amend" signifies modification. "Add" on the other hand means to increase. What the provision envisages therefore, is that the Reply of the Petitioner must strictly be confined to the new facts raised in the Respondent's reply and must not go over that to attempt to amend or add to the Petition. See: **ALL PROGRESSIVES CONGRESS v PEOPLES DEMOCRATIC PARTY & ORS (2015) LPELR-24587(SC); DINGYADI v WAMAKKO (2008) 17 NWLR (Pt. 1116) 395 at 442 – 443; ADEPOJU v AWODUYILEMI (1999) 5 NWLR (Pt. 603) 364; and IKORO v IZUNASO & ORS (2008) 4 LRECN.**

Indeed, in succinctly explaining the new issue which should attract a reply, the Supreme Court had held in **EGESIMBA v ONUZURIKI (2002) 15 NWLR (Pt. 791) 466 at 518,** thus:

> "A new issue to attract a reply must in law be really new in the sense of being brand and fresh. The issue must be really new to the statement of claim, in that it was not existing therein and was therefore brought into existence or introduced for the first time in the statement of defence by the defendant. The new issue, both in its content and materiality, must be further and additional to the statement of claim. Thus, the mere fact that a defendant states his own side of the case does not necessarily make it new, particularly


CERTIFIED TRUE COPY

when the plaintiff has told a contrary story in his statement of claim. In such a situation, the case stated by the defendant amounts to joining issues with the plaintiff and that does not bear the name of a new issue in law. A new issue arises where the plaintiff did not avert to or touch the content of the defendant's averments in anticipation, and the defendant's averment was introduced to the pleadings for the first time and therefore unique and novel to his pleadings."

A careful examination of the Petitioners' Petition, the 1st, 2nd and 3rd, as well as the 4th Respondent's respective Replies, and the Replies which the Petitioners filed in response thereof, reveals that apart from rehashing what they have already averred in their petition and denying what the Respondents have stated in their respective Replies, the Petitioners also introduced new facts in their Replies to the Respondents' Replies which were not contained in their Petition. This is in clear contravention of Paragraph 16(1)(a) of the 1st Schedule to the Electoral Act, 2022.

The law, as encapsulated in Paragraph 16(1)(a) of the 1st Schedule to the Electoral Act quoted above, forbids new additions or amendments by a Petitioner which are not contained in their Petition because such new additions or amendments will prejudice the Respondents and breach the


CERTIFIED TRUE COPY

Respondents' fundamental right to fair hearing guaranteed by Section 36(5) of the Constitution of the Federal Republic of Nigeria, 1999, since the Respondents will have no opportunity to respond to those new additions or amendments. See also: **PDP v ANOR v INEC & ORS (2019) LPELR-48101(CA) at pages 41 – 43, para C, per Adah, JCA; and MAKU & ANOR v AL-MAKURA & ORS (2015) LPELR-41814(CA) at pages 99 – 103, paras. D – C, per Agube, JCA.**

An examination of paragraph 4 (iii), (iv) and (v) of the 1st Respondent's Reply shows that the paragraph has not raised any new issue, contrary to the assertion of the Petitioners in paragraph 15 of their Reply to the 1st Respondent's Reply to the Petition. It is only a response to paragraphs 7 and 8 of the Petition. But the Petitioners' averment in the same paragraph 15 that the 1st Respondent's officials at the polling units failed to give clear copies of the results of the election (Forms EC8A) to the Petitioners' agents, as the pink copies given to the Petitioners agents were very faint and unreadable, is a new fact which tends to amend the Petition.

Paragraphs 16(i) – (vii), 17, second part of 18, 22 and 24 of the 1st Respondent's Reply are traverse to paragraphs 21 – 27 of the Petition. Hence, paragraph 16 of the Petitioners' Reply which purport to respond to new issues in paragraphs 17, 18, 19, 20, 21, 22 and 24 of the 1st



CERTIFIED TRUE COPY

Respondent's Reply actually contain new facts which will amount to amendment of the Petition. Also, paragraphs 17, 18, 19, 24, 25, 27, 28, 29, 30, 31, 32, 34, 35, 36 and 37 of the Petitioners' Reply to the 1st Respondent's Reply are either a rehash of the facts already averred in the Petition or contain new facts which will amount to amendment of the Petition.

In respect of the Petitioners' Reply to the 2nd and 3rd Respondents Reply to the Petition, the latter are seeking for an order striking out paragraphs 8 – 42 of the Petitioners Reply. However, a careful examination of those paragraphs shows that only paragraph 21 of that Reply has raised a new allegation against the 1st Respondent of attempts to manipulate the data uploaded on the backend server of the AWS. The said paragraph 21 of the Petitioners' Reply to the 2nd and 3rd Respondents' Reply is hereby struck out.

Similarly, the Petitioners have introduced new facts in paragraphs 16, 17, 18, 20, 22, 23, 24, 25 and 27 of their Reply, some of which contain serious allegations to the 4th Respondent has no opportunity to respond. Being in contravention of Paragraph 16(1) of the 1st Schedule to the Electoral Act, 2022, the said paragraphs are hereby struck out.


CERTIFIED TRUE COPY

## THE MAIN PETITION:

In bringing this Petition, the Petitioners, who were contestants in the Presidential elections held on the 25th of February, 2023, have challenged the declaration and return of the 2nd Respondent as the winner of the election and sought for the declaratory and consequential reliefs which I have reproduced in the beginning of this judgment. The Petitioners have predicated their Petition on the three statutory grounds earlier stated.

Although in the ruling of this Court on the objections of the Respondents, some paragraphs of the Petition and Replies have been struck out for stated reasons, this Court will take into consideration the entire averments in the Petition in determining the merit or otherwise of the Petition, in the interest of justice.

At trial, the Petitioners opened their case with tendering from the Bar several certified true copies of electoral and other documents which were objected to by all the Respondents who reserved the reasons for their objection to the stage of final address. The said documents were therefore admitted and marked as Exhibits, without prejudice to the objections of the Respondents. The Court ordered the Respondents to file separate addresses on their objections along with their final addresses.


CERTIFIED TRUE COPY

In proof of their Petition, the Petitioners called thirteen (13) witnesses who gave evidence as PW1 – PW13. Of those witnesses, only three had their witness statements on oath filed along with the Petition, while the other ten were subpoenaed witnesses whose statements were filed separately after hearing in the Petition had commenced. The Respondents objected to the competence of the subpoenaed witnesses to give evidence and adopt their witness statements on oath and reserved the reasons for their objection to the stage of final address. Without prejudice to the objection, the said witnesses adopted their respective witness statements on oath, after which they were duly cross examined by all the Senior Counsel for the Respondents.

Upon closure of the Petitioners' case, the 1st Respondent, as well as the 2nd and 3rd Respondents called one (1) witness each in their defence. The 4th Respondent did not call any witness but opted to rely on the evidence already adduced by the other Respondents and that elicited under cross examination on behalf of the 4th Respondent.

After the close of evidence, the parties filed and exchanged their respective final addresses, including separate addresses in support of their various objections which they raised during trial.


CERTIFIED TRUE COPY

**RESPONDENTS' OBJECTIONS TO THE COMPETENCE OF SOME OF THE PETITIONERS' WITNESSES AND TO THE DOCUMENTS TENDERED BY THEM DURING TRIAL:**

On the 14th of July, 2023, the 1st Respondent filed a Written Address on objections to the admissibility of documents tendered by the Petitioners and to the evidence of some of the Petitioners' witnesses. On the same date, the 2nd and 3rd Respondents as well as the 4th Respondent also filed their respective Written Addresses in support of their objections to the competence of some of the Petitioners' witnesses and to the admissibility of the documents tendered by the Petitioners during trial.

In opposition, the Petitioners filed their Replies to the 1st, the 2nd and 3rd, and the 4th Respondents objections, which were filed on the 23rd, July, 2023, 20th July, 2023 and 23rd July, 2023, respectively. The Petitioners also filed two Written Addresses in support of their objections to the admissibility of the documents tendered by the 1st, as well as 2nd and 3rd Respondents. These were filed on the 23rd and 20th of July, 2023, respectively. The 1st as well as the 2nd and 3rd Respondents opposed the Petitioner's Objections with Written Addresses which they filed on 28th July, 2023 and 25th July, 2023, respectively.

The 1st Respondent raised objection to the evidence of PW3, PW4, PW5, PW6, PW7, PW8, PW9, PW10, PW11 and PW13 who were subpoenaed

CA/PEPC/03/2023; CA/PEPC/04/2023; CA/PEPC/05/2023.   52





CERTIFIED TRUE COPY

witnesses called by the Petitioners. The main contention of the 1st Respondent is that the witness statements on oath of those witnesses were not frontloaded with the Petition at the time the Petition was filed on 20th March, 2023, but were filed in June, 2023 during hearing. Citing Paragraph 4(5) of the 1st Schedule to the Electoral Act, 2022, the learned Senior Counsel for the 1st Respondent argued that the witness statements on oath of those witnesses which were filed outside the 21 days limited for presentation of the Petition, are incurably defective and grossly incompetent. Relying on **OKE v MIMIKO (No. 1) (2014) 1 NWLR (Pt. 1388) 225 at 262 – 263; and ANDP v INEC & 2 ORS, Appeal No. CA/A/EPT/406/2020, delivered on the 17th of July, 2020,** he pointed out that PW4, PW7 and PW8 worked for the Petitioners as experts, and that PW7 has stated in her statement on oath that she is a member of the second Petitioner and even contested the National Assembly elections which was conducted simultaneously with the Presidential Elections of 25th February, 2023. He also pointed out that PW4 had admitted during cross examination that he was requested by the Petitioner to produce the report which he concluded on 19th of March, 2023 before the Petition was filed. Counsel submitted that it is certain that PW4, PW7 and PW8 are not adversaries or official witnesses and do not need subpoena to be compelled to attend Court in this Petition. Relying on **DINGYADI V INEC (No. 1) (2010) 18 NWLR (Pt. 1224) 1 at 74 – 45; OKE v MIMIKO (2014) 1**



**NWLR (Pt. 1388), 332; and FRANCIS ADENIGBA & ANOR v C. B. OMOWORARE & ORS (2015) LPELR-40531(CA),** Counsel submitted that securing the attendance of PW4, PW7 and PW8 through subpoenas constitute abuse of court process. He finally urged the Court to discountenance the witness statements on oath of PW3, PW4, PW5, PW6, PW7, PW8, PW9, PW10, PW11 and PW13 which were not filed along with the Petition but were sought to be included after the time limited for filing same had expired, which amounts to an amendment of the Petition.

The 1st Respondent also objected to the admissibility of Exhibits PCD1 – PCD3, PCE1 – PCE4, PCF2, PCG2, PCJ1, PCJ2, PCJ3A – F, PCJ4, PCK1 and PCK2, which were tendered through PW4, PW5, PW7 and PW8 whose witness statements were filed outside the prescribed period. Counsel explained that Exhibits PCD1 – PCD3, PCE1 – PCE4 and PCF2 are documents including expert reports tendered through PW4; Exhibit PCG2 is a flash drive tendered through PW5; Exhibits PCJ1, PCJ2, PCJ3A – F and PCJ4 were tendered through PW7; and Exhibits PCK1 and PCK2 were tendered through PW8. He submitted that those witnesses through whom those documents were tendered were all subpoenaed witnesses whose witness depositions were filed outside the prescribed period in Paragraph 4(5) of the 1st Schedule to the Electoral Act, 2022. Relying on **OKE v MIMIKO (supra); and BUHARI v INEC (2008) 19 NWLR (Pt. 1120)**





**246 at 414, paras. E – A,** he urged the Court to discountenance and expunge the witness statements of the said witnesses and the said exhibits admitted through them.

It was also the contention of the 1st Respondent that Exhibits PCD1 – PCD3, PCE1 – PCE4, PCJ2, PCJ3A – F and PCK1 are caught up by the provisions of Section 83(3) of the Evidence Act, 2011 and are inadmissible, having been made during the pendency of this Petition and/or in anticipation of this Petition. He relied on **OWIE v IGHIWI (2005) 5 NWLR (Pt. 917) 84; PDP v INEC (2012) 7 NWLR (Pt. 1300) 538 at 565; and LADOJA V AJIMOBI (2016) 10 NWLR (Pt. 1519) 87,** and urged the Court to expunge the said exhibits. Counsel added that Exhibits PCJ3A – F were tendered through PW7 who claimed to be an expert under the employment of Amazon Web Services, but who admitted that she was not the maker of the documents, but had merely downloaded same from internet. He also pointed out that the subpoena was personally addressed to the PW7 instead of Amazon Web Services. He submitted that the documents tendered by PW7 amount to hearsay evidence and ought to be expunged. He relied on **ANDREW v INEC (2018) 9 NWLR (Pt. 1625) 507 at 576, paras. B – C; BELGORE v AHMED (2013) 8 NWLR 9Pt. 1355) 60; ABDULMALIK v TIJANI (2012) 12 NWLR (Pt. 1315) 461 at 474; and HARUNA v MODIBBO (2004) 16 NWLR (Pt. 900) 487.**





The 1st Respondent also objected to the admissibility of Exhibits PD1 – PD18, PL1 – PL18, PN1 – PN31, PP1 – PP13, PQ1 – PQ13, PR1 – PR25, PV1 – PV7, PW1 – PW21, PAA1 – PAA21, PAB1 – PAB12, PAD1 – PAD18, PAE1 – PAE25, PAL1 – PAL18, PAM1 – PAM15, PAN1 – PAN31, PAQ1 – PAQ12, PAT1 – PAT18, PAU1 – PAU10, PAV1 – PAV18, PBB1 – PBB23, PBD1 – PBD25, PBM1 – PBM15, PBN1 – PBN11, PBQ1 – PBQ21, PBT1 – PBT25, PBW1 – PBW17, PCN33, PCN37 – PCN39, which were Forms EC8As, EC8Bs and EC8Cs tendered by the Petitioners in respect of Akwa Ibom, Cross River, Delta, Edo, Kogi, Ogun, Sokoto, Ebonyi and Nasarawa States. The contention of the 1st Respondent is that no facts were specifically pleaded by the Petitioners in respect of those States, because no reference was made in the Petition to any Local Government Area, or polling unit in any of those States. Relying on **EMEGOKWUE v OKADIGBO (1973) 4 S.C. 113 at 117; OGBORU v OKOWA (2016) 11 NWLR (Pt. 1522) 84 at 150; BUHARI v OBASANJO (supra) at 201, paras. F – A; HASHIDU v GOJE (2003) 15 NWLR (Pt. 843) 380 at 389, paras. E – G; and BELGORE v AHMED (supra) at 95, para. F,** Counsel submitted that the pleadings provided by the Petitioners were not specific and all those exhibits tendered by the Petitioners go to no issue and ought to be expunged by the Court. Learned Senior Counsel for the 1st Respondent finally urged the Court to reject the evidence of PW3, PW4, PW5, PW6, PW7, PW8,



PW9, PW10, PW11 and PW13 and all the identified inadmissible documents tendered by the Petitioners.

On their part, the 2nd and 3rd Respondents also objected to the competence of PW3, PW4, PW5, PW6, PW7, PW8, PW9, PW10, PW11 and PW13, the Petitioners' subpoenaed witnesses, on the ground that their witness statements on oath were not frontloaded along with the Petition within the 21 days of declaration of result of the election, as limited by Paragraph 4(5) of the 1st Schedule to the Electoral Act, 2022. In his oral submission in support of the objection, learned Senior Counsel for the 1st Respondent had referred the Court to Paragraph 4(5) and (6) of the 1st Schedule to the Act and relied on the decisions of this Court in **ARARUME v INEC (2019) LPELR-48397(CA) at page 33; PDP v OKOGBUO (2019) LPELR-489989(CA) at pages 22 – 28; and ANDP v INEC & ORS, Appeal No. CA/A/EPT/406/2020, delivered on 17th July, 2020, at pages 35 – 43.** He submitted that the Petitioners were aware that they will be calling those witnesses, but failed to list them and frontload their witness statements as required by law. He urged the Court to discountenance the evidence of those witnesses.

The 2nd and 3rd Respondents also objected to the admissibility of the various documents tendered as Exhibits by the Petitioners on the ground that facts relating to those Exhibits were not specifically pleaded by the



Petitioners in the Petition. The 2nd and 3rd Respondents particularly objected to the result sheets tendered as Exhibits by the Petitioners in respect of some States, and submitted that the said Exhibits are not relevant because the Petitioners failed to ventilate any complaint in relation to those States. The Exhibits objected to by the 2nd and 3rd Respondents are:

(i) Exhibits PAQ1 – PAQ12, PBC1 – PBC16 and PBD1 – PBD25, listed in the Petitioners' Fifth Schedule of Documents, which are the Ward Collation Results Sheets for Ebonyi State (Forms EC8B), the Local Government Collation Result Sheets for Ekiti and Delta States (Forms EC8C),

(ii) Exhibits PBK1 – PBK16, PBL1 – PBL15, PBM1 – PBM23, PBN1 – PBN11, PBR1 – PBR16 and PBQ1 – PBQ21, listed in the Petitioners' Seventh Schedule of Documents, which are Forms EC40G (Summary of Registered Voters in Polling Units Where Election did not Hold or was Cancelled) for Niger, Osun, Edo and Sokoto States, as well as Forms EC8A (Polling Unit Results) for Ekiti and Ogun States,

(iii) Exhibits PBW1 – PBW17, PBY1 – PBY10, PBZ1 – PBZ9, listed in the Petitioners' Ninth Schedule of Documents, which are IReV



Reports for Bayelsa and Gombe States downloaded and certified by the 1st Respondent;

(iv)    Exhibits PCN37, PCN38 and PCN51, listed in the Petitioners' Eleventh Schedule of Documents, which are Supplementary IReV Reports for Cross River and Gombe States downloaded and certified by 1st Respondent;

(v)     Exhibits PJ1 – PJ8, PK1 – PK31, PL1 – PL18, PP1 – PP13, PQ1 – PQ13, PR1 – PR25, PU1 – PU18, PV1 – PV7 and PW1 – PW21, listed in Petitioners' Eleventh Schedule of Documents, which are Forms EC8A (Polling Unit Results) for Bayelsa, Oyo, Edo, Ebonyi, Nasarawa, Delta, Ondo, Sokoto and Kogi States;

(vi)    Exhibits PY1 – PY8, PAA1 – PAA21, PAB1 – PAB12, PAC1 – PAC25, PAD1 – PAD18, PAE1 – PAE23, PAF1 – PAF25, PAG1 – PAG11, PAK1 – PAK31, PAL1 – PAL18, PAM1 – PAM15 and PAN1 – PAN31, also listed in the Eleventh Schedule of Documents, which are Forms EC8B (Ward Results) for Bayelsa, Kogi, Nasarawa, Niger, Ondo, Sokoto, Delta, Ekiti, Oyo, Cross River, Edo and Akwa Ibom States;

(vii)   Exhibits PAR1 – PAR8, PAT1 – PAT18, PAU1 – PAU10, PAV1 – PAV18, PAX1 – PAX25, PAY1 – PAY18, PAZ1 – PAZ33 and PBB1 – PBB23, also listed in Eleventh Schedule of Documents,


CERTIFIED TRUE COPY

which are Forms EC8C (Local Government Results) for Bayelsa, Cross River, Ebonyi, Edo, Niger, Ondo, Oyo and Sokoto States;

(ix) Exhibits PBP1 – PBP21, which are the IReV Reports from INEC for Adamawa State downloaded and certified by the 1st Respondent which are listed in the Petitioners' Sixth Schedule of Documents. The 2nd and 3rd Respondents objected to these exhibits on the ground that they were not accompanied with a certificate of authentication as required by Section 84(2) of the Evidence Act, 2011.

In addition to the above, the 2nd and 3rd Respondents also objected to the admissibility of all the Form EC8As, EC8Bs, EC8Cs and all other documents tendered for polling units, wards and local governments across the Country on the ground that the polling units, wards and local government areas were not specifically pleaded in the Petition. These include Form EC8As for Ebonyi State (Exhibits PP1 – PP13), Nasarawa State (Exhibits PQ1 – PQ13), Delta State (Exhibits PR1 – PR25), Sokoto State (Exhibits PV1 – PV7), Kogi State (Exhibit PW1 – PW21); Form EC8Bs for Kogi State (Exhibits PAA1 – PAA21), Nasarawa State (Exhibits PAB1 – PAB11), Sokoto State (Exhibits PAE1 – PAE21), Delta State (Exhibits PAF1 – PAF25), Cross River State (Exhibit PAL1 – PAL18), Akwa Ibom State


CERTIFIED TRUE COPY

(Exhibit PAN1 – PAN31), Ebonyi State (Exhibits PAQ1 – PAQ12); Form EC8Cs for Cross River State (Exhibits PAT1 – PAT18), Ebonyi State (Exhibits PAU1 – PAU10), Rivers State (Exhibit PBA1 – PBA23), Sokoto State (Exhibits PBB1 – PBB23), Delta State (Exhibit PBD1 – PBD25); Forms EC40G (PU) for Edo State (Exhibits PBM1 – PBM23); IReV Report for Edo State (Exhibits PBW1 – PBW17); Supplementary IReV Report for Cross River State (Exhibits PCH37 – PCH39); List of Registered Voters and PVCs Collected for 2023 Elections with respect to Local Government Areas in Ogun State (Exhibit PCN5), Akwa Ibom State (Exhibit PCN6), Kebbi State (Exhibit PCN7), Kogi State (Exhibit PCN9), Cross River State (Exhibit PCN10), Enugu State (Exhibit PCN11), Sokoto State (Exhibit PCN12), Ebonyi State (Exhibit PCN16), Nasarawa State (Exhibit PCN17), Delta State (Exhibit PCN18), Anambra State (Exhibit PCN22), Jigawa State (Exhibit PCN25), Edo State (Exhibit PCN27) and Abia State (Exhibit PCN29).

Learned Senior Counsel for the 2nd and 3rd Respondents also submitted that Exhibits PBP1 – PBP21, the IReV Report from INEC for Adamawa State downloaded and certified by the 1st Respondent are not admissible because they were not accompanied with a certificate of authentication in compliance with Section 84(2) of the Evidence Act, 2011. He similarly objected to the admissibility of Exhibits PCE, PCE1 – PCE4, which the Petitioners claim in paragraph 50 of the Petition to be the blurred copies

CERTIFIED TRUE COPY

of results in 18,088 polling units where votes were suppressed due to alleged failure to transmit polling unit results, for the Petitioners failure to specify in the Petition the polling units to which the 18,088 polling unit results belong.

The learned Senior Counsel for the 2nd and 3rd Respondents submitted that with the failure of the Petitioners to specifically plead facts relating to all those documents which they tendered, the documents are inadmissible and same must be expunged by the Court. He placed reliance on Section 6 of the Evidence Act, 2011; Paragraphs 4(5) and 41(8) of the First Schedule to the Electoral Act, 2022; as well as the cases of **NWABUOKU v ONWORDI (2006) All FWLR (Pt. 331) 1236 at 1251; FAWEHINMI v NBA (No. 2) (1992) 2 NWLR (Pt. 105) 558 at 583; TORTI v UKPABI (1984) 1 SCNLR 214; OGU v MANID TECHNOLOGY & MULTIPURPOSE CO-OPERATIVE SOCIETY LTD (2010) LPELR-4690; OJIOJU v OJIOJU (2010) 8 NWLR (Pt. 1198) 1 at 28; INEC v RAY (2004) 14 NWLR (Pt. 892) 92 at 136; and EKERE v EMMANUEL (2022) 11 NWLR (Pt. 1841) 339 at 358.** He finally urged the Court to expunge those documents.

On the part of the 4th Respondent, objection was raised to the same certified true copies of Forms EC8As, EC8Bs, EC8Cs, EC8Ds, EC40G, EC8Es, the IReV Reports, Expert Reports and Exhibit B5 Series, which


CERTIFIED TRUE COPY

were tendered by the Petitioners in the course of trial. The learned Senior Counsel for the 4th Respondent contended that the contested documents are hearsay evidence, having not been tendered by the makers of those documents. He relied on **BELGORE v AHMED (supra); MARK v ABUBAKAR (2004) 2 NWLR (Pt. 1124) 79 at 184 – 185; IMIAMA v AKPABIO (2008) 17 NWLR (Pt. 1116) 225 at 300; ANDREW v INEC (2018) 9 NWLR (Pt. 1625) 507 at 576, paras. A – B; OMISORE v AREGBESOLA (2015) 15 NWLR (Pt. 1482) 205; UDOM v UMANA (2016) 2 NWLR (Pt. 1526) 179; and OKONJI v NJOKANMA (1999) 12 NWLR (Pt. 638) 250.** He argued that the said documents are documentary hearsay and therefore inadmissible because they cannot be tendered from the Bar, having been disputed by the 4th Respondent pursuant to Paragraphs 10 and 11 of its answers to the Pre-hearing Information Sheet (Form TF008 filed on 2nd May, 2023). He pointed out that Paragraph 41(3) of the 1st Schedule to the Electoral Act states categorically that all disputed documents shall be tendered by a witness who is the maker during the evidence-in-chief. He cited **NWANKWO v YAR'ADUA (2010) 12 NWLR (Pt. 1209) 518 at 588.** He urged the Court to expunge the documents.

Learned Counsel also submitted that the disputed documents are not admissible because what is being tendered are not exact copies of the original, since the copies being tendered are laced with certain written comments which are not contained in the original documents from


CERTIFIED TRUE COPY

where the said exhibits were purportedly made, thereby altering the contents of the original documents. He referred to Sections 87, 89, 90 and 104 of the Evidence Act, 2011 and relied on the case of **OMISORE v AREGBESOLA (supra) at page 294, paras. G – H.**

Learned Counsel also submitted that the disputed electoral forms used for the Presidential Election conducted on 25th of February, 2023 which were tendered by the Petitioners were not certified in accordance with the provisions of Section 104 of the Evidence Act, 2011, in that the signatures and dates on all the documents are not written in long hand but were rather engraved on the documents. He relied on **BELGORE v AHMED (supra); and OMISORE v AREGBESOLA (supra).** In addition, he submitted that the documents were purportedly certified "for and on behalf of the certifying officer" which means that the officer who certified the documents is not the officer who has the custody of those public documents and cannot validly certify same in law. He further relied on **TABIK INVESTMENTS LTD v GTB (2011) 17 NWLR (Pt. 1275) 240 at 256; AMAECHI v INEC (2008) 5 NWLR (Pt. 1080) 227; and NWABUOKU & ORS v ONWORDI & ORS (2006) 5 S.C. (Pt. 111) 103 at 114 – 115.**

It was also the contention of the 4th Respondent that in tendering and demonstrating PCG2 (the Flash Drive), the Petitioners did not fulfil the requirements of Section 84 of the Evidence Act, 2011 and PW5 through



whom it was tendered is not originator or the maker of the video and therefore not in a position to satisfy the requirement of the law. He relied on **AKEREDOLU & ANOR v MIMIKO (2013) LPELR-20532(CA).** He added that PW5 is not the appropriate person to issue the purported certificate of compliance as he did not know the condition of the gadget used to upload the alleged recording and or interview which he tendered. He further stated that PW5 is clearly not the maker of the video clips and cannot be cross examined thereon. He contended that where a document makes serious allegations against a party and such document is not tendered by the maker, but admitted and relied upon by the trial court without affording the adverse party opportunity to cross examine the real maker thereof on the contents of the document, then it will amount to a breach of the right to fair hearing guaranteed by Section 36(6)(d) of the 1999 Constitution. He relied on **NIMASA v HENSMOR NIGERIA LTD (2015) 5 NWLR (Pt. 1452) 278; MADUEKWE v OKOROAFOR (1999) 9 NWLR (Pt. 263) 69 at 81, paras. A – B; 83, para. H.**

On his objection to the competence of some of the Petitioners' witnesses, learned Senior Counsel for the 4th Respondent stated that PW4 and PW7 are witnesses who worked for the Petitioners as experts and are therefore not adversaries or official witnesses and do not require subpoena to be compelled to attend Court. He argued that the issuance of subpoenas on the application of the Petitioners for PW4 and PW7,





CERTIFIED TRUE COPY

who are willing witnesses of the Petitioners, was not done *bona fide*. He submitted that this is not a mere irregularity but a gross abuse of court process. He urged the Court to deprecate and nullify same.

It was also the contention of learned Senior Counsel for the 4th Respondent that PW4, PW5, PW6, PW7, PW8, PW9, PW10, PW11 and PW13 who were subpoenaed witnesses cannot give evidence in this Petition because their supposed witness statements on oath failed to comply with the provisions of Paragraph 4(5) of the 1st Schedule to the Electoral Act, 2022, and as such all their testimonies lack foundation. He relied on **ARARUME v INEC (2019) LPELR-48397(CA); UDUMA v ARUNSI (2012) 7 NWLR (Pt. 1298) 55 at 109, paras. A – C; ANDP v INEC, Appeal No. CA/A/EPT/406/2020, delivered on 17th July, 2020; DINGYADI v INEC (No. 1) (2010) 18 NWLR (Pt. 1224) 1 at 74 – 75.**

Learned Counsel submitted that the purported expert reports tendered by the Petitioners in Exhibits PCJ1, PCJ2, PCJ3A – F and PCJ4 are inadmissible in evidence because PW2 and PW7 who produced the reports did not establish their qualification and skills as experts in any relevant field as required by Section 68 of the Evidence Act, 2011 so as to make their report admissible. He relied on **SOWEMIMO v STATE (2004) 11 NWLR (Pt. 885) 515 at 532.** He further submitted that the purported server/cloud with which PW2 and PW7 claimed to have


CERTIFIED TRUE COPY

carried out their analysis were not identified by the witnesses in Court. He urged the Court to treat Exhibits PCJ1, PCJ2, PCJ3A – F and PCJ4 with caution, especially as the purported experts that produced them were engaged by the Petitioners. He relied on **U.T.B. v AWANZIGANA ENT. LTD (1994) 6 NWLR (Pt. 348) 56 at 77, paras B – F; PDP V INEC (2012) 7 NWLR (Pt. 1300) 538 at 565; SEISMOGRAPH SERVICES v AKPORUOVO (1976) 6 S.C. 119 at 136; SHELL PETROLEUM DEVELOPMENT COMPANY v FARAH (1995) 3 NWLR (Pt. 382) 148 at 183 – 184; and NGIGE v OBI (2006) 14 NWLR (Pt. 999) 1 at 191 – 192.** He submitted that there was no basis for which the Petitioners called the purported expert evidence of PW7 to prove that there was no glitch in the transmission of results from the BVAS to the IReV, because it is common knowledge that network connections drop sometimes making it impossible for the internet gateway to open for transmission. He posited that this Court can determine the matter based on credible evidence already before it and not necessarily on any expert evidence. Relying on the case of **U.T.B v AWANZIGANA ENT. LTD (supra) at page 80, para. H,** he urged the Court to disregard Exhibits P87 – P89 and P90 – P90A – K and expunge same from the record of the Court.

It was also the submission of learned Senior Counsel for the 4th Respondent that Exhibit X2, the European Union Report tendered by the Petitioners through RW1 is inadmissible, same having been obtained by


CERTIFIED TRUE COPY

the Petitioners from the Registry of this Court and not from the custodian of the original copy. He pointed out that Exhibit X2 was a document tendered by the Peoples Democratic Party in Petition No. CA/PEPC/05/2023 and the Petitioners obtained a certified copy of same from the Court which is not the custodian of the original, especially as the documents was not authored or signed, thus making it a worthless document. He submitted that it is only the official who has custody of the original of a public document who is authorized to certify a copy of same. Relying on **OKAFOR v OKAFOR (2015) 4 NWLR (Pt. 1449) 335 at 363; OGBUYINYA v OKUDO (1979) All NLR 105 at 112; GARUBA v K.I.C. (2005) 5 NWLR (Pt. 917) 160 at 176 SC; and APGA v AL-MAKURA (2016) 5 NWLR (Pt. 1505) 316 at 348,** Counsel urged the Court to disregard Exhibit X2 and expunge same from its record. He finally urged the Court to reject the identified documents tendered by the Petitioners as well as the evidence of PW1 – PW12 as inadmissible in law.

Responding to the 1st Respondent's objections, the learned Senior Counsel for the Petitioners submitted that the subpoenaed witnesses are competent to testify and they are not prejudiced by the fact that their witness statements on oath were filed in June, 2023 after the Petition was filed. He argued that their testimony did not breach the provisions of Paragraph 4(5)(a) – (c) of the First Schedule to the Electoral Act, 2022 because the law does not forbid a subpoenaed witness who is competent





to give his testimony orally from reducing the same testimony into a witness statement on oath. He further argued that a subpoena is at the instance of the Court and that the Petitioners have listed as numbers 9 and 10 in the list of witnesses, the forensic/expert witnesses to be subpoenaed and the Respondents were on notice of the nature of those witnesses.

Learned Counsel submitted that contrary to the 1st Respondent's assertion, PW4, PW7 and PW8 do not work for the Petitioners. Citing **BASHIR v KURDULA (2019) LPELR-48473; OMIDIRAN v ETTEH (2011) 2 NWLR (Pt. 1232) 481; LASUN v AWOYEMI (2009) 16 NWLR (Pt. 1168) 513 at 548 – 549; OKONJI v NJOKANMA (1999) 12 NWLR (Pt. 638) 250; and C.P.C. v OMBUGADU (2013) 18 NWLR (Pt. 1385) 66,** Counsel submitted that the testimonies of PW4, PW7 and PW8 do not constitute an abuse of court process as contended by the Respondents.

On the 1st Respondent's prayer that this Court should expunge Exhibits PCD1 – PCD3, PCE1 – PCE4, PCF2, PCG2, PCJ1, PCJ2, PCJ3A – F, PCJ4, PCK1 and PCK2 because they were tendered through the Petitioners' subpoenaed witnesses, and they were also contrived for the purpose of the suit, contrary to Section 83(3) of the Evidence Act, 2011, learned Counsel for the Petitioners adopted his preceding argument and also submitted that Section 83(3) of the Evidence Act, 2011 does not apply to




CERTIFIED TRUE COPY

expert witnesses since they are not persons interested in the action and are not swayed by personal interest. He relied on **C.P.C v OMBUGADU (supra).**

On the Respondents' Objection to Forms EC8As, EC8Bs, EC8Cs for Akwa Ibom, Cross River, Edo, Ebonyi, Nasarawa, Sokoto, Delta, Kogi and Ogun States, Counsel submitted that what is required is for the Petitioners to plead facts which could elicit that documents to be tendered. He referred to Paragraphs 19, 72 - 73 and 101 of the Petition and submitted that the complaint of the Petitioners touch on all States of the Federation and is not limited to some few States as erroneously conceived by the 1st Respondent. Counsel also contended that the orders of this Court made during Pre-hearing Report is binding on all parties concerning the duly certified true copies of INEC documents, especially in the absence of appeal against same. Relying on the recent decision of the Supreme Court in **OJEY v FRN (2023) 5 NWLR (Pt. 1876) 1 at 30, paras. D – F, CHIGBU v TONIMA (1999) 3 NWLR (Pt. 593) 115; and SANI AKWUE (2019) LPELR-48206(CA),** the Petitioners submitted that since INEC had testified in this Petition, no document certified by INEC and tendered by the Petitioners can be regarded as dumping of documents and the parties have agreed on the certified documents, pursuant to which the Court made an order admitting the documents.




CERTIFIED TRUE COPY

Responding to the 2nd and 3rd Respondents' Objection to the admissibility of INEC certified documents, learned Senior Counsel for the Petitioners submitted that the parties are bound by the order of this Court made in the Pre-hearing Report of 23rd May, 2023 to the effect that since those documents have been consented to by the parties the documents shall be tendered from the Bar and admitted during hearing. He argued that the said order is binding on the parties and urged the Court to discountenance all the objection raised by the 2nd and 3rd Respondents.

In reaction to the 2nd and 3rd Respondents' objection to Exhibits PAQ1 – PAQ12, PBC1 – PBC16 and PBD1 – PBD25 which were listed in the Petitioners' Fifth Schedule of Documents, learned Senior Counsel for the Petitioners submitted that from paragraphs 59, and 101 of the Petition and paragraph 60 and 102 of PW12's witness statement on oath adopted on 22nd June, 2023, it is clear that the Petitioners were challenging the return of the 2nd and 3rd Respondents in the States they were purported to have won of which Ekiti State was one of them. He similarly argued that in paragraph 73 of the Petition and 74 of PW12's witness statement the Petitioners have listed the States that they were challenging, among which are Delta and Ebonyi and other States of the Federation. He submitted that the non-compliance with the Electoral Act, 2022 was a universal one and not restricted to only the States listed, and that the documents tendered substantially demonstrate to this Court that the


CERTIFIED TRUE COPY

issue of non-compliance by the 1st Respondent to its laws, guidelines and relevant statutes was a universal issue. According to him, the 1st Respondent has not denied the failure to comply with the provisions of the Electoral Act, 2022 on the 25th of February, 2023. He added that the allegations of blurred 18,088 IReV result sheets which was pleaded in paragraphs 60 and 61 and the star witness statement on oath cut across all the States of the Federation, hence those Exhibits.

On the objection to Exhibits PBP1 – PBP21, the certified copies of IReV documents from INEC on Adamawa State, the Petitioners contended that Section 84 of the Evidence Act does not apply to those documents because they are public documents that have passed the test of certification, and the requirement in Section 84 is only necessary when the document is tendered by the maker, in which case INEC is the only body that has the duty to tender same in line with Section 84 of the Evidence Act. He pointed out that contrary to the assertion of the 2nd and 3rd Respondents, the Petitioners had tendered certificates of compliance for six (6) States which were marked, as Exhibits PCB1 – PCB6, and for 28 States, including Adamawa State which were marked as Exhibits PCC1 – PCC28.

Learned Counsel repeated the same argument as a response to the 2nd and 3rd Respondents' objection to the Exhibits in the Petitioners'

CERTIFIED TRUE COPY

Seventh, Ninth and Eleventh Schedules of Documents. On the Forms EC8Bs for Bayelsa, Kogi, Nasarawa, Niger, Ondo, Sokoto, Delta, Ekiti, Oyo, Cross River, Edo and Akwa Ibom States, as well as EC8Cs for Bayelsa, Cross River, Ebonyi, Edo, Niger, Ondo, Oyo, and Sokoto States, learned Counsel submitted that the Petitioners' complaints concerning the general election goes for all those States. He submitted that it is only when those documents are tendered by the Petitioners that the discrepancies can be seen to show how the failure to upload real time on election day has significantly impacted the election. He particularly referred to paragraphs 70, 71, 72, 73, 74 and 101 of the Petition where the documents were specifically pleaded. He argued that the cases of **OJIOJU v OJIOJU (supra); and OGU v MANID TECHNOLOGY & MULTIPURPOSE CO-OPERATIVE SOCIETY LTD (supra)**, cited by the Respondents are not helpful, because the pleadings in the Petition and the facts in the Petitioners' star witness statement on oath have captured the Petitioners' case.

On the 2nd and 3rd Respondents' reliance on Section 104 of the Evidence Act, 2011, Counsel pointed out that on 22nd June, 2023 the Petitioners tendered all the receipts for certification of documents which they obtained from the 1st Respondent which were admitted through PW12 and marked Exhibit PCQ. He submitted that this covered all the documents mentioned in paragraph 102 of the Petitioner's star witness



deposition. He argued that the case of **TABIK INVESTMENT v GT BANK (supra)**, cited by the 2nd and 3rd Respondents actually support the case of the Petitioners in the manner adopted for admissibility of the public documents.

Learned Counsel referred to the arguments of the 2nd and 3rd Respondents over the failure of the Petitioners to specify the polling units in respect of the blurred IReV results. He submitted that the request for specific polling units of the blurred results is nothing but a request for an impossibility of polling units results that are unreadable.

Counsel finally reiterated that the Petitioners have complied with paragraphs 4(5)(c) and 41(8) of the 1st Schedule to the Electoral Act, 2022 as they have specifically pleaded the documents in paragraph 101 coupled with the expert report which detailed most of these polling units. He urged the Court to discountenance and dismiss the objections of the 2nd and 3rd Respondents.

In opposition to the 4th Respondent's objection, the learned Senior Counsel for the Petitioners made similar submissions to those earlier made in opposition to the objections of the 1st, 2nd and 3rd Respondents. He particularly submitted that paragraph 41(3) of the 1st Schedule to the Electoral Act, 2022 never stated that it is only the maker of a document that must tender it. He also submitted that the 4th Respondent also failed

CERTIFIED TRUE COPY

to draw attention of the Court during trial to the comments made on the secondary public documents tendered by the Petitioners and to point to the exact copies that carry those comments as alleged by it. He submitted that with that failure, it is too late in the day for the 4th Respondent to complain.

On the 4th Respondent's argument over improper certification of the documents, learned Counsel for the Petitioners relied on the decision of this Court in **REGENCY (OVERSEAS) CO. LTD v. ARIORI & ORS (2019) LPELR-47281(CA),** and submitted that the 4th Respondent failed to specify the exact documents which were improperly tendered in evidence. On the 4th Respondent's objection to the evidence of PW4, PW5 and PW7, Counsel submitted that PW5 is excused from complying with Section 83 of the Evidence Act in relation to Exhibit PCG2 since in the opinion of the 4th Respondent, PW5 is not the maker of the document. As for PW4 and PW7, he submitted that the 4th Respondent failed to show why their evidence is incompetent. He argued that PW4 had stated that he was a public servant under the employment of Nnamdi Azikiwe University, Awka, and as such would require a subpoena to testify. He added that PW4 had also informed the Court that even as the Petitioners approached him for the project of having real data for the results of the election of 25th February, 2023, he did not do the project for a fee but for educational learning of his students. Counsel also argued

CERTIFIED TRUE COPY

that notwithstanding that PW7 is a member of the 2nd Petitioner, she did not allow partisan affiliation to prejudice her professional competence.

On the 4th Respondent's objection to the evidence of PW4, PW5. PW6, PW7, PW8, PW9, PW10, PW11 and PW12, Counsel submitted that the 4th Respondent muddled up everything, in that there is nowhere PW2 featured in the expert evidence of PW7, and there is nothing in Section 68 of the Evidence Act which impeaches the evidence of PW7 who testified as Cloud Architect and by extension an expert. Turning to the 4th Respondent's objection to Exhibit X2, he submitted that the Court can as well demand for this exhibit to assist in the final determination of the case even if the parties fail to do so. He added that the evidence of the witnesses and the documents tendered are meant to assist the Court and Exhibit X2 is an integral part of this election which is prepared by persons who were neither partisan nor influenced by any partisan consideration. Counsel concluded by referring this Court to the recent decision of the Supreme Court in **OJEY v FRN (2023) 5 NWLR (Pt. 1876) 1 at 30, para. D – F,** to the effect that where a public institution testifies in the same case, the bundle of certified true copies of documents tendered in that case can no longer be regarded as dumping. He argued that since INEC has testified in this Petition, no document certified by it and tendered by the Petitioners can be regarded as dumped upon the Court. Relying on **S.P.D.C.N. v EKWEMS (2023) 4 NWLR (Pt. 1874) 213, and PETERSIDE v**




CERTIFIED TRUE COPY

**ODILI (2022) 17 NWLR (Pt. 1860) 549,** he urged the Court to discountenance the 4th Respondent's objection.

Replying on points of law, learned Counsel for the 1st Respondent submitted that the case of **LASUN v AWOYEMI (supra)**, relied upon by the Petitioners is inapplicable herein because the said case was decided under the Electoral Act of 2006 which did not have provisions similar to those of Paragraph 4(5)(a) of the 1st Schedule to the Electoral Act, 2022, especially as it relates to filing of witness statement on oath. He further contended that contrary to the submission of the Petitioners, the law regarding tendering of documents through its maker has not been extended to cover employees of colleagues of the maker who have no input to such documents, hence it is immaterial whether PW7 claimed to be the maker as it is on record that she downloaded the documents she tendered and did not produce them herself. He relied on **ABDULMALIK v TIJJANI (2012) 12 NWLR (Pt. 1315) 461 at 474; and HARUNA v MODIBBO (2004) 16 NWLR (Pt. 900) 487.**

On the Petitioners' submission that Section 83(3) of the Evidence Act does not apply to expert witnesses, Counsel submitted that the Section is applicable to all witnesses, and that the case of **CPC v OMBUGADU (supra)**, relied upon by the Petitioners did not state otherwise. On the Petitioners argument that the electoral documents they tendered are

CERTIFIED TRUE COPY

relevant and pleaded, he submitted that having failed to ventilate any complaint regarding the States in respect of which those documents were tendered, the exhibits serve no purpose and are irrelevant and should be expunged from the records of the Court. He relied on **BUHARI v OBASANJO (2005) 7 SCNJ 1.**

Replying on points of law to the Petitioners' response to their objection, learned Senior Counsel for the 2nd and 3rd Respondents contended that the argument of the Petitioners that there is a binding order of this Court is unfounded, as it is trite law that parties cannot by agreement alter the settled position of the law, to the effect that a document which is not pleaded is inadmissible. They relied on the case of **OLOWU v BUILDING STOCK LTD (2018) 1 NWLR (Pt. 1601) 343 at 394 – 395.** Learned Counsel also contended that the law is settled that the parties and the court are bound by the pleadings. He pointed out that from the totality of the paragraphs of the Petition, the Petitioners contested election results in 10 States. He referred to paragraph 73 of the Petition. He submitted that the general principle of law on pleadings and what facts are to be pleaded have been enunciated in **ODUNSI v BAMGBALA (1995) 1 NWLR (Pt. 374) 641 at 655; and YARE v N.S.W. & I C (2013) 12 NWLR (Pt. 1367) 173 SC,** He added that contrary to the assertion of the Petitioners, there is no reference to Bayelsa and Gombe States in paragraphs 70 – 73 of the Petition or paragraphs 71 – 74 of PW12's witness statement on oath. He




CERTIFIED TRUE COPY

urged the Court to expunge Exhibits PBW1 – PBW17, PBY1 – PBY10 and PBZ1 to PBZ9.

Also replying on points of law, learned Senior Counsel for the 4th Respondent argued that contrary to the position of the Petitioners, a maker of public documents must be called to testify to the contents of such document and lay proper foundation for it to be admissible in evidence. He submitted that the Petitioners tendered disputed documents from the Bar in utter disregard to the provisions of Paragraph 4(3) of the 1st Schedule to the Electoral Act, 2022. He added that the stipulation of the Apex Court in the cases of **ANDREW v INEC (supra); and OKONJI v NJOKANMA (1999) 12 NWLR (Pt. 638) 250,** still remains the extant position of the law.

Learned Counsel pointed out that the certificate of compliance tendered in respect of Exhibit PGC2 does not emanate from the person who allegedly produced the said exhibit, and as such, the case of **STANBIC IBTC BANK v LONGTERM GLOBAL CAPITAL LTD & ORS (2021) LPELR-55610**, relied upon by the Petitioners is inapplicable to this scenario. He further submitted that PW4 and PW7 are not adversaries or unwilling witnesses, but are Petitioners' party members, workmen or consultants. He relied in **DINGYADI v INEC (No. 1) (2010) 18 NWLR (Pt 1224) 1 at 74 – 75.** He added that it is preposterous for the Petitioners to argue that



the provisions of Section 68 of the Evidence Act does not impeach the expert evidence of PW7 who claimed to be an expert but failed to produce her qualifications before the Court.

Learned Counsel also argued that Exhibit X2, which was not certified by and obtained from the proper custodian of the document, is not legally admissible in evidence and in as much as the documents tendered are meant to assist the Court in doing justice, such documents should not be tendered in utter disregard to the legal requirements. Relying on **DUNGAL v SORO (2019) 10 NWLR (Pt. 1679) 37 at 48, paras. E – G,** he urged the Court to discountenance and expunge Exhibit X2.

## RESOLUTION OF THE RESPONDENTS' OBJECTIONS TO WITNESSES AND TO DOCUMENTS:

On the first segment of the Respondents' objection, all the Respondents challenged the competence of PW3, PW4, PW5, PW6, PW7, PW8, PW9, PW10, PW11 and PW13, and the Respondents' essential contention is that the witness statements on oath of those witnesses of the Petitioners were not frontloaded along with the Petition, but were only filed during trial, contrary to Paragraph 4(5)(b) of the 1st Schedule to the Electoral Act, 2022.

Section 285(5) of the 1999 Constitution (as amended) which limits the time for presentation of election petition, provides as follows:


CERTIFIED TRUE COPY

"An election petition shall be filed within 21 days after the date of the declaration of the result of the elections."

In the same vein, Section 132(7) of the Electoral Act, 2022 provides as follows:

"An election petition shall be filed within 21 days after the date of the declaration of the result of the elections."

Paragraph 4 of the 1st Schedule to the Electoral Act, 2022 stipulates the contents of an election petition which shall be filed. In particular, Paragraph 4(5) of said Schedule mandates as follows:

"(5)   The election petition shall be accompanied by –

(a)   a list of the witnesses that the Petitioner intends to call in proof of the petition;

(b)   written statements on oath of the witnesses; and

(c)   copies or list of every document to be relied on at the hearing of the petition."

By subparagraph (6) of that paragraph, a petition which fails to comply with the above requirements shall not be accepted for filing by the Secretary.



Paragraph 14(2) of the same 1st Schedule to the Act then provides as follows:

"(2) After the expiration of the time limited by –

(a) Section 132(7) of this Act for presentation of the election petition, no amendment shall be made –

(i) introducing any of the requirements of paragraph 4(1) not contained in the original election petition filed, or

(ii) effecting a substantial alteration of the ground for, or the prayer in, the election petition, or

(iii) except anything which may be done under subparagraph (2)(a)(ii), effecting a substantial alteration of or addition to, the statements of facts relied on to support the ground for, or sustain the prayer in the election petition; and

(b) paragraph 12 for filing the reply, no amendment shall be made –

(i) alleging that the claim of the seat or office by the petitioner is correct or false, or

(ii) except anything which may be done under the provisions of subparagraph (2)(a)(ii), effecting any


CERTIFIED TRUE COPY

> substantial alteration in or addition to the admissions or
> the denials contained in the original reply filed, or to the
> facts set out in the reply."

The above quoted provisions of the Constitution, the Electoral Act, 2022 and the 1st Schedule thereto, have been thoroughly considered by the Supreme Court in **OKE & ANOR v MIMIKO & ORS (2013) LPELR-20645(SC) at pages 43 – 45, paras. D – D, per Ogunbiyi, JSC; (NO. 1) (2014) 1 NWLR (Pt. 1388) 225,** which has been followed by several decisions of this Court. See among others:   **OGBA v VINCENT (2015) LPELR-40719(CA) at pages 42 – 49, paras. C, per Agim, JCA; ARARUME & ANOR v INEC & ANOR (2019) LPELR-48397(CA) at pages 28 – 36, per Tsammani, JCA; OKWURU v OGBEE & ORS (2015) LPELR-40682(CA) at pages 25 – 29, per Bolaji-Yusuff, JCA; PDP v OKOGBUO & ORS (2019) LPELR-48989(CA) at pages 11 – 28, per Orji-Abadua, JCA; and ANDP v INEC & ORS, Appeal No. CA/A/EPT/406/2020, delivered on 17th July, 2020, at pages 35 – 43.**

In **OKE v MIMIKO (supra),** the Apex Court, per Ogunbiyi, JSC held that:

> "By Paragraph 4(1) and (5) of the 1st Schedule to the Electoral Act,
> a composite analysis of an election petition has been spelt out and
> also a list of materials which must be accompanied. The use of the
> word "shall" in the subsections is very instructive, mandatory and


CERTIFIED TRUE COPY

conclusive. In other words, the provisions do not allow for additions and hence, the procedure adopted by the appellants in seeking for an extension of time is nothing other than surreptitious attempt to amend the petition. This is obvious from the nature and substance of the application especially where one of the grounds seeks to put in facts which were allegedly not available at the time of filing the petition but only came into their possession after the statutory time limit allowed for the presentation of election petition. Expressly, there is no provision in the legislation which provides for extension of time. What is more, vide paragraph 14(2) of the 1st Schedule to the Electoral Act, the Appellants by Section 134(1) of the Electoral Act had been totally foreclosed from any amendment which was in fact the hidden agenda promoting the application. The saying is true that even the devil does not know a man's intention; it can only be inferred from the act exhibiting that which is conceived in the heart and mind. The use of the word "shall" in paragraph 14(2)(a) of the 1st Schedule to the Electoral Act is mandatory and places a complete bar on any form of amendment to a petition filed and does not also allow for an exercise of discretion whatsoever. See UGWU v ARARUME (2007) 12 NWLR (Pt. 1048) 367 at 510 – 511 and BAMAIYI v A.G FEDERATION (2001) 12 NWLR (Pt. 727) 428 at 497. Further still and

CERTIFIED TRUE COPY

on a critical perusal of the application, relief 2 seeks "leave to call additional witness, to wit A.E.O". It is pertinent to restate that at the close of pleadings parties had submitted the list of witnesses who were to testify together with their depositions. The idea, purpose and intention of the application is suggestive of nothing more but a clear confirmation seeking for an order of an amendment as rightly and ingeniously thought out by the trial tribunal and also affirmed by the lower court. This will certainly violate the provisions of Section 285(5) of the Constitution and Section 134 of the Electoral Act."

In his concurring judgment in the same case, Ngwuta, JSC specifically stated that:

"The additional or further witness depositions sought to be allowed for a just and fair determination of the petition are fresh facts as found by the tribunal and which finding was endorsed by the lower court. This Court will not interfere with a concurrent finding of fact of the two lower courts when the appellants have failed to show a special circumstance for this Court to do so. Election petitions are time-bound and the Court will not allow a party to resort to any sort of subterfuge to frustrate the intention of the Electoral Act that petitions be disposed of expeditiously."

CA/PEPC/03/2023; CA/PEPC/04/2023; CA/PEPC/05/2023.

85



CERTIFIED TRUE COPY

The Petitioners in this case have relied on the earlier decisions of this Court in **OMIDIRAN v ETTEH (supra) and LASUN v AWOYEMI (supra),** to argue that the subpoenaed witnesses whose witness statements on oath were filed outside the time limited for presentation of the Petition are competent to testify because they are subpoenaed witnesses who do not work for the Petitioners. However, it is pertinent to observe that unlike in the present case, the subpoenas issued at the instance of the Petitioners in the cases of **OMIDIRAN v ETTEH (supra); and LASUN v AWOYEMI (supra),** were decided under the Electoral Act of 2006 which did not have provisions similar to Paragraph 4(5) of the 1st Schedule to the extant Electoral Act, 2022. Secondly, the subpoenas in the above two cases were issued and served on adversaries, namely - the Resident Electoral Commissioners. Again, those two cases were decided before the introduction of Section 285(6) of the Constitution of the Federal Republic of Nigeria, 1999 which mandates that an election petition shall be decided within 180 days from the date of filing of the Petition.

Thus, whilst this Court in **OMIDIRAN v ETTEH (supra) and LASUN v AWOYEMI (supra),** appeared to have adopted a flexible approach, the Apex Court had taken a strict approach in its latter decision in **OKE v MIMIKO (supra).** Indeed, in subsequently following the Apex Court's decision in **OKE v MIMIKO (supra),** this Court, per Agim, JCA (as he then was, now JSC) highlighted this strict position of the law in **OGBA v**





CERTIFIED TRUE COPY

**VINCENT (supra),** at pages 46 – 48, paras. A – B, wherein he held as follows:

> "I think that this Court in *Omidiran v Etteh* and the Supreme Court in *Oke v Mimiko* adopted different approaches in addressing the issue of whether a Tribunal or Court can allow a witness deposition or other document not filed along with the petition or not filed within the time allowed for filling election petition to be filed and used in an election petition proceeding. *Omidiran's* case did not strictly enforce the time limits prescribed in S. 141 of the Electoral Act 2006, the provisions in the First Schedule thereto on prohibiting the introduction of additional facts in the proceedings after the period allowed for filing the petition and closure of pleadings and Paragraph 1(1) of the Election Tribunal and Court Practice Directions 2006 on the content and form of the petition. It held that the purpose of the Practice Directions is to guide and regulate compliance with and observance of the provisions of the First Schedule to the Act and the Federal High Court Rules, where applicable. This elastic application of the electoral laws by this Court in that case is not in line with the current judicial approach of strict enforcement of electoral laws and the current approach of applying the Election Tribunal and Court Practice Directions as overriding the Rules of Court in election cases. In *Oke v Mimiko,* the

CERTIFIED TRUE COPY

Supreme Court approached the issue in keeping with the current judicial trend of strictly applying electoral laws and procedural rules and giving them supremacy over Rules of Court in election cases. The Supreme Court has consistently in a long line of cases insisted on this strict and inelastic approach in enforcing the electoral laws. See *Audu & Anor v. Wada & Ors (SC.332/2012 of 10-9-2012 @ p.2), ACN v. Nyako & Ors (SC.409/2012 of 5-11-2012 @ p.3-5), Omisore & Anor v. Aregbesola & Ors ( 5C.204/2015 of 27-5-2015 @ p.55).* The law as laid out *strictisima juris* in *Oke v. Mimiko* is that a witness deposition that is not filed along with the petition within the 21 days allowed for filing the petition cannot be filed in the proceedings. It held thus- "...if there was an evidence which was fundamental to the determination of the petition, that evidence ought to have been placed willy-nilly before the Tribunal within the time limit specified by the Electoral Act or any other Act. That evidence ought to be regarded as the Spinal cord of the petition. Even if it was been withheld by any person, there are several ways to go about placing same before the Tribunal. The Evidence Act is very clear on this. The Petitioners ought to have restored to that procedure ..."

The firm position of the Supreme Court as stated in **OKE v MIMIKO (supra),** and followed by this Court in **OGBA v VINCENT (supra),** is that

CERTIFIED TRUE COPY

by the combined provisions of Section 285(5) of the 1999 Constitution, Section 132(7) of the Electoral Act, 2022 and Paragraphs 4(5) and (6) and 14(2) of the 1st Schedule to the Act, every written statement on oath of the witnesses which a party intends to call must be filed along with the petition within the time limited by Section 285(5) of the Constitution of the Federal Republic of Nigeria 1999 (as amended) and Section 132(7) of the Electoral Act, 2022. Once the time limited for filing of a petition has elapsed, the contents of the Petition cannot be added to or amended in any manner or under any guise. Any written statement on oath of a witness filed outside that 21 days limitation will amount to a surreptitious amendment of the Petition and a breach of Paragraph 14 of the 1st Schedule to the Electoral Act, 2022. This is irrespective of whether the witnesses to be called are ordinary or expert witnesses and whether they are willing or subpoenaed witnesses. Since then, this has been the consistent position of the law followed by this Court.

Indeed, in **OKWURU v OGBEE (supra)**, this Court stressed this position when Bolaji-Yusuff, JCA stated thus:

> "From the records, PW3 and PW4 were summoned by subpoena issued by the Tribunal and presented as expert witnesses. The question is whether this without more entitles the appellant to file their statements on oath outside the time set for filing a petition or

CERTIFIED TRUE COPY

a reply to the respondent's reply in answer to the petition. I am of the humble view that whether an expert witness or not, a witness remains a witness. Though the proviso to Order 3 Rule 3(1) of the Federal High Court (Civil Procedure) Rules,2009 made applicable to an election petition by Paragraph 54 of the First Schedule to the Electoral Act provides that "(i) the statements on oath of witnesses requiring subpoena from the Court need not be filed at the commencement of the suit. (ii) the witnesses who require subpoena or summons shall at the instance of the party calling them be served with Civil Form 1 (a) before the filing of statements of such witnesses", the application of that rule is with regard to and/or subject to the provisions of the Electoral Act not independent of the Act. Paragraph 54 reads: "Subject to the express provisions of this Act, the practice and procedure of the Tribunal or the Court in relation to an election petition shall be as nearly as possible, similar to the practice and procedure of the Federal High Court in the exercise of its civil jurisdiction and the Civil Procedure Rules shall apply with such modifications as may be necessary to render them applicable having regard to the provisions of this Act, as if the petitioner and the respondent were respectively the plaintiff and the defendant in an ordinary civil action." The provisions of the Electoral Act being a substantive law

CA/PEPC/03/2023; CA/PEPC/04/2023; CA/PEPC/05/2023.                    90



CERTIFIED TRUE COPY

the opposing party would have no opportunity to react to it... It is my humble view that the position of the law as can be gleaned from Section 285 (5) of the Constitution, Paragraphs 4, 14 (2) and 16 (1) of the First Schedule to the Electoral Act is that a petitioner cannot be allowed to file and use documents or witness statements on oath filed outside the time set for filing a petition and to which the respondents would have no opportunity to react. To do so will amount to creating an avenue which a petitioner can use or exploit to overreach the respondent(s). That is the stand of the Supreme Court in *Oke v. Mimiko (No. 1)(supra),* followed by this Court in *Ogba v Vincent (supra)."*

Again, in **ARARUME & ANOR v INEC & ORS (supra),** this Court, per Tsammani, JCA held that:

"The law therefore is that the deposition of a witness must accompany the Petition at the time of filing of the Petition. In other words, the written statement on oath of an intended witness must be filed along with the petition. Thus, any written deposition of a witness not filed along with the petition will not be countenanced by the Court or Tribunal. See *Oraekwe & Anor. v. Chukwuka & Ors (2010) LPELR-9128(CA); Chukwuma v. Nwoye & Ors (2009) LPELR-4997(CA).* It therefore means that a written deposition filed by a



shall override any rule of Court which is contrary to its provision. The subsidiary legislation must conform with the principal law. See *NNPC v. Famfa Oil Ltd (2012) LPELR-7812(SC).* The proviso to Order 3 Rule 3(1) of the Federal High Court (Civil Procedure) Rules, 2009 cannot override or affect or whittle down the absolute and mandatory provisions of Section 285 (5) of the Constitution of the Federal Republic of Nigeria, 1999 (as amended) which stipulates that an election petition shall be filed within 21 days after the date of the declaration of result of the elections and Paragraphs 4(1) and (5) and 14 (1) and (2) of First Schedule to the Electoral Act which stipulate the content of a petition. See *The Gov. of Oyo State & Ors v. Oba Ololade Folayan (1995) 8 NWLR (Pt. 413) page 292; Barclays Bank of Nigeria Ltd v. Ashiru & 2 Ors (1978) 6 -7 SC (Reprint) 70 or (1978) LPELR - 75 2 (SC), UTA French Airlines v. Williams (2000) 14 NWLR (Pt. 687) pages 277.* It is therefore clear that in law, the provisions of Order 3 Rule 3 (1) of the Federal High Court (Civil Procedure) Rules, 2009 cannot provide a platform for filing and using witness statement on oath not filed within the time limit set for presentation of petition and which time cannot be extended for any reason under any guise. The focus of our decision in *Ogba v Vincent (supra),* was the injustice in allowing a piece of evidence not covered by the pleadings to be presented to the Court when



CERTIFIED TRUE COPY

witness not listed in the petition nor his deposition frontloaded cannot be countenanced by the Court or Tribunal after the expiration of the time prescribed for the filing of the Petition. I think that is what the trial Tribunal decided in this case in line with the decision in *Ogba v. Vincent (supra)*... The combined effect of Paragraph 4(5) (i) & (ii) and 41(1) and (3) of the First Schedule to the Act is that no witness can testify in- chief before a Tribunal if he has not deposed to a written statement on oath which must necessarily have been filed along with the Petition."

From the foregoing judicial decisions, it is clear that in election petition litigation, whether the witnesses which a party intends to call are ordinary or expert witnesses and whether they are willing or subpoenaed witnesses, their witness depositions must be filed along with petition before such witnesses will be competent to testify before the tribunal or court.

It is instructive to observe that one of the leading Senior Counsel for the Petitioners in this Petition, Dr. Onyechi Ikpeazu, SAN, was the lead Counsel to the 2nd Respondent in **ARARUME & ANOR v INEC & ORS (supra),** wherein he successfully challenged the competence of a subpoenaed witness, Ama Ibom Agwu (PW2) on the same ground that the witness statement on oath of the said witness was filed on 8/7/2019,

CERTIFIED TRUE COPY

long after the time limited for filing of the Petition. Therefore, the Petitioners in this case were well aware of the settled legal position on subpoenaed witnesses in election petitions, stated by the Supreme Court and by this Court. Yet, they embarked on subpoenaing PW3, PW4, PW5, PW6, PW7, PW8, PW9, PW10, PW11 and PW13 (ten out of their thirteen witnesses), whose witness statements on oath were not frontloaded along with the Petition.

The Petitioners have tried to argue that the said witnesses are witnesses of this Court. With respect, this argument is misconceived, because the subpoenas in respect of those witnesses were issued upon the request of the Petitioners. The applications for the issuance of the subpoenas were duly filed at the Registry of this Court by the Petitioners' Counsel and the requisite fees, including filing fees and service fees as assessed were duly paid by them, before this Court approved and issued the subpoenas. Therefore, those witnesses are the Petitioners' witnesses and not witnesses of this Court.

Indeed, the procedure for calling of witnesses by the Court is by summons as stipulated in Paragraph 42(1) of the 1st Schedule to the Electoral Act, 2022. By the provisions of that Paragraph, "the tribunal or court may summon a person as a witness who appears to the tribunal or court to have been concerned in the election." It is clear from the

CERTIFIED TRUE COPY

provision of that paragraph that it is a person summoned by the Court *suo motu* in exercise of its powers under Paragraph 42(1) that is a witness of the Court and not a person subpoenaed at the request of a party to the case.

In the instant case, PW3 who was subpoenaed at the request of the Petitioners is a staff of Channels Television who tendered Exhibits PBH3 and PBH4, two flash drives containing 3rd INEC Consultative Meeting with Leaders of Political Parties held on 26th October, 2022, and Interview with Mr. Festus Okoye, National INEC Commissioner held on 12th March, 2023, respectively. PW4, a Professor of Mathematics, who was engaged before the election by the Petitioners and whom the Petitioners presented as a subpoenaed expert witness, stated under cross examination by the 1st Respondent that he concluded his Report on the 19th of March, 2023 before the Petition was filed. PW5 is a staff of Arise Television who also tendered Exhibit PCG2, a Flash Drive showing the INEC Chairman delivering an address at the Chatham House, London, UK on the preparations for the 2023 Elections in Nigeria. PW6, is a staff of Africa Independent Television (AIT) who tendered Exhibit PCH1, a Flash Drive of the Programme: Democracy Today anchored on 22nd November, 2022 wherein the INEC Chairman was shown giving a brief on the preparations for the 2023 General Elections. PW7 who claimed to be a Cloud Engineer and Architect working with Amazon Web Services



CERTIFIED TRUE COPY

Incorporated, tendered Exhibits PCJ3A – F, which are 6 Reports of Amazon Web Services (AWS) Health Dashboard, which she said she downloaded from the Amazon Website. Under cross examination however, she not only admitted that she is a member of the 2nd Petitioner (the Labour Party), but she had contested elections as a candidate of the 2nd Petitioner for the House of Representatives elections conducted along with the Presidential Elections on 25th February, 2023. PW8 who claimed to be a cyber security expert engaged by the Labour Party on 10th March, 2023 stated that he produced his preliminary report on 17th or 18th March, 2023, before the Petition was filed. He tendered Exhibit PCK1, a Meta Data. PW9, a staff of Women & Child Rescue Initiative, a non-governmental organization, claimed to be an observer in the 25th February, 2023 elections, but stated that the subpoena was addressed to him personally and served at his village address. PW10 claimed to be an INEC adhoc staff who acted as a Supervisor. He stated under cross examination that the subpoena was addressed to him personally and not through INEC. PW11 who is a staff in the Legal Services Department of National Information Technology Development Agency (NITDA) stated that the subpoena was addressed to him personally instead of his organization. As for PW13 who claimed to have acted as a Presiding Officer in the 25th February, 2023 elections, he stated that he was on subpoena. The Subpoena which was admitted



CERTIFIED TRUE COPY

as Exhibit PCR was however addressed to him personally and not through INEC.

It is pertinent to observe that the above ten witnesses subpoenaed by the Petitioners were all witnesses who were available to the Petitioners at the time of filing the Petition. They are neither subpoenaed as adversaries nor subpoenaed as official witnesses. It is therefore beyond controversy that the witness statements on oath of those witnesses filed after the time limited for presentation of the Petition had elapsed, are incompetent and the said witnesses had no vires to testify in this Petition. Their testimonies as embodied in their respective witness statements on oath, being incompetent, are accordingly struck out.

With regard to the Respondents' objections to the admissibility of documents tendered by the Petitioners, the first objection raised by the Respondents is to exhibits tendered through PW4, PW5, PW6, PW7 and PW8. These are Exhibits PCD1, PCD2, PCD3, PCE1, PCE2, PCE3, PCE4 and PEF2 tendered through PW4; Exhibits PCG1 and PCG2 tendered through PW5; Exhibits PCH1 tendered through PW6; Exhibits PCJ1, PCJ2, PCJ3A – F and PCJ4 tendered through PW7; and Exhibits PCK1 and PCK2 tendered through PW8. The said exhibits are:



CERTIFIED TRUE COPY

(i)     **Exhibit PCD1:** Report of Data Analysis from Results of the 25th February, 2023 Presidential Elections in Nigeria (IREV Scores Investigation);

(ii)    **Exhibit PCD2:** Report of Data Analysis from the Results of the 25th February, 2023 Presidential Election in Nigeria (Rivers State Scores); and

(iii)   **Exhibit PCD3:** Report of Data Analysis from the Results of the 25th February, 2023 Presidential Election in Nigeria (Benue State Scores).

(iv)    **Exhibits PCE1 – PCE4:** Four boxes said to contain 18,088 blurred results downloaded from the IREV Portal.

(v)     **Exhibit PCF2:** A letter dated 20/02/2023 addressed to PW4 by the 2nd Petitioner.

(vi)    **Exhibit PCG2:** Flash Drive containing Video Clip of INEC Chairman's Address at Chatham House, London, UK on the 17th of January, 2023.

(vii)   **Exhibit PCH1:** Flash Drive of AIT Programme: DEMOCRACY TODAY anchored by PW6, containing Live Streaming of Briefing by INEC Chairman of 22/11/22.

(viii)  **Exhibit PCJ1:** Resume of PW7



CERTIFIED TRUE COPY

(ix)  **Exhibit PCJ2:** document titled: Employment Verification Letter.

(x)   **Exhibits PCJ3A – F and PCJ4:** 6 Amazon Web Services Health Dashboard/Status Reports and Certificate of Compliance, respectively.

(xi)  **Exhibits PCK1:** Bundle of Documents referred to as Meta Data.

(xii) **Exhibit PCK2:** Copy of INEC Press Release dated 11/11/2022 signed by Festus Okoye, National INEC Commissioner.

The Respondents' essential argument is that since the subpoenaed witnesses and their witness statements on oath are incompetent, the documents tendered through those witnesses cannot be countenanced by the Court.

By paragraph 41(3) of the 1st Schedule to the Electoral Act, 2022, oral examination of witnesses is not allowed. Witnesses are only to adopt their respective written depositions and tender in evidence all disputed documents or other exhibits referred to in their depositions. By paragraph 4(5)(b) of the Schedule, such written depositions of the witnesses must be filed along with the Petition.

CA/PEPC/03/2023; CA/PEPC/04/2023; CA/PEPC/05/2023.



CERTIFIED TRUE COPY

Since the above exhibits are documents, including expert reports, which were tendered through the subpoenaed witnesses whom we have already declared incompetent because their witness statements on oath were filed in violation of the mandatory provisions of Paragraph 4(5)(b) of the 1st Schedule to the Electoral Act, 2022, the documents admitted through them which form part of their evidence are inadmissible and liable to be expunged from the record. See: **BUHARI V INEC (2008) LPELR-814(SC) at 155, paras. C – F, per Tobi, JSC.**

The Petitioners have argued that since the parties have agreed during pre-hearing session that documents properly certified by INEC will not be objected to, and the said documents were tendered from Bar pursuant to pre-hearing order of this Court of 23rd May, 2023, the parties are bound by the order of the Court since same has not been appealed against by the 2nd and 3rd Respondents. However, this contention of the Petitioners does not represent the position of the law. It is trite that a court is not permitted in any event to admit and act on legally inadmissible evidence even if such evidence had been admitted by agreement of the parties or under order of court in the course of hearing. Once such evidence is legally inadmissible, the court must reject it when giving its final judgment even if that will amount to overruling itself by doing so. See: **SHANU & ANOR v AFRIBANK NIGERIA PLC (2002) LPELR-3036(SC), at page 28, paras. A – B, per Uwaifo, JSC.** Indeed, even in the



CERTIFIED TRUE COPY

case of **SANI v AKWUE (2019) LPELR-48206(CA)**, relied upon by the Petitioners, this Court at page 20, paras. B – A, restated the position of the law that even when pieces of evidence had been improperly received in evidence, the trial court as well as appellate court have the power to expunge it from the record and decide the case only on legally admissible evidence.

On the objection of the Respondents to the admissibility of the documents tendered as expert reports by the Petitioners, which were admitted as Exhibits PCD1 – PCD3, PCE1 – PCE4, PCJ2, PCJ3A – F and PCK1, the Respondents' contention is that they are caught up by the provisions of Section 83(3) of the Evidence Act, 2011, having been contrived for the purpose of this suit. It is settled law as provided in Section 83(3) of the Evidence Act, 2011 and pronounced upon in several decisions of the appellate courts, that a document which is made by a party interested in a pending or anticipated proceeding, involving a dispute as to any fact which the document tends to establish, is inadmissible in evidence. See: **LADOJA v AJIMOBI (2016) LPELR-40658(SC) at pages 94 – 96, paras. B – E,** where the Supreme Court, per Peter-Odili, JSC held as follows:

> "In respect of what is referred to as a person interested, I shall refer
> to the cases of: Nigerian Social Insurance Trust v. Klifco Nigeria Ltd

CERTIFIED TRUE COPY

(2010)LPELR 22 - 23 Paras C- E as follows: "As regards the phrase "a person interested "I agree with the respondent that the phrase has been examined in the case of Evan v. Noble (1949) 1 KB 222 at 225 where a person not interested in the outcome of action has been described as, a person who has no temptation to depart from the truth one side or the other, a person not swayed by personal interest but completely detached, judicial, impartial, independent'. In other words, it contemplates that the person must be detached, independent, and non-partisan and really not interested which way in the context the case goes. Normally, a person who is performing an act in official capacity cannot be a person interested under Section 91(3). I think the phrase 'a person interested' ever moreso has been quite definitively put in the case of Holton v. Holton (1946) 2 AER 534 at 535 to mean a person who has pecuniary or other material interest in the result of the proceeding a person whose interest is affected by the result of the proceedings, and, therefore would have no temptation to pervert the truth to serve his personal or private ends. It does not mean an interest in the sense of intellectual observation or an interest purely due to sympathy. It means an interest in the legal sense, which imports something to be gained or lost." C.P.C. v. Ombugadu (2013) ALL FWLR (Pt.706) 406 at 472 - 473 Para H - B when considering and

CERTIFIED TRUE COPY

determining who is a person interested under Section 91(3) of the Evidence Act 2011 held thus: "By the provision of Section 91(3), Evidence Act, a person interested is a person who has a pecuniary or other material interest and is affected by the result of the proceedings and therefore would have a temptation to pervert the truth to serve his personal or private ends. It does not mean an interest purely due to sympathy. It means an interest in the legal sense which imports something be gained or lost". For effect Section 83(3) of the Evidence Act 2011 stipulates thus: 83(3) "Nothing in this section shall render admissible as evidence any statement made by a person interested at a time when proceedings were pending or anticipated involving a dispute as to any fact which the statement might tend to established." In concluding it needs be stated in keeping with Section 83(3) of the Evidence Act, 2011 and judicial authorities which abound that as a general rule or principle, a document made by a party to a litigation or person interested when proceedings are pending or is anticipated as in the case at hand, such evidence is not admissible See: Highgrade Maritime Services Ltd v F.B.N. Ltd(1991) 1 NSCC 199 at 135: Anyaebosi & Ors v R. T. Briscoe Nig. Ltd (1987) 2 NSCC 805 at 823."

CERTIFIED TRUE COPY

In fact, in its most recent decision in **OYETOLA & ANOR v INEC & ORS (2023) LPELR-60392(SC),** the Supreme Court, per Agim, JSC restated this position in the following words:

> "The other evidence adduced by the Appellant to prove their case is the expert analysis report prepared by PW1, who by his own admission is a member of the 2nd Appellant and had been a Special Assistant to the 1st Appellant and was engaged by the Appellants to establish the invalidity of the disputed results in Form EC8A for the 744 polling units. He testified further that "I made the report as directed by the Petitioners" and that "I am part of those who wrote the Petition". By his own testimony he established that he was no an independent expert as he had an interest in the subject of his analysis and carried out the analysis from the conclusion that the results were invalid, to justify to support the contemplated election petition. It was an analysis from an answer and not from a question. Such a report is not the product of an independent, impartial, detached and professional analysis. He is clearly a person with the disposition or temptation to depart from the truth... The listing of the expert analysis report in the Petition among the documents to be relied on to prove the petition show it was made in anticipation or contemplation to be filed. The report having been made by PW1 as a person interested in the subject matter of the report when the



petition was anticipated to establish that the election result was invalid is not admissible evidence by virtue of Section 83(3) of the Evidence Act, 2011 as amended."

See also: **B.B. AFUGO & SONS LTD v ORTHOPEDIC HOSPITAL MANAGEMENT BOARD (2016) LPELR-40598(SC) at pages 67 – 68, paras. B – F; U.T.C v. LAWAL (2013) LPELR-23002(SC) at pages 25 – 26, paras. B – E; NURUDEEN v OYETOLA (2023) LPELR-60093(CA) at page 54, paras. F – E; and BUA INTERNATIONAL LTD V SAIMA (NIG.) LTD (2023) LPELR-59533(CA) at pages 29, paras. A – F.**

In the instant case, PW4 who claimed to be an expert was contracted by the Petitioners before the election to carry out data analysis on the results of the Presidential elections held on the 25th of February, 2023. He even tendered his letter of engagement by 2nd Petitioner dated 20th February, 2023 which was admitted as Exhibit PCF2. According to him, he produced his initial report on 19th of March, 2023. His report was made a day before this Petition was filed on 20th March, 2023. Obviously, the report (Exhibit PCD1 – PCD3) was prepared in anticipation of this Petition. As for PW7, who also claimed to be an expert witness, she admitted that she was not only a member of the 2nd Petitioner, but had contested the House of Representatives election under the platform of the 2nd Petitioner, which election was conducted the same time with the



Presidential Election on the 25th of February, 2023. She also admitted that the report she presented in Exhibits PCJ3A – F, are public information hosted by Amazon which she downloaded from the Amazon Website and that the open access information she downloaded in her Report cannot be amended by her. This shows that PW7 was clearly not the maker of the said documents. As for PW8, who claimed to be a cyber security expert, he stated under cross examination by the 1st Respondent that he was engaged by the 2nd Petitioner as an expert on 10th March, 2023 and that he produced a preliminary report on 17th and 18th of March, 2023 and final report (Exhibit PCK1) at the end of May, 2023 while this proceeding was pending.

It is therefore evident from the above that PW4, PW7 and PW8 are persons interested in the outcome of this proceedings. The reports produced by PW4 and PW8 qualify as statements made by persons interested in anticipation or during the pendency of this Petition. As for PW7 she is admittedly an interested party having been a member of and even contested election under the umbrella of the 2nd Petitioner. Her interest is further underscored by the fact that she admitted under cross examination that she was attending court throughout the proceedings prior to her evidence. By virtue of Section 83(3) of the Evidence Act, 2011, the reports tendered by those witnesses which form part of their evidence are inadmissible.

CERTIFIED TRUE COPY

In view of the foregoing, Exhibits PCD1 – PCD3, PCE1 – PCE4, PCF2, PCG2, PCH1, PCJ1, PCJ2, PCJ3A – F, PCJ4, PCK1 and PCK2, tendered through the incompetent PW4, PW5, PW6, PW7 and PW8, are hereby expunged from the record of this Court.

The second aspect of the Respondents' objection is on the ground of improper certification or authentication. On the 2nd and 3rd Respondents' objection to Exhibit PBP1 – PBP21, the IReV Report for Adamawa State on the ground that no certificate of authentication of those computer-generated documents was filed incompliance with Section 84 of the Evidence Act, 2011, Exhibits PCB1 – PCB6 referred to by the Petitioners in response to the objection are IReV Certificates of Compliance for Bayelsa, Benue, Ekiti, Niger, Ogun and Rivers States. Adamawa State is not included in those exhibits. Exhibits PCC1 – PCC28 which include Adamawa State are actually BVAS Reports and their Certificates of Compliance. That of Adamawa is PCC21. In short, no certificate of compliance was produced by the 1st Respondent in respect of Exhibits PBP1 – PBP21, the blurred IReV Results (EC8As) in respect Adamawa State.

However, since the documents were stated to have been downloaded from INEC's IREV Portal and were certified by INEC as true copies of what they have in their IReV Portal, the documents qualify as public

CERTIFIED TRUE COPY

documents within the meaning of Section 102 of the Evidence Act, 2011 and the certification by INEC authenticates those documents. Therefore, the provision of Section 84 of the Evidence Act is not applicable in this case. This is the position of the law as espoused of the Supreme Court in the case of **KUBOR v DICKSON (2012) LPELR-9817(SC),** where the Apex Court held that computer/internet generated documents printed from the website of a public institution is a public document and only a copy of such document which is duly certified in compliance with Section 104 of the Evidence Act, 2011 is admissible. See also **DAUDU v FRN (2018) LPELR-43637(SC),** where the Apex Court, per Aka'ahs, JSC held that:

> "There is no doubt that the documents are computer generated which the EFCC got from the various banks during investigation. It is therefore presumed that before the banks surrendered them to the EFCC, they must have certified that the contents of the statements of accounts contained therein were correct. Even the appellant relied on the contents of the documents for his defence. The lower court pointed out that the appellant cannot approbate and reprobate. He cannot rely on the documents for his defence and at the same time ask that they be expunged from the record. The documents sought to be expunged were found to have been duly certified."

CA/PEPC/03/2023; CA/PEPC/04/2023; CA/PEPC/05/2023.                              108


CERTIFIED TRUE COPY

Exhibits PBP1 – PBP21, having been downloaded from INEC IReV Portal and duly certified by INEC, are clearly admissible.

As for the 4th Respondent's objection to Exhibit PCG2, the Flash Drive tendered by PW5, a staff of Arise TV, it is clear that the said witness had in paragraphs 6 – 12 of his witness statement on oath not only stated that he participated in all stages of the recording, production and packaging of the Flash Drive but he had certified the process of its production as required by Section 84 of the Evidence Act.

On the 4th Respondent's objection to the admissibility of Exhibit X2 on the ground that Exhibit X2 was obtained by the Petitioners from the Registry of this Court and not from the custodian of the original copy, we have examined Exhibit X2 which is the European Union Election Observation Mission Nigeria 2023 Final Report. As rightly observed by the 4th Respondent, the photocopy of the document is certified by Secretary of the Presidential Election Petition Court and not any officer of the European Union Election Observation Mission which is the custodian of the original copy of the document. By Section 104(1) of the Evidence Act 2011, the secondary evidence of any public document is only admissible in evidence if it has been duly certified by a public officer having custody of the original copy of the document, who by that Section may give a copy of same to any person who has a right to inspect





"together with a certificate written at the foot of such copy that it is a true copy of such document or part of it as the case may be." Under subsection (2) of that Section, the public officer is enjoined to certify same by subscribing his name, official title and date and where he is authorized to use a seal, with his seal. Clearly, the Registry of this Court which is not the custodian of the original copy of Exhibit X2 cannot validly certify that document under Section 104(1) of the Evidence Act, 2011. See: **OMISORE v AREGBESOLA & ORS (2015) 15 NWLR (Pt. 1482) 205 at 294; and EMMANUEL v UMANA & ORS (2016) LPELR-40037(SC) at pages 49 – 51, paras. B – A,** where Nweze, JSC stated that the whole essence of the Court's insistence on the scrupulous adherence to the certification requirements of public documents is to vouchsafe their authenticity vis-à-vis the original copies. Since Exhibit X2 has not been validly certified, it is inadmissible in evidence. Accordingly Exhibit X2 is expunged from the record.

The third aspect of the Respondents' objection to the Petitioners' documents is on the ground that the Petitioners failed to plead specific facts to cover the documents objected to. The said documents objected to by all the Respondents are: Exhibits PD1 – PD18, PJ1 – PJ8, PK1 – PK31, PL1 – PL18, PN1 -- PN31, PP1 – PP13, PQ1 -- PQ13, PR1 – PR25, PU1 – PU18, PV1 – PV7, PW1 – PW21, PY1 – PY8, PAA1 – PAA21, PAB1 – PAB12, PAC1 – PAC25, PAD1 – PAD18, PAE1 – PAE25, PAF1 – PAF25, PAG1 –


CERTIFIED TRUE COPY

PAG11, PAK1 – PAK31, PAL1 – PAL18, PAM1 – PAM15, PAN1 – PAN31, PAQ1 – PAQ12, PAR1 – PAR8, PAT1 – PAT18, PAU1 – PAU10, PAV1 – PAV18, PAX1 – PAX25, PAY1 – PAY18, PAZ1 – PAZ33, PBA1 – PBA23, PBB1 – PBB23, PBC1 – PBC16, PBD1 – PBD25, PBK1 – PBK16, PBL1 – PBL15, PBM1 – PBM23, PBN1 – PBN11, PBR1 – PBR16, PBQ1 – PBQ21, PBT1 – PBT25, PBW1 – PBW17, PBY1 – PBY10, PBZ1 – PBZ29, PCH37 – PCH39, PCN5 – PCN12, PCN16 – PCN18, PCN22, PCN25, PCN27, PCN29, PCN33, PCN37 – PCN39, PCN51. The above exhibits are result sheets in Forms EC8As, EC8Bs, EC8Cs, IREV Reports, List of Registered Voters and PVCs Collected for 2023 General Elections, as well other electoral forms from the States of Abia, Adamawa, Akwa Ibom, Anambra, Bayelsa, Cross River, Delta, Ebonyi, Edo, Enugu, Jigawa, Kogi, Nasarawa, Ogun, Rivers and Sokoto.

I have carefully examined the Petitioners' pleadings and the documents objected to by the Respondents. The Petitioners have specifically averred in paragraph 101 of the Petition that they will be relying on "all 1st Respondent's electoral and all other necessary documents used for the conduct of the Presidential Election", including the documents which they listed as items (a) – (ccc) of that paragraph. However, election petitions are sui generis, and it is settled that for an averment in an election petition to be competent, material facts relating to complaints made therein must be pleaded. See: **BELGORE v AHMED (supra);**

CA/PEPC/03/2023; CA/PEPC/04/2023; CA/PEPC/05/2023.



**IKPEAZU v OTTI (supra); and PDP v INEC & 3 ORS (supra).** In the latter case of **PDP v INEC (supra),** the Supreme Court, was categorical on this mandatory requirement of specificity in averments of election petitions when the Court held as follows:

> "On whether the affected paragraphs were rightly struck out, I have read the affected paragraphs and found that they relate to allegations of non-voting in several polling points, disruption of election, non-conclusion of election, thumb-printing of ballot papers, falsification of election results, wide spread disruption, irregularities and malpractices without providing particulars or the polling units where the alleged malpractices took place. The lower court was therefore right when it held as follows: "The paragraphs above in my view are too generic, vague and lacking in any particulars as they are not tied specifically to any particular polling unit or any particular number of people who were alleged to be disenfranchised. The fact that a party can file further particulars or deny in a reply the averment in the pleading must not be general, it must be specific as to facts. It is settled law that a petitioner's obligation to plead particulars of fraud or falsification without which the allegation is a non-starter." I have nothing to add to this statement of law as advanced above, and I adopt it as mine."


CERTIFIED TRUE COPY

Thus, where allegations of non-compliance and corrupt practices are made, such as in the instant petition, the polling units, wards or other places where those irregularities and malpractices are alleged to have occurred must be specifically pleaded. The Petitioners have argued that the issue of non-compliance by the 1st Respondent to its laws, guidelines and relevant statutes is a universal complaint because it is an infraction against the Nigerian People and the Nigerian State. However, this contention of the Petitioners is not in consonance with the requirement of the law as espoused in **BELGORE v AHMED (supra); IKPEAZU v OTTI (supra); and PDP v INEC & 3 ORS (supra).** This is more so as the Petitioners' allegations of non-compliance is interwoven with allegations of corrupt practices and the same set of facts are pleaded for both.

In the instant case, the Petitioners tendered Forms EC8As for Ebonyi State (Exhibits PP1 – PP13), Nasarawa State (Exhibits PQ1 – PQ13), Delta State (Exhibits PR1 – PR25), Sokoto State (Exhibits PV1 – PV7) and Kogi State (Exhibits PW1 – P21); Forms EC8Bs for Kogi State (Exhibits PAA1 – PAA21), Nasarawa State (Exhibits PAB1 – PAB11), Sokoto State (Exhibits PAE1 – PAE21), Delta State (Exhibits PAF1 – PAF25), Cross River State (Exhibits PAL1 – PAL18), Akwa Ibom State (Exhibits PAN1 – PAN31) and Ebonyi State (Exhibits PAQ1 – PAQ12); Forms EC8Cs for Cross River State (Exhibits PAT1 – PAT18), Ebonyi State (Exhibits PAU1 – PAU10), Sokoto State (Exhibits PBB1 – PBB23) and Delta State (Exhibits PBD1 – PBD25);



Forms EC40G (PU) for Edo State (Exhibits PBM1 – PBM23); I-REV Reports for Edo State (Exhibits PW1 – PW17); Supplementary I-REV Reports for Cross River State (Exhibit PCH37 – PCH39); List of Registered Voters and PVCs Collected for 2023 General Elections with respect to Local Government Areas in Ogun State (Exhibits PCN5), Akwa Ibom State (Exhibit PCN6), Kebbi State (Exhibit PCN7), Kogi State (Exhibit PCN9), Cross River State (Exhibit PCN10), Enugu State (Exhibit PCN11), Sokoto State (Exhibit PCN12), Ebonyi State (Exhibit PCN16), Nasarawa State (Exhibit PCN17), Delta State (Exhibit PCN18), Anambra State (Exhibit PCN22), Jigawa State (Exhibit PCN25), Edo State (Exhibit PCN27) and Abia State (Exhibit PCN25). However, a look at the entire petition shows that no single complaint was made by the Petitioners in respect of any of those States as to make those exhibits relevant to the Petitioners' case. For instance, in paragraph 72, to which the Petitioners referred in response to the objection, the Petitioners have alleged that there was over voting in the States of Ekiti, Oyo, Ondo, Taraba, Osun, Kano, Rivers, Borno, Katsina, Kwara, Gombe, Yobe and Niger States. However, the Petitioners failed to specify the polling units where the over-voting took place, the total number of accredited voters, the total number of votes cast and the number of votes to be deducted from the scores of the parties. Similarly, in paragraph 73 which was also referred to by the Petitioners in their response to the objection, the Petitioners have

CERTIFIED TRUE COPY

averred that "based on the uploaded results, the votes recorded for the 2nd Respondent did not comply with the legitimate process for computation of the result and disfavoured the Petitioners", and listed the States of Rivers, Lagos, Taraba, Benue, Adamawa, Imo, Bauchi, Borno, Kaduna, Plateau and other States of the Federation. But the Petitioners failed to state the scores improperly computed and how they were disfavoured.

As regards the objection to Exhibits PCE1 – PCE4, said to be 18,088 blurred results downloaded from IReV and contained in 4 boxes, the Petitioners have contended that the Respondents' request for the Petitioners to specify the 18,088 polling units to which those blurred reports relate is an impossibility, because the results are unreadable and the details of most of the polling units are stated in Exhibits PCD1 – PCD3, the expert report tendered by PW4. This contention of the Petitioners is however misconceived. This is because the Petitioners who claim that they could not specify the polling units in the 18,088 blurred results because those results are unreadable, are the same persons who have stated that the said polling units have been specified in the expert report of PW4, through whom the blurred results were tendered. However, PW4 who stated under cross examination that the primary source of the data he used in producing his report was the IReV portal did not state how he was able to determine the particular polling units and the

CERTIFIED TRUE COPY

impacted votes, accredited voters and number of PVCs collected. As I earlier noted, PW4's report was concluded on 19th of March, 2023 before the Petitioners filed this Petition on 20th of March, 2023, which means the Petitioners were aware of the polling units to which their complaints relate even before they filed the Petition. So, their theory of "impossibility" which they invented around the 18,088 blurred results is misconceived and an obvious misadventure.

Again, in paragraphs 7 and 8 of the Petition, the Petitioners admitted that they have agents in the polling units and those agents signed and collected duplicate copies of the results sheets. Those paragraphs read as follows:

> "7.    The 2nd Petitioner is a body corporate with perpetual succession and in the sponsorship of the 1st Petitioner, and the conduct of the election thereof, acted through its members duly appointed as agents at all stages of the election, namely, at the polling units, the Ward Collation Centres, the Local Government Collation Centres, the State Collation Centres, and at the ultimate Collation Centre at the Federal level in Abuja.

> 8.    In the conduct of the election, the agents duly appointed by the Petitioners performed their assigned and statutorily

CA/PEPC/03/2023; CA/PEPC/04/2023; CA/PEPC/05/2023.                                    116



designated roles at the election. These roles included observing and monitoring the process of arrival of election materials where they were supplied by the 1st Respondent, and leading to and including the process of accreditation, voting, counting of votes and announcement of the results of the election. These agents where the election proceeded in due form, upon the 1st Respondent's agents duly entering the results in the result sheets at the polling units, signed and collected duplicate copies of the result sheets."

Having clearly admitted that their agents signed and collected duplicate copies of the result sheets, their contention that they are unable to determine the polling units from which the blurred results emanated is untrue. In fact, this admission reinforces the need for the Petitioners to specify all the polling units in respect of which they have made complaints since their agents were availed with copies of the results of the polling units.

As regards the Petitioners contention that they have complied with paragraph 4(5)(c) and 41(8) of the 1st Schedule to the Electoral Act, 2022, I had earlier considered this argument of the Petitioners while resolving the Respondents' objections to the Petitioners pleadings, wherein I held that the provision of Paragraph 4(5)(c) of the 1st Schedule to the Electoral



Act, 2022 only relates to the front-loading of documents to be relied upon by the Petitioners as their evidence during trial. It does not obviate the mandatory requirement for pleading material facts as stated in Paragraph 4(1)(d) & (2) and 41(8) of the same Schedule, so as to enable the adverse party to know the exact case he is to meet and to respond to same accordingly. As I also stated in our earlier ruling, the reports which the Petitioners stated they had detailed the polling units was not filed along with the Petition so as to afford the Respondents the opportunity to respond to same, but was merely tendered at trial, by which time the Respondents had no opportunity to respond. Since the Petitioners have failed to specify in the Petition the polling units to which Exhibits PCE1 – PCE4, the 18,088 blurred results relate, the said documents are clearly inadmissible. See: **BELGORE v AHMED (supra) and PDP v INEC (supra).** The said Exhibits are hereby discountenanced and expunged from the record.

## PETITIONERS' OBJECTIONS TO THE RESPONDENTS' DOCUMENTS

In the course of trial, the Petitioners also objected to the documents tendered by the 1st and the 2nd and 3rd Respondents. At the hearing of the 4th of July, 2023, the 1st Respondent had tendered Exhibits RA1, RA2, RA3, RA4, RA5, RA6 and RA7 through its sole witness, Dr. Lawrence Bayode, a Deputy Director in the ICT Department of the 1st Respondent,


CERTIFIED TRUE COPY

who gave evidence as RW1. Of those documents, the Petitioners had objected to the admissibility of the Exhibits RA1, RA2, RA6 and RA7. Similarly, at the hearing of the 5th of July, 2023, the Petitioners had objected to all the documents tendered by the 2nd and 3rd Respondents from the Bar and through their sole witness, Senator Michael Opeyemi Bamidele who testified as RW2. The Petitioners had reserved their reasons for the objections to be adduced at the stage of final address.

Pursuant to the order of this Court that parties should file separate addresses on their objections, the Petitioners have filed separate addresses in support of their objections to the documents of the 1st Respondent and those of the 2nd and 3rd Respondents. The written address in support of the objection to the 1st Respondent's documents was filed on 23rd July, 2023, while that in support of the objection to the 2nd and 3rd Respondents' documents was filed on the 20th of July, 2023.

## PETITIONERS' OBJECTIONS TO 1ST RESPONDENT'S DOCUMENTS

In the written address in support of the Petitioners' objection to the 1st Respondent's documents, Dr. Livy Uzoukwu, the learned Senior Counsel for the Petitioners, essentially raised the sole issue of whether having regard to the Pre-Hearing Report of 23rd May, 2023 and Paragraph 41(3) of the 1st Schedule to the Electoral Act, 2022 and other relevant provisions of the Act and decided cases, Exhibits RA1, RA2, RA6 and RA7

CERTIFIED TRUE COPY

are inadmissible and liable to be expunged from evidence. Similarly, in the address in support of the objection to the 2nd and 3rd Respondents' documents, the Petitioners raised the sole issue of whether having regards to the said Pre-hearing Session Report and paragraph 41(3) of the 1st Schedule and decided cases, the documents tendered by the 2nd and 3rd Respondents are inadmissible and liable to be expunged from evidence.

The learned Silk had pointed out that Exhibit RA1 is a private document emanating from the 3rd Respondent and argued that "in the absence of the narrow exceptions to the maker of the document being the person to tender the document, the witness of the 1st Respondent (RW1) cannot tender same in evidence." He relied on **MAINSTREET BANK LTD v GENERAL STEEL MILLS & ORS LTD (2016) LPELR-45457(CA).**

Learned Senior Counsel also submitted that Exhibit RA2 is inadmissible because the 1st Respondent cannot approbate and reprobate at the same time, since by Exhibit RA2 the 1st Respondent is trying to deny another letter received by it from the 4th Respondent on 15th July, 2022 which it had also certified. He argued that Exhibit RA2 can only be a concocted document by the 1st Respondent in a desperate attempt to save face. He relied on **GLOBE MOTORS HOLDINGS NIG. LTD v IBRAHEEM (2021) LPELR-54550(CA).**

CERTIFIED TRUE COPY

As for Exhibits RA6 and RA7, learned Senior Counsel submitted that those documents are not admissible because they are not part of the documents allowed to be tendered from the Bar pursuant to the Pre-Hearing Order of this Court, which, according to him, is to the effect that only certified documents by INEC and documents not objected to can be tendered from the Bar. He argued that the 1st Respondent cannot vitiate that Order of Court. He relied on the cases of **KANU v FRN (2022) LPELR-58768(CA); A.G. KWARA STATE & ANOR v LAWAL & ORS (2017) LPELR-58768(SC); and BABATUNDE & ORS v OLATUNNI & ANOR (2000) S.C.9,** all of which are to the effect that an order of court remains in force and must be complied by all unless it has been stayed or set aside. Learned Counsel finally urged the Court to sustain the objection and expunge Exhibits RA1, RA2, RA6 and RA7 from the record of the Court.

In response to the Petitioners' objection, learned Senior Counsel for the 1st Respondent, A. B. Mahmoud, SAN submitted that, with regard to Exhibit RA1, that the said document is not only relevant but it was pleaded in paragraph 19 of the 1st Respondent's Reply to the Petition and listed as item 9 in the 1st Respondent's List of Documents. He also pointed out that the document is duly certified by the 1st Respondent, being a correspondence addressed to it and a document which is in its custody. He contended that a certified true copy of a public document can be tendered without calling the maker of the document or even the



public officer in whose custody the document emanated from. He relied on **AGAGU v DAWODU (1990) 7 NWLR (Pt. 160) 56; DAGGASH v BULAMA (2004) 14 NWLR (Pt. 892) 144; and BOB-MANUEL v WOJI (2010) 8 NWLR (Pt. 1196) 263 at 273, paras. A – B.**

Learned Senior Counsel further submitted that the Petitioners' challenge to admissibility of Exhibit RA2 on the ground that the 1st Respondent cannot approbate and reprobate at the same time, is strange and is not contemplated by the Evidence Act or case law, since relevancy and the fact that a document is pleaded are the requirements that govern admissibility. He relied on **TORTI v UKPABI (1984) 1 SCNLR 427; ADEYEFA v BAMGBOYE (2013) 10 NWLR (Pt. 1363) 532 at 545, paras. F – G; and DAGGASH v BULAMA (supra).**

The learned Silk also submitted that the Petitioners' challenge to the admissibility of Exhibits RA6 and RA7, on the ground that the documents are not part of those allowed to be tendered from the Bar by the Pre-hearing Order of this Court is misleading. He referred this Court to Section 122(2)(m) of the Evidence Act, 2011 and urged this Court to take judicial notice of the proceedings of 4th July, 2023. He submitted that contrary to the assertion of the Petitioners that Exhibits RA6 and RA7 were tendered from the Bar, the said exhibits were actually tendered through RW1 who referenced the cloud trail logs in paragraphs 8, 29(viii)



and 44(i) of his witness statement on oath, and who gave evidence that his name and signature are on the cloud trail log. Relying on **TUKUR v GOVT. OF GONGOLA STATE (1989) 4 NWLR (Pt. 117) 517 at 544, paras. D – G,** he submitted that counsel owe a duty to assist the Court and not to mislead it. He however added that this mistake on the part of the Petitioners appears to be an erroneous glitch and not a deliberate one. He urged the Court discountenance the objections of the Petitioners on the admissibility of Exhibits RA1, RA2, RA6 and RA7.

**RESOLUTION:**

By virtue of the provisions of Section 102(b) of the Evidence Act, 2011, public documents include public records kept in Nigeria of private documents. See: **ONWUZURUIKE v EDOZIEM & ORS (2016) LPELR-26056(SC) at pages 10 – 11, paras. F – B**, where the Supreme Court, per Onnoghen, JSC held that a private document sent to the Police formed part of the record of the Police and is consequently a public document within the provisions of Section 109 of the old Evidence Act, now Section 102 of the extant Evidence Act, 2011. It is also trite that a public document duly so certified, is admissible in evidence notwithstanding that it is not tendered by the maker. Indeed, a certified true copy of a public document can be tendered by person who is not a party to the case. See: **MARANRO v ADEBISI (2007) LPELR-4663(CA); DAGGASH v**



**BULAMA (2004) 14 NWLR (Pt. 892) 144 at 187; and MUSTAPHA SHETTIMA & ORS v ALHAJI BUKAR CUSTOMS (2021) LPELR-56150(CA).** Exhibits RA1 and RA2, being in the public record of the 1st Respondent are public documents and are therefore admissible in evidence, having been certified by the 1st Respondent under Section 104 of the Evidence Act, 2011.

On the Petitioners' objection to Exhibits RA6 and RA7, the record of proceedings of this Court of 4th July, 2023 shows that contrary to the assertion of the Petitioners the said Exhibits RA6 and RA7, which are the Cloud Trail Log and Certificate of Compliance with Section 84 of the Evidence Act, respectively, were not tendered from the Bar but through RW1. Indeed, the record shows that the Petitioners consented to the said documents being taken as read and demonstrated. We therefore have no hesitation in discountenancing the Petitioners objection to those documents.

On the whole, the Petitioners' objection to Exhibits RA1, RA2, RA6 and RA7 tendered by the 1st Respondent is unmeritorious. It is hereby overruled.

CERTIFIED TRUE COPY

## PETITIONERS' OBJECTIONS TO THE 2ND AND 3RD RESPONDENTS' DOCUMENTS.

In the written address in support of the Petitioners' objection to the documents tendered by the 2nd and 3rd Respondent, it was submitted by the learned Senior Counsel to the Petitioners that Exhibits RA8 and RA9 tendered through RW2, which are: (i) a letter by the Inspector-General of Police (IGP) to the US Consulate, Lagos to ascertain whether the 2nd Respondent has a criminal record in the US; and (ii) the reply to that letter by the US Consulate, respectively, are not relevant to the issue of the 2nd Respondent's forfeiture of $460,000 being proceeds of narcotic trafficking and money laundering. He argued that the exhibits were tendered to deceive and hoodwink Nigerians and this Court. He added that RW2 had admitted that the order of the Illinois Court is not a money judgment. He argued that the said documents did not exculpate the 2nd Respondent from the indictment against him by the Chicago Court and the appropriate authority to provide information regarding the indictment of the 2nd Respondent is the Chicago Court. He also relied on Section 124 of the Evidence Act to argue that the said documents are not from proper custody within the meaning of Sections 116 and 123 of the Evidence Act. He cited **LAWAL v HON. COMMISSIONER FOR LANDS, HOUSING & SURVEY, OYO STATE (2013) LPELR-21114(CA) at pages 19 –**



CERTIFIED TRUE COPY

**19, per Daniel-Kalio, JCA.** He urged the Court to expunge Exhibits RA8 and RA9 from the evidence.

On Exhibit RA10 which contains the educational records of the 2nd Respondent, learned Counsel submitted that the 2nd and 3rd Respondents have mixed up proceedings, because there is nothing to show that the academic records of the 2nd Respondent is in issue in this Petition. Citing **AJAO & ORS v ALAO & ORS (1986) LPELR-285(SC); GANI FAWEHINMI v NBA (2) (1992) 2 NWLR (Pt. 105) 558 at 583; and TORTI v UPABI (1984) 1 SCNLR 214,** he submitted that the said bundle of educational records of the 2nd Respondents tendered as Exhibit RA10 is irrelevant to this Petition and urged this Court to expunge same from the record.

With regard to Exhibits RA11 – RA16, which are the data pages of the 2nd Respondent's Nigerian Passports and copies of United States Visas variously issued to the 2nd Respondent, learned Counsel for the Petitioners submitted that the documents have nothing to do with answering the question of forfeiture of $460,000 by the 2nd Respondent to the US Government for narcotics trafficking and money laundering. He argued that forfeiture in whatever guise does not confer benefit, except the 2nd and 3rd Respondents are tendering the documents in order to show that there was compensation given to the 2nd Respondent for

CERTIFIED TRUE COPY

Relying on the cases of **PDP v AYEDATIWA & ORS (2015) LPELR-41800(CA); ANYANWU v OGUNEWE (2014) 8 NWLR (Pt. 1410) 471, para. D; PDP v SYLVA (2012) All FWLR (Pt. 607) 598 at 622 – 623; and ONUOHA v OKAFOR (1983) 2 SCNLR 244,** he submitted that apart from the fact that a non-member of a political party cannot complain against the membership of another political party, the issue of membership of a pollical party is not one which is justiciable. He urged the Court to expunge Exhibits RA17 and RA18 from the record. He also adopted his earlier argument on irrelevance and urged this Court to expunge Exhibit RA19 from the evidence.

It was also the contention of the Petitioners that Exhibit RA22, being a letter authored by the 3rd Respondent and addressed to the 4th Respondent, was tendered from the Bar without the maker who can be cross examined on same. Relying on **ANDREW v INEC (2018) 9 NWLR (Pt. 1625) 576 (SC),** the Petitioners argued that the said exhibit is inadmissible and urged the Court to expunge same from the record. As for Exhibits RA24 and RA25, which are the certified copies of pages 28 and 27 of the Nigeria Tribune Newspapers of 23rd February, 2023, the Petitioners urged this Court to disregard the headline but not the contents of the documents. They pointed out that the true reporting in the documents was that "raw" results will not be uploaded and transmitted, but what the Commission would upload and transmit real

CERTIFIED TRUE COPY

forfeiting $460,000 to the US Government, which is neither contained in the pleadings of the 2nd and 3rd Respondents nor in the testimony of their sole witness. Adopting his earlier argument on irrelevance, he urged the Court to expunge Exhibits RA11 – RA16 for being irrelevant and inadmissible in this proceeding.

Turning to the Petitioners' objection to admissibility of Exhibits RA17 and RA18, which are the 2nd Petitioners' letter submitting its Register of Members to the 1st Respondent and the 2nd Petitioner's Register of Members for Anambra State, respectively, learned Counsel argued that the said exhibits are irrelevant because the issue of membership is an internal affair of the party and it does not fall within the qualifying elements under Section 134(3) of the Electoral Act, 2022. He submitted that although the 2nd and 3rd Respondents have raised a preliminary objection on membership of the 1st Petitioner to the 2nd Petitioner, this issue had been put to rest by this Court in **APM v INEC (2023) NWLR (Pt. 1890),** wherein it was confirmed that the 1st Petitioner is a member of the 2nd Petitioner. He pointed out that membership of a political party is a continuous process and the essence of Section 77 of the Electoral Act, which requires political parties to submit their register of members to 1st Respondent, is to guard against the impunity of political parties and prevent a political party from short-changing aspirants during primaries by using non-members of the party to make a return of their own choice.

CA/PEPC/03/2023; CA/PEPC/04/2023; CA/PEPC/05/2023.

CERTIFIED TRUE COPY

time on election day is the hard copy of Form EC8A which contains the raw results of all the political parties, and that this means the photo or scanned copies of Form EC8A is what the Commission would upload and transmit to the IREV. He urged this Court to disregard Exhibits RA24 and RA25.

On Exhibit RA27, the ECOWAS Preliminary Report dated 27th February, 2023 which was tendered by the 2nd and 3rd Respondents, the Petitioners submitted that the document which is public document is neither in its original form nor in a certified form as required by Sections 102 and 104 of the Evidence Act. Relying on **EFFIONG & ANOR v EKPE & ORS (2019) LPELR-48976(CA); and TABIK INVESTMENTS v GT BANK (2011) LPELR-3131(SC),** they urged this Court to expunge Exhibit RA27 from the record.

Finally, on Exhibit RA28, which is RW2's Membership Card of the American Bar Association, learned Senior Counsel for the Petitioners submitted that the document was never pleaded nor listed in the 2nd and 3rd Respondents' Reply and is also not mentioned in the witness statement on oath of RW2. He relied Paragraph 41(3) of the 1st Schedule to the Electoral Act, 2022 and **ASHIRU v INEC (2020) 16 NWLR (Pt. 1751) 416 at 442 – 443,** and urged the Court to expunge the exhibit from the record.


CERTIFIED TRUE COPY

Responding to the Petitioners objections, the learned Senior Counsel for the 2nd and 3rd Respondents submitted that the Petitioners have gone into the merit of the case in their arguments on the admissibility of Exhibits RA8 and RA9 which relate only to general inquiry for criminal liability and not whether there was an order of forfeiture against the 2nd and 3rd Respondents. He pointed out that the Petitioners have by their argument admitted that there was no record of criminal liability whatsoever against the 2nd Respondent and this has no nexus with the admissibility of the documents. Relying on the case of **FREDRICK v IBEKWE (2019) 17 NWLR (Pt. 1702) 467 at 480 – 481,** wherein the Supreme Court stated the three criteria for admissibility of documentary evidence, he submitted that the documents were pleaded in paragraphs 50 and 115 of the 2nd and 3rd Respondents' Reply. He added that the Petitioners' argument over the relevance of the documents is self-contradictory, in that while they allege that the 2nd Respondent was indicted by the Illinois Court in the USA, they are also objecting to the relevance of Exhibit RA9 which is a document issued by the US Government of which the Illinois Court is an organ, showing that the 2nd Respondent has no criminal record in the USA. He added that contrary to the Petitioners argument over custody of the documents, the two letters are those written and received by the Nigeria Police all of which

CERTIFIED TRUE COPY

are in its custody. He urged the Court to discountenance the Petitioners objection to Exhibits RA8 and RA9.

On the argument of the Petitioners over the relevance of Exhibit RA10, learned Senior Counsel submitted that the Petitioners have at paragraphs 20 – 32 of the Petition alleged that the 2nd Respondent is not qualified to contest the election, which allegation the 2nd and 3rd Respondents have countered that the 2nd Respondent is more than qualified to contest the election and pleaded his extensive resume which included his academic qualifications. Counsel equally submitted that the argument of the Petitioners over the relevance of Exhibits RA11 – RA16 is misconceived because being immigration documents they establish that the Petitioners' allegation against the 2nd Respondent is concocted and that the 2nd Respondent is not under any criminal impediment in the USA which would have impeded his unfettered movement in and out of the USA. He submitted that relevance is determined by the pleadings and relied on <u>ASUQUO v EYO (2014) 5 NWLR (Pt. 1400) 247 at 264; and ACB LTD v ALHAJI GWAGWADA (1994) 5 NWLR (Pt. 342) 25 at 44; HIGHGRADE MARITIME SERVICES LTD v FIRST BANK LTD (1991) LPELR-1364(SC) at 26; and ANYANWU & ORS v UZOWUAKA & ORS (2009) LPELR-515(SC).</u> He urged the Court to discountenance the Petitioners' objection.

CERTIFIED TRUE COPY

On the Petitioners objection to the admissibility of Exhibits RA17 and RA18, learned Counsel submitted that the documents have met the criteria for admissibility of documents and the said documents were tendered in order to challenge the *locus standi* of the 1st Petitioner to present the Petition. He submitted that being an issue of jurisdiction, it can be raised through any medium at any time of the proceedings, even *suo motu* by the Court. He relied on **N.U.C v ALLI (2014) 3 NWLR (Pt. 1393) 33 at 83; ADEKUNLE v ADELUGBA (2011) 16 NWLR (Pt. 1272) 154 at 170; and ADESANYA v THE PRESIDENT OF NIGERIA (1981) 5 SC 112 at 140.**

On Petitioners' objection to Exhibit RA19, learned Counsel submitted that same is not only relevant but also admissible in evidence having been pleaded in paragraph 115 of the Respondent's Reply as a response to the Petitioners allegation over the status of the FCT. As for Exhibit RA22, Counsel also submitted that although the document was first tendered from the Bar, it was subsequently tendered and identified by RW2, Senator Opeyemi Bamidele as one of the documents he referred to in his witness statement on oath. He added that the witness had knowledge of the making of the document and its contents, and the Petitioners' argument that the maker of the document was not called is of no moment. Relying on **MAKINDE v ADEKOLA (2022) 9 NWLR (Pt.**

CERTIFIED TRUE COPY

**1834) 13 at 44,** he urged the Court to discountenance the Petitioners' argument.

Turning to the Petitioners objection to Exhibits RA24 and RA25, learned Senior Counsel pointed out that the Petitioners had no reason to urge the Court to disregard the heading but not the contents of those document. He submitted that this is not an aspect of admissibility and urged the Court to disregard the Petitioners' argument. As for the objection to RA27, the ECOWAS Commission Preliminary Declaration of 27th February, 2023, learned Counsel submitted that the Petitioners have failed to show how the ECOWAS Observation Mission to Nigeria is a public office/governmental body or how H.E. Earnest Bai Koroma the former President of Republic of Sierra Leone is a public officer within the meaning of Section 18 of the Interpretation Act. He urged the Court to disregard the Petitioners' argument over lack of certification of Exhibit RA27. Counsel equally submitted that Exhibit RA28 merely seeks to establish the status of RW2 as per his profession and it forms part of the introductory statement of the witness of which a witness may be led during examination-in-chief. He submitted that Paragraph 41(3) of the 1st Schedule to the Electoral Act, 2022 is inapplicable and urged the Court to discountenance the Petitioners' objection.



CERTIFIED TRUE COPY

**RESOLUTION:**

On the Petitioners' objection to Exhibits RA8 and RA9, an examination of the Petitioners petition shows that in paragraph 28 they have challenged the 2nd Respondent's qualification to contest the election on the ground that "he was fined the sum of $460,000 (Four Hundred and Sixty Thousand Dollars) for an offence involving dishonesty, namely narcotics trafficking imposed by the United States District Court, Northern District of Illinois, Eastern Division." As rightly submitted by the 2nd and 3rd Respondents they have countered this allegation of the Petitioners in paragraphs 46 – 53 and particularly pleaded in Paragraph 50 that "the United States of America, through its Embassy in Nigeria, had by a letter dated February 4, 2003, addressed to the then Inspector-General of Police, confirmed that upon their record checks of the Federal Bureau of Investigation's National Crime Investigation Centre (NCIC), a centralized information centre that maintains records of every criminal arrest and conviction within the United States of America, there were no record of any form of criminal arrests, wants or warrants against the 2nd Respondent. The Respondents shall found and rely upon copy of the said letter of February 4, 2023 (sic), signed by Michael M. Bonner."

From the foregoing, it is obvious that issues were joined by the parties on the indictment alleged by the Petitioners and Exhibits RA8 and RA9

CERTIFIED TRUE COPY

are clearly relevant. As for the argument of the Petitioner over the custody of the documents, Exhibits RA8 is a letter of inquiry written by the Inspector-General of Police to the Consular-General of the United States Embassy in Nigeria inquiring as to whether the 2nd Respondent had any criminal record in the United States of America, while Exhibit RA9 is the reply to Exhibit RA8 by the United States Embassy in Nigeria. Both letters form part of the record of the Nigeria Police and are therefore public documents under Section 102(b) of the Evidence Act. Certification by the Nigeria Police Force is a confirmation that Exhibits RA8 and RA9 are true copies of those documents which are in their custody. See: **ONWUZURUIKE v EDOZIEM & ORS (supra); and AGBAJE v COKER (2016) LPELR-40157(CA) at pages 13 – 14, paras. F – A.**

With regard to the Petitioners' objection to the relevance of Exhibit RA10, the record shows that the Petitioners' challenge to the qualification of the 2nd Respondent was confined to allegations of double nomination of his running mate, the 3rd Respondent, and the alleged fine of the 2nd Respondent of the sum of $460,000 by a US Court. The educational qualifications of the 2nd Respondent were never challenged by the Petitioners in the Petition. It was the 2nd and 3rd Respondents who introduced the educational qualifications of the 2nd Respondent in their Reply and the Petitioners have not joined issues with the 2nd and 3rd Respondents in their Reply to the 2nd and 3rd Respondents' Reply. It is


CERTIFIED TRUE COPY

trite that a court of law adjudicates only on matters over which the parties are in dispute. See: **ADEDEJI v OLOSO & ANOR (2007) LPELR-86(SC),** where the Apex Court held that:

> "The isolation of issues, truly in dispute, from those not in dispute, enables the court to save valuable time and cost. It is, by this process, that the court is enabled only to receive evidence on matters in respect of which the parties are in dispute."

See also: **TRADE BANK PLC v BENILUX (NIG.) LTD (2003) LPELR-3262(SC).**

Since there is no controversy or dispute between the parties as it relates to the 2nd Respondent's educational qualifications, Exhibit RA10 is not relevant to the determination of this Petition. It is hereby discountenanced.

Our examination of Exhibits RA11 – RA16 which are data pages and visa pages in the 2nd Respondent's Nigerian Passport, shows that contrary to the assertion of the Petitioners that the documents are not relevant, the Petitioners have alleged in paragraphs 28 - 32 of the Petition that the 2nd Respondent was fined $460,000 for an offence involving dishonesty, namely narcotics trafficking and in response to this allegation, the 2nd and 3rd Respondents have denied same in paragraphs 46 - 53 of their Reply and specifically pleaded those documents in Paragraph 52 of the their Reply to the Petition to show that the 2nd Respondent "enjoyed an



CERTIFIED TRUE COPY

unrestricted right of ingress and egress to the United States of America and up till now, he still enjoys an unimpeded right of access to the United States of America." It is therefore our considered view that Exhibits RA11 – RA16 are relevant to these proceedings and the Petitioners objection to same is hereby discountenanced.

As for Exhibits RA17 and RA18, the Petitioners reason for objecting to same has nothing to do with the admissibility of the documents, the 2nd and 3rd Respondents having raised objection to the 1st Petitioner's locus standi to present the Petition in paragraph 1i (a) – (m) of their Reply to the Petition. However, we have already considered and determined the issue of the Petitioners locus standi whilst resolving the Respondents' preliminary objections. We have already resolved same in favour of the Petitioners. Therefore, this objection has been overtaken by our ruling on the preliminary objection.

On the Petitioners' contention that Exhibit RA19, the Report of the Committee on the Location of the Federal Capital of Nigeria, is not relevant, we have examined the pleadings and the said Exhibit. It is apparent to us that while the Petitioners have averred in paragraph 81 of the Petition that a Presidential candidate must score 25% of the votes in FCT before he can be declared and returned elected, the 2nd and 3rd Respondents have averred in paragraph 86 of their Reply that the FCT

CERTIFIED TRUE COPY

does not enjoy a special status over the other States of the Federation and that Abuja is still inhabited by Nigerians who are deemed equal to Nigerians in any other parts of Nigeria and residents of Abuja are not conferred with any privilege and advantage that is not accorded to citizens of other communities or States in Nigeria. We are therefore of the view that facts have been pleaded which renders Exhibit RA19 relevant and admissible.

On the Petitioners' objection to the admissibility of Exhibit RA22, we observe that the document is the same as Exhibit RA2 which we have already found to be admissible, having been certified by INEC as a copy of document in their possession. The tendering of Exhibit RA22 which is not even certified, is therefore a surplusage and is hereby discountenanced.

With regard to the objection to admissibility of Exhibits RA24 and RA25 which are CTCs of pages 28 and 27 of Nigerian Tribune Newspaper, respectively, the reasons advanced for the objection by the Petitioners are not legal grounds for challenging admissibility of a document. We have no hesitation in discountenancing the objection. Contrary to the argument of the 2nd and 3rd Respondents' Counsel that Exhibit RA27, the ECOWAS Preliminary Declaration, is a private document, the said document forms part of the official record of the Economic Community



CERTIFIED TRUE COPY

of West African States (ECOWAS), an official body established under the ECOWAS Treaty, an agreement made by the member States of the ECOWAS Community, and the treaty was signed by Heads of States and Governments of the 16 member States. It is undoubtedly a public document within the meaning of Section 102 of the Evidence Act, 2011. However, we observe that Exhibit RA27 is not certified as required by Section 104 of the Evidence Act to render same admissible. Not being so certified, Exhibit RA27 is hereby expunged from the record. As for the objection to Exhibit RA28, being the American Bar Association Membership Card of RW2, which was tendered by RW2 under cross examination by the 4th Respondent, it is clear to us that the document was neither pleaded nor listed or referred to in the statement of RW2. As rightly argued by the Petitioners, Exhibit RA28 is inadmissible. Accordingly, it is hereby expunged from the record.

## THE MERIT OF THE PETITION:

Having disposed of the various objections to witnesses and to some of the documents tendered in this Petition, I now proceed to consider the merit of the Petition.

The parties filed, exchanged and adopted their respective final addresses starting with the Respondents. The respective Final Addresses of the 1st, the 2nd and 3rd, and the 4th Respondents were all filed on the 14th of July,

CA/PEPC/03/2023; CA/PEPC/04/2023; CA/PEPC/05/2023.                                        139

CERTIFIED TRUE COPY

2023, respectively. On the 23rd of July, 2023, 20th July, 2023 and 23rd July, 2023, the Petitioners filed three separate Final Addresses in response to the final addresses of the 1st, 2nd and 3rd and the 4th Respondents, respectively. In reaction to the Petitioners' Final Addresses, the 1st, 2nd and 3rd and the 4th Respondents filed their Reply Addresses on 28th July, 2023, 21st July, 2023 and 28th July, 2023, respectively. The 1st Respondent and the 2nd and 3rd Respondents also filed Lists of Additional Authorities on the 28th and 31st of July, 2023, respectively. On the 1st of August, 2023, the parties adopted their respective final addresses.

In his adopted final written address, learned Senior Counsel for the 1st Respondent, A. B. Mahmoud, SAN distilled the following five issues for determination:

(a) Whether having regard to the provisions of Sections 131 and 137 of the Constitution of the Federal Republic of Nigeria, 1999 (as amended), and the evidence before the Court, the 2nd and 3rd Respondents were qualified to contest the Presidential Election of 25th February, 2023.

(b) Whether having regard to Section 47(2) and (3) of the Electoral Act, 2022, Paragraphs 38 and 92 of the Regulations and Guidelines for the Conduct of Elections, 2022, the inability of the 1st Respondent to transfer or transmit the



results of the Presidential Election to the iReV portal real time amounted to non-compliance to Electoral Act and whether such non-compliance substantially affected the outcome of the election.

(c)  Whether by the totality of the evidence adduced, the Petitioners have proven that the election of the 2nd Respondent was invalid by reason of corrupt practices and non-compliance with the provisions of the Electoral Act, 2022.

(d)  Whether in the absence of any proof of unlawful votes to be added to the scores of the Petitioners and/or unlawful votes to be deducted from the 2nd Respondent's scores at the election, the Petitioners have proven that the 2nd Respondent was not elected by majority of lawful votes cast.

(e)  Whether having regard to the declared results of the election and the provision of Section 134(2)(b) of the Constitution of the Federal Republic of Nigeria, 1999 (as amended), the 2nd Respondent ought not to have been returned as duly elected after having scored the highest number of votes cast with 25 percent of the votes cast in over two-thirds of the States in the Federation.



The learned Silk for the 2nd and 3rd Respondents, Chief Wole Olanipekun SAN formulated the following four issues for determination:

(i)    Having regard to the relevant provisions of the Constitution of the Federal Republic of Nigeria, 1999 (as amended), the salient provisions of the Electoral Act, 2022, the judgment of the Federal High Court in **Suit No. FHC/ABJ/CS/1454/2022, between Labour Party v. INEC, delivered on 23rd January, 2023 (Exhibit X1),** as well as admissible evidence on record, whether the election of the 2nd Respondent into the office of President of the Federal Republic of Nigeria on 25th February, 2023, was not in substantial compliance with the principles and provisions of the Electoral Act, 2022.

(ii)    In view of the clear provisions of the Constitution of the Federal Republic of Nigeria, 1999 (as amended), the Electoral Act, 2022 and plethora of judicial precedents on the criteria for qualification of candidates for election to the office of President, coupled with the unreported decision of the Supreme Court in SC/CV/501/2023: Peoples Democratic Party v. Independent national Electoral Commission (INEC) & 3 Ors., delivered on 26th May, 2023 (Exhibit RA23), whether


CERTIFIED TRUE COPY

the 2nd and 3rd Respondents were/are not eminently qualified to contest the presidential election of 25th February, 2023.

(iii) Upon a combined reading of Sections 134 and 299, as well as other relevant sections of the Constitution of the Federal Republic of Nigeria, 1999 (as amended), Section 66 of the Electoral Act, 2022 and other relevant statutes, whether the 2nd Respondent has not satisfied the necessary constitutional and statutory requirements to be declared winner of the Presidential Election of 25th February, 2023, and retuned as President of the Federal Republic of Nigeria.

(iv) Considering the constitution of the petition and the terse evidence adduced, whether this Honourable Court can accede to any of the reliefs being claimed by the Petitioners.

Prince L. O. Fagbemi, SAN, the Senior Counsel for the 4th Respondent also nominated four issues for determination, which are:

1) Whether having regard to the issues joined and the evidence led on the nomination of the 3rd Respondent as Vice Presidential candidate of the 2nd Respondent and the alleged civil forfeiture of the sum of $460,000 (Four Hundred and Sixty Thousand Dollars) to the United States by order of the District Court in Case No. 93C 4483, the Petitioners have

 CERTIFIED TRUE COPY

established that 2nd Respondent was not qualified to contest the presidential election held on 25th February, 2023 as provided for in the Constitution of the Federal Republic of Nigeria, 1999 (as altered).

2)  Whether, having regard to the relevant and admissible evidence led by parties, the conduct of the Presidential Election held on the 25th February, 2023 was vitiated by non-compliance that was substantial enough to have affected its outcome and justified nullification of the election as envisaged by the applicable provisions of the Electoral Act, 2022.

3)  Whether the burden of proving that 1st Petitioner, and not 2nd Respondent scored majority of lawful votes cast in each of the at least two-third of all the States of the Federation and the Federal Capital Territory, to be declared and returned as the winner of the Presidential election held on 25th February, 2023, has been discharged by the Petitioners.

4)  Whether having regard to the totality of the evidence led by the parties and the applicable law, the Petitioners are entitled to succeed on any of the reliefs sought in the Petition at all,


CERTIFIED TRUE COPY

or that the Petition ought to be dismissed in favour of the Respondents.

On the part of the Petitioners, their lead Senior Counsel, Dr. Livy Uzoukwu, SAN distilled the following three issues in the Petitioners' Final Addresses in response to the Final Addresses of the 1st and 4th Respondents.

1.      Whether the 2nd and 3rd Respondents are qualified to contest the Presidential election, by reason of the unchallenged facts and circumstances arising under Section 137(1)(d), 142(1) (2) of the 1999 Constitution, Section 35 of the Electoral Act 2022, in this Petition.

2.      Whether from the documentary evidence before the Honourable Court read and examined together with the unchallenged expert and technical evidence of the Petitioners' Witnesses, the Petitioners proved that the non-compliance by the 1st Respondent with the relevant provisions of the Electoral Act, 2022 and the subsidiary legislations made thereunder substantially affected the outcome of the questioned Presidential Election held on 25th February, 2023.

CA/PEPC/03/2023; CA/PEPC/04/2023; CA/PEPC/05/2023.



CERTIFIED TRUE COPY

3.  Whether the declaration and returning of the 2nd Respondent by the 1st Respondent as the winner of the Presidential Election held on the 25th February, 2023 was not invalid for non-compliance with the provisions of the Electoral Act, (2022) and by virtue of the mandatory provisions of Section 134(2)(b) of the Constitution of the Federal Republic of Nigeria, 1999 as amended.

In response to the 2nd and 3rd Respondents' Final Address, the Petitioners adopted issues A1 – 3 of the Issues for Determination which they earlier filed on the 18th of May, 2023 during the Pre-hearing Session. These are:

1.  Whether the 2nd Respondent at the time of the Presidential Election held on the 25thj day of February, 2023 was not disqualified to contest the said election by virtue of the provisions of Section 137(1)(d) of the Constitution of the Federal Republic of Nigeria, 1999 as amended.

2.  Whether the 3rd Respondent at the time of the Presidential Election held on the 25th of February, 2023 was qualified to contest the said election as the Vice Presidential candidate to the 2nd Respondent; and if answered in the negative, whether this did not invalidate the qualification of the 2nd Respondent to contest the said election.



3.  Whether the Presidential Election held on 25th February, 2023 wherein the 2nd Respondent was declared and returned by the 1st Respondent as the winner, was not invalid by reason of non-compliance with the provisions of the Electoral Act, 2022 and INEC Guidelines and Regulations for the Conduct of Elections, 2022, made pursuant to the Act.

From the pleadings, the evidence adduced and the submissions of Counsel of the parties, it is my considered view that the following are the issues which will effectively determine this petition:

1.  Whether having regard to the provisions of Sections 137 of the Constitution of the Federal Republic of Nigeria, 1999 (as amended), Section 35 of the Electoral Act, 2022 and the evidence before the Court, the 2nd and 3rd Respondents were qualified to contest the Presidential Election of 25th February, 2023.

2.  Whether having regard to the evidence adduced by the parties the Petitioners have established that there was substantial non-compliance with the provisions of the Electoral Act, 2022 and that the non-compliance substantially affected the results of the election.

CA/PEPC/03/2023; CA/PEPC/04/2023; CA/PEPC/05/2023.



CERTIFIED TRUE COPY

3.    Whether from the totality of the evidence adduced, the Petitioners have proven that the presidential election held on 25th February, 2023 was invalid by reason of corrupt practices.

4.    Whether from the evidence adduced the Petitioners have established that the 2nd Respondent was not duly elected by majority of lawful votes cast at the election.

### ISSUE 1

*Whether having regard to the provisions of Sections 137 of the Constitution of the Federal Republic of Nigeria, 1999 (as amended), Section 35 of the Electoral Act, 2022 and the evidence before the Court, the 2nd and 3rd Respondents were qualified to contest the Presidential Election of 25th February, 2023.*

On this issue, A. B. Mahmoud, SAN submitted on behalf of the 1st Respondent that the reliefs in respect of the Petitioners' allegation of non-qualification are declaratory, for which the Petitioners must lead credible evidence in support of their case. Relying on **ALI UCHA & ANOR v ELECHI & ORS (2012) LPELR-7823(SC); and NWOKIDU v OKANU (2010) 2 NWLR (Pt. 1181) 362; DANTATA v MOHAMMED (2000) 7 NWLR (Pt. 1064) 176; and BUHARI v OBASANJO (2005) All FWLR (Pt. 273) 1 at 48,** he further submitted that it is only after the Petitioners have led credible



CERTIFIED TRUE COPY

evidence in support of their case that the evidential burden will shift to the Respondents to dislodge the case presented by the Petitioners.

Learned Senior Counsel cited Section 134(3) of the Electoral Act, 2022 and the decision of the Supreme Court in **LADO & ANOR v MASARI & ORS (2019) LPELR-55596 (SC),** and contended that the qualification of the 2nd and 3rd Respondents would only be determined by reference to the qualifying and/or disqualifying factors contained in Sections 131 and 137 of the 1999 Constitution.

On the Petitioners' allegation of double nomination of the 3rd Respondent, Counsel referred to Exhibit X2, the certified true copy of the judgment of the Supreme Court in **PDP v INEC & 3 ORS (2023) LPELR-60457(SC) at page 47, per Okoro, JSC,** and submitted that by the doctrine of judicial precedent, that decision which has finally determined the issue of double nomination of the 3rd Respondent, is binding on all other courts including this Court. He also relied on **DINGYADI & ANOR v INEC & ORS (2011) LPELR-950(SC) at pages 48 – 49, paras. A – B.** He further submitted that the issue of the alleged double nomination of the 3rd Respondent having been considered and pronounced upon by the Supreme Court, cannot be revisited or reviewed by this Court.

Learned Senior Counsel contended that the issue of double nomination is neither one of the qualifying factors stated in Section 131 nor one of


CERTIFIED TRUE COPY

the disqualifying factors stated in Section 137 of the 1999 Constitution. Citing the Supreme Court decision in respect of a similar complaint in **JEGEDE v INEC (2021) LPELR-55481(SC),** he submitted that since the allegation of the Petitioners does not fall within the qualifying or disqualifying factors stated in the Constitution, the Petitioners cannot validly raise such allegation as a ground for disqualifying the 2nd and 3rd Respondents from contesting the Presidential election.

The learned Silk submitted that by Section 31 of the Electoral Act, 2022 which provides for voluntary withdrawal of nomination of candidates, the role of the candidate is limited to giving a notice of his withdrawal to the political that nominated him. He added that under Section 35 of the Act which forbids double nomination, knowledge of the double nomination by the candidate must be established to ground a case of double nomination. Relying on **JIME v HEMBE & ORS (2023) LPELR-60334(SC); and PDP v INEC (supra),** he submitted that the evidence led before this Court, especially Exhibits RA2 and RA22 show that the 3rd Respondent had on the 6th of July, 2023 duly informed his political party, the 4th Respondent, of the withdrawal of his candidature. He added that PW1 and PW2, the Petitioners witnesses had denied knowledge of this document. He argued the document speaks for itself and same should be preferred over oral evidence.


CERTIFIED TRUE COPY

On the Petitioners' allegation of imposition of fine on the 2nd Respondent by United States District Court in Case No. 93C 4483, learned Counsel submitted that the prescription of fine as a disqualifying factor in Section 137 of the 1999 Constitution is hinged on a sentence. He pointed out that PW1, the Petitioner's witness had admitted under cross examination that Case No. 93C 4483 relied upon was a civil forfeiture proceeding and there was no charge or conviction. Finally, Counsel submitted that the Petitioners have failed to establish their allegation that the 2nd and 3rd Respondents were not qualified to contest the Presidential Election of 25th February, 2023. He urged this Court to so hold and resolve this issue in favour of the 1st Respondent.

On the part of the 2nd and 3rd Respondents, Chief Wole Olanipekun submitted that the Supreme Court in **PDP v INEC & 3 ORS (supra),** had made very critical findings in respect of the facts relating to the alleged double nomination of the 3rd Respondent and firmly held that the 3rd Respondent did not at any time have double nomination. He added that the Apex Court had found that the 3rd Respondent duly withdrew his candidacy of Borno Central Senatorial District on 6th July, 2022 when he gave notice of voluntary withdrawal to his political party, the 4th Respondent. He added that contrary to the allegation of the Petitioners, what took place on the 15th of July, 2022 as shown on INEC Form EC11C (Exhibit PA3) was not the withdrawal itself but the conveyance of the


CERTIFIED TRUE COPY

development to the 1st Respondent in line with the requirement of Section 31 of the Electoral Act, 2022. He submitted that the 3rd Respondent's nomination is in conformity with Section 142(1) of the 1999 Constitution and urge the Court to so hold and resolve this issue in favour of the 2nd and 3rd Respondents.

On the Petitioner's allegation of imposition of fine on the 2nd Respondent, learned Senior Counsel submitted that Exhibit PA5 can be classified judicially as a non-conviction based forfeiture (NCBF) which is a forfeiture not associated with criminal conviction and sentencing. Citing Article 54(1)(C) of the United Nations Convention Against Corruption and Sections 13(1)(d) and 24 of the Economic & Financial Crimes Commission Act which contain provisions relating to such non-conviction based forfeiture, as well as the case of **OTI v EFCC (2020) 14 NWLR (Pt. 1743) 48 at pages 90 – 91,** he submitted that the proceedings in Exhibit PA5 does not involve trial or conviction for an offence.

Learned Counsel submitted that even if it is assumed, though not conceded that the order of forfeiture in Exhibit PA5 is connected with criminal forfeiture, the forfeiture order which was made thirty years ago is no longer a valid ground for disqualification of the 2nd Respondent since the forfeiture order is over the period of ten years limited for disqualifying a Presidential candidate under Section 137(1)(e) of the

CERTIFIED TRUE COPY

1999 Constitution. He added to underscore the fact that the 2nd Respondent has not criminal record in the USA, the 2nd and 3rd Respondents have tendered Exhibits RA13 – RA16 to show that the 2nd Respondent has always enjoyed the rights of ingress and egress to and from US, a right which anyone who is burdened by criminal forfeiture cannot enjoy. He urged the Court to resolve this issue in favour of the 2nd and 3rd Respondents.

On behalf of the 4th Respondent, Prince L. O. Fagbemi, SAN submitted that the judgment of the Supreme Court in PDP v INEC & 3 ORS (supra) is a judgment in rem which binds the whole World including non-parties to the suit. He relied on **IGWEMMA v OBIDIGWE (2019) 16 NWLR (Pt. 1697) 117 at 138 – 139, paras. F – C; OGBORU & ANOR v UDUAGHAN & ORS (2011) LPELR-8236(SC) at pages 41 – 42; and A.G ABIA STATE v A.G. FEDERATION (2022) LPELR-57010(SC) at 268 – 272.** He urged the Court to take judicial notice of the judgment in **PDP v INEC & 3 ORS (supra)**, which was tendered and admitted by this Court as Exhibit X2. He also relied on **OGWUCHE v FRN (2021) 6 NWLR (PT. 1773) 540 at 555; and ONWUAKPA v ONYEAMA (2022) 17 NWLR (Pt. 1858) 97 at 179.**

On the allegation that the 2nd Respondent was fined of the sum of $460,000 for an offence involving dishonesty, he submitted that civil forfeiture of an asset cannot be a ground for disqualification from



CERTIFIED TRUE COPY

contesting an election under the Nigerian Constitution. He pointed out that Exhibits PA1 – PA4 do not contain the word "fine" and that PW1 had admitted under cross examination that it was a civil forfeiture proceeding. He referred this Court to the cases of **JONATHAN V FRN (2019) 10 NWLR (Pt. 1681) 533 at 570 – 571, paras. A – H; and KUBOR v DICKSON & ORS (2012) LPELR-9817(SC); and ALHAJI & ANOR v GAYA & ORS (2008) LPELR-3709(CA)**. He pointed out that PW1 had admitted under cross examination that the said exhibits are not accompanied by any certificate of conviction which is required to prove criminal conviction under Sections 248 and 249 of the Evidence Act, 2011. Citing **BLUES v COP (1959) WRNLR 234; SANYAOLU v INEC & ORS (2007) EPR 579; and AKANNI v OLANIYAN (2006) 8 NWLR (Pt. 983) 536,** he argued that the Petitioners can only satisfy the requirement of those sections by production of a certificate of conviction signed by the registrar or other officer of the Court which has custody of the record of conviction. He added that the Petitioners have failed to establish any previous conviction against 2nd Respondent. Learned Counsel also submitted that the purported foreign judgment in Case No 93C 4483 is not registered in Nigeria as make same judicially noticeable under Section 106(h)(i)(ii) of the Evidence Act, 2011.

Responding to the 1st Respondent's contentions on this issue, learned Senior Counsel for the Petitioners, Dr. Livy Uzoukwu, SAN submitted that

CERTIFIED TRUE COPY

the purported sponsorship of the 2nd and 3rd Respondents by the 4th Respondents was rendered invalid by reason of the 3rd Respondent knowingly allowing himself to be nominated as Vice Presidential Candidate whilst he was still a Senatorial Candidate for the Borno Central Constituency. Citing Section 142 of the 1999 Constitution and Section 35 of the Electoral Act, 2022, he submitted that from Exhibits PA1 – PA4 there is no doubt that the letter of 6th July, 2022 (Exhibit ….) purportedly written by the 3rd Respondent withdrawing his candidacy does not amount to withdrawal of his nomination as Senatorial Candidate as provided in Section 31 of the Electoral Act, 2022. He added that by Section 31 of the Act, a withdrawal of nomination can only be done by the political party and not the candidate and the withdrawal shall be conveyed to the Commission before it becomes effective and the evidence shows that the withdrawal was only received by the 1st Respondent on the 15th of July, 2022. He placed relied on the decision of this Court in **GBOLARUMI v PDP (2019) LPELR-48282(CA) at page 38.**

On the reliance placed by the 1st Respondent on the Supreme Court decision in **PDP v INEC & 3 ORS (supra)**, he argued that the pronouncement of the Apex Court in that case which stated that there was no double nomination on the part of the 3rd Respondent is an obiter dictum, since the Court had decided the case on the threshold issue of lack of locus standi on the part of the Petitioners. Relying on **BAMAIYI v**


CERTIFIED TRUE COPY

**STATE (2001) 8 NWLR (Pt. 715) 270 at 285**, and the decision of this Court in **EKPE v ITANJAH (2019) LPELR-48462(CA),** he submitted that the question under Section 35 of the Electoral Act, 2022 is not whether the 3rd Respondent withdrew his candidature but whether he knowingly allowed himself to be nominated by more than one political party or in more than one constituency. He submitted that the 3rd Respondent did on the 14th of July, 2022 allow himself to be nominated as Vice Presidential Candidate while still the Senatorial candidate of the 4th Respondent for Borno Central Constituency. He argued that the effect of the breach of Section 31 of the Electoral Act, 2022 is that the nomination of the 3rd Respondent is void, and the 2nd and 3rd Respondents who are running a joint ticket are deemed not to be qualified to contest the election by virtue of Section 142 of the 1999 Constitution. He relied on **PDP v DEGI-EREMIENYO (2020) LPELR-49734(SC); and APC v MARAFA (2020) 6 NWLR (Pt. 1721) 383**, and urged to hold that all the votes cast for the 2nd and 3rd Respondents in the Presidential Election are wasted votes.

As regards the second segment of this issue relating to the Petitioners allegation of imposition fine on the 2nd Respondent, the learned Senior Counsel for the Petitioners submitted that the decision of the United States District Court in Case No. 93C 4483 as encapsulated in Exhibit PA5 was made sequel to a "Settlement Order of Claims to Funds held by

CERTIFIED TRUE COPY

Heritage Bank and Citibank" wherein Bola Tinubu, the 2nd Respondent and others claimed ownership of the sums in the accounts. Relying on **DAUDU v FRN (2018) LPELR-43637(SC); and KALU v FRN (2012) LPELR-9287(CA)**, as well as Section 137(1)(d) of the 1999 Constitution, he submitted that the Petitioners' case is that the 2nd Respondent was fined the sum of $460,000 by a US District Court for an offence involving dishonesty, namely narcotics trafficking and money laundering and therefore is expressly disqualified from contesting the Presidential Election.

The learned Silk further submitted that 1st Respondent misconception that a conviction must exist before a person will be disqualified from contesting for the office of the President stems from its misguided reliance on Section 137(1)(e) of the 1999 Constitution, when the Petitioners' case is not based on that Section of the Constitution. He argued that all the evidence adduced and arguments canvassed by the Respondents including Exhibits RA9, RA13 – 16, to the effect that the 2nd Respondent has never been arrested, charged, convicted and sentenced with respect to any criminal offence in the US and elsewhere are irrelevant and ought to be discountenanced.

The Petitioners' response to the 2nd and 3rd Respondents' arguments on this issue are essentially the same to their above response to the

CERTIFIED TRUE COPY

arguments of the 1st Respondent. They only added that the candidacy of the 2nd Respondent is invalidated by the failed nomination of the 3rd Respondent. They further argued that when the 2nd Respondent stood election as the Presidential candidate of the 4th Respondent despite his own qualification by virtue of Section 137(1)(d) of the 1999 Constitution, both the 2nd and 3rd Respondents were affected by the virus of constitutional and statutory disqualification affecting each and both of them.

On the 2nd and 3rd Respondents' argument relating imposition of fine on the 2nd Respondent, the Petitioners also basically made the same submission as the one in response to the 1st Respondent's argument. They however added that Exhibit PA5, the enrolled Order of the US Court is sealed and certified and had complied with the provisions of Section 106(h)(i) of the Evidence Act, 2011. He urged the Court to disregard the 2nd and 3rd Respondents' argument that Exhibit PA5 is required to be registered under Section 3 of the Reciprocal Enforcement of Foreign Judgments Ordinance and Foreign Judgments (Reciprocal Enforcement) Act, since Exhibit PA5 is not a money judgment.

Learned Counsel for the Petitioners submitted that it has been held by the US Supreme Court in **AUSTIN v UNITED STATES, 509 US 602 (1993); and TIMS v INDIANA, Appeal No. 17-1091, decided by US Supreme**




CERTIFIED TRUE COPY

**Court on 20/2/2019,** that civil forfeiture ordered in an action in rem is a fine and is a punishment regardless that it did follow from criminal conviction. He also referred to the cases of **A.G. BENDEL STATE v AGBOFODOH (1999) 2 NWLR (Pt. 592) 476; BASHIR v FRN (2016) LPELR-40252(CA); and ABACHA v FRN (2014) LPELR-2201(SC) at pages 46 – 47, paras. F – B,** where the words "fine" and "forfeiture" were defined. He submitted that by the express meaning and intendment of Section 137(1)(d) of the 1999 Constitution, a person who, even though not convicted, has forfeited property on account of criminal conduct should not aspire to or be allowed to occupy the exalted office of President of Nigeria. He added that the word "or" is used twice in Section 137(1)(d) of the Constitution to separate persons convicted from persons who, even though not sentenced are affected by an order of a fine imposed by a court.

With regard to the 4th Respondent's arguments on this issue, the Petitioners made the response to the one they made in response to the 1st Respondent's submissions. It is therefore needless to repeat same here.

In reply to the Petitioner's final address, the 1st Respondent submitted that the Petitioners had abandoned their ground that the 2nd Respondent was not elected by a majority of lawful votes cast and its



CERTIFIED TRUE COPY

accompanying prayer for the Petitioners to be declared as having scored the highest number of votes cast. He observed that the Petitioners failed to respond to the 1st Respondent's submissions on that issue and in fact made no attempt in their address to contend that the Petitioners scored the highest number of votes cast at the election or to justify the prayers sought by the Petitioners to be declared as having scored the highest number of votes at the election. Relying on **OCHIGBO v AMEH (2023) LPELR-59616(CA) at pages 9 – 10, paras. E – C; NWANKWO & ORS v YAR'ADUA & ORS (2010) 12 NWLR (Pt. 1209) 518; and DANA LTD v OLUWADARE (2006) 39 WRN 121,** he submitted that the Petitioners have abandoned that ground of the Petition and its associated relief. He urged the Court to so hold.

Learned Counsel further submitted that this Court is entitled to, and indeed in the prevailing circumstances, bound to follow the pronouncement of the Supreme Court in **PDP v INEC & 3 ORS (supra),** which is on the same issues ventilated by the Petitioners in respect of alleged double nomination of the 3rd Respondent. He relied on **BUHARI & ORS v OBASANJO & ORS (2003) LPELR-813(SC) at pages 66, paras. B – C; LADEJOBI & ORS v OGUNTAYO & ORS (2015) LPELR-41701(CA) at pages 29 – 32, paras. B – B; and CHEVRON NIG. LTD v A.G. & COJ DELTA STATE & ANOR (2018) LPELR-44837(CA).**


CERTIFIED TRUE COPY

Also replying to the Petitioners' Final Address, the Senior Counsel to the 2nd and 3rd Respondents submitted that the Supreme Court had in PDP v INEC & 3 ORS (supra) considered the subject matter of the 3rd Respondent's voluntary withdrawal of his candidature for Borno Central Senatorial District and every other issue incidental to it under the law and had made a categorical pronouncement that the 3rd Respondent had not breached any law. He further submitted that the case of **PDP v DEGI-EREMIENYO (supra)**, referred to by the Petitioners no longer represents the position of the law. He stated that the Apex Court had in its recent decision in **EDEBVIE v OROHWEDOR (2023) 8 NWLR (Pt. 1886) 219 at 277,** held that its decision in **PDP v DEGI-EREMIENYO (supra)**, is no longer the law.

On the Petitioners' arguments relating to fine imposed on the 2nd Respondent, learned Counsel submitted that the two cases of **AUSTIN v UNITED STATES (supra); and TIMS v INDIANA (supra),** relied upon by the Petitioners' Counsel are cases in which the forfeiture proceedings were based a plea of guilt criminal charges and are not civil forfeiture proceedings. He stated that the two cases are therefore inapplicable to the circumstances of this case.

In reply to the Petitioners' address, learned Senior Counsel for the 4th Respondent stated the issue of the 3rd Respondent's withdrawal of his

CERTIFIED TRUE COPY

nomination as Senatorial candidate is a pre-election dispute which cannot be litigated by this Court. He relied on **OKADIGBO v EMEKA (2012) LPELR-7839(SC) and APC v CHIMA (2019) LPELR-48878(CA).**

On the Petitioners argument over 2nd Respondent's qualification, learned Counsel submitted that the Supreme Court had held in **ACTION CONGRESS v INEC (2007) 12 NWLR (Pt. 1048) 220 at 293 – 294,** that a trial, conviction and sentence must have taken place for a person to be disqualified under Section 137(1)(d) and (e) of the Constitution. He further submitted that the Petitioners have not shown that there was any prior criminal trial or conviction of the 2nd Respondent.

The Counsel to the 4th Respondent finally submitted that the validity of the 3rd Respondent's nomination was the main issue in PDP v INEC & 3 ORS (supra), and that even if the pronouncements of Okoro, JSC, Ogunwumiju, JSC and Agim, JSC are *obiter,* the Supreme Court had held repeatedly that its *obiter* is binding on the lower courts. He relied on **MRS MACLEANS v INLAKS LTD (1980) 8 – 11 SC 1; FERODO LTD v IBETO IND. LTD (2004) 5 NWLR (Pt. 866) 317 at 371 – 372, paras. H – B; and BUHARI v OBASANJO (2003) 17 NWLR (Pt. 850) 587 at 664, paras. D – F.**

## RESOLUTION OF ISSUE 1:

The Petitioners allegations in ground 1 of the Petition are: (1) that the 2nd Respondent was not qualified to contest the Presidential Election

CERTIFIED TRUE COPY

held on 25th February, 2023 because the 3rd Respondent who was his running mate had knowingly allowed himself to be nominated in more than one constituency contrary to Section 35 of the Electoral Act, 2022; and (2) that the 2nd Respondent was fined the sum of $460,000 (Four Hundred and Sixty Thousand Dollars) by the US District Court of Illinois on October 4, 1993 for an offence involving dishonesty, namely narcotics trafficking and money laundering, pursuant to 21 USC 381(a)(6) and 18 USC 982.

In proof of those allegations, the Petitioners first tendered from the Bar the following Exhibits:

(i) **Exhibit PA1** - Form EC11A - Notice of Withdrawal of Candidate of Ibrahim Kabir Masari received by INEC on 15/07/2022;

(ii) **Exhibit PA2** - Affidavit in Support of Personal Particulars deposed to by Kashim Shettima as candidate for the Borno Central Senatorial District received by INEC on 17/07/2022;

(iii) **Exhibit PA3** - Form EC11C – Notice of Withdrawal of Kashim Shettima as Candidate for Borno Central Senatorial District received by INEC on 15/07/2022;



   (iv)   **Exhibit PA4** - Affidavit of Personal Particulars of Kashim Shettima as Vice Presidential Candidate of the 4th Respondent received by INEC on 15/07/22;

   (v)   **Exhibit PA5** – Record of Proceedings, Terms of Settlement and Order of Forfeiture.

The Petitioners then called **PW1, Sir Lawrence Uchechukwu Nnanna Nwakaeti,** a legal pratitioner, whose witness statement was sworn to on 20th March, 2023 under the acronym LUNN, at pages 86 – 90 of the Petition. According to him, the sponsorship of the 2nd and 3rd Respondents by the 4th Respondent was rendered invalid by reason of the 3rd Respondent knowingly allowing himself to be nominated as the Vice-Presidential Candidate while he was still a Senatorial Candidate for Borno Central Senatorial Constituency. PW1 also stated in paragraph 17 of his statement that he knew that the 2nd Respondent was not qualified to contest the election because he was fined the sum of $460,000 by US District Court, Northern District of Illinois, Eastern Division for offence involving dishonesty, namely narcotics trafficking. He identified Exhibits PA1 – PA5 as the documents which he referred to in paragraph 11 of his statement on oath as proof of his assertions. Upon cross examination by the 1st Respondent however, PW1 stated that apart from voting in the elections he did not play any other role. He also stated that even though

CA/PEPC/03/2023; CA/PEPC/04/2023; CA/PEPC/05/2023.


CERTIFIED TRUE COPY

he is a practising lawyer he was not an author and had never appeared before the Court of Appeal or the Supreme Court as amicus on any constitutional matter. Even as he admitted that his statement on oath was not based on his legal opinion, he insisted that it was based on matters of pure law. When cross examined by the 2nd and 3rd Respondents' Counsel, PW1 stated that he would be surprised that there is nowhere the 2nd Respondent was fined in Exhibit PA5. He also admitted that Exhibit PA5 was neither registered in Nigeria nor accompanied by a certificate by any Consular Officer either in the USA or in Nigeria. He also admitted under cross examination by the 4th Respondent's Counsel that the documents in Exhibit PA5 are civil forfeiture proceedings and that he did not mention any charge against the 2nd Respondent in his statement.

The Petitioners also called **PW12, Yunusa Tanko,** a member of the 2nd Petitioner and member of its Situation Room. He adopted his statement which he deposed to on 20th March, 2023 under the acronym TU and which is at pages 44 – 81 of the Petition. In paragraphs 23 and 24 of his statement, he stated that on the 14th of July, 2022, the 3rd Respondent, contrary to the Electoral Act, 2022, whilst still being a Senatorial Candidate for Borno Central Constituency, knowingly allowed himself to be nominated as the Vice-Presidential Candidate to the 2nd Respondent on the platform of the 4th Respondent. PW12 also stated in paragraphs

CERTIFIED TRUE COPY

29 – 33 of his witness statement that the 2nd Respondent was not qualified to contest the Presidential Election because he was fined the sum of $460,000 by the US District Court in Case No. 93C 4483 for an offence involving dishonesty, namely narcotics trafficking. He also identified Exhibits PA1 – PA5 as the documents which he listed in paragraph 24 of his statement in proof of his assertion. It is noted that paragraphs 23, 24 and 25 of the statement of this witness is exactly the same as the averments in paragraphs 22, 23 and 24 of the Petition. Also paragraphs 29, 30 31 and 32 of PW12's statement on oath are the same with paragraphs 28, 29, 30 and 31 of the Petition. Obviously PW12 merely re-echoed the pleadings in the Petition as his evidence in respect of the allegation of disqualification of the 2nd and 3rd Respondents.

When cross examined by Fagbemi, SAN on behalf of the 4th Respondent, PW12 stated that the Petitioners' grounds for bringing this action is based on double nomination and forfeiture of $460,000. He was shown a certified true copy of the judgment of the Supreme Court in **Appeal No. SC/CV/501/2023: PEOPLES DEMOCRATIC PARTY v INEC & 3 ORS, delivered on 26th May, 2023**. Upon identifying same, the said judgment was tendered through him and admitted in evidence as **Exhibit X2** without prejudice to the objection raised by the Petitioners to the admissibility of the document.


CERTIFIED TRUE COPY

All the Respondents had earlier raised preliminary objection to Ground 1 and paragraphs 21 - 27 of the Petition which challenge the qualification of the 2nd Respondent to contest the election, arguing that the issue of double nomination of the 3rd Respondent was caught up by issue estoppel, same having been determined by the Supreme Court in **PDP v INEC & 3 ORS (supra),** a certified true copy of which was tendered under cross examination of PW12 by the 4th Respondent and admitted as Exhibit X2. A certified true copy of the same judgment was also tendered from the Bar by the 2nd and 3rd Respondents' Counsel and admitted as Exhibit RA23. The Respondents have further argued that the Petitioners who are not members of the 4th Respondent, lack the locus standi to challenge the nomination of candidates of the 4th Respondent. We had deferred our ruling on that objection to this stage because a consideration of same at that time would touch on the substance of this case.

It is pertinent to observe that upon our careful perusal of Exhibits X2 and RA23, which are the certified true copies of the Supreme Court unanimous judgment in **PDP v INEC & 3 ORS (supra),** it is clear to us that the Apex Court had not only determined that the Petitioners in that case had no locus standi to question the nomination of the 3rd Respondent herein, the Court proceeded to determine with finality that there was no double nomination on the part of the 3rd Respondent.

CERTIFIED TRUE COPY

On the contention relating to the locus standi of the Petitioners to complain about the double nomination of the 3rd Respondent, the Apex Court, per His Lordship Jauro, JSC delivering the lead judgment in **PDP v INEC & 3 ORS (supra),** held at pages 30 - 31, paras. C – D, as follows:

> "The position of the law has always been that no political party can challenge the nomination of a candidate of another political party. The position did not change in section 285(14)(c) of the Constitution. No matter how pained or disgruntled a political party is with the way and manner another political party is conducting or has conducted its affairs concerning its nomination of candidates for any position, it must keep mum and remain an onlooker for he lacks locus standi to challenge such nomination in court. A political party equally lacks the locus standi to challenge the actions of INEC in relation to another political party. Section 285(14)(c) only allows a political party to challenge the decisions and activities of INEC disqualifying its own candidate from participating in an election, or to complain that the provisions of the Electoral Act or any other law have not been complied with in respect of the nomination of the party's own candidates, time table for an election, registration of voters and other activities of INEC in respect of preparation for an election. A political party is only vested with locus to file a pre-election matter when the aforesaid situations affect it or its own



candidates. When the actions of INEC relate to the activities of a political party, no court has the jurisdiction to entertain a suit brought by another political party in that regard."

The above legal position as determined by the Apex Court in **PDP v INEC (supra)**, clearly shows that the Petitioners in this case who belong to a different political party from the 2nd and 3rd and the 4th Respondents have no locus to complain about the nomination of the 3rd Respondent. Hence, they cannot use same to challenge the qualification of the 2nd and 3rd Respondents to contest the Presidential election.

On the Petitioners' allegation of double nomination of the 3rd Respondent, the Supreme Court specifically held in **PDP v INEC & 3 ORS (supra)**, that there was no such double nomination. In the concurring judgment of His Lordship Okoro, JSC, particularly at pages 46 – 47, paras. C – D, the Apex Court held as follows:

"It is crystal clear that by the two exhibits alluded to above, the 4th Respondent did the needful by resigning his position as Senatorial Candidate for Borno Central Senatorial District since 6th July, 2022 before being nominated by the 3rd Respondent to run alongside him as Vice Presidential Candidate of All Progressives Congress (APC). Section 31 of the Electoral Act, 2022 states clearly as follows: "A candidate may withdraw his candidature by notice in writing

CERTIFIED TRUE COPY

signed by him and delivered personally by the candidate to the political party that nominated him for the election and the political party shall convey such withdrawal to the Commission not later than 90 days to the election." The above provision of the Electoral Act, was duly complied with by the Respondents. It is my well-considered opinion that as at the 6th of July, 2022, having withdrawn his nomination and personally served same on the 2nd Respondent of the withdrawal of nomination on 6th of July, 2022, and the subsequent replacement on the 14th of July, 2022, the 4th Respondent was no longer a candidate for the Borno Central Senatorial District Elections and his subsequent nomination as Vice-Presidential candidate of the 2nd Respondent for the Presidential election was not multiple nomination as there was no longer a nomination for the 4th Respondent since his withdrawal on the 6th of July, 2022."

Also concurring, His Lordship Agim, JSC held page 84, paras. C – B, held as follows:

"It is glaring from the express wordings of S. 31 of the Electoral Act, 2022 that the legislative intention is that the withdrawal should take effect upon the nominated candidate personally delivering a written notice of his withdrawal to the political party and not when

CA/PEPC/03/2023; CA/PEPC/04/2023; CA/PEPC/05/2023.

CERTIFIED TRUE COPY

the political party conveys it to INEC. S. 31 states that what the party conveys to INEC is the withdrawal. The provision gives the party not later than 90 days to the election to convey the withdrawal of its candidate to INEC. Since the election held on 25-02-2023, the political party had up to 24-11-2022 to convey the 4th respondent's withdrawal to INEC. So it matters not if it was conveyed on 10-7-2022, 15-7-2022 or any other date, provided it is conveyed not later than 90 days to the election. The date of conveyance within the prescribed period has no effect on the withdrawal that has already been done. Therefore, the 4th Respondent withdrew as the 2nd Respondent's Senatorial candidate for Borno Central Senatorial District on 6-7-2022 when his written letter of withdrawal dated 6-7-2022 when his written letter of withdrawal dated 6-7-2022 was received by his party on 6-7-2022."

In fact, in the concurring judgment of His Lordship Augie, JSC, the learned jurist was categorical when he held that there cannot be double nomination on the part of the 3rd Respondent herein, because he did not contest for any primary election for Vice President, but "was merely selected to run for a different office as an associate, a scenario envisaged by Section 142(1) of the Constitution of the Federal Republic of Nigeria, 1999 as amended."

CA/PEPC/03/2023; CA/PEPC/04/2023; CA/PEPC/05/2023.                                    171


CERTIFIED TRUE COPY

As regards the contention of the Petitioners that the pronouncement of the Supreme Court in **PDP v INEC & ORS (supra)**, which had settled the issue of nomination of the 3rd Respondent is an *obiter dictum*, it is trite an *obiter dictum* is a judicial expression of opinion or comment by a judicial officer made in passing while rendering a judgment which does not decide the live issue in the matter. See: **KAYODE BABARINDE & ORS v THE STATE (2013) LPELR-21896(SC) at pages 62 – 63, paras. D – A; K.R.K. HOLDINGS NIG. LTD v FIRST BANK OF NIG. LTD & ANOR (2016) LPELR-41463(SC) at page 19, paras. A – E; and AONDOAKAA, SAN v OBOT & ANOR (2021) LPELR-56605(SC) at page 46, paras. B – E.**

It is pertinent to state that the firm pronouncements of the learned and respected Justices of the Supreme Court on the alleged double nomination of the 3rd Respondent in **PDP v INEC & 3 ORS (supra),** are not mere comments, expressions of sentiments or opinions made in passing. Rather, they are clear findings of fact and statements of the firm position of the law in relation to the status of the nomination of the 3rd Respondent by the 2nd Respondent as his running mate to contest the Presidential election for the offices of President and Vice President of the Federal Republic of Nigeria, respectively. The fact that the Supreme Court intentionally decided to consider the merit of that case (supra), is clearly manifest from the pronouncement of Ogunwumiju, JSC at page 74, para. C wherein he stated that: "It is apt in this type of political case



CERTIFIED TRUE COPY

of public interest to look into the merits of this case." The pronouncement of the Supreme Court in **PDP v INEC (supra)** on the status of the nomination of the 3[rd] Respondent is therefore, undoubtedly a decision on the merit and not an *obiter dictum* as erroneously contended by the Petitioners.

The Supreme Court had re-emphasized the binding effect of its judgments on the lower courts in the case of **ODEDO v PDP & ORS (2015) LPELR-24738(SC),** where Kekere-Ekun, JSC stated at page 65, paras. B – E, as follows:

> "The Supreme Court is the highest court in the land. By virtue of Section 235 of the Constitution of the Federal Republic of Nigeria 1999 its decisions are final. In other words, a decision of the Apex Court settles the position of the law in respect of a particular issue and becomes a binding precedent for all other courts of record in Nigeria. Legal practitioners have a responsibility to keep abreast of the pronouncements of the Court and advise their clients accordingly. It is wrong to ignore decisions of this Court and seek to perpetuate a position that has already been pronounced upon. This is one of the causes of congestion in our courts and must be discouraged."


CERTIFIED TRUE COPY

See also: **DINGYADI & ANOR v INEC & ORS (2011) LPELR-950(SC), at pages 48 – 49, paras. A – B, per Adekeye, JSC; and NOBIS-ELENDU v INEC & ORS (2015) LPELR-25127(SC), at pages 35 – 36, paras. A – C, per Muhammad, JSC.** Therefore, this Court resists the invitation by the Petitioners' Counsel to ignore the firm pronouncement of the Apex Court on the validity of the nomination of the 3rd Respondent as the running mate of the 2nd Respondent and Vice-Presidential Candidate of the 4th Respondent.

The law is settled that where an issue of fact affecting the status of a person or a thing has been determined in a final manner as a substantive part of a judgment of a court having jurisdiction to determine that status, such determination will constitute estoppel by judgment to any subsequent proceedings between any parties whatsoever. See: **MADAM ABUSATU AGBOGUNLERI v JOHN DEPO & ORS (2008) LPELR-243(SC) at page 20, paras. D – G, per Muhammad, JSC; MR. AKINFELA FRANK COLE v MR. ADIM JIBUNOH & ORS (2016) LPELR-40662(SC) at pages 37 – 38, para. D, per Kekere-Ekun, JSC; and APC v PDP & ORS (2015) LPELR-24587(SC) at page 106, paras. A – E, per Galadima, JSC.**

Since it is clear that the Supreme Court in **PEOPLES DEMOCRATIC PARTY v INEC & 3 ORS (supra),** had finally decided that the nomination of the 3rd Respondent by the 2nd Respondent as his running mate to contest the

CERTIFIED TRUE COPY

Presidential Election is valid, the Petitioners' allegation of double nomination of the 3rd Respondent which they have raised in this Petition, is evidently caught up by issue estoppel.

As for the merit of this issue on double nomination of the #rd Respondent, I observe that it is an issue that has been agitated as a sole ground in Petition No. CA/PEPC/04/2023 and same will be addressed while consideration of that Petition since the three Petitions have been consolidated.

The second allegation also made by the Petitioners in ground 1, which is as contained in paragraphs 28 – 32 of the Petition, is that 2nd Respondent is disqualified from contesting the presidential election because as they stated in paragraph 28 of the Petition:

> "The Petitioners further plead that the 2nd Respondent was also at the time of the election not qualified to contest for election to the office of President as he was fined the sum of $460,000 (Four Hundred and Sixty Thousand Dollars) for an offence involving dishonesty, namely narcotics trafficking imposed by the United States District Court, Northern District of Illinois, Eastern Division, in Case No: 93C 4483 between:
>
> UNITED STATES OF AMERICA
> Plaintiff

CERTIFIED TRUE COPY

v.

FUNDS IN ACCOUNT 263226700 HELD BY FIRST HERITAGE BANK, IN THE NAME OF BOLA TINUBU,

FUNDS IN ACCOUNTS 39483134, 394833396, 4650279566, 00400220, 39936404, 39936383 HELD BY CITIBANK N.A. IN THE NAME OF BOLA TINUBU OR COMPASS FINANCE AND INVESTMENT CO.

FUNDS IN ACCOUNTS 52050-89451952, 52050-89451952, 52050-89451953 HELD BY CITIBANK, INTERNATIONAL IN THE NAME OF BOLA TINUBU,

Defendants"

The Petitioners have pleaded and relied on the Order of the US Court in Exhibit PA5 which they tendered from the Bar and which was subsequently identified by PW1 and PW12 in their evidence earlier summarized.

The Petitioners have centered their contention on the provisions of Section 137(1)(d) of the 1999 Constitution which reads as follows:

"137(1)    A person shall not be qualified for election to the office of President if –

(d)    he is under a sentence of death imposed by any competent court of law or tribunal in Nigeria of a sentence of imprisonment or fine for any offence involving dishonesty or fraud by whatever name called or for any other offence imposed on him by any court

CA/PEPC/03/2023; CA/PEPC/04/2023; CA/PEPC/05/2023.                                    176



tribunal or substituted by a competent authority for any other sentence imposed on him by such a court or tribunal."

A careful examination of the above provision shows that the operative words of that paragraph of the Section are "sentence", "imprisonment or fine" and "for any offence." Blacks' Law Dictionary 6th Edition at page 1081 defines an "offence" as:

"A felony or a misdemeanour; a breach of the criminal laws; violation of law for which penalty is prescribed. The word "offence", while sometimes used in various senses, generally implies a felony or a misdemeanour infringing public as distinguished from mere private rights, and punishable under the criminal laws, though it may also include the violation of a criminal statute for which the remedy is merely a civil suit to recover the penalty. An act clearly prohibited by the lawful authority of the State, providing notice through published laws."

Also, the Supreme Court in the case **ABDULLAHI UMAR v STATE (2014) LPELR-23190(SC)**, held that an offence is as an act which is clearly prohibited by law and which may be a crime or a civil offence. "Sentence" on the other hand has been defined by the same Blacks' Law Dictionary at page 1362 as:



CERTIFIED TRUE COPY

"The judgment formally pronounced by the court or judge upon the defendant after his conviction in a criminal prosecution, imposing the punishment to be inflicted, usually in the form of a fine, incarceration or probation."

Again, this Court also defined "sentencing" in **YAKUBU v STATE (2015) LPELR-40867(CA) at page 36 paras. A – F,** as:

"...the judicial determination of a legal sanction to be imposed on a person found guilty of an offence. It means the prescription of a particular punishment by a Court to someone convicted of a crime."

It is discernible from the above that the "fine" referred to in paragraph (d) of Section 137(1) quoted above is one which emanates from a sentence for a criminal offence involving dishonesty or fraud. The words "for imprisonment or fine" also pre-supposes that the "fine" envisaged under the section is one which is imposed as an alternative to imprisonment. In other words, the provision of Section 137(1)(d) relates to sentence of death, or sentence of imprisonment or fine imposed as a result of a criminal trial and conviction.

Indeed, in considering the offence that can amount to disqualification under Section 137(1) of the Constitution, the Supreme Court had held in

CERTIFIED TRUE COPY

**ACTION CONGRESS v INEC (2007) 12 NWLR (Pt. 1048) 220 at 259 – 260,** as follows:

> "The disqualification in Section 137(1) clearly involves a deprivation of right and a presumption of guilt for embezzlement or fraud in derogation of the safeguards in Section 36(1) and (5) of the Constitution. The trial and conviction by a Court is the only constitutionally permitted way to prove guilt and therefore the only ground for the imposition of criminal punishment or penalty for the criminal offences of embezzlement or fraud. Clearly, imposition of the penalty of disqualification for embezzlement or fraud solely on the basis of an indictment for those offences by an Administrative Panel of Enquiry implies a presumption of guilt, contrary to Section 36(5) of the Constitution of the Federal republic of Nigeria, 1999, whereas, conviction for offences and imposition of penalties and punishments are matters appertaining exclusively to judicial power."

See also on this: **AMAECHI v INEC & ORS (2008) LPELR-446(SC) at pages 49 – 51, paras. E – F; OMOWAIYE v A.G. OF EKITI STATE & ANOR (2010) LPELR-4779(CA) at pages 28 – 28, paras. A – F, per Nweze, JCA (as he then was); and ABDULKARIM & ORS v SHINKAFI & ORS (2008) LPELR-3555(CA) at pages 24 – 32, paras. A – C.**

CA/PEPC/03/2023; CA/PEPC/04/2023; CA/PEPC/05/2023.



CERTIFIED TRUE COPY

A careful perusal of Exhibit PA5 relied upon by the Petitioners shows that the Case No. 1:93-cv-04483 was in the Civil Docket of the US District Court, Northern District of Illinois and it was a civil forfeiture proceeding against Funds in specified Accounts with First Heritage Bank and Citibank N.A. Exhibit PA5 is actually an action in rem against the funds with First Heritage Bank and Citibank. It is not an action in personam against the 2nd Respondent.

In **JONATHAN v FRN (2019) 10 NWLR (Pt. 1681) 533,** the Supreme Court held inter alia, that Section 17 of the Advance Fee Fraud & Other Related Offences Act, 2006 provides for the power to make an order of forfeiture without conviction for an offence; and that an order of forfeiture under the section shall not be based on conviction for an offence under the Act or any other law. The Apex Court further held that there was no need to prove any crime in forfeiture of property under Section 17 of the Advance Fee Fraud & Other Related Offences Act as civil forfeiture is a unique remedy which rests on the legal fiction that the property, not the owner is the target therefore it does not require conviction or even a criminal charge against the owner as it is not a punishment nor is it for criminal purposes.

CERTIFIED TRUE COPY

See also: **LA WARI FURNITURE & BATH LTD v FRN (2019) 9 NWLR (Pt. 1677) 252; and ALISON-MADUEKE v EFCC (2021) LPELR-56922(CA) at pages 16 – 24, paras. E – C.**

From the legal definitions and judicial authorities above, it is clear that the "sentence of imprisonment or fine for any offence involving dishonesty or fraud" envisaged in Section 137(1)(d) of the Constitution is one imposed upon a criminal trial and conviction. In the instant case, the Petitioners have failed to show evidence that the 2nd Respondent was indicted or charged, arraigned, tried and convicted and was sentenced to any term of imprisonment or fine for any particular offence.

On the part of the 2nd and 3rd Respondents, they have contended that the 2nd Respondent was never fined for any offence and has no criminal record in the United States. In proof of their assertion, they have tendered Exhibits RA8 and RA9 from the Bar and called RW2 to give evidence and identify the said exhibits as documents he referred to in his adopted statement on oath of 12th April, 2023. In paragraphs 45 – 52 of his statement on oath, RW2 had stated that the 2nd Respondent was never convicted or fined for any criminal offence in the United States as alleged by the Petitioners. In particular, RW2 stated as follows in paragraphs 46, 47 and 49:

CA/PEPC/03/2023; CA/PEPC/04/2023; CA/PEPC/05/2023.


CERTIFIED TRUE COPY

"46. In Case No. 93C 4483 at the United States District Court, Northern District of Illinois, Eastern Division which was pleaded by the Petitioners:

(i) No criminal charge was filed against the 2nd Respondent;

(ii) The 2nd Respondent was not arraigned and did take/make a plea to any count in a charge for allegations of crime;

(iii) The 2nd Respondent did not go through a criminal trial;

(iv) The 2nd Respondent was not convicted of any crime or any criminal activity;

(v) No sentence of imprisonment was imposed on the 2nd Respondent;

(vi) No sentence of fine was imposed on the 2nd Respondent;

(vii) No form of sentence was imposed on the 2nd Respondent;

(viii) Case No. 93C 4483 was a civil suit in respect of which the court exercised civil jurisdiction under 18 USC 981 and 28 USC 1345 and 1355.



CERTIFIED TRUE COPY

47.   I also know that in Case No. 93C 4483 at the United States District Court, Northern District of Illinois, Eastern Division, no im personam criminal sentence was imposed on the 2nd Respondent."

"49.   The 2nd Respondent was not convicted in Case No. 93C 4483 United States District Court, Northern District of Illinois. The United States of America, through its Embassy in Nigeria, had by a letter dated February 4, 2003, addressed to the then Inspector-General of Police, confirmed that upon the record checks of the Federal Bureau of Investigation's National Crime Investigation Centre (NCIC), the centralized information centre that maintains the records of every criminal arrest and conviction within the United States of America, there were no records of any form of criminal arrests, wants or warrants against the 2nd Respondent. I shall rely upon copy of the said letter of February 4, 2023 (sic), signed by Michael M. Bonner."

Under cross examination by the 4th Respondent, RW2 had stated that as a practising Attorney in the United States he knows that there cannot be a conviction unless there is an indictment. He also stated the Exhibits RA8 and RA9 gave the 2nd Respondent a clean bill of health as far as


CERTIFIED TRUE COPY

criminal conviction is concerned. When cross examined by the Petitioners' Counsel, RW2 stated that the American Court relied on Section 981 of the American Money Laundering Law which is civil and not Section 982 which is criminal and which the Petitioners stated in their Petition. He further stated that in the US even a minor traffic infraction will be reported, so that if someone has a criminal record the general record will show it. He added that a general search was conducted in respect of the 2nd Respondent.

A look at Exhibits RA8 and RA9 tendered by the 2nd and 3rd Respondents shows that upon receipt of Exhibits RA8 written by Nigeria's Inspector-General of Police to the Consular General of the US Embassy in Nigeria inquiring of the criminal record if any of the 2nd Respondent, the US Embassy had replied vide Exhibit RA9 and stated as follows:

> "In relation to your letter dated February 3, 2003, reference number SR.3000/IGPSEC/ABJ/VOL.24/287, regarding Governor Bola Ahmed Tinubu, a record check of the Federal Bureau of Investigation's (FBI) National Crime Information Center (NCIC) was conducted. The results of the checks were negative for any criminal arrest records, wants, or warrants for Bola Ahmed Tinubu (DOB 29 March 1952). For information of your department, NCIC is a centralized information center that maintains the records of every



criminal arrest and conviction within the United States and its territories."

Apart from all the above, Section 249 of the Evidence Act, 2011 has stipulated how previous criminal conviction outside Nigeria can be established. Section 249(1) & (2) provides:

"(1) A previous conviction in a place outside Nigeria may be proved by the production of a certificate purporting to be given under the hand of a police officer in the country where the conviction was had, containing a copy of the sentence or order and the fingerprints of the person or photographs of the fingerprints of the person so convicted together with evidence that the fingerprints of the person so convicted are those of the defendant.

(2) A certificate given under subsection (1) of this Section shall be prima facie evidence of all facts set out in it, without proof that the officer purporting to sign it did in fact sign it and was empowered to do so."

It is instructive to observe that when cross examined by the 4th Respondent, PW1 had admitted that there was no certificate under the hand of a police officer in the United States of America where a crime was alleged to have been committed by the 2nd Respondent.

CERTIFIED TRUE COPY

It is significant to state that this Petition is a declaratory action in which the Petitioners are seeking inter alia, that this Court declare the 2nd and 3rd Respondents as unqualified to contest the election. The Petitioners who have made the allegation have the burden to prove their allegation on the strength of their own case and not on the weakness of the Respondents. See: **OKEREKE v UMAHI & ORS (2016) LPELR-40035(SC) at page 54, paras. C – C, per Kekere-Ekun, JSC; EMENIKE v PDP (2012) LPELR-7802(SC) at page 22, paras. A – D, per Fabiyi, JSC; OMISORE v AREGBESOLA (2015) 15 NWLR (Pt. 1482) 297 – 299, para. F – A, and UCHA v ELECHI (2012) LPELR-7823(SC) at page 43, paras. B – D, per Mohammed, JSC.**

The Petitioners have evidently failed to establish their allegation that the 2nd Respondent is disqualified from contesting the presidential election under Section 137(1)(d) of the 1999 Constitution because he was fined the sum of $460,000.00 by US District Court, Northern District of Illinois. As shown above, the order of forfeiture in Exhibit PA5 on which the Petitioners have relied does not qualify as a sentence of fine for an offence involving dishonesty or fraud within the contemplation of Section 137(1)(d) of the 1999 Constitution.

As regards to whether paragraph (e) of Section 137(1) should be read together with paragraph (d) of that subsection, the settled rule of



interpretation of the Constitution or statute is that where the court is faced with two or more differing provisions over the same subject matter, the judicial attitude is to treat the special provision as overriding the general provision, on the principle that by enacting a separate provision for a part of the general class intends that the said part shall not be treated the same with the general class. See: **IWUCHUKWU & ANOR v A.G. ANAMBRA STATE & ANOR (2015) LPELR-24487(CA) at pages 62 – 64, paras. E – A, per Agim, JCA; MARTIN SCHROEDER & CO. v MAJOR & CO. NIG. LTD (1989) LPELR-1843(SC) at page 13, paras. E – A, per Wali, JSC; and F.M.B.N. v OLLOH (2002) 4 S.C. (Pt. 11) 177.**

Since in both paragraphs (d) and (e) of Section 137(1) "a sentence for the offence involving dishonesty" is mentioned but in paragraph (e) a limitation of ten years has been introduced, then it means in respect of sentence for offence of dishonesty, the two paragraphs must be read together, such that for conviction and sentence for an offence involving dishonesty, it must be within a period of less than ten years before the date of the election in order for such a conviction and sentence to be used for disqualifying a Presidential candidate from contesting the election.

It is also a cardinal principle of interpretation of the Constitution that relevant provisions must be read together and not disjointly. See



CERTIFIED TRUE COPY

**ABEGUNDE v THE ONDO STATE HOUSE OF ASSEMBLY & ORS (2015) LPELR-24588(SC) at pages 28 – 29, paras. D – B, per Muhammad, JSC.**

From all the foregoing, it is clear that having regard to the provisions of Section 137 of the Constitution of the Federal Republic of Nigeria, 1999 as amended and the evidence led before this Court, the 2nd Respondents was not disqualified from contesting the Presidential Election held on 25th February, 2023. In consequence, issue 1 is hereby resolved against the Petitioners and in favour of the Respondents.

### ISSUE 2

*Whether having regard to the evidence adduced by the parties the Petitioners have established that there was substantial non-compliance with the provisions of the Electoral Act, 2022 and that the non-compliance substantially affected the results of the election.*

On this issue, A. B. Mahmoud, SAN submitted on behalf of the 1st Respondent, that there is a presumption of regularity in favour of results of an election as declared by the 1st Respondent, and it is the duty of the Petitioners who challenge the results declared to rebut that presumption by leading credible evidence. He relied on **KING v INEC & ORS (2008) LPELR-4403(CA); and LAWAL v APC (2019) 3 NWLR (Pt. 1658) 86,** as well as Section 134(2) of the Electoral Act, 2022. He further submitted that it



CERTIFIED TRUE COPY

is only a complaint of non-compliance which is based on the express provisions of the Electoral Act, 2022 that can ground an action to question an election. He cited Section 138(2) of the Electoral Act, 2022 and the case of **NYESOM v PETERSIDE (2016) NWLR (Pt. 1492) 71 (SC).**

Learned Counsel also contended that by Section 135(1) of the Electoral Act, the Petitioners who have alleged non-compliance with the Electoral Act, 2022 are obligated not only to establish such non-compliance, but also prove that the non-compliance were substantial enough to affect the outcome of the election. He cited **BUHARI v OBASANJO (2005) 13 NWLR (Pt. 941) 1.** He referred the Court to paragraphs 53 and 55 of the Petition and pointed out that the Petitioners have founded their allegation of non-compliance on the basis that the 1st Respondent is mandated to electronically transmit and collate the election results and upload such results to the IReV Portal. He posited that there is no such obligation on the 1st Respondent to electronically transmit and collate results of the election. He referred this Court to Exhibit X1, which is the judgment of the Federal High Court, Abuja Division in **Suit No. FHC/ABJ/CS/1454/2022: LABOUR PARTY v INEC,** wherein the Court rejected the contention of Labour Party (the 2nd Petitioner herein) that the 1st Respondent is by the provisions of the Electoral Act, 2022 under an obligation to electronically transmit results of the election and cannot resort to manual collation and stated that INEC is at liberty to prescribe




CERTIFIED TRUE COPY

the manner in which election results could be transmitted. He added that there has been no appeal against that judgment as testified by PW12, the Petitioners' witness. Learned Counsel submitted that the unappealed decision is binding on the Petitioners and constitutes estoppel against them. He relied on **EDEM & ORS v ISHIE & ORS (2022) LPELR-58595(SC) at page 19, paras. A – B** and argued that the Petitioners claim of non-compliance in paragraphs 53 and 55 has no basis.

Learned Counsel submitted that should the Court disagree with the contention that the decision of the Federal High Court in Exhibit X2 is binding, it is clearly stipulated in Paragraph 92 of INEC Regulations and Guidelines for the Conduct of Elections, 2022 (Exhibit RA3) that collation of the election results is to be carried out manually, and there is nowhere in the Regulations that such collation of results is prevented until results are uploaded on the 1st Respondent's IReV. He submitted that by paragraph 93 of the Regulations the results uploaded on IReV are only to be used in the collation process where there is a discrepancy in the hard copy of the 1st Respondent's result and those issued to a political party agent and where the 1st Respondent's hard copy is not available. He added that even where no results are uploaded on the IReV and the 1st Respondent's hard copy is unavailable, recourse may still be had to hard copies with the Nigeria Police and Party Agents.



Learned Counsel argued that even if it is assumed that the obligation to electronically transmit results of the election in real time for use in the collation process does exists, the Petitioners have failed to lead credible evidence to support their claim on the substantial effect of the alleged incidence of non-compliance.

Learned Counsel referred the Court to the evidence of PW7 and submitted that the witness was obviously a person interested in the outcome of the proceedings because she is a member of the 2nd Petitioner on the platform of which she had contested for elective office and lost. He added that witness who evidence was procured by subpoena after proceedings had commenced, admitted that she was not authorized by Amazon Web Services which she claimed was her employer. He relied on **AGBALLA v NNAMANI 2 EPR 757 at 773 – 774, per Dongban-Mensem, JCA (as he then was, now PCA).**

Learned Counsel also submitted that the evidence of PW8 under cross examination that there is a cloud trail for every Amazon Account that logs every API action made within that account, Exhibit RA6, the Amazon Cloud Trail of the 1st Respondent's e-transmission clearly shows that the technological glitch was not a made-up story as the Petitioners are seeking to perpetuate, because the AWS shows that indeed patches were deployed to fix the errors that caused the glitch on election day.

CERTIFIED TRUE COPY

Learned Counsel further submitted that RW1 had in paragraph 40 of his witness statement explained why it was possible for the results of the other elections held on the same day to be uploaded on the IReV when the results of the Presidential elections could not be uploaded. He added that RW1 had stated in his unimpeached evidence that the BVAS on its own is not capable of sorting the results, but that the results were uploaded according to the type of election.

On behalf of the 2nd and 3rd Respondents, Chief Wole Olanipekun, SAN submitted that all the provisions of the INEC Regulations created alternative between an electronic transmission and transfer of results, with the use of the article "or". He referred to Paragraphs 38(i), 50(xx), 53(xii), 54(xii) of the Regulations and Paragraphs 3.4.5 and 4.2.2 of the INEC Manual where the words "electronically transmit or transfer" were used. He added that by Paragraphs 92 and 93 of the Regulations electronic copy is only relevant where there is no hard copy of collated result. Relying on the case of **UCHA v ELECHI (2012) 13 NWLR (Pt. 1317) 330 at 359; and ABUBAKAR v YAR-ADUA (2009) All FWLR (Pt. 457) 1,** he submitted that the Petitioners have failed to show how their alleged non-transmission of results affected the election.

Learned Senior Counsel pointed to deficiencies in the evidence of PW7 and made similar submissions to those made by the 1st Respondent,



before concluding that the evidence of the witness is manifestly unreliable and Exhibits PCJ3(A – F) which were tendered through her are also inadmissible.

On behalf of the 4th Respondent, Fagbemi, SAN submitted that an administrative innovation employed by the 1st Respondent, the uploading of the results does not invalidate an election which has been concluded by the declaration of the results at the polling unit, since the law is settled that once the election results has been announced at the polling unit, it cannot be cancelled under any guise. He cited **DOMA v INEC (2012) 13 NWLR (Pt. 1317) 297 at 338, paras. C – D; and IKPEAZU v OTTI (2016) 8 NWLR (Pt. 1513) 38 at 84 – 84, paras, G – B.** He submitted that the failure to abide by the provisions of Paragraph 38 of the INEC Regulations and Guidelines for the Conduct of Election, 2022 cannot be a basis for the nullification of the election, since the Regulations cannot override the Electoral Act. He relied on **EMMANUEL V UMANAH & ORS (2016) LPELR-40037(SC).**

Making similar submissions to the other Respondents, learned Counsel submitted that no by Paragraph 93 of the Regulations, INEC first works with hard copy for collation of results and the Petitioners have failed to show how the alleged failure to transmit the results directly to the IReV affected the scores credited to the Petitioners or how it assisted the 2nd



Respondent in winning the election. He relied on **AKUNEZIRI v OKENWA (2000) 15 NWLR (Pt. 691) 526.** He added that the testimonies of the Petitioners witnesses confirmed that election took place and results were released in the polling units and were later collated at the relevant collation centres. He urged the Court to discountenance the Petitioners' contention that the 1st Respondent is mandated to electronically transmit and collate election results.

In response to the submissions of the 1st Respondent, learned Senior Counsel for the Petitioners, Dr. Livy Uzoukwu, SAN, submitted that the decision of the Supreme Court in **OYETOLA v INEC (2023) LPELR-60392(SC),** properly read and understood, supports the Petitioners' contention that the uploading/ electronic transmission of the results of the election in real time or during the election, from the polling units to the IReV is a mandatory requirement of the electoral process. He further submitted that the evidence of PW2, a cloud engineer/Architect: PW3, a staff of Channels Television; PW4, a Professor of Mathematics; PW5, a staff of Arise Television; PW6, a staff of AIT; PW7, a Cloud Engineer/Architect and employee of Amazon Web Services; and PW8, a Cyber Security and Risk Advisory Consultant, is to the effect that INEC was irrevocably committed to the on-line real transmission of the election results from the polling units to the IReV on the day of the election. He added that this fact was particularly established via the

CERTIFIED TRUE COPY

evidence of PW3, PW5 and PW6 and from Exhibits PBH3, PBH4, PCH1 and PCG2, the video clips which were played in open Court, showing that INEC made representations to that effect locally in Nigeria and internationally.

Learned Counsel contended that by Section 60(5) of the Electoral Act, the presiding officer shall transfer the results including a total number of accredited voters and results of the ballot in manner as prescribed by the Commission. He argued that the word "transfer" comes from the ICT protocol called "File Transfer Protocol" which is a means of transmitting a file from a device such as the BVAS to a server such as the IReV. He added that the requirement in Section 60(5) that the Presiding Officer shall transfer the results in manner prescribed by the Commission connotes the intention of the law maker that any non-compliance with the subsection will attract serious consequences. He specifically referred the Court to Sections 47(2), 47(3), 50(2), 60(5), 64(4)(a), 64(5) and 64(6)(b) and (c) of the Electoral Act and Paragraphs 38(i) and (ii), 48(a), (b) and (c), 50(v), (vii) and (xx), 51(ii), 55(xii), 54(xii) and 93 of the Regulations and Guidelines for the Conduct of the Elections which specify the procedures for the transmission polling unit results from the polling unit to the collation centre as well as the procedure for the collation of polling unit results by the collation officer. He submitted that a combined reading of the provisions of 50(2) and 60(5) of the Electoral

CERTIFIED TRUE COPY

Act, leaves no one in doubt that the 1st Respondent was enabled with the power to prescribe the procedures for the transmission of results from the polling units to the collation centres and the procedure for collation of same.

He further submitted that INEC had pursuant to its Regulations and Guidelines for the Conduct of the Election 2022 and Manual for Election Officials 2023 provided the step-by-step processes for the collation, uploading and transmission of results of the election from polling unit to the IReV. He posited that the Regulations and Manual are subsidiary legislations made by the 1st Respondent pursuant to Section 148 of the Electoral Act. He cited **FAYEMI v ONI (2009) LPELR-4146(CA) at 80 – 93; YUSHAU v INEC (2019) LPELR-49629(CA); BUHARI v OBASANJO (supra) at page 511; CPC v INEC (2011) 18 NWLR (Pt. 1279) 493 at 592; and FALEKE v INEC (2016) NWLR (Pt. 1543) 61 at 156, paras. D – F,** and argued that by the Regulations and Guidelines the 1st Respondent is duty bound to electronically transmit the result of the election directly from the polling unit which shall serve as the benchmark for a proper collation of the result of the election in a polling unit. Counsel posited that being part of the process on the election day, and constituting a fundamental part of the electoral process for which the result and winner of the election is to be declared, the information on the EC8A transmitted to the IReV must be complete, verifiable, compared with the information

CA/PEPC/03/2023; CA/PEPC/04/2023; CA/PEPC/05/2023.                                    196

CERTIFIED TRUE COPY

on the physical EC8A and ascertained to be correct before any valid declaration and return can be made. He submitted that burden of proof had shifted to the 1st Respondent to prove that as it claimed the blurredness of thousands of results on the IReV do not matter, that they do not affect the transparency and integrity of the election, that they can read and discover the contents of the blurred results, they can link the blurred results to alleged hard copies of the results other than the same and exact originals of the blurred results that produced the blurred results.

Learned Counsel also submitted that from the press releases of the 1st Respondent tendered before the Court, together with the representations/assurances given by the 1st Respondent, it follows that the requirement for the uploading/electronic transmission of the results of the election in real time and during the election, from polling units using the BVAS to the IReV, is a fundamental/indispensable requirement of the election process under the Electoral Act, 2022.

The learned Silk pointed out that contrary to the argument of the 1st Respondent that the evidence of PW7 should be treated with a pinch of salt because she is a person interested, PW7 had given unchallenged "expert evidence of publicly accessible information by way of documents which she downloaded from the internet showing the health status of

CERTIFIED TRUE COPY

the AWS Servers in the six (6) regions where AWS hosted its Servers." He submitted that a cursory look at the health status report in Exhibits PCJ3 (A – F) and PCJ4 confirms that there was indeed no report of any "glitch" on any of the AWS servers on the day of the election.

Learned Counsel submitted that RW1 had given misleading evidence in paragraphs 27 and 28 of his statement by claiming that results of the Presidential election could not be uploaded immediately because down time was encountered on the application which lasted for 4 hours 50 minutes until it was resolved and the first Presidential election results was uploaded at 8.55 pm on 25th February, 2023. Counsel added that RW1 had also testified that any blurred results downloaded from IReV will not affect the authenticity of the physical results and will not be relevant for the collation of results. He referred to Exhibits PCE1 – PCE4, the four boxes of blurred documents) uploaded from IReV which were tendered by PW4, which he said the 1st Respondent had falsely misrepresented as Forms EC8As. He argued that the blank sheets can only mean copies of blank results sheets. He added that contrary to the evidence of RW1 about the temporary failure of communication between the e-transmission system and the IReV which had returned a HTTP error, the Petitioners have shown the health status of the Amazon Web Services through the evidence of PW7 which shows that there was



no technological glitch. He also referred to Exhibit X1, the INEC E-Transmission Vulnerability Report made on 22nd February, 2023.

Learned Counsel referred the Court to paragraph 59 of the Petitioner and submitted that the 1st Respondent failed to comply wth the mandatory provision of Section 73(2) of the Electoral Act which mandates the recording in the prescribed forms of the quantity, serial numbers and other particulars of the result sheets, ballot papers and other sensitive electoral materials. He added that the 1st Respondent had joined issues with the Petitioners in Paragraph 57 of its Reply by maintaining that there was due compliance with Section 73(2) of the Electoral Act. He argued that by the state of the pleadings the onus was clearly on the 1st Respondent to prove that there was indeed due compliance with the provision of the Electoral Act since the Petitioners are asserting the negative while the 1st Respondent is asserting the positive. He relied on **FIRST BANK OF NIGERIA PLC & ANOR v ADEOSUN BUSINESS INVESTMENT LTD & ORS (2020) LPELR-51203(CA); and ROYAL UNITED NIGERIA LTD v STERLING BANK PLC (2018) LPELR-50839(CA).**

Counsel also submitted that as pleaded by the Petitioners in paragraph 59 and led in evidence through PW12, the Petitioners obtained the order of this Court for inspection of election documents but the 1st Respondent refused to produce the forms despite several letters addressed to them


CERTIFIED TRUE COPY

by the Petitioners which were tendered through PW12 as Exhibits PCQ1 – PCQ6. He added that the Petitioners also served subpoena duces tecum for the 1st Respondent to produce the said forms but the officer of the 1st Respondent who came to the Court on 20th June, 2023 failed to bring the forms. He urged the Court to invoke Section 167(d) of the Evidence Act and hold that even if the 1st Respondent had produced the forms they would be unfavourable to them. He relied on **OKPOKAM v TREASURE GALLERY LTD & ANOR (2017) LPELR-42809(CA).** He urged the Court to hold that the non-compliance by the 1st Respondent with the provisions of Section 73(2) of the Electoral Act, 2022 is firmly established. He added that the said non-compliance is in respect of those states where the 2nd Respondent was declared to have won which he stated to be Benue, Borno, Ekiti, Jigawa, Kogi, Kwara, Niger, Ogun, Ondo, Oyo, Rivers and Zamfara States as contained in Form EC8DA admitted Exhibit PBF.

Finally, Counsel submitted that failure to upload and transmit the results of the elections from the polling unit to the IReV as mandated by law substantially affected the outcome of the election, in that the integrity and credibility of the entire election process were compromised and cannot be guaranteed. He urged the Court to so hold.



The Petitioners submissions in response to the 2nd and 3rd Respondents' final address is essentially the same with that which they made in response to the 1st Respondent's final address. However, learned Counsel for the Petitioners added that the unchallenged expert evidence of the Petitioners witnesses, including documentary evidence before the Court, support the Petitioners' case and sufficiently established that the non-compliance by the 1st Respondent were not only substantial, but grievously affect the outcome of the Presidential election.

Learned Counsel for the Petitioners also pointed out that the unchallenged oral evidence of PW4 which was supported by the Report of Data Analysis of the Results for Benue and Rivers States contained in Exhibits PCD1, PCD2 and PCD3, clearly shows that the Petitioners won the election in both States. He stated that by the unchallenged evidence the number of States won by the Petitioners in the Presidential election will now be fourteen States and the FCT, whilst the 2nd – 4th Respondents will have their number of States which they won reduced by two States. He pointed out that contrary to the position of the 2nd and 3rd Respondents, the Report of PW4 shows that the BVAS accreditation of the polling unit in Degema Local Government where the Petitioners alleged over voting is zero, which means that there was no accreditation in that polling unit and therefore there was no lawful election in the polling unit. He added that Appendix F attached to the Data Analysis



CERTIFIED TRUE COPY

Report is a Spreadsheet summary of the National Over-Voting Count, while Appendix G is the Spreadsheet of the polling units affected by over-voting on State-by-State basis.

In response to the 4th Respondent's Final Address, the Petitioners equally made similar submissions to the responses which they made to the 1st and to the 2nd and 3rd Respondents Final Address. Learned Counsel for the Petitioners submitted that the 4th Respondent did not adduce any evidence in support of its Reply to the Petition and as such their pleadings are deemed abandoned. He also submitted that the evidence of PW7, PW8 and PW9 confirm that if the 1st Respondent had properly tested its IT infrastructure deployed for the conduct of the election, in compliance with the applicable Standard and Guidelines for Government Websites published pursuant to the National Information Technology Development Agency (NITDA) Act, the high vulnerability identified at page 16, para. 7.1 to 7.14 of Exhibit X1 (INEC e-Transmission Web Portal Vulnerability Assessment and Penetration Test Report of 22nd February, 2023) would have been resolved before deployment of the software for the conduct of the Presidential election. He added that the recommended remediation in paragraph 7.15 of Exhibit X1 was not shown to have been conducted.




Counsel also submitted that Exhibit RA6 does not meet the features requirements of a cloud trail log as enumerated in the evidence of RW1 under cross examination, as it does not contain event time, event source, AWS Region, Source IP Address, I.A.M. (Identity Access Management) and User Address.

In his Reply to the Petitioners' submissions, learned Counsel for the 1st Respondent submitted that contrary to the contention of the Petitioners, Section 134(2) of the Electoral Act renders ineffectual for the purposes of questioning an election a complaint predicated solely on non-compliance with the provisions of the Regulations and Guidelines of the 1st Respondent. He relied on **JEGEDE v INEC (2021) 14 NWLR (Pt. 1797) 409 at 550 – 551; and NYESOM v PETERSIDE (2016) 17 NWLR (Pt. 1512) 452.** He stated that the case of **FALEKE v INEC (supra)**, relied upon by the Petitioners did not decide that a non-compliance only the provisions of the INEC Regulations can be the basis to question an election, as that decision was not made in respect of an election petition questioning an election on the ground of non-compliance.

Learned Counsel further argued that by the recent decision of the Lagos Judicial Division of the Court of Appeal in **Appeal No. CA/LAG/CV/332/2023: APC v LABOUR PARTY & 42 ORS,** the decision in Exhibit X1 **(Suit No. FHC/ABJ/CS/1454/2022: LABOUR PARTY v INEC),**



CERTIFIED TRUE COPY

was upheld and construed against the Petitioners as issue estoppel in relation to the Petitioners' contention that electronic transmission of results is mandatory. He pointed out that election petition proceedings are sui generis with its own laws governing same and regulating the grounds on which an election can be questioned. He added that assurances and promises have no place in our electoral law or jurisprudence.

He argued that by Section 135(1) of the Electoral Act, a complaint of non-utilization of prescribed forms which he submitted is not even proved cannot without showing the effect on the election be a basis to void an election and Section 73(2) cannot be excluded from the ambit of Section 135(1) of the Act.

As for the 2nd and 3rd Respondents, they replied the Petitioners by submitting that the case of **OYETOLA v INEC (supra)**, did not determine or consider the power or discretion of INEC to determine the mode of transmission of election results, particularly after such results have been correctly entered into the respective Form EC8As by the presiding officers. He added that the case of **OYETOLA v INEC (supra)**, is in fact against the Petitioners.

Learned Counsel drew the attention of this Court to the recent decision of the Court of Appeal in **Appeal No. CA/LAG/CV/332/23: APC v LABOUR**

CA/PEPC/03/2023; CA/PEPC/04/2023; CA/PEPC/05/2023. 204



**PARTY & 42 ORS, delivered on 19th June, 2023,** where the same Labour Party and others have, in spite of the judgment of the Federal High Court, Abuja Division (Exhibit X1) delivered against them, went ahead to file a similar suit before the Lagos Division of the same Federal High Court and on 8th March, 2023 obtained an order of mandamus compelling INEC to comply with Paragraphs 37 and 38 of the Regulations and Guidelines for the Conduct of Elections 2022 in the conduct of Governorship and House of Assembly elections in Lagos State. He pointed out that on appeal to the Court of Appeal by the APC the Lagos Division of the Court had set aside that judgment on 19th July, 2023 holding that the Petitioners have attempted to relitigate the same cause.

Counsel pointed out that the Petitioners have in their submission also urged this Court to make use of encrypted documents and even referred this Court to a weblink "www.en.m.wikipedia.org" just as PW7 and PW8, the purported experts of the Petitioners had done, especially Exhibit PCK1 tendered by PW8 which contains over 10,000 encrypted secret codes only known to the witness. He submitted that it is not within the jurisdiction of this Court to start investigating or decoding and decrypting the secret codes in its chambers.

In its reply to the Petitioners, the 4th Respondent submitted that the case of **OYETOLA v INEC (supra)**, does not avail the Petitioners, as what the

CERTIFIED TRUE COPY

Court will consider is whether the Petitioners have proved their case sufficiently to entitle them to the relief they sought. He further submitted that contrary to the Petitioners' position, evidence elicited by a party under cross examination can be relied upon by him in support of his case even if he did not call any witness. He relied on **OMISORE v AREGBESOLA (2015) 15 NWLR (Pt. 1482) 205 at 321; and ANDREW v INEC (2018) 9 NWLR (Pt. 1625) 507.**

**RESOLUTION OF ISSUE 2:**

The appropriate starting point for the resolution of this issue, is to first consider the objection of the 1st Respondent to ground 2 of the Petition which they raised at preliminary stage but which I deferred to this stage because it touches on the substance of the Petition.

The 1st Respondent's objection is that the Petitioners are estopped from re-litigating the issues contained in Ground 2, paragraphs 33 – 79, as well as reliefs 5(i) and (ii) of the Petition, as it relates to electronic transmission and collation of the election results, in view of the subsisting judgment of the Federal High Court in **Suit No. FHC/ABJ/CS/1454/2022: LABOUR PARTY v INDEPENDENT NATIONAL ELECTORAL COMMISSION,** delivered on 23rd January, 2023, a certified true copy of which they attached to their motion as Exhibit A, and which was later tendered in evidence at trial as Exhibit X1. The 1st Respondent



particularly referred this Court to paragraph 55 and 74 of the Petition, and submitted that the facts alleging non-compliance with the Electoral Act which are set out in paragraphs 33 – 79 of the Petition are hinged on the same issue of electronic transmission of results which was resolved against the 2nd Petitioner, in the said **Suit No. FHC/ABJ/CS/1454/2022,** to the effect that there is no mandatory requirement for the 1st Respondent to electronically transmit results of the election. Reliance was placed on the cases of **BAMGBEGBIN & ORS v ORIARE & ORS (2009) LPELR-733(SC), at page 43, para. B; and OYEROGBA & ANOR v OLAOPA (1998) LPELR-2878(SC) at page 24, para. B.**

An examination of the Petitioners' Petition and Exhibit X1 shows that in their Petition, especially paragraphs 37 and 45, the Petitioners have averred as follows:

> "37.  The Petitioners aver that at the conclusion of the election at each polling unit, the Presiding Officer was mandatorily required to electronically transmit or transfer the result of the polling unit directly to the collation system of the 1st Respondent. In addition, the Presiding Officer was also mandatorily required to use the BVAS to upload a scanned copy of the Form EC8A to the 1st Respondent's Result Viewing Portal (iRev) in real time."

CERTIFIED TRUE COPY

"45.  The Petitioners aver that, apart from the importance of the BVAS in the capture of accreditation at a polling unit in an election, the BVAS is also mandatorily to be used in the process of uploading the information or data imputed into it by the 1st Respondent's Presiding Officer at each polling unit who shall upon completion of voting and due recording and announcement of the result:

(i)  Electronically transmit or transfer the result of the polling unit directly to the collation system as prescribed by the 1st Respondent;

(ii)  Use the BVAS to upload a scanned copy of the Form EC8A to the INEC Result Viewing Portal (iRev), as prescribed by the 1st Respondent; and

(iii)  Take the BVAS and the original copy of each of the forms in tamper-evident envelope to the Registration Area/Ward Collation Officer, in the company of security agents. The Polling Agents may accompany the Presiding Officer to the Registration Area/ Ward Collation Centre."

In Exhibit X1, the certified true copy of the judgment of the Federal High Court in **Suit No. FHC/ABJ/CS/1454/2022 (supra),** which the 1st


CERTIFIED TRUE COPY

Respondent is contending should constitute estoppel to ground 2 of this Petition, the sole question presented for determination in the Originating Summons is as follows:

"Whether having regards to combined effect of Sections 47(2), 50(2), 60(4), 60(5) and 62(1) (2) and other relevant provisions of the Electoral Act 2022, the Respondent can still insist on manual collation of results in the forthcoming general elections."

Upon determination of the above questions, the Plaintiff (which is the 2nd Petitioner herein) sought for the following reliefs:

"1. A DECLARATION that the Respondent has no power to opt for manual method other than the electronic method provided for by the relevant provisions of Electoral Act.

2. AN ORDER of this Honourable Court directing/compelling the Respondent to comply with the Electoral Act, 2022 on electronic transmission of result in the forthcoming general election."

In its judgment in Exhibit X1, the Federal High Court held as follows:

"In view of the foregoing, can the act of the Defendant in collating and transferring election results manually in the forthcoming 2023 general elections be said to be contrary to the relevant provisions

CA/PEPC/03/2023; CA/PEPC/04/2023; CA/PEPC/05/2023.

CERTIFIED TRUE COPY

of the Electoral Act, 2022? The answer can only be in the negative as there is nowhere in the above cited sections where the Commission or any of its agents is mandated to only use an electronic means in collating or transferring of election result. If any, the Commission is only mandated to collate and transfer election results and number of accredited voters in a way or manner deemed by it.

In view of the above, I am finding that by the provisions of Sections 50(2) and 60(5) of the Electoral Act, 2022, the correct interpretation of the said statute is that the Defendant (Independent National Electoral Commission) is at liberty to prescribe the manner in which election results could be transmitted and I so hold. Consequently, this matter is hereby dismissed."

It is trite law that for a judgment of a court to constitute estoppel in a subsequent action, it must have finally decided the same issue in contention between the same parties or their privies. See: **ANCHORAGE LEISURES LTD & ORS v ECOBANK (NIG) LTD (2023) LPELR-59978(SC) at pages 12 – 13, paras. C - A; and ADEDAYO v BABALOLA & ORS (1995) LPELR-85(SC) at page 24, para. A.**

CA/PEPC/03/2023; CA/PEPC/04/2023; CA/PEPC/05/2023.                    210



From the averments contained in the Petitioners' Petition which I have earlier reproduced above, it is clear that the Petitioners' allegation of non-compliance averred in ground 2 of the Petition is hinged on the contention that INEC "was mandatorily required to electronically transmit or transfer the results of the polling units directly to the collation system of the 1st Respondent" and also "mandatorily required to use the BVAS to upload a scanned copy of the Form EC8A to the 1st Respondent's Result Viewing Portal (iRev) in real time." (See paragraph 37 and 45 of the Petition quoted above).

First, it is evident that in both this Petition and in Exhibit X1, the parties are the same, in that 2nd Petitioner herein was the sole Plaintiff in Exhibit X1, while the 1st Respondent herein was the sole Defendant in Exhibit X1. Secondly, from the above referred averments in this Petition and the reliefs sought by the 2nd Petitioner in Exhibit X1, it is clear that the issue in both cases is whether the 1st Respondent herein is mandatorily required to electronically transmit or transfer election results from the polling unit direct to the collation system. With the judgment of the Federal High Court in Exhibit X1, the excerpt of which has been reproduced above, it is evident that the Federal High Court had decided the issue against the Petitioners herein, by holding that the 1st Respondent cannot be compelled to electronically transmit election results. There is no evidence before this Court that the 2nd Petitioner

CERTIFIED TRUE COPY

against whom the judgment in Exhibit X1 was given has appealed against that decision. It is settled law that unappealed decision of a court remains subsisting and binding upon the parties. See: **ABBA v ABBA AJI (2022) LPELR-56592(SC) at page 61, paras. C – D; JEGEDE V INEC & ORS (2021) LPELR-55481(SC) at page 19, paras. C – D; and OLEKSANDR & ORS v LONESTAR DRILLING CO. LTD & ANOR (2015) LPELR-24614(SC) at page 39, paras. A – C.**

It is also trite that the doctrine of issue estoppel is that where an issue has been decided by a competent court, the court will not allow it to be relitigated by the same or different parties. See: **APC v PDP & ORS (2015) LPELR-24587(SC) at page 116, paras. B – D; and INAKOJU & ORS v ADELEKE & ORS (2007) LPELR-1510(SC) at pages 120 – 121, paras. E – B.**

It is also pertinent for us to state that in the final address of the 1st Respondent, our attention was drawn to the recent decision of the Lagos Division of this Court in **Appeal No. CA/LAG/CV/332/2023: APC v LABOUR PARTY & 42 ORS,** wherein this Court set aside the decision in **Suit No. FHC/L/CS/370/23: LABOUR PARTY & ORS v INEC,** another case forum-shopped by the 2nd Petitioner at the Lagos Division of the Federal High Court, after losing at the Abuja Division of the same Court in Exhibit X1. In the judgment in Appeal No. **Appeal No. CA/LAG/CV/332/2023: APC v LABOUR PARTY & 42 ORS,** this Court had upheld the decision of



the Federal High Court in Exhibit X1 **(Suit No. FHC/ABJ/CS/1454/2022: LABOUR PARTY v INEC)**, and construed same against the Petitioners as issue estoppel, in relation to the Petitioners' contention which they are making in this Petition, that is, that INEC is mandatorily required to electronically transmit election results.

By virtue of Section 122(2) of the Evidence Act, this Court is entitled to take judicial notice of the decision in **Appeal No. CA/LAG/CV/332/2023: APC v LABOUR PARTY & 42 ORS.** Not only that, this Court is by the doctrine of precedent bound by that decision. Since the above judicial pronouncements have decided that under the Electoral Act and INEC Regulations and Guidelines for the Conduct of Elections, the 1st Respondent cannot be compelled to electronically transmit election results, the Petitioners are clearly estopped by those decisions from contending in ground 2 of this Petition that the 1st Respondent is mandatorily required to electronically transmit the election results to the collation system.

As a court of first instance in this Petition, we shall, notwithstanding our above finding, proceed to determine the merit of ground 2 of the Petition relating to non-compliance.

It is observed that in their Petition, the Petitioners have alleged the same set of facts in paragraphs 33 – 79 as constituting both non-compliance

CA/PEPC/03/2023; CA/PEPC/04/2023; CA/PEPC/05/2023.



CERTIFIED TRUE COPY

and corrupt practices. On a careful perusal of the Petition however, it seems to me that the allegations of non-compliance are contained in paragraphs 33 – 56 and 59 of the Petition, while specific allegations of corrupt practices were made in paragraphs 60 - 78, even though same were also founded on the same acts of non-compliance alleged by the Petitioners.

The gravamen of the Petitioners' allegations of non-compliance are as encapsulated in paragraphs 37, 45, 50, 51 and 55 of the Petition which are reproduced below:

"37. The Petitioners aver that the conclusion of the election at each polling unit, the Presiding Officer was mandatorily required to electronically transmit or transfer the result of the Poling Unit directly to the collation system of the 1st Respondent. In addition, the Presiding Officer was also mandatorily required to use the BVAS to upload a scanned copy of the Form EC8A to the 1st Respondent's Result Viewing Portal (iRev) in real time."

"45. The Petitioners aver that, apart from the importance of the BVAS in the capture of accreditation at a polling unit in an election, the BVAS is also mandatorily to be used in the process of uploading the information or data imputed into it

CERTIFIED TRUE COPY

by the 1st Respondent's Presiding Officer at each Poling Unit, who shall, upon completion of voting and due recording and announcement of the result:

(i)    Electronically transmit or transfer the result of the Polling Unit directly to the collation system as prescribed by the 1st Respondent;

(ii)   Use the BVAS to upload a scanned copy of the Form EC8A to the INEC Result Viewing Portal (iRev), as prescribed by the 1st Respondent;

(iii)  Take the BVAS and the original copy of each of the forms in tamper-evident envelope to the Registration Area/Ward Collation Officer, in the company of Security Agents. The Polling Agents may accompany the Presiding Officer to the Registration Area/Ward Collation Centre."

"50. The Respondent created various levels of collation at the Registration Areas, Local Government Areas, State Constituencies and the Federal Constituency; and by that process, the results of any election, including the one hereby challenged, were only to be accepted for collation if the collation officer ascertained that the number of accredited



CERTIFIED TRUE COPY

voters corresponded with the number captured in the BVAS and where votes for the parties corresponded with the result electronically transmitted directly from the Polling Units.

51. In the case of a dispute, the results electronically transmitted or transferred directly from the lower levels and announced were to be used to determine the results at that level of the collation process. Where no result was directly transmitted in respect of the polling unit or a level of collation, it will not be possible to resolve that dispute. In this case, the Petitioners' agents and agents of other political parties walked away in protest from the National Collation Centre when the Collation Officer blatantly refused to resolve their disputations of the results being collated as mandatorily stipulated by the Electoral Act, 2022. The Petitioners hereby plead a video clip of the incident as reported by some media houses."

"55. The Petitioners aver that due to the manifest non-compliance by the 1st Respondent with the Electoral Act and specific requirements of the Regulations for the conduct of the Presidential election, by the said 1st Respondent failing, refusing and neglecting to instantly transmit and upload the result of that election electronically to the iRev from the



CERTIFIED TRUE COPY

BVAS, the 1st Respondent violated the integrity and safety measures entrenched for the conduct of the said election."

The Respondents, particularly the 1st Respondent, denied the allegations of non-compliance made by the Petitioners in their respective Replies to the Petition. In particular, the 1st Respondent denied that there was any "collation system of the 1st Respondent" to which polling unit results were mandatorily required to be electronically transmitted or transferred directly by the Presiding Officer, and stated that the prescribed mode of collation of results is as stipulated in paragraphs 50 – 55 of the Regulations and Guidelines for the Conduct of the Elections. They further stated that the prescribed mode of collation was "manual collation" of the various Forms EC8A, EC8B, EC8C, EC8D and EC8E of the Presidential Election. (See paragraph 31 of the 1st Respondent's Reply). They also stated that the BVAS is designed to upload the accreditation data at the end of the accreditation process, scan and transmit the result of the election at a polling unit through the e-transmission system which is uploaded to the 1st Respondent's Result Viewing (iRev) Portal. The 1st Respondent further averred that the upload of data or images captured and automatically stored on the BVAS device requires data service, and where there is no such data service or where the service is poor, the BVAS device is designed to work offline, and the upload of data will occur when data service is available. They also stated that polling unit results

CA/PEPC/03/2023; CA/PEPC/04/2023; CA/PEPC/05/2023.




CERTIFIED TRUE COPY

were duly uploaded on the 1st Respondent's e-transmission system by the respective Presiding Officers at the end of the election, but some of the results were not visible on the iRev Portal due to technical glitch experienced on the election day.

In specific response to the Petitioners allegation of failure, refusal and neglect to instantly transmit and upload the results electronically from the BVAS to the iRev, the 1st Respondent stated in paragraph 55(vii) and (x) as follows:

"(vii) Immediately after the election on 25th February, 2023, Polling Unit results were uploaded and received by the e-transmission system whilst using the BVAS there was a temporary failure of communication between the e-transmission system and the iRev Portal for the Presidential election. In this regard, the e-transmission system returned an HTTP 500 error which is an application error such that the transmitted results though received on the e-transmission application hosted on the AWS, the e-transmission could not organize and push the results instantly to the Presidential module on the iRev Portal because it could not map the result uploaded for the Presidential election to any State. The 1st Respondent pleads and shall rely on the AWS CloudTrail logs



indicating patches deployed to fix the error/technical glitch on the election day."

"(x)    Upon resolution of the HTTP 500 error, the results which were delayed in the e-transmission system were eventually organized and pushed to the iRev Portal. The results are available as generated in their original form from the polling units using the BVAS."

The 1st Respondent stated that the technical glitch did not in any way affect the result of the Presidential election. However, in paragraph 37 of their Reply to the 1st Respondent's Reply, the Petitioners denied that there was any technical glitch experienced on election day as contended by the 1st Respondent and stated that the failure by the 1st Respondent to upload the Presidential election results using the BVAS to the IRev was a ploy to manipulate the actual results of the election.

As indicated in their pleadings and submissions of Counsel, the Petitioners' allegation of non-compliance with the Electoral Act, 2022 and the Regulations and Guidelines for the Conduct of Elections, 2022 is anchored on the provisions of Sections 47(2), 60(1), (2) and (5), 64(4)(a) and (b), 64(5) and 73(2) of the Electoral Act and Paragraphs 38(i) and (ii), 48(a), (b) and (c), 50(v), (vii) and (xx), 51(ii), 54(xii), 55(xii) and 93 of the Regulations and Guidelines.

CERTIFIED TRUE COPY

I have carefully considered the submissions of the parties on this issue of non-compliance with the provisions of the Electoral Act and the Paragraphs of the Regulations and Guidelines for the Conduct of the Election, 2022. The Independent National Electoral Commission (INEC), the 1st Respondent herein, is established by Section 153(1)(f) of the Constitution of the Federal Republic of Nigeria, 1999, and part of its functions as stated in Paragraph 15, Item F, Part I of the Third Schedule to the said Constitution, is to organize, undertake and supervise elections, including election to the offices of the President and Vice President, among other political offices listed. Being a creation of the Constitution, INEC is empowered by Section 160(1) of the Constitution to make its own rules or otherwise regulate its own procedure; and in so doing it shall not be under the control of the President. Indeed, by Section 158(1) of the Constitution, INEC shall not be subject to direction or control of any authority or person.

By Section 4 of the 1999 Constitution, the legislative powers of the Federal Republic of Nigeria is vested in the National Assembly, which in the exercise of that power has enacted the Electoral Act, 2022 to regulate the conduct of elections in the Federal, State and Area Councils of the Federal Capital Territory. Section 47(2) of the Electoral Act, relied upon by the Petitioners mandates every Presiding Officer to use a smart card reader or any other technological device that may be prescribed by

CA/PEPC/03/2023; CA/PEPC/04/2023; CA/PEPC/05/2023.                    220



the Commission, for the accreditation of voters to verify, confirm or authenticate the particulars of the intending voter in the manner prescribed by the Commission. Also, under Section 60(5) of the Act, the Presiding Officer shall transfer the results of the election, including the total number of accredited voters and the results of the ballot in a manner as prescribed by the Commission. Section 62(1) of the Act specifically provides that after the recording and announcement of the result, the Presiding Officer shall <u>deliver</u> same along with election materials under security and accompanied by the candidates or their agents where available to such person as may be prescribed by the Commission. Further, Section 64(4) states that a Collation Officer or returning Officer at an election shall collate and announce the results of an election subject to his/her verification and confirmation that – (a) number of accredited voters stated on the collated result are correct and consistent with the number of accredited voters recorded and <u>transmitted directly</u> from polling units under Section 47(2) of the Act; and (b) the votes stated on the collated result are correct and consistent with the votes or results recorded and <u>transmitted directly</u> from the polling units under Section 60(4) of the Act.

At this stage, it should be noted that Section 47(2) referred to in Section 64(4)(a) relates to procedure for accreditation of voters by the Presiding Officer using the technological device prescribed by the Commission. As

CERTIFIED TRUE COPY

for Section 60(4) referred to in Section 64(4)(b) of the Act, it only mandates the Presiding Officer to count and announce the result at the polling unit. In fact, subsection (5) of Section 60 goes ahead to mandate the Presiding Officer to <u>transfer</u> the result including total number of accredited voters and the results of the ballot in a manner as prescribed by the Commission.

The Act also provides in Section 64(5) that the Collation Officer or returning Officer shall use the number of accredited voters recorded and <u>transmitted directly</u> from polling units under Section 47(2) of the Act and the votes or results recorded and <u>transmitted directly</u> from polling units under Section 60(4) of the Act to collate and announce the result of an election if a collated result at his or a lower level of collation is not correct.

From the aforementioned Sections, it is clear that while subsection (4) of Section 64 provides for what the collation or returning officer will use to verify and collate the results, subsection (5) also provides for what the collation or returning officer will use to collate the results. Subsection (6) of the same Section provides for what the collation or returning officer will use to determine the correctness of disputed result where there is a dispute. These are: (a) the original of the disputed collated result for each polling unit where the election is disputed (which in our view means the



physical or hard copy of the disputed collated result); (b) the technological device used for accreditation of voters in each polling unit where the election is disputed; (c) the data of accreditation recorded and <u>transmitted directly</u> from each polling unit where the election is disputed as prescribed under Section 47(2) of this Act; and (d) the votes and result of the election recorded and <u>transmitted directly</u> from each polling unit where the election is disputed as prescribed under Section 60(4) of the Act (which requires only the counting and announcement of the result at the polling unit).

A careful examination of the above Sections relied upon by the Petitioners shows that the Electoral Act had used the words "deliver" in Section 62(1), "transfer" in Section 60(5) and "transmitted directly" in Sections 50(2), 64(4), (5) and (6), of the Electoral Act, 2022, in stating how results of elections should be handled under those provisions. A look at the definitions of those words in the Blacks' Law Dictionary, Sixth Edition shows that the word "transfer" is defined at page 1497 as "to convey or remove from one place, person, etc., to another;" or to "pass or hand over from one to another"; or to "specifically to change over the possession or control." The word "transmit" on the other hand is defined by the same Law Dictionary to mean "to send or transfer from one person or place to another or to communicate."

CERTIFIED TRUE COPY

In my view, the Electoral Act, 2022 has used the words "deliver", "transfer" and "transmitted directly" interchangeably to describe how the results of the election shall be moved from one stage to another until the results are finally collated and declared. In all these, the Electoral Act, 2022 has not specifically provided that the results of the election shall be electronically transmitted.

It is in the exercise of its powers under Section 160(1) of the 1999 Constitution and Section 148 of the Electoral Act, 2022, INEC, that the 1st Respondent herein, made the Regulations and Guidelines for the Conduct of Elections, 2022 as well as INEC Manual for Election Officials, 2023. In paragraphs 14(a) and 18(a) of the Regulations, the 1st Respondent prescribed the Bimodal Voter Accreditation System (BVAS) as the technological device for the purpose of accreditation and verification of voters in the 2023 general Elections.

The Petitioners have also hinged their allegation of non-compliance on Paragraphs 38(i) and (ii), 48(a), (b) and (c), 50(v), (vii) and (xx), 51(ii), 54(xii), 55(xii) and 93 of the Regulations and Guidelines. Paragraph 38 of the Regulations provides:

> "38. On completion of all the Polling Units voting and results procedures, the Presiding Officer shall:


CERTIFIED TRUE COPY

(i)    Electronically transmit or transfer the result of the polling unit, direct to the collation system as prescribed by the Commission.

(ii)   Use the BVAS to upload a scanned copy of the EC8A to the INEC Result Viewing Portal (IReV), as prescribed by the Commission.

(iii)  Take the BVAS and the original copy of each of the Forms in tamperevident envelope to the Registration Area/Ward Collation Officer, in the company of Security Agents. The Polling Agents may accompany the Presiding Officer to the RA/Ward Collation Centre."

"48   (a)   An election result shall only be collated if the Collation Officer ascertains that the number of accredited voters agrees with the number recorded in the BVAS and votes scored by Political Parties on the result sheet is correct and agrees with the result electronically transmitted or transferred directly from the Polling Unit as prescribed in these Regulations.

(b)   If a Collation or returning Officer determines that a result from a lower level of collation is not correct, he/she shall use the result electronically transmitted or transferred



CERTIFIED TRUE COPY

directly from that lower level to collate and announce the result.

(c) If no such result has been directly transmitted electronically for a polling unit or any level of collation, the provision of Clause 93 of these Regulations shall be applied."

"50. The Registration Area/Ward Collation Officer shall –

(v) Compare the number of voters verified by the BVAS

with the number of accredited voters and total votes cast for the Polling Unit as contained in Form EC8A series for each Polling Unit.

(vii) Validate the scanned copy of Form EC8A and upload same to the IReV Portal with the assistance of the Registration Area Technical Support Staff (RATECHs);

(xx) Electronically transmit or transfer the result directly to the next level of Collation as prescribed by the Commission.

51. Where there is any discrepancy in a result submitted by a Presiding Officer to the RA/Ward Collation Officer as verified from result transmitted or transferred directly from the Polling Unit, the RA/Ward Collation Officer shall:



(i)     Request explanation from the Presiding Officer(s) concerned about the circumstances of the discrepancy;

(ii)    Locate the point of discrepancy, resolve the discrepancy using the electronic result and request the Presiding Officer to endorse the resolution; and

(iii)   Make a report of the discrepancy to the next level of collation."

"93.    Where the INEC hardcopy of collated results from the immediate lower level of collation does not exist, the Collation Officer shall use electronically transmitted resuts or results from the IReV portal to continue collation. Where none of these exist, the Collation Officer shall ask for duplicate hardcopies issued by the Commission to the following bodies in the order below:

(i)     The Nigeria Police Force; and

(ii)    Agents of Political Parties."

From the foregoing provisions of the Regulations and Guidelines relied upon by the Petitioners, it is clearly evident to me that although the Electoral Act has provided in Section 62(1) for the delivery by the Presiding Officer of the result along with other election materials under

CA/PEPC/03/2023; CA/PEPC/04/2023; CA/PEPC/05/2023.



CERTIFIED TRUE COPY

security and accompanied by candidates or their polling agents, where available, to such person as may be prescribed by the 1st Respondent, the 1st Respondent has by Paragraph 38 of the Regulations and Guidelines quoted above, introduced electronic transmission to a collation system in addition to the physical transfer of the election results to the Registration Area/Ward Collation Officer.

As stated earlier, the technological device prescribed by INEC in the conduct of the 2023 election is the Bimodal Voter Accreditation System (BVAS). The functions of the BVAS as stated in paragraphs 14(a) and 18(a) is for verifying the voter, through a positive identification of the voter and authentication of the voter, by matching his or her fingerprints or face (facial recognition), thus accrediting the voter to vote at the election and storing the data and number of such accredited voters. By Paragraph 38(ii) and (iii) of the Regulations, the BVAS is also to be used by the Presiding Officer to upload a scanned copy of the EC8A to the INEC Result Viewing Portal (iReV), after which the Presiding Officer shall take the BVAS and the original copy of each of the forms to the Registration Area/Ward Collation Officer.

From the above functions of the BVAS, it is clear to me that, apart from using the BVAS to scan the physical copy of the polling unit result and upload same to the Result Viewing Portal (iReV), there is nothing in the

CA/PEPC/03/2023; CA/PEPC/04/2023; CA/PEPC/05/2023.

CERTIFIED TRUE COPY

Regulations to show that the BVAS was meant to be used to electronically transmit or transfer the results of the Polling Unit direct to the collation system. It should be noted that INEC Results Viewing Portal (IReV) is not a collation system. The Supreme Court in **OYETOLA v INEC (2023) LPELR-60392(SC)** has explained the difference between the Collation System and the IReV. In that case, Agim, JSC held as follows:

> "As their names depict, the Collation System and the INEC Result Viewing Portal are part of the election process and play particular roles in that process. The Collation System is made of the centres where results are collated at various stages of the election. So the polling units results transmitted to the collation system provides the relevant collation officer the means to verify a polling unit result as the need arises for the purpose of collation. The results transmitted to the Result Viewing Portal is to give the public at large the opportunity to view the polling unit results on the election day."

A community reading of the relevant provisions of the Electoral Act, 2022, the Regulations and Guidelines for the Conduct of Elections, 2022 and the INEC Manual for Election Officials, 2023, shows the Electoral Act expressly provides in Section 62(1) that after recording and announcement of the result, the Presiding Officer shall deliver same

CERTIFIED TRUE COPY

along with election materials under security and accompanied by the candidates or their polling agents to such persons as may be prescribed by the Commission. The Regulations and Guidelines as well as the INEC Manual also state that hardcopies of election results shall be used for collation and it is only where no such hardcopies of the election results exist that electronically transmitted results or results from the IReV will be used to collate the results.

The Petitioners who contend that INEC was mandatorily required to electronically transmit the election results to the collation system, have called PW2 as an expert witness who stated that he is a software engineer. He stated that he was aware that INEC was mandated to electronically transmit or transfer the result from the polling unit direct to the collation system as prescribed by INEC. He stated that the IReV Portal is part of the technological architecture developed/deployed by INEC for the storage, management, display and uploading of polling unit results to be accessed by the public. However, under cross examination he admitted that he was not familiar with the operations and applications of the BVAS machine and that his investigations and findings were on the INEC IReV Portal. He also agreed that it was only INEC that could prescribe the method of transmission of election results.



PW4 was also called as an expert witness by the Petitioners. Even though he stated that part of his brief by Labour Party was to determine INEC compliance with Electoral Act, 2022 and the INEC Regulations and Guidelines for Conduct of Elections, 2022, he prevaricated under cross examination by the 1st Respondent when he first stated that IReV Portal is an electronic collation system but later recanted and said the IReV Portal is not capable of collating and/or tabulating the results of an election. The witness also stated under cross examination by the 2nd and 3rd Respondents that it is the image of Form EC8A that will be transmitted to IReV while the hardcopy of the Form EC8A will be taken to the Ward Collation Centre. As for PW7, also called as expert witness by the Petitioners, her evidence was basically in respect of the health status of Amazon Web Services (AWS), which hosted the INEC IReV Portal. The testimony of PW8, a cyber security expert also called by the Petitioners, was also related to the INEC IReV Portal.

On the part of the 1st Respondent, RW1, Dr. Lawrence Bayode, the Deputy Director in the ICT Department of the 1st Respondent has testified that contrary to the assertion of the Petitioners in paragraph 37 of the Petition, there was no "collation system of the 1st Respondent" to which polling unit results were mandatorily required to be electronically transmitted or transferred directly by the Presiding Officer. He stated that the prescribed mode of collation was manual collation of the various

CERTIFIED TRUE COPY

Forms EC8A, EC8B, EB8C, EC8D and EC8E for the Presidential Election. He explained that the BVAS machine was designed to upload accreditation data at the end of the accreditation process and scan and transmit the results of the polling units through the e-transmission system to the IReV Portal. Even as this witness was cross examined by the Petitioners' Counsel, he was not cross examined on his evidence that INEC has not established any collation system to which results will be electronically transmitted from the polling units. Thus, his testimony on that fact remained unchallenged and uncontroverted. It is settled that the Court has a duty to act on unchallenged and uncontroverted evidence. See: **BRONWEN ENERGY TRADING CO.LTD v OAN OVERSEAS AGENCY (NIG) LTD (2022) LPELR-57307(SC) at page 31, paras. B – C; and OGUNYADE v OSHUNKEYE & ANOR (2007) LPELR-2355(SC) at pages 22 – 23, paras. B - F.**

In addition, RW2, called by the 2nd and 3rd Respondents, had testified that the 1st Respondent through its Chairman made clarifications on 23rd of February, 2023 that raw figures of election results will not be transmitted electronically by the 1st Respondent as such transmission was susceptible to hacking. He identified Exhibits RA24 and RA25 as documents he referred to in his statement. These are the certified true copies of pages 28 and 27 of Tribune Newspapers of 23rd February, 2023 wherein the Chairman made the said clarification.





CERTIFIED TRUE COPY

As indicated in our ruling on objections to documents, the Petitioners did not object to the contents of Exhibits RA24 and RA25 but only stated that they were objecting to the heading but not the contents. We overruled that objection in our ruling because the reason advanced by the Petitioners' Counsel did not amount to a proper objection to those documents. It is also noteworthy that the Petitioners never cross examined RW2 on his oral evidence and the said Exhibits in support of his oral evidence. In Exhibit RA24, the INEC Chairman was reported to have stated that raw figures will not be transmitted because the law does not allow for electronic transmission of results and because it is susceptible to hacking. He stated that only scanned copies of polling unit results will be uploaded to the IReV for public viewing.

From the evidence led by the parties on this issue, it is clear that, apart from testifying that the 1st Respondent failed to transmit scanned copies of polling unit results to the INEC iRev Portal, none of the witnesses called by the Petitioners had given evidence of the existence of any collation system to which results shall be electronically transmitted by the Presiding Officers of the 1st Respondent.

Contrary to the contention of the Petitioners that under the Regulations it will not be possible to collate the Presidential election results without verifying same with the electronically transmitted results, Paragraph 92



CERTIFIED TRUE COPY

of the same Regulations categorically provides that "at every level of collation, where the INEC copy of collated result from the immediate lower level of collation exists it shall be adopted for collation." In addition, Paragraph 48(c) of the Regulations provides that "if no result has been directly transmitted electronically for a polling unit or any level of collation, the provision of clause 93 of this Regulations shall apply." The said clause 93 of the Regulations which I had earlier quoted above, provides that where the INEC hardcopy of collated results from the immediate lower level of collation does not exist, the collation officer shall use electronically transmitted result or results from the IRev portal to continue collation. And where none of this exist, the Collation Officer shall ask for the duplicate hardcopies issued by the Commission to the Nigeria Police or to the Agents of Political Parties, in that order.

The foregoing provisions of the Electoral Act and the INEC Regulations clearly show that it is not correct as contended by the Petitioners that results of the election cannot be validly collated without the electronically transmitted results. Indeed, the Regulations primarily provide for manual transmission or transfer and collation of results. There is nothing in the Electoral Act or the INEC Regulations and Guidelines to show that an electronic collation system was prescribed by the Commission to which results will be electronically transmitted.


CERTIFIED TRUE COPY

Thus, the Petitioners were unable to establish their assertion that the 1st Respondent is mandatorily required to electronically transmit the polling unit results to a collation system. The 1st Respondent on the other hand has adduced unchallenged evidence that apart from the INEC IReV Portal, no collation system was established by the 1st Respondent to which the result of the Presidential election must be electronically transmitted for collation.

It is therefore my finding that both the Electoral Act and the Regulations and Guidelines provide for manual collation of election results, and the electronic transmission to a collation system apparently introduced by the 1st Respondent in the Regulations and Guidelines are not mandatory as contended by the Petitioners herein. It is also my finding based on the evidence adduced that the only collation system put in place by the 1st Respondent in the conduct of the Presidential election is comprised of the physical collation centres in the Registration Areas/Ward Collation Centres, Local Government Area Collation Centres, the State Collation Centres and the National Collation Centre elaborately stated in Paragraphs 47, 50, 53, 54 and 55 of the Regulations and Guidelines for the Conduct of Elections, 2022.

With regard to the Petitioners' contention that the 1st Respondent deliberately failed to upload the Presidential election results to the INEC

CERTIFIED TRUE COPY

Results Viewing Portal (iRev) real time, the Petitioners have averred in Paragraphs 53, 97 and 98 of the Petition that:

"53. The Petitioners also contend that in manifest violation of the 1st Respondent's Regulations and the Electoral Act, 2022, the results of the Presidential Election held in the Polling Units were not fully uploaded on the iRev as at the time of the purported declaration of the 2nd Respondent as the winner of the Presidential Election which gave room for manipulation of the said results by officials of the Respondent."

"97. The 1st Respondent, via a written communication, sought to excuse the manifest non-compliance with the requirements of the Electoral Act, 2022 and the Regulations by claiming that there were glitches in the electronic system which prevented it [the 1st Respondent] from uploading the results of the Presidential election from the polling units to the iReV portal on the day of the election. The said written communication is hereby pleaded.

98. The Petitioners shall contend that the alleged glitches in the electronic system installed and managed by the 1st Respondent were a ploy invented by the 1st Respondent to credit unlawful votes to the 2nd Respondent and thereby,

 

> wipe out the clear advantage which inured to the Petitioners following the lawful exercise of voting rights by the electorate."

In response to the above allegation, the 1st Respondent had averred in Paragraphs 49 and 55(vii), (viii) (ix) and (x) of their Reply to the Petition that:

> "49. The 1st Respondent in response to paragraph 53 of the Petition states that the Polling Unit results were duly uploaded on the 1st Respondent's e-transmission system by the respective Presiding Oficers at the end of the election but some of the results were not visible on the IReV portal due to technical glitch experienced on the election day."

> "55(vii)    Immediately after the election on 25th February, 2023, Polling Unit results were uploaded and received by the e-transmission system whilst using the BVAS there was a temporary failure of communication between the e-transmission system and the IReV portal for the Presidential election. In this regard, the e-transmission system returned an HTTP 500 error which is an application error such that the transmitted results though received on the e-transmission application hosted on the AWS, the e-transmission could not

CERTIFIED TRUE COPY

organize and push the results instantly to the Presidential module on the IReV portal because it could not map the results uploaded for the Presidential election to any State. The 1st Respondent pleads and shall rely on the AWS CloudTrail logs indicating patches deployed to fix the error/technical glitch on the election day.

(viii) The 1st Respondent avers and shall further demonstrate at trial that the HTTP 500 error on the e-transmission system which delayed the instant push of the results transmitted from the Polling Units to the IReV portal did not in any way alter, affect or vitiate the original results from the Polling Units which in their original form are stored in the BVAS and were utilized by the Ward Collation Officers at the Ward Collation Centres to validate and verify the original copies of the Polling Unit results.

(ix) The 1st Respondent shall further contend that the technical glitch did not in any way affect the result of the election.

(x) Upon resolution of the HTTP 500 error, the results which were delayed in the e-transmission system were eventually organized and pushed to the IReV portal. The results are



available as generated in their original form from the Polling Units using the BVAS."

In Paragraph 37 of their Reply to the 1st Respondent's Reply, the Petitioners have again denied that there was any technical glitch and maintained their assertion that the failure to upload the results on the IReV was a ploy by the 1st Respondent to manipulate the results. They stated that they will rely on the server logs and server contents of the IReV hosted on the AWS Cloud platform to show that the result of the election were uploaded on the IReV portal but the 1st Respondent attempted to delete/remove the uploaded results.

It is trite that a Petitioner who alleges non-compliance with Electoral Act has the legal burden to establish such non-compliance and show how the non-compliance substantially affected the result of the election. See: **LADOJA v AJIMOBI (2016) LPELR-40658(SC) at page 29, paras. A - E; and SHINKAFI v YARI (2016) LPELR-26050(SC) at pages 19 – 20, para. C.**

In proof of their assertion, the Petitioners subpoenaed PW7 and PW8 as expert witnesses, but the Respondents challenged their competence to testify because their witness statements on oath were not frontloaded along with the Petition as mandatorily required by Paragraph 4(5) of the 1st Schedule to the Electoral Act. In my ruling at the earlier part of this judgment, we have upheld the Respondents' objection and struck out



their evidence which include their witness statements on oath and the documents and/or reports tendered through them. These are Exhibits PCJ3A – F and PCJ4 (6 Reports of AWS Health Dashbard Status and Certificate of Compliance) tendered through PW7; and Exhibit PCK1 (Meta Data) admitted through PW8.

However, notwithstanding that position, I shall proceed to consider the evidence of PW7 and PW8 and the other witnesses called by the Petitioners. PW7 claimed to be a Cloud Engineer/Architect and employee of Amazon Web Services. She stated that she is not only a member of the Labour Party, the 2nd Petitioner herein, but she contested election as its candidate for Member House of Representatives for Ogoja/Yala Federal Constituency of Cross River State. She stated that for an IT Application, the SDLC includes requirement gathering, analysis and design, development/implementation, testing the code, staging the software and deployment. She stated that she was aware that at the process of testing and staging of Software (code), any problem/challenges with the software will usually show and/or be flagged. She stated that each function is supposed to be tested and any issues flagged ought to be remedied before deploying the software. She stated that if a software/application has any glitch, such a glitch will pop up (be flagged) at the testing stage. She stated that from her preliminary review of the public viewing facing IReV website, she is aware that the polling unit



results images are stored in Amazon S3 (an AWS storage service). She stated that as an employee of AWS, the AWS has a Service Level Agreement (SLA) with its customers which is accessible to the public on docs.aws.amazon.com, and that by the SLA for S3 service, it is designed to provide 99.999999999% durability and 99.99% availability of objects stored over a year. She said this is accessible to the public on http://docs.aws.amazon.com/AmazonS3/latest/userguide/DataDurability.html. She stated that the AWS Cloud Servers are hosted in 33 Regions and the health status of AWS Cloud Services for all Regions for the past twelve months from date is accessible to the public on http://health.aws.amazon.com/health/status. She stated that the health status of each service in each region on February 25th, 2023 indicated that there were no glitches on any of the AWS Cloud Servers. She stated that from the Post-Event Summary (PES) by AWS, the last time a significant outage occurred on the AWS Cloud Servers was on December 10, 2021 which was an internal connectivity issue that affected EC2 API and Container API, among other service access issues impacting only one region (US-EAST-1). She said this is available to the public on http://aws.amazon.com/premiumsupport/technology/pes/. PW7 stated that she was aware that a glitch in a software means a malfunctioning as a result of which the Application is not able to perform properly, and that fixing a glitch in a software/application by the creation of patches refers




to series of changes made into the system by writing small codes which is imputed into the software to change its current state and thereby function properly.

On cross examination by the 1st Respondent, PW7 admitted that she missed post production maintenance which is an important element of software development lifecyle. She denied that glitches occur at post production maintenance stage and stated that it appears at the testing stage. She stated that she was aware of Personal Heath Dashboard but stated that the 1st Respondent's Personal Health Dashboard is not before the Court. She admitted that the AWS adopts a shared responsibility model in which AWS play its part while the customer play its own part when it comes to security. She admitted that the Report she tendered only shows the health status of all AWS Services in all regions in terms of the infrastructure and not security. She admitted that in order to know what happened on applications deployed on AWS infrastructure by a customer it is not necessary to get a technical report. PW7 also stated that she is familiar with AWS CloudTrail and that there is a CloudTrail for every AWS account and for every API action made on that account. She admitted that she did not produce the CloudTrail for INEC deployed Application before the Court. She denied that the CloudTrail is the best account of what transpired on INEC deployed application but did not state the best way to know what transpired. She stated that it is highly



unusual for glitches to occur for primary functions of applications in production. She stated that she was not aware that glitches happened with the Central Bank of Nigeria e-Naira project or the one that happened with the MTN Momo PSG. She admitted that she was a candidate for the Labour Party at the last election. She also admitted that the subpoena under which she came to Court was served on her personally and not on Amazon Web Services.

Also, on cross examination by the 2nd and 3rd Respondents, PW7 admitted that Exhibit PCJ2 which she presented as her employment verification letter was not signed by anyone, but insisted that there is the name of "Employment Resource Centre" written on it. She also admitted that she had been attending the Court and watching the proceedings before the day of her testimony. She admitted that the Report she presented before the Court is public information hosted by Amazon and that it is available and accessible to the public. She however insisted that the Report is hers because she was the one who downloaded it and brought same to the Court.

PW7 also admitted under cross examination that she won primary election for her Constituency under Labour Party, the 2nd Petitioner, and that she even filed an action against INEC because she was not placed on the final list of candidates published by INEC. She admitted that her

CERTIFIED TRUE COPY

complaint was because she tried several times to upload her information on INEC site but all her efforts failed because of network failure. She admitted that network failure can happen at either end of an application. Even as she disagreed that there was a glitch on INEC site, she admitted that in her affidavit she stated that INEC site crashed. PW7 also stated that she was aware that AWS experienced outage of several hours on Tuesday, 28/02/2017 and that as at 2021, AWS was reported to have suffered more than 27 outages. She also admitted that what was sent to IReV was the image of the Form EC8A.

On cross examination by the 4th Respondent, PW7 stated that she did not know about password protocols and cannot speak about password protocols to modify the applications of INEC. She admitted that the open access information she downloaded in her Report cannot be amended by her. In fact, she admitted that she was not representing Amazon Web Services (AWS) in this case. She however insisted that she is an expert. She stated that she was aware of glitch which affected Japan Brokers in September, 2021 but stated that the last one she was aware of was in December, 2021. As to whether glitches can happen again, she stated that anything is possible.

In his evidence, PW8, Dr. Chibuike Ugwuoke, another expert witness called by the Petitioners, stated that he is a Cyber Security and Risk


CERTIFIED TRUE COPY

Advisory Consultant, and that he was approached by the Labour Party to provide expert evidence in this Petition. He said he had read the Electoral Act, 2022, the INEC Regulations and Guidelines for the Conduct of the Elections, 2022 and the INEC Manual for Election Officials, 2023 with particular attention to the relevant provisions dealing with uploading and transmission of election result from the polling units using the BVAS to IReV portal. He said that he has also read the Petition as well as the Reply to the Petition filed by the 1st Respondent. He stated that from his reading of those documents and processes, when a software/ application undergoes the required minimum testing before deployment, any functionality error/bug will be flagged. He stated that the purpose of testing is to remedy/resolve all such errors before the application is deployed to production.

On cross examination by the 1st Respondent, PW8 stated that he was approached on 10th March, 2023 and he finished his work sometime in May, 2023. He said that he did his Preliminary Report on 17th and 18th March, 2023 and concluded the Final Report at the end of May, 2023. PW8, who stated in paragraph 14 of his adopted witness statement that he read the Petition and the 1st Respondent's Reply to the Petition in doing his work, stated that he could not recall whether he read the Petition. But when his attention was drawn to paragraph 14 of his statement, he agreed that he had read those pleadings. He admitted that


CERTIFIED TRUE COPY

it is not impossible for errors to occur after deployment of technology or application. When referred to paragraphs 22 and 23 of his statement, he stated that he referred to the Meta Data on the IReV in 3 polling units to establish that it is possible to show Meta Data. He stated that there were errors in those polling units and he did not have to examine the physical copies of the Forms EC8A of those polling units. He stated that from the tabulation of the Meta Data he could not tell that whether the results stated in those polling units were collated. He stated that all the work he did was on his Computer. He confirmed that the AWS security model is a shared responsibility model between AWS and the Client. He stated that he was aware of the CloudTrail and confirmed that the CloudTrail will explain the availability of the application of INEC on the AWS infrastructure. PW8 who insisted that there was an electronic collation system only pointed to an upload at the last paragraph of Exhibit PCK2 and stated that it means an electronic collation system.

When cross examined by the 2nd and 3rd Respondents, PW8 denied that it was part of his brief to assist the Labour Party to respond to the Respondent's Replies. He admitted that he did not inspect any of the BVAS machines and did not interrogate Festus Okoye whose statements he referred to. He confirmed that Exhibit A which he attached to his Report is the Meta Data of 23 pages showing multiple uploads. He denied that it contains information which are coded and not explained and

CERTIFIED TRUE COPY

insisted that the information he provided are decrypted and readable. He admitted that he supplied some links in some paragraphs of his Report but stated that he did not expect the Court to go and browse, access and download the information contained from those links.

When cross examined by the 4th Respondent, PW8 admitted that he downloaded the 12 polling units results he attached to his Report from the IReV and he did not interact with the Presiding Officers of those polling units and did not see the hardcopies of those results. He could not also tell whether those results have been collated.

Starting with the evidence of PW7, it is evident that she is a person who has an interest to serve in this Petition being a member of the 2nd Petitioner under whose platform she contested election for House of Representatives. Her interest in this Petition is further underscored by her admission that she has been attending Court and watching the proceedings prior to making her statement on oath and testifying as a witness. Her testimony therefore, was essentially a demonstration of her support and loyalty to the 2nd Petitioner. Her claim to being an employee of Amazon Web Services (AWS) is also suspect as she produced no credible evidence to that effect. Exhibit PCJ2 which is the paper she presented as evidence of her employment by AWS is obviously a worthless paper. It has no author, although she insisted that the author


CERTIFIED TRUE COPY

is "Employee Resource Center". The paper was also not signed. Her evidence adds no value to the Petitioners case because she stated that her evidence relates to the health status of AWS in terms of infrastructure and not in terms of security. She had admitted that the "Expert Report" in Exhibit PCJ3A – F which she brought to Court are actually documents publicly available on Amazon Website which she downloaded, and her only claim to its ownership is that she was the one who downloaded it and brought it to Court. She even admitted that she could not add or subtract anything from the Reports. Those Reports are obviously not her own. She also admitted that the health status of the 1st Respondent's Application hosted on the AWS is not before the Court. My conclusion on the totality of the evidence of this witness is that it is devoid of any probative value.

As for PW8, he has demonstrated that he worked to an answer. Not only did he admit that he read the Petition and Reply of the 1st Respondent in the course of his commissioned work, he also stated that he read the Electoral Act and INEC Regulations and Manual for Election Officials. On the authority of **LADOJA v AJIMOBI (supra),** the evidence of this witness is also not of any probative value.

Apart from the above, other witnesses of the Petitioners, especially PW4, PW9, PW10, PW12 and PW13 all stated that they voted and everything



went well in their respective polling units. In particular, PW4, PW10 and PW13 all stated that their polling unit results were taken to collation centres. Therefore, even the evidence of the Petitioners' witnesses show that the polling units results were physically taken to the Registration Areas/Ward Collation Centres. The Petitioners have led no evidence to establish the existence of any other collation centre to which the Presidential election results were to be electronically transmitted for collation.

On the part of the 1st Respondent, RW1 testified that the failure to upload some of the results of the Presidential election to the IReV real time on 25th February, 2023 was due to a technical glitch experienced on their e-transmission system. RW1, through whom the 1st Respondent tendered Exhibits RA6 and RA7, stated that at the end of the polls in some Polling Units on the 25th February, 2023 it was observed by the 1st Respondent that Polling Unit results being uploaded to the INEC's e-transmission system by the Presiding Officers were pushed to the Senate and House of Representatives Modules on the IReV, but the results of the Presidential election were not being pushed to the Presidential Module on the IReV. That based on threat levels and reports by security agencies that the 1st Respondent's servers may be subjected to attacks on election day, the 1st Respondent's first course of action was to investigate whether the servers were being attacked. That preliminary

CERTIFIED TRUE COPY

investigations showed there was no attack, but the issue was a HTTP 500 error from within the application which are mostly errors due to problems of configuration, permissions or failure to create application resources correctly. That a thorough investigation revealed that the e-transmission was unable to map the uploaded results of the Presidential election to any specific State, and that the Presidential folder structure which was meant to organize the uploaded result sheets in order of ELECTION/STATE/LGA/WARD/POLLING UNIT was causing the application to crash and return a server error whenever it tried to create the folder structure for the Presidential election.

RW1 explained that creating a folder structure to organize the uploaded results in the hierarchy of ELECTION/STATE/LGA/WARD/POLLING UNIT was a new feature introduced as an improvement in the e-transmission system, and that the old system randomly saved uploaded results by time stamps, making it difficult to download result sheets by election or by State. He stated that the deficiency was observed after the Osun Governorship elections in 2022. RW1 stated that during the election of 25th February, 2023 the application was able to query and detect the base States for the Senatorial districts and Federal constituencies based on the mapping of all senatorial districts and federal constituencies to their respective States, and that this mapping still exists in the database, and the upload was successful because it was able to identify the State

CA/PEPC/03/2023; CA/PEPC/04/2023; CA/PEPC/05/2023.                                    250

CERTIFIED TRUE COPY

and build the folder hierarchy for the results organization. But for the Presidential election, the application crashed because the Presidential election does not belong to any State on the 1st Respondent's database and any attempt by the application to build a folder structure to organize the election results failed with a HTTP error response. RW1 stated that since these were live servers that were being used for the election, extra care was taken not to cause a complete outage, and four application patches/updates were created and deployed immediately with the aim of fixing the HTTP error. He stated that the first Presidential election results was successfully uploaded at 8:55 pm on the 25th February, 2023. He further stated that to confirm that the glitch actually happened as well as the time that all patches to fix the error were created and deployed can be viewed on AWS CloudTrail, an AWS functionality that allows enabling operational and risk auditing. He added that all actions taken to fix the error are recorded as events in the CloudTrail logs. He stated that the technological glitch experienced on the e-transmission system was not a ploy to manipulate the election, and the glitch did not affect the results of the election. He then tendered Exhibits RA 6 and RA7, the CloudTrail log and its Certificate of Compliance with Section 84 of the Evidence Act, 2011 and identified same as the documents he referred to in his witness statement on oath.


CERTIFIED TRUE COPY

Under cross examination by the Petitioners, RW1 confirmed that testing was carried out on the e-transmission system of the 1st Respondent on the 4th of February, 2023 before it was deployed and a Report was issued. When shown a Report produced on subpoena, he identified same as a Report on Vulnerability Assessment and Penetration Testing dated 22nd February, 2023, but stated that it was not the Report of Testing carried out on the e-transmission system on 4th February, 2023. The Petitioners then tendered the Report of Vulnerability Assessment and Penetration Testing through this witness which was admitted as Exhibit X1.

From the evidence adduced on this point, it is clear that, the Petitioners are unable to substantiate their contention, the burden of proof of which was on them by virtue of Section 131(1) of the Evidence Act, 2011. They have failed to establish that the 1st Respondent had deliberately failed to upload the results of the Presidential election to the iRev in order to manipulate the results in favour of the 2nd Respondent. The 1st Respondent on the other hand has offered credible evidence in the form of Exhibits RA6 and RA7 to show that its e-transmission Application hosted on the Amazon Web Services, which is supposed to upload the results of the Presidential election to the iRev, had suffered a glitch on the election day on 25th February, 2023. On the preponderance of evidence, I am convinced that the Petitioners have failed to establish their assertion that the 1st Respondent had deliberately failed to upload

CERTIFIED TRUE COPY

the results of the Presidential election to the iRev in order to manipulate the results in favour of the 2nd Respondent.

As I stated earlier, the electronic transmission of results of an election is not expressly stated anywhere in the Electoral Act, but was only introduced by the 1st Respondent in its Regulations and Guidelines, 2022 and in the INEC Manual for Election Officials, 2023. By Section 134(2) of the Electoral Act, 2022 only an act or omission which is contrary to the Electoral Act, 2022 can be a ground for questioning an election. Thus, complaints relating to non-compliance with provisions of the Regulations and Guidelines or the Manual of Election Officials are not legally cognizable complaints for questioning an election. In interpreting Section 138(2) of the Electoral Act, 2010, which is similar to Section 134(2) of the extant Electoral Act, 2022, the Supreme Court held in **NYESOM v PETERSIDE (supra), at page 66 – 67, paras. F – C,** as follows:

> "The above provisions appear to be quite clear and unambiguous. While the Electoral Commission is duly conferred with powers to issue regulations, guidelines or manuals for the smooth conduct of elections, by Section 138(2) of the Act, so long as an act or omission regarding such regulations or guidelines is not contrary to the provisions of the Act itself, it shall not of itself be a ground for questioning the election."

CA/PEPC/03/2023; CA/PEPC/04/2023; CA/PEPC/05/2023.                    253



See also: **JEGEDE v INEC (2021) LPELR-55481(SC) at 25 – 26 at paras. A – D.**

Since, as shown above, the electronic transmission of election results is not specifically provided for in the Electoral Act, 2022, but was only provided in the Regulations and Guidelines for Conduct of Elections, 2022 and INEC Manual for Election Officials, 2023, the failure to electronically transmit election results cannot be made a ground for challenging an election under Section 134(1)(b) of the Electoral Act, 2022.

The Petitioners also alleged in paragraph 59 of the Petition that the 1st Respondent failed to record in the prescribed forms the quantity, serial numbers and other particulars of result sheets, ballot papers and other sensitive electoral materials on the prescribed forms EC25A, EC25A(I), EC8B and EC8B(I) – that is to say, electoral materials received for LGA, electoral materials distribution for RA, electoral materials receipts/ reverse logistics and polling units materials receipts/distribution in respect of the States where the 2nd Respondent purportedly won. The Petitioners further alleged that following the order of Court for inspection, they applied through their campaign organization and lawyers for the forms, but the 1st Respondent refused to give/issue those forms and refused to allow the inspection of the forms despite the order.

CA/PEPC/03/2023; CA/PEPC/04/2023; CA/PEPC/05/2023.                                    254

CERTIFIED TRUE COPY

In response to the Petitioners allegations, the 1st Respondent countered that its officials duly recorded in the prescribed Forms the quantity, serial numbers and other particulars of result sheets, ballot papers and other sensitive electoral materials in the prescribed Forms EC25A, EC25A(I), EC8B, and EC8B(I) in respect of the States where the 2nd Respondent duly won the election as done in the States where the Petitioners won the election, as the procedure adopted in the election across all States of the Federation are uniform and the same. The 1st Respondent further stated that it duly complied with the order of inspection granted by the Honourable Court and the Petitioners were not denied access to the Forms EC25A, EC25A(I), EC8B, and EC8B(I) as alleged by the Petitioners.

It was the submission of the learned Senior Counsel for the Petitioners that having regard to the state of the pleadings, and the issue of fact in contention, the onus is on the 1st Respondent to prove that there was indeed due compliance with the provision of Section 73(2) of the Electoral Act, since the Petitioners are asserting the negative while the Respondents are asserting the positive. He relied on the decisions of this Court in **FIRST BANK OF NIGERIA PLC v ADEOSUN BUSINESS INVESTMENTS LTD & ORS (2020) LPELR-51203(CA); and ROYAL UNITED NIGERIA LTD v STERLING BANK PLC (2018) LPELR-50839(CA).** He submitted that the 1st Respondent did not lead any evidence in proof of

CERTIFIED TRUE COPY

their positive assertion that there was compliance with the said provision of Section 73(2) of the Electoral Act.

Learned Counsel submitted that on the part of the Petitioners, they have led evidence through PW12 that the Petitioners obtained order of this Court for inspection of documents but the 1st Respondent had refused to produce the Forms, despite several letters demanding the Forms from the Petitioners, which were tendered as Exhibits PCQ1 to PCQ6. He added that the Petitioners have also served subpoena duces tecum on the 1st Respondent to produce the said Forms but the officer of the 1st Respondent, a Deputy Director, Certification, Complaints and Legal Drafting, who came to Court in answer of the subpoena on 20th June, 2023, failed to bring the Forms. Counsel urged the Court to invoke the provision of Section 167(d) of the Evidence Act against the 1st Respondent and hold that the Forms if produced would have been unfavourable to the 1st Respondent. He cited **OKPOKAM v TREASURE GALLERY LTD & ANOR (2017) LPELR-42809(CA).** He further submitted that the non-compliance with Section 73(2) of the Electoral Act has been established which has invalidated the election in those states which the 2nd Respondent was declared to have won, namely – Benue, Borno, Ekiti, Jigawa, Kogi, Kwara, Niger, Ogun, Ondo, Oyo, Rivers and Zamfara States, which are shown in the Form EC8D(A), admitted in evidence as Exhibit PBF. He pointed out that Section 135(1) of the Electoral Act, 2022 only





deals with non-compliance generally, but Section 73(2) of the Act has provided a specific effect of non-compliance with its provisions. Relying on **KRAUS THOMPSON ORGANISATION v NATIONAL INSTITUTE FOR POLICY AND STRATEGIC STUDIES (2004) 17 NWLR (Pt. 901) 44,** he urged the Court to hold that substantial non-compliance has been established by the Petitioners.

Arguing per contra, learned Senior Counsel for the 1st Respondent referred the Court to Section 135(1) of the Electoral Act, 2022 and submitted that the Petitioners' complaint of non-utilisation of prescribed forms, even though not proved, cannot without showing the effect on the election be a basis to void an election. He submitted that the attempt by the Petitioners to exclude Section 73(2) of the Act from the ambit of Section 135(1) is a non-starter, because the non-compliance referred to in Section 135(1) is with the provisions of the Act and no part of the Act was excluded by the Section. He posited that for non-compliance with Section 73(2) of the Act to void an election, it must have substantial effect on the election and the Petitioners have neither proved such non-compliance nor shown that it has substantially affected the result of the Presidential election. He urged the Court to so hold.

The Petitioners have contended that since they are alleging that the 1st Respondent had failed to record in the prescribed forms the quantity and

CERTIFIED TRUE COPY

particulars of the materials used in the elections, they are alleging the negative and as such the burden is on the 1st Respondent to establish that they have duly complied with the provisions of Section 73(2) of the Electoral Act. They have relied on the decisions of this Court in **FIRST BANK OF NIGERIA PLC v ADEOSUN BUSINESS INVESTMENTS LTD & ORS (supra); and ROYAL UNITED NIGERIA LTD v STERLING BANK PLC (supra).**

Whilst it is true that the burden of proof is generally on the party that asserts the affirmative of an issue and not on the party who asserts the negative, there is an exception to that general principle. Where a negative assertion forms an essential part of the party's case, the burden is on him to establish that fact. This position was clearly stated by the Supreme Court in the case of **BUHARI v INEC (supra) at page 80, paras. C – D**, when Tobi, JSC held thus:

> "A negative allegation must not be confounded with the mere traverse of an affirmative one. The true meaning of the rule is that, where a given allegation, whether affirmative or negative, forms an essential part of a party's case, the proof of such allegation rests on him."

Again, this Court in **DASHE & ORS v DURVEN & ORS (2019) LPELR-48887(CA) at pages 14 – 17, paras. E – E,** espoused this legal position when Ugo, JCA held thus:

CA/PEPC/03/2023; CA/PEPC/04/2023; CA/PEPC/05/2023.                     258

CERTIFIED TRUE COPY

"I am in no doubt that this argument of appellants about negative and positive assertions is misconceived, for while it is true that the burden of proof is generally on the person who substantially asserts the positive of an issue, and not on the person who makes a negative assertion, there is a caveat to that principle to the effect that where a negative assertion forms an essential part of a plaintiff's case (as it evidently is in the case of the appellants) the burden of proof of such allegation rests on him. The law on this point was lucidly stated by Bowen L.J. in Abrath v. N.E. Railway. Co 11 QBD 440 at 457 when he said that: "Now in an action for malicious prosecution, the plaintiff has the burden throughout of establishing that the circumstances of the prosecution were such that the Judge can see no reasonable and probable cause for instituting it. In one sense that is the assertion of a negative, and we have been pressed with the proposition that, when a negative is made out, the onus of proof shifts. That is not so. If the assertion of a negative is an essential part of a plaintiff's case, the proof of the assertion still rests upon the plaintiff. The terms 'negative and affirmative' are after all, relative, and not absolute."

In the instant case, the Petitioners have made their allegation of non-compliance with Section 73(2) of the Electoral Act, 2022 by the 1st Respondent as an essential part of their case in challenging the results of




CERTIFIED TRUE COPY

the election declared by the 1st Respondent. Not only are the Petitioners statutorily required by Section 135(1) of the Electoral Act to establish substantial non-compliance with the provisions of the Act, they are required to show how such non-compliance has substantially affected the results of the election. As rightly observed by the learned Senior Counsel for the 1st Respondent, the non-compliance that will not invalidate an election under Section 135(1) unless it is shown to be substantial and to have substantially affected the result of the Election, encompasses non-compliance with all provisions of the Electoral Act, including Section 73(2) thereof. In other words, Section 73(2) is not derogated from the ambit of Section 135(1) of the Act.

Indeed, in **BUHARI v INEC (supra),** Tobi, JSC, while considering Section 145(1) of the old Electoral Act, similar to Section 135(1) of the extant Electoral Act, 2022, had held at page 48, paras. B – D, that:

> "A petitioner who files a petition under Section 145(1) of the Electoral Act has the burden to prove the ground or grounds. This is because he is the party alleging the grounds and he has a duty to prove the affirmative. He is the party who will lose if no evidence is given on the grounds. If the petitioner does not prove his case under Section 145(1) of the Act, the action fails."

CERTIFIED TRUE COPY

Therefore, the Petitioners who have alleged non-compliance with Section 73(2) as part of their cause of action have the burden to establish such non-compliance in accordance with the requirements of the Section 135(1) of the Act.

The Petitioners have relied on the evidence of PW12 and on Exhibits PCQ1 to PCQ6 also tendered through PW12. The Exhibits are acknowledged copies of letters dated 6th March, 2023, 14th March, 2023, 16th March, 2023 and 20th March, 2023, all written by the Petitioners or their Solicitors to the Chairman of the 1st Respondent demanding for inspection of documents and for certified true copies of the electoral forms. The Petitioners also relied on Subpoena Duces Tecum served on the 1st Respondent to produce the said forms. In his testimony at paragraphs 58 to 60 of his adopted witness statement on oath, PW12 merely stated that the Petitioners made several applications through its campaign organization and Solicitors for certified copies of election documents and data relating to the Presidential election, but they were denied by the 1st Respondent and that the 1st Respondent had failed to record in the prescribed forms the quantity, serial numbers and other particulars of result sheets, ballot papers and other sensitive electoral materials.



CERTIFIED TRUE COPY

The Record of Proceedings of this Court also shows that at the instance of the Petitioners, Subpoenas dated 30th May, 2023 and 13th June, 2023 were issued on the Chairman of the 1st Respondent to produce some documents. The record also shows that on the 20th of June, 2023, one Olufunmilayo Taiwo, a Deputy Director, Certification & Complaints and Legal Drafting with INEC appeared on behalf of the 1st Respondent in answer to the subpoena duces tecum. Whilst she produced some of the documents required of the 1st Respondent in the subpoenas, she informed the Court that the documents listed in the Subpoenas as items B, C, D and E are in the States and since the Subpoena was served on them just the previous day, it would take some time for the 1st Respondent to get them.

An examination of Exhibits PCQ1 – PCQ6 which were tendered by the Petitioners through PW12, shows that all except Exhibit PCQ4 are letters addressed to the Chairman of the 1st Respondent by the Petitioners and their solicitors requesting for inspection of documents and for certified copies of those documents. Exhibit PCQ4 is a Covering Letter addressed to the Resident Electoral Commissioner, Benue State from the law firm of Dr. Onyechi Ikpeazu, SAN & Co. notifying the Resident Electoral Commissioner of subsequent action on the Solicitors letter by the National Chairman INEC Headquarters, Abuja dated 6th March, 2023.

CERTIFIED TRUE COPY

It is instructive to observe that Section 74(1) of the Electoral Act, 2023 mandates the Resident Electoral Commissioner in a State where an election is conducted to within 14 days after an application is made to him by any of the parties to an election petition, cause a certified true copy of such document to be issued to the said party. Subsection (2) of that section even provides that any Resident Electoral Commissioner who fails to comply with subsection (1) commits an offence and is liable on conviction to a maximum fine of N2,000,000.00 or imprisonment for a term of 12 months or both.

A look at the letters in Exhibits PCQ1 – PCQ6 shows that they were all addressed to the Chairman of INEC instead of the Resident Electoral Commissioners in the States as required of the Petitioners by Section 74(1) of the Electoral Act, 2023. It is therefore clear that the Petitioners have failed to follow the clear legal procedures of requesting for those documents. More so, when the record shows that the subpoenas which they claimed to have served upon the 1st Respondent were also served on the Chairman of the 1st Respondent and as stated by the Officer who answered the subpoena, same was served only the previous day to her appearance in Court.

From his evidence, PW12 had stated that apart from voting at his Polling Unit 04 at Dawaki, Abuja, the only role he played in the 25th February,

CERTIFIED TRUE COPY

2023 Presidential election was that he was a member of the 2nd Petitioner's Situation Room, and on cross examination by the Respondents he has stated that he was neither a polling agent nor a collation agent. His evidence that the 1st Respondent had failed to record in the prescribed forms the quantity, serial numbers and other details of the electoral materials can only be hearsay evidence which has no probative value. Also, the mere production of Exhibits PCQ1 – PCQ6 cannot establish an allegation of non-compliance with Section 73(2) of the Evidence Act, 2022. Apart from the evidence of PW12 and Exhibits PCQ1 – PCQ6 tendered through him, the Petitioners have produced no other evidence to substantiate their allegation that 1st Respondent failed to comply with the provisions of Section 73(2) of the Electoral Act, 2022. Rather, PW10, Kefas Iya, a supervisory presiding officer (SPO) for Madagali Ward in Adamawa State who was subpoenaed by the Petitioners to testify on their behalf, had stated in paragraphs 4 and 5 of his witness statement on oath that as SPO, he reported to the Local Government Area INEC Office in Gulak, Madagali Local Government Area in Adamawa State on the 24th of February, 2023 to collect the sensitive and non-sensitive materials for the 25th February Presidential and National Assembly elections, and that after collecting the materials he proceeded together with security agents and other INEC Officials (Presiding Officers, Assistant Presiding Officers I, Assistant Presiding


CERTIFIED TRUE COPY

Officers II and Assistant Presiding Officers III) to Madagali Ward that evening to the registration Area. His evidence was also to the effect that on the day of the elections everything went well and after sorting and counting, the Presiding Officers did the entry and snapped the results with BVAS for the upload and transmission of the results to the INEC portal but were unable to upload and when they complained to him, he requested them to come to the Registration Area.

It is therefore clear from the above that the Petitioners were unable to establish their allegation of non-compliance by INEC with Section 73(2) of the Electoral Act, 2023. The evidence PW12 and Exhibits PCQ1 to PCQ6 have not been able to rebut the presumption of regularity which enures to the 1st Respondent under the law, which can only be rebutted with cogent and credible evidence. See: **APC v SHERIFF & ORS (2023) LPELR-59953(SC), at page 145 paras. B – E; and CPC v INEC & ORS (2011) LPELR-8257(SC) at page 57, paras. A – C.**

From the totality of the evidence adduced on this issue, I am of the considered view that the Petitioners have failed to prove substantial non-compliance with the provisions of the Electoral Act, 2022. Issue 2 is also resolved against the Petitioners and in favour of the Respondents.

CERTIFIED TRUE COPY

## ISSUE 3

*Whether from the totality of the evidence adduced, the Petitioners have proven that the presidential election held on 25th February, 2023 was invalid by reason of corrupt practices.*

It was the submission of A. B Mahmoud SAN, on behalf of the 1st Respondent referred to the Petitioners of manipulation and suppression of votes and submitted that the settled position of the law is that a Petitioner must plead and lead direct evidence to establish same. He cited **OBAFEMI & ANOR v PDP & ORS (2012) LPELR-8034(CA).** He pointed out that the Petitioners did not lead any evidence through a witness conversant with the entries in all the electoral forms tendered in evidence by them. He submitted that although the Petitioners pleaded that they will rely on forensic and statistical reports, what was tendered by PW4, the Professor of Mathematics fell short of requirement of the law.

On the Petitioners' allegation of inflation and deflation of votes, learned Counsel submitted that the position of the law as stated in **AJADI v AJOBOLA (2004) 16 NWLR (Pt. 898) 91,** is that a Petitioner alleging inflation of figures needs to prove his allegation by giving particulars of the inflated figures and show that if the inflated figures are removed from the votes credited to his opponent the results would have changed



CERTIFIED TRUE COPY

in his favour. He added that the Petitioners to plead and lead evidence on their allegation which borders on crime and need to be proved beyond reasonable doubt.

As regards the Petitioners' allegation of over-voting, he submitted that the extant position of the law is that direct record of accredited voters in the BVAS machines and the voters registers of the affected polling units are required to establish such allegation. He cited **OYETOLA v ADELEKE (supra).** He added that the Petitioners only wanted the Court to act on the so-called expert opinion of PW4 who neither examined the voters register for the affected polling units nor is acquainted with the data in each of the BVAS machines. Counsel also pointed out that PW12 had stated under cross examination that he was relying on the report of PW4 for the details of the infractions he deposed in his statement on oath made on the 20th day of March, 2023 which preceded (Exhibit PCD2) the report he said he was relying on.

Addressing the Court on the probative value of the evidence of PW4, PW7 and PW8, Counsel submitted that the position of the law it that evidence of expert witnesses procured at the instance of parties to a petition must be treated with a pinch of salt. Relying on Section 83(3) of the Evidence Act, 2011 and **FAYEMI v ONI (2009) 7 NWLR (Pt. 1140) 223 at 276 – 277; SA'EED v YAKOWA (2013) 7 NWLR (Pt. 1352) 124; and**



**ISIAKA v AMOSUN (2016) 9 NWLR (Pt. 1518) 417,** he argued that the evidence of those witnesses lack probative value because the evidence shows they were not in existence at the time they were purportedly pleaded.

On the Petitioners' allegation of suppression of votes by uploading 18,088 blurred results on the iRev, Counsel submitted that even if the results uploaded on the iRev were blurred as alleged by the Petitioners there are duplicate copies in the possession of the Petitioners' Polling Agents and they failed to present any of those results in order to show any discrepancy and establish their allegation of suppression. He added that their evidence amounts to mere speculation or conjecture. He cited **NWAEBILI v ONYEAMA & ORS (2015) LPELR-40665(CA) at pages 35 – 36, paras. A – A.**

On the part of the 2nd and 3rd Respondents, Chief Olanipekun, SAN submitted that the report presented by PW4 is not accurate, same having covered only two out of the 36 States of the Federation and the FCT. He stated that PW4 had admitted under cross examination that the totality of the polling units in both Rivers and Benue States which he claimed to have considered in his report would not amount to 18,088 polling units. He added that PW4, a Professor of Mathematics is not competent to determine whether INEC had complied with the provisions

CERTIFIED TRUE COPY

of the Electoral Act and the Regulations and Guidelines and INEC Manual, as it is only the Court that can do so. He further submitted that PW4 had admitted that it is only the image of the Form EC8A that is uploaded on the iRev.

Learned Counsel pointed out that the polling units forming part of theb purported report of PW4 were not pleaded thus making his entire evidence irrelevant. He referred to the case of **INEC v ABUBAKAR (2009) 8 NWLR (Pt. 1143) 259 at 289; and AKPOTI v INEC (2022) 9 NWLR (Pt. 1836) 403 at 428.** Learned Counsel submitted that the evidence of PW12 is basically hearsay since he was neither a polling unit agent nor a collation agent for his party on the day of the election.

L. O. Fagbemi, SAN, on behalf of the 4th Respondent submitted that no witness of the Petitioners disputed the validity of the results released at their various polling units and showed how the results were manipulated as not the represent what was declared at those polling units. He contended that allegations of corrupt practices are criminal in nature and must be specifically pleaded and proved beyond reasonable doubt. He cited **PDP v INEC (2014) 17 NWLR (Pt. 1437) 525 at 561 – 562, paras. E – A.** He submitted that the allegations of corrupt practices in paragraphs 61, 64, 66 and 68 of the Petition ranging from suppression of electoral results, mischief, falsification, misrepresentation of results, use of


CERTIFIED TRUE COPY

alteration and fictitious results and reduction are impuned by the faucity of relevant facts, hence lack of merit. He submitted that evidence led in respect of facts not pleaded goes to no issue, and cited **BUHARI v INEC (2008) 4 NWLR (Pt. 1078) 506 at 629, paras, F – H; ODOM v PDP (2015) 6 NWLR (Pt. 1456) 527 at 565, paras. C- D.** He added that the Petitioners failed to demonstrate through their pleadings and by credible evidence how the allegation of corrupt practices has affected the overall results against their interest, as none of the Petitioners witnesses stated that corrupt practices occurred during the election. He submitted that the Petitioners petition clearly lacks merit and urged the Court to apply Section 135(1) of the Electoral Act, 2022 and dismiss the Petition.

Responding on behalf of the Petitioners, Dr. Ozoukwu, SAN submitted that the 1st Respondent had, in response to the request by the Petitioners for certified copies of electoral documents including Forms EC8A issued CTCs of 18,088 blurred electoral forms and blank papers and irrelevant images which they certified as the result of the election. He submitted that since the 1st Respondent manually collated the result of the elections with hardcopies of the EC8As, the 1st Respondent should have certified the hardcopies and issued them to the Petitioners. He cited the cases of **DICK v OUR AND OIL CO. LTD (2018) 14 NWLR (Pt. 1638); and UZOMA v ADODIKE (2009) LPELR-8421(CA)**, on certification of documents. He submitted that the Data Analysis of PW4 for the 18,088



CERTIFIED TRUE COPY

of the Forms EC8A shown that the number of accredited voters and voters who collected their PVCs in those polling units were 2,565,269 and 9,165,191 respectively. He added that the above figure of 2,565,269 votes cast by accredited voters (or 9,165,191 voters who collected their PVCs) in those 18,088 polling units is far more than the purported margin of lead in the INEC announced result of the election, between the 2nd Respondent and the 1st Petitioner, and as such the election is invalidated and ought to be nullified. He further argued that the unchallenged Data Analysis of PW4 further confirmed that the purported result of the election in the polling units in Form EC8As in 39,546 polling units were inaccessible on the iRev and in those polling units 23,119,298 registered voters collected their PVCs, while 5,532,553 voters were accredited to vote in those polling units. He added that those figures of 23,119,298 and 5,532,553 are far more then the purported margin of lead in the INEC announced return of the elections, and for that reason, the election ought to have been declared inconclusive, invalid and or null and void.

Learned Counsel also submitted that the Data Analysis Report produced by PW4 has shown that on a proper and accurate computation of the result of the election in Rivers and Benue States, using the Forms EC8A uploaded on the iRev, and the certified true copies of the same forms given by the 1st Respondent to the Petitioners, the Petitioners won the Presidential election in Rivers and Benue States. He argued that by that




unchallenged evidence, the number of States won by the Petitioners will now be 13 States and the FCT, while the States won by the 2nd and 4th Respondent would be reduced by those two States. On that argument, learned Counsel urged this Court to declare the return of the 2nd and 3rd Respondent as the winners of the Presidential election held on 25th February, 2023 invalid and nullify the said election.

On the 1st Respondent's argument that the evidence of PW8 was concluded and made after the institution of the Petition, Counsel submitted that the evidence of PW8 was positive that he started his work on 10th March, 2023 and submitted a preliminary report on 17th March, 2023 which dates were before the filing of the Petition. As for the 1st Respondent's argument that the evidence of PW4 fell short of the requirement of law, because the witness had admitted he was not conversant with the entries in either a genuine or manipulated result, and that all he utilized in his analysis were the secondary copies of the results uploaded on iRev portal, Counsel countered that PW4 had clearly indicated that his analysis of the 18,088 polling unit results was based on the Labour Party Agents' EC8As and the CTC of EC8As supplied by INEC. Counsel urged the Court to refer to the 18,088 blurred copies of the purported results in Exhibits PCE1 – PCE4 and draw inference from the proven fact. He added that the Court is entitled to draw inferences from

CERTIFIED TRUE COPY

the proven fact. He relied on **DAVID v INEC (2020) 4 NWLR (Pt. 1713) 188 at 202 – 203.**

In addition, learned Counsel submitted that there are 8,123 blurred results also issued and certified by INEC, the details of which cut across 14 states and 168 Local Government Areas. He submitted that the 18,088 blurred results downloaded by the Petitioners from the iRev and the 8,123 blurred results, blank sheets and images of persons that are part of the iRev reports which the 1st Respondent certified have a combined total figure of 26,211 blurred results. He argued that even the 8,123 results are substantial.

On the 1st Respondent's argument that the claim of over-voting is incorrect because Polling Unit 002 of Ward 7 Degema, Rivers State which forms part of Exhibit PCD2 shows that the analysis of over-voting was incorrect, Counsel submitted that the 1st Respondent had failed to relate the report of PW4 on over-voting as per Appendix G with the unchallenged evidence of BVAS accreditation which showed 0 accreditation for polling unit 002 of Ward 7 Degema. He relied on **OYETOLA v INEC (supra)**, and submitted that there could not have been any legitimate voting in that polling unit.

In response to the 2nd and 3rd Respondents, the learned Senior Counsel for the Petitioners made essentially the same submissions to those he



CERTIFIED TRUE COPY

made in response to the 1st Respondent. He added that the CTCs of the blurred results debunk the claim of RW1 that the hard copies of Forms EC8As were used to collate the results of the election. Relying on **DANLADI v DANGIRI (2015) 2 NWLR (Pt. 1442) 124 at 159, para. D,** he submitted that the 1st Respondent ought to have certified the hardcopy in their possession.

On the evidence of PW4, Counsel submitted that the witness was not cross examined on his evidence and that since his evidence is unchallenged, the Court has no choice but to rely on same. He cited **UBA PLC v UNISALES INT'L NIG LTD (2014) LPELR-24283(CA) at page 41, para. B.** Counsel submitted that the when the Court places the evidence of PW2, PW3, PW4, PW5, PW6, PW7, PW8, the Petitioners' expert/special witness on the one side of the imaginary scale and that of the 2nd and 3rd Respondents on the other side of the scale it will find that number of States which the Petitioners have won in the Presidential election will now be thirteen States and the FCT while the 2nd, 3rd and 4th Respondents will have their number of States reduced by two States. He urged the Court to hold that the Petitioners have established substantial non-compliance and that the non-compliance had substantially affected the results of the election.

CERTIFIED TRUE COPY

Again, the Petitioners made essentially the same submissions in response to the 4th Respondent's address on this issue. He added that the failure of the 1st Respondent to upload and transmit the results of the election from polling units to iRev as mandated by law substantially affected the outcome of the election, in that the integrity and credibility of the entire election process were compromised and cannot be guaranteed. He urged the Court to so hold and nullify the election.

In his reply to the Petitioners' submissions, A. B. Mahmoud SAN observed that the Petitioners made no attempt to contend that the Petitioners scored the highest number of votes cast at the election or to at least justify the prayers sought in that the Petitioners be declared as having scored the highest number of votes. He argued that the implication is that they have conceded to the arguments of the Respondents. He cited **OCHIGBO v AMEH (2023) LPELR-59616(CA) at pages 9 – 10, paras. E – C; and NWANKWO v YAR'ADUA (2010) 12 NWLR (Pt. 1209) 518.**

Learned Counsel further submitted that it is a misconception of the burden of proof for the Petitioners to suggest that the 1st Respondent has a burden to tender hardcopies of the results used in the collation process, since the results enjoy the presumption of regularity and the Petitioners have not made out a case to warrant a shift of the burden of

CERTIFIED TRUE COPY

proof. He relied on **UCHA & ANOR v ELECHI & ORS (2012) LPELR-8429(CA).**

Learned Counsel referred to page 6 of Exhibit PCD1 tagged "IREV Scores Investigation" wherein it was stated that 10,038 results were uncovered using the LP Agents copies of Form EC8A results and CTCs of Forms EC8A results supplied by INEC. He pointed out that the CTCs referred which were used by PW4 to arrive at the outcome indicated were not produced before the Court by the Petitioners. He wondered why the Petitioners continue to harp on an allegation that 18,088 polling unit results were blurred when the Petitioners have stated through PW4 that they uncovered 10,038 of those 18,088 polling units and saw the scores with the aid of the CTCs supplied by the 1st Respondent and their copies given to their Party Agents. He submitted that a party cannot be allowed to approbate and reprobate at the same time. He relied on **FORTE OIL V FIDELITY FINANCE CO. LTD & ORS (2021) LPELR-55877(CA).**

Learned Counsel also stated that at the material time of filing pleadings in this petition, the Petitioners did not give particulars of the 18,088 polling units said to have blurred results on iRev and that they only alluded to spreadsheet contained in the report of PW4 which was not even concluded at the material time of filing the Petition. He stated that

CERTIFIED TRUE COPY

with that failure on the part of the Petitioners they cannot turn around and cast the blame at the feet of the 1st Respondent.

Learned Counsel further submitted that the Petitioners' effort at shifting the burden of proof to the 1st Respondent by arguing that the RW1 had withheld evidence is misconceived as the burden of proof is on them to prove their allegation of non-compliance and the 1st Respondent which has no burden cannot be alleged to have withheld evidence. He urged the Court to hold that the Petitioners have failed to prove their allegations.

In his reply to the Petitioners address, Chief Olanipekun, SAN submitted that Petitioner cannot be heard to complain that they did not tender evidence because the 1st Respondent did not supply them with top copies of Form EC8As in the polling units, when by Section 74(1) and (2) of the Electoral Act they are supposed to apply to the Resident Electoral Commissioner (REC) in the particular involved and not to the INEC Chairman as they did in this case. He added that the Petitioners have failed to point to any specific Form EC8A which is caught up by the vices of mutilations, cancellations and outright swapping of votes as alleged by them, the figures concerned and how the figures affected their votes.

Learned Counsel pointed out that the Petitioners who submitted blurred copies of exhibits tendered by them have argued that those documents

CERTIFIED TRUE COPY

cannot by described by any stretch of imagination as authentic documents. He stated that by their submission, the Petitioners have crippled their case can the Court should conclude that authentic evidence has not been adduced by them since the Court cannot speculate on what is on those blurred documents. He cited **SEISMOGRAPH LIMITED v OGBEIN (1976) 4 S.C. 84; and STATE v AIBAMGBEE (1988) 1 NWLR (Pt. 84) 548 at 577.**

On the part of the 4th Respondent, Fagbemi, SAN submitted that the argument of the Petitioners that Exhibits PCA14, PBS19, PBS21, PBZ9, PCA25, PCA26, PCA28, PCA29 and the supposed 18,088 polling units forms admitted as Exhibits PCE1 – PCE4 were blurred and the Court should rely on them in making its findings is fallacious and not supported by law. He stated that the said documents were not demonstrated before the Court and this Court lacks the vires to peruse same in the comfort of its chambers. He relied on **ANDREW v INEC (2018) 9 NWLR (Pt. 1625) 507.** He submitted that the Petitioners have not proved that non-compliance exists not to talk of how it substantially affected the result of the election. He relied on **BUHARI v INEC & ORS (2009) 4 EPR 623 at 840.**

CERTIFIED TRUE COPY

**RESOLUTION OF ISSUE 3:**

In their Petition, the Petitioners made allegations of suppression of scores; unlawful reduction and inflation of results; uploading of fictitious results, misrepresentation and manipulation of results where no election took place; over-voting and wrong computation of results. These allegations are contained in paragraphs 60 – 78 of the Petition.

**PETITIONERS ALLEGATION OF FICTITIOUS UPLOADING OF RESULTS AND SUPPRESSION/INFLATION AND REDUCTION OF SCORES:**

In paragraphs 60, 61, 62, 64, 65, 68 and 69 of the Petition, the Petitioners alleged that due to the 1st Respondent's refusal and neglect to upload and transmit the result of the election to the IReV on the day of the election, the 1st Respondent suppressed the actual scores obtained by the Petitioners. According to them, the suppression of the 1st Petitioners' scores which occurred in 18,088 (Eighteen Thousand and Eighty Eight) Polling Units was orchestrated by the 1st Respondent deliberately uploading unreadable and blurred Forms EC8As on the IReV; and thereby, suppressed the lawful scores obtained by the Petitioners in the said Polling Units. They further alleged that in Rivers State during the collation exercise, the 1st Respondent announced scores of the Petitioners as 175,071 votes and the 2nd and 3rd Respondents as having 231,591 votes, when in actual fact the Petitioners' lawful votes are

CERTIFIED TRUE COPY

205,110 while that of the 2nd and 4th Respondents ought to be 84,108. They similarly alleged that in Benue State the 1st Respondent suppressed the lawful votes obtained by the Petitioners when it announced their votes as 308,372 and that of the 2nd and 4th Respondents as 310,468, when the actual votes of the Petitioners were 329,003, and that of the 2nd and 4th Respondents were 300,421. The Petitioners also alleged that the 1st Respondent whilst purporting to upload the result of the Presidential election on the iRev, embarked on massive misrepresentation and manipulation by uploading fictitious results in Polling Units where there were no elections as well as uploading incorrect results. They stated that if the results of Polling Units, Wards, Local Governments, States are properly tabulated and calculated as required by the Electoral Act and the Regulations and Guidelines for election, the overall results of the election and the percentages scored by the Political Parties will show that the Petitioners won the Presidential election of 25th February, 2023. They stated that the Petitioners shall rely on a Report of Inspection of the electoral materials.

In the earlier ruling of this Court on the preliminary objections raised by the Respondents on the propriety of the averments contained in the Petition, we held that apart from the allegations of inflation and reduction of votes in Rivers and Benue States where the Petitioners have stated the figures alleged to be inflated and reduced, the other

CERTIFIED TRUE COPY

allegations of the Petitioners are nebulous and bereft of the material particulars. We held that the said averments contain no particulars of the polling units where the alleged infractions took place or the figures alleged to have been inflated or reduced. We had struck out those paragraphs for offending Paragraph 4(1)(d) and (2) of the 1st Schedule to the Electoral Act, 2022. See: **BELGORE v AHMED (supra); and PDP v INEC & 3 ORS (supra),** where the strict legal requirement of material particulars in election petitions were stressed.

Indeed, apart from the strict requirement of stating material particulars in election petitions, it is also trite that in civil litigations including election petitions, whenever fraud or any other crime is alleged, material facts of such allegation of fraud or other crime must be pleaded and clearly set out. See: **OMOBORIOWO & ORS v AJASIN (1984) LPELR-2643(SC); BESSOY LTD v HONEY LEGON (NIG) LTD & ANOR (2008) LPELR-8329(CA) at page 26, paras. D – E; and OLURIN & ORS v SANGOLANA & ORS (2021) LPELR-56280(CA) at page 38, paras. C – E.**

The Petitioners' allegations of suppression of votes, inflation and reduction of votes, massive misrepresentation and manipulation by uploading fictitious results all amount to falsification of results of an election. In **SABIJA v TUKUR (1983) 11 S.C. 109,** the Supreme Court held


CERTIFIED TRUE COPY

that allegation of inflation with non-existing votes is another way of alleging falsification of results.

Indeed, in **HARUNA v MODIBBO (2004) 16 NWLR (Pt. 900) 487 at 542, paras. A – C,** the Supreme Court held that:

> "Where a Petition is based on allegation of incidents of fraudulent acts, mutilation of results or falsification of results, that allegation is criminal in nature and evidence required in proof thereof must be clear and unambiguous. In other words, the proof must be beyond reasonable doubt."

See also Section 135(1) of the Evidence Act, 2011 and **BUHARI v OBASANJO (2005) 13 NWLR (Pt. 941) 1 at 200 – 201; and EMMANUEL v UMANAH (2016) LPELR-40037(SC) at pages 17 – 18; IKPEAZU v OTTI (2016) LPELR- 40055(SC) at pages 15 – 16, paras. B – A; ABUBAKAR & ORS v YAR'ADUA (2008) LPELR-51(SC) at page 126, paras. C – D; OMISORE v AREGBESOLA (2015) LPELR-24803(SC) at pages 175 – 176, paras. E – C; and MAGAJI v ALL PROGRESSIVES CONGRESS (APC) & ORS (2023) LPELR-60356(SC) at pages 48 – 49, para. E.**

In order to establish falsification of election result, the Petitioner must produce in evidence two sets of results; one genuine and the other false. See: **KAKIH v PDP & ORS (2014) LPELR-23277(SC) at pages 51 – 52, paras.**



CERTIFIED TRUE COPY

**C – C; and NWOBODO v ONOH (1984) LPELR-2120(SC).** Indeed, in **ADEWALE v OLAIFA (2012) 17 NWLR (Pt. 1330) 478 at 516,** this Court held that:

> "To prove falsification of results of an election, two sets of results one genuine and the other false must be put in evidence by the party making the accusation. After putting in evidence the two sets of results, a witness or witnesses conversant with the entries made in the result sheets must be called by the party making the accusation of falsification or forgery of results of the election to prove from the electoral documents containing the results of the election how the results of the election were falsified or made up."

See also: **CHIMA ANOZIE v DR. KEN OBICHERE & ORS(2005) LPELR-7478(CA), per Dongban- Mensem, JCA (as he then was, now PCA); JOSEPH OLUJIMI KOLAWOLE AGBAJE v BABATUNDE RAJI FASHOLA (SAN) & ORS. (2008) LPELR-3648(CA), per Galinje, JCA (as he then was) at pages 71 – 76, paras. E – A; and OKECHUKWU & ANOR v ONYEGBU & ORS. (2008) LPELR-4711(CA), per Saulawa, JCA (as he then was, now JSC) at pages 53 – 54, paras. G – D.**

To prove their petition, the Petitioners who indicated during pre-hearing that they will call 50 witnesses, called only 13 witnesses. These are:

PW1 -    Lawrence Ukechukwu Nnanna Nwakaeti, a lawyer;

PW2 -    Anthony Chinwo, a Software Engineer and Architect;





PW3 -     Lucky Obewo-Isawode, a Senior Reporter with Channels Television;

PW4 -     Prof. Eric Uwadiegwu Ofoedu, a Professor of Mathematics;

PW5 -     Lummie Edevbie, a staff Arise TV, Abuja;

PW6 -     Ijeoma Osamor, a staff of Darr Communications, owners of AIT Television;

PW7 -     Mpeh Clarita Ogar, a Cloud Engineer/Architect;

PW8 -     Dr. Chibuike Ugwuoke, a Cyber Security & Risk Advisory Consultant;

PW9 -     Onoja Uloko Sunday, a staff of Women & Child Rescue Initiative, and an Election Observer;

PW10 -    Kefas Iya, an INEC Supervisory Presiding Officer;

PW11 -    Barr. Emmanuel Edet,  Deputy Director/Head, Legal Services & Board Matters Unit, National Information Technology Development Agency (NITDA);

PW12 -    Yunusa Tanko, Chief Spokesman of the Labour Party Presidential Campaign Council & its Director of Media; and,

CA/PEPC/03/2023; CA/PEPC/04/2023; CA/PEPC/05/2023.                                    284

 CERTIFIED TRUE COPY

PW13 - Peter Emmanuel Yari an INEC Presiding Officer for Polling Unit 035, Open Field, Ward 04 of Jikun Local Government Area of Kaduna State.

Of the above thirteen 13 witnesses, only three (3) had their witness statements on oath filed along with the Petition. These are PW1, PW2 and PW12. In our ruling on the Respondent's objection to the competence of the Petitioners' witnesses at the beginning of this judgment, we have struck the evidence of PW3, PW4, PW5, PW6, PW7, PW8, PW9, PW10, PW11 and PW13 on the ground that their witness statements on oath were not filed along with the petition as mandatorily required by Paragraph 4(5)(b) of the 1st Schedule to the Electoral Act.

However, even if the statements of those witnesses of the Petitioners were to be considered, the question is are those testimonies cogent and credible to establish the petitioners' allegations stated above?

PW1's testimony was only on the alleged double nomination of the 3rd Respondent and forfeiture proceedings which I have already determined above. Even as he stated that he voted in his polling unit during the elections he stated that he did not play any other role in the elections beyond exercising his civic responsibility. As for PW2, who said he was a software engineer, he stated that upon his reading of the relevant provisions of the Electoral Act and INEC Regulations, he is aware that the

CERTIFIED TRUE COPY

Presiding Officer in a Polling Unit is mandated to electronically transmit or transfer the result of the election direct to the collation system as prescribed by INEC and to also use the BVAS to upload a scanned copy of the Polling Unit result sheet to the INEC Result Viewing Portal (iRev) as prescribed by INEC. He said from his knowledge of software engineering and computer operations, iRev is a server and is accessible to the public. He said he was aware that the information or data generated/inputted in the BVAS whether operating online or offline were transmitted to the INEC servers, including virtual servers hosted on AWS Cloud.

On cross examination by the 1st Respondent however, the witness admitted that his opinion was based purely on his reading of the Electoral Act and INEC Guidelines and that he was not familiar with the applications and operations of the BVAS machine. He stated that he did not play any role in the elections. Indeed, as admitted by the witness, his statement particularly at paragraphs 10 – 13, is a virtual reproduction of Section 38 of the Electoral Act, 2022. On cross examination by the 4th Respondent, he admitted that he did not state his educational or professions qualifications or experience in his statement on oath. He also stated that his investigations was based on publicly available application programme interface (API), and collected information through it, like Form EC8As. He said he did not have the documents and forms he used and that everything was in his Laptop.


CERTIFIED TRUE COPY

Contrary to the speculation of the Petitioners that INEC was not prepared to conduct the promised credible, authentic and transparent election or that it deliberately or mischievously allowed a compromised IT infrastructure to be deployed for the conduct of the Presidential election, PW2 confirmed that Amazon Web Services is the most secure service providers in the World, and that it is used by corporations, companies, individuals and governments that are most concerned with security. In his entire evidence, PW2 did not talk about the contents of any result. Instead of supporting the Petitioners' allegations, the evidence of this witness supports the case of the 1st Respondent.

As for PW3, PW5 and PW6, they merely tendered flash drives containing speeches of the INEC Chairman Mahmoud Yakubu and INEC National Commissioner Festus Okoye wherein they gave assurances that results of the election will be transmitted to the iRev for public viewing. Being mere assurances, the evidence of these witnesses had no utilitarian value in establishing allegation of corrupt practices made by the Petitioners in this case.

In his evidence, PW4 tendered Exhibits PCD1, PCD2 and PCD3 which he claimed to be the report of his analysis of the Presidential Elections. The witness also tendered four boxes containing what he called 18,088 blurred Polling Unit results downloaded from the iRev portal which were

CERTIFIED TRUE COPY

also admitted as Exhibits PCE1 – PCE4. However, in the earlier ruling of this Court on the Respondent's objection, we have struck out Exhibits PCD1, PCD2 and PCD3 as well as Exhibits PCE1, PCE2, PCE3 and PCE4, along with the witness statement on oath of PW4 which was not filed along with the Petition, since the documents were tendered through the incompetent witness.

The witness claimed in his evidence that from his investigations, the scores on Form EC8As of 39,546 polling units were inaccessible as they contain uploads not connected with Presidential election, and that the number of accredited voters affected by the 18,088 blurred results was 2,565,269, while the number of voters who collected their PVCs was 9,165,191. According to him this signified that the votes of 5,532,553 accredited voters were discountenanced by the 1st Respondent. He added that 23,119,298 registered voters collected their PVCs in those 39,546 polling units and concluded that both the number of accredited voters of 5,532, 553 and number of voters who collected their PVCs of 23,119,298 in the 39,546 polling units far exceeded the margin of lead from the 1st Respondent's announced result of 1,807,206 over the first runner-up, and 2,693,193 over the second runner-up.

PW4 also stated that in Benue State, neither the results he obtained from the iRev nor the CTCs of Form EC8As matched the results of the 1st



Respondent. He stated that the INEC CTCs of Form EC8As showed that LP got 272,468 votes and APC got 256,086 votes, while the results from the iRev portal showed that LP got 260,795 votes while APC got 268,630 votes. He added that the INEC announced result showed that LP got 308,372 votes and APC got 310,468 votes. He concluded that adding uncovered votes and deducting votes affected by over-voting, mutilation and alteration in Benue State, LP got 281,426 votes, while APC got 258,683 votes.

A look at the 18,088 blurred polling unit results which the witness claimed to have downloaded from the iRev portal, shows that they were not certified by 1st Respondent. Being secondary evidence of public documents, they are clearly inadmissible. See: Sections 89(e) and 90(c) of the Evidence Act, 2011 and **EMEKA v IKPEAZU & ORS (2017) LPELR-41920(SC).** Of note is that PW4 admitted under cross examination by the 1st Respondent that the primary source of the data he used in his investigation is from the iRev portal. This clearly means that he based his investigation on inauthentic data since the essence of certification of public document is to ensure authenticity of public documents. See: **EGBUE v ARAKA (2003) LPELR-532(SC) at pages 16 – 17, paras. D – A; and EMMANUEL v UMANA (2006) LPELR-40037(SC) at pages 49 – 51, paras. B – A.**

CERTIFIED TRUE COPY

Also under cross examination, PW4 stated that his reference to Form EC8A and the result on iRev portal are not the same thing and that Form EC8A is a paper, while the result on the iRev is a copy of it. He particularly admitted that by his reference to blurred Form EC8As on the iRev, he was not suggesting that the hard copies of Forms EC8As are also blurred. This admission by PW4 has dealt a death-knell to the allegation made by the Petitioners in paragraph 60 of the Petition that "the 1st Respondent suppressed the 1st Petitioner's scores in 18,088 polling units by deliberately uploading unreadable and blurred Forms EC8As on the iReV."

In fact, PW4 had under cross examination completely rubbished his own report when he admitted that the iRev portal is not capable of collating and tabulating the election results, and that it is the image of the Form EC8A that is transmitted to iReV while the hardcopy of the Form EC8A is taken to the collation centre, which he stated is collated at the Ward, Local Government, State and National collation centres. He also admitted that since the result in the Form EC8As is taken to the collation centres, the failure to transmit its image in iRev or that image transmitted is blurred will not change the result already entered in Form EC8A. Again, the witness admitted under cross examination that his report in Exhibits PCD1, PCD2 and PCD3 only covered the two States of Rivers and Benue and that he worked on only available data and that if



CERTIFIED TRUE COPY

he had more data his report would have been different. He further admitted that his Report (Exhibits PCD1, PCD2 and PDC3) is not a product of expertise as any secondary school student can do the simple arithmetic involved in it. This admissions by PW4 effectively rubbishes his entire Report as inconclusive and manifestly unreliable. On the whole, the evidence of this witness, even if it were to be considered is devoid of any probative value.

As for the evidence of PW7, we have earlier analysed and evaluated her testimony and found that she was not only a person interested in this Petition, the Report in Exhibits PCJ3A - F which she brought to Court purportedly as an expert witness was merely downloaded by her from an AWS site which was openly accessible to the public. Her evidence is also of no probative value.

With regard to the evidence of PW8, I have earlier analysed and evaluated his evidence while resolving issue 2. Suffice it for me to state that I had found that PW8 having admitted that in the course of his commissioned work he had read the Petition and the 1st Respondent's Reply, as well as the Electoral Act and INEC Regulations and Manual, and that he finished his final report in May, 2022 during the hearing of this petition, PW8 had practically worked to a pre-determined answer and his evidence was of no probative value. See: **LADOJA v AJIMOBI (supra).**

CERTIFIED TRUE COPY

PW9, who gave evidence as an accredited observer of the election, had stated that everything about the election in the polling unit which he observed went , as accreditation and voting took place, the votes were counted and the results were announced and recorded on Form EC8A but was not uploaded on the iReV at the polling unit. Under cross examination by the Respondents, he restated that from his observation, the election went on smoothly in his polling unit and that the election officials complied with INEC regulations. He stated that the result was taken to the collation centre by the election officials. Rather than support the Petitioners' case, the evidence of this witness actually reinforced the Respondents' case that the election was conducted in substantial compliance with the Electoral Act and INEC Regulations and Guidelines.

PW10 stated that he acted as an ad-hoc Supervisory Presiding Officer for Madagali Ward and that on election day he collected the materials with security agents and other INEC ad-hoc Presiding Officers, Assistant Presiding Officers and moved to Madagali Ward. He stated that voting went on well until 6.30 pm, and all voters who were on cue by 2pm duly voted at Unit 004 Dissa. He stated that after sorting and counting of the votes, the Presiding Officers did the entry and snapped the results with the BVAS but were unable to transmit and upload same to the INEC iReV portal after the result of the National Assembly elections was uploaded.



He stated that when the Presiding Officers complained to him, he asked them to come to the Registration Area where he requested them to meet the Registration Area Centre Tech who asked them to submit the BVAS to him for transmission, but was unable to upload.

On cross examination by the 1st Respondents' Counsel, PW8, stated that apart from the small issue between agents of APC and PDP which was satisfactorily resolved, everything went well and the results were entered into Form EC8As in the units and were properly announced. He added that the physical copies of the Form EC8As were taken to the Ward Collation Centre. On cross examination by 2nd and 3rd Respondents, the witness confirmed that notwithstanding the difficulty in uploading the results, the collation of the Forms EC8A took place in the Ward. The evidence of this witness also supports the case of the Respondents rather that of the Petitioners.

PW11, the Head of Legal Services of National Information Technology Development Agency (NITDA) merely stated that he was subpoenaed to produce and tender the following documents: (a) Correspondence/Document/letters/Emails sent by/from Independent National Electoral Commission (INEC) to National Information Technology Development Agency requesting for the IT clearance/approval of the IT Infrastructure to be deployed and/or



deployed by INEC for the conduct of the 2023 general Elections; (b) The Certificate of clearance/approval issued by NITDA to INEC pursuant to any request in (a) above; (c) Report submitted by INEC to NITDA containing Certification for the testing/review of the IT Infrastructure deployed for the conduct of the 2023 General Elections. He stated that they don't have any of the documents in their office. Under cross examination, by 2nd and 3rd Respondents he stated that the NITDA Act does not contain Cyber Security Standards. He also stated under cross examination by the 4th Respondent that their Supervising Ministry is Ministry of Communications and Digital Economy, and that the Minister stated that there were 16 million attempts to hack the INEC IT infrastructure on the day of the elections. The evidence of this witness is of no assistance to the Petitioners

PW12, the Petitioners' star witness, whose evidence was merely a copy of the averments in the Petition, stated that on the day of the election he voted at his polling unit at Dawaki, Abuja, after which he went to the Situation Room of his party, the 2nd Petitioner. He stated that apart from his polling unit and the Situation Room, he was not present physically at any other place on the day of the election. He stated that he was not a collation agent or polling agent in any polling unit or collation centre. His evidence-in-chief was therefore mostly laced with hearsay. It is settled that hearsay evidence is inadmissible and has no probative value. See:



election was conducted in substantial compliance with the Electoral Act, 2022.

In **BUHARI v INEC & ORS (2008) LPELR-814(SC)**, the Supreme Court clearly stated the law at pages 172 – 173, paras. E – D, that:

> "A petitioner who contests the legality or lawfulness of votes cast in an election and the subsequent result must tender in evidence all the necessary documents by way of forms and other documents used at the election. He should not stop there. He must call witnesses to testify to the illegality or unlawfulness of the votes cast and prove that the illegality or unlawfulness substantially affected the result of the election. The documents are amongst those in which the results of the votes are recorded. The witnesses are those who saw it all on the day of the election; not those who picked the evidence from an eye witness. No. They must be eye witnesses too. Both forms and witnesses are vital for contesting the legality or lawfulness of the votes cast and the subsequent result of the election. One cannot be a substitute for the other. It is not enough for the petitioner to tender only the documents. It is incumbent on him to lead evidence in respect of the wrong doings or irregularities both in the conduct of the election and the recording of the votes; wrong doings and irregularities which



affected substantially the result of the election. Proving an Election Petition or proof of an Election Petition is not as easy as the Englishman finding coffee on his breakfast table and seeping it with pleasure; particularly in the light of Section 146(1) of the Electoral Act. A petitioner has a difficult though not impossible task."

See also: **MOHAMMED & ANOR v DANLADI & ORS (2019) LPELR-49138(CA) at pages 49 – 53, paras. F – D.**

In this Petition, where the Petitioners have labelled several allegations against the 1st Respondent such as suppression of scores; unlawful reduction and inflation of results; uploading of fictitious results, misrepresentation and manipulation of results where no election took place; and wrong computation of results, it is evident from the above that the Petitioners have not led any credible evidence to substantiate those allegations. Of the 13 witnesses they called, only two are presiding officers who were present at their polling units. Hence the Petitioners have not been able to establish any of those malpractices which they alleged. The evidence of the witnesses which the Petitioners called as experts to try establish that the 1st Respondent is mandatorily required to transmit election results for purposes of collation or to link the delay in the upload of the Presidential Election results to IreV by the 1st Respondent to any of the malpractices which they alleged are devoid of any value. The Petitioners' allegations have remained mere speculations

CERTIFIED TRUE COPY

**LADOJA v AJIMOBI (2016) LPELR-40658(SC) at page 75, paras. B – D; and OKEREKE v UMAHI (2016) LPELR-40035(SC) at page 55, paras. B – C.**

Apart from his evidence in chief being inadmissible hearsay, Exhibit X1, a certified true copy of judgment of the Federal High Court, Abuja in Suit No. FHC/ABJ/CS/1454/2022 was tendered through him under cross examination by the 1st Respondent, and he read out a portion of the judgment of the court which was to the effect that the 1st Respondent was under no mandatory obligation to electronically transmit or collate results of the election. He also admitted that he did not state in his statement on oath any figure unlawfully ascribed to the 2nd and 3rd Respondents by the 1st Respondent. He also stated that his party had agents throughout the Federation with over 133,000 agents. When asked by the 2nd and 3rd Respondents' Counsel to state the score of the Labour Party, the witness stated that he would not know scores of the Labour Party because the results are still being uploaded on the iReV. He added that he would not know the unlawful votes credited because he is not an expert and that the wasted votes are part of the statement made by the expert. When cross examined by the 4th Respondent, PW12 said he was not aware that INEC Chairman had given a statement that INEC will not transmit results electronically. When confronted by the 4th Respondent's Counsel, he confirmed that his statement on oath wherein he stated that he will rely on the evidence of forensic expert was made




on 20th March, 2023 while the final expert report he was relying on was made in May, 2023. It is clear that PW12 relied on an expert report that was not in existence at the time he made his statement. It is obvious that the evidence of this witness lacks credibility and is therefore manifestly unreliable.

PW13 was the only Presiding Officer called by the Petitioners in this Petition. His evidence was that in his polling unit 035 at Open Field, Ward 04, Chikun Local Government Area of Kaduna State, the election went well and that thereafter all efforts to upload the Presidential election results as captured in Form EC8A failed except the National Assembly results. That when all efforts failed, he proceeded to the Collation Centre with other ad-hoc staff. When cross examined by 1st Respondent's Counsel, he stated that he recorded the results manually and the only problem he had that day was the uploading of the result and that when he could not upload the result, he called his supervising officer who told him to take the result to the Ward Collation Centre which he did. On cross examination by 2nd and 3rd Respondent's Counsel he confirmed that after recording the result manually, he signed and the party agents also signed. When cross examined by the 4th Respondent, he stated that after signing the result he gave copies to Party Agents. The evidence of this witness actually supports the case of the Respondents that the

CA/PEPC/03/2023; CA/PEPC/04/2023; CA/PEPC/05/2023.



CERTIFIED TRUE COPY

and unfounded accusations. The Petitioners have failed to establish beyond reasonable doubt the corrupt practices which they alleged, as required of them under Section 135(1) of the Evidence Act, 2011.

## PETITIONERS' ALLEGATION OF OVER-VOTING:

On the Petitioners' allegation of over-voting, learned Counsel for the 1st Respondent contended that to prove over-voting, the direct record of accredited voters in the BVAS machines are required alongside the Voters Register of the affected polling units. He pointed out that the Petitioners failed to produce the BVAS machines and the Voters Register. He submitted that the Petitioners want this Court to rely only on the expert opinion of PW4 which is not credible. He submitted that when PW4 was confronted with the results in Polling Unit 002 of Ward 7 of Degema LGA, Rivers State which was part of his Report on over-voting in Exhibit PCD2 he stated that there was no over-voting as the number of votes cast was 40 while number of accredited voters was also 40. He relied on **OYETOLA v INEC (2023) LPELR-60392(SC)**, and urged this Court to discountenance PW4's evidence on over-voting. The other Respondents did not make any submission on this point.

In his respondent to the 1st Respondent's submission, learned Counsel for the Petitioners submitted that the attempt by the learned Counsel for the 1st Respondent to discredit the evidence of PW4 by alluding to




CERTIFIED TRUE COPY

PW4's evidence on Polling Unit 002 of Ward 7 Degema, Rivers State which forms part of Exhibit PCD2 was made to mislead the Court as the learned Counsel for the 1ˢᵗ Respondent did not relate the report on over voting in Appendix G of Exhibit PCD2  with the unchallenged BVAS accreditation for the polling unit in question which shows that there was no accreditation. He submitted that the record shows there was no legitimate voting at that polling station. He relied on **OYETOLA v INEC (supra).**

The Petitioners' allegation of over-voting is contained in paragraphs 72, 76 and 77 of the Petition which are:

> "72. The Petitioners plead that votes cast in a Polling Unit should not be more than the total number of accredited voters in the BVAS. The Petitioners shall rely on the Forensic Reports of the election materials showing that the votes cast in the Polling Units in Ekiti State, Oyo State, Ondo State, Taraba State, Osun State, Kano State, Rivers State, Borno State, Katsina State, Kwara State, Gombe State, Yobe State and Niger State exceeded the number of voters accredited on the BVAS in those States."

> "76. The Petitioners further contend that when the purported scores recorded in the polling units where the above



CERTIFIED TRUE COPY

instances of over-voting occurred are deducted from the alleged votes obtained by the 2nd Respondent and on which the 1st Respondent based the hurried declaration of the 2nd Respondent as the winner of the election, the margin of the purported lead between the 2nd Respondent and the Petitioners will be far less than the number of voters who ought to legitimately vote in those polling units. The Petitioners plead and shall rely on Form EC40G(iii) issued by the 1st Respondent.

77. The Petitioners state that instances of over-voting in the conduct of the Presidential election held on 25th February, 2023 occurred in more places than stated on the Form EC40G(iii). The Petitioners hereby also plead and shall rely on the Report of the BVAS Accreditation in the polling units, which Report listed below and which is incorporated as part of this Petition."

In the earlier ruling of this Court, the Respondents' various preliminary objections to the competence of the above averments of the Petitioners' allegation of over-voting were upheld and the Court had struck out the said paragraphs for being vague, nebulous and imprecise, having failed to disclose the specific polling units in the States where the over-voting

CERTIFIED TRUE COPY

is alleged to have occurred, the number of votes affected, the alleged margin of lead, etc. Indeed, in that ruling, I had observed that the Forensic Report containing the details of the polling units and other information which the Petitioners said they have incorporated to the pleadings by reference, were not filed along with the Petition as to be part of the pleadings. See: **BELGORE v AHMED (supra); and PDP v INEC & 3 ORS (supra).**

In proof of their above allegation of over-voting however, the Petitioners solely relied on the evidence of PW4, a subpoenaed expert witness, as well as the Forensic Report made by him which is contained in Exhibits PCD1, PCD2 and PCD3. PW4's evidence was basically that from his investigation in Exhibits PCD1, PCD2 and PCD3, he discovered that there was over-voting in 4,457 polling units which affected 2,317,129 voters who had collected their PVCs. He stated that this also exceeds the margin of lead of 1,807,206 over the first runner-up. He also stated that from his analysis of Rivers State results, the 1st Respondent announced results which were inconsistent with those uploaded on the iRev portal. PW4 also stated that from the Form EC8As downloaded from the iRev portal, there is evidence of mutilations and alterations in favour of APC and against the Labour Party (LP). He stated that from the results on the iRev portal, LP got 208,564 votes, while APC got 118,999 votes in Rivers State, as against 175,071 votes for LP and 231,591 votes for APC. He concluded

 CERTIFIED TRUE COPY

that when the unlawful figures are deducted, it will amount to 205,110 votes for LP and 84,108 votes for APC.

In the ruling on objections to witnesses and documents made in the earlier part of this judgment, the witness statement on oath of PW4 was one of those struck out for offending Paragraph 4(5)(b) of the 1st Schedule to the Electoral Act, 2022, same not having been filed along with the Petition. With the statement of PW4 struck out for being incompetent, Exhibits PCD1, PCD2 and PCD3, the Forensic Report tendered by him were also struck out for being inadmissible.

As stated earlier, the oral evidence of PW4 contained in his Witness Statement on Oath and his Report in Exhibits PCD1, PCD2 and PCD3 are the only evidence adduced by the Petitioners to establish their allegation of over-voting. With the witness statement on oath of PW4 having been struck out for being incompetent and the Forensic Report in Exhibits PCD1, PCD2 and PCD3 also struck out for being inadmissible, there was no other evidence to substantiate the Petitioners' allegation of over-voting. The Petitioners have therefore failed to prove their allegation of over-voting. Issue 3 is also resolved against the Petitioners.

Based on all the foregoing, it is evident that the Petitioners have failed to establish their allegations of corrupt practices and over-voting. In

  CERTIFIED TRUE COPY

consequence, issue 3 is also resolved against the Petitioners and in favour of the Respondents.

## ISSUE 4

*Whether from the evidence adduced the Petitioners have established that the 2nd Respondent was not duly elected by majority of lawful votes cast at the election.*

On this issue, all the Respondents referred to Paragraphs 80 – 82 of the Petition and submitted that the contention of the Petitioners that for a candidate to be declared a winner of Presidential election he must score not less than one-quarter of the votes cast in the Federal Capital Territory (FCT) is misconceived. He submitted that this issue being one of interpretation of the provisions of Section 134(2) of the Constitution, the Supreme Court had admonished against an interpretation of stultifying narrowness and encouraged a more liberal and broad interpretation. He cited **RABIU v STATE (1981) 2 NCLR 293; GLOBAL EXCELLENCE COMM. LTD v DUKE (2007) 16 NWLR (Pt. 1056) 22 at 41 – 42; A.G. OF BENDEL STATE v A.G. OF THE FEDERATION & ORS (1982) 3 NCLR 1; and MAIHAJA v GAIDAM (2018) 4 NWLR (Pt. 1610) 454 at 492, para. B.**

Learned Counsel cited Section 134(2)(b) of the 1999 Constitution and contended that to suggest that scoring at least one-quarter of the votes



CERTIFIED TRUE COPY

in the FCT is a mandatory requirement before a candidate can be declared winner of a Presidential election will be to ignore other salient provisions of that Section all of which must be read together to find the intention of the legislature. They pointed out that the provisions of Section 132(4) of the Constitution states that for the purpose of an election to the Office of the President the whole of the Federation shall be regarded as one constituency, while Section 318 has defined the Federation as the Federal Republic of Nigeria, which by Section 2 of the Constitution is one indivisible and indissoluble sovereign entity consisting of States and a Federal Capital Territory.

Learned Counsel then referred to Section 299 which provides that the provisions of the Constitution shall apply to the Federal Capital Territory as if it were one of the States of the Federation. They submitted that Section 299 of the 1999 Constitution has been interpreted and the status of the FCT, Abuja has been clearly determined. They cited **SULAIMAN v APC (2023) 5 NWLR (Pt. 1877) 211 at 255; BAKARI v OGUNDIPE (2021) 5 NWLR (Pt. 1768) 1 at 31; BABA-PANYA v PRESIDENT, FRN (2018) 15 NWLR (Pt. 1643) 395; and OKOYODE v FCDA (2006) All FWLR (Pt. 298) 1200 at 48 – 50, paras. D – E.** They submitted that if the provisions of Sections 134(2)(b) and 299 of the Constitution are read together, it will be clear that the intendment of Section 134(2)(b) in specifying "all the States in the Federation and the Federal Capital Territory, Abuja" is not


CERTIFIED TRUE COPY

for the Federal Capital Territory, Abuja to be considered separately as requiring that a candidate must score not less than one quarter in the Federal Capital Territory, Abuja before he is declared winner in a Presidential election. They added that the word "and", as used in Section 134(2)(b) of the Constitution, has been judicially interpreted, citing the cases of **BUHARI v INEC & ORS (2008) LPELR-814(SC) at 77 – 78, paras. E – B; and DASUKI v DIRECTOR GENERAL, STATE SECURITY & ORS (2019) LPELR-48113(CA).** They argued that the provisions of Section 134(2)(b) as it relates to the requirement of having not less than one-quarter of the votes in each of at least two-thirds of all the States in the Federation and the Federal Capital Territory, Abuja ought to be taken as an aggregate of all the States in the Federation and the Federal Capital Territory, Abuja, comprising of the 36 States plus the FCT, Abuja, making the 37th State. He urged the Court to so hold and discountenance the Petitioners' contention on this issue.

Arguing per contra, learned Senior Counsel for the Petitioners referred to paragraph 81 of the Petition, wherein the Petitioners have averred that the 2nd Respondent besides not scoring a majority of lawful votes cast at the election, he did not obtain at least one quarter of the votes cast in the Federal Capital Territory, Abuja and ought not to have been declared and returned elected. Learned Counsel for the Petitioners submitted that when examining Section 134(2)(b), Section 299 of the



Constitution must be considered. He submitted that the word "and" as used in Section 134(2)(b) of the Constitution is conjunctive as judicially interpreted in a litany of cases. He cited **ABUBAKAR v YAR'ADUA (2008) 19 NWLR (Pt. 1120) 7.** According to him, the language of the Constitution is clearly to the effect that for a candidate to be declared the winner of the Presidential election, that candidate must secure at least one quarter of the votes cast in two thirds of the entire 36 States of the Federation, which is 24 States, and that candidate must also secure not less than one quarter of the votes cast in the Federal Capital Territory, Abuja. He argued that the conditions in Section 134(b) are conjunctive and must be interpreted as such.

Learned Counsel for the Petitioners referred to the decisions of this Court in **OKOYODE v FCDA (supra); and PANYA v PRESIDENT, FRN & ORS (supra),** which were cited by the Respondents. He submitted that those decisions were only on Section 299 and none of them interpreted Section 299 together with Section 134(2) and they cannot wholly guide the interpretation on the combined effect of those provisions. Counsel argued that the purposive interpretation of the provisions of Sections 134(2) and 299 is that obtaining 25% votes in the FCT is an additional stand-alone requirement for election into the office of the President, more so, as Section 3 and Part II of the Second Schedule of the

CERTIFIED TRUE COPY

Constitution list the States of the Federation and FCT is not included as a State.

It was also the argument of the Petitioners' Counsel that the provisions of Section 299 which states that the provisions of the Constitution shall apply to the FCT as if it were one of the States of the Federation is for the purpose of enjoying executive, legislative and judicial powers vested in the State. He submitted that the provision of that part of Section 299 cannot be read in isolation of its remaining part which relate to the executive, legislative and judicial powers, since the Constitution must be read together with its surrounding provisions. He cited **IWUCHUKWU & ANOR v A.G. ANAMBRA STATES & ANOR (2015) LPELR-24487(CA); GRAND SYSTEMS PETROLEUM LTD v ACCESS BANK PLC (2015) 3 NWLR (Pt. 1446) 317 at 346, paras. E – H.**

Counsel further submitted that Section 299 which states that FCT is to be treated as a State is a general provision, while Section 134(2)(b) is a specific provision on the conditions for declaration of a Presidential Candidate as winner of the election. He contended that a special provision cannot be derogated from a general provision. He cited **KRAUS THOMPSON ORGANISATION v NATIONAL INSTITUTE FOR POLICY & STAREGIS STUDIES (2004) LPELR-1714(SC) at page 18, paras. D – E; MARTINS SCHROEDER & CO. v MAJOR & CO. LTD (1989) 2 NWLR (Pt.**



CERTIFIED TRUE COPY

**101) 1 (SC); KABO A. LIMITED v DE O. CORPORATION (2022) LPELR-58721(CA) at paras. A – C; and AWOLOWO v SHAGARI & ORS (1979) FNLR Vol. 2.**

Learned Counsel submitted that the approach adopted by the Respondents to the interpretation of Section 134(2)(b) is wrong and argued that the Section ought not to be interpreted without recourse to Sections 2(2) and 14(2) of the Constitution under Chapter II. He relied on **OKOGIE & ORS v A.G., LAGOS STATE (1981) 2 NCLR 337; A.G., ONDO STATE v A.G. FEDERATION & ORS (2002) 9 NWLR (Pt. 772) 222; and RABIU v STATE (supra); and BUHARI v INEC & ORS (2008) LPELR-814(SC); and BGL PLC & ORS v FBN (2021) LPELR-54655.** Counsel further submitted an important cannon of interpretation is that the express mention of one of two related things excludes that which is not mentioned, and the use of different phrases in one Section confirms the difference between the two phrases. He argued that every provision in Part I, Chapter VIII of the Constitution such as Section 299 relate only to that part and Section 134 cannot be interpreted with reference to Section 299 of the Constitution, bearing in mind Section 3(5) of the same Constitution. He finally urged this Court to discountenance the Respondents' argument and resolve this issue in favour of the Petitioners.


CERTIFIED TRUE COPY

## RESOLUTION OF ISSUE 4

This issue basically borders on the interpretation of Section 134(2)(b) of the 1999 Constitution. The appropriate starting point for the resolution of this issue therefore, is to reproduce, for ease of reference, Section 134(2)(a) & (b) of the Constitution of the Federal Republic of Nigeria, 1999 (as amended), the interpretation of which is in contention. It reads:

"134(2)   A candidate for an election to the office of President shall be deemed to have been duly elected, where, there being more than two candidates for the election –

(a)   he has the highest number of votes cast at the election; and

(b)   he has not less than one-quarter of the votes cast at the election in each of at least two-thirds of all the States in the Federation and the Federal Capital Territory, Abuja."

The contention is as to the interpretation to be accorded to paragraph (b) of subsection (2) of Section 134 quoted above. In particular, the contention is whether or not by the wordings in that paragraph a candidate must, in addition to scoring not less than one-quarter of the votes cast in at least two-thirds of the States in the Federation, also score



one-quarter of the votes cast in the Federal Capital Territory Abuja (FCT) before he can be deemed to have been duly elected. In other words, whether in determining two-thirds of the States of the Federation the Federal Capital Territory is to be included and regarded as one of the States of the Federation, or its status is to be regarded as distinct from the other States of the Federation, such that scoring one-quarter of votes in the FCT is a mandatory requirement for a candidate to be deemed duly elected as President.

It is pertinent to state that unlike interpretation of statutes, the interpretation of Constitution has its own guiding principles. In **FRN V NGANJIWA,** which was cited by the Petitioners as **SC/794/2019,** but which is reported as **FRN v NGANJIWA (2022) LPELR-58066(SC),** the Supreme Court has succinctly reviewed decided cases on interpretation of the Constitution and outlined these guiding principles:

(a)    In interpreting the Constitution, which is the supreme law of the land, mere technical rules of interpretation of statutes should be avoided, so as not to defeat the principles of government enshrined therein. Hence a broader interpretation should be preferred, unless there is something in the text or in the rest of the Constitution to indicate that a

CERTIFIED TRUE COPY

narrower interpretation will best carry out the objects and purpose of the Constitution.

(b) All Sections of the Constitution are to be construed together and not in isolation.

(c) Where the words are clear and unambiguous, a literal interpretation will be applied, thus according the words their plain and grammatical meaning.

(d) Where there is ambiguity in any Section, a holistic interpretation would be resorted to in order to arrive at the intention of its framers.

(e) Since the draftsperson is not known to be extravagant with words or provisions, every section should be construed in such a manner as not to render other sections redundant or superfluous.

(f) If the words are ambiguous, the law maker's intention must be sought, first, in the Constitution itself, then in other legislation and contemporary circumstances and by resort to the mischief rule.



(g)  The proper approach to the construction of the Constitution should be one of liberalism and it is improper to construe any of the provisions of the Constitution as to defeat the obvious ends which the Constitution was designed to achieve.

See also on this: **NAFIU RABIU v STATE (1980) 8 - 11 S.C. 130 at 148; A.G. BENDEL STATE v A.G. FEDERATION & ORS (1981) N.S.C.C. 314 at 372 – 373; BUHARI v OBASANJO (2005) 13 NWLR (Pt. 941) 1 at 281; SAVANNAH BANK LTD v AJILO (1989) 1 NWLR (Pt. 97) 305 at 326; and A.G., ABIA STATE v A.G. FEDERATION (2005) All FWLR (Pt. 275) 414 at 450,** which were also referred to by the Apex Court.

In finding appropriate answer to this issue, I wish to observe, first, that with all due respect to Counsel to the Petitioners, their interpretation of Section 134(2)(b) of the 1999 Constitution founded principally on a fixation with the word "and" appearing between the phrases "he has not less than one-quarter of the votes cast at the election in each of at least two-thirds of all the States in the Federation," and "the Federal Capital Territory, Abuja," is completely fallacious, if not outrightly ludicrous. Even their recourse to the case of **ABUBAKAR v YAR'ADUA (2008) 19 NWLR (Pt. 1120) 7**, does not help their argument because Tobi, JSC made it clear that a purposive rule of interpretation will not be appropriate "...where the intention of the lawmaker is clear, precise and unequivocal,



CERTIFIED TRUE COPY

so much so that a person can say "Yes this is what the lawmaker has in his mind."

Thus, in the interpretation of the Constitution, the principles upon which the Constitution was established rather than the direct operation or literal meaning of the words used, measure the purpose and scope of its provisions. See: **GLOBAL EXCELLENCE COMMUNICATIONS LTD v DONALD DUKE (2007) 6 NWLR (Pt. 1059) 22 at 41 – 41 (SC); (2007) LPELR-1323 (SC) at pages 18 – 19; A.G. OF BENDEL STATE v A.G. FEDERATION (1982) 3 NCLR 1; SARAKI v FRN (2016) 3 NWLR (Pt. 1500) 531; SKYE BANK PLC v IWU (2017) 16 NWLR (Pt. 1590) 124; SHELIM v GOBANG (2009) All FWLR (Pt. 496) 1866 at 1878 (SC).**

That, this is the position, is not at all open to doubt. In **BRONIK MOTORS LTD v WEMA BANK LTD (1983) LPELR-808 (SC),** Nnamani, JSC, of blessed memory, speaking for the Apex Court, confirmed it when, after a painstaking analysis of the cases on the point, said at pages 30 - 32 that:

> "A Constitution is a living document (not just a statute) providing a framework for the governance of a country not only for now but for generations yet unborn. In construing it, undue regard must not be paid to merely technical rules otherwise the objects of its provisions as well as the intention of the framers of the Constitution would be frustrated.


CERTIFIED TRUE COPY

As was stated in Minister of Home Affairs v. Fisher (1979) 2 W.L.R. 899, (1980) A.C. 319 @ 323, a Constitutional requirement should not necessarily be construed in a manner according to rules which apply to Acts of Parliament. Although the manner of interpretation of a constitutional instrument should give effect to the language used, recognition should also be given to the character and origins of the instrument. Such an instrument should be treated as sui generis calling for principles of interpretation of its own suitable to its character without necessary acceptance of all the presumptions that are relevant to legislation of private law.

It has also been accepted by all our courts that a broad and liberal interpretation should prevail in interpreting the provisions of our Constitution although one has constantly to bear in mind the object which such provisions were intended to serve. Sir Udo Udoma, J.S.C, very aptly stated this in Nafiu Rabiu v. The State (1980) 8-11 S.C. 130 @ 148 where the learned Justice said:

> 'My Lords, it is my view that the approach of this Court to the construction of the Constitution should be, and so it has been, one of liberalism, probably a

CERTIFIED TRUE COPY

> variation of the theme of the general maxim ut magis valeat quam pereat. I do not conceive it to be the duty of this Court so to construe any of the provisions of the Constitution as to defeat the obvious ends the Constitution was designed to serve where another construction equally in accordance with the words and sense of such provisions will serve to enforce and protect such ends."

Some years down the line in **GLOBAL EXCELLENCE COMMUNICATION LTD v DONALD DUKE (2007) LPELR-1323 (SC),** Onnoghen, JSC, later CJN, reiterated the relevant principles for interpretation of the Constitution, with His lordship saying, among others, at page 19, that:

> "The principles upon which the Constitution was established, rather than the direct operation or literal meaning of the words used measure the scope and purpose of its provisions. The words of the Constitution are therefore not to be read with stultifying narrowness."

All these were further followed by this Court recently in **FEDERAL REPUBLIC OF NIGERIA v MUHAMMADU MAIGARI DINGYADI (2018) LPELR-4606 (CA)**, in the following way at page 33:

CA/PEPC/03/2023; CA/PEPC/04/2023; CA/PEPC/05/2023.                    316




CERTIFIED TRUE COPY

"One main guiding post is that the principles upon which the Constitution was established rather than the direct operation or literal meaning of the words used measure the purpose and scope of its provisions: See Global Excellence Communications Ltd v. Donald Duke (2007) 6 NWLR (Pt. 1059) 22 @ 41-41 (SC); Attorney-General of Bendel State v. Attorney General of the Federation (1982) 3 NCLR 1; Saraki v. F.R.N. (2016) 3 NWLR (Pt. 1500) 531; Skye Bank Plc v. Iwu (2017) 16 NWLR (Pt. 1590) 124. There is always a need for the fulfilment of the object and true intent of the Constitution. Therefore, the Constitution must always be construed in such a way that it protects what it sets out to protect and guide what it is meant to guide – Adeleke v. Oyo State House of Assembly (2006) 6 NWLR (Pt. 1006) 608. In interpreting the Constitution of a nation, it is the duty of the Court to ensure the words of the Constitution preserve the intendment of the Constitution – Okogie v. A.G. Lagos State (1989) 2 NCLR 337, Abaribe v. Speaker, Abia State House of Assembly (2002) 14 NWLR (Pt. 788) 466, Marwa v. Nyako (2012) LPELR-7837 (SC). Every Constitution has a life and moving spirit within it and it is this spirit that forms the raison de' entre of the Constitution without which the Constitution will be a dead piece of document. The life and moving spirit of the Constitution of this country is captured in the Preamble. It has been


CERTIFIED TRUE COPY

held that when a Constitutional provision is interpreted, the cardinal rule is to look to the Preamble to the Constitution as guiding star, and the directive principles of State Policy as the '**book of interpretation**', and that while the Preamble embodies the hopes and aspirations of the people, the Directive Principles set out the proximate grounds in the governance of the country – Thakur v. Union of India (2008) 6 SCC 1.

In other words, in interpreting the wordings of section 212(1)(a) of the 1999 Constitution (as amended), the Court should be guided by principles upon which the Constitution was established rather than by the direct operation or literal meaning of the words used in the provision, and where the literal meaning of the words used are not in consonance with the guiding principles, literal interpretation must be jettisoned for another approach that accords with the guiding principles of the Constitution - Abaribe v. Speaker, Abia State House of Assembly (supra) (2002) 14 NWLR (Pt. 788) 466; Global Excellence Communications Ltd v. Donald Duke (2007) 6 NWLR (Pt. 1059) 22. The interpretation that would serve the interest of the Constitution and best carries out its objects and purpose must always be preferred – Kalu v. State (1988) 13 NWLR (Pt. 583) 531."




CERTIFIED TRUE COPY

Following these well-settled guidelines, our first port of call in unlocking the argument of the Petitioners is the Preamble to the 1999 Constitution and the Directive Principles of State Policy contained therein all of which embody the principles of the Constitution. The Preamble to the 1999 Constitution loudly proclaims equality between citizens as its cornerstone among others, thus:

"WE the people of the Federal Republic of Nigeria;

Having firmly and solemnly resolved;

……………………………………………….

AND TO PROVIDE a Constitution for the purpose of promoting the good government and welfare of all persons in our country on the principles of freedom, *EQUALITY* and Justice, and for the purpose of consolidating the Unity of our people:

DO HEREBY MAKE AND GIVE TO OURSELVES the following Constitution:"

For those who are not used to reading preambles, the Constitution still in its Fundamental Objectives and Directive Principles of State Policy contained in Chapter II of the Constitution, which this Court aptly described as the 'road to construction' in **FRN v DINGYADI (supra),** repeats this equality principle. Under its *Social Objectives* provision of that Chapter in Section 17 thereof, it again proclaims that:

CA/PEPC/03/2023; CA/PEPC/04/2023; CA/PEPC/05/2023.                    319

CERTIFIED TRUE COPY

"(1)  The State Social order is founded on ideals of Freedom, Equality and Justice.

(2)  In furtherance of the social order –

(a)  Every citizen shall have equality of rights, obligations and opportunities before the law; "

Equality of rights in every citizen as stated in this provision cannot by any means be read to exclude equality of the weight and value of their votes. No, it includes it. Even more so, when the issue here is the right of every such citizen to elect with their votes their President whose policies are supposed to and will affect all of them equally regardless of which part of the country they reside or live.

So even stopping here, the futility and hollowness in the argument of the Petitioners that the votes of the voters in the FCT, Abuja have more weight than other voters in the country, to the extent of their votes purportedly have a veto effect on other votes, is rendered bare. That notwithstanding, let us still proceed to consider, for whatever it is worth, their interpretation of Section 134(2)(b) of the same 1999 Constitution, which incidentally centres around the word 'and' in that provision.

In the first place, the settled position of the law is that in interpreting a constitutional provisions the Court should be guided by the principles upon which the Constitution was established, rather than by the direct

CERTIFIED TRUE COPY

operation or literal meaning of the words used in the provisions, and where the literal meaning of the words used are not in consonance with the guiding principles, literal interpretation must be jettisoned for another approach that accords with the guiding principles of the Constitution. It is quite clear that a calm reading of Section 134(2)(b) of the Constitution will leave no one in doubt that the use of the word 'and' by the framers, between the words "*all the States in the Federation*" and "*the Federal Capital Territory, Abuja*" indicates nothing more than the framers' understandable desire for consistency in referring to the Federal Capital Territory by that name, as it is done all through the Constitution whenever reference is made to the Federal Capital Territory. The word 'and' and 'Federal Capital Territory, Abuja' do not by any means imply the meaning imputed to it by the Petitioners.

In any event, Section 299 of the Constitution dispels any lingering doubt that may still be existing in anyone's mind by stating clearly that:

> "The provisions of this Constitution shall apply to the Federal Capital Territory, Abuja, as if it were one of the States of the Federation; **and accordingly –**
>
> **(a)    all the legislative powers, the executive powers and the judicial powers vested in the House of Assembly, the Governor of a State and in the courts of a State shall, respectively, vest in the**

CERTIFIED TRUE COPY

National Assembly, the President of the Federation and in the courts which by virtue of the foregoing provisions are courts established for the Federal Capital Territory, Abuja;

(b)    all the powers referred to in paragraph (a) of this section shall be exercised in accordance with the provisions of this Constitution.

(c)    the provisions of this Constitution pertaining to the matters aforesaid shall be read with such modifications and adaptations as may be necessary to bring them into conformity with the provisions of this section."

(Emphasis mine)

This provision states most unequivocally that the entire provisions of the Constitution shall apply to the Federal Capital Territory as if it were one of the States of the Federation. It is noteworthy that the punctuation mark employed by the framers immediately after the part of that provision ending with "Federation" emphasized by me, is a semicolon whose function in a sentence is to separate independent clauses of a compound sentence: See **MERIAM WEBSTER'S ONLINE DICTIONARY** which defines 'semicolon' as "a punctuation mark used chiefly in a coordinating function between major sentence elements (such as



independent clauses of a compound sentence)." **WIKIPEDIA** also explains its use thus: "In the English Language, a semicolon is most commonly used to link two independent clauses that are closely related in thought, such as when restating the preceding idea with a different expression."

The point being made here is that, contrary to the position of the Petitioners, by the express provisions of Section 299 above, the provisions of the entire Constitution shall apply to the Federal Capital Territory as if it were one of the States of the Federation. This means that Section 134(2)(b) of the same Constitution, requiring a presidential candidate to poll at least one quarter of the votes cast in two-thirds of the States of the Federation in order to be returned elected, means nothing more than that the Federal Capital Territory shall be taken into account in calculating the said two-third of the States of the Federation. In other words, the FCT is no more than one of the States of the Federation for the purpose of that calculation. Nothing more than that can be implied or inferable from Section 134(2)(b) of the Constitution.

If anything, this position is confirmed in the cases of **BAKARI v OGUNDIPE (2021) 5 NWLR (Pt. 1768) 1 at 38,** where it was said by the Apex Court that "By virtue of the provisions of the Section 299 of the Constitution it is so clear that the Federal Capital of Nigeria has the same status of a

CERTIFIED TRUE COPY

State; it is as if it is one of the States of the Federation."; and **IBORI v OGBORU (2009) 6 NWLR (Pt. 920) 102 at 138,** where it was confirmed by this Court that "The Federal Capital Territory, Abuja is to be treated like a State by virtue of Section 299 of the 1999 Constitution…. If the Federal Capital Territory, Abuja, is to be treated like any other State, then it is not superior to or inferior to any other State in Nigeria."

It is also my considered view that if the framers had wanted to make scoring one-quarter of votes cast in the Federal Capital Territory, Abuja, a specific requirement for the return of a Presidential candidate, they would have made that intention plain by using words that clearly separate the scoring of one-quarter of votes in the Federal Capital Territory as a distinct requirement.

As expressly stated in Section 299 of the Constitution, for the purposes of fulfilling the requirements of Section 134(2)(b) of the Constitution for the return of a Presidential candidate as duly elected, the Federal Capital Territory, Abuja, is to be treated as one of the States in the calculation of two-third of the States of the Federation. Such that if the candidate polls 25% or one-quarter of the votes in two-thirds of 37 States of the Federation (FCT Abuja inclusive), the Presidential Candidate shall be deemed to have been duly elected, even if he fails to secure 25% of the


CERTIFIED TRUE COPY

votes cast in the Federal Capital Territory, Abuja, as the 2nd Respondent did.

In conclusion, I hold, without any equivocation, that in a Presidential election, polling one quarter or 25% of total votes cast in the Federal Capital Territory of Abuja is not a separate precondition for a candidate to be deemed as duly elected under Section 134 of the Constitution. In consequence, issue 4 is also resolved against the Petitioners and in favour of the Respondents.

It is trite law that there is a rebuttable presumption of regularity with respect to election results and it is for a Petitioner who challenges that result to rebut such presumption with credible evidence. This settled principle was stated by the Supreme Court in **BUHARI v INEC (supra),** where at page 54, paras. D – F, Tobi, JSC held as follows:

> Election results are presumed by law to be correct until the contrary is proved. It is however a rebuttable presumption. In other words, there is a rebuttable presumption that the result of any election declared by a returning officer is correct and authentic and the burden is on the person who denies the correctness and authenticity of the return to rebut the presumption.




Similarly, in **NYESOM v PETERSIDE & ORS (2016) LPELR-40036(SC),** the Apex Court reiterated this position when His Lordship Kekere-Ekun, JSC held that:

> The law is trite that the results declared by INEC enjoy a presumption of regularity. In other words, they are prima facie correct. The onus is on the petitioner to prove the contrary.

Indeed, in **UDOM GABRIEL EMMANUEL v UMANA OKON UMANA & ORS (2016) LPELR-40037(SC),** this legal position was driven home when the Apex Court stated at pages 37 – 38, paras. C – A, as follows:

> Surely, the presumption of regularity enjoyed by INEC's results are not rebuttable by presumptuous postulations or rhetorical questions, but only by cogent, credible and acceptable evidence... This must be so, for a court of law can only pronounce judgment based on credible evidence presented and properly established before it. It is, thus, not at liberty to go outside the evidence and search for extraneous evidence in favour of the parties.

See also on this: **ABUBAKAR v YAR'ADUA (2009) 19 NWLR (Pt. 1120) 1; and CPC v INEC (2011) LPELR-8257(SC), per Adekeye, JSC at 57, paras. A – C; LOUIS v INEC & ORS (2010) LPELR-4442(CA), per Augie, JCA (as he then was) at page 30, paras. A – D; and IKIRIKO ODHULUMA HOPE v**

CERTIFIED TRUE COPY

**BARRISTER JOSEPH ELLEH & ANOR (2009) LPELR-8520(CA), per Saulawa, JCA at page 19, paras. C – F.**

From the foregoing, it is clearly evident that the Petitioners have failed to discharge the burden of proof placed on them by law. They have failed to prove any of the three grounds contained in paragraph 20 of this Petition. They have not been able to lead any cogent, credible and acceptable evidence to rebut the legal presumption of correctness of the results of the Presidential Election held on 25th February, 2023, as declared by the 1st Respondent.

Having resolved all four issues in this Petition against the Petitioners, this Petition is clearly unmeritorious.

## PETITION NO: CA/PEPC/04/2023

**BETWEEN**

ALLIED PEOPLES MOVEMENT (APM)          -          **PETITIONER**

       **AND**

1. **INDEPENDENT NATIONAL ELECTORAL COMMISSION (INEC)**
2. **ALL PROGRESSIVES CONGRESS (APC)**          **RESPONDENTS**
3. **TINUBU BOLA AHMED**
4. **KASHIM SHETTIMA**
5. **KABIRU MASARI**



CERTIFIED TRUE COPY

## JUDGMENT
## (DELIVERED BY HARUNA SIMON TSAMMANI, JCA)

The Petitioner herein (ALLIED PEOPLES MOVEMENT) participated in the Presidential Election conducted by the 1st Respondent on the 25/2/23 by sponsoring a candidate (Ojei Princess Chichi). Aggrieved by the declaration and return at the election, has vide its Petition filed on the 20th day of March, 2023 prayed this Court, at paragraph 31 of the Petition, to grant it the following reliefs:

31. WHEREOF your Petitioner claims and prays as follows:

(i) That it may be determined that:

(a) The 3rd Respondent was not qualified to contest as the Presidential candidate of the 2nd Respondent as at 25th February, 2023, when the Presidential Election was conducted by the 1st Respondent in the Federal Republic of Nigeria, having violated the provisions of Section 142(1) of the Constitution of the Federal Republic of Nigeria, 1999, as amended.

(b) A DECLARATION that the return of the 3rd Respondent by the 1st Respondent as the President elect of the Federal Republic of Nigeria is null, void and of no legal effect whatsoever, the 3rd Respondent having violated the provisions of Section 142(1) of the Constitution of the Federal Republic of Nigeria, 1999 as amended and the 4th Respondent having violated the provision of Section 35 of the Electoral Act, 2022.




CERTIFIED TRUE COPY

(c) The 4th Respondent was not qualified to contest as the Vice-Presidential candidate of the 2nd Respondent as at 25th February, 2023, when the Presidential Election was conducted by the 1st Respondent in the Federal Republic of Nigeria, having violated the provisions of Section 35 of the Electoral Act, 2022.

(d) The declaration and return of the 3rd Respondent by the 1st Respondent on 1st March, 2023, as the President elect of the Federal Republic of Nigeria is invalid by reason of non-compliance with the provisions of the Constitution of the Federal Republic of Nigeria, 1999; and the Electoral Act, 2022.

(ii) A DECLARATION that having regard to the joint-ticket principle enshrined in Section 142(1) of the Constitution of the Federal Republic of Nigeria, 1999, the withdrawal of the 5th Respondent as the Vice-Presidential candidate of the 2nd Respondent, by operation of law amounted to automatic withdrawal and invalidation of the candidature of the 3rd Respondent as the Presidential candidate of the 2nd Respondent for the Presidential Election conducted by the 1st Respondent on the 25th day of February, 2023.

(iii) A DECLARATION that arising from the invalidity of the 3rd Respondent's nomination, the 1st Respondent ought not to have included the name, or the abbreviation of the name, or the logo of the 2nd Respondent in the ballot papers and other election materials used by the 1st Respondent for

CERTIFIED TRUE COPY

the conduct of the Presidential Election held on the 25th day of February, 2023.

(iv) The 4th Respondent was not qualified to contest as the Vice-Presidential candidate of the 2nd Respondent as at 25th February, 2023, when the Presidential Election was conducted by the 1st Respondent in the Federal Republic of Nigeria, having violated the provisions of Section 35 of the Electoral Act, 2022.

(v) AN ORDER NULLIFYING and VOIDING all the votes scored by the 3rd Respondent in the Presidential Election conducted by the 1st Respondent on 25th February, 2023, in view of his non-qualification as a candidate of the 2nd Respondent.

(vi) UPON the grant of prayer (v) above, AN ORDER NULLIFYING AND/OR SETTING ASIDE the return/declaration of the 3rd Respondent as the winner of the Election conducted by the 1st Respondent for the office of the President of the Federal Republic of Nigeria on the 25th day of February, 2023, same having been made in violation of the provisions of Section 142(1) of the Constitution of the Federal Republic of Nigeria, 1999; and Section 35 of the Electoral Act, 2022.

(vii) UPON the grant of prayers (v) and (vi) above, and in the absence of the 3rd Respondent's participation in the Presidential Election held on 25th February, 2023 pursuant to Section 136(2) of the Electoral Act, AN ORDER declaring the candidate with the next

CA/PEPC/03/2023; CA/PEPC/04/2023; CA/PEPC/05/2023.


CERTIFIED TRUE COPY

highest number of votes as the winner of the election.

The Grounds(s) of the Petition as set out in paragraph 15 of the Petition is as follows:

15. Your Petitioner states that the ground upon which this petition is presented is that, the 3rd Respondent was at the time of the Election not qualified to contest the Election.

The Respondents were duly served the Petition and also responded by filing their Replies. The 1st Respondent's Reply to the Petition was filed on the 9/4/2023. The 2nd Respondent's Reply to the Petition was also filed on the 9/4/2023 while that of the 3rd and 4th Respondents was filed on the 13/4/2023. The 5th Respondent also filed a Reply to the Petition on the 16/4/2023. The Petitioner then filed Replies to the respective Replies of the Respondents to the Petition. The Respondents filed a number of Motions all of which challenged the competence of the Petition. Those Motions were duly heard during the pre-hearing session and Rulings reserved.

## RULINGS ON RESPONDENTS' APPLICATIONS

The 1st Respondent/Applicant also filed a Motion on Notice on the 6/5/2023 wherein he sought the following reliefs:



CERTIFIED TRUE COPY

1. AN ORDER striking out paragraphs 2, 3, 4, 5, 6, 7, 13, 14 and 15 of the Petitioner's Reply filed on the 20th day of April, 2023 in response to the 1st Respondent's Reply.

2. AN ORDER striking out paragraphs 8, 9, 10, 11 and 12 of the Petitioner's Reply filed on the 20/4/2023 in response to the 1st Respondent's Reply.

3. AND FOR SUCH further or other orders as the Honourable Tribunal shall deem fit to make in the circumstance.

We were urged to note that the grounds upon which this application is predicated are that:

1. Under paragraph 16(1)(a) of the First Schedule to the Electoral Act, 2022, a Petitioner is only expected to respond to new issues which the petition did not deal with and is not entitled to reproduce the content of the original petition or bring in new facts fending to add to the contents of the petition filed by him.

2. The entirety of paragraphs 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14 and 15 of the Petitioner's Reply filed on the 20th day of April, 2023 in response to the 1st Respondent's Reply were not pleaded in answer to any new issue of facts in the 1st Respondent's Reply to the petition but merely repeats the contents of the Petition.

3. The repetition of the contents of the petition by the Petitioner in its Petitioner's Reply is an attempt to annotate and thus constitute additions to the petition.

CA/PEPC/03/2023; CA/PEPC/04/2023; CA/PEPC/05/2023.                                    332




CERTIFIED TRUE COPY

4. In view of the foregoing, it is in the interest of justice to grant this application.

The Motion is supported by an Affidavit of 4 paragraphs and a Written Address. The Petitioner/Respondent then responded by filing Counter Affidavit of 7 paragraphs on the 13/5/2023. Same was accompanied by a Written Address in opposition to the Application.

In arguing the Application, learned senior counsel for the 1st Respondent/Applicant raised one issue for determination as follows:

> "Whether considering the repetitions inherent in the Petitioner's Reply and in view of the provisions of paragraphs 16(1) of the First Schedule to the Electoral Act, 2022, this application ought not to be granted?"

Arguing the Application, learned senior counsel for the 1st Respondent/Applicant contended that, the issue raised herein, borders on the competence of the Petitioner's Reply. It is then submitted that, the Petitioner's Reply, particularly paragraphs 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14 and 15 contravene the provisions of paragraph 16(1) of the First Schedule to the Electoral Act, 2022 in respect of when to file a Reply and what a Reply should contain. Relying on the provision of paragraph 16(1) of the 1st Schedule to the Electoral Act, 2022, the cases of **Kwara v. Innocent (2009) 1 NWLR (pt. 1121) 199, Udeachara v. Onyejeocha & Ors (2019) LPELR – 49547 (CA), Ogboru & Anor v. Okowa & Ors (2016) LPELR**

CA/PEPC/03/2023; CA/PEPC/04/2023; CA/PEPC/05/2023.

CERTIFIED TRUE COPY

**– 48350 (SC)** and **A.P.C. v. P.D.P. (2015) 15 NWLR (pt. 1481) 1 at 81**, learned senior counsel contended that, the Petitioner's Reply can only be filed in Reply to new issues of facts raised in defence. Furthermore, that at the time of filing his Reply, the Petitioner is prohibited from introducing new facts in his Reply which tend to amend, annotate, or add to the contents of the petition.

Learned Senior Counsel for the 1st Respondent/Applicant went on to submit that, the law has placed a very strict and narrow compass that guides the filing of a Petitioner's Reply. That in the instant case, the Petitioner has unguardedly repeated contents of the petition in its Reply to which the 1st Respondent will have no opportunity to file any response to. That, the entire paragraphs 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14 and 15 of the Petitioners Reply are not in reaction to any new issue raised in the 1st Respondent's Reply to the petition but a repetition of same. That paragraphs 2, 3, 7, 8, 9, 10, 11, 12 and 13(a) of the Petitioner's Reply are complete repetition of paragraphs 16, 17, 18, 19, 20, 21, 22, 23 and 24 of the petition.

It is also argued that, paragraphs 4, 5, 6, 13(b), 14 and 15 of the said Petitioner's Reply repeat the contents of paragraphs 28(i) – (xii), 29 and 30 of the petition. That the consequence of failure to comply with the mandatory provisions of paragraph 16(1) of the 1st Schedule to the



CERTIFIED TRUE COPY

Electoral Act, 2022 is that, such paragraphs of the Petitioner's Reply will be discountenanced. We were accordingly urged to strike out the stated paragraphs which run counter to the provisions of paragraphs 16(1)(a) & (b) and (2) of the First Schedule to the Electoral Act, 2022.

In response, learned senior counsel for the Petitioner/Respondent contended that the only issue that call for determination here, is:

> **"Whether the 1st Respondent/Applicant's Application is not liable to be struck out."**

Learned Senior Counsel then submitted that, Laws are meant to be obeyed, and that where a Law or rule of Court stipulate a method of doing a thing, only that method can be employed. The case of **Amasike v. The Registrar General, C.A.C. & Anor (2010) LPELR – 456 (SC)** was cited in support. Paragraph 16(1) of the 1st Schedule to the Electoral Act, 2022 was then cited to submit that the only infraction contemplated by paragraph 16(1) of the First Schedule of the Electoral Act is, where the Petitioner introduces or adds new facts, new grounds or new relief which tends to amend or add to the contents of the petition. That the paragraphs of the Petitioner's Reply which the 1st Respondent/Applicant complains of do not in any way amount to repetition but clear response to the allegations contained in the Respondent's Reply.

CA/PEPC/03/2023; CA/PEPC/04/2023; CA/PEPC/05/2023.                    335



Learned Senior Counsel for the Petitioner/Respondent went on to submit that, the provision of the 1st Schedule to the Electoral Act do not extend to the alleged repetitions claimed by the Applicant. That the case of **Udeachara v. Onyejocha (supra)** cited by the Applicant relates to the issue of raising fresh issues in a Petitioner's Reply which is not the issue in the instant petition. That the case of **Ujamatyu & Anor v. Uba & Ors (supra)** cited by the 1st Respondent/Applicant is also not applicable to the instant petition as the facts and issues raised cannot apply to the instant petition.

Learned Senior Counsel for the Petitioner/Respondent then submitted that, it is clear that, the paragraphs complained of complied with the provisions of the First Schedule to the Electoral Act. That, assuming without conceding that assertions of the First Respondent are right, Section 53 of the First Schedule to the Electoral Act stipulate that, such defect shall not render the petition void save where the Tribunal or Court so directs. We were accordingly urged to discountenance the Application.

A similar Application was filed by the 2nd Respondent on the 8/5/2023. Therein, the 2nd Respondent prayed this Court to grant the following reliefs:

CERTIFIED TRUE COPY

1. AN ORDER of the Honourable Tribunal granting leave to the 2nd Respondent/Applicant to file and argue this application before or outside the pre-hearing session in this petition.

2. AN ORDER of this Honourable Court striking out paragraphs 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17(I), (II), (IV) and (V), 18, 19, 20, 21, 22, 23 and 24 of part "B" of the Petitioner's Reply and/or the entire Petitioner's Reply to the 2nd Respondent's Reply to the petition for being an unnecessary repetition and/or introduction of new facts unrelated to the 2nd Respondent's Reply to the petition.

3. AN ORDER of the Honourable Court striking out in whole, or infracted part thereof, of the witness Statements on Oath filed together with the Petitioner's Reply to the petition for being irregular and in flagrant non-compliance with the relevant provisions of the 1st Schedule to the Electoral Act, 2022.

**AND FOR SUCH FURTHER ORDER(S)** as this Honourable Court may deem fit to make in the circumstances of the case.

The Grounds upon which the Motion is predicated are as follows:

1. Paragraph 16 of the 1st schedule to the Electoral Act, 2022 mandatorily stipulates the circumstances where petitioner is permitted to file a Reply to a Respondent's Reply in an election petition;



CERTIFIED TRUE COPY

2. The entire Part "B" or identified portions of the Petitioners' Reply to the 2nd Respondent's Reply to the petition are in gross violation of paragraph 16 of the 1st Schedule to the Electoral Act, 2022;

3. The Electoral Act, 2022 and its Schedule are strictly made for Election Petition and are sui generis;

4. The First Schedule to the Electoral Act, 2022 permits or allows a reply to be filed by the Petitioner only when new issues of facts have been raised in the 2nd Respondent/Applicant's Reply to the petition;

5. No new or fresh issue was raised in the 2nd Respondent's Reply to the petition to require a reply by the Petitioner;

6. The Honourable Court lacks jurisdiction to countenance/consider/entertain the fresh facts and issues contained in the Petitioner's Reply to the 2nd Respondent's Reply to the petition;

7. <u>The averments in Part (B), paragraphs 1, 2, 3, 4, 5, 6, 7, 9, 10, 12, 13, 14, 15, 16, 17(I),(II),(IV) and (V), 18, 19, 20, 21, 22 and 24 of the Petitioner's Reply to the 2nd Respondent's Reply to the petition constitute mere repetition or rehash of facts already in the Petition, by the Petitioner, as they do not react to any fresh issue(s) raised in the 2nd Respondent's Reply to the Petition but merely re-stated what the Petitioner has previously stated, contrary to the mandatory provisions of Paragraph 16(1) of the First Schedule to the Electoral Act, 2022 (As Amended);</u>



8. The averment in paragraph 23 of the <u>Petitioner's Reply to the 2nd Respondent's Reply to the petition</u> no doubt raise a fresh issue;

9. All the witness statements on oath filed together with the incompetent Petitioner's Reply to the 2nd Respondent's Reply to the Petition, are also irregular and are, therefore liable to be struck out;

10. The 2nd Respondent will be overreached by the new facts and his constitutional right to fair hearing prejudiced by the introduction of the new fact by the Petitioner;

11. The 2nd Respondent is foreclosed from reacting to new facts presented in the Petitioner's Reply to the 2nd Respondent's Reply to the Petition by the provision of the Electoral Act; and

12. The said paragraphs and/or averments under challenge are calculated to spring surprises on the 2nd Respondent to the Petition; and the 2nd Respondent/Applicant will be gravely prejudiced if those infracted paragraphs in the Petitioner's Reply to the 2nd Respondent's Reply to the Petition are allowed.

The Motion is supported by an Affidavit of 6 paragraphs deposed to by Emmanuel Okon, a Litigation Secretary in the Law firm of Lateef O. Fagbemi & Co, Principal and lead counsel to the 2nd Respondent/Applicant. A Written Address was filed along with the




Application. In response, the Petitioner/Respondent filed a Counter Affidavit of 7 paragraph along with a Written Address. A Written Reply on Points of Law was also filed by the 2nd Respondent/Applicant.

Now, in arguing the Motion, learned senior counsel to the 2nd Respondent/Applicant contended that, this Motion is filed because various averments in "Part B" of the Petitioner's Reply, offend paragraphs 16(1) and 16(1)(a) of the 1st Schedule to the Electoral Act, 2022 as same constitute a rehash of the petition, or are unduly repetitive of the facts already in the petition which was filed on the 20/3/2023 and also raise fresh issues. To that end, two issues were set down for determination by this Court:

1. Whether this application can be heard and determined by this Honourable Court before or outside the pre-hearing session?

2. Whether the Petitioner's Reply to the 2nd Respondent's Reply to the petition filed on 20th April, 2023 and/together with all the accompanying statements on oath are not incompetent and liable to be struck out in the entire circumstances of this Petition?

The first issue raised here is unnecessary as the Petitioner has not joined issue with the 2nd Respondent on it. That procedure is the right one sanctioned by paragraphs 18(7)(d) and 47(1) of the First Schedule to the Electoral Act, 2022.

CA/PEPC/03/2023; CA/PEPC/04/2023; CA/PEPC/05/2023.                    340


CERTIFIED TRUE COPY

On the 2nd issue, learned senior counsel for the 2nd Respondent/Applicant submitted that, by the specific provisions of the Electoral Act, 2022, particularly paragraph 16(1)(a) thereof, prohibit raising of new facts in a Petitioner's Reply. Therefore, that it is not usually necessary where no new case has been put up, to file a Petitioner's Reply. The cases of **Adepoju v. Awoduyilemi (1999) 5 NWLR (pt. 603) 364 at 382; Olubodun v. Lawal (2008) All FWLR (pt. 434) 1468 at 1501** and **PDP v. INEC (2022) 18 NWLR (pt. 1863) 653** were cited in support. The cases of **Ogboru v. Okowa (2016) 11 NWLR (pt.1522) 84** and **Sylva v. INEC (2018) 18 NWLR (pt. 1651) 310** were also cited to further submit that, the contested paragraphs of the petition are in violation of paragraphs 16(1) and 16(1)(a) of the 1st Schedule to the Electoral Act, 2022. That, no new facts arose from the 2nd Respondent's Reply to the petition as to require the Petitioner to plead such contested averments. It is therefore argued that, such averments were attempts by the Petitioner to add to the contents of the petition. The cases of **Dingyadi v. Wamako (2008) 17 NWLR (pt.1116) 385** and **Gbefin v. Hassan & Ors (2015) LPELR – 40453 (CA)** were cited.

Learned Senior Counsel for the 2nd Respondent/Applicant went on to submit that, a clear interpretation of paragraphs 16(1) and 16(1)(a) of the 1st Schedule to the Electoral Act, 2022 would show that, the Petitioners are entitled to file a Reply to the Respondent's Reply only where the 2nd



Respondent's Reply has raised new issues of facts in defence of its case, and the new issues so raised have not been delt with by the Petitioner. That the new issues so raised shall not amount to bringing new facts, grounds or prayers tending to amend or add to the contents of the petition filed.

It is then contended by learned senior counsel for the 2nd Respondent/Applicant that, the averments in paragraph 23 of the Petitioner's Reply relates to the issue of time frame within which the 3rd Respondent expressed his desire to withdraw and when he withdrew from the Senatorial race, which issue was never raised by either the petition or the 2nd Respondent in her Reply to the petition. Similarly, that the averments in Part "B", paragraphs 1, 2, 3, 4, 5, 6, 7, 9, 10, 11, 12, 13, 14, 15, 16, 17(I), (II), (III), (IV) and (V), 18, 19, 20, 21, 22 and 24 of the Petitioner's Reply constitute mere rehash or repetition of the averments in paragraphs of the petition, which are at best additional facts to those contained in the petition or a rehash of same. That in such circumstances, the 2nd Respondent will have no opportunity to controvert same.

Learned Senior Counsel for the 2nd Respondent then submitted that it was in furtherance of those offending paragraphs that depositions in the accompanying Statements on Oath were made. That the effect is that

CERTIFIED TRUE COPY

those witness Statements on Oath filed together with the invalid Petitioner's Reply are irregular and liable to be struck out. The cases of **Obot v. CBN (1993) NWLR (pt. 310) 140** and **Unity Bank Plc v. Bouari (2008) 7 NWLR (pt. 1086) 3372** were cited in support. The cases of **Orji v. Ugochukwu (2009) 14 NWLR (pt. 1161) 207 at 296 – 297** and **Ogboru v. Okowa (2016) 11 NWLR (pt. 1522) 84** were then cited to submit that if the Petitioner's Reply is struck out, the sworn statements as well as exhibits intended to prove those averments should also be struck out, since they go to no issue. The cases of **Abayomi v. A.G. Ondo State (2006) 8 NWLR (pt. 982) 211**, **Bayero v. Mainasara & Sons Ltd (2006) 8 NWLR (pt.982) 391** and **Buhari v. INEC (2008) 4 NWLR (pt. 1078) 546 at 601** were also cited in support.

The learned senior counsel for the Petitioner/Respondent submitted that laws are meant to be obeyed and when a law or rule stipulates a method of doing something, only that method is to be followed. The case of **Amasike v. The Registrar General, C.A.C. & Anor (2010) LPELR – 456 (SC)** was cited in support. That the only infraction contemplated by paragraph 16(1) of the First Schedule to the Electoral Act, 2022 is where the Petitioner introduces or adds new facts, new grounds or new prayers tending to amend or add to the contents of the Petition filed. However, that in the instant case, the averments in the paragraphs of the Petitioner's Reply which the 2nd Respondent complains of, do not in any


CERTIFIED TRUE COPY

way amount to repetition or rehash of the petition but clear response to the 2nd Respondent's Reply. That paragraph 23 of the Petitioner's Reply is in response to the issue of fact relating to the lapse of the candidacy of the 2nd Respondent which was introduced in the 2nd Respondent's Reply to the petition.

It is then argued that paragraphs 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17(i), 17(ii), (iii), (iv) and (v), 18, 19, 20, 21, 22 and 24 of the Petitioner's Reply are not new facts, rehash or repetition of averments in the petition filed. The case of **Globe Motors Holdings (Nig.) Ltd v. Ibraheem (2021) LPELR – 54550 (CA)** was cited in support. That the Petitioner merely replied to the new issues raised by the 2nd Respondent; therefore, the cases cited by the 2nd Respondent/Applicant are not applicable in the circumstances of this Petition.

In reply on points of law, learned senior counsel for the 2nd Respondent/Applicant contended that, the arguments presented by the Petitioner do not represent the position of the law on the requirements of pleadings. That where, as in the instant case, the Reply of the 2nd Respondent merely met the specific allegations of the Petitioner without introducing any new issue, the Petitioner is not at liberty to respond by filing a Reply. That the Petitioner had copiously pleaded the exact facts at paragraphs 28(ii) and (iii) of the petition and the Reply of the 2nd

CERTIFIED TRUE COPY

Respondent thereto, meant that issues had been joined by the parties in respect of that issue; therefore, the filing of a Reply on it is not permissible in law. We were accordingly urged to discountenance the Petitioner's Written Address and to grant this Application.

The 3rd and 4th Respondents also by a Motion on Notice filed on the 13/5/2023 sought the following reliefs:

1. AN ORDER, striking out the entire reply filed by the Petitioner on 20th April, 2023, together with the accompanying witness Statements on Oath, list of witnesses to be relied on and the list of additional documents.

2. FURTHER OR IN THE ALTERNATIVE TO PRAYER 1 ABOVE, AN ORDER striking out paragraphs 1, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, and 21 of the Petitioner's Reply under the heading: "Petitioner Reply to the 3rd and 4th Respondents'' Reply to the Petion") filed 20th April, 2023, to the Applicant's Reply to the Petition.

3. AND FOR SUCH FURTHER ORDER or orders as this Honourable Tribunal may deem fit to make in the circumstances.

The Grounds upon which the Application is predicated are as follows:

(i) Petitioner had filed its Petition on 20th March, 2023 premising same on 1 ground as indicated on paragraph 15 of the Petition.

CA/PEPC/03/2023; CA/PEPC/04/2023; CA/PEPC/05/2023.    345




(ii)    3rd and 4th Respondents (Respondents) accordingly filed their reply to the petition, alongside a Notice of Preliminary Objection on the competence of the said petition on several grounds.

(iii)    The Petitioner in its purported reply to the applicants' reply which they filed on 20th April, 2023 have, vide several paragraphs of the said reply, raised and/or introduced new facts which are overreaching to the applicants who can no longer reply to the purported reply.

(iv)    Petitioner's reply aims at substantially altering the grounds and reliefs in the petition as originally filed.

(v)    Petitioner is out of time statutorily allowed for amendment of election petition.

(vi)    The reply dated and filed 20th April, 2023, is in breach of paragraph 16(1)(a) of the First Schedule to the Electoral Act, 2023.

(vii)    Pursuant to (i) – (vi), supra, the Tribunal is without jurisdiction to countenance the reply.

The Motion is supported by an Affidavit of 8 paragraphs together with a Written Address. In opposition, the Petitioner/Respondent filed a Counter-Affidavit of seven (7) paragraphs on the 16/5/2023 together with a Written Address.



In arguing the Application, learned senior counsel for the 3rd and 4th Respondents raised one issue for determination as follows:

> "Having regard to the alien nature of the Petitioner's reply filed 21st April, 2023 purporting to reply to the applicants' reply dated 12th April, 2023, whether this Honourable Tribunal will not grant the applicant's application as prayed."

Learned Senior Counsel then submitted that a reply to any process is not an avenue or opportunity to explore at large in order to cover new issues or open new frontiers. The case of **Ughuterbe v. Shanono (2004) 16 NWLR (pt. 889) 300 at 318** was cited in support. That a Petitioner's Reply is circumscribed by paragraph 16(1)(a) and (b) of the 1st Schedule to the Electoral Act, 2022. That the word used in the said paragraph is "shall", which is a mandatory prescription or compulsion. The cases of **Bamaiyi v. A.G. Federation (2001) 12 NWLR (pt. 727) 468 at 497** and **Achineku v. Ishagbe (1988) 4 NWLR (pt. 89) 411** were cited in support and to further submit that the imperatives of paragraph 16(1)(a) are:

(i)      That no new facts shall be brought;

(ii)      That no new grounds shall be allowed;

(iii)      That no new prayers are permissible;

(iv)      That items (i), (ii) and (iii) supra are prohibited, in so far as they tend to amend or add to the contents of the petition already filed.





CERTIFIED TRUE COPY

That in paragraphs 1, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20 and 21 of the Petitioner's Reply, the Petitioner introduced new facts and issues which are overreaching to the Respondents in relation to the facts of the Respondent/Applicant's sponsorship viz-a-viz the 5th Respondent, allegations of multiple nomination, the lateness of the Petitioner's challenge, wrongful and unlawful return, the virus of a joint ticket, acceptance of nomination, etc, which are not tethered in the original petition. That those facts and issues introduced had the purpose of systematically amending the petition since the time statutorily allotted for any amendment has long lapsed.

Learned Senior Counsel for the 3rd and 4th Respondents submitted that, the Petitioner's Reply does not proffer any reply to the Respondents' Reply but raises completely new issues unconnected with the Respondents' Reply. The cases of **Dingyadi v. Wamako (2008) 17 NWLR (pt. 1116) 395 at 443**; **Adepoju v. Awoduyilemi (1999) 5 NWLR (pt. 603) 364 at 382 – 383** and **Airhiarbere v. Oshiomhole (2013) All FWLR (pt. 687) 782 at 792** were then cited to submit that, a Petitioner's Reply is not a license for the Petitioner to rake in new issues tending to amend or add to the contents of the petition.

On the issue of Petitioner's witness statement on oath filed in reply to the Respondent's Reply, the case of **Orji v. PDP (2009) 14 NWLR (pt.**


CERTIFIED TRUE COPY

**1161) 310 at 403 – 404** was cited to submit that, there is no provision for the frontloading of witness depositions through a Petitioner's Reply. We were then urged to hold that, the witness statement on oath attached to the Petitioner's Reply cannot be countenanced, and to have same struck out. On that note, we were urged to strike out the entire Petitioner's Reply to the 3rd and 4th Respondent's Reply filed on the 20th April, 2023.

The response of the learned senior counsel for the Petitioner/Respondent is in line with his arguments in response to the Motion filed by the 1st, and 2nd Respondents filed on the 06/5/2023, and 8/5/2023 respectively. Of note here, is the contention of learned senior counsel to the Petitioner/Respondent that the Petitioner's Reply to the 3rd and 4th Respondents' Reply do not raise or introduce any new facts separate from the ones already established in the petition. That, it is the 3rd and 4th Respondents who have raised new issues in their Reply to the petition that have necessitated a Reply by the Petitioner. The case of **Sani A. & Anor v. Akwe & Ors (2019) LPELR – 48756 (CA)** was cited in support.

On the witness statement filed along with the Petitioner's Reply, learned senior counsel for the Petitioner/Respondent submitted that the case of **Orji v. PDP (supra)** cited by the Applicants is inapplicable in the instant case. That in **Orji v. PDP**, the Petitioner sought to call a new witness


CERTIFIED TRUE COPY

entirely different from the witness mentioned on the list of witness filed with the Petition. The case of **Adedayo v. Christine (2021) 9 NWLR (pt. 1780) 148 at 180** was then cited to submit that the witness statement attached to the Reply of the Petitioner to the 3rd and 4th Respondents' Reply is valid as there is no law that prevents a Petitioner from filing a witness statement in support of its Reply. We were accordingly urged to dismiss the objection.

Now, it is apparent that the 1st Respondent's Motion filed on the 06/5/2023, the 2nd Respondent's Motion filed on the 08/5/2023, and the 3rd and 4th Respondents' Motion filed on the 13/5/2023 are all aimed at having certain paragraphs of the Petitioner's Replies to the respective Replies of the Respondents' Replies to the Petition struck out. The common ground in all the Applications is that the averments in the Petitioner's Reply have introduced new issues, facts and/or grounds to the Petition. Furthermore, that some of the averments are rehash or repetition of the averments in the Petition filed. That those averments in the Petitioner's Replies offend paragraph 16(1)(a) and (b) of the First Schedule to the Electoral Act, 2022. The said paragraph to the Electoral Act (supra) stipulates that:

> 16.(1) If a person in his reply to the election petition raises new issues of facts in defence of his case which the petition has not dealt with the Petitioner shall be entitled to file in

CA/PEPC/03/2023; CA/PEPC/04/2023; CA/PEPC/05/2023.

CERTIFIED TRUE COPY

the registry, within five days from the receipt of the respondent's reply, a Petitioner's reply in answer to the new issues of fact, so that —

(a) The Petitioner shall not at this stage be entitled to bring in new facts, grounds or prayers tending to amend or add to the contents of the petition filed by him; and

(b) The Petitioner's reply does not run counter to the provisions of paragraph 14(1).

In my view, the provisions of paragraph 16(1) of the First Schedule to the Electoral Act, 2022 are clear, unequivocal and unambiguous. It does not therefore, require any technical rule of interpretation to be understood. From a holistic reading of that provision, it would be seen that it is meant to explain the purpose of Petitioner's Reply to the Respondent's Reply. Its purpose is to raise answers to the defence, or any fact which must be specifically pleaded and which has the effect of destroying the Respondent's defence, or make it not maintainable. The bottom line is that, a Petitioner is permitted by the First Schedule to the Electoral Act, 2022, to file a Reply where the Respondent to the petition has in his Reply raised new issues of fact in the defence, which fact the Petitioner has not dealt with in the petition. However, in doing so, the Petitioner's Reply shall not introduce new facts, grounds or prayers tending to amend or

CA/PEPC/03/2023; CA/PEPC/04/2023; CA/PEPC/05/2023.



CERTIFIED TRUE COPY

add to the contents of the Petition. See **APC v. PDP (2015 15 NWLR (pt. 1481) 1 at 31**.

It is therefore clear that paragraph 16(1) of the First Schedule to the Electoral Act does not permit a Petitioner in his Reply to introduce or bring in any new issue or fact which ought to have been raised in the petition itself. In other words, a Petitioner cannot in the guise of a Reply to a Respondent's Reply, introduce a new issue of fact which was never raised in his Petition nor raised by the Respondent. To do that will amount to amending or adding to the petition, and also taking the Respondent by surprise because at that stage, the Respondent will not be in a position to react to such new issue or fact. It will therefore breach the Respondents fundamental right to fair hearing. Therefore, the Petitioner is not permitted to repair or rehash his averments in the Petition in such a way that it will amount to an amendment or reconstruction of the petition. See **Dingyadi v. Wamako (2008) 17 NWLR (pt. 116) 395**.

With the state of the law as stated above, at the back of my mind, I have endeavoured to scrutinize the pleadings in the Respondents' respective Replies to the petition, vis-à-vis the specific paragraphs of the Petitioner's Replies complained of. I start with the 1st Respondent's complaint. The 1st Respondent's complaint is against paragraphs 2, 3, 4, 5, 6, 7, 8, 9, 10,

 CERTIFIED TRUE COPY

11, 12, 13, 14 and 15 of the Petitioner's Reply. I have carefully studied those paragraphs of the Petitioner's Reply. It is my view that paragraphs 1, 6, 7, 8, 12 and 14 of the Petitioner's Reply to the 1st Respondent's Reply are competent as they are proper replies to the 1st Respondent's Reply. However, paragraphs 2, 3, 4, 5, 9, 10, 11, 13 and 15 of the said Petitioner's Reply are not competent as they are either rehash of facts pleaded in the petition or they introduce and/or add new facts to the petition. Being incompetent, they are hereby struck out.

The complaint of the 2nd Respondent is against paragraphs 1, 2, 3, 4, 5, 6, 7, 9, 10, 11, 12, 13, 14, 15, 16, 17(i), (ii), (iii), (iv) and (v), 18, 19, 20, 21, 22, 23 and 24 (Part B) of the Petitioner's Reply to the 2nd Respondent's Reply to the petition. I have carefully considered those paragraphs in the light of paragraph 16(1)(a) and (b) of the First Schedule to the Electoral Act, 2022.

It is settled law that where a respondent raises in his Reply to the Petition, fresh or new issues, it will be necessary for the Petitioner to file a Reply to the Respondent's Reply to the Petition. At that stage, the Petitioner may also file further written statement(s) on oath of witnesses he may wish to call in rebuttal of the new issues(s) raised by the Respondent. This is because, any failure by the Petitioner to reply or answer to those new issues raised by the Respondent will be deemed

CA/PEPC/03/2023; CA/PEPC/04/2023; CA/PEPC/05/2023.




CERTIFIED TRUE COPY

that the Petitioner has conceded to such fresh or new issues. See **Idriss v. ANPP (2008) 8 NWLR (pt. 1088) 1** and **Dingyadi v. Mammako (2008) 17 NWLR (pt. 1116) 395 at 442**. That being so, the written statements on oath of witnesses, filed along with the Petitioner's Reply to the Respondent's Replies, in proof of the paragraphs struck out are accordingly struck out.

In my view, paragraphs 1, 2, 4, 5, 6, 9, 11, 12, 13, 16, 17(ii), 22, 23 and 24 of the Petitioner's Reply to the 2nd Respondent's Reply to the Petition are either rehash of paragraphs in the Petition, or introduced or added new facts to the petition. They are incompetent and accordingly struck out. I am also of the view that, paragraphs 1, 3, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19 and 20 of the Petitioner's Reply to the 3rd and 4th Respondents' Reply to the petition are mere rehash of the averments of the petition. They are in my view, incompetent and accordingly struck out.

This ruling is in respect of a Motion on Notice filed by the 1st Respondent on the 7/5/2023 seeking the following reliefs(s).

1. AN ORDER of this Honourable Tribunal striking out the Petition for being incompetent and an abuse of Court process.



CERTIFIED TRUE COPY

The Grounds upon which this application has been predicated are as follows:

1. The Ground/Particulars of the Petition challenging the election of the 3rd Respondent on the validity of their nomination borders on pre-election matters pursuant to the provision of Sections 29(5) and 84(14) of the Electoral Act, 2022, as such is statute barred which divest this Honourable Tribunal the requisite jurisdiction to entertain it.

2. Issues relating to qualifications of candidates as the basis of validity of nomination in any election are pre-election matters instituted at the Federal High Court, before elections are conducted following the publication by the 1st Respondent of the list of candidates for elective positions.

3. That the Petitioner did not file any action against the nomination and/or qualification of the 3rd Respondent at the Federal High Court to ventilate its grievances within the time allowed by Law.

4. That equally, the Petitioner lacks the *locus standi* to question the validity of the nomination of the 3rd and 4th Respondents pursuant to Section 84(14) of the Electoral Act, 2022.

5. That by virtue of the decision in **APC v. PDP & Ors. (2019 LPELR – 49499 (CA)**, the Petitioner lacks the *locus standi* to present this petition.

CA/PEPC/03/2023; CA/PEPC/04/2023; CA/PEPC/05/2023.





6. In view of the above, this Honourable Tribunal lacks the requisite jurisdiction to entertain this petition.

The Motion is supported by an Affidavit of six (6) paragraphs deposed to by one Gift Nwadike, Litigation Secretary in the Law Firm of Dikko and Mahmoud, Solicitors to the 1st Respondent/Applicant. It is also accompanied by a Written Address filed in support of the Motion. In response, the Petitioner/Respondent filed a Counter Affidavit on the 14/5/2023 consisting of seven (7) paragraphs, deposed to by one Kalu Kenneth Okorie, Litigation Secretary in the Law Office of Messrs O.M. Atoyebi, SAN & Partners. A Written Address was also filed along with the Counter Affidavit.

Arguing the Application, learned Senior Counsel for the 1st Respondent/Applicant contended that the jurisdiction of this Court to entertain election petitions is derived from Section 239(1)(a) of the 1999 Constitution and 130 and 134 of the Electoral Act, 2022. The cases of **Obasanjo & Ors v. Yusuf & Anor (2004) LPELR – 2151 (SC)** and **Dankwambo v. Abubakar & Ors (2015) LPELR – 2571 (SC)** were also cited in support. That a thorough perusal of this petition will show that the grouse of the Petitioner arises from the 5th Respondent's withdrawal as the Vice-Presidential candidate of the 2nd Respondent and the subsequent nomination of the 4th Respondent as the Vice-Presidential

CERTIFIED TRUE COPY

candidate of the 2nd Respondent. Furthermore, that the Petitioner seeks to establish that the 2nd Respondent's sponsorship of the 3rd Respondent ceased to exist due to issues arising from the withdrawal of the 5th Respondent as such Vice-Presidential candidate.

Learned Senior Counsel then argued that it has been settled in the case of **Wada & Ors. v. Bello & Ors (2016) LPELR – 47015 (SC)**, that failure to nominate a running mate has no effect on the sponsorship by a political party for its candidate at an election. That such act cannot be linked to or added to the mandatory requirements for qualification for the office of President as stipulated in Section 131 of the Constitution. That in the circumstances, the 3rd Respondent having met the requirements of Section 131 of the Constitution, his sponsorship could not be lost because of issues arising from the nomination of a running mate. Section 134(3) of the Electoral Act, 2022 was cited in support. That in the circumstances, this Court is bound to dismiss this Petition by virtue of Section 134(3) of the Electoral Act, 2022.

It is further argued that an election Tribunal does not have the jurisdiction to deal with any issue of disqualification or non-qualification arising from the nomination exercise of a political party. The cases of **Ucha v. Onwe (2011) LPELR – 8085 (SC)** and **Ukabam & Anor. V. Obi & Ors (2019) LPELR – 48838 (CA)** were cited in support and to further

CERTIFIED TRUE COPY

submit that the issue of nomination of a candidate is a pre-election matter which cannot be entertained by an election Tribunal. That such issue is strictly governed by Section 84(14) of the Electoral Act, 2022. That in the circumstances, the Petitioner was bound to approach the Federal High Court for redress.

Flowing from the above, learned Senior Counsel for the 1st Respondent/Applicant submitted that, the Petitioner lacks the *locus standi* to question the validity of the nomination of the 3rd and 4th Respondents by virtue of Section 29(5) of the Electoral Act, 2022. That, the Petitioner not being a member of the 2nd Respondent, has no *locus standi* to question the validity of the nomination of the 3rd and 4th Respondents. In other words, that the Petitioner who is not a member of the 2nd Respondent nor an aspirant in the process of nomination of the 3rd and 4th Respondents, lacks the *locus* to question the validity or otherwise of such nomination.

Learned Senior Counsel went on to submit that in the event this Court holds that it has the jurisdiction to entertain this Petition, the issue is statute barred, being a pre-election matter. Citing Section 285(9) of the Constitution, learned senior counsel submitted that the Petitioner deposed in paragraphs 21, 22 and 23 of the petition that it was aware that the issues arising from the nomination of the 4th Respondent arose

CERTIFIED TRUE COPY

since the 14/7/2023. That since no suit was filed within 14 days since the cause of action arose, this petition is statute barred by virtue of Section 285(9) of the 1999 Constitution. In other words, the ground of the petition as contained in paragraphs 15 and 16 of the petition, having been filed in violation of Section 285(9) of the Constitution is statute barred and this Court has been deprived of jurisdiction to entertain same.

In response, learned senior counsel for the Petitioner/Respondent argued that this Application is incompetent as the issues, grounds and facts in support have not been substantiated by any relevant facts. The case of **Ezeobi v. Daily Times (Nig.) Plc (2013) 17 NWLR (pt. 1382) 200 at 216** was then cited to submit that parties are bound by the reliefs sought on the Motion paper and that a Court is not entitled to deal with substantive issues at the interlocutory stage. That the issues raised by this Motion relate essentially to the substantive matters to be decided in this petition. The case of **Adedolapo & Ors v. The Military Administrator of Ondo State & Ors (2005) LPELR – 7538 (CA)** were cited in support.

It is then submitted by learned senior counsel for the Petitioner/Respondent that by virtue of Section 239(1)(a) of the 1999 Constitution, this Court has the jurisdiction to hear and determine whether the 3rd and 4th Respondents were validly elected to the office of

CERTIFIED TRUE COPY

President and Vice-President respectively. That this Court has the jurisdiction to countenance this petition as it relates to the sponsorship of the 3rd Respondent. That the Petitioner admitted in paragraph 2.06 of the Written Address that for a person to be qualified for President of Nigeria, he must meet the requirements of Section 131 of the Constitution and must not be in breach of Section 137 of the Constitution. That in the instant case, the 3rd Respondent did not meet the Constitutional prescription of Section 131(c) of the Constitution. The case of **Afeez Adelowo Jimoh v. Yinusa Kazeem Ayandoye & Ors (2015) LPELR – 8006 (CA)** was then cited to submit that the issues in this petition touching on qualification is interwoven around nomination and sponsorship. That the case of **Wada & Ors. v. Bello & Ors (2016) LPELR – 47015 (SC)** cited by the 1st Respondent/Applicant is not helpful as same was decided under the Electoral Act, 2010 and therefore not relevant under Section 134(3) of the Electoral Act, 2022.

Learned Senior Counsel for the Petitioner/Respondent went on to submit that, Section 131 of the 1999 Constitution requires that a candidate for an election must be a member of a political party and be sponsored by that party. That in the circumstances, it is the validity of the nomination of a Presidential candidate on the nomination of his Vice-Presidential candidate. The cases of **PDP & Ors v. Degi-Eremienyo & Ors (2020) LPELR – 49734 (SC)** and **Atiku Abubakar v. AGF (2007) 3 NWLR**

CERTIFIED TRUE COPY

**(pt. 1022) 601 at 642** were cited in support. That in the circumstances, this petition is not on pre-election matter as erroneously contended by the Applicant and therefore not statute barred. In other words, that the petition is not premised on Section 285(14) of the Constitution but Section 134(1) of the Electoral Act, 2022. The cases of **Fayemi v. Oni & Ors (2019) LPELR – 49291 (SC)** and **Dangana & Anor v. Usman & Ors (2013) 6 NWLR (pt. 1349) 50** were then cited to submit that the issue of qualification of a candidate at an election is both pre- and post-election matter which can be challenged in the Federal High Court or Election Tribunal.

Learned counsel for the Petitioner/Respondent then submitted that in the circumstances of this case, the period of 14 days prescribed by Section 285(11) of the Constitution is not applicable to this petition. Rather, that it is the provisions of Sections 131(c) and 142 of the Constitution, and Sections 35 and 134(1) of the Electoral Act, 2022 that are applicable. The case of **PPA & Anor v. Saraki (2000) LPELR – 8072 (CA)** was then cited to submit that Sections 31 and 33 of the Electoral Act are not pre-election matters as argued by the 1st Petitioner/Applicant. The cases of **Abubakar v. Yar'adua (2008) 19 NWLR (pt. 1120) 1 at 70**; Oke v. Mimiko & Ors (2013) LPELR – 21368 (SC); Lemachi & Anor v. INEC & Ors (2019) LPELR – 48928 (CA) and **ANPP & Anor v. Osiyi & Ors (2008) LPELR – 3781 (CA)** were also cited in support.



CERTIFIED TRUE COPY

On the issue of *locus standi*, learned senior counsel for the Petitioner/Respondent contended that, the Applicant is under the misguided belief that the instant petition is a pre-election matter. That by Section 133(1) of the Electoral Act, 2022 the Petitioner has the *locus* to present the instant Petitioner. That the case of **APC v. PDP & Ors (2019) LPELR – 49499 (CA)** cited by the 1st Respondent/Applicant is not applicable to the facts and circumstances of this petition. That the issue has long been settled in **Waziri & Anor v. Geidam & Ors (2016) LPELR – 40660 (SC)** and **Obot v. Etim & Ors (2007) LPELR – 8071 (CA)**. We were accordingly urged to discountenance the Application.

The 3rd and 4th Respondents filed a similar Motion on the 12/5/2023. Therein, the 3rd and 4th Respondents prayed for:

1. AN ORDER OF THIS HONOURABLE COURT, striking out and/or dismissing this petition for being incompetent, fundamentally defective and vesting no jurisdiction on this Honourable Court to adjudicate thereon.

2. FURTHER OR IN THE ALTERNATIVE TO (1) ABOVE, AN ORDER OF THIS HONOURABLE COURT, striking out the grounds of the petition.

The Grounds upon which the Application is predicated are that:

i. The Petitioner lacks the locus Standi to institute this petition/maintain and claim the reliefs sought in the



petition, which are related to the validity or otherwise of the nomination of the 3rd and 4th Respondents to contest the election, subject matter of this petition.

ii. The reliefs sought do not confer any benefit on the Petitioner.

iii. Further to (ii) supra, the entire petition is academic and frivolous, vesting no jurisdiction on this Honourable Court to entertain it.

iv. The petition is not properly constituted, as the 5th respondent cannot be made a party to an election petition under and by virtue of section 133(1)(2) and (3) of the Electoral Act, 2022.

v. Arising from (iv) supra, the Honourable Court is without jurisdiction to grant relief 2 of the petition, and the relief ought to be struck out.

vi. Pursuant to paragraph (v) above, all other reliefs contained in the petition become otiose and liable to be struck out.

vii. The petition centres on pre-election issues of Nomination and Sponsorship of the 4th respondent as an Associate/Running mate of the 3rd respondent for the February 25, 2023 election to the office of the President of the Federal Republic of Nigeria.

viii. Issues of Nomination and sponsorship of 3rd respondent's running mate are pre-election matters by virtue of section 285(14) (c) of the 1999 Constitution (as amended) and are



CERTIFIED TRUE COPY

not cognizable before this Honourable Court sitting as an election tribunal.

ix. This Honourable Court lacks the jurisdiction to entertain pre-election related matters by virtue of section 84(14) of Electoral Act, 2022.

x. The time within which to ventilate pre-election issues/challenge the validity of the nomination/sponsorship of the 4th respondent as an Associate/Running mate of the 3rd respondent has lapsed. Petitioner's cause of action (if any) by virtue of section 285 (9) of the 1999 Constitution of the Federal Republic of Nigeria (as amended) is time/statute barred.

xi. The petition lacks necessary facts to support the alleged double nomination of the 4th respondent for election in more than one constituency.

xii. The petitioner, having participated in the Presidential election, is estopped from challenging the legality of the nomination/sponsorship of the 3rd respondent as the 2nd respondent's candidate in the said election.

xiii. The issue of the locus standi of any other political party to challenge the nomination of the 4th Respondent as the Associate or Running Mate of the 3rd Respondent raised in the petition has been settled and decided by the Court of Appeal in **APPEAL NO. CA/ABJ/108/2023 PEOPLES' DEMOCRATIC PARTY V. ALL PROGRESSIVES CONGRESS & ORS.**, in the judgment delivered on the 24th day of March, 2023 against the position being adopted in this petition by the Petitioner.



xiv. Alleged double nomination of the 4th respondent for election is not a recognized ground under sections 131, 137 and 142 of the 1999 Constitution of the Federal Republic of Nigeria (as amended) for invalidating the election of the 3rd and 4th respondent.

xv. Alleged irregularity in the nomination of an Associate or Running Mate, or alleged invalidity of such nomination are not grounds of qualification or disqualification under Section 131 and 137 of the 1999 Constitution of the federal Republic of Nigeria (as amended) or at all, and are not matters that are cognizable before an election tribunal.

xvi. **THE PETITION DOES NOT DISCLOSE ANY RESONABLE CAUSE OF ACTION AND LIABLE TO BE STRUCK OUT AND/OR DISMISSED** on the following grounds:

    a. The 2nd respondent (APC) did not at any time change or substitute her candidate for the office of the President. The only candidate whose name the 2nd respondent submitted to the 1st respondent pursuant to section 29 of the Electoral Act, 2022 was the 3rd respondent. Reliance of the petitioner on Section 33 of the Electoral Act does not therefore disclose a cause of action.

    b. The facts pleaded and relied on by the petitioner which centre on wrongful or invalid nomination of an Associate or Running Mate are not cognizable under the Constitution, including Section 131 (c) of the Constitution, as grounds upon which the qualification of a candidate could be determined.

 

CERTIFIED TRUE COPY

c. Section 142 of the Constitution of the Federal Republic of Nigeria 1999 (as amended) and Section 35 of the Electoral Act, 2022 on which the petitioner has founded the petition are pre-election matters which do not constitute cause of action for an election petition, and are not justiciable before an election tribunal.

d. The facts pleaded and relied on by the petitioner in support of the petition do not disclose any cause of action founded on the provision of the Constitution as it relates to qualification or disqualification to contest for the office of the President of the Federal republic of Nigeria.

**AND TAKE FURTHER NOTICE** that at the hearing of this application, reliance shall be placed on the documents and processes already forming part of the record of this Honourable Court.

The Application is supported by an Affidavit of 5 paragraphs deposed to by one Adoga Moses, Litigation Clerk in the Law Firm of Messrs Wole Olanipekun & Co and a Written Address. The Petitioner/Respondent countered by filing a Counter Affidavit of 5 paragraphs deposed to by Kalu Kenneth Okorie, Litigation Secretary in the Law Office of Messrs O.M. Atoyebi, SAN & Partners together with a Written Address.

CERTIFIED TRUE COPY

In arguing the Motion, learned senior counsel for the 3rd and 4th Respondents distilled one issue for determination as follows:

> "Having regard to the clear provisions of the Constitution of the Federal Republic of Nigeria, 1999 (as amended), the Electoral Act, 2022 and settled judicial authorities on the subject, whether this Honourable Court will not accede to the reliefs sought in this application".

Learned Senior Counsel submitted, first of all, that the Petitioner lacks the locus standi to present this petition.  That, the gravamen of this petition revolves around the nomination of the 3rd and 4th Respondents as candidates for the Presidential election of 25/2/2022 and thus rooted in the combined provisions of Section 285(14) of the 1999 Constitution and Section 84(14) of the Electoral Act, 2022.  That by those provisions, only an aspirant may institute an action on issues connected to nomination and sponsorship of candidates as same is entirely an intra-party affair.  The cases of **Maihaja v. Geidam (2017 LPELR – 42474 (SC)**, **Ukachakwu v. PDP (2014) 17 NWLR (pt. 1435) 134 at 182** and **Uwazuruike v. Nwachukwu (2013) 3 NWLR (pt. 1342) 503 at 526** were cited in support.  Furthermore, that the appropriate Court to ventilate such grievance is the Federal High Court.

Learned Senor Counsel went on to submit that the alleged irregularity in the nomination of an associate or running mate, or alleged invalidity of



CERTIFIED TRUE COPY

such nomination are not grounds of qualification or disqualification under Sections 131 and 137 of the 1999 Constitution. That in the circumstances, such matters are not cognizable before an election tribunal as eloquently captured in Section 134(3) of the Electoral Act, 2022. That the provisions of Sections 134(3) of the Electoral Act (supra), and Sections 131 and 137 of the Constitution are very clear, unambiguous and unequivocal. That this Court is bound to give those provisions their ordinary grammatical meaning. The cases **of Abegunde v. OSHA (2015) 8 NWLR (pt. 1416) 314 at 357, Marwa v. Nyako (2012) 6 NWLR (pt. 1296) 199 at 278** and **Calabar Central Cooperative Study v. Ekpo (2008) 6 NWLR (pt. 1083) 362 at 388** were cited in support.

Learned Senior Counsel for the 3rd and 4th Respondents went on to submit that, in any case, the issue of nomination is a pre-election matter in respect of which this Court has no jurisdiction to determine. That, the jurisdiction of this Court on election matters is circumscribed by Section 239(1)(a) of the 1999 Constitution (as amended). The cases of **Obi v. INEC (2007) 11 NWLR (pt. 1046) 436** and **Dickson v. Sylva (2017) 10 NWLR (pt. 1573) 299 at 333** were cited in support.

It is also argued by learned senior counsel for the Applicants that, the Petitioner was fully aware of the facts it alleges, nonetheless proceeded to contest the Presidential election alongside the 3rd and 4th Respondents



without complaining. The cases of **Sylva v. INEC & Ors (2016) 11 SC.52** and **Ude v. Nwara & Anor (1993) LPELR – 3289** were then cited to submit that the Petitioner is deemed to have waived its right to complain.

Learned Senior Counsel for the 3rd and 4th Respondents also contended that, in the entire reliefs sought in the petition, the Petitioner has not sought anything for its benefit. That the Petitioner having scored inconsequential votes in the Presidential election, if this Court accedes to its prayers, it will not fetch it any benefit in terms of being returned as winner. That in that respect, the court would have ended up sanctioning a petition commissioned as a proxy litigation for the benefit of a third party. In other words, that the petition is of no utilitarian purpose to the Petitioner. That it means that the Petitioner, not having shown sufficient interest, threat or injury it will suffer, has no locus standi to have filed this petition. The case of **Bakare v. Ajose – Adeogun (2014) All FWLR (pt. 737) 611 at 636** was cited in support. On that note, we were urged to grant this application.

In response, learned senior counsel for the Petitioner/Respondent contended that this Motion is misconceived and should be dismissed. Learned counsel then submitted that the Applicants are under the misguided belief that this action is a pre-election matter. The cases of **Waziri & Anor v. Geidam & Ors (supra)** and **Obot v. Etim & Ors (2007)**



**LPELR -8071 (CA)** were then cited to submit that, the Petitioner has the locus to institute this petition by virtue of Section 133(1) of the Electoral Act, 2023. Therefore, that this Court has the requisite jurisdiction to countenance the petition under Section 239(1)(a) of the 1999 Constitution.

Learned counsel for the Petitioner/Respondent also submitted that for a person to be qualified to contest for the office of President of Nigeria, he must satisfy the requirements of Section 131 of the Constitution and must not be in breach of Section 137 of the Constitution. That by the Constitutional provision where a candidate is not a member of a political party and is not sponsored by that party, he cannot be qualified for the office at President of Nigeria. The case of **Afeez Adelowo Jimoh v. Yinusa Kazeem Ayandoye & Ors (2015) LPELR – 8006 (CA)** was then cited to submit that, the issues touching on qualification are interwoven around nomination and sponsorship. That in that respect, the provision of Section 142(1) of the Constitution makes the requirements of nomination and sponsorship inseparable. The cases of **Atiku Abubakar v. A.G.F. (2007) 3 NWLR (pt. 1022) 601 at 642** and **PDP & Ors v. Degi-Eremienyo & Ors (2020) LPELR – 49734 (SC)** were cited in support.

On the issue of waiver, learned senior counsel for the Petitioner/Respondent argued that, from the pleadings in the petition

CERTIFIED TRUE COPY

and Replies of the Applicants, it is clear that the Petitioner participated in the election under reference, and accordingly has the right to file the instant petition. Therefore, the cases of **Sylva v. INEC (supra)** and **Aron & Ors v. Elemo & Ors (supra)** are inapplicable to the facts of this petition. That, the Petitioner having participated in the election, is entitled to institute this petition. As a corollary to this issue, it was contended that, Sections 133 and 134 do not require a Petitioner to show that the petition will confer benefit on him. That all the Law requires is participation in the election.

Now, to determine the two Applications filed by the 1st Respondent, and 3rd and 4th Respondents, it is necessary to refer to the grounds and facts upon which this petition is predicated. To that end, I find paragraph 15 and 17 of the Petition helpful. Therein, the Petitioner pleaded that:

15. Your Petitioner states that the ground upon which this petition is presented is that the 3rd Respondent was at the time of the Election not qualified to contest the election.

17. Your Petitioner states that the 4th Respondent was not qualified to jointly contest with the 3rd Respondent for the Presidential Election held on 25th February, 2023, having been purportedly nominated by the 2nd Respondent as its candidate for more than one office.

CA/PEPC/03/2023; CA/PEPC/04/2023; CA/PEPC/05/2023.

371

 CERTIFIED TRUE COPY

Now it is apparent that the sole ground for this petition is hinged on the qualification of the 2nd Respondent. The issue of qualification or disqualification of a candidate to contest an election for the office of President of Nigeria is a Constitutional one. That is why it is stipulated in Section 134(1)(a) of the Electoral Act, 2022 that:

> 134.(1) An election may be questioned on any of the following grounds –
>> (a) a person whose election is questioned was, at the time of the election, not qualified to contest the election;

The qualifications and disqualifications of a candidate to contest election for the office of President are stipulated in Sections 131 and 137 of the 1999 Constitution of the Federal Republic of Nigeria (as amended). While the qualifications are enshrined in Section 131, the disqualifications are engrained in Section 137(1)(a) – (j) of the 1999 Constitution (supra). It is apparent therefore, that the issue of qualification of a candidate to contest an election could be a ground in an election petition, though, it may also ground pre-election matter where such issue of qualification or disqualification of a candidate arises from the primary election of the party by virtue of Section 285(14) of the 1999 Constitution. Where the issue of qualification or disqualification arises before the election (pre-

CERTIFIED TRUE COPY

election) an action on that issue must be instituted pursuant to Section 285(11) and (14) of the Constitution.

It should be noted upon a quick and careful perusal of the pleadings in the Petition that, the issue of disqualification of the 2nd Respondent rests solely on the issue of alleged invalid nomination of his running mate, to wit, the 3rd Respondent. The issue of invalid nomination is captured by paragraphs 18, 19, 20 and 21 of the Petition. For proper understanding it is pleaded by the Petitioner as follows:

18.    The 3rd Respondent was not qualified to contest for the office of President as he was not validly sponsored by the 2nd Respondent as he did not have a validly nominated running mate.

19.    The 4th Respondent had been nominated (and accepted same) for the office of Senator representing Borno Central Senatorial District in Borno State for the 25th of February, 2023 National Assembly Election.

20.    As at the time the 4th Respondent was purportedly nominated and when he accepted the nomination as Vice-Presidential Candidate of the 2nd Respondent, he was still a validly nominated Senatorial candidate of the 2nd Respondent, thus indicating double/multiple nomination.

21. That from the acknowledgment slip dated Friday, July 15th, 2022, generated from the online portal of the 1st

CA/PEPC/03/2023; CA/PEPC/04/2023; CA/PEPC/05/2023.




CERTIFIED TRUE COPY

Respondent, it is clear that the 4th Respondent before 05:13pm GMTplus1 on the 15/07/2022 was still a validly nominated Senatorial Candidate of the 2nd Respondent for Borno State. The Petitioner hereby pleads and shall rely on the said acknowledgment slip. Notice to produce original copy of same is hereby given to the 1st Respondent.

The second arm of the issue is captured by paragraphs 22, 23, 24, 25 and 26 of the petition as follows:

22. That from the acknowledgment slip dated Thursday, July 14, 2022 generated from the online portal of the 1st Respondent, it confirmed or evidenced that the 4th Respondent at 06.33pm GMTplus1 on the 14/7/2022 replaced the 5th Respondent as the Vice-Presidential candidate of the 2nd Respondent. The Petitioner hereby pleads and shall rely on the said acknowledgment slip. Notice to produce original copy of same is hereby given to the 1st Respondent.

23. As at the 14th day of July, 2022, when the 4th Respondent accepted the nomination of the 2nd Respondent as purportedly replacing the 5th Respondent, he was still a Senatorial Candidate of the 22nd Respondent seeking to represent Borno Central Senatorial District in Borno State. Your Petitioners hereby plead the notices of withdrawal of candidate filed by the 5th Respondent and 4th Respondent respectively on the 14th day of July, 2022 and 15th day of July, 2022 and shall rely on same at the trial of this suit.



24. The acts of the 4th Respondent's double or multiple nomination make his nomination for either of the elective offices/constituencies void particularly the latter.

25. Your Petitioner shall at the hearing of the petition rely on the provisions of Section 131(c) and 142 of the Constitution of the Federal Republic of Nigeria, 1999; Sections 31, 33, 35 and 136(2) of the Electoral Act, 2022.

26. Your Petitioner further states that the return of the 3rd Respondent by the 1st Respondent as the winner of the Presidential Election conducted on 25th February, 2023 was wrongful and unlawful as the 3rd Respondent was not qualified to contest the Election as he was not validly sponsored by the 2nd Respondent.

Considering the facts pleaded above, it is clear that, the claim of disqualification or non-qualification of the 3rd Respondent is centred solely on the invalid or double nomination of the 4th Respondent. However, it is the settled law that, the issue of nomination of a candidate at an election is a pre-election matter. Therefore, the issue of qualification or disqualification can only be ventilated on the grounds enumerated in Sections 131 or 137 of the Constitution. That is why Section 84(3) of the Electoral Act, 2022 stipulates that:

"A political party shall not impose nomination qualification or disqualification criteria, measures, or





conditions on any aspirant or candidate for any election in its constitution, guidelines, or rules for nomination of candidates for elections, except as prescribed under Sections 65, 66, 106, 107, 131, 137, 177 and 187 of the Constitution."

It therefore means that, the conditions of qualification or disqualification are those prescribed under Sections 131 and 137, in case of persons contesting for Presidential Office. That means that, where it is alleged in an election petition, that a person is or was not qualified to contest election to the office of President of Nigeria, as stipulated in Section 134(1)(a) of the Electoral Act, 2022, it is Sections 131 and 137 of the Constitution of the Federal Republic of Nigeria that are applicable. See **PDP v. INEC (2014) 17 NWLR (pt.1437) 525; Kakih v. PDP (2014) 15 NWLR (pt. 1430) 424 – 425, Ucha v. Onwe (2011) 4 NWLR (pt. 1237) 386 at 427** and **Captain Idris Ichaila Wada & Or v. Yahaya Bello & Ors (2016) LPELR – 41263 (CA)**. Thus, where election has been conducted and result declared, such election cannot be questioned on grounds of qualification save under Sections 131 and 137 of the Constitution, in the case of a Presidential election. This postulation is supported by Section 134(3) of the Electoral Act where it is stipulated that:

"With respect to Subsection 1(a), a person is deemed to be qualified for an elective office and his election shall not be questioned on grounds of qualification if, with respect to the particular election in question, he

CERTIFIED TRUE COPY

> meets the applicable requirements of Sections 65, 106, 131 or 177 of the Constitution and he is not, as may be applicable, in breach of Sections 66, 107, 137 or 182 of the Constitution."

As stated earlier, the applicable provisions are Sections 131 and 137 of the Constitution. It is clear from the plenitude of the pleadings in this petition, that the facts grounding the Petitioner's claim of disqualification or non-qualification of the 3rd and 4th Respondents is hinged on double and invalid nomination of the 4th Respondent. I had pointed out earlier in the course of this Ruling that, the issue of qualification or disqualification of a candidate at an election is strictly a requirement of the Constitution. It is held by the Supreme Court in **Alhassan & Anor v. Ishaku & Ors (2016) LPELR – 40083 (SC)** That:

> "…, by virtue of the provisions of Section 138(1)(a) of the Electoral Act, a Tribunal's power to decide whether a person is qualified to contest an election is restricted to establishing the requirements of Section 177 and 182 of the Constitution against the adverse party. An Election Tribunal has no jurisdiction to inquire into the primaries of a political party."

It is apparent therefore that issues of nomination or sponsorship of candidates by political parties come under pre-election matters and should be instituted and determined before the conduct of the election. See **Shinkafi & Anor v. Yari & Ors (2016) LPELR – 26050 (SC)** and **Ella &**

CA/PEPC/03/2023; CA/PEPC/04/2023; CA/PEPC/05/2023.

377



**Ors v. Agbo & Anor (1999) LPELR – 6609 (CA)**. That being so, a ground of election petition questioning the election of a person duly qualified to contest such election as required by the Constitution cannot be sustained where it is predicated on nomination or sponsorship of such candidate. Therefore, a Petitioner who relies on non-qualification of his opponent to nullify the election must bring the facts of such non-qualification within the ambit of Sections 131 and 137 of the 1999 Constitution.

I note that the Petitioner/Respondent sought to tie his complaint of non-qualification to Section 142(1) of the 1999 Constitution. That provision stipulates as follows:

> "142.(1) In any election to which the foregoing provisions of this part of this chapter relate, a candidate for an election to the office of President shall not be deemed to be validly nominated unless he nominates another candidate as his associate from the same political party for his running for the office of President, who is to occupy the office of Vice-President and that candidate shall be deemed to have been duly elected to the office of Vice-President if the candidate for election to the office of President who nominated him as such associate is duly elected as President in accordance with the provisions aforesaid."





CERTIFIED TRUE COPY

I am of the view that the above cited provision of the Constitution does not create additional qualifications or disqualifications for a candidate contesting for the office of President of Nigeria. Furthermore, Section 142 of the 1999 Constitution read along with Section 141 create the offices of President and Vice-President. Section 142(1) is a specific provision donating power to the President to nominate a person as his associate to occupy the office of the President. That is why Subsection 2 of Section 142 mandates that the requirements of qualification and disqualification attaching to the occupier of seat of President also applies to the holder of the office of Vice-President. It is therefore my view that Section 142(1) of the Constitution does not introduce the issue of nomination or sponsorship of a Vice-President so as to enlarge the scope of qualifications or disqualifications applicable to the seat of President. There cannot therefore be a disqualifying factor of a candidate for the office of President outside those specified in Sections 131 and 137 of the Constitution. It can safely be said that those provisions have sufficiently and conclusively covered the field until there is an amendment. See **A.G. Abia v. A.G. Federation (2002) 5 NWLR (pt. 763) 204 at 391 – 392; PDP v. INEC & Ors (supra)**.

As a fall out to my findings above, I hold the firm view that the issue of nomination or sponsorship of the 4th Respondent being a pre-election matter ought to have been ventilated by the Petitioner before the

CA/PEPC/03/2023; CA/PEPC/04/2023; CA/PEPC/05/2023.



CERTIFIED TRUE COPY

Federal High Court, as this Court has no original jurisdiction to delve into the matter. Even if, this Court has such jurisdiction, the cause of action being on a pre-election matter is statute barred by virtue of Section 285(9) of the Constitution of the Federal Republic of Nigeria, 1999 (as amended).

Having found as above, it is my view that the two Motions filed by the 1st Respondent, 3rd and 4th Respondents on the 07/5/23 and 12/5/2023 respectively, have merit. Accordingly, I find that the petition is liable to be struck out for being incompetent.

By a Motion on Notice filed on the 08/5/2023, the 2nd Respondent/Applicant sought the following reliefs:

1. AN ORDER of this Honourable Tribunal granting leave to the 2nd Respondent/Applicant to bring and argue this application before/outside or during the pre-hearing session.

2. AN ORDER of this Honourable Tribunal striking out grounds (i) and (ii) contained in paragraph 16 of the Petition for being incompetent.

3. AN ORDER of the Honourable Tribunal striking out paragraphs 17, 18, 19, 20, 21, 22, 23, 24, 25, 26, 27, 28 and 29 of the Petition which are predicated on the incompetent grounds (i) and (ii) in paragraph 16 of the Petition for being an abuse of Court process.

CA/PEPC/03/2023; CA/PEPC/04/2023; CA/PEPC/05/2023.                                        380

 
CERTIFIED TRUE COPY

4. AN ORDER of this Honourable Tribunal striking out reliefs (i) – (vii) of the Petitioner's Petition for being incongruous, Illogical and ungrantable, and

5. AN ORDER of the Honourable Tribunal dismissing or otherwise striking out the petition for want of jurisdiction and on the ground that the petition does not disclose any reasonable cause of action.

**AND FOR SUCH FURTHER ORDER OR OTHER ORDERS** as this Honourable Tribunal may deem fit to make in the circumstances.

The Grounds upon which the Application is predicated are as follows:

1. Petitioner alone in the absence of its sponsored candidate cannot benefit and did not have any special interest in the election or return of the 3rd Respondent as the winner of the election;

2. Failure to make the sponsored candidate of the petitioner a party to this petition is fatal to the competence of the petition, and *afortiori* the jurisdiction of the honourable court/tribunal to entertain the petition as constituted;

3. The Petition discloses no reasonable cause of action or no cause of action at all as presently constituted;

4. The Petition is predicated upon the ground of alleged non qualification of the 3rd Respondent to contest the Presidential election held on the 25th February, 2023;




CERTIFIED TRUE COPY

5. The Petitioner's grouse as presented in the sole ground of the Petition centres on the alleged non qualification of the 3rd Respondent to contest the said election having regard to the purported double nomination of the 4th Respondent as 2nd Respondent's candidate for Borno Central Senatorial seat which the Petitioner alleges was subsisting when the 4th Respondent was nominated as the Vice-Presidential candidate of the 3rd Respondent;

6. The Petitioner in effect challenged the withdrawal of the 5th Respondent as the Vice-Presidential candidate of the 3rd Respondent after nomination, and the subsequent nomination of the 4th Respondent as the replacement of the 5th Respondent as the Vice-Presidential candidate of the 2nd Respondent;

7. The Petitioner is neither a member of the 2nd Respondent nor would the sponsorship and nomination of candidates of the 2nd Respondent for the Presidential election serve any utilitarian purpose for the Petitioner;

8. The Petitioner does not fall under the category of persons that can challenge the internal working operation of the 2nd Respondent regarding the nomination and sponsorship of the 2nd Respondent's candidates for the election;

9. The Grounds of the Petition are incompetent and invalid, having not complied with Section 134(1)(a) and (b) of the Electoral Act, 2022;





10. The Petition cannot survive after the striking out of grounds (i) and (ii) and the related paragraphs dealing with non-qualification;

11. The issues/facts contained in the Petition are statute barred;

12. The Petitioner lacks the locus standi to challenge the 2nd Respondent's decision and or nomination of the Political Party's candidate(s) for election, which is an internal affair of the 2nd Respondent which is non justiciable, thus robbing this Honourable Court of jurisdiction to entertain this petition;

13. Earlier before the presentation of this Petition, the Petitioner herein had instituted **Suit No: FHC/ABJ/CS/1215/2022 ALLIED PEOPLES MOVEMENT V. INEC & 12 ORS** as a pre-election matter, challenging the nomination and substitution of running mates of named political parties (including the 2nd Respondent herein) for the Presidential election on the same ground in this petition;

14. By the said suit referred to above, this Petition constitute an abuse of judicial process;

15. The ground of the Petition and the facts in support as contained in Paragraphs 15, 16, 17, 18, 19, 20, 21, 22, 23, 24,26,27,28 and 29 of the Petition which pertain to the issue already agitated, struckout/decided by a Court of competent jurisdiction in **Suit No: FHC/ABJ/CS/1734/2022** per Hon. Justice Ekwo on 13th

CA/PEPC/03/2023; CA/PEPC/04/2023; CA/PEPC/05/2023.



January, 2023; and **Appeal NO: CA/ABJ/CV/108/2023** dismissed by the Court of Appeal subsequently, constitute an abuse of court process and are caught by issue estoppel and can therefore not be litigated before this Honourable Court by the Petitioner.

16. Paragraph 16(ii) of the Petition is incompetent and liable to be struck out as the Petitioner has not presented any ground complaining of non-compliance with the provisions of the Electoral Act, 2022 which could have necessitated the Petitioner to furnish any fact to support such purported ground of non-compliance;

17. The Petitioner's complaint of non-compliance with the Electoral Act or any relevant law is not challenging any of the 1st Respondent's act/conduct;

18. Paragraphs 25, 28(i), (iii), (v), (vii) and 29 of the Petition offend the rule of pleadings which mandates the pleading of facts only and forbids the pleading of law;

19. The outcome of this Petition will not confer any appreciable benefit or confer any utilitarian value of benefit on the petitioner.

The Motion has in support, an Affidavit of 8 paragraphs together with a Written Address filed along with the Motion. An Originating Summons earlier filed by the Petitioner before the Federal High Court in **Suit No: FHC/ABJ/CS/1215/2022; ALLIED PEOPLES MOVEMENT V. INEC & 12 ORS**

CA/PEPC/03/2023; CA/PEPC/04/2023; CA/PEPC/05/2023.                                    384



CERTIFIED TRUE COPY

was annexed to the Affidavit as Exhibit "A". In opposition to the Motion, the Petitioner filed a Counter Affidavit of 5 paragraphs deposed to by one Kalu Kenneth Okorie, Litigation Secretary in the Law Firm of Messrs O.M. Atoyebi, SAN & Partners, Counsel to the Petitioner/Respondent.

In arguing the Application, the 2nd Respondent/Applicant nominated two issues for determination as follows:

1. Whether this is not a proper application to be heard and determined before, outside or during the pre-hearing session?

2. Whether the prayers of the Applicant in the present application should not be granted considering the circumstances and contents of the petition vis-à-vis the mandatory provision of the Electoral Act, 2022, the Constitution of the Federal Republic of Nigeria, 1999 (as amended) and established judicial decisions of the Apex Court?

The issue number one is answered in affirmative as the Application was heard during the pre-hearing session and reserved for Ruling.

On issue 2, learned senior counsel for the 2nd Respondent/Applicant contended that grounds I and II of the petition are incompetent being in gross violation of Section 134(1) of the Electoral Act, 2022 and Sections 285(9) and (10) of the Constitution thereby robbing this Court of jurisdiction to entertain same. Referring to paragraph 16 of the petition,

CA/PEPC/03/2023; CA/PEPC/04/2023; CA/PEPC/05/2023.


CERTIFIED TRUE COPY

learned senior counsel submitted that the said Grounds run foul of Section 134(1) of the Electoral Act, 2022. The cases of **Ojukwu v. Yar'adua (2009) 12 NWLR (pt. 1154) 50; Mathew Aondohemba Damkor & Anor v. Terkaa D. Ucha & Ors (2019) LPELR – 48876; Yusuf v. Obasanjo (2003) NWLR (pt.847)** were cited in support. Furthermore, that there are no facts in support of ground (ii) of the petition, and therefore, incompetent.

Learned Senior Counsel for the 2nd Respondent/Applicant contended further, that the Petition constitutes an abuse of Court process in that the Petitioner had earlier filed a pre-election matter similar or on same facts with this petition. That the matter before the Federal High court is still pending, therefore to litigate again on the same facts constitute an abuse of Court process. In other words, it has been demonstrated in the Applicant's Affidavit, that **Suit No: FHC/ABJ/CS/1215/2022**; between: **Allied People Movement (APM) v. INEC & 12 Ors** has rendered this petition an abuse of Court process. The cases of **Lokpobiri v. Ogola (2016) 3 NWLR (pt. 1499) 328** and **Idowu v. F.R.N. (2012) 11 NWLR (pt. 1312) 441 at 454 – 455** were cited in support.

It is further argued that this petition borders on the same principal claim and facts with **Suit No: FHC/ABJ/CS/1215/2022** pending before the Federal High Court, Abuja. That the parties in this petition are also

CERTIFIED TRUE COPY

parties in that suit, and that it does not matter whether the parties in one are more than the other. That, the principle that parties must be the same does not mean that all the parties in the previous suit must be made parties in the later suit, so long as the parties in the previous suit are also parties in the instant suit. The cases of **Falaye v. Otapo (1995) 3 NWLR (pt. 381) 1; Ministry of Works v. Tomas (Nig.) Ltd (2002) 2 NWLR (pt. 752) 740** and **Abubakar v. Bebeji Oil & Allied Products Ltd (2007) 18 NWLR (pt. 1066) 319** were cited in support. That, the proper order to give in the circumstance is to dismiss the process which constitutes the abuse.

Learned Senior Counsel for the 2nd Respondent/Applicant also contended that, from the facts of this petition, it is challenging the nomination of the 4th Respondent as the validly nominated candidate of the 2nd Respondent on the ground that the 3rd Respondent lost his candidacy and therefore, no longer qualified to contest the Presidential Election. That, the issues raised by this petition have been resolved by the Court of Appeal in Appeal No: CA/ABJ/CS/108/2023 and therefore constitute issue estoppel. In other words, that the issue of nomination of the 4th Respondent have been resolved in Appeal No: CA/ABJ/CS/108/2023. The cases of **APC v. PDP & Ors (2015 LPELR – 24587 (SC)** and **Oyekola v. Amodu (2017) LPELR – 42391 (CA)** were cited to submit that, in the circumstance, the Petitioner is precluded from contending the opposite

CERTIFIED TRUE COPY

of any specific point which has been put in issue and determined with certainty against him.

Learned Senior Counsel for the 2nd Respondent/Applicant went on to contend that, the petition borders on the allegation of non-qualification of the 3rd Respondent to contest the election on the ground that the 4th Respondent allegedly allowed himself to be nominated as Vice-Presidential candidate without first resigning as the 2nd respondent's Senatorial candidate for Borno Central Senatorial District, which are matters that predated the conduct of the Presidential election held on the 25/2/2023.  That the Petitioner had the opportunity to take advantage of Section 84(14) of the Electoral Act, 2022 to activate the appropriate proceedings against the Respondents.  In other words, that facts grounding the petition qualify as pre-election matter by virtue of Section 285(14) of the 1999 Constitution of the Federal Republic of Nigeria (as amended).  That the action ought to have been initiated within 14 days from the date the cause of action arose.  The cases of **Salim v. C.P.C. & Ors (2013) 6 NWLR (pt. 1351) 501; Ibrahim v. INEC (1999) 8 NWLR (pt. 614) 334** and **Alhassan & Anor v. Ishaku & Ors (2016) 10 NWLR (pt.1520) 230** were cited in support.  It is then submitted that, the facts in paragraphs 16, 21, 22 and 23 of the petition which allege the disqualification being pre-election matter should also be struck out.

CA/PEPC/03/2023; CA/PEPC/04/2023; CA/PEPC/05/2023.

388



CERTIFIED TRUE COPY

Flowing from the above contention, learned senior counsel for the 2nd Respondent went on to submit that, being a pre-election matter, the Petitioner lacks the legal capacity to institute the action. That the remedy available to the Petitioner is as provided in Sections 29(5) and 84(14) of the Electoral Act, 2022, and not Section 134(1) of the Electoral Act, 2022. The cases of **Angadi v. PDP (2018) 15 NWLR (pt. 1641) 1 at 34 – 36, Tukur v. Uba (2013)4 NWLR (pt. 1737) 37** were cited to submit that, the jurisdiction of the Courts stipulated in Section 84(14) of the Electoral Act, 2022 is that activated by an aspirant who has participated in the primaries of a political party, which has given him the necessary *locus standi*.

Learned Senior Counsel went on to submit that, election petition matters are sui generis and time bound such that, if it is not properly constituted, it would deprive the Court of jurisdiction to hear and determine same. The case of **James v. INEC (2015) 12 NWLR (pt. 1424) 538 at 591** was cited in support. That, it is not in dispute that the Petitioner as a political party, sponsored a candidate for the Presidential election, and which candidate, Ojei Princess Chichi is therefore a necessary party to the petition. That, the said candidate was not joined as a co-petitioner so as to be bound by the judgment or order against him. The case of **Olawoye v. Jomoh (2013) 13 NWLR (pt. 1371) 362** and **Okwu & Anor v. Umeh (2016) 1 S.C (pt. 1)** were cited in support. We were then urged to hold

CERTIFIED TRUE COPY

that, having failed to join Ojei Princess Chichi, the petition is incompetent and improperly constituted.

Conversely, learned senior counsel submitted that, Section 133 of the Electoral Act, 2022 provides for persons entitled to present election petitions, and persons entitled to be joined as Respondents in an election petition. That by Section 133(2) and (3) of the Electoral Act, 2022, the 4th and 5th Respondents cannot be joined as Respondent to this petition since they are not the party or the Presidential candidate who won the election. The case of **APC v. PDP & Ors (2015) LPELR – 24349** was cited in support and to further submit that, there is a misjoinder of the 4th and 5th Respondents in this petition. The cases of **Azubuike v. PDP (2014) LPELR – 22258 (SC); Green v. Green (2002) 45 WRN** 90 and **Enterprise Bank Nigeria Ltd v. Asoro (2014) 3 NWLR (pt. 1394)** were then cited in urging us to strike out the names of the 4th and 5th Respondents for misjoinder.

Finally, learned senior counsel for the 2nd Respondent contended that, this petition is bereft of any cognizable cause of action, having been shown to be an abuse of Court process, caught by estoppel and failure to comply with mandatory provisions of paragraph 4(1) and (2) of the 1st Schedule to the Electoral Act, 2022; and Section 134(1) of the Electoral Act, 2022. That in any case, the determination of and pronouncement

CERTIFIED TRUE COPY

on the relief in this petition will amount to academic exercise because, the reliefs sought in the petition will serve no beneficial purpose. The case of **Mohammed Usman v. The State (2019) LPELR – 47396 (SC)** was cited in support. We were accordingly urged to resolve all the issues in this Application in favour of the 2nd Respondent/Applicant and to strike out or dismiss the petition.

In response to the Motion, learned senior counsel to the Petitioner/Respondent formulated one issue for determination as follows:

> **"Whether the Applicant's Application is not unmeritorious and not liable to be dismissed."**

Learned Senior Counsel then contended that, the Petitioner only averred facts in relation to the grounds in support of the petition in paragraph 16 of the petition, while the Ground was averred in paragraph 15. That in the circumstances, the cases cited by the Applicant are irrelevant, and that paragraphs 25, 28(ii), (iii), (v) and (vii) of the petition do not offend the rules of pleadings as they contain pure facts in tandem with the rules of pleadings.

The case of **Ogboru & Anor v. Uduagham & Ors (2013) LPELR – 20805 (SC)** were cited to submit that, this petition is not an abuse of Court process. That the principle of abuse of court process arises where the

CERTIFIED TRUE COPY

two matters in issue are still alive but in the instant case, Suit No: FHC/ABJ/CS/1215/2022 has since been abandoned as the time limited for its litigation has since expired being a pre-election matter.

On the doctrine of estoppel, learned senior counsel for the Petitioner/Respondent cited the case of **APC v. PDP & Ors (2015) LPELR – 24587 (SC)** to submit that, the instant action has not been decided by any Court as to make the principles of estoppel applicable. That Suit No: FHC/ABJ/1734/2022 was not decided on its merit, therefore, the concept of estoppel cannot apply in the instant petition. The case of **Ogbogu & Ors v. Ndiribe & Ors (1992) LPELR – 2283 (SC)** was then cited to submit that, a judgment that can be used for the purpose of issue estoppel must be a case decided on its merit. That in this petition, both the trial Court and this Court did not determine the action on its merit.

Learned Counsel for the Petitioner/Respondent went on to submit that, this petition is not statute barred as it is not brought pursuant to Section 285(14)(b) of the Constitution but guided and premised on Section 134(1) of the Electoral Act which stipulate the grounds upon which an election petition can be presented, including the fact that the person returned as elected was not qualified to contest the election. The case of **Fayemi v. Oni & Ors (2019) LPELR – 49291 (SC)** was cited in support. Furthermore that, it is trite law that issue of qualification of a candidate to contest in



an election is both pre and post-election matter that can be challenged in both the Federal High Court or an Election Tribunal. The case of **Dangana & Anor v. Usman & Ors (2013) 6 NWLR (pt. 1349) 50** was cited in support. The cases of **PPA & Anor v. Saraki (2007) LPELR – 8072 (CA)** and **Abubakar v. Yarádua (2008) 19 NWLR (pt. 1120) 1 at 70** were then cited to submit that, Sections 31 and 33 of the Electoral Act do not deal with pre-election matters.

On the issue of locus standi, learned senior counsel for the Petitioner/Respondent contended that, the Applicant is under the mistaken belief that this action is a pre-election matter. That by Section 133(1) of the Electoral Act, 2022, the Petitioner being a political party is vested with the locus to present the petition. That the cases of **Waziri & Anor v. Geidam & Ors (2016) LPELR – 40660 (SC)** and **Obot v. Etim & Ors (2007) LPELR – 8071 (CA)** were cited to submit that, the Applicant has not presented any reasonable argument to negate the right of the Petitioner to present the petition. That Sections 29(5) and 84(14) of the Electoral Act, 2022 relate to pre-election matters and therefore inapplicable to the instant suit which is a post-election matter.

Learned Senior Counsel for the Petitioner/Respondent contended that this petition is well constituted. That, the drafters of the Electoral Act, 2022 clearly enumerated category of persons who can present an

CERTIFIED TRUE COPY

Election Petition as highlighted in Section 133 of the Electoral Act. The case of **Accord v. INEC (2015) LPELR – 25674 (CA)** was then cited to submit that, the Petitioner, being a political party can present an Election Petition. That the non-joinder of the candidate in an Election Petition will not render the petition incompetent; and that in the instant case, the parties sued are those meant to be sued, therefore, there is no case of misjoinder. That, the 3rd Respondent ran on a joint ticket with the 4th Respondent. Therefore, the joinder of the 4th Respondent is proper as he will also be affected by the outcome of the judgment or order.

Learned Senior Counsel for the Petitioner/Respondent went on to submit that, the jurisdiction of this Court is statutorily circumscribed by Section 239(1)(a) of the 1999 Constitution, and Section 134(1)(a) and (3) of the Electoral Act, 2022. That the implication is that, for a person to be qualified to occupy the office of President of Nigeria, he must satisfy the conditions in Section 131 of the 1999 Constitution and not be in breach of Section 137 of the Constitution, a candidate for an election must be a member of a political party and be sponsored by that party. That in the circumstances, Section 142(1) of the Constitution makes the candidacy of a Vice-President applicable to that of a Presidential candidate. The cases of **PDP & Ors v. Degi-Eremienyo & Ors (2020) LPELR – 49734 (SC)** and **Atiku Abubakar v. A.G.F. (2007) 3 NWLR (pt. 1022) 601 at 642** were cited in support.

CA/PEPC/03/2023; CA/PEPC/04/2023; CA/PEPC/05/2023.

394


CERTIFIED TRUE COPY

On whether the petition discloses any reasonable cause of action, learned senior counsel for the Petitioner/Respondent contended that, the petition is not an abuse of court process nor is it caught by issue estoppel as contended by the Applicant. That the Petition is based on disqualification which is cognizable under Section 131 and 137 of the 1999 Constitution, and 134(3) of the Electoral Act, 2022.

Now, it would be seen that this Application is premised on several grounds. The first is that the Grounds of the petition are incompetent. This is premised on the erroneous argument of the 2nd Respondent/Applicant that the Grounds for the petition are as stated in paragraph 16 of the petition. A careful perusal of the petition would disclose that, there is only one ground for the petition and is stated in paragraph 15 of the petition which stipulates that:

> "15. Your Petitioner states that the ground upon which this petition is presented is that the 3rd Respondent was at the time of the Election not qualified to contest the Election."

The averments in paragraph 16, as unequivocally captioned, deal with the facts of the petition. This ground for the objection to the competence of the petition, therefore, lacks substance and is accordingly discountenanced.

CERTIFIED TRUE COPY

The 2nd ground for the objection is that, the petition is an abuse of Court process. It is premised on the fact that, the Petitioner/Respondent had earlier instituted an action before the Federal High Court in Suit No: FHC/ABJ/CS/1215/2022; Between: **Allied Peoples Movement (APM) Vs. INEC & 12 Ors** on the same subject matter as in this petition against the 1st, 2nd, 3rd, 4th and 5th Respondents in this petition and others. It was however deposed in paragraph 3(M) of the Counter Affidavit filed by the Petitioner in opposition to this Application that, the matter was not determined on the merit by the trial Court who referred the matter to the Court of Appeal for interpretation. That in any case, the matter had since lapsed in 180 days for its determination by law, being a pre-election matter.

It is trite law that, abuse of Court or judicial process simply means, the use of a Court process mala fide or in bad faith to the annoyance of the opponent. One variety of it is the institution of multiferous actions between the same parties with regard to the same subject matter and same issue, in the same or another Court. See **Abdu Yunusa Indabawa v. Garba Magashi & Anor (2016) LPELR – 41626 (CA)** and **Umeh v. Inu (2008) 8 NWLR (pt. 225) at 245**. A quick look at the Originating Summons in Suit No: FHC/ABJ/CS/1275/2022 will show that, same was instituted in the Federal High Court, Abuja on the 27th day of July, 2022. Being a pre-election matter, it ought to have been determined within 180 days as

CA/PEPC/03/2023; CA/PEPC/04/2023; CA/PEPC/05/2023.                                   396

CERTIFIED TRUE COPY

required by Section 285(10) of the 1999 Constitution. It therefore means that it lapsed by January, 2023 about a month before the Election in question was conducted. This petition having been instituted on the 20/3/2023 when Suit No: FHC/ABJ/CS/1215/2022 was no more alive, does not qualify as an abuse of Court process. This ground for this objection is also discountenanced.

On whether this petition is caught by the doctrine of estoppel, it was argued that the issues raised in this petition has been firmly resolved by this Court in Appeal No: CA/ABJ/CS/108/2023. Issue estoppel arises when the issue has been decided upon to finality by a Court of competent jurisdiction. In other words, once an issue has been raised and distinctively determined between the parties, neither party can be allowed to fight that issue all over again. The same issue cannot be raised by either party again in the same or subsequent proceedings except in special circumstances. See **Adone & Ors v. Ikebudu & Ors (2001) LPELR – 191 (SC)** and **Tukur v. Uba & Ors (2012) LPELR – 9337 (SC)**. For issue estoppel to apply, the following conditions must be satisfied:

(a) The same question was decided in both proceedings;

(b) The decision which creates the estoppel must be final; and

(c) The parties to the judicial decision or their privies to the proceedings in which the estoppel is raised.



CERTIFIED TRUE COPY

To determine whether the above three elements exist (they must co-exist), the Court will closely examine the reasons for the judgment and other relevant facts that were actually in issue in the proceeding. See **Oyekola & Ors v. Amodu (2017) LPELR – 42391 (CA); OSPM Ltd v. Nibel Co. Nig. Ltd (2017) 3 NWLR (pt.1552) 207 at 234** and **Dasuki (Rtd) v. F.R.N. (2018) LPELR – 43969 (CA)**. I have studied the case sought to be relied on as estoppel in this case. It is apparent that the parties in that case are not the same as in the instant petition. The issues though the same, were not resolved to finality in the previous case; **Appeal No: CA/ABJ/CS/108/2023**. The action was struck out on ground of lack of *locus standi* by the lower Court which this Court affirmed on appeal. Thus, the objection on the ground is also discountenanced.

On whether the petition is statute barred, I had held in the earlier Motion filed by the 1st Respondent on the 7/5/2023, and 3rd and 4th Respondents' Motion filed on the 12/5/2023, which were taken together, this Petition which is premised on the nomination or sponsorship of the 4th Respondent is a pre-election matter. That being a pre-election matter, it ought to have been instituted and ventilated by the Petitioner before the Federal High Court within 14 days from the date of occurrence of the event or action complained of. That not having been done, the cause of

CERTIFIED TRUE COPY

action in this Petition stands barred by virtue of Section 285(9) of the 1999 Constitution of the Federal Republic of Nigeria (as amended).

On the issue of *locus standi*, I had also held in the previous Motions filed on the 7/5/23. 12/5/23 that, issues of nomination or sponsorship of candidate by political parties for an election come under pre-election matters. It is settled that, the issue of nomination of candidates by substitution is purely a pre-election matter, the only person with the *locus standi* to challenge the nomination is an aspirant who participated in the process of such nomination. In other words, apart from an aspirant who took part in the primary election, no other person is authorised to challenge such nomination by a political party for an election. Such process of challenging the nomination is sanctioned by Section 84(14) of the Electoral Act, 2022, 285(14) of the Constitution. See also **Shinkafi & Anor v. Adulazeez A. Yari & Ors (2016) 7 NWLR (pt. 1511) 340** and **Alhassan & Anor v. Ishaku & Ors (2016) LPELR – 40083 (SC)**.

It therefore follows that, the cause of action in this petition which is rooted in the nomination or sponsorship of the 4th Respondent is a pre-election matter. Being a pre-election matter, the Petitioner herein has no locus standi to challenge or question such nomination or sponsorship of the 4th Respondent by the 2nd Respondent. Thus, in **Peoples Democratic Party (PDP) Vs. Independent National Electoral Commission**



CERTIFIED TRUE COPY

**& 3 Others** unreported decision of the Supreme Court delivered on the 26th day of May, 2023 in SC/CV/501/2023, **Jauro, JSC** held at page 31 lines 1 – 16 thereof as follows:

> "The provision does not make the filing of pre-election matters by political parties an all – comers affair. It is not the purpose of the provision that the floodgate of pre-election litigation be open to political parties who will hide under it to challenge the actions or inactions of rival political parties under the guise of challenging the decision or activities of INEC. The application of Section 285(14)(c) of the Constitution does not extend to a political party poking into the affairs of another.
> The position of the law has always been that no political party can challenge the nomination of the candidate of another political party. No matter how pained or disgruntled a political party is with the way and manner another political party is conducting or has conducted its affairs concerning its nomination of its candidates for any position, it must keep mum and remain an onlooker, for it lacks the locus standi to challenge such nomination in Court."

It is clear therefore, that a political party, such as the Petitioner herein, only has the locus standi to file a pre-election matter when the situation affects it or its own candidate by virtue of Section 285(14)(c) of the 1999 Constitution. That being so, as in the instant petition where the grounds of the petition is rooted on the nomination or sponsorship of the candidate of another political party, this Petitioner will have no *locus*

CA/PEPC/03/2023; CA/PEPC/04/2023; CA/PEPC/05/2023.



CERTIFIED TRUE COPY

*standi* to institute the action, be it in the Federal High Court or an Election Tribunal. For that reason, it is my view that the cause of action in this petition being on the nomination and sponsorship of the 3rd and 4th Respondents by the 2nd Respondent/Applicant, the petition is incompetent for lack of ***locus standi*** on the petition to institute same. It is also liable to be struck out for being incompetent.

The 2nd Respondent/Applicant also contended that the Petition is not properly constituted as the candidate sponsored by the Petitioner has not been joined as a Co-Petitioner in the petition. The short answer to that is that, Section 133(1)(b) of the Electoral Act, 2022 entitles the Petitioner as a political party to institute an election petition. The Applicant has not referred us to any provision of the Electoral Act, or any authority that mandates the political party to file an election petition, only where its candidate has been joined as Co-Petitioner. It is true that, it is proper for the candidate of the party to be so joined but there is no law that compels the political party to join its candidate in the petition. Afterall, the purpose of such joinder is so that the candidate be bound by any judgment or order of the Court or Tribunal but any non-joinder will not invalidate the Petition. This is particularly so when Section 133(1) of the Electoral Act (supra) states that:

> "An election petition may be presented by one or more of the following persons –



CERTIFIED TRUE COPY

(a)    a candidate in an election; or

(b)    a political party which participated in the election."

By the use of the disjunctive word "or", it means that an Election Petition may be filed by the candidate alone, or the political party alone, or both of them.  See **Buhari & Anor v. Yusuf & Anor (2003) 14 NWLR (pt. 841) 446** and **APC v. PDP & Ors (2015) LPELR – 24349 (CA)**.  The objection on this ground is therefore discountenanced.

By a Motion on Notice filed on the 15/5/2023, the 5th Respondent (Kabir Masari) prayed this Court to grant him the following reliefs:

1. AN ORDER of this Honourable Court dismissing this Petition in its entirety for want of jurisdiction.

2. AN ORDER striking out the name of the 5th Respondent/Applicant from this Petition for non-disclosure of any reasonable cause of action against him.

3.  AND SUCH FURTHER or other orders that this Honourable Tribunal may deem fit to make in the circumstances of this Petition.

The Grounds upon which the Application has been brought are as follows:

1.    That the sole ground of the Petition is not supported by facts that can be countenanced in an Election Petition.

CA/PEPC/03/2023; CA/PEPC/04/2023; CA/PEPC/05/2023.



2. That the facts contained in the Petitioner's Petition are facts which relates to or connected with pre-election matters which are outside the scope, province and purview of an election petition.

3. That the purported facts being relied upon by the Petitioner are predicated on the domestic and internal affairs of a political party which are completely outside the purview of an election petition.

4. The choice of candidates by political parties for elective office(s) being a political issue is governed by the rules, guidelines and the Constitution of the political parties concerned and is not subject to be questioned by this Honourable Tribunal.

5. That under and by virtue of the provisions of Section 285(9) of the Constitution of the Federal Republic of Nigeria, 1999 (as mended), the issues raised in the Petition is/are pre-election matters, and therefore statute barred.

6. That the 5th Respondent (Kabir Masari) was not the winner of the Presidential Election held on the 25th day of February, 2023 and a fortiori, ought not to be joined in this Petition as he (5th Defendant) is not a party interested in this Petition as he did not contest for the Presidential election held on the 25th day of February, 2023.

7. That the Petitioner was never an Aspirant in the primaries conducted by the 2nd Respondent (All



Progressives Congress) prior to the presidential election held on the 25th of February, 2023.

8. That it is only the Federal High Court that is clothed with jurisdiction and power to adjudicate on the issues of nomination raised in the Petition and NOT this Honourable Tribunal.

9. That the 5th Respondent was never nominated to contest any election in any constituency or more than one constituency as contemplated under section 35 of the Electoral Act, 2022 nor a candidate of the 2nd Respondent in the Election conducted on the 25th of February, 2023, to warrant the 5th Respondent being made a party in this petition.

10. That the Petitioner's suit as constituted is calculated to irritate and/or annoy the 5th Respondent as it is not in any way supported by any law.

11. That based on the facts stated in the Petitioner's Petition which are facts exclusively connected to pre-election issues, the Honourable Court has no vires to grant the Petitioner's reliefs in the circumstances.

12. That the Petitioner's Petition is a flagrant abuse of the process of this Honourable Tribunal.

13. The Presidential candidate of the Petitioner being a necessary party is not joined in this Petition and as a result, same is not properly constituted.


CERTIFIED TRUE COPY

14. The Petition does not disclose any action or reasonable cause of action against the 5th Respondent.

The Application is supported by an Affidavit of 5 paragraphs deposed to by one Rejoice Adore, a Litigation Secretary in the Law Offices of Roland Otaru, SAN & Co, of counsel representing the 5th Respondent/Applicant. A Written Address was also filed along with the Motion. In opposition to the Application, the Petitioner/Respondent filed a Counter Affidavit of 5 paragraphs deposed to by one Kalu Kenneth Okorie, Litigation Secretary in the Law Office of Messrs O.M. Atoyebi, SAN & Partners, counsel to the Petitioner/Respondent. A Written Address was filed along with the Counter Affidavit.

Now, in arguing the Application, the 5th Respondent/Applicant raised three issues for determination as follows:

1. Whether, having regard to the sole ground of non-qualification anchoring the Petitioner's Petition, read in juxtaposition with particulars of facts as supplied in the Petition, the complaint of the Petitioner is not one of pre-election in which this Honourable Tribunal is not clothed with vires or jurisdiction to entertain.

2. Whether the 5th Respondent/Applicant, not being a candidate but a mere aspirant at a time before the voluntary withdrawal of his candidature at a pre-election in the electioneering exercise of the 2nd Respondent, qualifies as a necessary or proper party


CERTIFIED TRUE COPY

whose joinder is necessary and against whom a cause of action is disclosed in the Petition.

3. Whether, by the presentation of this Petition, despite the Petitioner's knowledge of the factual background of the Petition, as arising from the intra party activities of the 2nd Respondent, the Petition has not thereby degenerated to an abuse of Court process and robbing this Honourable Court, therefore, of the vires to entertain same.

I have studied the three issues raised by the 5th Respondent/Applicant. It is clear to me that issues 1 and 3 dealing with whether or not this Petition has to do with pre-election matter; and whether the petition is an abuse of court process have been considered and resolved in the Motions filed by the 1st, 2nd, and 3rd & 4th Respondents respectively. I therefore see no need to waste valuable time in resolving same issues here again, as we are bound by the determinations in those Motions. Issue 2 shall however be resolved as they were never raised by the other Respondents.

Now, the argument of the 5th Respondent/Applicant or issue 2 is that, from the averments in the petition, it is clear that the 5th Respondent is neither a necessary nor proper party to the petition. That he was not a candidate in the election held on the 25th February, 2023 nor was he declared a winner of the election. The case of **Babayeju v. Ashamu (1999) 9 NWLR (pt. 567) 546 at 555** was then cited to submit that, in the



circumstances, the petition does not disclose any cause of action against the 5th Respondent. That the only interest the 5th Respondent has in this petition is his membership of the 2nd Respondent, and which interest will not in any way be affected by the outcome of this petition. We were accordingly urged to hold that, no cause or reasonable cause of action has been disclosed against the 5th Respondent/Applicant, and to strike out his name from the petition.

In response, learned counsel for the Petitioner/Respondent contended that, the 5th Respondent/Applicant is a necessary party in this petition and was properly joined. The case of **Jegede v. INEC (2021) 14 NWLR (pt. 1797) 409** was then cited to submit that, where a party against whom allegations have been made, such person ought to be joined as a party in order to give him fair hearing. That, it is trite law, that a person who will be affected by the outcome of a case, must be made a party to the suit. That, in that respect, the 5th Respondent is a necessary and proper party to this petition. It is thus argued that, the case of **Babayeju v. Ashamu (supra)** relied on by the Applicant is inapplicable to an election petition case which is *sui generis*.

Now, Section 133 of the Electoral Act defines persons who are necessary parties in an election petition. Generally, necessary respondents in an election petition are the persons whose election or return is complained of, and the Electoral body that conducted the election. See Section

CERTIFIED TRUE COPY

133(2) and (3) of the Electoral Act, 2022. Those are what are termed statutory respondents. It should be remembered the Election Petitions are *sui generis*, and its procedure strictly regulated by statute. Thus, where a person does not fall within the category of statutory respondents, they are not necessary parties in an election petition. See **Agbareh v. Mimra (2008) All FWLR (pt.409) 559; APC v. PDP (2015) LPELR – 24587 (SC)** and **Buhari v. Yusuf (2003) 4 NWLR (pt.841) 446 at 498**. Thus, in **Waziri v. Gaidam (2016) 11 NWLR (pt. 1523) 230 at 265 paragraphs F – G**; the Supreme Court held that:

> "From the above, I have no difficulty in going along with the submissions of the respective counsel for the respondent that Section 137(2) and (3) of the Electoral Act, 2010 has no room for the joinder of the 5th Respondent who neither won the election nor performed any role as electoral officer or agent of the third Respondent in the election petition challenging the result of such an election and even no relief was claimed against the said 5th respondent and indeed, he had nothing to gain or lose in the petition aforesaid."

Indeed, a holistic reading of the facts of this petition does not disclose any complaint against the 5th Respondent. The only fact that relates to the 5th Respondent, relevant to the petition, is the act of withdrawal of his candidacy as the running mate of the 3rd Respondent. That is an act that occurred within the pre-election period, therefore, cannot amount

CERTIFIED TRUE COPY

to any act done by the 5th Respondent at the election. It cannot therefore ground any complaint by the Petitioner against the 5th Respondent in an election petition. It may be relevant in a pre-election matter but not in an Election Petition. It is therefore my finding that, there is no any claim on the 5th Respondent. In other words, the reliefs sought in the petition will not in anyway affect the 5th Respondent as he did not participate in the petition either as a candidate or agent of the 2nd Respondent, and no declaration was made in his favour by the 1st Respondent. In that respect, I hold that the objection of the 5th Respondent on this ground has merit. Accordingly, I order that the name of the 5th Respondent be struck out of this Petition.

**THE PETITION**

After the pre-hearing session, hearing on the Petition opened and closed on the 21/6/2023. The Petitioner called one (1) witness and closed its case. None of the Respondents called any witness but tendered some documents from the Bar, and the Petition was adjourned for adoption of Written Addresses. Parties then filed and served Written Addresses as directed by this Court, and same were adopted on the 14/7/2023. The matter was then adjourned for judgment.

The 1st Respondent's Written Address was filed on the 30/06/2023. Therein, four (4) issues were raised for determination as follows:


CERTIFIED TRUE COPY

1.  Whether considering the facts of the Petition and evidence led thereon, the Petitioner has the locus standi to question the nomination of the 4th Respondent as a ground of challenging the qualification and return of the 3rd Respondent as the winner of the Presidential election of 25th February, 2023?.

2.  Whether having regard to the facts pleaded and evidence led thereon vis-à-vis the provision of Section 134(3) of the Electoral Act, 2022, can the issue of validity of the nomination of the 4th Respondent as the Vice-Presidential candidate of the 2nd Respondent be validly raised as a ground before this Honourable Court to question/challenge the qualification and return of the 3rd Respondent as the winner of the Presidential election of 25th February, 2023?.

3.  If the answer to (2) is in the affirmative, whether having regard to the facts pleaded, the nomination of the 4th Respondent as the Vice-Presidential candidate of the 2nd Respondent is void as to render the 3rd Respondent not qualified to contest the Presidential election of 25th February, 2023?.

4.  Whether considering that the reliefs sought as per the Petition accrues no utilitarian benefit to the Petitioner, this Petition is not an abuse of Court process.

The 2nd Respondent's Written Address was filed on the 30/6/2023 wherein three issues were posited for determination as follows:

1.  Whether the Supreme Court judgment in Suit No: SC/CV/501/2023 – **Peoples Democratic Party v. INEC**



CERTIFIED TRUE COPY

delivered on 26th May, 2023 (Exhibit X1) operates as issue estoppel, hence binding on the instant petition?.

2. Whether the 3rd Respondent was disqualified to contest the Presidential election held on the 25th day of February, 2023 on account of the issues joined and evidence led on the pre-election process of nomination of 4th Respondent as 3rd Respondent's Vice-Presidential candidate at the election, against the backdrop of the cognizable qualifying and disqualifying factors relating to candidates sponsored at the Presidential election as stipulated in the Constitution of the Federal Republic of Nigeria, 1999 (as amended).

3. Whether having regard to the totality of the evidence led by parties and the applicable law, the Petitioner is entitled to succeed on any of the reliefs sought in the petition at all, or that the petition ought to be dismissed in favour of the Respondents?.

The 3rd and 4th Respondents' Written Address was filed on the 27/06/2023. The 3rd and 4th Respondents distilled only one (1) issue for determination as follows:

1. Considering the Petition as presented, including the evidence of the sole witness called against the clear provisions of the law and settled judicial authorities, including, in particular, the recent decision of the Supreme Court in Appeal No: **SC/CV/501/2023 – Peoples Democratic Party (PDP) v. Independent National Electoral Commission INEC & 3 Ors**; delivered

CERTIFIED TRUE COPY

on 26th May, 2023 (unreported), whether this petition is not bound to be dismissed without much ado.

The 5th Respondent also filed a Written Address on the 28/6/2023. The 5th Respondent also raised one (1) issue for determination; as follows:

> "Having regard to the factual circumstances of this case, juxtaposed with the provisions of the 1999 Constitution (as amended) and the Electoral Act, 2022, whether the nomination of the 4th Respondent as the 3rd Respondent's running mate for the Presidential election of 25th February, 2023 is invalid and thus affected and or invalidated the candidacy of the 3rd Respondent in the election."

The Petitioner filed Written Addresses in response to the Final Addresses of the Respondents. The Written Address in response to the Address of the 1st Respondent was filed on the 7/7/2023. Three issues were raised therein for determination as follows:

(i)   Whether the 3rd Respondent was qualified to contest the Presidential election held on the 25th February, 2023 and be validly declared as the winner of the said election by the 1st Respondent, having regard to the provisions of Sections 131(c) and 142(1) of the Constitution of the Federal Republic of Nigeria, 1999 (as amended) and Section 35 of the Electoral Act, 2022.

(ii)  Whether the Petitioner proved its case, as to justify the grant of the reliefs sought in this petition.



(iii) Whether the decision of the Supreme Court in **Peoples' Democratic Party VS. Independent National Electoral Commission & 3 Ors** with Appeal No: **SC/CV/501/2023**, bars and prevents the Petitioner from challenging the qualification of the 3rd Respondent to contest the Presidential Election held on the 25th February, 2023 on the basis of Sections 131(c) and 142 of the Constitution of the Federal Republic of Nigeria, 1999 (as amended).

The Petitioner's Written Address in response to the Final Address of the 2nd Respondent, and 3rd and 4th Respondents were also filed on the 06/7/2023. The issues raised in the Petitioner's Address in response to the 1st Respondent's Address, were repeated in the Written Addresses in response to the 2nd, and 3rd and 4th Respondents' Addresses. That being so, I need not repeat same here. The same issues were repeated in the Petitioner's Address in response to the 5th Respondent's Final Address. The 1st, 2nd and 3rd and 4th Respondents filed Replies on Points of Law to the Petitioner's Written Addresses.

Having reflected on the issues raised by the respective parties, I am of the view that the issues formulated by learned counsel for the Petitioner are adequate for the determination of the petition. The three issues shall however be considered together.

Now, learned senior counsel for the 1st Respondent began by questioning the *locus standi* of the Petitioner to present this petition. He cited the



cases of **Daniel v. INEC (2015) LPELR – 757/2013 (SC); Thomas Olufosoye (1989) 1 NWLR (pt. 18) 609** and **Opobiyi & Anor v. Layiwola Muniru (2011) 18 NWLR (pt. 1278) 387** to define the term *locus standi*. That to determine whether the Petitioner possesses the locus standi to institute the instant action, recourse must be had only to the petition, especially the particulars thereof. The case of **MTN (Nig.) Communications Ltd v. Musical Copyright Society of Nig. Ltd/GTE (2017) LPELR – 50121 (CA)** was cited in support. That, a closer look and perusal of the petition will readily disclose that, the complaints of the Petitioner as constituted, is against the nomination of the 4th Respondent as the Vice-Presidential candidate of the 2nd Respondent. That, the 4th Respondent whilst being the Senatorial candidate of the 2nd Respondent for Borno Central Senatorial Election, allowed himself to be nominated as the Vice-Presidential candidate of the 2nd Respondent in contravention of Section 35 of the Electoral Act, 2022.

Learned Senior Counsel for the 1st Respondent also raised and argued on whether the Petitioner can ground its petition based on qualification rooted on the nomination and sponsorship of the 3rd and 4th Respondents by the 2nd Respondent. I wish to point out that, the issue of locus standi of the Petitioner, and nomination of the 3rd and 4th Respondents were considered and determined in the various Rulings on the Motions and objections raised by the Respondents delivered earlier today. It is



therefore not necessary and convenient to consider same here. I shall however proceed to consider the substantive issues(s) in the petition which has been argued by the 1st Respondent as its issue three (3).

Now arguing on the issue, learned senior counsel for the 1st Respondent contended that, as the custodian of the nomination Forms and Notices of the candidates at the election, had in reaction to the petition narrated with dates, the facts leading to the nomination, withdrawal and substitution of the 2nd Respondent's Vice-Presidential candidate at the election. That prior to the nomination of the 4th Respondent as the vice-Presidential candidate of the 2nd Respondent for Borno Central Senatorial election, and had by a letter dated the 6th July, 2022 (Exhibit PA4) communicated his withdrawal as the 2nd Respondent's Senatorial candidate to the 2nd Respondent. Furthermore, that by a letter dated 6th July, 2022 forwarded the notice of withdrawal of the 4th Respondent to the 1st Respondent, on the 13th day of July, 2022.

It is then contended that, the 2nd Respondent had on the 15th day of July, 2022 completed and submitted Form EC11C for the nomination of the 4th Respondent as the new Vice-Presidential candidate of the 2nd Respondent following the withdrawal of 5th Respondent who had earlier been nominated as the Vice-Presidential candidate. That in the circumstances, the 4th Respondent was not a candidate for the Borno



Central Senatorial Constituency election as at the 15th of July, 2022 when he became formally nominated the Vice-Presidential candidate of the 2nd Respondent.

Learned Senior Counsel went on to submit that, a candidate for an election can withdraw his candidacy pursuant to Section 31 of the Electoral Act, 2022. That the procedure for the withdrawal are that:

(i) the candidate shall deliver personally to his political party that nominated him, his notice of withdrawal in writing;

(ii) the political party shall then deliver to INEC the notice of withdrawal; and

(iii) the notice of withdrawal shall be given to INEC not later than 90 days to the election.

Therefore, that for a candidate to validly withdraw his candidacy for an election, the requirements of Section 31 of the Electoral Act must be complied with. The cases of **Ekpe v. Itanjah & Ors (2019) LPELR – 48462 (CA)** and **Haruna v. PDP & Anor (2022) LPELR – 59266 (CA)** were cited in support. That in compliance with the provision of Section 31 of the Electoral Act (supra), the 4th Respondent wrote a letter to his political party (2nd Respondent) on the 6th of July, 2022 intimating it of his withdrawal as the candidate for the Borno Central Senatorial election of the 2nd Respondent. That on the same day, the 2nd Respondent authored


CERTIFIED TRUE COPY

a letter to the 1st Respondent (INEC) communicating such withdrawal and also attaching the 4th Respondent's Notice of Withdrawal as the Borno Central Senatorial candidate of the 2nd Respondent. That the said letter was received by the 1st Respondent on the 13th of July, 2022; and that there was nothing else required by Law as regards the withdrawal of the 4th Respondent as a Senatorial candidate of the 2nd Respondent for the Borno Central Senatorial election. It is therefore submitted that, the 4th Respondent's withdrawal as the candidate of the 2nd Respondent for Borno Central Senatorial election was done in full compliance with Section 31 of the Electoral Act, 2022.

On the issue of double nomination, learned counsel for the 1st Respondent referred to Section 35 of the Electoral Act, 2022 to contend that, the operative words in that provision is "nomination", "candidate" and "knowingly". It is thus contended that, for a candidate to be caught by that provision, his intent and knowledge of allowing double nomination must be established. The case of **Jime v. Hember & Ors (2023) LPELR – 60334 (SC)** was cited in support; and to further submit that, awareness or consciousness or intent to allow the double nomination is a vital ingredient that must be established. That, the onus is on the Petitioner to establish both the double nomination and the fact that the 4th Respondent knowingly allowed himself to be doubly nominated.

CA/PEPC/03/2023; CA/PEPC/04/2023; CA/PEPC/05/2023.                                        417

CERTIFIED TRUE COPY

Learned Senior Counsel for the 1st Respondent then submitted that, from the totality of the evidence on record, there is no dint of evidence offered by the Petitioner that the 4th Respondent knowingly allowed himself to be nominated in more than one constituency. Rather, that the evidence, particular Exhibit PA4, that the 4th Respondent had withdrawn his candidacy and communicated same to the 2nd Respondent. We were accordingly urged to hold that, no case of double nomination was established, nor that the 4th Respondent knowingly allowed such double nomination.

Learned Counsel for the 1st Respondent went on to submit that, the same set of facts on allegation of double nomination against the 4th Respondent, were raised and carefully considered by the Supreme Court in **People's Democratic Party (PDP) v. INEC & Ors** unreported in **SC/CV/501/2023**, particularly in the concurring decision of, **Okoro, JSC** and **Agim, JSC**. Thus, on the authority of **PDP v. INEC & Ors (supra)**, we were urged to resolve the issue against the Petitioner.

Learned Senior Counsel for the 2nd Respondent contended that, the case of the Petitioner is that, the 3rd Respondent was, at the time of the election conducted on the 25/2/2023, not qualified to contest as the Presidential candidate of the 2nd Respondent due to "double nomination" of the 4th Respondent by virtue of Section 35 of the Electoral

CA/PEPC/03/2023; CA/PEPC/04/2023; CA/PEPC/05/2023.                                418

CERTIFIED TRUE COPY

Act, 2022. That the issue has been settled by the Supreme Court in Exhibit X1 – **PDP v. INEC & Ors** delivered on the 26/3/2023; and that this petition which is predicated on the same ground/issue is caught by the doctrine of issue estoppel. That Exhibit X1 and this petition are the same in substance and effect. That the basis of the principle of estoppel is that, there must be an end to litigation, so that, issues which have been litigated and conclusively settled must not be relitigated by and between the same parties and their privies. The remark of **Lord Denning, M.R in his book titled: What Nest in the Law at pp.5 – 6**, and the case of **APC v. PDP & Ors (2015) LPELR – 24587 (SC)** were referred to.

Learned Senior Counsel reiterated that, the sole witness for the Petitioner (PW1) confirmed under cross-examination that, the sole Ground for this petition is that, the 3rd Respondent was at the time of the Presidential election not qualified to contest the Election because the 4th Respondent's nomination as Vice-Presidential candidate amounted to double nomination. That, the same witness confirmed under cross-examination that, the issue of the double nomination of the 4th Respondent was settled in **PDP v. INEC (supra)**. It is thus submitted that, the Supreme Court has sufficiently determined the issue of the alleged double nomination of the 4th Respondent to conclusion. The case of **Oyetunji v. Awoyemi & Ors (2013) LPELR – 20226 (CA)** was cited in support. That, PW1 admitted in cross-examination that she was aware

CERTIFIED TRUE COPY

of the Supreme Court decision in **PDP v. INEC (supra)**, yet the Petitioner went ahead to file this petition.

Learned Senior Counsel for the 2nd Respondent then cited the dicta of **Agim**, JSC at pages 2 – 4 and **Okoro**, JSC at pages 7 – 9 of their Lordships' concurring judgments to point out the similarities of the issues in contention in this petition and **PDP v, INEC (supra)**.

Learned Senior Counsel referred to Section 84 of the Electoral Act, 2022 to further submit that, the Petitioner has not in any way shown how the acts complained of affects it, and has no *locus standi* to institute this petition, therefore a nosy busybody and meddlesome interloper peeping into the affairs of the 2nd Respondent without any backing in Law.  In other words, that the Petitioner being a distinct and separate political party cannot challenge the nomination of the 4th Respondent who is a candidate of the Respondent.  The cases of **Obasanjo v. Yusuf (2004) 9 NWLR (pt. 877) 144; Adams v. Umar (2009) 5 NWLR (pt. 1133) 41;** and **Jegede & Anor v. INEC & Ors …… NWLR (pt, 1797) 560 – 561** were then cited to submit that, the limited scope of the jurisdiction vested in this Court by Section 239(1) of the 1999 Constitution cannot extend to the determination of the issue brought up by the Petitioner in this petition.

It is thus argued by learned senior counsel for the 2nd Respondent that, the issue of nomination of the 4th Respondent has been determined by

CERTIFIED TRUE COPY

the Supreme Court. The case of **Registered Trustees of the NACHPN v. MHWUN & Ors (2022) LPELR – 59040 (CA)** was then cited to submit that, where estoppel has been successfully pleaded and proved, that will be the end of the matter. That what remains to be determined is whether the decision of the Supreme Court in **PDP v. INEC & Ors (supra)** is final on the issue of double nomination of the 4th Respondent by the 3rd Respondent. The case of **Onyeabuchi v. INEC (supra) at 438 – 439** was further cited in support; and also submit that a decision is final when the Court that determined it cannot vary, re-open or set aside the decision. That, the decision of the Supreme Court in **PDP v. INEC & 3 Ors** on the validity or otherwise of the nomination of the 4th Respondent is a final judgment.

Learned Counsel for the 1st Respondent went on to submit that, the decision in **PDP v. INEC & Ors (supra)** is a **judgment in rem** having pronounced upon the status of nomination of the 4th Respondent. The cases of **Igwemma v. Obidigwe (2019) 16 NWLR (pt. 1697) 117 at 138**; **Noekoer v. Executive Governor of Plateau State (2018) 16 NWLR (pt. 1646) 481** and **Dike v. Nzeka (1986) 4 NWLR (pt. 34) 144** were then cited to submit that, what the Petitioner herein is trying to do is to relitigate on the same subject matter despite the subsisting **judgment in rem**. The cases of **Ogwuche v. FRN (2021) 6 NWLR (pt. 1773) 540 at 555**; **Corporate Ideal Insurance Ltd Vs. Ajaokuta Steel Co. Ltd (2014) 7 NWLR (pt. 1405)**


CERTIFIED TRUE COPY

156; **Okochi v. Animkwoi (2003) 8 NWLR (pt. 851) 1; Ayakandwe v. Augustine (2023) 2 NWLR (pt. 1867) 189 at 204** and **Onwuakpa v. Onyeama (2022) 17 NWLR (pt. 1858) 97 at 179** were then cited to urge us to take judicial notice of the decision of the Supreme Court in **PDP v. INEC & 3 Ors** (Exhibit X1) and apply same in the circumstances of this case.

Learned Senior Counsel for the 2nd Respondent then contended that, the consequence of filing this petition is that, it amounts to abuse of Court process. That the category of circumstances that may result in abuse of Court process are not closed, but the common denominator in abuse of Court process is the improper use of Court process to the irritation and harassment of the opponent; or the improper use of the Court process to unduly harass, irritate and annoy the opponent by relitigating an issue already determined by the Court. The cases of **Saraki v. Kotoye (1992) 9 NWLR (pt. 264) 156; CBN v. Ahmed (2001) LPELR – 837 (SC)** and **FBN Plc v. May Medical Clinics; Opekun v. Sadiq & Ors (2002) LPELR – 8183 (CA)** were cited in support. That by the admission of PW1 of the existence of Exhibit X1, the Petitioner deliberately proceeded with this petition so as to irritate and annoy the Respondents. We were accordingly urged to hold that this petition is frivolous, vexatious and oppressive which is tantamount to abuse of Court process.

CERTIFIED TRUE COPY

The cases of **Owonikoko & Ors v. Arowosaiye (1997) LPELR – 6266 (CA)**; **African Reinsurance Corp. v. JDP Construction Nig. (2003) LPELR – 215 (SC)** and **Dana Airlines Ltd v. Yusuf & Ors (2017) LPELR – 43051 (CA)** were then cited to submit that, where a Court comes to the conclusion that its process is abused, the proper order to make is that of dismissal of the entire suit. We were then urged to so find.

Learned Counsel for the 2nd Respondent also agreed that the issue before this Court is whether the Petitioner has been able to prove its allegation of disqualification. That it is the Law that he who asserts must prove, therefore, in election petition where the reliefs sought are mainly declaratory in nature, the burden is on the Petitioner to establish by evidence the disqualification alleged. That in actions where declaratory reliefs are sought, the person alleging has the burden to succeed on the strength of his case and not on the weakness of the case for the adversary. The cases of **Ogbom v. Okowa (2016) 11 NWLR (pt. 1622) 84 at 147** and **Makinde v. Adekola (2022) 11 NWLR (pt. 1834) 13 at 39** were cited in support.

It is then submitted that, it is for the Petitioner to prove that the 3rd and 4th Respondents have not satisfied the Constitutional requirement regarding qualification of candidates to contest the Presidential election of 25/2/2023. That, the crux of Petitioner's case is that, the 3rd


CERTIFIED TRUE COPY

Respondent was at the time of the election not qualified to contest the position of President of Nigeria as a result of double nomination of the 4th Respondent. It is also argued that, the issue of qualification to contest an election is a Constitutional matter under the Constitution of the Federal Republic of Nigeria, 1999 (as amended). Therefore, that where the issue of qualification is raised in an election petition, same must relate to qualifying or disqualifying factor by virtue of the Constitution. The cases of **Abubakar v. INEC (2020) 12 NWLR (pt. 1737) 37 at 102**; **Useni v. INEC (2022) 10 NWLR (pt. 1839) 413** and **Agi v. PDP (2017) 14 NWLR (pt. 1595) 386 at 455** were cited in support.

Learned Senior Counsel for the 2nd Respondent drew our attention to Section 131 of the 1999 Constitution which state the qualifications of a candidate to contest election for the office of President of the Federal Republic of Nigeria. It is then submitted that the 3rd Respondent was eminently qualified to contest the election for the office of President having met all the conditions to be elected to the office. That, the nature of qualification in question is the validity or otherwise of the nomination of the 4th Respondent, which is not a condition or qualification requirement under the Constitution. That in the instant case, the Petitioner has not made out any case that the nomination of the 4th Respondent as Vice-Presidential candidate of the 2nd Respondent

CERTIFIED TRUE COPY

amounted to double nomination as to disqualify the 3rd Respondent from contesting the Presidential election.

Learned Senior Counsel for the 2nd Respondent set out the disqualifying factors for election to the office of the President of Nigeria under Section 137(1)(i) – (j) and (2)(a) – (d) of the 1999 Constitution, to submit that, the facts pleaded by the Petitioner for challenging the qualification of the 3rd and 4th Respondents as candidates of the 2nd Respondent are not cognizable under Section 137 of the 1999 Constitution. Learned Counsel then cited Sections 134 and 142 of the Constitution and the case of **Buhari v. INEC (2008) LPELR – 814 (SC)**; and Section 35 of the Electoral Act to submit that, neither the 3rd nor the 4th Respondent breached those provisions of the Constitution. It is thus submitted that, the 3rd Respondent is a member of the 2nd Respondent and was validly sponsored by the party in compliance with the provisions of the Constitution.

Learned Senior Counsel for the 2nd Respondent went on to submit that, the responsibility of nominating a Vice-Presidential candidate is on the Presidential candidate, and that the way and manner in which such nomination is done, is not prescribed by the Constitution nor the Electoral Act but left solely at the discretion of the Presidential candidate. However, that the Petitioner contends that the 4th Respondent was nominated as a Senatorial candidate of the 2nd Respondent for Borno

CA/PEPC/03/2023; CA/PEPC/04/2023; CA/PEPC/05/2023.                    425

CERTIFIED TRUE COPY

Central Senatorial District when he was nominated by the 3rd Respondent for the office of Vice-President in violation of Section 35 of the Electoral Act, 2022.

It is further argued that, the office of Vice-President is not one for which a primary election is conducted but is merely nominated by a Presidential candidate. That the 4th Respondent complied with Section 31 of the Electoral Act by withdrawing his candidacy for Borno Central Senatorial District to the 2nd Respondent vide a letter dated the 6th of July, 2022 (Exhibit R1) and the 2nd Respondent conveyed the notice of withdrawal to the 1st Respondent on the 15th July, 2022. It is thus submitted that, the 4th Respondent was only obligated by Section 31 of the Electoral Act to submit a letter of withdrawal to the 2nd Respondent, which he did on the 6th of July, 2022. Therefore, that before the 14th July, 2022 when the 4th Respondent was nominated as the Vice-Presidential candidate of the 2nd Respondent, he was no longer a Senatorial candidate for Borno Central Senatorial election. That, in the circumstances, there was no case of double nomination as alleged by the Petitioner.

It was then submitted that, in any case the issue has been given judicial imprimatur by the Supreme Court in the unreported case of SC/CV/501/2023: **PDP v. INEC & Ors** delivered on the 26/5/2023. That, the Supreme Court held therein that, there was no positive evidence

CERTIFIED TRUE COPY

before the Court to show that the 4th Respondent knowingly stood as the nominated candidate of the 2nd Respondent for the office of Vice-President as well as Senator representing Borno Central Senatorial District in the general election of 25/2/2023. That, on the face of the documents admitted as Exhibits PA2, PA3 and PA4, it is clear that the substitution and nomination of the 4th Respondent is in compliance with the provisions of the Electoral Act, 2022. That in any case, the dates within which the 4th Respondent submitted his withdrawal notice to the 2nd Respondent as well as the notice of withdrawal of the 4th Respondent's Senatorial candidacy are undoubtedly within the bounds of the law. The case of **Balami v. Bwala (1993) 1 NWLR (pt. 267) 51 at 57 – 58** was cited in support.

Learned Senior Counsel for the 2nd Respondent then cited the cases of **Sylva v. INEC (2018) 18 NWLR (pt. 1651) 310 at 368** and **Doma v. INEC (2012) 13 NWLR (pt. 1317) 297** to submit that, the evidence of PW1 under cross-examination constitute admission against the interest of the Petitioner as PW1 was not declared a hostile witness. It is therefore contended that, the Petitioner has woefully failed to prove its case, therefore is not entitled to any of the reliefs sought; and to dismiss the petition entirely.



CERTIFIED TRUE COPY

Arguing the sole issue formulated by the 3rd and 4th Respondents, learned senior counsel referred to the evidence of the Petitioner's sole witness, to contend that the evidence led by the Petitioner is very bland or light. That the Petitioner's case is built on the fact that, as at the time the 4th Respondent's name was submitted to INEC as the Vice-Presidential candidate of the 2nd Respondent and running mate to the 3rd Respondent, he was yet to relinquish his senatorial candidacy for the Borno Central Senatorial election. Learned Counsel then highlighted critical dates for the determination of the issue; which are the 6th July, 2022, 14th July, 2022 and 15th July, 2022 respectively. That it was only on the 6th July, 2022 that the 4th Respondent communicated his withdrawal from the senatorial contest to the 2nd Respondent; which letter is in evidence as Exhibit PA4. That by the said letter, the 4th Respondent had clearly evinced his intention to withdraw his candidacy from the Senatorial contest.

That on the 14th July, 2022, the name of the 4th Respondent and his personal particulars were submitted to INEC as a substitute candidate, upon the withdrawal of the 5th Respondent. That there was a gap of 8 days between the 6th day of July, 2022, when the 4th Respondent withdrew from the Senatorial race and the 14th July, 2022 when his name was submitted to INEC as the substitute candidate for the 2nd Respondent's Vice-Presidential candidate. That, the judgment (Exhibit

CA/PEPC/03/2023; CA/PEPC/04/2023; CA/PEPC/05/2023.                   428

CERTIFIED TRUE COPY

X1) of the Supreme Court which is binding on this Court, aptly captures the point being made; in the contributory judgment of **Ogunwumiju, JSC**. That in any case, all the activities culminating in the nomination of the 4th Respondent as the Vice-Presidential candidate of the 2nd Respondent are entirely the internal affairs of the 2nd Respondent. That in the circumstances, not only is the subject of the Petitioner's complaint non-justiciable, but the Petitioner not being a member of the 2nd Respondent lacks the *locus standi* to institute the petition on the subject matter.

On the issue of voluntary withdrawal of candidates for an election, learned senior counsel for the 3rd and 4th Respondents contended that by Section 31 of the Electoral Act, 2022, the 4th Respondent is statutorily empowered to withdraw his candidacy for any office at all, in the manner prescribed by the Electoral Act. That the wordings of Section 31 of the Electoral Act, 2022, that a "Candidate may withdraw his or her candidature" are clear and unambiguous. That the judgment of the Supreme Court in **PDP v. INEC & Ors** (Exhibit X1) is the reference point on the issue, and restates the right of choice of the candidate and the political party to withdraw from an election.

Referring again to Section 31 of the Electoral Act, 2022, learned senior counsel contended that, the prescribed mode of withdrawal by a candidate is "by notice in writing signed by him and delivered personally

CERTIFIED TRUE COPY

by the candidate to the political party that nominated him". That Exhibit PA4 indicates that the 4th Respondent wrote, personally signed and submitted or delivered to the 2nd Respondent a letter conveying his withdrawal from the Senatorial contest and to resile from the earlier nomination. That the decision to withdraw is a personal one, it therefore crystalized on the 6th July, 2022 when the 4th Respondent delivered the Written Notice personally to the 2nd Respondent; and that from that day he (4th Respondent) ceased to stand as the 2nd Respondent's candidate for Borno Central Senatorial District. The dicta of **Okoro**, **JSC** and **Agim**, **JSC** in **PDP v. INEC & Ors (supra)** (Exhibit X1), were cited in support.

Flowing from the above, learned senior counsel for the 3rd and 4th Respondents submitted that, contrary to the suggestion of the Petitioner, what took place on the 15th July, 2022 as shown on the INEC Form EC11 (Exhibit PA3) was a mere conveyance of the development to INEC as required by section 31 of the Electoral Act, 2022. That, Section 31 of the Electoral Act, 2022 is bifurcated with one part dealing with the withdrawal by notice of the candidate to his political party, and the other part dealing with the conveyance of such withdrawal by the political party to INEC. Therefore, that if the withdrawal had not crystalized, there would have been nothing for the political party to convey to INEC. The dictum of **Agim**, **JSC** in **PDP v. INEC & Ors (supra) at pages 5 – 6** was then cited to submit that, if the 4th Respondent had not successfully

CERTIFIED TRUE COPY

withdrawn on the 6th July, 2022, the 2nd Respondent would have ad no withdrawal to convey to INEC on the 15th July, 2022.

Learned Senior Counsel for the 3rd and 4th Respondents went on to submit that, it is immaterial that the withdrawal was communicated to INEC on 15th July, 2022, insofar as the communication is done not later than 90 days before the election. That, the Petitioners misconception, proceeded from the premise that the withdrawal was incomplete until same is communicated to INEC. We were accordingly urged to hold that the 4th Respondent's subsequent nomination as Vice-Presidential candidate by the 3rd Respondent on or about the 14th July, 2022 does not suffer from any factual or legal impediment, whatsoever.

Referring to Exhibit X1 (judgment of the Supreme Court in **PDP v. INEC & Ors**), which also challenged the qualification of the 3rd Respondent to contest the Presidential election on the claim of invalid nomination of the 4th Respondent, learned senior counsel for the 3rd and 4th Respondents recommended the dicta of the Justices of the Supreme Court of Nigeria, to serve as binding precedent for the determination of this petition. That the said judgment of the Supreme Court has covered the field in every area material and significant to the determination of this petition. Learned Counsel then contended that, the legal profession in Nigeria, and the entire commonwealth thrives on strict adherence to the doctrine of judicial precedence, or **stare decisis**. The case of **Atolagbe v. Awuni**



**(1997) 9 NWLR (pt. 552) 536 at 544 – 545, 567** was cited to stress the point. The cases of **Dalhatu v. Turaki (2003) 15 NWLR (pt. 843) 310; Osakwe v. Federal College of Education (2010) 10 NWLR (pt. 1201) 1 at 36; Sule v. Kabir (2011) 2 NWLR (pt. 1232) 533; Dada v. FRN (2016) 11 NWLR (pt. 1505) 312** and **Ezenwaji v. University of Nigeria & 4 Ors (2017) 5 – 6 SC (pt. II) 87** were cited in support.

Dr. Roland Otaru, SAN of learned counsel for the 5th Respondent contended that, the qualifying criteria for election to the office of President is Section 131 of the Constitution of the Federal Republic of Nigeria, 1999 (as amended. That, the entire substratum of this petition is built on the alleged invalid nomination of the 4th Respondent as pleaded in paragraph 18, 19, 20, 21, 22, 23, 24, 25, 28 and 29 of the Petition; and that those facts pleaded explains the Petitioner's erroneous contention that the 3rd Respondent is not qualified to contest for the office of President of Nigeria following the withdrawal of the 5th Respondent and subsequent nomination of the 4th Respondent in his stead as the Vice-Presidential candidate of the 2nd Respondent pursuant to Section 142(1) of the 1999 Constitution.

The cases of **PDP v. INEC & Ors (2014) LPELR – 23808 (SC); Onashile v. Idowu (1961) 2 SCNLR 53; Ugwu v. Ararume (2007) 12 NWLR (pt. 1048) 367; Adejumo v. Military Governor of Lagos State (1972) 3 S.C. 45** and


CERTIFIED TRUE COPY

**Ojokolobo v. Alamu (1987) 3 NWLR (pt. 61) 377** were then cited to submit that, in the interpretation of the Constitution, once the words used are clear and unambiguous, the literal meaning shall be applied. That, Section 142(1) of the Constitution only means that, at the time of nomination of a candidate for election to the office of President, such candidate must nominate an associate from the same political party as a Vice-President under Section 141 of the Constitution. That, the 3rd Respondent having nominated the 4th Respondent for the office of Vice-President, the requirement of Section 142(1) of the Constitution has been satisfied.

Learned Senior Counsel for the 5th Respondent then submitted that, the Petitioner has anchored his complain on double nomination pursuant to Section 35 of the Electoral Act, 2022. That in the instant Petition, the 4th Respondent had been nominated the Senatorial candidate of Borno Central Senatorial election of the 2nd Respondent. That subsequent to the emergence of the 3rd Respondent as the Presidential candidate, he picked the 5th Respondent as his running mate for the election. However, the 4th Respondent later withdrew as the Borno Central Senatorial candidate of the 2nd Respondent. That the facts pleaded in paragraphs 18,19, 20, 21, 22, 23, 24, 25, 28 and 29 of the petition are erroneous as there is no law which require primaries to elect a Vice-Presidential



candidate. The case of **Nobis-Elendu v. INEC & Ors (2015) LPELR – 25127 (SC)** was cited in support.

It is also contended by learned senior counsel for the 5th Respondent that, the whole case of the Petitioner boils down to whether the candidacy of the 4th Respondent is vitiated by double nomination; and if the Court answers or resolves in the negative, then the whole case of the Petitioner crumbles like a pack of cards. That incidentally, the issue was settled by the Supreme Court in **People's Democratic Party (PDP) v. Independent National Electoral Commission (INEC) & 3 Ors** unreported SC/CV/501/2023 delivered on the 26th May, 2023. That the facts of that case is on all fours as the instant petition; and the Supreme Court was emphatic in holding that the complaint of wrongful nomination of the 3rd and 4th Respondents is strictly an internal affair of the 2nd Respondent in respect of which the PDP lacked the *locus standi* to raise and litigate upon.

Learned Senior Counsel went on to submit that, the Supreme Court in the **PDP V. INEC case (supra)**, delved into the issue whether the nomination of the 4th Respondent amounted to "double nomination" within the meaning of Section 35 of the Electoral Act, came to the conclusion that there was no such double nomination. That the findings of their Lordships of the Apex Court in **PDP v. INEC & Ors (supra)** are extensive,

CA/PEPC/03/2023; CA/PEPC/04/2023; CA/PEPC/05/2023.

CERTIFIED TRUE COPY

far-reaching and leave no room for any conjecture, such that this Court will have no choice than to adopt and apply same based on the doctrine of **stare decisis**. On that note, we were urged to resolve the sole issue in this petition against the petition, and dismiss the appeal.

In response, learned counsel for the Petitioner contended that, the 3rd Respondent was not qualified to contest the Presidential Election held on the 25/2/2023, therefore, the 1st Respondent was wrong when it declared and returned him as duly elected. That, this petition is anchored on the ground that the 3rd Respondent was not qualified to contest the Presidential Election aforestated because he did not have a validly nominated running mate as provided by Sections 131 and 142(1) of the Constitution of the Federal Republic of Nigeria, 1999 (as amended). The cases of **PDP v. INEC (2014) 17 NWLR (pt. 1437) 525** and **Balewa v. Umazu (1999) 5 NWLR (pt.604) 636 at 644 – 645** were then cited to submit that, this Court has the jurisdiction to entertain an election petition based on qualification or non-qualification of the person declared elected.

Learned Senior Counsel for the Petitioner referred to Section 134(1)(a) of the Electoral Act, 2022 and paragraphs 15 and 16 of the petition to submit that, it is accepted by all sides in this petition that the 4th Respondent was the candidate of the 1st Respondent for the Borno

CA/PEPC/03/2023; CA/PEPC/04/2023; CA/PEPC/05/2023.

CERTIFIED TRUE COPY

Central Senatorial District before the withdrawal of the 5th Respondent. That upon the withdrawal of the 5th Respondent, the 3rd Respondent nominated the 4th Respondent as a replacement. It is then contended that, the 4th Respondent was therefore nominated for two offices at two different constituencies for the 2022 general elections. That by Section 35 of the Electoral Act, shall nomination is void.

The cases of **Dankwambo v. Abubakar (2016) 1 NWLR (pt. 1495) 157 at 180**; **Dickson v. Sylva (2017) 8 NWLR (pt. 1567) 167 at 233** and **A.G; Lagos State v. A.G; Federation (2003) 12 NWLR (pt. 833) 1 at 159** were then cited to submit that, where the words used in a statute one plain and unambiguous, they must be given their plain or literal meaning unless if to do so will lead to manifest absurdity or be in conflict with the Constitution. It is also contended that time is irrelevant when construing the provisions of Section 35 of the Electoral Act, 2022, and that if the Law maker intended that time will be relevant, it would have clearly provided so. It is then submitted that, the intention of the Law maker is that, a candidate cannot aspire to more than one office in one election cycle under the Electoral Act, 2022.

It is further submitted by learned senior counsel for the Petitioner that, the consequence of breach of Section 35 of the Electoral Act, 2022 is that, the 3rd Respondent had no running mate for the Presidential Election



held on the 25/2/2022 in violation of Section 142(1) of the 1999 Constitution. That by Section 142(1) of the Constitution, a person cannot be a Presidential candidate without a Vice-Presidential candidate. It follows therefore, that for a person to be qualified to contest a Presidential Election, he must nominate a Vice-Presidential candidate as decided by this Court in **Balewa v. Muazu (1999) 5 NWLR (pt. 604) 638** and **Ojoye Diri v. Advanced Nigeria Democratic Party & Ors (2020) LPELR – 50947 (CA)**. That in effect, a combined reading of Sections 131 and 142(1) of the Constitution would reveal that, a Presidential candidate will not qualify to contest an election where the Vice-Presidential candidate was not sponsored according to Law. The case of **Okocha Samuel Osi v. Accord Party (2016) LPELR – 41388 (SC)** and **Onnoghen v. FRN (2019) LPELR – 47908 (CA)** was cited in support.

Learned Senior Counsel for the Petitioner went on to submit that Section 142(1) of the Constitution renders the qualification of a Vice-Presidential candidate mutatis mutandi with that of the Presidential candidate as stipulated for by Section 131 of the Constitution. Furthermore, that Section 33 of the Electoral Act, 2022 has constitutional flavour. That, the case of the Petitioner is that, the 3rd Respondent contested Presidential election of 25/2/23 without an associate known to law as the said associate was not sponsored in accordance with the provisions of the Constitution, therefore, the 3rd Respondent cannot be said to have been

CA/PEPC/03/2023; CA/PEPC/04/2023; CA/PEPC/05/2023.

CERTIFIED TRUE COPY

sponsored by the 1st Respondent as contemplated by Section 131(c) of the Constitution. Learned Counsel drew our attention to paragraphs 23, and 28 of the petition and paragraphs 13, 25, 26, 27, 28, 30, 34, 35, 36 and 40 of the written Statement on Oath of PW1 together with Exhibit PA2.

Learned Counsel for the Petitioner then submitted that, the case of the Petitioner has always been that, the 2nd Respondent sponsored the 3rd and 5th Respondents as its Presidential and Vice-Presidential candidates for the 25th February, 2023 election. That on the 24th June, 2022, the 5th Respondent withdrew from the Presidential election and deposed to an Affidavit in the High Court of the F.C.T. to that effect. That pursuant to the withdrawal of the 5th Respondent, the 2nd and 3rd Respondents purportedly sponsored the 4th Respondent to replace the 5th Respondent on the 14th July, 2022. Citing the cases of **BSS Engineering Services Ltd & Ors v. Fidelity Bank (supra); Egharevba v. Osagie (2009) 18 NWLR (pt. 1173) 299** and **Olaloye v. Attorney-General of Osun State (2015) All FWLR (pt. 774) 37 at 69 – 70**, learned counsel contended that, the case of the Petitioner is supported by documentary evidence evincing the withdrawal of the 5th Respondent as well as the purported sponsorship of the 4th Respondent by the 2nd Respondent to be the associate of the 3rd Respondent.



It is then submitted that, it is clear from the testimony of P.W.1 and Exhibit PA2 that, the 5th Respondent withdrew from the Presidential election as the associate of the 3rd Respondent on the 24th June, 2022. That, the 2nd and 3rd Respondents then purportedly sponsored the 4th Respondent as replacement of the 5th Respondent on the 14th July, 2022. Therefore, that the said sponsorship of the 4th Respondent as associate of the 3rd Respondent was done within twenty-one days from when the 5th Respondent withdrew as the associate of the 3rd Respondent. That those facts were not contradicted by the Respondents and therefore remain unchallenged and uncontroverted. The cases of **Ogunyade v. Osunkoye & Anor (2007) LPELR – 2355 (SC)** and **F.C.D.A. v. Alhaji Musa Naibi (1990) 5 SCNJ 186 at 195 – 196** were then cited to submit that by failing to challenge the evidence of the Petitioner on this point, the Respondents have conceded to this point of the Petition. That facts admitted need no further proof. The case of **O.A.N. Overseas Agency Nig. Ltd v. Bronwen Energy Trading Ltd & Ors (supra)** was cited in support, and to further submit that, the sponsorship at the 3rd Respondent as at the 24th June, 2022 was inchoate and could only be validated within 14 days as provided by Section 33 of the Electoral Act.

It is then contended by learned counsel for the Petitioner that, a political party that wishes to sponsor a candidate to replace a withdrawn candidate has to do so within the window provided for by Section 33 of


CERTIFIED TRUE COPY

the Electoral Act, 2022. That the times stipulated by the Electoral Act are immutable and sacrosanct, a breach of which renders any action taken on the issue, void. The cases of **Ehinlanwo v. Oke & Ors (2008) LPELR – 1054 (SC)** and **INEC & Ors v. Fazing & Ors (2010) LPELR – 5020 (CA)** were cited in support. We were then urged to hold, based on the judicial authorities cited, that the 4th Respondent was never an associate to the 3rd Respondent as his sponsorship on the 14th July, 2022 was invalid, having not been done within 14 days as stipulated by Section 33 of the Electoral Act, 2022.

Learned Counsel for the Petitioner also contended that, the testimony of PW1 and Exhibit PA2 indicate that, the 5th Respondent withdrew from the Presidential election as the associate of the 3rd Respondent. That, the combined effect of the withdrawal of the 5th Respondent from the Presidential Election as an associate of the 3rd Respondent and his consequent non-participation in the election as well as the invalid sponsorship of the 4th Respondent by the 2nd Respondent as an associate of the 3rd Respondent is that, the 3rd Respondent was at the time of the Presidential election, not qualified to contest the election. The case of **Mr. Peter Okocha & Anor v. INEC & Ors (2010) LPELR – 34345 (CA)** was then cited in urging us to hold that, the 3rd Respondent was, at the time of the Presidential Election, not qualified to contest the election, having



violated the provisions of Sections 131(c) and 142 of the Constitution of the Federal Republic of Nigeria, 1999 (as amended).

On the unreported case of **Peoples Democratic Party (PDP) v. INEC & Ors (supra)** (Exhibit X1), learned counsel for the Petitioner cited the cases of **Ogbom v. Ibori (2005) 13 NWLR (pt. 942) 418**; **Osunrinde v. Ajamogun (1992) 6 NWLR (pt.156) 383** and **Oyede v. Olusesi (2005) 16 NWLR (pt. 951) 617** to contend that, for a plea of issue estoppel to apply, the following conditions must be satisfied:

    (a)  The same question must have been decided in both proceedings;

    (b)  The judicial decision which creates the estoppel must be final; and

    (c)  The parties to the judicial decision or their privies to the proceedings in which the estoppel is pleaded, must be the same.

It is then argued that, the question decided in **PDP v. INEC (supra)** is not the same for the determination of the instant petition; the decision sought to be relied on is not final, and the Petitioner is not a privy of PDP nor was it a party in the case at the Supreme Court. The case of **Oleksand v. Lonestar Drilling Co. Ltd (2015) 9 NWLR (pt.1464) 337** was cited in support. That, the Supreme Court in **PDP v. INEC & Ors (supra)** was


CERTIFIED TRUE COPY

merely decided on the *locus standi* of PDP to institute the matter at all. Therefore, that the appeal was determined by the Supreme Court on the issue of *locus standi* contrary to the assertion of the Respondents who are urging this Court to hold that the substantive issue(s) in that case were completely determined on the merit by the Supreme Court. The dictum of **Adamu Jauro**, **JSC** at pages 35 – 38 of the judgment, and the case of **Onyeabuchi v. INEC (2002) 8 NWLR (pt. 769) 417 at 439** were cited in support, and to urge us to reject the argument of the Respondents that the authority of **PDP v. INEC (supra)** constitute *res judicata* or issue estoppel. We were accordingly urged to hold that the 3rd Respondent was not qualified to contest the Presidential Election of 25th February, 2022 and grant the reliefs sought by the Petitioner.

I have also studiously considered the Petitioner's Final Written Addresses in response to the Final Addresses of the 2nd, 3rd and 4th, and 5th Respondents. Having done that, I find no substantial difference in the response of the Appellant to those Written Addresses, from that of the 1st Respondent. Thus, for the sake of brevity and to avoid repetition, I see no need to repeat them here. However, I shall consider briefly, any new point considered by the Respondents in their Replies on Points of Law to the Petitioner's Final Written Address.

CERTIFIED TRUE COPY

In reply on Points of Law, learned senior counsel for the 1st Respondent, in answer to the Petitioner's contention that, the 1st Respondent having not called any witness at the trial is deemed to have abandoned his pleadings, submitted that, refusal to call witness is not the same thing as not leading evidence in support of the defence. That the Petitioner failed to appreciate that, the 1st Respondent actually led evidence in support of its pleaded facts through the cross-examination of PW1. The cases of **PDP v. Nwankwo & Ors (2015) LPELR – 40668 (CA); Andrew & Anor v. INEC & Ors (2017) LPELR – 48518 (SC)** and **Abubakar & Anor v. INEC & Ors (2019) LPELR – 48488 (CA)** were cited in support. Learned Senior Counsel for the 1st Respondent then contended that the evidence elicited though the cross-examination of PW1 are in proof of the pleadings of the 1st Respondent. The case of **Andrew & Anor v. INEC & Ors (2017) LPELR – 48518 (SC)** was then cited to urge us to discountenance this argument of the Petitioner that the 1st Respondent abandoned his pleadings.

On the provision of Section 35 of the Electoral Act, 2022, learned Senior Counsel for the 1st Respondent submitted that, to void the nomination of a candidate, such candidate must have knowingly allowed himself to be simultaneously nominated in more than one constituency. That, where the candidate withdrew his nomination from one constituency before taking up the nomination of another constituency, the provision of Section 35 of the Act cannot be activated against such candidate.

CA/PEPC/03/2023; CA/PEPC/04/2023; CA/PEPC/05/2023.

CERTIFIED TRUE COPY

443

On the contention of the Petitioner that upon the withdrawal of the 5th Respondent as the Vice-Presidential candidate of the 2nd Respondent, the 2nd Respondent ought to conduct fresh primary election within 14 days to replace the 5th Respondent, learned counsel for the 1st Respondent submit that, a quick glance at Section 33 of the Electoral Act would reveal that the section applies only to nominations submitted pursuant to Section 29 of the Act. In other words, that Section 33 applies to a candidate whose name has been submitted under Section 29 of the Electoral Act or nominations that are birthed by virtue of a valid primary election. That in the circumstances, to the extent that the 5th Respondent's nomination was not through any primary election, his substitution upon his withdrawal cannot also be through any primary election. It is then contended that the cases of **Ehinlanwo v. Oke & Ors (2008) LPELR – 1054 (SC)** and **Mr. Peter Okocha & Anor v. INEC & Ors (2010) JELR – 34345 (CA)** are therefore inapplicable.

On the argument of the Petitioner that since the Petitioner was not a party to the case of **Peoples Democratic Party v. INEC & Ors**, SC/CV/501/2023 (Exhibit X1), the principle of estoppel does not bar him from relitigating the issue, learned senior counsel for the 1st Respondent submitted that, the Supreme Court has fully and exhaustively addressed and established that only a party member who participated in the primary election of its party that has the locus standi to challenge or



question the nomination of a candidate. That, in so far as the Petitioner is not a member of the 2nd Respondent nor was it an aspirant at its primary election, it lacks the locus standi to question the nomination of the 3rd and 4th Respondents. The case of **Bamgbegbin v. Oriare (2009) 13 NWLR (pt. 1158) 370** was cited in support.

Responding on points of law, learned senior counsel for the 2nd Respondent contended that, the Petitioner has not challenged or proffered any answer to the salient points raised and argued by the 2nd Respondent, such as, the overall legal effect of Exhibit X1 being a judgment of the Supreme Court and the principles of *stare decisis*; the incongruity and academic nature of the reliefs sought in the Petition; and the Petitioner's failure to prove *actus reus* and *mens rea* of the allegation on violation of Section 35 of the Electoral Act. That in the circumstances, the Petitioner is deemed to have conceded those points. The case of **Adesanya v. Otuewu (1993) 1 NWLR (pt. 270) 414 at 456** was cited in support. That in particular, the Petitioner failed to address on his objection to the admissibility of Exhibit X1, which means that the exhibit was properly admitted.

Learned Counsel then submitted that, in Law, evidence elicited from a party or his witness under cross-examination which goes to support the case of the party cross-examining constitutes evidence in support of the

CERTIFIED TRUE COPY

case or defence as the case may be. The case of **Andrew v. INEC (supra)** was then cited to submit that, PW1 was cross-examined with respect to Exhibit X1 which cleared the question of double nomination of the 4th Respondent.

On the issue of lack of cross-examination of the Petitioner's witness by the 2nd Respondent, learned Senior Counsel submitted that, it is not all evidence that is given by a witness under examination-in-chief that must be tested by cross-examination. That a worthless or apparently incredible evidence need not be subjected to any cross-examination. The case of **Fasogbon v. Layade (1999) 11 NWLR (pt.628) 543 at 553 – 554** was cited in support. That in any case, assuming without conceding that PW1 was not cross-examined, the fact that the evidence given by PW1 was so watery and worthless, makes cross-examination of such witness, merely academic exercise.

Learned Senior Counsel for the 2nd Respondent contended that, the case of **Mr. Peter Okocha v. INEC (2009) 7 NWLR (pt. 1140) 295** cited by the Petitioner did not decide the issue of valid nomination or double nomination, rather what this Court decided was on unlawful exclusion. That it is erroneous for the Petitioner to contend that Exhibit X1; judgment of the Supreme Court in **PDP & INEC & Ors (supra)** does not constitute *res judicata*. That the concurring decisions of the esteemed

CERTIFIED TRUE COPY

Law Lords of the Supreme Court form part of the judgment as it is meant to complement the lead judgment by way of addition to or even improvement on the issues resolved in the lead judgment. That it is the lead judgment and the concurring judgment that crystalize into the full judgment of the Court. That after resolving the issue of **locus standi** in the **PDP v. INEC (supra)** case, the Supreme Court exercised its powers under the Supreme Court Act, to proceed to resolve the substantial issues in the appeal, as a matter of policy of the Court. The case of **Okorocha v. PDP (2014) 7 NWLR (pt. 1406)** was cited in support.

Learned Senior Counsel then submitted that, the Supreme Court by the decision in **PDP & INEC & Ors (supra)**, intended that the issue of double nomination or validity vel non of the 4th Respondent's nomination as the Vice-Presidential candidate of APC should not resurface again for litigation under any guise. The dicta of **Augie, JSC, Ogunwumiju, JSC** and **Agim, JSC** are eloquent evidence of the position of the Supreme Court. Learned counsel then submitted that, contrary to the assertion of the Petitioner, the Supreme Court made crucial findings and pronouncements on the issue of double nomination of the 4th Respondent, and that pursuant to Section 287 of the 1999 Constitution, that pronouncement is binding on all Courts in Nigeria by dint of **stare decisis**. The cases of **Toyin v. PDP (2019) 9 NWLR (pt. 1670) 50 at 66;**



**Gwede v. D.S.H.A. (2019) 8 NWLR (pt. 1673) 30 at 47** and **Dingyadi v. INEC (No. 1) (2010) 18 NWLR (pt. 1224) 1** were cited in support.

The 3rd and 4th Respondents also filed a Reply on points of law. Therein, it was argued that, the Petitioner has not disputed the fact that every aspect of the decision of the Supreme Court in Exhibit X1 is, by the doctrine of *stare decisis* and Section 287(1) of the Constitution binding on this Court. Furthermore, that the Petitioner has not rebutted the fact that the 4th Respondent duly submitted his Letter of voluntary withdrawal from the senatorial contest on the 6th of July, 2022. Also, that the Petitioner has not pointed to any Law, whether statutory or judicial, which mandates a primary election for the nomination of a running mate for an election. That while the Petitioner does not deny the fact that the 4th Respondent did in fact voluntarily withdraw his nomination as a Senatorial Candidate, the date of the said withdrawal seems to matter to the Petitioner.

Learned Senior Counsel also contended that, the Petitioner has argued that, the 2nd Respondent ought to have conducted a fresh primary election to nominate the 4th Respondent, upon the voluntary withdrawal of the 5th Respondent. That this explains why the Respondents had no obligation to call any witness, particularly when Section 33 of the Electoral Act, 2022 stipulates that in the case of withdrawal by a

CERTIFIED TRUE COPY

candidate, "the political party affected shall, within 14 days of the occurrence of the event, hold a fresh primary election to produce and submit a fresh candidate to the Commission for the election concerned". That the phrase "fresh primary" presupposes the existence of an initial primary. However, that in the case of the 4th Respondent, no primary election is required to fill the office of Vice-President, which is a direct answer to Section 142(1) of the Constitution which gives the prerogative of nominating an associate to the Presidential candidate, to the 3rd Respondent and not the political party. The cases of **A.G; Federation v. Abubakar (2007) 8 NWLR (pt. 1041) 1 at 81** and **PDP v. INEC & Ors (supra)** per **Augie**, **JSC** were cited in support.

## RESOLUTION:

Now, it is apparent from the averments in the Petition, the oral and documentary evidence and the submissions of counsel that, this petition is grounded on the disqualification of the 3rd Respondent to have contested the Presidential election of 25th February, 2023. This is evident in paragraph 15 of the petition wherein the Petitioner pleaded thus:

> "15. Your Petitioner states that the ground upon which this petition is presented is that, the 3[rd] Respondent was at the time of the Election not qualified to contest the Election."



This is further explained as emanating from the non-qualification of the 4th Respondent to have contested the election as the Vice-Presidential candidate of the 2nd Respondent. It is specifically pleaded in paragraph 17 of the Petition as follows:

> "17. Your Petitioner states that the 4th Respondent was not qualified to jointly contest with the 3rd Respondent for the Presidential Election held on 25th February, 2023, having been purportedly nominated by the 2nd respondent as its candidate for more than one office."

The specific reasons for questioning the qualification of the 3rd Respondent have been pleaded in paragraph 16(i) and (ii) of the Petition as follows:

> 16. Your Petitioner questions the declaration/return of the 3rd Respondent (the candidate of the 2nd Respondent) by the 1st Respondent as the duly elected President on the following grounds:
>
> (i) The 3rd Respondent, at the time of the Election held on 25th February, 2023, was not qualified to contest as the Presidential candidate of the 2nd Respondent by virtue of the provisions of Section 13(c) and 142 of the Constitution of the Federal Republic of Nigeria, 1999 (as amended), and Section 35 of the Electoral Act, 2022.
>
> (ii) The declaration and return of the 3rd Respondent by the 1st Respondent as the duly elected President of


CERTIFIED TRUE COPY

the Federal Republic of Nigeria, are invalid by
reason of non-compliance with the provisions of
the Constitution of the Federal Republic of Nigeria,
1999 (as amended), and the Electoral Act, 2022.

A combined reading of paragraphs 15, 16 and 17 of the petition coupled
with the particulars thereof, show clearly that, the petition is premised
on non-qualification of the 3rd and 4th Respondents. I find it necessary to
state that, the grounds for questioning the return at an election are
stipulated in Section 135 (1) of the Electoral Act as follows:

134. (1) An election may be questioned on any of the following
rounds –

(a)   a person whose election is questioned was, at
the time of the election, not qualified to
contest the election;

(b)   the election was invalid by reason of corrupt
practices or non-compliance with the
provisions of this Act; or

(c)   the respondent was not duly elected by
majority of lawful votes cast at the election.

For the purposes of this Petition, it is ground 134(1)(a) that is relevant.
In other words, the election of the 3rd and 4th Respondents as President
and Vice-President of Nigeria is questioned on the ground that they are
not qualified to have contested the said Presidential election. I consider


CERTIFIED TRUE COPY

paragraphs 18, 19, 20, 21, 22, 23, 24, 26 and 28 of the Petition as relevant for the determination of this Petition. For better appreciation those paragraphs are hereby reproduced as follows:

18. The 3rd Respondent was not qualified to contest for the Office of President as he was not validly sponsored by the 2nd Respondent as he did not have a validly nominated running mate.

19. The 4th Respondent had been nominated (and accepted same) for the Office of Senator, representing Borno Central Senatorial District in Borno State for the 25th of February, 2023, National Assembly Election.

20. As at the time the 4th Respondent was purportedly nominated and when he accepted the nomination as Vice-Presidential Candidate of the 2nd Respondent, he was still a validly nominated Senatorial Candidate of the 2nd Respondent, thus indicating double/multiple nomination.

21. That from the acknowledgement slip dated Friday July 15th 2022, generated from the online portal of the 1st Respondent, it is clear that the 4th Respondent before 05:13 pm GMT + 1 on the 15/07/2022 was still a validly nominated Senatorial Candidate of the 2nd Respondent for Borno Central Senatorial District, Borno State. The Petitioner hereby pleads and shall rely on the said acknowledgement slip. Notice to produce original copy of same is hereby given to the 1st Respondent.

22. That from the acknowledgement slip dated Thursday July 14, 2022, generated from the online portal of the 1st Respondent, it confirmed or evidenced that the 4th



CERTIFIED TRUE COPY

Respondent at 06:33 pm GMT + 1 on the 14/07/2022 replaced the 5th Respondent as the Vice-Presidential candidate of the 2nd Respondent, the Petitioner hereby pleads and shall rely on the said acknowledgment slip. Notice to produce original copy of same is hereby given to the 1st Respondent.

23. As at the 14th day of July, 2022, when the 4th Respondent accepted the nomination of the 2nd Respondent as purportedly replacing the 5th Respondent, he was still a Senatorial candidate of the 2nd Respondent seeking to represent Borno Central Senatorial District in Borno State. Your petitioners hereby plead the notices of withdrawal of candidate filed by the 5th Respondent and 4th Respondent respectively on the 14th day of July, 2022 and 15th day of July, 2022 and shall rely on same at the trial of this suit.

24. The acts of 4th Respondent double or multiple nomination make his nomination for either of the elective offices/constituencies void particularly the latter.

26. Your Petitioner further states that the return of the 3rd Respondent by the 1st Respondent as the winner of the Presidential Election conducted on 25th February, 2023, was wrongful and unlawful as the 3rd Respondent was not qualified to contest the Election as he was not validly sponsored by the 2nd Respondent.

28. The validity of the 3rd Respondent's nomination as the Presidential Candidate of the 2nd Respondent hinged on the 3rd Respondent nominating a running mate or a Vice-Presidential Candidate. The 3rd Respondent nominated the 5th Respondent, and the name of the 5th Respondent was submitted to the 1st Respondent as the Vice-Presidential Candidate of the 2nd

CERTIFIED TRUE COPY

Respondent, and the 3rd Respondent's running mate for the said Presidential Election held on 25th February, 2023. The Petitioner shall at the trial of the Petition rely on the said nomination form, and same is hereby pleaded. Notice to on the said nomination form, and same is hereby pleaded. Notice to produce original of same is hereby given to the 1st Respondent.

i. Subsequently, the 5th Respondent withdrew his purported nomination thereby invalidating the nomination of the 3rd Respondent as the Presidential Candidate of the 2nd Respondent in view of the provisions of Section 131(c) and 142 of the Constitution of the Federal Republic of Nigeria, 1999, (as amended). The Petitioner shall at the trial of this Petition rely on the withdrawal form/letter written to the 1st Respondent by the 5th Respondent and same is hereby pleaded. Notice to produce original of same is hereby given to the 1st Respondent.

ii. There was a gap of about three weeks between the period the 5th Respondent expressed intention to withdraw and his actual withdrawal of his purported nomination, and the time the 3rd Respondent purportedly replaced the 5th Respondent with the 4th Respondent as his Vice-Presidential Candidate

iii. By the time the 3rd Respondent nominated the 4th Respondent to replace the 5th Respondent, the candidature of the 3rd Respondent had lapsed and he was no longer in a position constitutionally to nominate a running mate since he had ceased to be a Presidential Candidate of the 2nd Respondent having regards to the provisions of Section 142 of the 1999 Constitution.



iv. After the Primary Election conducted by the 2nd Respondent to elect its Presidential Candidate, the 3rd Respondent (winner of the said Primary Election) was constitutionally required to nominate a person as his running mate and his Vice-Presidential Candidate on a joint ticket for the Presidential Election.

v. The nomination of the 5th Respondent by the 3rd Respondent activated the joint ticket principle enshrined in Section 142 of the 1999 Constitution, and the subsequent withdrawal of the 5th Respondent from the joint ticket invalidated the nomination of the 3rd Respondent as the two candidates stand or fall together.

vi. The 2nd Respondent did not conduct another Primary Election for the purpose of producing another Presidential Candidate within the time frame stipulated by the 1st Respondent for nomination of candidates for the 2023 Presidential Elections.

vii. As at the time of the replacement of the 5th Respondent with the 4th Respondent, the 3rd Respondent by virtue of the provisions of Section 142 of the 1999 Constitution no longer had right or power to nominate another running mate having made the first and only nomination allowed by law.

viii. The 2nd Respondent failed to conduct any other Primary Election wherein the 3rd Respondent was re-nominated as the 2nd Respondent's Presidential Candidate for the



CERTIFIED TRUE COPY

Presidential Election held on the 25th day of February, 2023.

ix.     The 2nd Respondent having failed to comply with the provision of the Constitution, has lost its right to nominate the 3rd Respondent as its Presidential Candidate for the Election held on 25th February, 2023.

x.      The 2nd Respondent is bereft of any power, right or authority whatsoever to substitute or replace the 5th Respondent (its Vice-Presidential Candidate) whose name had already been submitted to the 1st Respondent unless the procedures laid down in the Constitution and the Electoral Act, 2022, are followed by the 2nd Respondent.

xi.     The withdrawal of the 5th Respondent as the Vice-Presidential Candidate of the 2nd Respondent invalidated the candidature of the 3rd Respondent as the Presidential Candidate of the 2nd Respondent for the purpose of the Presidential Election conducted by the 1st Respondent on the 25th day of February, 2023.

xii.    The 2nd Respondent had no valid Presidential and Vice-Presidential Candidates for the Presidential Election conducted by the 1st Respondent on the 25th day of February, 2023.

In response, the 1st Respondent (INEC) filed a Reply to the petition where it was averred in paragraphs 14, 15 and 16 of the 1st Respondent's Reply to the petition as follows:



CERTIFIED TRUE COPY

14. The 1st Respondent denies paragraphs 19, 20, 21, 22, 23, 24 and 25 of the Petition. The Petitioner is thus put to the strictest proof of the averments contained therein and in response, the 1st Respondent avers that:

i. Prior to the nomination of the 4th Respondent as the new Vice-Presidential candidate of the 2nd Respondent, the 4th Respondent was the 2nd Respondent's candidate for Borno Central Senatorial election.

ii. Further to the above and prior to the nomination of the 4th Respondent as the new Vice-Presidential candidate of the 2nd Respondent, the 4th Respondent had by a letter dated **6th July, 2022** communicated his withdrawal as the 2nd Respondent's candidate for the Borno Central Senatorial election to the 2nd Respondent.

iii. The 2nd Respondent by its letter dated 6th day July, 2022 forwarded the notice of withdrawal of the 4th Respondent referenced in (iii) to the 1st Respondent on the **13th day of July, 2022**. The 1st Respondent pleads and shall rely on the 2nd Respondent's Letter dated 6th July 2022 and the attached letter of withdrawal of the 4th Respondent at the trial.

iv. Further to the Notice of withdrawal of the 4th Respondent as the 2nd Respondent's candidate for the Borno Central Senatorial election (i.e. the completion of withdrawal process), the 2nd Respondent on the **15th day of July, 2022** completed and submitted Form



**EC11C** for the nomination of the 4th Respondent as the new Vice-Presidential candidate of the 2nd Respondent (i.e following the voluntary withdrawal of the previously nominated Vice-Presidential candidate) and the Affidavit in support of his Personal Particulars (**Form EC9**) to the 1st Respondent. The 1st Respondent pleads and shall rely on **Form EC11C** and **Form EC9** of the 4th Respondent.

v. From the records of the 1st Respondent, the 2nd Respondent had by a letter dated **6th July, 2022** but received by the 1st Respondent on the **13th of July, 2022** notified the 1st Respondent of the withdrawal of the candidacy of the 4th Respondent for the Borno Central Senatorial election.

vi. The fact stated in (v) above was prior to the nomination of the 4th Respondent as the new Vice-Presidential candidate of the 2nd Respondent (i.e. following the voluntary withdrawal of the previously nominated Vice-Presidential candidate).

vii. On account of the foregoing, the 4th Respondent was **NOT** a candidate for the Borno Central Senatorial Constituency election as at the **15th of July, 2022** when he became formally nominated as the Vice-Presidential Candidate of the 2nd Respondent having been withdrawn as a candidate in that regard on **13th day of July, 2022**.

15. Further to the foregoing, the 1st Respondent avers and shall at trial contend that:



    i. The withdrawal of a candidate's nomination for an election is effective from the date the Political party that nominated the candidate communicates the candidate's withdrawal from such post to the 1st Respondent.

    ii. The complaint/allegation of invalid or valid nomination as an act or a process is a pre-election matter and an internal affair of the political party nominating a candidate which is distinct and different from acts of sponsorship.

16. The 1st Respondent denies Paragraphs 26, 27, 28, 29 and 30 of the Petition and puts the Petitioner to the strictest proof of the allegations contained therein and in response states as follows:

    i.    The 3rd Respondent was declared the winner of the Presidential Election conducted on the 25th of February, 2023 having been nominated and sponsored by the 2nd Respondent in that regard.

    ii.    The 5th Respondent's withdrawal of his candidature was done according to the dictate of the law and did not in any way, invalidate the nomination of the 3rd Respondent as the Presidential Candidate of the 2nd Respondent.

    iii.    The period between the withdrawal and substitution of the 5th Respondent by the 4th Respondent as the Vice-Presidential candidate of the 2nd Respondent is in consonance with the time lines provided for by the Electoral Act, 2022.

CA/PEPC/03/2023; CA/PEPC/04/2023; CA/PEPC/05/2023.        459


CERTIFIED TRUE COPY

iv.  The 2nd Respondent is not required by the Electoral Act, 2022 to conduct another primary election for the purpose of nominating a Vice-Presidential candidate to replace the one that has withdrawn.

v.  The 2nd Respondent is allowed by law to nominate another running mate after the voluntary withdrawal of the 5th Respondent.

vi.  The declaration of the 3rd and 4th Respondents by the 1st Respondent as the winners of the Presidential election of 25th February, 2023 is not affected by the 4th Respondent's voluntary withdrawal as a Senatorial Candidate and the withdrawal of the 5th Respondent as the Vice-Presidential candidate; the nomination and substitution process having been done in compliance with the Electoral Act, 2022.

vii.  The declaration of the 3rd and 4th Respondents is not in contravention of the provisions of the Constitution of the Federal Republic of Nigeria, 1999 and the Electoral Act, 2022.

viii.  The Electoral Act, 2022 gives room for substitution of candidates following the withdrawal of a prior candidate.

The 2nd Respondent also filed a 2nd Respondent's Reply to the petition wherein similar facts averred in the 1st Respondent's Reply to the petition were pleaded. The 3rd and 4th Respondents, whose election is being

CERTIFIED TRUE COPY

questioned, filed a Joint Reply to the petition wherein they pleaded in paragraphs 16, 17, 18, 19, 20, 21, 22, 23, 24, 25, 26 and 29, as follows:

16. Contrary to paragraphs 19, 20, 21, 22, 23 and 24 of the petition, the respondents aver as follows:

   i.   The 4th respondent did not engage in or allow himself to be nominated for two positions concurrently and/or at the same time.

   ii.  Upon the withdrawal of the 5th respondent as the vice-presidential candidate of the 2nd respondent, a vacancy occurred in that position.

   iii. On the part of the 5th respondent, he duly informed the 2nd respondent of his withdrawal in writing as stipulated by law.

   iv.  As for the 4th respondent, he also, by a notice in writing on 6th July, 2022, duly withdrew his nomination as the candidate of the 2nd respondent for the Borno Central Senatorial District, and the 2nd respondent, upon receipt of the said notice, declared the seat vacant.

17. The withdrawal of the 5th respondent as the vice-presidential candidate of the 2nd respondent was done within the purview of the clear provisions of the Electoral Act, 2022, as he gave signed notice in writing and delivered same to the 2nd respondent and the respondent duly conveyed the notice of withdrawal to the 1st respondent, not later than 90 days to the election.

CA/PEPC/03/2023; CA/PEPC/04/2023; CA/PEPC/05/2023.



461

18. Further to the said withdrawal of the 4th respondent from the senatorial contest, a fresh primary election, duly monitored by the 1st respondent, was conducted for the nomination of the 2nd respondent's candidate in the general election into the office of Senator representing Borno Central Senatorial District of Borno State, wherein, Barr. Kaka Shehu Lawan emerged as the 2nd respondent's candidate, Respondents shall found and rely on the report of the 1st respondent in respect of the said primary election.

19. By a letter dated 10th July, 2022, written by the 2nd respondent to the 1st respondent, formally notifying the 1st respondent of the outcome of its primary election for the Borno Central Senatorial District, amongst others, the 2nd respondent stated thus:

"Following our earlier correspondence dated 6th July, 2022 with reference no: APC/NHDQ/INEC/19/022/83, we write to notify the commission that the herein candidates are forwarded as replacements to the candidates who withdrew voluntarily:

| S/N | CONSTITUENCY | Withdrawn Candidate | Replacement Candidates |
|-----|--------------|---------------------|------------------------|
| 1. | Borno Central | Sen. Kashim Shettima | Kaka Shehu Lawan |
| 2. | Cross River North | Hon. Martin Orim | Sen. Prof. Benedict Ayade |
| 3. | Enugu West | Mrs. Oby Nwofor | Prof. Nicolas Eze |



| 4. | Bauchi Federal Constituency | Hon. Shehu Aliyu Musa | Abdullahi Sirajo Jibrin |
| 5. | Isa/Sabon Birni Fed. Constituency | Idris Mohammed Gobir | Abdulkadir Jelani Danbuga. |

20. The respondents aver that their nominations as the 2ⁿᵈ respondent's Presidential and Vice-Presidential candidates respectively were accepted by the 1ˢᵗ respondent (INEC) and a fortiori, their names were published in the List of Candidates for National Elections (Presidential, Senatorial and house of Representatives) by the 1ˢᵗ respondent (INEC) on September 19, 2022 pursuant to the provision of section 32(1) of the Electoral Act, 2022 which provided for the publication of the list of the Candidates at least 150 days before the date of the Presidential Election that was held in February, 25ᵗʰ 2023. The respondents will rely on the List of candidates published by INEC for the various elective offices.

21. The respondents aver that their names as the presidential and vice-presidential candidates respectively of the 2ⁿᵈ respondent (APC) were listed as Number 12 in the LIST OF CANDIDATES pleaded above.

22. The respondents aver that the substitution of the 5ᵗʰ respondent with the 4ᵗʰ respondent was validly done by the 2ⁿᵈ respondent prior to the 1ˢᵗ respondent's acceptance and publication of the list of candidates on 19ᵗʰ September, 2022.

23. The respondents state that the name of the 4ᵗʰ respondent as the candidate of the 2ⁿᵈ respondent for the Borno Senatorial District election was not at any time published, displayed or circulated by the 1ˢᵗ respondent.


CERTIFIED TRUE COPY

24. The respondents plead that the issues raised in the petition as they relate to the right of a political party to challenge the nomination of a candidate by another political party have been decided and settled by the Court of Appeal in Appeal No: CA/ABJ/108/2023 between Peoples' Democratic Party v. All Progressives Congress & Ors. which judgment was delivered on the 24th March, 2023 to the effect that no political party is vested with such right. The Court of Appeal affirmed the judgment of the Federal High Court which earlier dismissed the suit instituted against the 3rd and 4th respondents by the People's Democratic Party, describing the PDP as a busy body.

25. Pursuant to paragraph 24 supra, and following the judgments of the Federal High Court and the Court of Appeal afore-mentioned, the respondents state that:

i.    The petitioner here is a busybody.

ii.   The issues involved in this petition have been finally resolved/disposed of to the knowledge of the petitioner.

iii.  The judgment of the Court of Appeal, which is a judgment in *rem*, is binding on the petitioner and all persons, authorities and principalities alike.

26. Contrary to paragraph 20 of the petition, the respondents aver that as at the time the 4th respondent accepted the nomination as the Vice- Presidential candidate of the 2nd respondent for the election of 25th February, 2023:

i.    His name was not published as a senatorial candidate for Borno Central Senatorial District by the 1st respondent.



ii.   The 2nd respondent had already conducted a primary election, monitored by the 1st respondent which produced a candidate on behalf of the 1st respondent for the Borno Central Senatorial District election, which held on 25th February, 2023.

iii.  The said candidate, Barr. Kaka Shehu Lawan, contested the senatorial election of 25th February, 2023 on the ticket of the 2nd respondent, won the election and was declared as winner by the 1st respondent, who thereafter, issued him with a certificate of return. The respondents shall found on the said certificate of return.

29. The respondents deny paragraph 28 of the petition, put the petitioner to the strictest proof of same and further state as follows:

i.    The withdrawal of the 5th respondent was within his right as a person and had no impact whatsoever on the nomination of the 3rd respondent who subsequently nominated the 4th respondent in the 5th respondent's stead.

ii.   There was no such gap of about three weeks as alleged by the petitioner between the voluntary withdrawal of the 5th respondent and the nomination of the 4th respondent.

iii.  There was no need for the conduct of a fresh primary election for the nomination of the 4th respondent by the 3rd respondent, as primary elections are never conducted for the nomination of running mates.

iv.   The 2nd respondent duly nominated and sponsored the 3rd and 4th respondents as its presidential and vice-



CERTIFIED TRUE COPY

presidential candidates at the election held on 25th February, 2023 and the said nomination and sponsorship were in full compliance with the provisions of the Constitution of the Federal Republic of Nigeria, 1999 (as amended) and the Electoral Act, 2022.

v.     The 3rd respondent won the presidential election of 25th February, 2023 by majority of lawful votes cast.

vi.    The petitioners who performed woefully at the election, scoring 25,961 votes as against the 8,794,726 votes scored by the 3rd respondent, is not by a sponsored petition contending that it won the election, but playing the role of a spoiler by seeking reliefs in proxy, on behalf of a non-party to this petition.

From the totality of the pleadings in the petition, and the Replies of the Respondents, what appears from the complaint of the Petitioner is that, the 4th Respondent while still a candidate of the 2nd Respondent for Borno Central Senatorial District, was nominated and did accept to be the Vice-presidential candidate of the 2nd Respondent. That this act violated the provision of Section 35 of the Electoral Act, 2022, as it amounted to his double nomination. That in the circumstances, his nomination as an associate of the 2nd Respondent for the Presidential election is void. That, the result is that the 3rd Respondent was disqualified from contesting the election because he did not have a validly nominated running-mate at the time of the election. The Petitioner relied on Section 131 and 142(1)

CA/PEPC/03/2023; CA/PEPC/04/2023; CA/PEPC/05/2023.                                                                          466



CERTIFIED TRUE COPY

of the 1999 Constitution for this postulation. Now, Sections 131 and 142(1) of the 1999 Constitution of the Federal Republic of Nigeria (as amended) stipulate as follows:

131. A person shall be qualified for election to the office of President if –

(a) he is a citizen of Nigeria by birth;

(b) he has attained the age of forty years;

(c) he is a member of a political party and is sponsored by that political party; and

(d) he has been educated up to at least School Certificate level or its equivalent.

142.(1) In any election to which the foregoing provisions of this part of this chapter relate, a candidate for an election to the office of President shall not be deemed to be validly nominated unless he nominates another candidate as his associate from the same political party for his running mate for the office of President, who is to occupy the office of Vice-President and that candidate shall be deemed to have been duly elected to the office of Vice-President if the candidate for election to the office of President who nominated him as such associate is duly elected as President in accordance with the provisions aforesaid.

The general principles of interpretation of the Constitution which is the Supreme Law of the land is that, mere technical rules of interpretation of


CERTIFIED TRUE COPY

statutes are, to some extent, be avoided in a way as not to defeats the principles of government. Thus, where the words used are clear and unambiguous, a literal interpretation should be applied. In the interpretation therefore, the provisions of the Constitution are to be accorded holistic interpretation so as to avoid ambiguity and arrive at the true intention of the legislature. The Court must limit itself to the words used in the Constitution without resort to any external materials. See **Sani v. President, Federal Republic of Nigeria & Anor (2020) LPELR – 50990 (SC); Amadi v. INEC (2013) 4 NWLR (pt. 1345) 595 at 633** and **Agi v. PDP & Ors (2016) LPELR – 42578 (SC)**. Thus, in **Wike Ezenwo Nyesom v. Honourable (Dr.) Dakuku Adol Peterside & Ors (2015) LPELR – 25724 (SC)**, the Supreme Court observed that:

> "…. the principles of construction of Constitutions to the effect that a constitution is a living document (not just a statute) providing a framework for the governance of a country not only for the present but for generations yet unborn. It was held that in construing the Constitution, undue regard must not be paid to merely technical rules because in doing so the objects of the provisions as well as the intention of the framers of the Constitution would be frustrated. Courts have always been encouraged to adopt a broad and liberal spirit in interpreting the provisions of the Constitution while constantly bearing in mind the object which such provisions were meant to serve."

CERTIFIED TRUE COPY

That being so, where the Constitution has stipulated the qualifications to be attained by a person contesting or seeking to contest for any elective office created by the Constitution, the Courts cannot create or import into the Constitution any other qualifying or disqualifying factor. This has been the position of the Supreme Court and dutifully followed by this Court. It has therefore been held that qualification or disqualification of candidates to contest election is exclusively determined within the context or scope of the Constitution; and that nothing can be added to it. In other words, the Constitution being the grund norm is superior to any other law, including the Electoral Act. Therefore, where the Constitution has qualified a person or candidate to contest an election, no other Law except the Constitution itself, can disqualify him. See **Agi v. PDP & Ors (2016) LPELR – 42578 (SC); ANPP v. Usman (2008) 12 NWLR (pt. 1100) 1; PDP v. INEC (2014) 17 NWLR (pt. 1437) 525 at 559 – 560** and **Nwaogu v. Atuma (2013) 11 NWLR (pt. 1364) 117**.

The Petitioner in this case has premised its complaint of non-qualification/disqualification of the 3rd and 4th Respondents as the Presidential and Vice-Presidential candidates of the 2nd Respondent, on the issue of invalid nomination of the 4th Respondent. That, the 4th Respondent while still the Senatorial candidate of the 2nd Respondent for the Borno Central Senatorial District, allowed himself to be nominated as the Vice-Presidential candidate of the 2nd Respondent for the same

CERTIFIED TRUE COPY

election. In the Rulings earlier delivered on Motions and Preliminary Objections, I had ruled that the petition grounded solely on the issue of invalid nomination or improper nomination is not a cognizable ground of disqualification under the Constitution. In other words, the claim in the petition that the 3rd Respondent was not qualified to contest the Presidential election because he nominated an associate whose nomination was invalid, does not flow from any ground of disqualification of a candidate to the office of President as stipulated in Sections 131 and 137 of the 1999 Constitution. See **Balewa v. Muazu (1999) 5 NWLR (pt. 604) 638 at 647; Faleke v. INEC (supra)** and **Tarzoor v. Ioraer (2016) 3 NWLR (pt. 1500) 463**. Thus, in **Shinkafi v. Yari (2016) 7 NWLR (pt. 1511) 340**, the Supreme Court held that:

> "The Supreme Court has listed in Section 182 very exhaustively all issues that can disqualify a person from contesting for the office of Governor of a State. From the record of this Court, the facts have not disclosed any evidence to show that the 1st Respondent was not qualified to contest elections into the office of Governor of Zamfara State. It is my view that once a candidate sponsored by his political party has satisfied the provisions set out in Section 177 of the Constitution and is not disqualified under Section 182(1) thereof, he is qualified to stand election to the office of Governor of a state. No other Law can disqualify him."




CERTIFIED TRUE COPY

It has not been contended by the Petitioner that either the 3rd or 4th Respondent is trammelled by the provisions of Sections 131; or 137 of the 1999 Constitution. The complaint of the Petitioner rooted on nomination and sponsorship of the 3rd and 4th Respondent will find accommodation in a pre-election dispute, which the Petitioner cannot even pursue, not being a member of the 2nd Respondent. See Sections 84(14) of the Electoral Act, 2022 and 285(14) of the Constitution. While I am tempted to put an end to this petition at this stage, but realising that this Court is not the final Court on the matter, I am constrained to look at the merit of the petition.

As pointed out earlier in the course of this judgment, the complaint of the Petitioner in this petition is that the 3rd Respondent was at the time of the Presidential Election held on 25th February, 2023, not qualified to contest the Election. This is because, according to the Petitioner, the 4th Respondent was not qualified to run on a joint ticket with him (3rd Respondent), as he (4th Respondent's) nomination was invalid for double nomination which violates Section 35 of the Electoral Act, 2022. The said Section 35 of the Electoral Act (supra) stipulates that:

> **"Where a candidate knowingly allows himself to be nominated by more than one political party or in more than one constituency, his nomination shall be void."**

CA/PEPC/03/2023; CA/PEPC/04/2023; CA/PEPC/05/2023.                                          471



As stated earlier, the Petitioner contended that the 4th Respondent was a candidate of the 2nd Respondent for the Borno Central Senatorial District when the 3rd Respondent nominated him as his Vice-Presidential candidate on the 14th July, 2022. In other words, that at the time the 4th Respondent was nominated, and he accepted the nomination as the Vice-Presidential candidate of the 2nd Respondent, he was still a validly nominated Senatorial candidate of the 2nd Respondent for Borno Central Senatorial District. The Petitioner contended that, the 2nd Respondent had earlier submitted the name of the 3rd Respondent together with that of the 5th Respondent to INEC as its Presidential and Vice-Presidential candidates for the 25th February, 2023 Election. However, that before the date of the election, the 5th Respondent withdrew his candidature as the running mate of the 3rd Respondent on the 24th June, 2023 and the name of the 4th Respondent was then submitted to INEC (1st Respondent) on the 15th July, 2022. That, the 2nd Respondent did not conduct any fresh primary election for the purpose of picking another running mate for the 3rd Respondent, after the withdrawal of the 5th Respondent.

The Respondents conceded that, the 4th Respondent was *ab initio*, the Senatorial candidate of the 2nd Respondent for Borno Central Senatorial District. However, that on the 6th July, 2022, he (4th Respondent) vide a letter dated the same day, notified his political party (2nd Respondent) of his withdrawal from the Senatorial candidature. That upon receipt of the

CA/PEPC/03/2023; CA/PEPC/04/2023; CA/PEPC/05/2023.                    472



CERTIFIED TRUE COPY

4th Respondent's letter, the 2nd Respondent immediately notified INEC (1st Respondent), and which notification letter was received on the 13th July, 2022. That the said letter also notified the 1st Respondent of its intention to conduct a fresh primary election for the replacement of the 4th Respondent following his withdrawal as a Senatorial candidate. That it was until the 14th July, 2022 that the 4th Respondent was nominated as the 3rd Respondent's associate for the Presidential Election of 25th February, 2023. The 5th Respondent's Notice of withdrawal as a candidate is in evidence as Exhibit PA2 while the Notice of Withdrawal and Letter of Voluntary withdrawal of the 4th Respondent are in evidence as Exhibits PA3 and PA4 respectively.

It would appear that, the Petitioner is of the view that, the 4th Respondent was still the Senatorial candidate of the 2nd Respondent as at the 14th July, 2022 when he (the 4th Respondent) was nominated as the Vice-Presidential candidate of the 2nd Respondent. However, the Respondents contended that the issue of the alleged double nomination of the 4th Respondent has been determined finally by the Supreme Court in **People's Democratic Party (PDP) v. INEC & 3 Ors; SC/CV/501/2023** delivered on the 26th of May, 2023. That in the circumstances, the said judgment of the Supreme Court constitute estoppel *per rem judicata*, and binding on the parties in this petition.

CERTIFIED TRUE COPY

Now, for a judgment to constitute issue estoppel the following conditions must be satisfied: -

1. the same question must be for decision in both proceedings (i.e. the same question for decision in the current suit must have been decided in the previous suit);

2. the decision relied upon to support the plea of issue estoppel must be final;

3. the parties or their privies must be the same.

The three elements must be present and co-exist for a plea of estoppel *per rem judicata* to apply. See ***Ito v. Ekpe & Ors (2000) 3 NWLR (pt. 650) 678***; ***Oshoboja v. Amida & Ors (2009) LPELR – 2803 (SC)*** and **Oleksandr & Ors v. Lonestar Drilling Co. Ltd & Anor (2015) LPELR – 24614 (SC)**.

It is obvious that the judgment sought to be relied on for the plea of estoppel is that of the Supreme Court, the highest and final Court in this Country. There is no doubt that the decision was final, and the issue that was determined by the Supreme Court is the same as in the present petition, to wit: whether the 4th Respondent breached Section 35 of the Electoral Act by allowing himself to be nominated in more than one constituency. The Petitioner has however argued that, the issue decided by the Supreme Court was merely on the *locus standi* of the PDP to question the nomination of the 4th Respondent, the candidate of the APC,

CA/PEPC/03/2023; CA/PEPC/04/2023; CA/PEPC/05/2023.

474



a different political party. That may well be so, but it is clear from the judgment (Exhibit X1), that the Supreme Court pronounced on the substantive issue of double nomination. Though **Jauro, JSC** who delivered the lead judgment declined to exercise the powers of the Supreme Court under Section 22 of the Supreme Court Act to pronounce on the merit of the case, the other Law Lords proceeded to do so.

It is settled law that a contributory or concurring judgment has equal weight as the lead judgment. It is part of the lead judgment and therefore has the same force and binding effect. The mere fact that a concurring or contributory judgment contains what is not in the lead judgment will not whittle down its binding effect. Thus in **Olufeagba & Ors v. Abdur-Raheem (2009) LPELR-2613(SC),** my Lord Fabiyi, JSC said:

> "A concurring judgment, has equal weight with or as a lead judgment. A concurring judgment compliments, edifies and adds to the lead judgment, when the justice, add to it certain aspects which the writer of the lead judgment did not remember to deal with. In so far as a concurring judgment performs same or all the above functions, it has equal force with or as the lead judgment in so far as the principles of *stare decisis* are concerned."

Now, it is apparent that the parties in Exhibit X1; **PDP v. INEC & Ors (supra)** are not the same as in the present Petition. The earlier decision though involved the 1st, 2nd, 3rd and 4th Respondents, the present


CERTIFIED TRUE COPY

Petitioner was not a party in that case. That is why it was argued by the Petitioner herein, that Exhibit X1 cannot operate as to estop it from litigating the issue of double nomination of the 4th Respondent. The Respondents have responded that the judgment in **PDP v. INEC & Ors** (Exhibit X1), is a judgment in *rem* as opposed to judgment in *personam*.

Now, in Law, a judgment in *personam* is a judgment against persons who are parties or privies to the particular suit or proceeding alone. It is referred to as judgment inter parties. It is a judgment binding on the parties to the action alone. A judgment in *rem* on the other hand, is a judgment that determines the status of a person or thing as distinct from the particular interest of a party to the litigation. It is referred to as a judgment contra-mundum, binding on the whole World. It is therefore binding, not only on the parties to the dispute but even on non-parties. Therefore, once the status of a person or thing has been pronounced upon by a Court of competent jurisdiction, no person is permitted to assert the contrary of what the Court has determined. See **Black's Law Dictionary (11th Edition) at page 1008; Gbemisola v. Bolarinwa (2014) 9 NWLR (pt. 1411) 1 at 19; Yanaty Petrochemical Ltd v. EFCC (2017) LPELR – 43473 (SC)** and **Ladejobi & Ors v. Oguntayo & Ors (2015) LPELR – 4170 (CA)**. A judgment in *rem* therefore, is an adjudication which pronounced upon the status of a particular subject matter, by a Court of competent jurisdiction.

CA/PEPC/03/2023; CA/PEPC/04/2023; CA/PEPC/05/2023.

476


CERTIFIED TRUE COPY

It is not in doubt that, the subject matter in **PDP v. INEC & Ors** (Exhibit X1), was in respect of the alleged double nomination of the 4th Respondent as the Vice-Presidential candidate of the 2nd Respondent in the 25th February, 2023 Presidential election.  That is the same issue raised in this Petition as grounding the disqualification of the 3rd and 4th Respondents in this Petition.  Thus, pronouncing on the issue in his contributory judgment, my noble Lord, **Okoro, JSC** who presided on the panel said at pages 4 – 5 of his judgment that:

> "There is no doubt that the 4[th] Respondent was at a stage nominated as a candidate representing Borno Central Senatorial District but upon being mutted he would pair with the 3[rd] Respondent as Vice-Presidential candidate of the 2[nd] Respondent, All Progressives Congress (APC) in the 25[th] February, 2023 General Election, he withdrew his candidature for the senate before taking up the position of Vice-Presidential candidate. Documents in the record attest to this fact. ....., these are Exhibits APC1 and APC2 which were made on the 6[th] and 10[th] July, 2022 respectively."

After considering those documents, his Lordship concluded at page 7 of the contributory judgment that:

> "It is crystal clear that the two Exhibits alluded to above, the 4[th] Respondent did the needful by resigning his position as Senatorial candidate for Borno Central Senatorial District since 6[th] July, 2022 before being nominated by the 3[rd] Respondent to run alongside him

CERTIFIED TRUE COPY

as Vice-Presidential candidate of All Progressives Congress (APC)."

My Lord, **Okoro**, **JSC** after citing Section 31 of the Electoral Act, 2022 then held at page 8 that:

> "The above provision of the Electoral Act, 2022 was duly complied with by the Respondents. It is my well-considered opinion that as at the 6th of July, 2022, having withdrawn his nomination and personally served same on the 2nd Respondent of the withdrawal of nomination on 6th of July, 2022, the 4th Respondent was no longer a candidate for the Borno Central Senatorial District Elections and his subsequent nomination as Vice-Presidential candidate of the 2nd Respondent for the Presidential election was not multiple nomination as there was no longer a nomination for the 4th Respondent since his withdrawal on the 6th of July, 2022."

My Lord, **Agim**, **JSC** was more elaborate in his contribution when he held at pages 5 – 6 of his contributory judgment as follows:

> "I agree with the views of Learned SAN for the 3rd Respondent and Learned Counsel for the 4th Respondent. It is glaring from the provision of Section 31 of the Electoral Act, 2022 that the withdrawal takes effect from when the nominated candidate submitted the notice of his or her withdrawal to the political party that nominated him or her. Section 31 prescribes how the withdrawal is done by the nominated candidate. It states thusly – "by notice in writing signed by him and delivered personally by him to the political party that



nominated him or her." Section 31 prescribes what the political party should do upon receipt of its nominated candidate's withdrawal. It states that it may convey the withdrawal to INEC not later than 90 days to the election.

It is glaring from the express wordings of Section 31 of the Electoral Act. 2022 that the legislative intention is that the withdrawal should take effect upon the nominated candidate personally delivering a written notice of his withdrawal to the political party and not when the political party conveys it to INEC. Section 31 states that what the party conveys to INEC is the withdrawal. The provision gives the party not later than 90 days to the election to convey the withdrawal of its candidate to INEC. Since the election held on 25-2-2022, the political party had up to 24-11-22 to convey the 4th Respondent's withdrawal to INEC. So, it matters not if it was conveyed in 10-7-2022, 15-7-2022 or any other date, provided it is conveyed not later than 90 days to the election. The date of the conveyance within the prescribed period has no effect on the withdrawal that had already been done. Therefore, the 4th respondent withdrew as the 2nd respondent's Senatorial candidate for Borno Central Senatorial District on 6-7-2022 when his written letter of withdrawal dated 6-7-2022 was received by his party on 6-7-2022.

As at 14-7-2022 when the 4th respondent accepted nomination as the 2nd respondent's Vice-Presidential candidate, he was no longer the party's Senatorial candidate for Borno Central Senatorial District. Therefore, his nomination as Vice-Presidential candidate is not multiple nomination."

CA/PEPC/03/2023; CA/PEPC/04/2023; CA/PEPC/05/2023.                    479


CERTIFIED TRUE COPY

My Lord then proceeded to hold at pages 6 – 7 of the said contributory judgment that:

> "Assuming, 15-7-2022 when the 2nd respondent filled and submitted the prescribed INEC Form for withdrawal of candidate in exhibit 6, is taken as the effective date of withdrawal, the contention that 4th respondent's nomination as Vice-Presidential candidate on 14-7-2022 amount to multiple nomination still remains valid. The facts would still not show multiple nomination of the 4th respondent. What is obvious from the facts is that the 4th respondent who had earlier been nominated by his party as Senatorial candidate was given another option or alternative to be the party's Vice-Presidential candidate. He accepted the second option with a manifest intention and action to relinquish the former nomination as Senatorial candidate. He withdrew the nomination as a Senatorial candidate and was thereafter nominated as Vice-Presidential candidate. Upon his withdrawal as senatorial candidate, the party nominated another person to replace him. His prompt and immediate withdrawal as Senatorial candidate demonstrate clearly that he had no intention, design, purpose or plan to hold two nominations and be the party's candidate in two constituencies. Whether he withdrew before or after being nominated as Vice-Presidential candidate is of no moment. Multiple nomination within the terms of Section 35 of the Electoral Act does not occur simply because he accepted a second nomination."

CERTIFIED TRUE COPY

I have endeavoured to quote extensively the dicta of the Law Lords of the Supreme Court in **PDP v. INEC & Ors (supra)**, in order to show that the issue of double or even multiple nomination of the 4th Respondent as the Senatorial candidate and Vice-Presidential candidate of the 2nd Respondent in the 25th February, 2023 general election has been settled to finality. It is a judgment in *rem*, therefore, binding on the parties to this petition, and in fact, the entire World. Being the judgment of the final Court of this land, the Supreme Court, no person is permitted to again raise and litigate on it in any other action or proceeding. It is therefore settled, and remains settled, that this Petition which questions the qualification; and seeks to disqualify the 3rd and 4th Respondents from contesting for and occupying the seat of President and Vice-President of Nigeria, on ground of double or multiple nomination of the 4th Respondent as Vice President Candidate of the 2nd Respondent, on ground of double or multiple nomination of the 4th Respondent has no substance.

I only wish to add that, Section 35 of the Electoral Act is targeted at the candidate and not the political party. That is why it uses the terms "a candidate" and "knowingly allows himself to be nominated" by more than one political party or more than one constituency. Thus, to prove that a candidate "knowingly" allows himself to be so nominated, both the intent and actual act of nomination, i.e. *mens rea* and *actus reus* of the



CERTIFIED TRUE COPY

act prohibited must be proved, the stipulation in the section being a penal provision. In the instant case, neither the intent nor the fact of the 4th Respondent to allow himself to be so nominated was established. Thus, my Lord, **Ogunwumiju**, **JSC**, in his contributory judgment in Exhibit X1, held as follows:

> "By Section 31 of the Electoral Act, the 4th Respondent, Shettima, was obliged to submit a notice of withdrawal in writing to his party which he did and then his party is to deliver that notice to the commission not later than 90 days to the election.
> In view of the above stated position of the Law on this issue and the facts of this case, there exists no "animus" or display of intention by the 4th Respondent to stand as the nominated candidate of the 2nd Respondent for the Vice-Presidential position and also the Senator representing Borno Central District in the general election of 25th February, 2023. There cannot be any other interpretation in the circumstances unless there is clear intention to knowingly stand as a candidate for two elective posts in the same election cycle."

In the same vein, my Lord, **Agim**, **JSC** at page 8 of his contributory judgment held, thus:

> "The manifest intention to relinquish the earlier nomination to pave way for the nomination of another person to replace him as the party's Senatorial candidate cannot be overlooked or disregarded. To simply isolate the assumed or purported short lived co-existence of the two nominations for treatment as



multiple nomination without regard to the obvious intention of the 4th respondent not be the party's candidate in elections in two constituencies is against the legislative intention of Section 35 of the Electoral Act, 2022.

The sequence of the occurrence of the events is not what determines the existence of multiple nomination. It is the intention, design or purpose to hold two or more nominations as candidate for election that shows that the person so nominated knowingly did so. The 2nd respondent did not intend that the 4th respondent should be its candidate for Borno Central Senatorial Election and its Vice-Presidential candidate for the Presidential election and the 4th respondent did not understand or know that he was so nominated.

The word "knowingly" in Section 35 of the Electoral Act must be interpreted broadly to include all its literal meanings. In Bartons Legal Thesarius 4th Edition by William C. Barton at p.356, it is defined to include "advisedly, deliberately, designedly, intentionally, learnedly, pointedly, purposefully, with knowledge, meltingly."

It is clear to me therefore, that from the oral and documentary evidence adduced by the parties in this petition, the intention and fact of knowingly allowing himself to be nominated in more than one constituency, as alleged by the Petitioner, against the 4th Respondent has not been established. In other words, both the *mens rea* and *actus reus* of the act prohibited by Section 35 of the Electoral Act, 2022 were not established.



One other aspect alleged by the Petitioner on its claim of invalid nomination of the 3rd and 4th Respondent is that, the 2nd Respondent did not comply with Section 33 of the Electoral Act in the nomination of the 4th Respondent as Vice-Presidential candidate. That, after the withdrawal of the 5th Respondent, the 2nd Respondent should have conducted a fresh primary election within 14 days for the purpose of nominating a new Vice-Presidential candidate.

Now, Section 33 of the Electoral Act, 2022 stipulates that:

> "A political party shall not be allowed to change or substitute its candidate whose name has been submitted under Section 29 of this Act, except in the case of death or withdrawal by a candidate:

> Provided that in the case of such withdrawal or death of a candidate, the political party affected shall, within 14 days of the occurrence of the event, hold a fresh primary election to produce and submit a fresh candidate to the Commission for the election concerned."

The interpretation of this provision does not, in my view, cause any difficulty as to require the application of any technical rule of construction. Therefore, a literal interpretation will suffice. It therefore means that, where a political party has submitted the name of a candidate pursuant to Section 29 of the Electoral Act, (supra), it cannot be allowed to substitute or change that candidate except in the event of

CA/PEPC/03/2023; CA/PEPC/04/2023; CA/PEPC/05/2023.                    484

CERTIFIED TRUE COPY

death or withdrawal of such candidate. By the proviso thereto, the political party affected, is enjoined to conduct a fresh primary election for the purpose of producing a new or fresh candidate to submit to the Electoral Commission. The grouse of the Petitioner here is that, the 5th Respondent withdrew his nomination as Vice-Presidential candidate of 2nd Respondent but the 2nd Respondent did not conduct another primary election for the purpose of producing a new Vice-Presidential candidate within the 14 days prescribed by Section 33 of the Electoral Act.

It should be remembered that by Section 142(1) of the 1999 Constitution, a Presidential candidate for election to the office of President has the sole discretion, authority or power of nominating his associate who shall run with him in the election as Vice-President. The choice or nomination of a Vice-Presidential candidate is, not the product of any primary election. Therefore, in my view, the requirement to conduct a fresh primary election does not apply to the nomination of a Vice-Presidential candidate. Thus, my Lord **Augie**, JSC highlighted the point in his contributory judgment in **PDP v. INEC & 3 Ors** (Exhibit X1) as follows:

> "No; the fourth Respondent was not required to buy any nomination Form. He was the second Respondent (APC's) candidate at the election into the office of Senator representing Borno Central Senatorial District. But before the election could hold, he was nominated as the third Respondent's associate, who is to occupy the office of Vice-

CERTIFIED TRUE COPY

President. The fourth Respondent did not buy a nomination Form for the said office, and most importantly, did not contest any primary election in order to emerge as APC's Vice-Presidential candidate."

The Petitioner in paragraph 28(2) of its Petition had averred and also contended in its final address that there was a gap of about 3 weeks between the period the 5th Respondent expressed his intention to withdraw and his actual withdrawal or purported nomination, thereby invalidating the nomination of the 3rd Respondent because the candidature of the 3rd Respondent had lapsed and was no longer in a position constitutionally to nominate a running mate. This contention of the Petitioner is however misconceived. There is nothing in the Constitution which robs a Presidential Candidate of his right to nominate his associate who shall be his running mate for the office of President. There is also nothing that invalidates the nomination of a new associate by a Presidential candidate as his running mate after the withdrawal of a previous associate, so long as the nomination of the new associate was submitted to the 1st Respondent 90 days before the election as mandated by Section 31 of the Electoral Act, 2022. This contention of the Petitioner is therefore discountenanced.

It is therefore my view that, the position of a person as a Vice-Presidential candidate, not being subject of a primary election, the provision of

CERTIFIED TRUE COPY

Section 33 of the Electoral Act, 2022 would not apply. On that note, I hereby hold that the Petitioner failed to prove the lone ground of its petition, to the effect that the 3rd and 4th Respondents were not qualified to contest the Presidential Election held on the 25th February, 2023 for the reason of double nomination of the 4th Respondent.

Having resolved the sole issue of the Petition against the Petitioner, this Petition is also devoid of any merit.

<u>**PETITION NO: CA/PEPC/05/2023**</u>

**BETWEEN:**

| 1. | **ABUBAKAR ATIKU** | |
| 2. | **PEOPLES DEMOCRATIC PARTY (PDP)** | **PETITIONERS** |

**AND**

| 1. | **INDEPENDENT NATIONAL ELECTORAL COMMISSION (INEC)** | |
| 2. | **TINUBU BOLA AHMED** | **RESPONDENTS** |
| 3. | **ALL PROGRESSIVES CONGRESS (APC)** | |

This is an election petition by the two petitioners against the 1st, 2nd and 3rd Respondents. The 1st petitioner, Abubakar Atiku, was a candidate at the Presidential Election held in Nigeria on 25th February 2023. He was sponsored by the 2nd petitioner, Peoples Democratic Party (PDP), a registered political party in Nigeria.

CA/PEPC/03/2023; CA/PEPC/04/2023; CA/PEPC/05/2023.

CERTIFIED TRUE COPY

The 1st Respondent, Independent National Electoral Commission (INEC), was established as one of the executive bodies created in section 153(1)(f) of the Constitution of the Federal Republic of Nigeria (1999) with power to, among others, organise, undertake and supervise all elections to the offices of the President and vice-president and others.

On Saturday the 25th of February 2023, the 1st Respondent conducted election into the offices of the President and the Vice President of the Federal Republic of Nigeria and the National Assembly. The Petitioners and the 2nd, 3rd Respondents along with sixteen others participated in the Election. At the conclusion of the Election, the 1st Respondent declared the 2nd Respondent as the duly elected President of the Federal Republic of Nigeria with 8,794,726 votes. The 1st Petitioner who was sponsored by the 2nd Petitioner came second with 6,984,520 votes.

The petitioners were aggrieved by the outcome of the election so they filed jointly this petition to challenge the Election.

The grounds for the petition were four, and these were stated as follows:

(a) The election of the 2nd Respondent is invalid by reason of non-compliance with the provisions of the Electoral Act, 2022.

(b) The election of the 2nd Respondent is invalid by reason of corrupt practices.

CA/PEPC/03/2023; CA/PEPC/04/2023; CA/PEPC/05/2023.



(c) The 2nd Respondent was not duly elected by majority of lawful votes cast at the Election.

(d) The 2nd Respondent was at the time of the Election not qualified to contest the Election.

The petitioners are seeking the following reliefs:

A.  That it may be determined that the 2nd Respondent was not duly elected by a majority of lawful votes cast in the Election and therefore the declaration and return of the 2nd Respondent by the 1st Respondent as the winner of the Presidential Election conducted on the 25th day of February, 2023 is unlawful, wrongful, unconstitutional, undue, null and void and of no effect whatsoever.

B.  That it may be determined that the return of the 2nd Respondent by the 1st Respondent was wrongful, unlawful, undue, null and void having not satisfied the requirements of the Electoral Act 2022 and the Constitution of the Federal Republic of Nigeria, 1999 (as amended) which mandatorily requires the 2nd Respondent to score not less than one quarter (25%) of the lawful votes cast at the Election in each of at least two-thirds of all the States in the Federation **AND** the Federal Capital Territory, Abuja.

C.  That it may be determined that the 2nd Respondent was at the time of the election not qualified to contest the said election.



D.   That it may be determined that the 1st petitioner having scored the majority of lawful votes cast at the presidential election of Saturday, 25th February 2023, be returned as the winner of the said election and be sworn in as the duly elected president of the Federal Republic of Nigeria.

**IN THE ALTERNATIVE:**

E.   An order directing the 1st Respondent to conduct a second election (run-off) between the 1st Petitioner and 2nd Respondent.

**IN THE FURTHER ALTERNATIVE:**

F.   That the election to the office of the President of Nigeria held on 25th February 2023 be nullified and a fresh election (re-run) ordered.

G.   Any such further relief(s) as the Honourable Court may deem fit to make in the interest of justice.

Upon being served with the petition, the Respondents joined issues with it by filing their respective replies incorporating preliminary objections and made other applications. Some of the applications filed by the parties were heard and rulings delivered at the pre-hearing stage while some were heard and rulings on them reserved till the time of the judgment of the Court. we now proceed to consider them.



CERTIFIED TRUE COPY

## PRELIMINARY OBJECTIONS

Seven application/preliminary objections were filed and argued by the Respondents during the prehearing session of this petition. Two each of the said seven applications were filed by the 1st and 3rd respondents while three were filed by 2nd Respondent.

First respondent's two applications were filed on 19/4/2023 and 9/5/2023 respectively. In the first of its two applications dated and filed on 19/4/2023, which also largely reflect the position of 2nd Respondent in his first two applications and 3rd Respondent in its first application, 1st Respondent sought:

1. An order striking out paragraphs 92, 93, 94, 95, 96, 97, 98, 99, 100, 101, 102, 103, 104, 107, 114, 115, 116, 118, 121, 126, 129, 130, 131, 132, 133, 137, 140, 142,143, 144 and 146 of the Petition on grounds of their vagueness, being generic, imprecise and lacking in specificity to elicit a Reply from the it.

2. An order striking out paragraphs 129 and 133 of the Petition for failure to join necessary parties, among other grounds.

3. An order striking out the ground of the petition that 2nd respondent did not score majority of the lawful votes as contained in paragraph 16(c) of the Petition, for incompetence and lacking in specificity and materials in the pleading for its sustenance.



4. Consequent upon 1-3 above, an order striking out prayers (a), (b) and (d) as sought in paragraph 150 of the Petition.

5. An order striking out the ground of the petition that the election is invalid by reason of noncompliance with the provisions of the Electoral Act 2022 as contained in paragraph 16(a) of the petition, for being defective and lacking in specificity and material facts in the pleading for its sustenance.

6. Consequent upon 5 above, an order striking out the ground of the petition alleging that the election of the 2nd respondent is invalid by reason of corrupt practices as contained in paragraphs 16(b) of the Petition, for lacking in specificity and material facts in the pleading for its sustenance.

7. An order striking out the ground of the petition that the 2nd respondent was at the time of the election not qualified to contest the election as contained in paragraph 16(a) of the petition, for lacking in specificity and material facts in the pleading for its sustenance.

8. An order striking out the ground of the petition that the 2nd Respondent was at the time of the election not qualified to contest the election as contained in Paragraph 16(d) of the Petition, for lacking material facts in the pleading for its sustenance.



9. Consequent upon 1-8 above, an order striking out and or dismissing the Petition for being incompetent, frivolous, vexatious, abusive, fundamentally defective and vesting no jurisdiction in the tribunal to adjudicate on it.

In the alternative to the above:

10. An order striking out prayers (a), (b), (c) and (d) of the Petition as sought in Paragraph 150 for being incongruous, contradictory and self-defeatist.

Its grounds for this application are that:

1. Grounds 1 and 2 of the Petition in Paragraph 16(a) and 16(b) alleges that the election of the 2nd Respondent is invalid by reason of noncompliance with the Electoral Act and invalid by reasons of corrupt practices, but there is no pleading of the particulars in the entire petition of how the alleged noncompliance with the provisions of the Electoral Act 2022 and corrupt practices substantially affected the result of the election.

2. Ground 3 of the Petition alleges that the 2nd Respondent was not duly elected by majority of lawful votes cast, when the Constitution did not require a candidate in an election consisting of more than two candidates to score a majority of lawful votes cast at the election.

CA/PEPC/03/2023; CA/PEPC/04/2023; CA/PEPC/05/2023.                    493



3. Further, the petitioners did not supply the particulars of lawful votes cast and/or unlawful votes to be deducted from the 2nd Respondent's scores in their pleadings.

4. Ground 4 of the Petition in Paragraph 16(d) alleges that 2nd Respondent was at the time of the election not qualified to contest the election, but no particulars of the alleged disqualification of the 2nd Respondent was provided.

5. No reasonable cause of action has been disclosed in the pleadings in respect of the entire grounds of the petition to warrant any further adjudication of the petition.

6. Relief (b) in Paragraph 150 of the petition is predicated on the allegation in the petition that the 2nd Respondent did not score 25% of the votes cast in the Federal Capital Territory, Abuja, yet by the admission of the petitioners in column 14 of the table as drawn by them in paragraph 111 of the Petition, 1st Petitioner did not also score 25% of the votes cast in the Federal Capital Territory, Abuja; Relief (b) and (d) in Paragraph 150 of the Petition is un-grantable.

7. By paragraph 6 above, Relief (b) and (d) in Paragraph 150 of the Petition are contradictory and un-grantable.

8. Contrary to the requirement of Paragraph 4(1) of the First Schedule of the Electoral Act 2022, paragraphs 92, 93, 94, 95, 96, 97, 98, 99, 100, 101, 102, 103, 104, 107, 114, 115, 116, 118, 121, 126, 129,



130, 131, 132, 133, 137, 140, 142,143, 144 and 146 of the petition bordering on substantial noncompliance with the Electoral Act 2022 and on corrupt practices are vague, generic, imprecise and lacking in specificity to elicit a Reply from the 1st Respondent.

9. In paragraphs 129 and 133 of the Petition made criminal allegations against Governor Yahaya Bello of Kogi State, the Chairman of Olamaboro Local Government of Kogi State, Hon. Friday Adejoh who are not parties and ought to have joined to defend the complaints/allegations against them.

Second Respondent also had a similar application/preliminary objection filed on 13/05/2023 (all his three applications were actually filed on the same 13/05/2023) seeking striking out of the petition or portions of it. His single prayer in the application is:

"An order of the Court striking out jointly and/or severally paragraphs 14 and 15, 19 – 81, 87 - 104, 108 - 128 and 133 to 150 of the petition for being fundamentally defective."

The 3rd Respondent, on its part, in its first application on the same issue filed on 8/5/2023 (its two applications were also filed on the same 8/5/2013) sought similar prayers like 1st and 2nd Respondents.

All three Respondents also had issues with the Replies petitioners served on them in response to their own replies. Their main complaint this time



is that the said Replies went beyond the ambit of Replies and raised new issues and facts like particulars of the non-qualification of 2nd respondent for the election and/or his dual citizenship of Republic of Guinea, all of which, according to the reply of the Petitioners, impacts on his qualification as a candidate for the election. Those new facts, they complained, tended to amend or reconstruct the Petition and so overreached them, even as they do not have any further opportunity to join issues with petitioners on them.

Other paragraphs of the Replies, they said, did not raise new issues but merely repeated averments already contained in the petition and so have no place in a Reply. For these same reasons, they sought striking out of the additional witness statement on oath and List of documents that accompanied the said Replies.

Besides, the above applications, 2nd Respondent had a third application that was peculiar to it. In the said application, which was also filed on 13/5/2023, 2nd Respondent again sought the striking out of the entire petition, this time on the following four grounds:

1. That the entire petition constitutes a gross abuse of the process of court by reason of an Originating summons in Suit No SC/CV/354/2023 dated 28th February 2023, filed by the Attorneys-General of Adamawa, Akwa Ibom, Delta, Edo and Sokoto States (all

CA/PEPC/03/2023; CA/PEPC/04/2023; CA/PEPC/05/2023.

CERTIFIED TRUE COPY

of them 'controlled by the 2nd petitioner' - as 2nd Respondent put it) at the Supreme Court of Nigeria, against the Attorney General of the Federation, where the said plaintiffs raised against the Attorney General of the Federation the same issue here of 1st respondent's failure to transfer or transmit Polling Unit Results from its BVAS to its Result Viewing Portal (IReV) in the 25th February 2023 general elections.

The plaintiffs therein, first respondent mentioned, sought in their suit declarations that the 2023 Presidential election was fundamentally flawed and so invalid, null and void and of no effect, which is what Petitioners also seek here, so this petition constitutes gross abuse of process.

There were other grounds for that application as I shall show later when considering it.

All seven applications were supported with affidavits and written submissions of applicants, which were in turn countered by the petitioners with counter affidavits and written submissions of their own. I shall now proceed to consider the merits of the applications. For ease of reference, I shall group the three sets of applications into Groups A, B, and C.

<u>A</u>



CERTIFIED TRUE COPY

I start with the first three applications of Respondents that attacked the validity of the Petition and/or its paragraphs, reliefs claimed and grounds on which it was brought.

### First Respondent's 1st application filed on 9ᵗʰ April, 2023

First Respondent set out the following issues for determination in its 9ᵗʰ April 2023 application:

1. Whether in view of the mandatory provisions of Paragraph 4(1) of the First Schedule of the Electoral Act 2022, the vague and imprecise averments in the Petition as sought are not liable to be struck out.

2. Whether having regard to the mandatory provisions of Paragraph 4(1) of the First Schedule of the Electoral Act 2022, a reasonable cause of action has been disclosed in respect of the Grounds of the Petition contained in paragraph 16(a), (b), (c) and (d) of the Petition to warrant further or any adjudication on same.

3. Whether having regard to the averments in support of the grounds of the petition and the prayers in Prayers 1(iii), 2, 3, 4(i) - 4(iv) – 4(iv) and 5(i) in paragraphs 102 of the Petition predicated on same issue, the instant Petition is not rendered academic and liable to be dismissed.

CA/PEPC/03/2023; CA/PEPC/04/2023; CA/PEPC/05/2023.



498

4. Whether the entire Petition is not defective and liable to be struck out in the light of the pleaded facts in the petition.

It argued its issues 1 and 2 above separately and took issues 3 and 4 together.

In seeking the striking out of paragraphs 92, 93, 94, 95, 96, 97, 98, 99, 100, 101, 102, 103, 104, 107, 114, 115, 116, 118, 121, 126, 129, 130, 131, 132, 133, 137, 140, 142,143, 144 and 146 of the petition on grounds of their vagueness, imprecision and lack of specificity to elicit a Reply from it, first Respondent (INEC) relied principally on Paragraph 4(1) of the 1st Schedule to the Electoral Act 2022 which states as follows:

**4(1)  An election petition under the Act shall:**

      (d)  **state clearly the facts of the election petition and the ground or grounds on which the petition is based and the relief sought by the Petitioners.**

Relying on **UGWU V. ARARUME** (2007) 12 NWLR (Pt. 1048) 367 and **OGIDI V. STATE** (2003) 5 NWLR (Pt. 918) 286, **UZODINMA V. UDENWA** (2004) 1 NWLR (Pt. 854) 303, **OJUKWU V. YAR'ADUA** (2009) 12 NWLR (Pt. 1154) 50 @ 148-149 and **ABUBAKAR V. YAR'ADUA** (2008) 19 NWLR (Pt. 1154) 50 @ 148-149, counsel on 1st Respondent's behalf argued that Paragraph 4(1) of the 1st Schedule of the Electoral Act 2022 implies compulsion and makes it mandatory for petitioners to plead the facts of


CERTIFIED TRUE COPY

their petition. They submitted that an election petition that is vague, imprecise, omnibus, nebulous or generic is contrary to the provisions of Paragraph 4(1) d) of the 1st Schedule of the Electoral Act 2022 and so liable to be struck out. Learned Counsel then carefully took on each and every one of paragraphs 92, 93, 94, 95, 96, 97, 98, 99, 100, 101, 102, 103, 104, 107, 114, 115, 116, 118, 121, 126, 129, 130, 131, 132, 133, 137, 140, 142,143, 144 and 146 of the Petition and advanced reasons why they are vague, generic, imprecise and lacking in specificity and deserving to be struck out.

Counsel also argued that the petitioners in paragraphs 129 and 133 of their Petition made allegations of unlawful acts allegedly carried out by one Hon. Friday Adejoh, Governor Yahaya Bello of Kogi State and some unnamed persons in the course of the Presidential election yet those persons were not joined to the petition so those two paragraphs are also liable to be struck out. Counsel cited *Bambe v. Adetunji* (1997) 1 S.C. 1 @ 88; *Oloriode v. Oyebi* (1984) 5 S.C. 1 @ 5, *Babatola v. Aladejana* (2001) LPELR-696 (SC) p. 19 to say the court lacks jurisdiction to enter judgment or make orders against persons that are not before it.

Responding to the first limb of 1st respondent's contention that paragraphs 92, 93, 94, 95, 96, 97, 98, 99, 100, 101, 102, 103, 104, 107, 114, 115, 116, 118, 121, 126, 129, 130, 131, 132, 133, 137, 140, 142,143,



144 and 146 of the Petition are imprecise vague and without necessary particulars of the allegations, learned senior counsel to the Petitioners argued that the said paragraphs were pleaded in support of the second ground of the Petition alleging that the Presidential Election was bedevilled by corrupt practices. Prime among those corrupt practices, they said, are suppression of votes, manipulation of BVAS machines and destruction of electoral materials and ballot boxes. Specific instances of these corrupt practices that took place in various States, Local Governments and polling units of the federation, they argued, were 'laid bare' in the petition, with particulars of the allegation. They argued that 1st respondent, instead of considering the paragraphs of the petition holistically, seems to have considered them in isolation and haphazardly hence its wrong conclusion that the petition was vague, imprecise and without necessary particulars. While admitting that the names of polling units were not specifically stated in the petition, Petitioners' Counsel submitted that Petitioners stated in different paragraphs of the Petition that the polling units affected were to be contained in a Statistician's Report to be relied upon at the hearing of the petition. They cited the cases of *Oluedun v. Ajayi* (2014) LPELR-24409 (CA); *Awolaja & Ors v. Seatrade Groningen B.V.* (2002) LPELR-651 (SC); *East Horizon Gas Ltd v. Efiok & Ors* (2010) LPELR-4066 (CA) p.10, to submit that Petitioners have by that pleading incorporated by reference the said Statistician's Report.



On the argument of 1st Respondent that the petition did not disclose any reasonable cause of action and so constituted abuse of judicial process, petitioners' counsel argued that 1st Respondent was by that argument trivialising matters of high Constitutional importance raised by petitioners in the Petition. They submitted that a petition that touches on correct interpretation of section 134(2)(b) of the Constitution of this country vis-à-vis the return of 2nd Respondent and the qualification or disqualification of 2nd Respondent regulated solely by sections 131 and 137 of the Constitution cannot by any means be said to disclose no reasonable cause of action.

On first Respondent's contention that Petitioners' failure to join Hon. Friday Adejoh, Governor Yahaya Bello of Kogi State and unnamed thugs against, whom they made allegations of criminal misconduct in paragraphs 129 and 133 of their Petition, made those paragraphs of the petition incompetent and liable to be struck out, counsel to petitioners submitted that section 133 of the Electoral Act 2022 has specified the persons who may be joined as Petitioners or Respondents in an election petition; that Hon. Friday Adejoh and Governor Yahaya Bello having not participated in the election nor returned, petitioners are not in violation of the Electoral Act or any rule of law in not joining them. Besides, they also argued, no relief was claimed against the said two men so they



cannot be said to be affected in any way by the eventual outcome of the petition.

## RESOLUTION OF ISSUE 1

Now, paragraph 4(1) of the First Schedule of the Electoral Act 2022 (as amended) states that:

> "**4(1) An election *petition* under the Act *shall*:**
>
> (d)     **state clearly *the facts of the election petition* and the ground or grounds on which the petition is based and the relief sought by the Petitioners.**"

This provision is clear and direct that it does not require any aid in its interpretation. It simply restates in mandatory terms the first rule of pleading, that claimants, in this case a petitioner, *shall* state '*clearly' the facts of the election petition* and the ground or grounds on which the petition, or claim, is brought.  This requirement/duty to plead one's complaints and facts clearly in the statement of claim/petition (not Reply) is a basic rule of pleading even in ordinary civil proceedings. Nnaemeka-Agu, JSC, in ***ATANDA V. AJANI* (1989) 3 NWLR (Pt. 111) 511 @ 546** put that point across most forcefully when he said that:

> "**It appears to me that *the rule which required every fact upon which a party intends to rely at the hearing to be pleaded goes to the fundamentals of justice. For no one can***



CERTIFIED TRUE COPY

*defend the unknown. If one has to defend or counter a fact made by his adversary, the one must have due notice of that fact to enable him prepare for his defence.* **That is the very essence of pleading. As it goes to the very root of the rule of** *audi alteram partem* **– one of the twin pillars of justice – it would be a misconception to describe it as mere technicality or irregularity.** *It is a matter which cannot, therefore, be waived.* **Indeed, by a long line of decided cases, it has been long settled that** *any evidence on a fact* **that ought to have been pleaded, but is not, goes to no issue at all at the trial and ought to be disregarded." (Italics ours)**

The complaint of 1st Respondent is that the petitioners in their petition did not state their case as 'clearly' as required by Paragraph 4(1)(d) of the Electoral Act 2022 to enable it respond properly to it. It complains that petitioners' complaints were vague, imprecise and lacking in particulars. It does not appear to me that this complaint can by any means be waived away as idle. If anything, even the petitioners seem to have admitted that they did not plead those necessary facts; for their response to that contention, as shown earlier, is rather that they pleaded a Statistician's Report which contains the required details of the polling units where the 'corrupt practices' they alleged took place. Incidentally, the said Report - a very voluminous four-part document they later tendered through its maker Mr Samuel Oduntan, P.W.21, during the trial, shows on its face that it did not even exist at the time they filed their petition and so was

CERTIFIED TRUE COPY

not served on Respondents along with the petition to enable them exercise their constitutionally guaranteed right of responding fairly to the 'corrupt practices' alleged particularised in it, and if necessary, also engage their own expert to reply to it. Yes, the principle of incorporation by reference relied on by them, petitioners, is part of our adjectival law and is supported by a fairly long line of cases including *M.M.A. V. N.M.A.* (2012) 18 N.W.L.R. (Pt. 1333) 506 @ 533 – 546, 531, 553 (SC), *Ekpemupolo & Ors v. Edremoda & Ors* (2009) LPELR-1089 (SC) p. 24-25; *J.F.S Investment Limited v. Brawal Line Ltd & Anor* (2010) 18 NWLR (Pt. 1225) 495 @ 540, *Eloho v. Idahosa* (1992) 2 NWLR (Pt. 223) 323 @ 3350, *Abod Brothers Limited v, Niger Insurance Co. Ltd & Anor* (1974) 4 ECSLR 525 @ 536, but that principle cannot by any means override the fair hearing/trial provisions of section 36 of the 1999 Constitution of this country which also underpins the rationale for exchange of pleadings by parties. See once again the dictum of Nnaemeka-Agu, JSC, in *Atanda v. Ajani* supra that "**the rule which required every fact upon which a party intends to rely at the hearing to be pleaded goes to the fundamentals of justice. *For no one can defend the unknown. If one has to defend or counter a fact made by his adversary, the one must have due notice of that fact to enable him prepare for his defence*.**" A Statistician's Report that is supposed to contain missing particulars in a petition but which was only filed in the middle of hearing of the same petition, long after the

CERTIFIED TRUE COPY

time for exchange of pleadings had closed and even after petitioners had called as many as sixteen witnesses in proof of their case, as happened in this case, cannot serve that purpose of *audi alteram partem* – let the other party be heard too. In short, the tactics employed by the Petitioners in this case as regards their pleading and the Statistician's Report referenced in it is to say the least most unfair and definitely negates the current practice regime that emphasizes frontloading of processes. Such dishonourable practice can only be likened to the unlawful boxing tactic of hitting one's opponent below the belt or from behind, which in the sport of boxing, is penalised promptly with deduction of points. It cannot be different here. The said Statistician's Reports, which is Exhibits PAH1, PAH2, PAH3 and PAH4 in this proceeding, must be and is hereby discountenanced.

That conclusion should make the resolution of this issue on imprecision of the petition fairly easy. I nevertheless want to exercise caution and still consider the paragraphs of the petition attacked by 1st Respondent, but it shall be only as they stand in the petition.

In that regard, I am satisfied that paragraph 92 of the petition, where the petitioners alleged wrongful cancellation of polling unit results in various Local Governments of Sokoto State, is lacking in particulars of the particular polling units affected and so liable to be struck out.



Paragraphs 93 and 94 of the Petition where Petitioners alleged that 1st Respondent's officials failed to properly fill Election Forms in Kano State, I think, sufficiently meets the requirements of Paragraph 4(1)(d) of the 1st schedule to the Electoral Act 2022.

Paragraph 95 of the Petition where the Petitioners alleged that results in unspecified polling units in some Local Government Areas of Kogi State were "manipulated through and by the inflation of the 2nd Respondent's votes and depletion of the Petitioner's votes" is in my opinion bad for vagueness not only as to the polling units where the alleged manipulation occurred but also as to the actual lawful votes of petitioners and 2nd respondent allegedly depleted and inflated respectively. The need to plead exact figures of votes affected by the alleged manipulation becomes even more crucial in my opinion when account is taken of *Paragraph 15 of the First Schedule of the Electoral Act 2022* stating that:

1. **When a petitioner claims the seat alleging that he had the highest number of valid votes cast at the election, the party defending the election or return *shall set out clearly* in his reply *particulars of <u>the votes</u>*, if any, which he objects to and the reasons for his objection against such votes, showing how he intends to prove at the hearing that the petitioner is not entitled to succeed. (Italics mine)**




Second and 3rd respondents can only properly exercise their right under this provision requiring them to 'give particulars of 'the votes' claimed by the petitioners that they object to and the reasons for their objection against "such votes,' after petitioners have set out clearly the lawful votes 'depleted' by the manipulation alleged by them.

Paragraph 97 of the Petition, in my opinion, are matters for proof at the hearing, even more so as the petitioners have stated in those two paragraphs that the disruption of elections in Adavi and Okehi Local Government Areas of Kogi State by agents of 2nd and 3rd respondents alleged therein was captured in video recording which they, petitioners, would lead evidence in proof.

Paragraph 98 of the Petition where Petitioners alleged that "elections in *10 polling units* were disrupted and there were no results from the said 10 polling units" is bad for vagueness and specificity in so far as it does not specify the affected 10 polling units. It is therefore also liable to be struck out.

I am also of the opinion that paragraphs 99 and 100, of the Petition also attacked by 1st respondent has to do more with proof, which is a matter for the substantive hearing, especially as the infractions complained of in them were again according to petitioners captured in a video recording which they promised to rely on at the trial.

CA/PEPC/03/2023; CA/PEPC/04/2023; CA/PEPC/05/2023.

508

CERTIFIED TRUE COPY

Paragraph 101 of the petition where the petitioners simply complained of failure of 1st respondent's officials to properly fill election documents seems to me sufficient pleading.

Paragraph 102 of petition where the Petitioners simply alleged that "infractions occurred in polling units (unidentified)" in various Local Governments of Kogi State and "these failures enabled the results of polling units in the said LGAs to be manipulated through and by the *inflation* of the 2nd respondent's votes and the *depletion* of the petitioners' votes," is bad and vague as to the particulars of the specific polling units and votes of petitioners and respondents affected by the said manipulation of inflation and deflation. It fails to meet both the requirements of clear pleading of facts of the petition under Paragraph 4(1)(d) of the First Schedule of the Electoral Act 2022 and Paragraph 15 of the same First Schedule earlier cited. The following dictum of the lead judgment of Tabai, J.S.C., in **BELGORE V. AHMED (2013) 8 NWLR (Pt. 1355) 60 at 95** (concurred in by his brethren Adekeye, Galadima, Ngwuta, and Ariwoola, JJ.S.C, as their Lordships all then all were) also gives an insight on the need for specificity in pleadings generally and more specifically in an election petition:

> "Although only material facts are required to be pleaded
> and in a summary form, *they must nevertheless be*



CERTIFIED TRUE COPY

*sufficiently specific and comprehensive to elicit the necessary answers from the opponent.* See *Ashiru Noibi v. Fikolati & Others* (1987) 3 SC 105 @ 119, *Omorhirhi v. Enatevwere* (1988) 1NWLR (Pt. 73) 746. *They must contain such details as to eliminate any element of surprise to the opposing party.* In this case where the pleadings in the petition which alleged electoral malpractices, non-compliance and/or offences in some polling units", many polling units", "most polling units" or "several polling units," cannot be said to have met the requirements of pleadings as stipulated in paragraph 4(1)(d) of the First Schedule of the Electoral Act and/or Order 13 rules 4(1), 5 and 6(1) of the Federal High Court (Civil Procedure) Rules 2009. The result is that this issue is resolved against the appellants."

Ngwuta, J.S.C., also had this to say on the subject at pages 124 – 124:

"The following phrases are employed in the pleadings in matters which are crucial to the petitioners/appellants' case at the tribunal:

"In many polling units…..in most polling units…..in some polling units…..in some of the polling units…."



CERTIFIED TRUE COPY

"My lords, the appellants complained that the election in the Local Government Areas and some Wards in seven other Local Government (sic) vitiated by substantial non-compliance with the provisions of the relevant statutes. *The phrases reproduced above are too general and imprecise to found a challenge to the validity of the election results*.

"The object of pleadings is to alert the other side of the case it would meet at the trial. See *George v. UBA Ltd* (1972) 8-9 SC 264. *It can hardly be said that pleading built on the said phrases contains pungent and direct statements of material facts on which the rights and obligations of the parties can be determined*. ….. Appellants' pleading contravened Order 13 rules 4(1), 5 and 6(1) of the Federal High Court (Civil Procedure) Rules, 2009."

See also *P.D.P. v. I.N.E.C.* (2012) 7 NWLR (Pt. 1300) 538 @ 560, paragraphs E-H (Muntaka-Coomassie, JSC).

For the same reasons, I am of the opinion that paragraph 103 of the petition where the petitioners simply averred generally that "1st Respondent wrongly entered incorrect results for the Petitioners in Borno State" is bad in so far as the polling units in Borno State affected by the 'incorrect results' are not stated.

I am however are of the view that paragraphs 104, 105 and 106 of the Petition sufficiently pleaded necessary facts to elicit appropriate response from respondents, even more so as paragraph 104 merely alleged bypass by 1st respondent of the use of BVAS machines in the

CERTIFIED TRUE COPY

presidential election in Borno State while paragraphs 105 and 106 simply stated the Petitioners' ground that 2nd Respondent was not elected by majority of law votes cast in the election.

In respect of paragraph 107 of the petition, first respondent complains that the petitioners there contended that the entire results of the presidential election were wrong yet they did not plead the results they perceive to be correct so it is also vague pleading. I am of the view that complaint is better considered while considering the merits of the petition. That is even more so as it appears to us that paragraph 107 seems averred to by petitioners to meet the provisions of Paragraph 4(1) (c) of the First Schedule to the Act 2022 that requires them to state in their petition among others the scores of the candidates in the election. To that extent, paragraph 107 cannot be faulted by application at this stage let alone sought to be struck out *in limine*.

Paragraph 108, 109, 110, 111, 112 and 113 of the Petition merely pleaded facts as to whether 2nd Respondent, who by 1st Respondent's own showing did not poll up to 25% of the total votes of the Federal Capital Territory, was properly returned by 1st Respondent having regards to the provisions of section 134(2)(b) of the 1999 Constitution of the Federal Republic of Nigeria and other relevant statutes. It is therefore in order.

I am afraid:

CA/PEPC/03/2023; CA/PEPC/04/2023; CA/PEPC/05/2023.                    512




Paragraph 114 of the petition where the petitioners simply alleged generally that "purported results from polling units across 36 State and Federal Capital Territory contain various forms of infractions;

Paragraph 115 where they alleged that "a total number of 4,307 polling units are without stamp on the respective Form EC8A therefrom. Details of the States and number of polling units in each State affected are shown in in the Statistician's Report herein pleaded...;"

Paragraph 116 where they complained that "results from 1,300 polling units do not have signatures of the Presiding Officers on the respective Forms EC8A. Details of the States and number of polling units in each State affected are shown in in the Statistician's Report herein pleaded;"

Paragraph 117 where they said "purported results from 6,418 polling units have and indicate zero accreditation. The polling units affected are as shown in the Statistician's Report herein pleaded;"

Paragraph 118 where they averred that critically 9, 463 polling units across 30 States have shown that the votes returned are in excess of accredited voters;"

And, finally, paragraph 119 where they contended that "given the number of registered voters in polling units where elections did not

CA/PEPC/03/2023; CA/PEPC/04/2023; CA/PEPC/05/2023.

CERTIFIED TRUE COPY

take place, in addition to those polling units where elections were cancelled, (the details of which are set out in the Statistician's Report pleaded by the Petitioners), the return of the 2nd Respondent as the winner of the election in the circumstances was hasty and undue as the margin of lead is less than the number of disenfranchised voters,"

are all bad for lack of particulars and necessary facts. As for the Statistician's Report referenced by them for the said particulars, I hereby reconfirm my earlier finding and conclusion on it.

Paragraph 120 of the petition is not challenged by 1st respondent so I shall overlook it, at least for now.

The petitioners in Paragraph 121 of the petition alleged that 1st Respondent's Presiding Officers of polling units failed to properly fill and countersign alterations in election forms, including Forms EC8A, EC8B, EC8C and EC8D, but they did not mention the polling Units, Wards, Local Governments and States the said infractions took place. They simply referenced the same Statistician's Report. This paragraph is bad for imprecision and so also liable to be struck out.

Paragraphs 122 to125 of the petition are not challenged by 1st respondent so I shall skip them.


CERTIFIED TRUE COPY

In paragraph 126 of the petition, the petitioners complained that:

> "... *all over Nigeria* there were manifest cases of over-voting. The total of the affected polling units in the various States are set out in the Statistician's Report pleaded and relied upon by the petitioners."

This pleading is also bad for vagueness. My earlier position on the Statistician's Report referenced by the petitioners is also reaffirmed.

Paragraphs 127 and 128 of the Petition are not challenged by 1st respondent so they are also skipped.

I do not share the view of 1st Respondent that paragraphs 129, 130, 131 and 132 of the Petition are bad for lack of imprecision. Petitioners in those paragraphs carefully pleaded the specific polling units and number of votes therein that they claim were affected by cancellation of elections complained of by them.

I am however of the opinion that the second complaint of 1st respondent against paragraph 129 of the petition, that it also deserves to be struck out for petitioners' failure to join Hon. Adejoh, Chairman of Olamaboro L.G.A. of Kogi State accused by them of having led thugs at gun point to force Electoral officers in named polling units in Olamaboro L.G.A. of Kogi State to declare concluded elections in the said units cancelled, is well

CERTIFIED TRUE COPY

made. The petitioners' response that not only was no relief claimed by them against Hon. Adejoh, he did not even 'participate' in the election neither was he returned so he is not a person contemplated by section 133 of the Electoral Act 2022 to be joined to an election petition, is not a valid response. Section of 133 of the Electoral Act 2022 only deals with the issue of which contestant of an election ought to be joined in an election petition by a co-contestant. It has nothing to do with the issue of joining of third parties against whom allegations of electoral infraction are made by petitioners as in this case. Such persons must be joined to the petition if the court is not to be exposed to the risk of infringing their fundamental right to fair hearing guaranteed by the Constitution. It is also of no moment that no relief was claimed against such persons in the petition; what is important is that allegations of electoral malpractice, which will require the court to make findings, including condemnation of their alleged conduct where necessary, are made in the petition. Support for that position can be found in **NWANKWO V. YAR'ADUA (2010) 12 NWLR (Pt. 1209) 518 at 583** where Muntaka-Coomassie, J.S.C., after reproducing the provisions of the then newly enacted section 144(2) of the Electoral Act 2006 (*in pari materia* with section 133(2) of the Electoral Act 2022) and confirming that that provision had done away with the old regime of the Electoral Act 2002 that required petitioners to join all

CERTIFIED TRUE COPY 

relevant Electoral Officers of INEC that conducted an impugned election, in addition to INEC itself, spoke thus at page 583:

> **"Unless the conduct of a party *who is not an agent of the Commission* is in question, it will then be necessary to join such party as a necessary party to the petition *in order to afford such party a fair hearing.*"** (Italics mine)

As regards the consequence of failure to join such necessary parties on the petition itself, His Lordship again said as follows:

> **"However, where such a party is not made a party, it will not result into the whole petition being struck out, but the particular allegation against such party is liable to be struck out."**

That is the fate of paragraph 129 of the petition where allegations of electoral malpractice were made by the Petitioners against Hon. Adejoh yet he was not cited in the petition. Incidentally, this is also one of the main reasons the Supreme Court gave in dismissing the appeal of the petitioners in the Ondo State Governorship case of ***Eyitayo Jegede & Another v. I.N.E.C. & Ors*** (2021) LPELR-55481 (SC) where allegations were made by the Petitioners in that case against the then National Caretaker Committee Chairman of the present 3rd Respondent, APC, Governor Mai Mala Buni of Yobe State, yet he was not joined to the



petition by the Petitioners. Paragraph 129 of the petition must therefore suffer striking out.

For the same reason, paragraph 133 of the petition, where similar allegations of an alleged gun totting Governor Yahaya Bello of Kogi leading thugs to compel cancellation of concluded elections in polling stations were made yet he was not joined to the petition, must also be struck out.

Paragraphs 135 and 136 of the Petition were not challenged by 1st Respondent so they are hereby skipped.

I consider this a convenient point to paragraphs 137 and 142 of the Petition which learned Senior Counsel to INEC further complained was also bad for non-joinder. Counsel's argument, this time, was that the Petitioners were also seeking in those two paragraphs to void the entire results of the Presidential election in Lagos and Kano States as declared by INEC, where Messrs Peter Obi of the Labour Party and Rabiu Musa Kwankwaso of the New Nigeria Peoples party scored the majority of lawful votes, yet Peter Obi of the Labour Party and Rabiu Musa Kwankwaso of the New Nigeria Peoples party were not joined to the petition so those paragraphs were also bad and liable to be struck out. I consider this argument misconceived. In fact, it seems to overlook section 132(4) of the 1999 Constitution stating expressly that:

CERTIFIED TRUE COPY

**For the purposes of an election to the office of President, the whole of the Federation shall be regarded as one constituency.**

That is the position as it relates to a presidential election. Percentages of votes polled by presidential candidates in any of the 36 States of the Federation or even the Federal Capital Territory only become of consequence when the issue verges on whether the candidate returned also satisfied the provisions of Section 134(1) (b) and (2) of the 1999 Constitution of this country (as amended) requiring him/her to poll 25% of votes cast in at least one two-thirds of the 36 States and the Federal Capital Territory. Outside of that, how many votes a presidential candidate polled in any of the States of this country is of little significance in an election petition challenging return in a multi-party presidential election. It certainly has no bearing on the question of who an aggrieved candidate challenging a presidential election return should join to his petition among the candidates that contested the election with him. By section 133 of the Electoral Act 2022 the only other candidate in the election a petitioner can properly join to his petition is the person returned as the winner of the election. See further on this the cases of *Buhari & Anor v. Yusuf* (2003) 14 NWLR (Pt. 841) 446; (2003) LPELR-812 (SC); *Yusuf v. Obasanjo & 50 others* (2003) 9-10 S.C. 53 @ 91; *Obasanjo v. Yusuf & Anor* (2004) LPELR-2151 (SC) p. 64. See particularly *Buhari &*

CERTIFIED TRUE COPY

*Anor v. Yusuf* (2003) 14 NWLR (Pt. 841) 446 @ 520 where it was said that "an unsuccessful candidate in an election cannot be made a party to an election petition against his will."

I also do not agree with 1st Respondent that paragraphs140, 141 and 142 of the Petition are vague or imprecise. I am rather of the view that facts necessary to elicit an appropriate response from the Respondents of the electoral infractions complained of by the petitioners have been pleaded in those paragraphs.

I however agree with 1st Respondent (INEC) that paragraph 143 of the petition where the petitioners simply complained that "1st respondent deliberately entered wrong scores/results" for 22 States named therein; Paragraph 144, where they averred that "there were discrepancies on very large scales at the various levels of recording and collation of results, particularly between the polling units and the Ward Collation Centres," without specifying the said polling units and Ward Collation Centres where these said 'large scale discrepancies' took place; and paragraph 145 where petitioners gave notice that they would rely on their same flawed Statistician's Report among other expert documents they did not frontload, are bad and liable to be struck out for vagueness.

Paragraph 146 of the petition where Petitioners simply stated as Ground Four of the Petition that:

CA/PEPC/03/2023; CA/PEPC/04/2023; CA/PEPC/05/2023.                                        520




CERTIFIED TRUE COPY

> **"The Petitioners aver that the 2nd Respondent was at the time of the election not qualified to contest the election, not having the constitutional threshold,"**

is also imprecise and vague as it gives no particulars of any of the several qualifying and disqualifying factors set out in sections 131 and 137 of the Constitution. The main purpose of pleadings as further fortified by Paragraph 4(1)(b) of the First Schedule of the Electoral Act 2022, I repeat, is to properly and clearly inform the adverse party of the case he is coming to meet, so that he can respond appropriately to it. That is fair hearing. That requirement of the law does not permit parties to keep their cards face-down as petitioners did in paragraph 146 of their petition when they simply averred, generally, that 2nd Respondent was not qualified to contest the 25th February 2023 Presidential election, without revealing in what form he was not qualified or disqualified for the election. That Paragraph of the petition falls fall far short of the requirements of Paragraph 4(1)(b) of the First Schedule of the Electoral Act 2022 and so liable to be struck out and must be struck out.

### Conclusion on issue One of 1st Respondent

The sum total of all the foregoing is that, while paragraphs 129 and 133 of the Petition are liable to be struck out for non-joinder of necessary parties, to wit Messrs Adejoh and Governor Yahaya Bello of Kogi State accused in the petition of committing electoral malpractices, Paragraphs

CERTIFIED TRUE COPY

92, 95, 98, 121, 126, 129, 133, 143, 144 and 146 are vague, imprecise and lack particulars and so fall short of the requirements of Paragraph 4(1)(b) of the First Schedule of the Electoral Act 2022. They are therefore **all ordered struck out**.

Paragraphs 93, 94, 96, 97, 99, 100, 101, 102, 104, 105, 108, 109, 100, 111, 112, 113, 114, 115, 116, 118, 119, 120, 122, 125, 130, 134, 138, 139, 140, 141, 142, 145 on the other hand are in order and properly pleaded.

**Issue 2** of first Respondent in this same application reads: *Whether having regard to the mandatory provisions of Paragraph 4(1)(b) of the First Schedule of the Electoral Act 2022, a reasonable cause of action has been disclosed in respect of the grounds of the Petition contained in paragraph 16(a), (b), (c) and (d) of the Petition to warrant further or any adjudication on same.* Counsel on behalf of 1st respondent this time anchored their arguments principally on the grounds on which the petitioners founded their petition. Counsel reproduced paragraphs 16(a), (b) and (c) of the petition where the petitioners alleged that:

  (a)   The election of 2nd respondent was invalid by reason of non-compliance with the provisions of the Electoral Act 2022;

  (b)   The election of 2nd respondent was invalid by reason of corrupt practices;



(c)     The 2nd respondent was not duly elected by majority of lawful votes cast at the election.

They next referenced section 134 of the Electoral Act 2022 stating that "an election may be questioned on, among others, that the election was invalid by reason of corrupt practices and non-compliance with the provisions of this Act" and argued that this provision (s. 134) has a proviso in section 135(1) to the effect that an election shall not be liable to be invalidated by reason of non-compliance with the provisions of this Act if it appears to the election tribunal or court that the election was conducted substantially in compliance with the principles of this Act and the non-compliance did not substantially affect the result of the election. Relying on the cases of *Ojukwu v. Yar' Adua* (2008) 4 NWLR (Pt. 1078) 435 @ 458-459 and *Yusuf v. George* (2019) LPELR-48661(CA), learned counsel submitted that for petitioners to sustain their ground of corrupt practices and non-compliance of the election with the provisions of the Act, they are required to not only plead the fact of non-compliance but further assert positively in the petition and prove that the non-compliance and corrupt practices complained of substantially affected the result of the election. To properly do that, they argued, petitioners must plead and show how many votes were affected by the irregularities and that the deduction of such votes would void the return of the 2nd Respondent as the winner of the election. They said not only did the



petitioners not assert in their petition that the non-compliance complained of substantially affected the election, they did not also plead the votes or polling units affected by the non-compliance to enable this court form an opinion on whether the non-compliances and corrupt practices complained of substantially affected the election or that 2nd respondent polled majority of lawful votes in the election and so ought to be returned or the election voided on grounds of noncompliance and corrupt practices. Without those facts in the petition, the petitioners, counsel submitted, have simply blown 'muted trumpet' and their petition lifeless and failed to disclose a reasonable cause of action, so it is liable to be dismissed.

### Resolution of issue 2

This issue does not deserve any serious consideration, the reason being that petitioners expressly stated in paragraph 17 of their petition that: "The petitioners aver that the election was not conducted in accordance with the provisions of the Electoral Act 2022 and other extant laws *and that the non-compliance substantially affected the result of the Election*, in that the 2nd Respondent ought not to have been declared and returned as the winner of the Election." That sufficiently answers the complaint of 1st Respondent.

CA/PEPC/03/2023; CA/PEPC/04/2023; CA/PEPC/05/2023.

CERTIFIED TRUE COPY

**Issues 3 and 4 of 1st Respondent's first application**: Counsel to 1st respondent in their issues 3 and 4, which they also argued together, basically relied on their contentions in issue 2 of the 'lifelessness' of the petition to submit that the petition has by reason of the alleged omission in the petition identified above, had become academic and constitutes abuse of process of court so this court is robbed of jurisdiction to entertain it.

**Resolution**

This combined issue is founded on issue 2, and since issue 2 has been determined against 1st respondent, issues 3 and 4 perish with it and so are hereby resolved against 1st Respondent.

***SECOND RESPONDENT'S Similar Application*** *filed on 13/05/2023* seeking dismissal of paragraphs 14 and 15, 19 – 81, 87 - 104, 108 - 128 and 133 to 150 of the petition for being fundamentally defective. For this application, learned counsel to Second Respondent simply set out a sole issue for determination thus:

> In view of the provision of paragraphs 4(1)(d) of the First Schedule to the Electoral Act 2022 and relevant judicial decisions, whether paragraphs 14 and 15, 19 – 81, 87 - 104, 108 - 128 and 133 to 150 of the petition are not liable to be struck out.

CA/PEPC/03/2023; CA/PEPC/04/2023; CA/PEPC/05/2023.                    525

CERTIFIED TRUE COPY

Anchoring their argument on Paragraph 4(1)(d) of the First Schedule to the Electoral Act 2022 and dicta in *Ojukwu v. Yar' Adua* (supra) to the effect that a petitioner is required under Paragraph 4(1)(d) of the First Schedule to the Electoral Act 2022 to state in clear terms the facts giving rise to the ground or grounds on which he based his petition and anything short of that renders the ground or grounds ambiguous, vague and incomprehensible and the court is bound to strike out such ground or grounds, counsel submitted that the paragraphs of the petition challenged by them suffer different defects both in law and in fact. To start with, they argued, paragraphs 19-71 of the petition which touch on the failure of the respondent to electronically transmit election results are incompetent, disclose no cause of action and are outside the jurisdiction of this court. They founded that argument on Section 134(2) of the Electoral Act stating that "an act or omission which may be contrary to the instruction or directive of the commission or of an officer appointed for the purpose of the election shall not of itself be a ground for questioning the election." Learned counsel argued that, having claimed that the whole idea of the electronic transmission derives its root from the directives of the Commission, the averments in those paragraphs cannot serve as valid grounds for challenging the applicant's election and we should so hold. It was further submitted by counsel that

CERTIFIED TRUE COPY

in so far as paragraphs 82-86 of the petition touch on the margin of lead principle, they are unsupported by any relief in the petition.

Respondent on a second limb argued that paragraphs 72-81 of the Petition are incompetent and disclose no cause of action and are unsupported by any of the relief embodied in the petition.

It was also argued by counsel that paragraphs 92-104 of the Petition do not relate to or support the ground in respect of which they are pleaded so they should be struck out in their entirety. Paragraphs 108 -113, counsel contended, were a mere rehash and repetition of paragraphs 72-81 of the same Petition and so also liable to be struck out.

Learned counsel rounded up by contending that paragraphs 91, 92, 115 -119, 121, 123 and 124 of the Petition which relied, referenced or attempted to incorporate a non-existent Report of Statisticians without serving such Report on the Respondents or making it available at the time of the preparation of the Respondent's Reply is also incompetent and in breach of 2nd Respondent's right to fair hearing and so liable to be struck out. They said 2nd Respondent ought to be provided with all the particulars of the case against him to enable him prepare his defence effectively.


CERTIFIED TRUE COPY

The petitioners, in response, argued that this application is premature as the court can only come to its determination after full trial. They submitted, in the alternative, that in any case, even the grounds supporting applicant's motion all confirm that the petition; that the grounds supporting the petition are actually fully supported by facts and these facts are even acknowledged by the 2nd Respondent/Applicant.

On 2nd Respondent's complaint of vagueness, imprecision and ambiguity of the paragraphs of the petition including the failure to attach the Statistician's Report, learned counsel cited the decision of this court in *Chris Ngige & Anor v. INEC & Ors.* (2014) LPELR-25413 (SC) to say that that argument goes nowhere; that by the provisions of the First Schedule to the Electoral Act 2022 and the Federal High Court (Civil Procedure) Rules that complement it, 2nd Respondent rather ought to ask them for further particulars of the allegations made in those paragraphs instead of seeking striking out of the petition. In any event, they further argued, Petitioners fully met all the requirements of pleadings as far as the 1st Schedule of the Electoral Act 2022, the Practice and Procedure and the rules of evidence applicable to election petitions are concerned. They said that 2nd Respondent/Applicant who filed the most voluminous Reply to the petition cannot turn around to claim that the facts of the petition which he copiously reacted to are imprecise, unclear, nebulous and vague. They said 2nd Respondent by this application is simply attempting

CERTIFIED TRUE COPY

to invite this court to embark on a summary trial of their petition, a practice they said is alien to law generally and election petitions in particular. They cited, among others, the cases of **Abubakar v. Nasamu** (2012) 17 NWLR (Pt. 1330) 523 @ 593, **Wellington v. PDP & Ors** (2023) LPELR-60003 (SC), **Buremoh v. Akande** (2012) 17 NWLR (Pt. 1563) 74 @ 98, **Obasanjo v. Yusuf** (2004) 9 NWLR (Pt. 877) 144 @ 218 in support of this argument. They rounded up by submitting that 2nd Respondent has chosen to interpret their petition as bordering on mere complaint against non-adherence with the 1st Respondent's instructions and directives when in fact it raises much weightier issues than that and challenges by virtue of section 149 of the Electoral Act 2022 and section 239 of the Constitution of the Federal Republic of Nigeria 1999 all unlawful conducts of the 1st Respondent in the election.

## Resolution

In the course of determining 1st Respondent's application on the same issue of vagueness and imprecision of the complaints in the petition, I dwelt extensively on the rationale for exchange of pleadings generally and particularly in election petitions as further set out by the lawmaker in Paragraph 4(1)(d) of the First Schedule of the Electoral Act 2022. I hereby adopt all those pronouncements.




In the same exercise, I also considered and pronounced on the same complaint of vagueness/lack of particulars, genericness and imprecision of the complaints of the petitioners in paragraphs 92 -146 of the Petition also made by 2nd Respondent here. I there determined that:

(1) Paragraphs 92, 95, 98, 107, 121, 124, 126, 129, 133, 143, 144 and 146 are vague, imprecise and lack particulars, and so fall short of the requirements of Paragraph 4(1)(b) of the First Schedule of the Electoral Act 2022 and therefore also liable to be struck out, **while**

(2) Paragraphs 93, 94, 96, 97, 99, 100, 101, 102, 104, 105, 108, 109, 100, 111, 112, 113, 114, 115, 116, 118, 119, 120, 122, 125, 130, 134, 138, 139, 140, 141, 142, 145 are in order and properly pleaded.

I abide by those findings. I shall therefore here simply focus on paragraphs 14-91, 147-150 and the few paragraphs between paragraphs 92-146 of the Petition omitted by the 1st respondent in its application, in determining the complaints of 2nd Respondent of whether petitioners' complaints in those paragraphs were really vague, imprecise and generic. I now start that exercise.

Without prejudice to what I had earlier said and which I hereby reconfirm on the invalidity of the Statistician's Report relied on by the Petitioners

CA/PEPC/03/2023; CA/PEPC/04/2023; CA/PEPC/05/2023.                                    530




CERTIFIED TRUE COPY

for particulars of their averments in the petition, I am of the opinion that paragraphs 14-15 of the Petition where the Petitioners specifically complained only about correctness of the contents of INEC Forms ECDA(A) (being the summary of final collation of results; and Form EC8E - being the final declaration of results), are  clear as to the issue raised therein and so not vague.

Paragraphs 16-18 of the petition are not attacked by 2nd respondent and so are hereby skipped.

I also do not find vague Paragraphs 20-22 of their petition where the petitioners complained that 1st Respondent did not keep to its earlier promise of electronic transmission of election results to its IReV portal in real time when it returned 2nd Respondent as duly elected.

I however find vague, imprecise and falling far short of the requirements of Paragraphs 4(1)(d) and 15 of the 1st Schedule of the Electoral Act 2022 the averments in Paragraph 23 of the Petition where the petitioners complained that (a) the result of the election as announced by INEC does not represent the lawful votes cast; (b) that votes were 'wrongly allocated to 2nd Respondent', and (c) that lawful votes cast for them (petitioners) were 'massively deducted' from their scores by INEC to facilitate the return of lawful valid votes cast for them. These paragraphs ought to contain the lawful votes of the Petitioners that were alleged

CERTIFIED TRUE COPY

'massively deducted', as well as those alleged to have been allocated to 2nd Respondent by INEC (1st Respondent) to return him elected.

We find properly and sufficiently pleaded paragraphs 24 down to 72 of the Petition where the petitioners again simply complained that INEC did not keep to its promise of real-time electronic transmission of election results to its IReV portal.

We however find vague, imprecise and lacking in particulars Paragraphs 82-86 of the Petition where the petitioners complained that Permanent Voters Card (PVCs) collected in the polling units where elections were cancelled or did not hold across the country is above 1,810,206, which is the margin of lead between 1st Petitioner and 2nd Respondent, consequently, the return of the 2nd Respondent was hasty, premature and wrongful. This pleading ought to contain the precise number of 'Permanent Voters Card (PVCs) alleged collected in the polling units' which by petitioners' contention would have closed the margin of lead between 1st Petitioner and 2nd Respondent to make the latter's return unlawful. Without that information, the complaint is difficult to understand and respond properly to let alone resolve.

Paragraphs 87 – 91 where the petitioners complained of corrupt practices in the conduct of the election by INEC, which practices they complained took the form, among others, of manipulation by 1st

CERTIFIED TRUE COPY

respondent through deliberate suppression and discounting of their lawful votes while inflating the votes of scores of 2nd Respondent, is vague in so far as the polling stations where the said corrupt practices took place are not stated.

Paragraphs 92 to 147 of the Petition, less paragraphs 135 and 136 of the Petition, also complained of by 2nd respondent as vague, imprecise and generic have been dealt with by us while considering 1st Respondent's application on the same issue. We hereby adopt our findings in that application in resolving the complaints of 2nd Respondent in this application.

As for paragraphs 135 and 136 of the Petition, we are of the view that paragraph 135, where petitioners complained of manipulation of the election in Lagos State by 1st Respondent resulting in 'depletion' of their votes and 'inflation' of 2nd Respondent's votes, is vague in the absence of pleading of the number of votes so depleted and inflated.

In respect of paragraph 136 of the petition, even the petitioners again complained that the votes returned by 1st Respondent for Obio-Akpor and Port Harcourt Local Government Areas of Rivers State did not reflect the actual votes scored in the said Local Government Areas or even those uploaded to Irev by INEC and so liable to be voided, no 'correct' figures of the actual votes cast or as reflected in the Irev as alleged were pleaded,

CA/PEPC/03/2023; CA/PEPC/04/2023; CA/PEPC/05/2023.

533

CERTIFIED TRUE COPY

so it is also bad for vagueness and imprecision and therefore liable to be struck out.

The sum total of the foregoing is that the complaints of vagueness, imprecision and genericness of averments hurled by 2nd respondent against the petition are only made out as regards Paragraphs 23, 82 – 86, 88 – 91, 92, 95, 98, 121, 124, 126, 129, 133, 135, 136, 143, 144 and 146 of the Petition. Accordingly, those paragraphs are hereby struck out, while the remaining paragraphs of the petition are deemed in order and pass the vagueness test of Paragraph 4(1)(d) of the 1st Schedule of the Electoral Act 2022.

In pronouncing the said paragraphs of the petition bad for vagueness and liable to be struck out, I am not unmindful of the argument of the petitioners that 2nd Respondent's remedy lies in an application for further particulars and not striking out. I am however of the opinion that application for particulars is only one of several options open to 2nd Respondent, who in any case is not under any obligation to help Petitioners make out their case against him by asking for particulars of their generic and nebulous complaints. That is also the point that was made by Fabiyi, JSC, in *P.D.P. v. I.N.E.C.* (2012) 7 NWLR (Pt. 1300) 538 when His Lordship said (at p. 564) that:



"The application for an order for further particulars or the like is *merely a shield in the hand of a party who so desires*, and *not a sword to be used by a party whose pleading is grossly inadequate, insufficient or devoid of necessary particulars herein*. The decision in *Olawepo v. Saraki* (2009) ALL FWLR (Pt. 498) 256 cited by learned counsel on both sides is in point. *It is not the duty of a respondent to groom a petitioner on how to draft its petition*."

It is also quite revealing, in fact even reassuring, I must say, that this argument of petitioners on the duty on 2nd Respondent to ask for further particulars of the allegations in their petition rather than asking for striking out the petition or its vague paragraphs, was also rejected by Muntaka-Coomassie, J.S.C. while delivering lead judgment in *P.D.P. v. I.N.E.C.* (2012) 7 NWLR (Pt. 1300) 538, even as the same argument had found favour with His Lordship (Muntaka-Coomassie, JSC) two years earlier in his contribution in *NWANKWO V. YAR'ADUA* (2010) 12 NWLR (Pt. 1209) 518 at 560. His Lordship in the latter case of *P.D.P. v. I.N.E.C.* (supra) endorsed the stand of trial tribunal that Paragraph 12(5) of the 1st Schedule of the Electoral Act 2022 (same as Paragraph 12(5) of the 1st Schedule of the Electoral Act 2010) permitting respondents to apply to strike out a petition did not exist in the 2006 Electoral Act in force at the time *Nwankwo v. Yar'Adua (supra)* was decided and that made all the difference.

CA/PEPC/03/2023; CA/PEPC/04/2023; CA/PEPC/05/2023.　　　535



Regarding the further argument of 2nd Respondent that, petitioners' complaint that 1st Respondent did not observe its own promises to transmit election results to its IRev portal in real time was caught and made comatose by Section 134(2) of the Electoral Act stating that 'an act or omission which may be contrary to the instruction or directive of the commission or of an officer appointed for the purpose of the election shall not of itself be a ground for questioning the election, I think it is neater, and even safer, to defer it to the main judgment for determination on its merits, especially since that contention is also one of the main complaints of the petitioners in the petition itself. That is what case law advises. See again *Nwankwo v. Yar'Adua* (2010) 12 NWLR (Pt. 1209) 518 @ 584-585 (SC).

## THIRD RESPONDENT'S APPLICATION ON THE SAME ISSUE OF VAGUENESS OF PARAGRAPHS OF THE PETITION.

In its own application of 8th May 2023, 3rd Respondent, like 1st and 2nd Respondents, also prayed us to strike out all of paragraphs 17-146 of the petition on the same grounds of vagueness, imprecision, nebulousness and petitioners' failure to join Mr Adejoh and Governor Yahaya Bello of Kogi State against whom allegations of electoral infraction were made. Additionally, it also complained that petitioners' averments in paragraphs 19, 20, 21, 35, 41, 42 and 45 of the Petition are all pre-

CA/PEPC/03/2023; CA/PEPC/04/2023; CA/PEPC/05/2023.

536



election matters which occurred before the election and outside the jurisdiction of this court sitting as an election petition court.

Again, the petitioners argued, in response, that their complaints were properly pleaded in the petition and so not imprecise nor pre-election matters as alleged by 3rd Respondent.

*Resolution*

Since the application of 3rd respondent relates to the same paragraphs of the petition objected to by 1st and 3rd Respondents, over which we have already made findings, we abide by and adopt those findings in determining the application of 3rd Respondent.

We further hold that petitioners' averments in paragraphs 19, 20, 21, 35, 41, 42 and 45 of the Petition are not pre-election matters. In fact, whereas the issues of the assurances given by INEC of real-time transmission of election results to Irev raised by petitioners in paragraphs 19 and 20 of the Petition, how the elections were generously funded by the Federal Government of Nigeria on account of those assurances as averred in paragraph 21 of the Petition, and how 1st Respondent transferred its in-house ICT Expert from one Department to another before the election as alleged in paragraph 35 of the petition, cannot by any means give rise to a cause of action let alone a reasonable cause of

CERTIFIED TRUE COPY

action in petitioners, the averments in paragraphs 41, 42 and 45 of the petition are simply notices by the petitioners to subpoena witnesses to testify about 1st Respondents omissions and commissions in the conduct of the actual election of 25Th February 2023 and so cannot by any means be described as causes of action let alone pre-election matters for which they could have commenced action as alleged.

In conclusion, the applications of 1st, 2nd and 3rd Respondents succeed only partly and the following orders are made on them:

(1) Paragraphs 23, 82 – 86, 88 – 91, 92, 95, 98, 121, 124, 126, 129, 133, 135, 136, 143, 144 and 146 and are hereby struck out as prayed.

(3) The remaining paragraphs of the petition attacked pass the vagueness test and Paragraph 4(1)(d) of the 1st Schedule of the Electoral Act 2022 and are hereby upheld.

That leaves us with the stand-alone application of 3rd respondent also filed on 8/5/2023, as well as the three applications of the Respondents all objecting to the Petitioners Replies to their Replies.

**Second Respondent's stand-alone application seeking striking out of the Petition for abuse of judicial process, etc.**



Third Respondent in his stand-alone application complained, amongst others, that this petition constitutes a gross abuse of judicial process by reason of an Originating Summons in Suit No SC/CV/354/2023 filed on 28th February 2023 by the Attorneys-General of Adamawa, Akwa Ibom, Bayelsa, Delta, Edo and Sokoto States against the Attorney General of the Federation at the Supreme Court of Nigeria. The principal argument of counsel to 2nd respondent on this issue is that the said plaintiffs' States of the Federation, whom he described as 'all controlled by the 2nd petitioner', in their originating summons in the apex Court raised against the Attorney General of the Federation the same issue here of 1st respondent's failure to transfer or transmit polling unit results from its BVAS to its Result Viewing Portal (IReV) in the 25th February 2023 general elections and even sought against the Attorney General of the Federation declarations that the said election was fundamentally flawed and so invalid, null and void and of no effect so this petition constitutes gross abuse of process. Senior counsel on 2nd Respondent's behalf submitted that while 1st Petitioner is a stakeholder in the governance and politics of the 1st plaintiff (Adamawa State) in Suit No SC/CV/354/2023, his running mate in the presidential election (Senator Okowa) was the incumbent Executive Governor of the 4th Plaintiff, Delta State, in that suit, so there was without doubt 'visible affinity' between the petitioners herein and the plaintiffs in the Supreme Court case, which affinity, counsel further

CERTIFIED TRUE COPY

submitted, 'translates to privity'. Counsel referenced the decision of this court in *Sani v. President, Federal Republic of Nigeria* (2010) 9 NWLR (Pt. 1198) 153 @ 177, where this court relying on Black's Law Dictionary, 8th Edition at p. 1239, defined privy in relation to litigation to 'include someone who controls a law suit though not a party to it, someone whose interests are represented by a party to the lawsuit, and a successor in interest to anyone having a derivative claim." Counsel submitted that the instant petition, being the last in the series, presents 'a classical case' of abuse of judicial process. They argued that had the Supreme Court determined Suit No SC/CV/354/2023 before it, there would not have been need for filing of the instant action. Contrariwise, they submitted, if this court determines this petition, it will automatically render Suit No SC/CV/354/2023 nugatory. They submitted that the incongruity the whole circumstances painted by them portends can be best imagined if this Court determines the issues in this petition one way or the other and the Supreme Court takes a different position. Counsel said it is an abuse of process where a party proceeds in the ventilation of his supposed grievance in such a way that two courts are set on a collision course with the likelihood of delivering contradictory decisions. The cases of *Saraki v. Kotoye* (1992) 9 NWLR (Pt. 264) 156 @ 188 (SC); *Ojo v. Olawore* (2008) 6-7 S.C. (Pt 11) 54 @ 70; *Dingyadi v. INEC* (No. 2) (2010) 18 NWLR (Pt. 1224) 154 @ 221 (SC) were cited by learned senior counsel



CERTIFIED TRUE COPY

to support the contention that instituting multiplicity of actions on the same subject against the same opponent; instituting different actions between the same parties simultaneously in the different courts; where two similar processes are used in respect of the exercise of the same right; where there is no iota of law supporting a court process or where it is premised on frivolity or recklessness, all constitute abuse of judicial process. They rounded off by citing ***Arubo v. Aiyeleru*** (1993) 3 NWLR (Pt. 280) 126 @ 146 to say abuse of process is a serious wrong in judicial proceeding and attracts the ultimate penalty of dismissal of the abusive process.

The thrust of the response of the petitioners' counsel is that Suit No SC/CV/354/2023 was not filed by the Petitioners so this petition cannot be properly labelled an abuse of process. In any event, they further argued, Suit No SC/CV/354/2023 has been long withdrawn by its plaintiffs even before it was mentioned and that fact is not only well known to 2nd respondent, it was even stated in Petitioners' Reply to the Petition. Counsel submitted that even counsel to 2nd Respondent know that abuse of judicial process cannot be established where parties are different hence their foray into the meaning of 'mere affinity' and how parties in Suit No SC/CV/354/2023 and this petition are related in affinity.

CA/PEPC/03/2023; CA/PEPC/04/2023; CA/PEPC/05/2023.

CERTIFIED TRUE COPY

In his reply on points of law, 2nd Respondent through his counsel submitted that not only have the petitioners failed to present to this Court any order of the Supreme Court striking out or dismissing Suit No SC/CV/354/2023, even assuming that they did, it would not have addressed their contention that the instant petition constitutes abuse of process, as the law, according to counsel, forbids withdrawal of a suit for the purpose merely of filing a fresh one. Such conduct itself, it was submitted, is also a specie of abuse of judicial process. The case of **Olawure v. Olanrewaju** (1998) 1 NWLR (Pt. 534) 436 @ 455 was cited in support of that argument.

Now, it is settled position of the law that once a court is satisfied that a proceeding before it amounts to abuse of process, it has the right and indeed duty to invoke its coercive powers to punish the party in abuse. Quite often that power is exercised by dismissal of the action that constitutes the abuse: see **Arubo v. Aiyeleru** (1993) 3 NWLR (Pt. 280) 126 @ 146 (SC); **Dingyadi v. INEC** (No. 2) (2010) 18 NWLR (Pt. 1224) 154 @ 221 (SC); **Ladoja v. Ajimobi** (2016) 10 NWLR (Pt. 1519) 87(SC); **Oyeyemi v. Owoeye** (2017) 12 N.W.L.R. (Pt. 1580) 364 (SC); **Otoko v. Aderia** (2018) ALL F.W.L.R. (Pt. 937) 1662 @ 1673. But multiplicity of actions on the same subject matter and issue will only constitute abuse of judicial process if the parties in both actions are the same or privies to one another: see **Okafor v. Attorney General of Anambra State** (1991) 2

CERTIFIED TRUE COPY

NSCC 407 @ 419-420. It necessarily has to be so because, except where a person is shown to be privy of another as recognised by law, no man can be punished for the actions or sins of another. That is the crux of the issue here. It is whether the Petitioners, Alhaji Abubakar Atiku and his Political Party, the Peoples' Democratic Party, can be properly described as privies of the Governments of Adamawa, Akwa Ibom, Bayelsa, Delta, Edo and Sokoto States who undisputedly instituted Suit No SC/CV/354/2023 against the Attorney General of the Federation before the Supreme Court of Nigeria. That question can only get a negative response, for the Government of a State, regardless of the political party platform on which its Executive Governor is or was elected, represents all shades of opinion in the State, including even those who may not belong to any political party at all. In fact, a State Government is not even bound nor obliged to take instructions from the political party of the Governor. Interestingly, our Law Reports are also replete with cases where State Governments elected on the same political party platform with the Federal Government have repeatedly sued the Federal Government at the Supreme Court. A good example is the recent New Currency Change case that was instituted by the Attorneys General of Kogi, Kaduna and Zamfara States against the Federal Government, even as both parties were APC Governments. In that situation, one wonders where counsel would place this proposition of privity by affinity.

CERTIFIED TRUE COPY

Again, in **Attorney General of Abia State & 35 Others v. The Attorney General of the Federation** (2002) LPELR-611(SC), all the Attorneys General of the 36 States of the Federation, including those elected on the same platform with the then Chief Olusegun Obasanjo and PDP-Government of the Federation, sued the Attorney General of the Federation over the constitutionality of some provisions of the 2001 Electoral Act that elongated the tenure of elected Local Government Councils. Again, in that litigation, where would we locate the 'privity' so-called of the Peoples' Democratic Party (PDP)?

In short, we reject this argument of 2nd Respondent of abuse of judicial process on account of litigation commenced by State Governments against the Attorney General of the Federation. That is as we also take note of the Notice of Discontinuance of Suit No SC/CV/354/2023 filed by the plaintiffs in that case since 3/3/2023, which Notice was tendered by the petitioners in this court as Exhibit PV in the course of the hearing of the main petition on 6/6/2023. This court is obligated by section 122(1)(m) of the Evidence Act 2011 to take judicial notice of its proceedings.

The other argument of note of 2nd Respondent in this application is the one of failure of petitioners to join Friday Adejoh and Governor Yahaya Bello of Kogi State and its effect on the petition. We have already struck

CERTIFIED TRUE COPY

out the relevant paragraphs of the petition where allegations of malpractice were made against the two men. We abide by that decision. We shall simply add that we do not agree with 2nd respondent's argument that the entire petition merits dismissal for non-joinder of those two men. The proper sanction, in the circumstances of this case as we have already pointed out citing **Nwankwo v. Yar'Adua** (2010) 12 NWLR (Pt. 1209) 518 @ 583 paras G-H. (SC), is to strike out the paragraphs of the petition where those allegations were made. That order, we also further add, and contrary to the argument of 2nd Respondent, will not affect the paragraphs where allegations were made against unnamed thugs. Unnamed persons cannot be joined to an election petition like it is sometimes done in trespass cases. See **Obasanjo v. Yusuf** (2004) LPELR-2151 (SC) p.18 -19 where a similar argument was rejected out of hand by Kutigi and Pats-Acholonu, JJ.S.C., thus:

> "It is impossible to drag *unknown* touts, police, army and hordes of others to court and join them. That would be bizarre."

**(THE CHALLENGES TO REPLIES FILED BY THE PETITIONERS)**

All three Respondents also challenged the validity of the Replies and their accompanying Witness Statements on Oath and List of documents petitioners served on them in response to their replies to the Petition.



Their common complaint in those applications is that the said Replies or paragraphs thereof offend Paragraph 16 of the First Schedule of the Electoral Act 2022 governing filing of replies by a petitioner and so liable to be struck out.

Since the said three Replies of Petitioners are slightly different in paragraphing, we deem it more appropriate to consider them separately despite the commonality of the complaints in them. We proceed to do that now by starting with 1st Respondent's application.

**First Respondent's Application:** First respondent's objection/application, filed on 9th May 2023, was against the Reply of the Petitioners that was served on it on 20/4/23. First respondent there sought orders:

(1) Striking out paragraphs 1.2(i), (ii), (iii), (v) and 2.1 (b), (c), and (d) of the Petitioner's Reply.

(2) Striking out the Further Witness Statement on Oath of the DM (who later revealed himself in the proceeding as Senator Dino Daniel Melaye) and PDPC both deposed on 20th April 2023.

(3) Striking out the petitioners' list of Additional Documents dated the day of 20th of April 2023 which accompanied it.

CA/PEPC/03/2023; CA/PEPC/04/2023; CA/PEPC/05/2023.

546



The thrust of its argument, which its counsel founded principally on Paragraph 16 of the First Schedule of the Electoral Act 2022, is that Petitioners in paragraphs 1.2 (i), (ii), (iii), (v) of their Reply to its Reply introduced new facts relating to 2nd Respondent's non-qualification to contest the presidential election of 25th February 2023. These new facts are (1) an alleged forfeiture by 2nd Respondent of the sum of $460,000 to a United States District Court in Illinois Eastern Division as purported compromise Agreement touching on proceeds of crime, (2) forgery of academic certificates and, (3) 2nd Respondent's citizenship of the Republic of Guinea. These new facts, learned counsel to 1st Respondent complained, were not mentioned in their petition and so amount to introducing new facts and issues in a Reply, a practice expressly prohibited by Paragraph 16 of the First Schedule of the Electoral Act 2022 and therefore liable to be struck out. Counsel pointed out that even though petitioners in their Reply to their reply claimed that these new facts were made in response to averments in their Reply to the petition, they were actually never raised there. They said all 1st Respondent said in its Reply, in response to the allegation of non-qualification of 2nd Respondent raised by petitioners in Paragraph 146 of the petition, was that, as regards that allegation, the petitioners did not state anything beyond their bare assertion in paragraph 146 that 2nd Respondent was not qualified. Rather than demonstrate to the court that there are more

CERTIFIED TRUE COPY

averments in the petition than that assertion, counsel submitted, the petitioners, brought in, in their Reply, new facts of purported crimes committed by 2nd respondent in a foreign country, for which he was alleged convicted, and an allegation of his having dual citizenship. These new facts/issues, counsel argued, citing Paragraph 16 of the First Schedule of the Electoral Act 2022, *A.P.C. v. P.D.P.* (2015) 15 NWLR (Pt. 1481) 1 @ 81 and *Ogboru & Anor v. Okowa & Ors* (2016) LPELR-48350 (SC), can only be raised in the original petition or by its amendment and not through petitioners' Reply, even more so as the Respondents would have no further opportunity to respond to them.

Counsel further argued that paragraph 2.1(c) of the Petitioners' Reply, where petitioners alleged that the officials that uploaded the polling unit results in Forms EC8A after the election of 25/2/2023 were not 1st Respondent's presiding officers, and that the said officials could not have uploaded results between 26/2/2023 till 26/4/2023 and up till date, were also new facts which 1st Respondent would not have any opportunity to controvert, and so ought not to be allowed.

Learned counsel further argued, too, that paragraph 2.1.(d) of Petitioners' Reply is not a response to any new issue raised by 1st respondent but just repetition of Petitioners' earlier averment in paragraph 19 of their petition that 1st Respondent's Chairman had earlier

CA/PEPC/03/2023; CA/PEPC/04/2023; CA/PEPC/05/2023.  CERTIFIED TRUE COPY

publicly stated that the prescribed mode of collation of results would be electronic.

As regards the Additional Witness Statements and list of documents accompanying the impugned Reply of the petitioners, counsel submitted that they also contained the same offensive new facts contained in the Reply, and so equally afflicted and ought to be struck out along with the Reply.

The Petitioners' counsel's first line of response to these arguments was that, in so far as the issues raised by petitioners in the said Reply regarding the non-qualification of 2nd Respondent do not relate to the election conducted by 1st Respondent, it ought to remain neutral and non-committal. In support of that argument, they cited the cases of **Okoye v. INEC** (2009) LPELR-4727 (CA), **Agagu v. Mimiko** (2009) 9 NWLR (Pt. 1140) 342 @ 441 and **INEC v. Jime & Ors** (2019) LPELR-48305 (CA). In any event, they submitted, Petitioners have not brought in any new facts or issues in their Reply; that 1st Respondent having claimed in paragraphs 16 and 15.3 of its Reply to the petition that 2nd Respondent met all the constitutional threshold and requirements, it cannot be heard to say at this stage that the details of the same lack of qualification supplied in the Reply, which do not fall outside those requirements, raised fresh issues or will amount to an amendment of the Petition.

CA/PEPC/03/2023; CA/PEPC/04/2023; CA/PEPC/05/2023.


CERTIFIED TRUE COPY

Counsel said the petitioners having founded their petition on four distinct grounds in paragraph 16 of their petition, the fourth being 16(d) in which they stated that 2nd respondent was at the time of the election not qualified, they were not under any duty to respondents at that stage of the pleading to supply the details of 'the evidence' they intended adducing to prove that complaint. They said with 1st Respondent's rebuttal of their averment in paragraphs 16(d) and 146 of the Petition, they saw it necessary to furnish the court with the nature and character 'of the evidence' to be adduced at the trial of the Petition through their List of Witnesses hence the inclusion of the paragraphs in issue. They argued that the documents they intend to rely on are even deemed to be in the possession of 1st Respondent and so cannot be said to be new to it. They rounded off by labelling the arguments of 1st respondent mere 'fishing for technicalities' which the courts have long departed from.

In their Reply on points of law, counsel to 1st respondent submitted that petitioners' contention that their allegations of 2nd Respondent's non-qualification by reason of his purported conviction by way of forfeiture and dual citizenship are matters personal to only 2nd Respondent and so he alone should respond to, begs the question. Learned counsel said it is immaterial that the said new facts were directed at 2nd Respondent, what the court should be concerned with is whether those facts could be put in at all by Petitioners through a Reply; that once this court finds that

CA/PEPC/03/2023; CA/PEPC/04/2023; CA/PEPC/05/2023.

CERTIFIED TRUE COPY

petitioners cannot, the fact that the issue of qualification relates to 2nd Respondent alone becomes of no moment.

## *Resolution*

To start with, I am not persuaded by the Petitioners' argument that the new facts or issues raised by them in their impugned Reply relate to non-qualification of 2nd Respondent and not the conduct of the election by 1st Respondent so 1st Respondent who is supposed to be neutral in the matter cannot be heard to be objecting to them. The issue raised by 1st Respondent actually relates to the competence of a major process before the court, to wit the Reply filed by petitioners. It is an issue which counsel to 1st respondent as ministers in the temple of justice, and even 1st respondent itself as a party to the petition, have a duty to bring to the attention of the court. That obligation even becomes more pronounced when it is realised that a substantial number of 1st Respondent's counsel are members of the inner bar who even have greater responsibilities to the court by virtue of their ranking. This preliminary-objection like the argument of petitioners is therefore rejected.

Coming now to the merits of the application/objection, it is common ground that the provisions of the Electoral Act most relevant to its resolution is Paragraph 16 of the First Schedule of the Electoral Act 2022 subtitled 'Petitioner's Reply'. That Paragraphs states thus:

CA/PEPC/03/2023; CA/PEPC/04/2023; CA/PEPC/05/2023.                    551



**16(1)** If a person in his reply to the election petition *raises new issues of facts in defence of his case* <u>which the petition has not dealt with</u>, the petitioner shall be entitled to file in the registry, within five days from the receipt of the respondent's reply, a petitioner's reply in answer to the new issues of fact, so that –

    **(a)** *The petitioner shall not at this stage be entitled to bring in new facts, grounds or prayers tending to amend or add to the contents of the petition filed by him*; and

    **(b)** ............

        (Emphasis mine)

The provision, with the employment of the word 'shall', forbids the addition of 'new facts' by a petitioner to his Reply, especially if such new facts may have the effect of tending to amend or even just adding to the contents of his petition. This court in ***A.P.C. v. P.D.P.*** (2015) 15 NWLR (Pt. 1481) 1 @ 81 (cited with approval by the Supreme Court in ***OGBORU & ANOR V. OKOWA & ORS*** **(2016) LPELR-48350 (S.C)** put this position perfectly when it said that:

> "...election petitions are sui generis. They are in a class of their own. That are made to fast-track the hearing of petitions. They are, however, not designed to spring surprises on parties. .. By paragraph 13 of its reply, the appellant then brought in the fresh issue ..... same was not proper. The appellant did not have a leeway to aver to new facts <u>which</u>




**ought to be in the original petition** filed. The court below was right when it found as follows:

> 'It is trite that the petitioner cannot introduce new facts not contained in the petition in his reply as in the instant case because as at the time of filing his petition, that fact is within his knowledge and if he did not adequately include it in his petition, the proper thing to do will be to amend his petition.'

Incidentally, this interpretation of Paragraph 16(1)(b) of the 1st Schedule of the Electoral Act 2022, also reflected in the cases of ***Arhiavbere v. Oshiomhole*** (2013) ALL FWLR (Pt. 687) 782 at 792, ***Orji v. P.D.P.*** (2019) 14 NWLR (Pt. 1161), 310 @ 403-404 and ***Adepoju v. Awoduyilemi*** (2019) 14 NWLR (Pt. 1161) 364 @ 382, only restates the well-settled position of our adjectival law that a claimant's claims or grievances are made in his statement of claim or petition as the case may be, and not in his Reply to the statement of defence to that claim. That position also finds expression in ***Olubodun v. Lawal*** (2008) ALL FWLR (Pt. 434) 1468 @ 1501 at paragraph E, where it was said (Aderemi, J.S.C.) that:

> "A plaintiff <u>must not in his reply</u> make *any allegation of fact* or raise any new ground of claim different from what is contained in his statement of claim. If a plaintiff does, *such a plea is irretrievably bad in law* and no evidence will be admissible in its proof."



CERTIFIED TRUE COPY

In fact, the settled position of the law is that except in some well-defined situations, a Reply to Statement of defence is not even permitted where no counterclaim is served. This is so because there is in law an implied joinder of issues on any fact raised in the statement of defence and any averment contained therein is deemed denied: see ***Bakare & Anor v. Ibrahim*** (1973) 6 S.C. 205, ***Akeredolu v. Akinremi*** (1989) 3 NWLR (PT 108) 164 @ 172; ***Egesimba v. Onuzuruike*** (2002) FWLR (PT 128) @ 1407; ***Spasco v. Alraine*** (1995) 9 SCNJ 288 @ 301, ***Ishola v. S.G.B.N.*** (1997) 2 NWLR (PT 488) 405; ***Obot v. C.B.N*** (1994) 8 NWLR (PT 310) 140 @ 159-160.

As to what will amount to 'new issue' in a defence to warrant filing a Reply, see *Egesimba v. Onuzuruike (supra)* (2002) FWLR (PT 128) @ 1407 – 1408 (SC), (2002) LPELR-1043 (SC) Ogundare, J.S.C., had this to say (at p.45, LPELR):

> **"The new issue, both in its content and materiality, *must be further and additional to the statement of claim. The mere fact that a defendant states his own side of the case does not necessarily make it new, particularly when the plaintiff has told a contrary story in his statement of claim. In that case, the case stated by the defendant amounts to joining issues with the plaintiff and that does not wear the name of a new issue in the trial."* (Italics mine)**

CA/PEPC/03/2023; CA/PEPC/04/2023; CA/PEPC/05/2023.

554



Ayoola, JSC, giving lead judgment in *Egesimba* elaborated more on the issue when His Lordship said (at pages 14 to 15 of LPELR) that:

> **"That there is an implied joinder of issues on a defence which is unaccompanied by a counter claim if no reply is served appears to me a general principle of our procedural law which, for avoidance of doubt, is often incorporated in rules of civil procedure in many jurisdictions.** *Parties are brought to an issue where the last pleading is the statement of defence to which a counter claim had not been appended.* **In such a case it is assumed that the plaintiff does not intend to rely on any excuse or justification in answer to any allegation in the statement of defence or raise any fresh facts not already contained in the pleadings filed, but is content to traverse the allegations in the statement of defence** *and, thereby, challenge the defendant to prove the truth of those allegations.*

Guided by all these and Paragraph 16(1)(a) of the First Schedule of the Electoral Act 2022, it does not by any means appear to me that the new facts of (a) conviction/fine, forgery, and dual citizenship of 2nd Respondent introduced by Petitioners into their Reply, (b) the additional averments of how results could not have been uploaded to INEC's IRev after the 25th day of February 2023, and (c) whether it was done at all and the relevant officials of INEC could not have been involved in it, not to even talk of the repetitions in the Reply of averments already made



by petitioners in their petition, can pass as reply filed pursuant to Paragraph 16(1)(a) of the First Schedule of the Electoral Act 2022. Particularly as it relates to the 'further details', as Petitioners labelled them in their Reply, of non-qualification of 2nd Respondent, contained in paragraph 2.1(b) of their Reply, it bears reiterating that all that the petitioners averred to on it in paragraph 146 of their petition is the bare statement that *"The Petitioners aver that the 2nd Respondent was at the time of the election, not qualified to contest the election, not having the constitutional threshold."* No details whatsoever was given by them of what they meant by 2nd Respondent's non-qualification, so 1st Respondent, who was obviously satisfied that 2nd Respondent was qualified to contest the election by the documents he presented to it, also simply joined issues with them in a similar general manner. It is now through their Reply that Petitioners, who themselves seemed to have had no clear idea of what they meant by 2nd Respondent's non-qualification for the election or simply deliberately kept it back when filing their petition, want to now introduce through their Reply at a time when respondents have no further right of responding to them. Such unfair tactics cannot, and is not, allowed by our law.

It must be noted, too, that under Section 131 of the 1999 Constitution of this country, there are as many as four different qualifications a person must possess before he can contest presidential election and another 10

CA/PEPC/03/2023; CA/PEPC/04/2023; CA/PEPC/05/2023. 556



different grounds that can disqualify such a candidate who has all the four qualifications of section 131. Therefore, an assertion that merely says that a person is not qualified to contest election by reason of non-qualification, will leave not just the person so assailed but every other person involved, including the court, at a loss as to what the pleader has in mind. In fact, to allow such pleading will amount to upsetting the very essence of filing pleadings in a case, which is to give the adversary and the court a clear notice of the pleader's case - a point further fortified in Paragraph 16(1)(a) of the First Schedule to the Electoral Act 2022.

Still on this issue, I must also not fail to point out that the petitioners were only being clever by half when they claimed in paragraph 2.1 (b) of their Reply that they were simply giving, as they put it, 'further details' of the non-qualification of 2nd respondent by averring to the conviction, fine, certificate forgery and dual citizenship of 2nd Respondent that they raised in their Replies. They had never given any details of 2nd Respondent's non-qualification and so cannot talk about 'further details' let alone hide under such 'further' details to smuggle in the new facts they averred in paragraph 1.2 (i) (ii), (iii), (iv) (v) and 2.1(b) of their Reply.

These new allegations of petitioners are not also mere 'evidence' in support of their ground of his non-qualification as their counsel also tried to make them out. They are facts which can only be contained in the

CERTIFIED TRUE COPY

petition itself, and not in a petitioner's Reply to Respondent's defence to the Petition.

Paragraphs 2.1(b), (c) and (d) of the Reply where petitioners averred to no-uploading of polling station results by 1st respondent's presiding officers at the election, I also agree with 1st Respondent, are new issues or at best mere further denials by the Petitioners to 1st Respondent's denials of the averments in the petition. Such is also not permitted in a Reply: see again *Bakare & Anor v. Ibrahim (supra) Akeredolu v. Akinremi (supra); Egesimba v. Onuzuruike (supra); Spasco v. Alraine (supra), Ishola v. S.G.B.N. (supra); Obot v. C.B.N (supra)* earlier cited.

In the light of all the foregoing, the two witness statements as well as the List of documents accompanying that Reply, all of which were based on the new facts contained in the impugned paragraphs of the Reply in issue, are also incompetent and liable to be struck out.

In summary, 1st Respondent's application of 9th May 2023 succeeds in its entirety. Accordingly, paragraphs 1.2 (i) (ii), (iii), (iv) (v) and 2.1(b), (c) and (d) of the Petitioners' Reply filed on 20th April 2023 in response to the reply of 1st Respondent, together with the two witness statements on oath and the List of documents which accompanied that Reply, are all hereby struck out.

CA/PEPC/03/2023; CA/PEPC/04/2023; CA/PEPC/05/2023.

CERTIFIED TRUE COPY

**SECOND RESPONDENT'S APPLICATION OF 13/05/2022 SEEKING STRIKING OUT OF THE ENTIRE 26 PARAGRAPH REPLY OF PETITIONERS FILED ON 23RD APRIL 2023.**

Learned senior counsel on 2nd Respondent's behalf complained in their written address that petitioners in paragraph 2, 4, 7, 8, 9, 10, 11, 12, 15, 18, 19, 20, 21, 23, 24, 25, 26, 27, 28, 29, 30, 31, 32, 33 and 34 of Part B of the said Petitioners' Reply (they left out paragraphs 5,6 and 18 of the said reply) introduced new facts and issues which are overreaching, particularly in relation to various contrived facts relating to 2nd respondent/applicant's age, educational qualification, state of origin, circumstances of birth, amongst others, which were not in the petition. Not done, counsel complained, the petitioners also introduced brand new witness statements on oath to support and hold up the new facts introduced in the reply. These facts, counsel submitted, are clearly indicative of the fact that the petitioners are out on a hide and seek game against the applicant, a practice they said judicial authorities have firmly condemned. They also referenced the same cases of *Arhiavbere v. Oshiomhole* (2013) ALL FWLR (Pt. 687) 782 at 792, *Orji v. P.D.P.* (2019) 14 NWLR (Pt. 1161) 310 @ 403-404 for their argument that a reply is not a license for a Petitioner to rake in new issues tending to amend or add to the contents of his petition.

CERTIFIED TRUE COPY

Regarding the Witness Statement filed along with the impugned Reply by petitioners, Counsel again cited *Orji v. P.D.P.* (2019) 14 NWLR (Pt. 1161) 310 @ 403-404 to submit that there is no provision in the relevant practice directions that permits frontloading of a Witness Statement filed along with a Reply, so it is incompetent and should be struck out.

Counsel rounded up their written address by calling on us to strike out the entire 26-paragraph Reply served on 2nd Respondent by the petitioners. That is even as their application completely left out paragraphs 5 and 6, 20, 21, 22, 23 and 26 of the same reply.

In their response of 18/5/2023, counsel to the Petitioners submitted that petitioners simply responded to new issues raised by 2nd Respondent in his Reply to the petition so the Reply is in order and permitted by Paragraph 16(1) (a) of the First Schedule to the Electoral Act 2022.

*Resolution*

I am not even in the least persuaded by the argument of the petitioners that they simply replied to 'new issues' raised by 2nd Respondent in its Reply to their petition. The petitioners, like they did in their Reply to the reply of 1st Respondent, introduced fresh facts and issues of the non-qualification of 2nd respondent on grounds of his alleged criminal conviction/fine, forgery of documents and dual citizenship. That is foul

CERTIFIED TRUE COPY

play which Paragraph 16(1) (a) to the First Schedule of the Electoral Act 2022 expressly prohibits.

Consequently:

1.  Paragraphs 1(vii)(a)(b), (c) and (viii) of Part One as well as paragraphs 2, 3(i), (ii), (iii) of Part Two of the Reply of Petitioners to 2nd Respondent, wherein petitioners averred to the new facts of purported criminal conviction of/forfeiture proceedings against 2nd Respondent and avers to his purported dual citizenship as grounds of his non-qualification, are all hereby struck out.

2.  Paragraphs 8, 11(i), 24 and 25 of the Petition, we hold on the state of the authorities earlier considered, are also new facts or at best mere denials and so liable to be struck out, too, as they do not qualify as replies.

Barring the above, all other paragraphs of the Petitioners' Reply filed on 23rd of April 2023 stand either not objected to or the complaints against them are not made out.

In other words, the application of 2nd Respondent only succeeds partly as stated above.



CERTIFIED TRUE COPY

**THIRD RESPONDENT'S APPLICATION AS IT RELATES TO THE REPLY OF PETITIONERS FILED ON 23RD APRIL 2023 TO ITS REPLY.**

The argument of 3rd Respondent was also on the same grounds with that of 1st and 2nd Respondents. Like 1st and 2nd Respondent, 3rd Respondent also relied principally on Paragraph 16(1) (a) of the First Schedule of the Electoral Act 2022. Learned senior counsel on its behalf complained in its written address that:

(1)     Petitioners in paragraph 1, 3, 4, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 19, 24, and 25 (they left out paragraphs 5,6 and 18 of the said reply) of the said Reply introduced new facts into the petition.

(2)     That the averments in Part (B), paragraphs 2, 4, 7, 8, 9, 11, 15, 18, 19, 20, 21, 22, 23, 24, 25, 26, 27, 28, 29, 30, and 31 of the Petitioner's Reply constitute mere repetitions, rehash of facts already in the Petition, as they do not react to any fresh issue raised in the Reply of 3rd Respondent but merely restated what the Petitioners have previously stated, contrary to Paragraph 16(1) (a) of the First Schedule of the Electoral Act 2022.

(3)     That the averments in paragraphs 8, 10, 32, 33 and 34 of Petitioner's Reply to the Petition are fresh or new issues of fact which tend to add to the contents of the petition or otherwise



amend it, contrary to the provisions of paragraph 16(1) (a) of the First Schedule of the Electoral Act 2022.

For these reasons, counsel to 3rd Respondents urged us to also grant the application and strike out the paragraphs challenged.

On their part, counsel to the Petitioners again argued that the petitioners simply responded to new issues raised by 3rd respondent in its Reply, which they had a duty to respond to or else they would be deemed to have admitted them.

***Resolution***

I find it necessary to first observe that, like all the other replies of petitioners, the impugned Reply of Petitioners of 20/4/2023 that was served on 3rd Respondent is in Parts A and B. Part A is devoted solely to the Preliminary objection raised by 3rd Respondent in its reply to the petition (that Part is understandably not challenged by 3rd Respondent so it shall remain as it is). It is only Part B of that Reply that is challenged by 3rd Respondent and it is also this Part that contains in its paragraphs 32 and 33 the fresh facts of 2nd Respondent's alleged status as ex-convict and having dual citizenship, all of which they now insist disqualified him as a candidate for the election. These facts, I have already determined, can only be raised in the Petition and not in their Reply to the Respondent's Reply to their Petition. They therefore offend Paragraph

CA/PEPC/03/2023; CA/PEPC/04/2023; CA/PEPC/05/2023.



16(1) (a) of the First Schedule of the Electoral Act 2022 and are liable to be struck out.

Besides, these two paragraphs, every other averment in Part B of the Reply, bar last paragraph 35, are, as 3rd Respondent's counsel rightly pointed out, either mere denials of 3rd Respondent's Reply to the petition or repetitions of petitioners' averments in their petition and so not permissible in a Reply as per Paragraph 16(1) (a) of the First Schedule of the Electoral Act 2022. See again the cases of *Bakare & Anor v. Ibrahim (supra), Akeredolu v. Akinremi, Egesimba v. Onuzuruike (supra), Spasco v. Alraine, Ishola v. S.G.B.N. (supra)* and *Obot v. C.B.N* (supra). It is also not the law, as erroneously argued by petitioner's counsel, that failure to reply to facts averred by 3rd Respondent in his Reply to the petition would mean admission of those facts. Failure to deny averments contained in a statement of defence does not imply admission like it does with failure to deny averments in a statement of claim: see *Egesimba's case* (Ayoola, J.S.C.) at pages 14 to 15 of LPELR).

In summary, 3rd Respondent's application succeeds in its entirety; consequently, barring paragraph 35, the entire Part B of the Reply of petitioners to the Reply of 3rd Respondent is incompetent and is hereby struck out.

CERTIFIED TRUE COPY

That concludes and settles all seven applications/preliminary objections of Respondents.

Next is the objection that were raised by the Respondents in the course of the hearing of the petition against the admissibility of documents that were tendered by the petitioners in proof of their petition.

## RESPONDENTS' OBJECTIONS TO DOCUMENTS TENDERED BY PETITIONERS AT THE TRIAL

In the course of the hearing of this petition, objections were raised by the three respondents, first to the validity of the Witness Statements on Oath deposed to some by the witnesses of the petitioners, specifically **P.W.12** (Petitioner's 12th Witness Egwuma Friday), **P.W.13** (Grace Timothy), **P.W.14** (Grace Ajagbona), **P.W.15** (Abidemi Joseph), **P.W. 16** (Miss Edosa Obosa), **P.W.17** (Miss Alheri Ayuba), **P.W.18** (Miss Sadiya Mohammed Haruna), **P.W.21** (Mr. Samuel Oduntan – a Statistician); **P.W.23** (Janet Nuhu Turaki), **P.W.24** (Christopher Bulus Ardo), **P.W.25** (Victoria Sani), **P.W.26** (Hitler Ewunonu Nwala - a forensic Expert) and **P.W. 27** (Mr. Mike Enahoro-Ebah, a Legal Practitioner) whose witness statements were filed/deposed to long after the petition was filed and so did not accompany the petition as required by Paragraph 4(5)(b) of the 1st Schedule to the Electoral Act 2022, stating that the election petition shall be accompanied by a list of the witnesses that the


CERTIFIED TRUE COPY

petitioner intends to call in proof of the petition. This objection was argued comprehensively by counsel to parties and the ruling on it deferred by the court to final judgment.

Objections were also raised by Respondents to virtually all the documents tendered by the petitioners in proof of their petition, but unlike the earlier objection on witness statements, counsel only gave notice that they would give reasons for those objections in their final addresses. They have since fulfilled their promise by filing separate addresses on those objections.

The petitioners on their part also objected to some of the documents tendered by the respondents in the course of their defence and gave notice that they would also give reasons for their objection in an address to be filed at the close of evidence. They, however, seem to have had a change of mind and have not filed any written submissions as promised. I am therefore left with only the objections of the Respondents.

I now proceed consider the said objections of respondents.

1. The *Validity of the Witness Statements on Oath of P.W.'s (Petitioner's Witnesses) 12, 13, 14, 15, 16, 17, 18, 21, 23, 24, 25, 26 and 27 that did not accompany the Petition as required by Paragraph 4(5)(b) of the 1st Schedule to the Electoral Act 2022.*

CERTIFIED TRUE COPY

This objection was taken and comprehensively argued by 1st Respondent's counsel, first on 08/6/2023 when P.W.12, Mr. Egwuma Omachonu Friday, a Presiding officer in the disputed 25/2/2023 Presidential election, tried to adopt his Witness Statement on Oath which he deposed only on the 6th of June 2023, long after the petition was filed on 21st March 2023. Subsequently, when the Petitioners called their witnesses numbers 13-18, 21, and 23-27, who also only deposed to their witness statements in the same June 2023, long after the filing of the petition and even after hearing of the petition had commenced, Respondents' counsel again raised and adopted the same objections against those witness and their Witness statements. As explained earlier, the thrust of their objection which was championed by Chief Wole Olanipekun, S.A.N., for 2nd Respondent, was anchored on Paragraph 4(5)(b) of the 1st Schedule to the Electoral Act 2022 requiring that the election petition shall be accompanied by among others, witness statements on Oath of the witnesses the petitioner intends to call in proof of the petition. Learned counsel argued that in so far as the witness statements on Oath of the said witnesses of petitioners did not accompany the petition of petitioners as required by Paragraph 4(5)(b) and (6) and (7) of the 1st Schedule to the Electoral Act 2022, they were incompetent and cannot be relied on by petitioners or the witnesses concerned. It is irrelevant, counsel argued, that the said witnesses came

CERTIFIED TRUE COPY

to testify on subpoenas issued to them by this Court, as Paragraph 4(5)(b) of the 1st Schedule to the Electoral Act 2022 makes no distinction between ordinary witnesses and those on testifying on subpoena. Learned Senior counsel in further support of that argument cited to us the fairly recent decisions of this court in **SENATOR IFEANYI ARARUME V. INEC & ORS (2019) LPELR-48397 (CA)**; the Unreported decision of this court of 17/7/2020 in **ADVANCE NIGERIA DEMOCRATIC PARTY (ANDP) v. INEC & 2 ORS. (2020) IN APPEAL NO. CA/A/EPT/406/2020**, and **PEOPLES DEMOCRATIC PARTY V. OKOGBUO (2019) LPELR-4899989 (CA)** p.22-23; **AMAKIRI v. INEC & ORS (2019) LPELR-48677 (CA)** and **BASHIR & ANOR v. KURDULA & ORS (2019) LPELR-48473 (CA)**.

First and second respondents' counsel also made arguments to the same effect.

Opposing that argument, Chief Chris Uche, S.A.N., lead counsel for Petitioners, first referred us to Paragraph 54 of the 1st Schedule to the Electoral Act 2022, which provision learned senior counsel submitted made the Federal High Court (Civil Procedure) Rules applicable to this proceeding. In that respect, Counsel submitted, Order 3 Rules 2 and 3 and Order 20 Rules 15 and 16 of the Federal High Court (Civil Procedure) Rules 2019 are relevant. Counsel submitted that by Order 3 Rules 2 and 3 of the Federal High Court (Civil Procedure) Rules 2019, a subpoenaed

CERTIFIED TRUE COPY

witness shall be first served a subpoena before he can depose to a witness statement, so the Witness statements on oath of P.W.*12, 13, 14, 15, 16, 17, 18, 21, 23, 24, 25, 26 and 27* are in order in so far as all of them came to testify on subpoenas served on them by the Court. In support of his position, learned senior counsel cited the cases of ***Omidiran v. Patricia Etteh & Anor*** (2010) LPELR-9160 (CA); ***Lasun v. Awoyemi*** (2019) LPELR-11912 (CA), ***Edoho v. A.G. Akwa Ibom State*** (1999) 1 NWLR (Pt. 425) 488 @ 494; ***Sule v. Ologunebi*** (2015) LPELR-24746 (CA); ***Olaniyan V. Oyewole*** (2008) 5 NWLR (Pt. 1079) 114.

## *Resolution*

Now, this contention of Respondents has far-reaching consequences, as its resolution in favour of Respondents will result in the court discountenancing the evidence of all the Presiding Officers, namely P.W.12, 13, 14, 15, 16, 17, 18, 23, 24 and 25 who were in the Polling Units in the election and so were eyewitnesses to the alleged failure by INEC to transmit and upload the election results to IreV (a major pillar of the petition). It will also result in discountenancing the evidence, oral and documentary, presented of petitioners' two expert witnesses, P.W. 21 (Samuel Oduntan) and P.W.26 (Hitler Ewunonu Nwala), but also their last witness Mike Enahoro-Ebah (P.W. 27) who alone testified on the non-qualification of 2nd respondent for the election and tendered documents



in that direction. That is even as we must not fail to remind us that the relevant facts in the Petition and Replies of the petitioners that would have supported the evidence of P.W.s 21, 26 and 27 (Messrs Samuel Oduntan, Hitler Ewunonu Nwala and Mike Enahoro-Ebah) have already been found incompetent and struck out by this Court while ruling on the applications/preliminary objections of Respondents.

Coming back to the objection of Respondents that Paragraph 4(5) (b) of the 1st Schedule to the Electoral Act 2022 does not make any dichotomy between 'ordinary' witnesses and those testifying only on subpoena as regards the duty to frontload witness depositions along the petition, so the evidence of P.W.12, 13, 14, 15, 16, 17, 18, 21, 23, 24 and 25, 26 and 27 whose witness statements on Oath were not frontloaded with the petition are incompetent, Paragraph 4(5)(b) of the 1st Schedule to the Electoral Act 2022 reads thus:

4(5) **The election petition *shall* be accompanied by -**

**(b) Written statements on oath *of the witnesses*; and**

Clearly, this provision, particularly the word 'witnesses', whose written statements on oath the lawmakers require that 'shall' accompany the election petition, must be given its literal interpretation: see the recent decisions of this court in **Ogba v. Vincent** (2015) LPELR-40719 (CA); **Senator Ifeanyi Ararume v. INEC & Ors** (2019) LPELR-48397 (CA);

CA/PEPC/03/2023; CA/PEPC/04/2023; CA/PEPC/05/2023.

CERTIFIED TRUE COPY

Unreported decision of this court of 17/7/2020 in *Advance Nigeria Democratic Party (ANDP) v. INEC & 2 Ors*. (2020) in Appeal No. CA/A/EPT/406/2020, and *Peoples Democratic Party v. Okogbuo* (2019) LPELR-4899989 (CA) p.22-23 on the issue. Where the words of a statute or instrument are clear like paragraph 4(5)(b) of the 1ˢᵗ Schedule to the Electoral Act 2022 is, particularly the unqualified 'witnesses' employed there, the court has no duty than to give it its literal meaning.

Now, in *Advance Nigeria Democratic Party (ANDP) v. INEC & 2 Ors*. (2020) in Appeal No. CA/A/EPT/406/2020 this court - Ige, Nimpar (JJ.C.A.) and Agim, J.C.A. as he then was - was unanimous in its decision on the point in issue. Ige, JCA, pronouncing the leading judgment of the court at p. 39 of this court, had this to say:

> "...I am of firm view that if section 145 of the Electoral Act 2010 and paragraphs 3, 4, 54 of the First Schedule to the Electoral Act 2010 are juxtaposed with Order 3 Rules 2 and 3 of the Federal High Court (Civil Procedure) Rules 2019, *it is eminently clear that Order 3 Rules 2 and 3 of the Federal High Court (Civil Procedure) Rules 2019 is outrightly inapplicable to the situation the appellant finds itself in this case*. Paragraph 3 and 4 of the First Schedule to the Electoral Act 2010 contain express and adequate provisions as to what the contents of a petition should be and the documents that must be frontloaded and accompany an election petition, including a list of the witnesses that the Petitioner intends to call in proof




CERTIFIED TRUE COPY

**of the petition and more importantly WRITTEN STATEMENTS ON OATH OF THE WITNESSES. Copies or list of every document to be relied on or at the hearing of the Petition must also accompany the Petition. All of these items as stipulated or laid out in paragraph 4(5) must be filed simultaneous with and along with the Petition."**

With His Lordship adding further at p. 43:

**"There is no dichotomy between the witnesses mentioned in paragraph 4(5) of 1st Schedule to the Electoral Act in respect the witness statement on Oath of witnesses and witness statement on Oath of a subpoenaed witness. There is no distinction between ordinary witness and subpoenaed witnesses under paragraph 4(5) of 1st Schedule to the Electoral Act. In essence, paragraph 4(5) of 1st Schedule to the Electoral Act covers witness statements Oath of all categories of witnesses the petitioner intends to call at the trial of his or her petition."**

In **Senator Ifeanyi Ararume v. INEC & Ors** (2019) LPELR-48397 (CA), Tsammani, J.C.A. (with the concurrence of his brothers Owoade, Akinbami, Bolaji-Yusuff and Bayero, JJ.CA) again confirmed this position, when it said at page 34-35 that:

**"Learned counsel for the appellants has argued that the P.W.2 was before the Court on a subpoena therefore the tribunal could not turn around to prevent him from testifying. It is not disputed that the said witness was before the Court on a**



CERTIFIED TRUE COPY

> **subpoena ad testificandum,** but it must be realized that the witness was summoned on the application of the appellants. He was not summoned by the tribunal in the exercise of their powers pursuant to paragraph 41(5) and (6) of First Schedule to the Electoral Act. He was therefore, for all intents and purposes, witness for the appellants. In that respect, his written statement on Oath was subject to the requirements of the law as stipulated by Paragraph 4(5) of the First Schedule to the Electoral Act (supra). …….. Strict compliance with Paragraph 4(5) of the First Schedule to the Electoral Act is mandatory. It is of such a nature that there is sanction in subparagraph (6) of Paragraph 4."

Also see the decisions of this court in *Peoples' Democratic Party v. Okogbuo & Ors* (2019) LPELR-4899989 (CA) where we followed the same position taken by us in 2015 in the case of *Ogba v. Vincent* (2015) LPELR-40719 (CA) with Agim, J.CA. (as he then was) giving leading judgment as we shall soon show.

It is of interest that in all these cases, the earlier decisions of this court in *Omidiran v. Patricia Etteh & Anor* (2010) LPELR-9160 (CA) and *Lasun v. Awoyemi* (2019) LPELR-11912 (CA) relied on strongly by Mr Chris Uche, SAN, for the petitioners were cited and considered but departed from by this court.

Quite remarkably, too, in his book *Modern Nigerian Election Petitions and Appeals Law*, published in November 2017, which book Chief Chris



Uche (SAN), the lead counsel for petitioners herein wrote a glowing Foreword to, the learned author, Mr. Kelechi Peter Ikorogha, Esq., had this to say (at pages 138-140) while commenting on this same issue and the erstwhile position of this court in *Omidiran v. Etteh* (2011) 2 NWLR (Pt. 1232) 471 @ 489 and *Lasun v. Awoyemi* (2009) 16 NWLR (Pt. 1168) 513 relied on by Chief Uche (SAN):

> "Just like a petitioner in an election has 21 days from the date of the result of the petition to file his petition otherwise such a petition becomes statute barred, there is also a time limit to the period within which a petitioner is to file a deposition or other document not filed along with the Petition. Thus, all evidence required in proof of a case must as a pre-condition to exercise jurisdiction, be brought within the stipulated time frame, that is to say twenty-one days after the declaration of the result. The Supreme Court has consistently in a long line of cases insisted on this strict and inelastic approach in enforcing the electoral laws. Thus the efficacy of the decision in *OMIDIRAN V. ETTEH* (2011) 2 NWLR (Pt. 1232) 471 @ 489 [see also *Lasun v. Awoyemi* (2009) 16 NWLR (Pt. 1168) 513 @ 548-549], wherein the Court of Appeal held that it would be appropriate to meet the justice of the case for a tribunal to order the filing of witness depositions by subpoenaed witnesses outside the stipulated time frame, has been watered down, in that all evidence required in poof of the case must be brought within the stipulated time frame. See the case of *OGBA V. VINCENT & ORS* (2015) LPELR-40719 (CA) where the Court of



CERTIFIED TRUE COPY

Appeal [Agim, J.C.A., as he then was, in lead judgment], held thus:

> "I think that this court in *OMIDIRAN v. ETTEH* and the Supreme Court in *OKE v. MIMIKO* adopted different approaches in addressing the issue of whether a Tribunal or court can allow a witness deposition or other document not filed along with the Petition or not filed within the time allowed for filing election Petition to be filed and used in an election proceeding. *Omidiran's case* did not strictly enforce the time limits prescribed in section 141 of the Electoral Act 2006, the provisions in the first schedule thereto in prohibiting the introduction of additional facts in the proceedings after the period allowed for filing the Petition and closure of pleadings and paragraph 1(1) of the election Tribunal and Court Practice Directions 2006 and the content and form of the Petition. It held that the purpose of the Practice Direction is to guide and regulate compliance with and observance of the provisions of the First Schedule to the Act and the Federal High Court Rules, where applicable. *This elastic approach of the electoral laws by this court in that case is not in line with the current judicial approach of strict enforcement of Electoral laws and the current approach of applying the election Tribunal and Court Practice Directions as overriding the Rules of Court in election cases*. In OKE v. MIMIKO the Supreme Court approached the issue in keeping with the current

CERTIFIED TRUE COPY

judicial trend of strictly applying electoral laws and procedural rules and giving them supremacy over rules of court in lection cases. .... The law as laid out *strictisma juris* in OKE v. MIMIKO is that a witness deposition that is not filed along with the petition within the 21 days allowed for filing the petition cannot be filed in the proceedings. It held thus:

> '.... If there was an (sic) evidence which was fundamental to the determination of the petition, that evidence ought to have been placed willy-nilly before the tribunal within the time specified by the Electoral Act or any other Act. That evidence ought to be regarded as the spinal cord of the petition. *Even if it was being withheld by any person, there are several ways to go about placing same before the tribunal. The evidence Act is very clear on this. The Petitioner ought to have resorted to that procedure....*"

> (Italics all ours)

As said earlier, Chief Chris Uche, SAN, in his Foreword to that book glowingly endorsed this author's position and even recommended it to Judges like us in these words:

> "The author *has ably* and remarkably sought to examine the legal framework of Electoral legislation within the landscape of judicial decisions emanating from disputes arising from

CERTIFIED TRUE COPY

> elections in the context of election litigation from the preparation of the petition itself through pre-trial proceedings, the actual trial, the judgment and trial proceedings…… *This book truly stands out* in the midst of several other books in this field.
>
> "As an avid participant in electoral litigation, *I wholeheartedly recommend this book* to all, particularly to lawyers, Judges, students of electoral laws, litigants and as well as all stakeholders in the development of our constitutional democracy."

I shall hold counsel to his words, not just because they are coming from him but also because they are correct.

Permit me to still say a word or two of my own on Petitioners' contention that Order 3 Rules 2 and 3 of the Federal High Court (Civil Procedure) Rules 2019 permitting parties to file witness deposition of a subpoenaed witness even after commencement of their action applies automatically to election petitions by virtue of Paragraph 54 of the First Schedule to the Electoral Act 2022, so the Witnesses statement of their witnesses filed by them after hearing of the petition had long commenced were in order. In the first place, Paragraph 54 of the First Schedule to the Electoral Act 2022 simply states as follows:

> **Subject to the express provisions of this Act, the practice and procedure of the Tribunal or the Court in relation to an**


CERTIFIED TRUE COPY

> **election petition shall be as nearly as possible, similar to the practice and procedure of the Federal High Court in the exercise of its civil jurisdiction, and *the Civil Procedure Rules shall apply with such modifications as may be necessary to render them applicable having regard to the provisions of this Act*, as if the petitioner and the respondent were respectively the plaintiff and the defendant in an ordinary civil action. (Italics ours)**

This provision clearly makes application of the Civil Procedure Rules of the Federal High Court in election petitions 'subject to the express provisions of the Electoral Act." It is not the other way round of modifying provisions of the Act to agree with the Rules of the Federal High Court as suggested by Petitioners' counsel. That much, Paragraph 54 further clarifies by stating that even where the Federal High Court Rules are considered applicable, they "*shall [only] apply with such modifications* as may be necessary to render them applicable having regard to the provisions of this Act."

What all that means is that, where there is express provision in the Act on a particular situation, as it clearly is in Paragraph 4(5)(b) of the First Schedule to the Electoral Act 2022 that says the election petition *shall* be accompanied by 'Written statements on oath *of the witnesses*," the

CA/PEPC/03/2023; CA/PEPC/04/2023; CA/PEPC/05/2023.                    578


CERTIFIED TRUE COPY

provisions of the Federal High Court (Civil Procedure) Rules will not apply. Fortunately, there is again high authority in support of this position in the dictum of Muntaka-Coommassie, J.S.C., in **NWANKWO v. YAR'ADUA** (2010) 12 NWLR (Pt. 1209) 518 (S.C). There, His Lordship, after reproducing Paragraph 50 of the 1st Schedule to the Electoral Act 2006 (now Paragraph 54 of the 1st Schedule to the Electoral Act 2022), had this to say @ p. 581 paragraph F-G:

> **"From the above, it is crystal clear that the provisions of the Federal High Court Rules are subject to the provisions of the First Schedule of the Electoral Act 2006, and if there is any conflict between them the provisions of the Rules under the Electoral Act will prevail. It is where there is a lacuna in the provision of the Rules provided in the Electoral Act 2006 that the provisions of the Federal High Court Rules will apply."**

I shall also add that Parliament having expressly stated without dichotomy in Paragraph 4(5)(b) of the First Schedule to the Electoral Act 2022 that Petitioners shall frontload witness statements of their witnesses along with their petitions, it is not within the province of the Court to give that provision a different interpretation. It is also of no moment that in the court's opinion the said literal meaning of Paragraph 4(5)(b) of the First Schedule to the Electoral Act 2022 seems harsh and may not meet the justice of the case, as is being suggested by the petitioners that subpoena is only issued to an unwilling witness so it is

CERTIFIED TRUE COPY

not contemplated by Paragraph 4(5)(b) of the First Schedule to the Electoral Act 2022 that a witness on subpoena should also depose to a witness statement before the subpoena to compel his attendance is served on him by the court. If anything, that argument rather brings to mind the very strong admonition by the British House of Lords of Lord Denning, M.R., in **DUPORT STEELS LTD v. SIRS** (1980) 1 ALL E.R. 529, where it was said by Lord Scarman in his Speech at p. 551 (on an appeal from Lord Denning's Lead judgment in that case) that:

> "But in the field of statute law the Judge must be obedient to the will of Parliament as expressed in its enactments. In this field Parliament makes and unmakes the law, the judge's duty is to interpret and to apply the law, not to change it to meet the judge's idea of what justice requires. Interpretation does, of course, imply in the interpreter a power of choice where differing constructions is possible. But our law requires that the judge choose the construction which in his judgment best meets the legislative purpose of the enactment. *If the result is unjust but inevitable, the judge may say so and invite Parliament to reconsider the provision. But he must not deny the statute.* Unpalatable statute may not be disregarded or rejected, merely because it is unpalatable. Only if a just result can be achieved without violating the legislative purpose of the statute may the judge select the construction which best suits his idea of what justice requires."



CERTIFIED TRUE COPY

That is the settled position of the law even in this country: see **NDOMA-EGBA V. CHUKWWUOGOR** (2004) 2 S.C. (Pt. 1) 107 @ 114-115 (Uwaifo, J.S.C.); **AROMOLARAN V. AGORO** (2015) ALL FWLR (Pt. 766) 574 @ 613 (Kekere-Ekun, JSC); **COCA-COLA (NIG.) LTD V. AKINSANYA** (2017) 17 NWLR (Pt. 1593) 74 @ 127-128 (Eko, JSC). That much Onnoghen JSC, later CJN, in **GLOBAL EXCELLENCE COMMUNICATIONS LTD & ORS V. DONALD DUKE** (2007) LPELR-1323 (SC) at p. 19-20, summarized aptly when he said that:

> *"The duty of the court is not to deal with the law as it ought to be but as it is."*

Paragraph 4(5)(b) of the First Schedule to the Electoral Act 2022, I will even venture to say further, appears to have been inserted by Parliament in further realisation of the *sui generis*/time-bound nature of election proceedings, a point further driven home by the *Constitution of the Federal Republic of Nigeria (Second Alteration Act) 2010* which introduced among others a new Section 285(6) into the 1999 Constitution. That provision states that an election tribunal or court shall deliver its judgment in writing within 180 days from the date of filing of the petition. This time limit for disposal of proceedings, it must be noted, is peculiar to election petition proceedings in our body of laws. It is not found in any other proceeding in the entire body of laws of this country.

CA/PEPC/03/2023; CA/PEPC/04/2023; CA/PEPC/05/2023.                     581

 CERTIFIED TRUE COPY

It thus imposes on the election court or tribunal a duty to properly utilise its case management/pre-hearing session as effectively as possible to carefully plan the future course and particularly its plenary hearing of every petition, so as not to fall foul of the maximum 180-days limit. That necessarily includes trimming the number of witnesses, where necessary, once pleadings are closed in the petition. That is also the point echoed by this court in **Peoples' Democratic Party v. Chibuzor Okogbuo & Ors** (2019) LPELR-48989 (CA) at p.24-25, when it said (per Orji-Abadua, JCA) that:

> "What is deducible is that Witness Deposition filed by a witness not listed in the Petition cannot be countenanced by the Court or Tribunal after the expiration of the time prescribed for the filing of the Petition. It was stressed by this court therein that to allow a Petitioner to file an additional witness statement at any stage of the Election proceedings would destroy the regulated environment that must exist to ensure that both parties to the petition are expeditiously heard and the Petition determined within 180 days from the date of the Petition. *This court observed that such an indulgence would remove the control of the pace of the proceedings from the control of the Constitution, the Electoral Act and the First Schedule to the Electoral Act and leave it at the whim of the parties and open the floodgate for all kinds of abuses of the judicial process.*"



CERTIFIED TRUE COPY

I think the same point is also deducible from the following dictum of Tobi, J.S.C., in his lead judgment in **Buhari v, INEC** (2008) LPELR-814 (SC) p. 97 paragraph A-B:

> "The whole concept of Election Petition being *sui generis*, in my view, is to project the peculiarity of the reliefs sought, *the time element* and <u>*peculiar procedure*</u> *adopted for the hearing of the petition* and all that."

It is quite interesting that what follows immediately after the above dictum, is another statement by His Lordship Tobi, JSC, emphasizing the need for witness statements to accompany an election petition as directed by Paragraph 1(1)(b) of the then Election Tribunal Practice Directions (now Paragraph 4(5)(b) of the First Schedule to the Electoral Act 2022. In pronouncing similar depositions in **Buhari v. INEC supra** incompetent for non-compliance with that provision, Tobi, JSC, again had this to say at p.97-98:

> "These depositions by paragraph 1(1)(b) of the Practice Directions are joined to the petition and they will go a long way to prove the petition. This is clear from the language of the sub-paragraph which is as follows:
>
> **1(1) ALL Petitions to be presented before the Tribunal or court shall be accompanied by ....... (b) written statements on oaths of the witnesses....."**




CERTIFIED TRUE COPY

"The operative word is 'accompanied', which means co-exist, or join."

(Italics ours)

See also the judgment of the apex court's in *Oke v. Mimiko* (2013) LPELR-20645 (SC) relied on by this court in *Ogba v. Vincent (supra).*

By rules of stare decisis, this court is bound not only by decisions of the apex court but also by its own previous decisions: see *Victor J. Rossek & Ors. v. African Continental Bank Ltd & Ors.* (1993) LPELR-2955 (SC) p.80; *I.T.P.P. Ltd v. UBN Ltd* (2006)12 NWLR (Pt. 995) 483 @ 504 paragraph A-C (Ogbuagu, JSC).

The long and short of all the foregoing is that the objection of the respondents to the witness statements of P.W. **12** (Egwuma Friday), **P.W.13** (Grace Timothy), **P.W.14** (Grace Ajagbona), **P.W.15** (Abidemi Joseph), **P.W. 16** (Miss Edosa Obosa), **P.W.17** (Miss Alheri Ayuba), **P.W.18** (Miss Sadiya Mohammed Haruna), **P.W.21** (Mr. Samuel Oduntan – the Statistician); **P.W.23** (Janet Nuhu Turaki), **P.W.24** (Christopher Bulus Ardo), **P.W.25** (Victoria Sani), **P.W.26** (Hitler Ewunonu Nwala - forensic Expert), and **P.W. 27** (Mr. Mike Enahoro-Ebah, Legal Practitioner) which did not accompany the Petition as required by Paragraph 4(5)(b) of the First Schedule to the Electoral Act, is hereby

CERTIFIED TRUE COPY

sustained and the said witness statements, being incompetent, are hereby struck out and expunged from the records of this court.

The further consequence of that decision is that, given the provisions of Paragraph 41(3) of the same First Schedule to the Electoral Act 2022 stating that:

> "There shall be no oral examination of a witness during his evidence-in-chief except to lead the witness to adopt his written deposition and tender in evidence all disputed documents or *other exhibits referred to in the deposition*;"

it follows that all the evidence, including evidence in cross-examination and all documents (Reports included, namely PAH1, PAH2, PAH3 and PAH4 and PAR1[A], PAR1[B], PAR1[C], PAR1[D], PAR1 [E] and PAR1[F] and *PBD, PBD1A, PBD1B, PBD1C, PBD1D, PBD1A, PBD2A, PBD3, PBD4, PBE1, PBE2, PBE3, PBE4, PBE5, PBE6, PBF1, PBF2, PBF3 and PBF4)* coming from and tendered by the said Petitioners' Witnesses, namely P.Ws. 12, 13, 14, 15, 16, 17, 18, 21, 22, 23, 24, 26 and 27 aforementioned, are incompetent and hereby also expunged from the records.

## OTHER OBJECTIONS OF THE RESPONDENTS

That takes me to the other objections raised by the respondents to the admission of documents tendered by petitioners at the hearing, which

CERTIFIED TRUE COPY

objections they only gave notice that they would give reasons at final address stage. All three respondents filed their submissions on the objections and adopted them on 1/8/2023. Petitioners on the same 1/8/2023 also adopted their responses to those objections.

Before going into the objections, I deem it necessary to first dispose of the preliminary argument of counsel to petitioners that some of the documents objected to by respondents are electoral materials certified by First Respondent (INEC) which documents parties had agreed at the pre-hearing session that they would not object to, so Respondents cannot resile from that agreement and raise objection as they are doing. They even cited section 169 of the Evidence Act 2011 to say Respondents are estopped from resiling from that agreement.

The simple answer to that argument is that, this court and indeed every court is bound to act on only admissible evidence, so if a document or piece of evidence is inadmissible in evidence, the court must expunge it, and it must do so even if that will require it to overrule its own interlocutory decision admitting that evidence. See on that *Francis Shanu & Anor. v Afribank Nigeria Plc* (2002) 17 NWLR (Pt 795) 185; (2002) LPELR-3036 (SC), p. 28 paragraph A-B (Uwaifo, JSC). Counsel, as ministers in the temple of justice, are therefore within their right, and in fact duty-bound, to draw the court's attention to that fact, regardless of whatever

CERTIFIED TRUE COPY

agreement they may have had with petitioners at the pre-hearing session. In any event, the court is only bound to honour lawful agreements, not unlawful ones to admit evidence that may well be inadmissible.

With that said, I now proceed to the objections as contained in the addresses filed by Respondents. Here, I shall take them together as I would have done if the reasons now advanced for them were canvassed earlier.

***First is Respondents' allegation of Improper or non-Certification of INEC Documents***: Counsel to 1st Respondent in paragraphs 1.34 to 1.36 of 1st Respondent's written address 14/7/23, 2nd Respondent at Paragraph 3.13 of his 20/7/23 address, and 3rd Respondent in paragraph 1.14 of its written address on objections filed on 14/7/23, all argued that payment for certification is one condition precedent under section 104 of the Evidence Act 2011 for certification of public document. They said petitioners did not pay for certification of some INEC documents, specifically Exhibits PAJ1-PAJ37, PAJ38, PAJ39A-F, PAJ40, PAJ41- PAJ47, PAK1- PAK13, PAL1, PAL2, PAQ-PAQ14, EXHIBITS PAS1-PAS20, PATI-PAT17, PAU1-PAU27, PAV-PAV20, PAW1-PAW25, PAX1-PAX13, PAY1-PAY18, PAZ1-PAZ17, PBA17-PBA27, PBB1-PBB21, and did not provide any evidence of payment of certification fees. Learned Counsel all citing the



cases of **Tabik Investment Ltd v. Gtb** (2011) 17 NWLR (Pt. 1275) 240, **Jimoh v. Hon. Minister of Federal Capital Territory** (2019) 5 NWLR (Pt. 1664) 45 @ 64 and **Emeka v. Chuba Ikpeazu & Ors** (2019) 5 NWLR (Pt. 1664) 45 @ 64, argued that certification fees for the said documents having not being paid for by petitioners, the documents remain inadmissible and liable to be expunged from the records.

Petitioners in response argued (in paragraph 4.1 and 6.0 to 6.2, paragraph 2.13 of their response to 2nd Respondent, and 2.6 – 2.7 of their response to 3rd respondent) that they actually paid certification fees to 1st Respondent for the said documents and they were issued receipts by 1st Respondent. Some of those receipts, they said, were attached to the documents themselves while others were separately receipted for, including in one instance payment of N6,669,301.25 and another for N150,967.50. They argued that it was therefore unconscionable of 1st respondent who collected such huge sums of money from them to turn around and plead non-payment of certification fees. Leaned senior counsel on Petitioners' behalf also pleaded the Evidence Act's presumption of regularity of official acts and submitted that it is was strange that a public institution like 1st Respondent would come before a court of law to disown documents officially issued by it.

CERTIFIED TRUE COPY

In specific response to 3rd Respondent's argument, counsel to petitioners argued that section 104(1) and (2) of the Evidence Act 2011 does not prescribe that the amount paid for certification must be reflected on the certified true copy of the document as part of the certification, so the argument of 3rd Respondent's counsel that because the certification of the said exhibits did not carry the amount paid for certification, certification fees was not paid for is clearly erroneous.

Now, section 104 of the Evidence Act 2011 simply states that:

> **Every public officer having custody of a public document which any person has a right to inspect shall give that person on demand a copy of it on payment of the legal fees prescribed in that respect, together with a certificate written at the foot of such copy that it is a certified true copy of such document or part of it as the case may be.**

> **(2)   The certificate mentioned in subsection (1) of this section shall be dated and subscribed by such officer with his name and his official title, and shall be sealed, whenever such officer is authorized by law to make use of a seal, and such copies shall be called certified true copies.**

There is nothing in the foregoing provision, particularly subsection (2) dealing with what should appear on the certification, that suggests that the fees paid for certification of a public document should also appear on the face of the document like the date, name and official title of the



public officer issuing that document, as required by subsection (2). Payment of certification fees is only a condition-precedent to the certification, so it could be stated in any other place, including another document. That point, this court also made plain in answer to a similar argument in **Daggash v. Bulama** (2004) 14 NWLR (Pt. 892) 144 @ 187 when it said that:

> "Payment of legal fee on application for a certified true copy is not part of the condition to make a document so certified a certified true copy. It is only a condition which must be fulfilled before the officer certifies a document."

See also **Uzoma v. Asodike** (2010) ALL FWLR (Pt. 548) 853 @ 868-869; **ANPP v. PDP** (2006) 17 NWLR (Pt. 1009) 467 @ 490 where it was said that certification fee payment contained in separate documents is sufficient. In this case, not only is there evidence of certification fee payment by petitioners first in the form of Exhibit PD, showing payment by petitioners to INEC of the sum of ₦150,967.50 for some documents, there is also a second INEC Receipt in INEC's own letter-head and attached to Exhibit PAF 4C. This latter document evidencing further payment of certification sum of ₦ 6, 696.301.50k by the petitioners' *"Atiku/PDP Legal Team",* shows that it was made vide Receipt No RRR: 27084265 3235 and on INEC's Receipt No 069727 of 25-05-2023. It specifically states on its face thus:

CA/PEPC/03/2023; CA/PEPC/04/2023; CA/PEPC/05/2023.



> ".. the sum of Six Million, Six Hundred and Ninety-Six Thousand, Three Hundred and One Naira and Twenty-Five Kobo only being Payment for CTC IPO Electronic of copy of data *level* (not very legible) with time stamp/event history/polling units of EC8As & S yet to be uploaded, Form EC9 *& Other documents* 2023 Presidential Election." (Italics ours)

All that, in my opinion, is sufficient evidence of certification fee payment, even more so when the receipt indicates that the said payment also covers 'other documents' outside those specifically mentioned therein. The burden had thus shifted to 1st Respondent (INEC) to show that the monies it received from petitioners for certification fee payment did not cover the documents they are now talking about, which documents INEC interestingly also certified. That burden, INEC never discharged, especially when account is taken of the fact that it did not even give the amount assessed, if any, that petitioners were owing them for certification. By the provisions of section 104(1) of the Evidence Act an applicant for certification of public document is only obliged to pay what is assessed by the public officer. What is more, the mere fact that respondent certified the said documents for petitioners, coupled with the evidence of certification fee payment by petitioners in Exhibits PD and PAF 4C, sufficiently triggers the provisions of section 168(1) of the Evidence Act 2011 that says "when any judicial or official act is shown to have been done in a manner substantially regular, it is presumed that




CERTIFIED TRUE COPY

formal requisites for its validity were complied with." This ground of the objection is therefore overruled.

***ALLEGED ENGRAVEMENT OF CERTIFICATION***: It was also argued by Respondents, relying on ***BELGORE V. AHMED* (2013) 8 NWLR (Pt.1355) 60 @ 100 (SC)**, that certification of the same documents was done by the public officer of INEC by engravement of his name, official title and date, instead of subscription, so that also invalidated the documents and rendered them inadmissible.

I have carefully perused the said documents and verified that that unlike ***Belgore v. Ahmed (supra),*** the documents in issue here bear the long-hand signature of the relevant certifying public officer of INEC. That, in our opinion, is substantial compliance with section 104 of the Evidence Act and attracts the presumption of genuineness vide section 146 of the Evidence Act.

1st and 2nd Respondents in particular also argued that Exhibits PAH1, PAH2, PAH3 and PAH4 tendered by P.W.21 (Mr. Samuel Oduntan) and Exhibits PAR1[A-F] tendered by P.W.26 (Mr Hitler Ewunonu Nwala), were made during the pendency of this proceeding or in anticipation of it and therefore inadmissible in evidence by virtue of section 83(3) of the Evidence Act 2011. In their response, the Petitioners argued that the said documents were made pursuant to the orders of this Court, pursuant to

CERTIFIED TRUE COPY

Section 146(1) of the Electoral Act 2022 permitting them to inspect documents, so they were properly before the court.

Much as I am not oblivious of our earlier ruling that these same documents, coming from witnesses whose witness statements on oath were not frontloaded with the petition, are incompetent and so already struck out, I am also of the opinion that petitioners seem to completely misconceive the objection raised by the Respondents, which is to the effect that the said documents having been undeniably made during the pendency of this petition or in anticipation of it, are rendered inadmissible by the principal law guiding admissibility of evidence: the Evidence Act 2011 and its Section 83(3). It is therefore lame of the Petitioners to found their breach of that provision on account of the orders of this court made pursuant to section 146(1) of the Electoral Act 2022 that they be allowed to inspect polling documents in the custody of INEC. In any case, section 146(1) of the Electoral Act 2022 merely states that "An order for inspection of a polling document or any other document or packet in the custody of the Chief National Electoral Commissioner or any other officer of the Commission may be made by an Election Tribunal or a Court of competent jurisdiction if it is satisfied that the order required is for the purpose of instituting, maintaining or defending an election." This does not in any way give Petitioners the leeway to adduce evidence in breach of section 83(3) of the Evidence Act

CERTIFIED TRUE COPY

2011. Section 146(1) of the Electoral Act 2022 and the interim orders of this court only permitted the petitioners to inspect election documents for the purposes of "instituting or maintaining" an election petition. Nothing in that provision allows a petitioner to file evidence, let alone the bulky expert Reports as in Exhibits PAH1-4 and PAR1$^{A-F}$, during the pendency of the petition. The whole idea behind section 83(3) of the Evidence Act 2011 is to eliminate the danger inherent in allowing a party to manufacture and bring in evidence specifically tailored in anticipation of a case or worse still produce such fresh evidence after the case had begun and parties had fully joined issues in it. That is exactly what the Petitioners sought to do with Exhibits PAH1-4 and PAR1$^{A-F}$ prepared and filed by their experts long after pleadings in the petition had closed, when Respondents would no longer have the opportunity of retaining their own experts to respond to the evidence presented against them in the said Reports. I am in agreement with the Respondents, and hereby uphold their objection, that the said Reports, which were admitted in evidence as Exhibits PAH1, PAH2, PAH3 and PAH4 and PAR1$^A$, PAR1$^B$, PAR1$^C$, PAR1$^D$, PAR1 $^E$ and PAR1$^F$ are, without prejudice to our earlier decision that they are incompetent, is also rendered inadmissible in evidence by virtue of section 83(3) of the Evidence Act 2011.



*INADMISSIBILITY OF ELECTION DOCUMENTS TENDERED AS EXHIBITS BY PETITIONERS ON GROUNDS OF ABSENCE OF PLEADING TO SUPPORT THEM AND CONSEQUENTIAL IRRELEVANCE TO THE PETITION*

The Respondents' argument here went thus:

(i)That Exhibits PC, PC1- PC36, being Collation Result Sheets in respect of Abia, Adamawa, Akwa Ibom, Anambra, Bauchi, Bayelsa, Cross River, Delta, Edo, Enugu, Gombe, Imo, Kaduna, Katsina, Kebbi, Niger, Osun, and Taraba States, are inadmissible in evidence, because, according to the 2nd Respondent, the Petitioners did not agitate any complaint in respect of them in their petition.

(ii) That Exhibits PG, PG1 – PG36, being BVAS Reports for Abia, Adamawa, Akwa Ibom, Anambra, Bauchi, Bayelsa, Cross River, Delta, Edo, Enugu, Gombe, Imo, Kaduna, Katsina, Kebbi, Niger, Osun, Yobe and Zamfara States, tendered by the petitioners are also inadmissible because, Petitioners, according to 2nd Respondent (INEC), did not ventilate any complaint in their petition relating to Bi-modal Accreditation System (BVAS) with respect to the said States.

(iii) That Exhibits PH, PH1–PH5, PH8-PH8, PH9, PH11, PH13, PH15, PH17, PH19, PH20, PH25, PH28 and PH35, which relate to INEC data on the number of registered voters and PVCs collected for the 2023 elections for




Abia, Adamawa, Akwa Ibom, Anambra, Bauchi, Bayelsa, Cross River, Delta, Edo, Enugu, Gombe, Imo, Kaduna, Katsina, Kebbi, Niger, Osun, Yobe and Zamfara States, are also inadmissible because Petitioners, according to 2nd Respondent, did not make any complaint in their petition with respect to the said States.

(iv) That Exhibits PK, PK1 - PK9, PL1 – PL23, PN1 – PN23, PQ1-20, and PR1-3, all of which are Forms EC8As downloaded from INEC's IreV portal for Local Government Areas in *Bayelsa and Kaduna States,* and Forms EC8Bs, EC8Cs and EC40G for Local Areas in Kaduna State respectively, are also inadmissible in evidence because Petitioners, according to 2nd Respondent, joined this time by 1st Respondent (INEC), did not complain about the elections in Bayelsa and Kaduna States.

(v) Furthermore, that Exhibits PN1-PN23, PQ1- PQ 20, PR1-PR3, PT1-PT33, which are Printouts of Bimodal Voters Accreditation data, with details including time-stamp for the presidential election, were not pleaded in the petition and so, according to 2nd Respondent, also irrelevant and inadmissible in evidence.

(vi) that Exhibits PP1-PP21 and PW1-PW10, which are Forms EC8Bs downloaded from the IREV for 21 Local Government Areas of Kogi State, and Forms EC8Bs for 10 Local Government Areas of Kogi State

CERTIFIED TRUE COPY

respectively, were according to INEC not specifically pleaded by the petitioners so they were also inadmissible in evidence.

(vii) that Exhibits PJ1-PJ18, PM1-PM20, PS1-PS10, PAK1-PAK13, PAL1, PAQ1-PAQ14, PAS1-PAS20, PAT1-PAT17, PAU1-PAU27, PAV1-PAV27, PBA1- PAB27 and PABB1-PBB21 were irrelevant, same being not pleaded by petitioners, according to 1st Respondent (INEC), and so inadmissible in evidence.

Third Respondent was also in agreement with 1st and 2nd respondents in most of these arguments of inadmissibility on grounds of failure of pleading and consequential irrelevance to the petition.

Petitioners through their counsel argued that their Petition covers the entire country; that in any case, in an election dispute all election materials and documents are relevant.

*Resolution*

It appears clear to me that the Respondents' objection here is misconceived and founded on an isolated reading of Paragraph 143 of the Petition where the petitioners averred that "…. the 1st Respondent and its agents wrongly and deliberately entered wrong scores/results for the underlisted 22 (twenty-two) States, namely: …. viz (Petitioners then went on to specifically mention Abia, Adamawa, Akwa Ibom, Anambra,

CERTIFIED TRUE COPY

Bauchi, Bayelsa, Cross River, Delta, Edo, Enugu, Gombe, Imo, Kaduna, Katsina, Kebbi, Niger, Osun, and Taraba States)." Pleadings of party is not read in that isolated manner to get at a party's complaint. Pleadings must be read holistically to get at the complaint in issue. If that is done as it should be, the respondents would have come across where Petitioners left no one in doubt that their complaint about the election is nationwide and not isolated to only some few States. That much is clear first from paragraph 107 of the petition where Petitioners averred as follows:

107. The petitioners shall give evidence to show the election results as purportedly declared by the 1st Respondent *in respect of each State of the Federation*, including the Federal Capital Territory, the details of which are contained in the table below, *are wrong*: (Italics ours)

They then proceeded to list each and every State of the Federation, including the Federal Capital Territory. They also gave in the table the 'wrong' election figures declared by INEC for each State and the FCT. In Paragraph 147 of their same Petition, they listed 60 different types/sets of documents they intended relying on to prove the said averment in paragraph 107 of the wrongness of the result declared by INEC for each State and the F.C.T. in the Presidential election. Among those documents listed by them are (a) BVAS CTC Reports, (b) Forms EC8 Series (EC8A,



EC8B, EC8C, EC8D, EC8D(A), EC8E - Certificate of Return received by Petitioners' agents at the election; (c) Summary of total Registered voters on Units basis; (d) Summary of PVCs collected on unit basis; (e) Data and Event logs from all BVAs machines used in the election, and (f) PVC Collection records. These documents were specifically listed at paragraphs 147(1), (6), (36), (37), (56) and (57) of the petition. These are the same averments/documents Respondents are asserting were not pleaded by the Petitioners and so irrelevant and inadmissible in evidence. They are wrong. This ambit of the objection of Respondents is therefore overruled and rejected.

## OBJECTIONS MADE BY ONLY 3RD RESPONDENT

The next set of objections to documents tendered by petitioners were raised by only 3rd Respondent. I now proceed to consider them.

1. **Admissibility of Video clips**: The argument that the Video Clips, Exhibits PAF1-PAF3, showing statements made by INEC chairman; Mr Festus Okoye, National Commissioner of INEC; and the European Union Election Observer Team, being statements contained in a 'computer' (as computer is defined in the Evidence Act) did not comply with Section 84 of the same Evidence Act, reason being that Dr Alex Adum Ter (P.W.19) who tendered them and made the Authentication Certificate pursuant to section 84 of the Evidence Act is not their



originator and so not in a position to give evidence that will satisfy the requirements of section 84 of the Evidence Act. It was further argued by 3rd Respondent's Counsel that Dr Ter was not in a position to be cross-examined on the said video clips so they were hearsay evidence coming from him and therefore inadmissible in evidence on that ground, too.

I am, however, of the opinion that this contention is also misconceived, especially when regard is had to paragraphs 1(a), (b), (e) (f) and (g) of the Certificate of Authentication of the said video clips made by P.w.19, Dr Ter.

The authentication required by Section 84 of the Evidence Act, in the circumstances the video clips in issue were made, is statements assuring the court that they are in the exact same state they were in the internet from where Dr Ter (P.W.19) downloaded them to his laptop computer and subsequently to his flash drives before bringing them to this court. That much is evident in the contents of Dr Ter's Certificate in Exhibit PAF 4B above. For the same reason, the argument that Dr Ter is not in a position to answer questions on the said clips and so his evidence on them is hearsay is also *non sequitur*.

2. ***Dumping of documents on court as a ground for inadmissibility***:
   Next is 3rd Respondent's argument that Exhibits PE, PF, PJ1-PJ17,



PK1-8, PL1-23, PM1-20, PN1-23, PP1-PP21, PQ1-PQ20, PR1-PR3, PS1-PS10, PT1-PT33, PW1-PW10, PAF1-PAF3, PAF4-, PAF4B, PAF4C, PAH1-PAH4, PAJ38, PAJ39, PAJ40 ABC, PAJ 41, PAK1-PAK13, PAL1-PAL2, PAR1-PAR(ABCDEF), PAS-PAS20, PAT1-PAT17, PAU-PAU27, PAV1-PAV19, PAW1-PAW28, PAX1-PAX13, PAY1-PAY18, PAZ1-PAZ17, PBA1-PBA27, PBB1-PBB21 tendered by petitioners were simply dumped on the court, and not linked to the parts of their case they intended using them, so they should be expunged on that ground too.

The simple and straightforward answer to this argument is that the issue of dumping of documents on court, which expression in any case suggests that the documents so dumped are already in evidence before the court, only goes to the weight to be attached to the documents by the court. On this reasoning, this ground of the objection is rejected and overruled.

3.*That some documents tendered were either made during the pendency of this proceeding and/or in anticipation of it and by interested persons:* Third Respondent also argued that Exhibits PAH1, PAH2, PAH3 and PAH4 made and tendered by P.W.21 (Mr. Samuel Oduntan), and Exhibits PAR1 (A, B, C, D, E and F) of P.W. 26 (Mr. Hitler Ewunonu Nwala) were not only made during the pendency of this



proceeding and/or in anticipation of it but also made by persons who were well remunerated by the petitioners so they offend section 83(3) of the Evidence Act 2011 and so inadmissible in evidence.

It was also submitted that P.W.21 who produced Exhibits PAH1, PAH2, PAH3 and PAH4 did not produce any certificate to back up his said expertise in the relevant field to make his Reports admissible in law; that besides, the purported Election Forms EC8As with which he claims to have made his analysis were not even produced by him, just as P.W.26 did not also identify the BVAS machines upon which he claimed to have conducted forensic analysis on, so their Reports, according to 3rd Respondent, should also be 'treated with caution'. Counsel cited *U.T.B. v. Awanzigana Ent. Ltd* (1994) 6 NWLR (Pt. 348) 56 @ 77 on this point.

The Petitioners did not answer 3rd respondent's argument that P.W. 21 and 26 made their Reports during the pendency of this petition or in anticipation of it. All they said in paragraph 2.25 of their Reply in response to that objection was that there was no evidence before the court to show that P.W. 21 is a member of 2nd Petitioner to be tagged an interested party in the outcome of the petition by virtue of section 83(3) of the Evidence Act.

My answer to the objection of 3rd Respondent, first, is that whether a person is an expert to give testimony in a court does not necessarily



depend on acquisition of certificates in the field concerned: see **Aigbadion v. The State** (1999) 1 NWLR (Pt. 586) 173. That is just as the issues of whether a witness is the maker of a document also only goes to the weight to be attached to that witness's evidence and not one that affects admissibility: See **Omega Bank (Nig.) Plc v. O.B.C. Ltd** (2005) 8 NWLR (Pt. 928) 547; (2005) LPELR-2636 (SC) p. 36-37; **G. Chitex Ind. Ltd v. O.B.I. (Nig.) Ltd** (2005)14 NWLR (Pt. 945) 392 @ 411 paragraph F-G (S.C).

Coming to the issue of whether the documents in issue were either made during the pendency of this proceeding and/or in anticipation of it and by interested persons, I must say that, aside our earlier ruling, which I hereby affirm, that the impeached Exhibits PAH1, PAH2, PAH3 and PAH4 of Mr. Samuel Oduntan (P.W.21) and PAR1 (A, B, C, D, E and F) of P.W. 26 are even incompetent by reason of petitioners' failure to accompany their petition with P.W. 21 and 26's witness statements in line with Paragraph 4(5)(b) of the First Schedule of the Electoral Act, it is also clear to me that 3rd Respondent's argument that Exhibits PAH1, PAH2, PAH3 and PAH4 of and PAR1 (A, B, C, D, E and F) were not only made by P.W. 21 and 26 during the pendency of this petition but P.W.21 in particular even admitted that he was well remunerated by the petitioners for his work. Their Reports are therefore inadmissible in evidence by virtue of Section 83(3) of the Evidence Act 2011. A document made in anticipation

CERTIFIED TRUE COPY

of litigation or during its pendency by persons interested is rendered inadmissible by section 83(3) of the Evidence Act 2011. See ***Anagbado v. Faruk*** (2019) 1 NWLR (Pt. 1653) 292 @ 312 (SC); ***C.P.C. v. Ombugadu*** (2013) ALL FWLR (Pt. 706) 406 @ 472-473 (SC); ***Ladoja v. Ajimobi*** (2016) 10 NWLR (Pt. 1519)87 @ 141 (SC); ***Oyetola & Anor. v. INEC & Ors*** (Unreported judgment of the Supreme Court of Nigeria of 9/5/2023 in Suit No SC/CV/508/2023).

Exhibits PAH1, PAH2, PAH3 and PAH4 and PAR1 (A, B, C, D, E and F), besides their earlier confirmed incompetence, are also caught by section 83(3) of the Evidence Act and so hereby further ruled inadmissible in evidence.

3. ***That Exhibits PBD, PBD1A, PBD1B, PBD1C, PBD1D, PBD1A, PBD2A, PBD3, PBD4, PBE1, PBE2, PBE3, PBE4, PBE5, PBE6, PBF1, PBF2, PBF3 and PBF4 tendered by the petitioners through P.W.27 (Mike Enahoro-Ebah) to show 2nd Respondent's non-qualification for the presidential election on grounds of his alleged conviction/fine in the United States of America, forgery of certificates and dual citizenship are irrelevant to the proceeding and so inadmissible in evidence, petitioners having not pleaded necessary facts in their petition to support them***.



In support of this argument of relevance of evidence as guide to admissibility, 3rd Respondent cited among others the cases of *Omega Bank (Nig.) Plc v. O.B.C. Ltd* (2005) 8 NWLR (Pt. 928) 547; (2005) LPELR-2636 (SC) p. 36-37 (Tobi, JSC) and *Torti v. Ukpabi* (1984) 1 SCNLR 427, (1984) 1 S.C. 370. The petitioners, while conceding in their Reply that relevance is the key to admissibility and the function of pleadings is to define and delimit with clarity and precision the real matter in controversy, submitted that documentary evidence need not be specifically pleaded to be admissible in evidence; that it is sufficient as long as facts covering such document are pleaded. In support of that, they cited among others the cases of *Kyari v. Alkali* (2001) 11 NWLR (Pt. 724) 412 @ 433-433, *Sterling Bank Plc v. Falola* (2014) LPELR-22529 (CA); *Aregbesola v. Oyinlola* (2009) 14 NWLR (Pt. 1162) 457 @ 478. They argued that by their pleading of disqualification of 2nd Respondent in paragraph 146 of their petition and the 'specific pleading of documentary facts' of non-qualification of 2nd Respondent in their Reply to 3rd Respondent's Reply, 2nd and 3rd Respondent were put on notice of their case of the non-qualification of 2nd Respondent sought to be supported and proved by Exhibits PBD, PBD1A, PBD1B, PBD1C, PBD1D, PBD1A, PBD2A, PBD3, PBD4, PBE1, PBE2, PBE3, PBE4, PBE5, PBE6, PBF1, PBF2, PBF3 and PBF4, so these documents were admissible and properly admitted in evidence.



CERTIFIED TRUE COPY

I have already ruled, while considering the preliminary applications/objections of Respondents to the petition and Replies of the petitioners, that Paragraph 146 of the Petition where petitioners averred to non-qualification of 2nd Respondent for the 2023 Presidential election, was bereft of facts to sustain it. I also held that the fresh facts of 2nd Respondent's conviction/fine by a District Court in Illinois in the United States, alleged forgery of documents and dual citizenship, all of which petitioners only introduced for the first time in their replies, were incompetent, ran afoul of both Paragraphs 4(1)(d) and 16(1) (b) are incompetent, liable to be struck out and were indeed struck out. I am also aware that we have just few seconds ago again ruled here in this judgment that the evidence of P.W. 27, through whom the said documents/exhibits now impeached by 3rd Respondent were brought in, is incompetent for non-compliance with Paragraph 4(5)(b) of the First Schedule to the Electoral Act 2022. Those rulings constitute issue estoppel binding not only on the parties but this court, too, meaning, further, that this court cannot depart from them: see *Francis Shanu & Anor v Afribank (Nig.) Plc* (2002) LPELR-3036 (SC) p. 25 paragraph D-E, (2002) 17 NWLR (Pt. 795) 185; *Lawal v. Dawodu & Ors.* (1972) 1 ALL N.L.R. (Pt. 2) 270; *Cardoso v. Daniel* (1986) LPELR-830 (SC) p. 27-28. Consequently, the objection of 3rd Respondent to the admissibility of Exhibits PBD, PBD1A, PBD1B, PBD1C, PBD1D, PBD1A, PBD2A, PBD3,

CERTIFIED TRUE COPY

PBD4, PBE1, PBE2, PBE3, PBE4, PBE5, PBE6, PBF1, PBF2, PBF3 and PBF4 is hereby upheld and the said documents are further ruled inadmissible and expunged from the records of this court.

The summary of all the foregoing is that:

1. The objection to the evidence adduced by **P.W.12** (Witness Egwuma Friday), **P.W.13** (Grace Timothy), **P.W.14** (Grace Ajagbona), **P.W.15** (Abidemi Joseph), **P.W. 16** (Miss Edosa Obosa), **P.W.17** (Miss Alheri Ayuba), **P.W.18** (Miss Sadiya Mohammed Haruna), **P.W.21** (Mr. Samuel Oduntan – a Statistician); **P.W.23** (Janet Nuhu Turaki), **P.W.24** (Christopher Bulus Andrew), **P.W.25** (Victoria Sani), **P.W.26** (Hitler Ewunonu Nwala - a forensic Expert) and **P.W. 27** (Mr. Mike Enahoro-Ebah, a Legal Practitioner) whose witnesses statements were filed/deposed to long after the petition was filed and so did not accompany the petition as required by Paragraph 4(5)(b) of the 1st Schedule to the Electoral Act 2022, is upheld, and that evidence, together with the documents, Reports included, tendered by the said witnesses, are hereby expunged from the records of this court.

2. The objection of respondents to Exhibits PAH1, PAH2, PAH3 and PAH4 made by Mr. Samuel Oduntan (P.W.21), and Exhibits PAR1 (A, B, C, D, E and F) made by Mr. Hitler Ewunonu Nwala (P.W. 26) is also



further upheld and the said documents, already held incompetent and inadmissible by our earlier rulings, are again hereby pronounced inadmissible in evidence on this ground too.

3. The objection of 3rd Respondent to the admissibility of Exhibits PBD, PBD1A, PBD1B, PBD1C, PBD1D, PBD1A, PBD2A, PBD3, PBD4, PBE1, PBE2, PBE3, PBE4, PBE5, PBE6, PBF1, PBF2, PBF3 and PBF4 tendered by p.W.27, Mr. Mike Enahoro-Ebah, is also upheld and the said documents are further ruled inadmissible and expunged from the records of this court.

Save for the above, all other objections of the Respondents to documents tendered by the Petitioners are overruled.

### The SUBSTANTIVE PETITION

I now move to consider the substantive matter. We, however, wish to state that, despite our conclusions above on the objections raised by Respondents to documents tendered by the petitioners, I am still minded to the evaluate evidence adduced and consider the merits of the petition. The only evidence I shall not revisit are Exhibits PBD, PBD1A, PBD1B, PBD1C, PBD1D, PBD1A, PBD2A, PBD3, PBD4, PBE1, PBE2, PBE3, PBE4, PBE5, PBE6, PBF1, PBF2, PBF3 and PBF4 relating to 2nd Respondent's alleged non-qualification that were tendered by P.W.27,


CERTIFIED TRUE COPY

Mr. Mike Enahoro-Ebah, the said documents in our view being bereft of pleadings to sustain them as elaborately stated earlier in this judgment.

Coming to the hearing, the petitioners called a total of 27 witnesses and closed their case on 24/6/2023. The Respondents opened their respective defences starting from the 3rd day of July, 2023. The 1st Respondent called one witness one of its staff, R.W.1 and closed its case. The 2nd Respondent also tendered documents and called one witness, R.W.2. The 3rd Respondent did not call any witness but tendered documentary evidence.

At the close of the case of the parties, the Court ordered written addresses. The addresses were all filed on schedule. In the final address for the 1st Respondent filed on 14/7/2023, the learned leading senior counsel for the 1st Respondent, Mr. A.B Mahmoud, SAN, raised four issues as follows:

1. Whether having regards to Section 47 (2) and (3) of the Electoral Act 2022, paragraphs 38, and 92 of the Regulations and Guidelines for the Conduct of Elections, 2022 and totality of the evidence adduced at trial the inability of the 1st Respondent to transmit the polling unit results electronically in real-time using the BVAS device to the iREV portal constitutes non-compliance

CERTIFIED TRUE COPY

with the Electoral Act if such substantially affected the outcome of the Presidential Election held on the 25th day of February, 2023?

2. Whether there exist cogent and credible evidence of corrupt practices to warrant the nullification of the Presidential election held on the 25th day of February 2023?

3. Whether going by the provisions of Sections 131 and 137 of the Constitution of the Federal Republic of Nigeria 1999 (As amended), the 2nd Respondent was at the time of the presidential election held on the 25th day of February 2023 not qualified to contest the said election?

4. Whether upon proper construction of Section 134 (2) (b) of the Constitution of the Federal Republic of Nigeria 1999, the requirement that a candidate must score "not less than one-quarter of the votes cast at the election in each of at least two-thirds of all the States in the Federation and the Federal Capital Territory, Abuja", means that a successful candidate must specifically score at least one-quarter of the votes cast in the Federal Capital Territory, Abuja in addition to two-thirds of all the States?



The 2nd Respondent, through his counsel Wole Olanipekun SAN, filed his final written address on 14/7/2023. He raised for determination four issues which were listed as follows:

i.  Considering the relevant provisions of the Constitution of the Federal Republic of Nigeria, 1999 (as amended) (**the Constitution**), the salient provisions of the Electoral Act, 2022, as well as admissible evidence on record, whether the election of the 2nd Respondent into the office of President of the Federal Republic of Nigeria on 25th February, 2023, was not in substantial compliance with the principles and/or provisions of the Electoral Act, 2022.

ii. In view of the clear provisions of the Constitution, the Electoral Act, 2022 and plethora of judicial precedents on the criteria for qualification of candidates for election to the office of President, coupled with the peculiar circumstances of this petition (wherein the petitioners pleaded no fact in support of their allegation of non-qualification of the 2nd Respondent) whether the 2nd Respondent was/is not eminently qualified to contest the presidential election of 25th February, 2023.

iii. Upon a combined reading of sections 134 and 299, as well as other relevant provisions of the Constitution, section 66 of the Electoral Act, 2022 and other relevant statutes, whether the 2nd



respondent has not satisfied the necessary constitutional and statutory requirements to be declared winner of the presidential election of 25th February, 2023, and returned as President of the Federal Republic of Nigeria.

iv. Considering the constitution of the petition and the terse evidence adduced, whether this Honourable Court can accede to any of the reliefs being claimed by the petitioners.

The 3rd Respondent through her lead counsel filed its final address on 14/6/2023. Four issues were also generated for the determination of this petition. The four issues were couched as follows:

1. Whether, having regard to the relevant and admissible evidence led by parties, the conduct of the presidential Election held on the 25th day of February 2023 was vitiated by non-compliance and corrupt practices that was substantial enough or directly attributed to the 2nd Respondent as to have affected the outcome of the election, and to justify nullification of the election in a manner envisaged by the applicable provisions of the Electoral Act, 2022?

2. Whether the burden of proving that 1st Petitioner, and not the 2nd Respondent, scored majority of lawful votes cast and satisfied the constitutional requirement of having one-quarter of the votes cast in each of at least two-thirds of all the States of the Federation and



the Federal Capital Territory, to be declared and returned as the winner of the Presidential election held on the 25th day of February, 2023, has been discharged by the Petitioner?

3. Whether having regard to the issues joined and evidence led on the qualification of the 2nd Respondent to contest in the presidential election held on 25th February, 2023 the petitioner has established that 2nd Respondent was not qualified to contest the presidential election as provided for in the Constitution of the Federal Republic of Nigeria, 1999 (as altered)? and

4. Whether having regard to the totality of the evidence led by parties and the applicable law, the petitioners are entitled to succeed on any of the reliefs sought in the petition at all, or that the petition ought to be dismissed in favour of the Respondents?

In response to the addresses filed by the 1st, 2nd, and 3rd Respondents, the Petitioners through their leading senior counsel Chief Chris Uche SAN filed their respective Written Addresses on 21/7/23, 22/7/23 and 23/7/23. The Petitioners' Senior Counsel filed separate written addresses in response to each of the 1st, 2nd and 3rd Respondents addresses. The issues for determination raised in the three written addresses filed by the petitioners in response to each of the written addresses of each of the respondents are the same, and they are:

CA/PEPC/03/2023; CA/PEPC/04/2023; CA/PEPC/05/2023.                    613




CERTIFIED TRUE COPY

1.Whether the return of the 2nd Respondent in the election to the office of the president of the Federal Republic of Nigeria held on 25th day of February 2023 was not invalidated by reason of substantial non-compliance with the provisions of the Electoral Act, 2022 on electronic transmission of results for collation and verification.

2. Whether the 2nd Respondent was lawfully declared and returned as the winner of the Presidential election held on 25th day of February 2023, having not secured one-quarter of the valid votes cast in the Federal Capital Territory, Abuja as required by the Constitution of the Federal Republic of Nigeria 1999 (as amended).

3. Whether the 2nd Respondent was not disqualified under the provisions of the Constitution of the Federal Republic of Nigeria, 1999 (As Amended) to contest the Presidential election held on 25th day of February 2023, having regard to the alleged order of forfeiture arising from drug-related offence, his acquisition of the citizenship of a country other than Nigeria, and presenting a forged certificate to the 1st Respondent?

4. Whether the 1st Respondent was not wrong in returning the 2nd Respondent when he was not duly elected by majority of the lawful votes cast in the election.



A look at the issues formulated by the parties will show clearly that, though differently worded, they are similar in context and content. It is in the face of this that I chose the four issues formulated by the petitioners, albeit with necessary modifications, to anchor the determination of this Petition. The issues for determination as modified are as follows:

1. **Whether the return of the 2nd Respondent in the election to the office of the President of the Federal Republic of Nigeria held on 25th day of February 2023 was invalid by reason of substantial non-compliance with the provisions of the Electoral Act, 2022.**

2. **Whether the 2nd Respondent was lawfully declared and returned as the winner of the Presidential election held on 25th day of February 2023, having not secured one-quarter of the valid votes cast in the Federal Capital Territory, Abuja.**

3. **Whether the 2nd Respondent was not disqualified under the provisions of the Constitution of the Federal Republic of Nigeria, 1999 (As Amended) to contest the Presidential election held on 25th day of February 2023, having regard to the alleged order of forfeiture arising from drug-related offence, his acquisition of the citizenship of a country other than Nigeria, and presenting a forged certificate to the 1st Respondent?**




4. **Whether 2nd Respondent was duly elected by majority of the lawful votes cast in the election and 1st Respondent was right in returning him as duly elected.**

## ISSUE ONE

On this issue of non-compliance, the petitioner contended that the Presidential Election was fatally flawed by non-compliance with the fundamental requirement of the New Electoral Regime of Electronic Transmission of Results for collation and verification. That it was not the case of the 1st Respondent that the so-called "technical glitch" was localised to a particular polling unit, ward, Local Government Area or a State but it was National.

The Learned Senior Counsel for the Petitioners canvassed that they led evidence to show that the Electoral Act, 2022 introduced use of technology to cure the mischiefs associated with the collation process at the Election. He referred to the case of *Ugwu & Anor v. Ararume & Anor (2007) 12NWLR (Pt. 1049) 365, 439* and urged the Court to apply the Mischief Rule to enforce the provision of Section 64(4) and (5) of the Electoral Act, 2022 and the INEC Regulations and Guidelines for Conduct of Election tendered as Exhibit PAE 1 and the INEC Manual for Election Officials tendered as Exhibit PAE 2. He cited Para 2.9.0 of the INEC Manual, Exhibit PAE 2. He further referred to Para 38 of INEC Regulations

CERTIFIED TRUE COPY

and Guidelines, Exhibit PAE 1. He canvassed that the law allowed the regulatory body the option to choose the technological device to use in the conduct of the election, and that the 1st Respondent chose the BVAS machine and the IReV as admitted by all the parties. That they (Petitioners) tendered as exhibits the video evidence of the undertaking and commitment by the 1st Respondent through its Chairman and Spokesman as **Exhibit PAF 1(a) to (c) and PAF 2(a) to (c)** to deploy these technological innovations in the election to ensure transparency of the election and to eliminate all forms of manipulation. He contended that the 1st Respondent did not either in its pleading or evidence deny this prescription by the Commission; that the belated attempt by the 2nd and 3rd Respondents to contend that the 1st Respondent's Chairman rescinded the prescription two days before the election by an interview is an afterthought which he said cannot alter legislation or statute-birthed regulations and guidelines.

He further submitted that Sections 64 (4) and (5) of the Electoral Act 2022 made the use of the BVAS machines mandatory for collation, verification and confirmation of results before announcement. In addition, counsel submitted that the INEC Regulations and Guidelines for the Conduct of Election (tendered as **Exhibit PAE 1)** and INEC Manual for Election Officials (tendered as **Exhibit PAE 2)** both made mandatory



CERTIFIED TRUE COPY

provisions for the results from the polling units to be transmitted real-time to the IReV.

The Learned Senior Counsel for the Petitioner further contended that the RW1, the sole witness of the 1st Respondent, confirmed under cross-examination that the above-said technological innovation by INEC was to guarantee the transparency of the electoral process and to guarantee the integrity of the results. That he confirmed that on 1st March 2023 when the results were announced, all the results had not been uploaded to the IReV, which was a glaring breach of the process of accountability and transparency of the collation. That the witness admitted that the system was hosted by Amazon Web Service, yet the 1st Respondent did not report and declined to report the failure to Amazon Web Service. The Counsel further asserted that the **PW 19, Dr Alex Adum Ter** (in paragraphs 42 to 83 of his Witness Statement on Oath adopted on 13/6/23), and **PW 22, Senator Dino Melaye**, (in paragraphs 38 to 78 of his Witness Statement on Oath adopted on 16/6/23) proffered comprehensive evidence on the deliberate bypass of the use of BVAS machines and IReV in the conduct of the election and electronic transmission of results. That, the **PW 19** also tendered IReV Webshots (**Exhibit PAF 4**) which showed clearly that **as at 18th March, 2023,** the results were yet to be uploaded. This evidence was neither challenged nor rebutted.

CA/PEPC/03/2023; CA/PEPC/04/2023; CA/PEPC/05/2023.                                     618



He contended further that the Petitioners Witnesses namely; **PW 12, Mr. Friday Ogwumah; PW 13, Grace Timothy; PW 14, Grace Ajagbona; PW 15, Abidemi Joseph; PW 16, Edosa Obosa; PW 17, Alheri Ayuba; PW 18, Sadiya Mohammed Haruna; PW 23, Janet Nuhu Turaki; PW 24, Christopher Bulus Ardo; and PW 25, Victoria Sanni,** gave evidence which he said unequivocally established that there was a sabotage of the transmission of results electronically, contrary to what they were prepared for at their pre-election training. That they were unanimous in their testimony that whereas they were able to transmit the results of the National Assembly elections which took place on the same day, the system blocked them from transmitting the results of the presidential election. He pointed out also that the sole witness of INEC, that is RW 1, confirmed that it was the same application that was installed on the same BVAS machines used for both the presidential election and the National Assembly elections but with separate provisions for each election.

On the issue of proof, the Learned Senior Counsel vigorously submitted that the Petitioners having given credible evidence that the transmission of results for the National Assembly elections went through whilst that of the Presidential election did not, the 1st Respondent, (as well as the beneficiaries of the 2nd and 3rd Respondents) had a duty to explain the discrimination in transmission. With the introduction of technology into



election by the Electoral Act 2022, he contended that the burden of proof now shifts to the Commission in circumstances such as this where the Petitioners have proffered credible evidence of non-compliance and he urged the Honourable Court to so find and hold. He relied on section 136(1) of the Evidence Act, 2011. He then submitted that the burden of proving that the necessary verification and confirmation in compliance with the mandatory provisions of Section 64(4) of the Electoral Act, 2022 was done, is on the 1st Respondent and indeed on all the Respondents for two reasons. The first reason he said is that it is a fact within the knowledge of the 1st Respondent whether or not it carried out the said mandatory verifications and confirmations as well as relevant materials (election results and accreditation data directly transmitted from the polling units and the hard copies of the election results which it collated) were at all material times in the custody of the 1st Respondent and it was the 1st Respondent that carried out the collation in issue. That the second reason is that the Petitioners are asserting the negative, namely, that the 1st Respondent failed to carry out the mandatory verifications and confirmations, whilst the 1st Respondent and indeed all the other Respondents are asserting the positive. He submitted that the position of the law is that the burden of proof is on the person asserting the positive and not on the person asserting the negative. He relied on the decision of this Court in the case of ***AMALE & ORS v. MUSTAPHA & ORS***


CERTIFIED TRUE COPY

*(2022) LPELR-56897(CA), pp. 41-42, paras. D-E,* adopting the Supreme Court decision on this issue, in the case of *ADEGOKE v. ADIBI & 7 ANOR (1992) LPELR-95 (SC)* that:

> *"The principle is that the burden of proof lies on he who asserts and not on he who asserts the negative of an issue."*

He therefore submitted that the burden is on INEC and indeed on the other Respondents to prove that the non-compliance aforesaid did not or ought not to nullify the said election, which said burden he said INEC and the other Respondents woefully failed to discharge. He said that this paradigm shift of the burden of proof in the new electoral jurisprudence has become even more relevant so that an electoral regulatory body does not act with impunity and expect to be protected by official presumption of regularity when it acts irregularly, hoping that all the burden of proof would rest on the Petitioners, even when dared to go to Court, as in the instant case.

The Learned Counsel canvassed further that contrary to the position of the Respondents, the decision of the Supreme Court in *OYETOLA & ANOR v. INEC & ORS (2023) LPELR-60392(SC)* supports the introduction and use of technology in election management and dispute resolution. That the decision has indeed established the fact that there is an

---

CA/PEPC/03/2023; CA/PEPC/04/2023; CA/PEPC/05/2023.                    621



CERTIFIED TRUE COPY

**electronic collation system and the IReV.** That as held by the Supreme Court in the ***Oyetola's case***, the use of the electronic transmission system for verifying result before collation is part of the election process and operational at that. Therefore, he contended that the failure or refusal to either deploy or use the transmission system, as admitted by the 1st Respondent, is non-compliance with the Electoral Act. He contended vigorously that under the new regime of technology-based elections, the old, traditional and analogue manner of proof of substantial non-compliance must yield way to a modern, dynamic and scientific approach by the Courts towards proof of substantial non-compliance. The intent of the new Electoral Act 2022 is that the old order must give way to the new order; the analogue must yield to the digital, and we urge this Honourable Court to resolve this issue in favour of the Petitioners.

The 1st Respondent made this issue of non-compliance as its issue one. In his argument of the issue, the 1st Respondent canvassed that the allegation of non-compliance by the Petitioner has been founded on their erroneous belief that the election results from the 176,846 polling units in Nigeria ought to have been transmitted to the Electronic Collation System of the 1st Respondent. That the Petitioners are contending that there exists an Electronic Collation System established by the 1st Respondent to receive election result and collate it



electronically. That they further contend that the 1st Respondent ought to have transmitted the result sheets of all the polling units (Forms EC8A) using the BVAS device to the IReV portal real-time and that in so far as all the results from the 176,846 polling units in Nigeria were not displayed or uploaded on the IReV portal, the 1st Respondent ought not to have declared the 2nd Respondent the winner of the election and that the declaration of the 2nd Respondent by the 1st Respondent as the winner was hasty. Learned Counsel submitted that it is settled that where a Petitioner complains of non-compliance with the provisions of the Electoral Act, the Petitioner has the burden to prove the allegation of non-compliance. He referred to **Ucha vs Elechi (2012) 13 NWLR pt. 1317 pg. 330; Gundiri vs Nyako (2014 2 NWLR pt. 1391 Pg. 211. And Section 135 (1) of the Electoral Act,** saying that the Petitioners beyond establishing the alleged non-compliance is duty bound to demonstrate by credible evidence that the said non-compliance in fact substantially affected the outcome of the election. He referred to **Akeredolu vs Mimiko (2014) 1NWLR pt. 1388 pg. 402 at 453.** He contended that to be able to prove this allegation, the Petitioners must first and foremost establish before this Court the provisions of the Electoral Act or the Guidelines where the 1st Respondent had prescribed electronic collation using the Electronic Collation System of the 1st Respondent. That it is only after they have proved same that the Petitioners can proceed to show





CERTIFIED TRUE COPY

that the 1st Respondent did not utilize the said Electronic Collation System which it had prescribed.

The Learned Senior Counsel for the 1st Respondent further submitted that paragraph 38 (i) of the Guidelines, **Exhibit PAE 2,** provides that Presiding Officers shall **electronically transmit or transfer results of polling units direct to the collation system prescribed by the 1st Respondent.** That the use of the word "OR" in paragraph 38 (i) gives the Presiding Officer the discretion or option to either transmit electronically on the one hand or transfer the result to the collation system prescribed by the 1st Respondent because it has been held in ***N.U.P vs INEC (2021) 17 NWLR pt. 1805 pg. 305 and APC vs A.S.I.E.C (2022) 12 NWLR pt. 1845 pg. 411*** that the use of "or" is to express an alternative or to give a choice between two or more things. He posited that in this Petition, two questions readily come to mind at this stage. They are- (1) Did the 1st Respondent prescribe an Electronic Collation System? (2) What was the collation system prescribed by the 1st Respondent? He contended that it is apparent from the evidence before this Honourable Court that the Petitioners were unable to substantiate their allegation that the 1st Respondent prescribed an Electronic Collation System.

That the sole witness for the 1st Respondent in his evidence in chief stated categorically that there was no electronic collation system



prescribed by the 1st Respondent and that the prescribed collation method was manual or better still physical collation. He referred to the evidence of RW1, which he said is supported by the testimonies of PW 12, PW 13, PW 14, PW 15, PW 16, PW 17, PW 18, PW 23, PW 24, & PW 25 who were all presiding officers in their respective polling units who also testified that they physically "**transferred the results of their polling units to the ward collation centre**" as they had been instructed in the course of their training by the 1st Respondent prior to the election. That the law is trite that facts admitted need no further proof. That the Petitioners' witnesses clearly admitted that collation was manual, and they complied strictly with the directive of the 1st Respondent in that regard. Learned Counsel further submitted that on the second leg of alleged non-compliance, even though the Petitioners did not in their petition specifically state or plead in details the particular polling units where results were not transmitted using the BVAS device, they proceeded to call PW 1, PW 2, PW 3, PW 4, PW 5, PW 6, PW 7, PW 8, PW 9, PW 10, PW 11, PW 19, PW 20, PW 21 & PW 22 in support of their allegation that results of the 176,846 polling units in Nigeria were not transmitted to the IReV viewing portal real time. He contended that the point is that parties are ad idem that the IReV portal is a public viewing portal that allows members of the public to view the results of the election and nothing more. That this was also the decision reached by

CERTIFIED TRUE COPY

the Supreme Court in the recent case of ***Oyetola vs INEC & ORS (Supra)*** where it was held that: **"The results transmitted to the Result Viewing Portal is to give the public at large the opportunity to view the polling unit results on the election day".**

The Learned Senior Counsel posed the question of "How has the alleged failure to upload the picture of form EC8As on the IReV portal affected the outcome of the elections of 25th February 2023? That in answering that questions put forward, the Court will take note of the following facts which PW 12, PW 13, PW 14, PW 15, PW 16, PW 17, PW 18, PW 23, PW 24 & PW 25 the 1st Respondent's Presiding Officers confirmed. These are that:-

1. Elections went well in their respective polling units.

2. At the close of the elections, the Forms EC8As were signed by them as well as the agents of the political parties present.

3. Duplicate copies of the Forms EC8As were handed over to agents of all political parties present.

4. Following their inability to transmit the EC8As using the BVAS device, they proceeded to their ward collation centres where they handed over the result sheets to the Ward Collation Officer who then collated the results manually.



CERTIFIED TRUE COPY

He therefore submitted that the failure of the 1st Respondent to transmit or upload the results of the 10 polling units which PW 12, PW 13, PW 14, PW 15, PW 16, PW 17, PW 18, PW 23, PW 24, & PW 25 presided does not discharge the onus placed on the Petitioners for the purpose of invalidating the Presidential election held on the 25th day of February, 2023.

Furthermore, the Learned Counsel for the 1st Respondent contended that there was substantial compliance with the provisions of the Electoral Act 2022. He relied on the cases of *Ali Ucha & Anor V. Elechi & Ors (2012) LPELR – 7823 (SC).* The Counsel in addition contended that the failure of the Petitioners to bring before the Court duplicate copies of Form EC8As delivered to their agents at the polling units should, under Section 167 (d) of the Evidence Act, 2011, engender the presumption of withholding evidence. He cited also the cases of *Uduma V. Arunsi (2012) 7 NWLR (PT.1298) 55; Njiokwuemeni V. Ochei (2004) 15 NWLR (Pt. 895) 196; and Oyetola V. INEC (Supra).* He urged the Court to resolve the issue in Favour of the 1st Respondent.

The Learned Senior Counsel for the 2nd Respondent on this issue canvassed that section 135 (1) of the Electoral Act, 2022 used the word "shall" to connote the fact that the invalidation of an Election for remote and un-substantiated reasons is mandatorily forbidden. He relied on the

CERTIFIED TRUE COPY

cases of *Ugwu V. Arurume (2007) 12 NWLR (Pt 1048) 367, 441 to 442;* and *Diokpa F. Onochies & Ors (2006) 6 NWLR (Pt. 975) 65, 89.* The Learned Senior Counsel prefaced his address on the issue with an examination of Section 135 of the Evidence Act. He contended that subsection (1) of section 135 of the Evidence Act is broken in to different limbs and compartment. The first he said is on the fact that there is prohibiting the invalidation of the election simply on the ground of non-compliance with the Act. Second, he said is that invalidation was forbidden if "if it appears" to the Court that the election was substantially in accordance with the Act. That the last limb is that it must be in accordance with the principles of the Act. He relied. On the case of *Skye Bank PLC V. Iwu (2017) 16 NWLR (Pt. 1590) 24, 94* that the word "substantial" is defined by the Black's Law Dictionary, 11th Edition, page 1729 to mean **"considerate in extent, amount, or value; large in volume and number",** while the **New Lexicon Webster's Dictionary of the English Language (1988 Edition),** at **page 987,** defines it as **"having real existence; not imaginary; firmly based; relatively great in size, value or importance".** That the essence of these definitions is to demonstrate that for any non-compliance to be substantial enough, or raised to the degree of invalidating an election, it must be of a high nature or degree, as opposed or mere conjecture or gainsaying. He submitted that all over the Commonwealth, this section is a recurring decimal in the *corpus juris,*



with slight variations in their wordings. He submitted also that since the First Republic, similar sections have been in our respective statutes, as contained in section 93 of the Electoral Act, 1962, section 123 of the Electoral Act, 1982, section 52 of the Presidential Election (Basic Constitutional and Transitional Provisions) Decree, 1999, section 121 of the Electoral Act, 2001, section 135 of the Electoral Act, 2002, section 146 of the Electoral Act, 2006 and section 139 of the Electoral Act, 2010. He cited **Ogboru V. Okowa (2016) 11 NWLR (Pt. 1522) 84 at 148** where the apex Court, while appreciating the fact that it is impossible to have a perfect election anywhere in the world, held that in the proof of an allegation of non-compliance, the petitioner must do the following;

> "Where however the Petitioner contends that an election or return in an election should be invalidated by reason of corrupt practices or non-compliance, the proof must be shown forth:
>
> (i)   That the corrupt practice or non-compliance took place; and
>
> (ii)  That the corrupt practice or non-compliance substantially affected the result of the election.

The quantum of measurement and consideration is not to show that there was a proof of non-compliance, as it is almost impossible to have a perfect election anywhere in the world. The measure however, is whether the degree of non-compliance is sufficient enough as to



CERTIFIED TRUE COPY

vitiate the credibility of the election held. The reason for the proof on the balance of probability is not farfetched therefore". He also referred to the case of *Andrew V. INEC (2018) 9 NWLR (Pt. 1625) 507 at 553.*

The Learned Senior Counsel further submitted that the law is well settled and the Act has not changed the principle that Form EC8A forms the foundation of the pyramid for election results. *See Agagu V. Mimiko (2009) 7 NWLR (Pt. 1140) 342 at 488, Ukpo V. Imoke (2009) 1 NWLR (Pt. 1121) 90 at 168.* In fact, **paragraph 91 (i) of the Regulations and Guidelines for the Conduct of Elections, 2022,** provides thus: *"Voting takes place at polling units. Therefore, Forms EC8A and EC 60E are the building blocks for any collation of results".* Arising from this provision, he contended that the collation of results happens on ground, in the full glare of everybody, and neither in the air nor in the 'cloud'. He pointed out that the results signed by the Presiding Officers and attested to by all the polling unit agents among who were PW 12, PW 13, PW 14, PW 15, PW 16, PW 17, PW 18, PW 23, PW 24 and PW 25 could not transmit results to the IREV and that this was the basis of their allegation of non-compliance. That that assumption of the Petitioner is a *faux pas* or *non-sequitur*. He also referred to paragraph 18 of the Petition, where the Petitioners have alleged that "the election was not conducted in compliance with the


CERTIFIED TRUE COPY

provisions of sections 47 (2) & (3), 60 (1), (2) & (5), 64 (4) (a) & (b), 64 (4), (6), (7) & (8), 71 of the Electoral Act, Paragraphs 3.3.0 and 3.4.0 of the 1st Respondent's Published Manual for Election Officials, 2022, Paragraphs 19, 35, 38, 40, 41, 42, 43, 47, 48, 50, and 62 of the 1st Respondent's Published Regulations and Guidelines for the Conduct of Elections 2022… "That a consideration of each of these provisions will determine whether this Court can accord the Petitioners any form of seriousness at all. That section 47(2) & (3), which provides for accreditation with the use of the card reader or any other technological device; section 64 (4) (a) and (b) which mandates the P.O. to reconcile the votes cast with the number of accredited voters; 64 (4), (6), (7) & (8), which provides for the procedure for resolving dispute or discrepancies in the collation of results; section 71, and section 73 which prescribes for the types of forms to be used for the election. That the centre-piece of the Petitioners' grouse is that the results were not electronically transmitted and uploaded to the IREV "in real time". He referred to the provision of section 60 (5) of the Electoral Act, which provides that "the presiding officer shall transfer the results including total number of accredited voters and the results of the ballot in a manner as prescribed by the commission". Proper appreciation of the provision of section 60 (5), with respect to INEC's prerogative to prescribe the mode of transfer of results, was



CERTIFIED TRUE COPY

contextualized by the several provisions of the Manual and Regulations. That paragraph 19 of the Regulation provides the procedure for accreditation while paragraph 35 provides the procedure for sorting of votes after election. He referred the Court to the clear provision of paragraph 38 of the Regulations, and submit that the said provision did not support the contention of the Petitioners; but rather, it provides for multiple/hybrid procedures, whether manually or electronically. That the only grouse expressed by the Petitioners through their evidence was that the results were not electronically transmitted to the next level of collation and upload to the IREV "in real time" or immediately. He contended that the Petitioners did not allege that any of the other procedures of the election, starting from the accreditation, voting, sorting, counting votes, entry into the relevant forms, and manual transmission was not complied with. That the testimonies of PW 4, PW 11, PW 12, PW 13, PW 14, PW 15, PW 16, PW 17, PW 18, PW 19, PW 20, PW 22, PW 23, PW 24, and PW 25 are very instructive, as despite being witnesses for the Petitioners, all testified to the fact that the only issue with the entire web of processes was that of electronic transmission and upload to the IREV through the BVAS in real time.

The Learned Senior Counsel made a definition of the phrases "Electronically Transmit" or "Transfer" and transmit or transfer as

CERTIFIED TRUE COPY

used in the Regulations. He said that the distinctions are very clear to the effect that while "transmit" connotes electronic activities, "transfer" infers physical activity.

He summed up that even if non-transmission through electronic means is at all, a non-compliance, the obligation of the petitioners would still remain to answer the question, "how then has the non-transmission affected the result of the election?" that in **Ucha V. Elechi (2012) 13 NWLR (Pt. 1317) 330 at 359,** the Supreme Court

> *"Where a Petitioner complains of non-compliance with the provisions of the Electoral Act, 2010 (as amended), he has a duty to prove it polling unit by polling unit, ward by ward and the standard required is proof on the balance of probabilities and not on minimal proof. He must show figures that the adverse party was credited with as a result of the non-compliance. Forms EC8A, election materials not stamped/signed by Presiding Officers. He must establish that non-compliance was substantial, that it affected the election result. It is only then that the Respondents are to lead evidence in rebuttal".*

He further referred to the decision of the Supreme Court in **Abubakar V. Yar'Adua (2009) All FWLR (Pt. 457) I**, which settles every issue, whether raised by the Petitioners or imagined by them in this Petition, and more particularly, at **page 156** of the Report, where the Supreme Court held that: "**if there is evidence that despite all the non-compliance with the**



**Electoral Act, the result of the election was not affected substantially, the Election Tribunal must, as a matter of law, dismiss the Petition, and that accords with section 146 (1) of the Electoral Act now section 139 (1)".**

The Learned Senior Counsel drew the attention of this Court to the unreported decision of the Federal High Court, Abuja Judicial Division, *per Nwite*, J. **in FHC/ABJ/CS/1454/2022- Labour Party V. Independent National Electoral Commission,** delivered on **23rd January, 2023**, in that case, the question for determination in the Originating Summons is as follows; "**Whether having regard to combined effect of section 47 (2), 50 (2), 60 (5) and 62 (1) (2) and other relevant provisions of the Electoral Act, 2022, the Respondent can still insist on manual collation of results in the forthcoming general election".** Declaratory reliefs were subsequently sought in line with the main question for determination. After considering the relevant provisions of the Electoral Act, the Regulations and Guidelines, as well as the Manuals, the Learned trial Judge held as follows:

> *"Now a close reading of section 50(2) has provided for voting and transmission of results, to be done in accordance with the procedure to be determined by the Commission. This is to say that the Commission is at liberty to prescribe or choose the manner in which election results shall be transmitted.... In view*



*of the foregoing, can the act of the defendant in collating and transferring election results manually in the forth coming 2023 general elections be said to be contrary to the relevant provisions of the Electoral Act, 2023? The answer can only be in the negative, as there in nowhere in the above cited sections where the Commission or any of its agent is mandated to only use an electronic means in collating or transfer election results and number of accredited voters, in a way and manner deemed fit by it... By provisions of section 50 (2) and 60 (5) of the Electoral Act, 2022, the correct interpretation of the said statute is that INEC is at liberty to prescribe the manner in which election results will be transmitted, and I so hold".*

While he admitted that the above is a decision of the Federal High Court, he inter alia referred to the case of ***Rossek V. ACB Ltd. (1993) 8 NWLR (Pt. 312) 382 at 434-435,*** where the Supreme Court held that a judgment of any Court of record is binding on all parties and persons, unless it is set aside by an appellate court; and failure by any person or authority to regard such judgment will only lead to anarchy. He then drew the attention of the Court to the fact that the judgment was also tendered as Exhibit X1 before this Honourable Court, through the Respondent's sole witness.

He urged the Court to resolve this issue in favour of the 2nd Respondent.

For the 3rd Respondent, the Learned Senior Counsel Prince L.O Fagbemi SAN on this issue one canvassed that the law is axiomatic that proof of

CA/PEPC/03/2023; CA/PEPC/04/2023; CA/PEPC/05/2023.                                      635



non-compliance for seeking nullification of election has to pass two distinct tests of substantiality. The non-compliance must be substantial and it must also substantially affect the outcome of the election by virtue of section 135 (1) of the Electoral Act, 2022. That this is the overwhelming duality burden. He cited the apex court's interpretation of identical precursor provision in the 2002 Electoral Act, in *BUHARI V. OBASANJO (2005) 7 SC (Pt. 1) 1; (2005) 13 NWLR (Pt. 941) 1 per Belgore, JSC,* at page 191 that '*the elementary evidential burden of "the person asserting must prove" has not been derogated from by Section 135 (1). The Petitioners must not only assert but must satisfy the Court that the non-compliance has so affected the election result to justify nullification".*

He submitted that generally no evidential burden will shift to the Respondent(s) to offer evidence in rebuttal unless that initial hurdle was crossed by Petitioners. He referred to *NGIGE V. INEC (2015) 1 NWLR (Pt. 1440) 281 AT 329 PARAS C-F.* That the allocation of primary burden under Section 135 (1) of the extant Electoral Act reflects the recognition by the lawmakers that elections in Nigeria or anywhere else for that matter are not conducted by angels or a perfect superhuman. The Petitioners defaulted in satisfying the two test of substantiality test that could avail them in this case. He pointed out that in several paragraphs of the petition, heavy weather was made of the supposed mandatory

CERTIFIED TRUE COPY

uploading of the result on the 1st Respondent's IReV as an indispensable validator of the electoral process. That this is a triply flawed proposition. First, he said it is not the provision of the Act that such result upload must be carried out. That even if it were so expressly provided (which he said is not the case) a breach would still not suffice to void an entire election. He cited section 135 (1) of the Electoral Act. Secondly, he canvassed that if it was a provision in INEC Regulations (which it was, Reg 38), non-compliance with it cannot form the basis for voiding an election. That the power to make the regulations derives from section 148 of the Act which is made subject to limitations imposed on its controlling effect by section 135 (1) of the self-same Electoral Act, 2022. Thirdly, that if it was an assurance or commitment made by INEC Chairman (in his capacity as an official of the Commission as pleaded by Petitioners), his decision later reverse it does not render the election invalid. He referred to section 139 of the Electoral Act and also Exhibit XI the judgment of *Nwite J.* affirming the discretion of INEC to electronically transmit results of election from polling units. That such an administrative innovation designed by the 1st Respondent, for uploading of the results does not have the force to invalidate an election which has been concluded by the declaration of the Results at the polling unit. Once the election result has been announced at the polling unit, it cannot be cancelled under any guise extra-judicially save in very limited circumstances by administrative




CERTIFIED TRUE COPY

review of INEC. See *DOMA V. INEC (2012) 13 NWLR (Pt.1317) 297 at 328 C-D, and IKPEAZU V. OTTI (2016) 8 NWLR (Pt. 1513) 38 at 84-85 G-B.*

The learned Senior Counsel contended further that the Petitioners were in grave error in their case theory from paragraphs 17-71 of the Petition that having regard for the provisions of the CFRN, the Electoral Act 2022, Regulations and Guidelines for the Conduct of Elections, 2022 issued by the 1st Respondent and the Manual for Election Officials 2023, failure to upload from polling unit to IReV invalidated the election. He opined that the law is ensconced that in election matters which are sui generis, Rules and Procedures in election Petitions are not to be applied like those in ordinary civil matters. See *APC V. PDP & Ors 2021 LPELR 52975 CA.* That the only contraventions that constitute a ground to challenge an election are those expressly prohibited by the Electoral Act. He relied on *Nyesom V. Peterside, supra* only contraventions that constitutes a ground to challenge an election are those expressly prohibited by the Electoral Act. The Learned Senior Counsel canvassed that the provisions of the **Regulations** however, state otherwise. **Regulations 38** provides for completion of all polling, *Presiding Officer shall: (i) Electronically transmit or transfer the result of the polling unit, direct to the collation system as prescribed by the Commission. (ii) Use the BVAS to upload a scanned copy of the EC8A to the INEC Result Viewing Portal (IReV), as prescribed by the Commission and (iii). Take the BVAS and the original*



*copy of each of the forms in a tamper-evident envelope to the Registration Area/Ward Collation Officer, in the company of Security Agents. The Poling Agents may accompany the Presiding Officer to the RA/Ward Collation Centre".*

He submitted that the above provisions of the Regulations cannot override the Act, to furnish independent grounds for a Petition. Conversely, **section 47 (2)** unambiguously makes it mandatory for INEC to use the technological device for accreditation of voters as condition for voting. Clearly, if the intention of the draftsman was to equally make it mandatory for the electronic transmission or transfer of results from the polling units to the collation centre the Act itself would have clearly said so. It further prescribes consequence for not deploying the use of card reader or any other technological device for the purpose of accreditation, while being silent on what should result in non-electronic transmission of results. In other words, the Act permits but it does not compel electronic transmission of results. That without conceding if such infraction of Regulations 38 was established, **Section 60 (5) of the Electoral Act** cannot be a basis for the challenge of an election. He cited **EMMANUEL V. UMANA & ORS (2016) LPELR – 40037 (SC).** He contended that a careful perusal of Clause 38 connotes that the draftsman intended that the BVAS and IReV technology be permitted in the electoral process, where practicable. This is due to the statement "Electronically transmit

CERTIFIED TRUE COPY

or transfer" in the relevant Regulation. He submitted that the use of 'or' in that clause denotes the existence of an alternative; showing that the word 'or' was employed to separate "electronically transmit" from the word "transfer" to a specific physical location – the ward collation centre.

Further, Counsel contended that Clause 93 of the INEC Regulations provides for use of hard copy results for ward collation; failing which recourse can be made to electronically transmitted results or results from the IReV portal to continue collation. But where none of these exists, the Collation Officer shall ask for duplicate hard copies issued by the Commission to the following bodies in the order below; (i) The Nigeria Police Force; and (ii) Agents of Political Parties. That the above clause 93 provides that INEC works first with hard copies, then IReV as fall back or duplicate hard copies of the election result, which will subsequently be employed in the collation of results; in that order. The word 'hard copies' in the same Regulations, reveals the recognition of an alternative to the electronic transmission; so that it is neither obligatory nor absolute. That a contrary argument will render redundant the provisions of Clause 48 and 93 of the INEC Regulations. He relied on the case of ***ADEGBOYEGA ISIAKA OYETOLA V. INEC (Supra) SC/CV/508/2023*** judgement delivered on the 9th of May, 2023 Court Per *Agim JSC* pronounced its reasoning on the issue on pages 23-24 held that the


CERTIFIED TRUE COPY

polling unit results transmitted to the collation system provides the relevant collation officer the means to verify a polling unit result as the need arises for the purpose of collation. The results transmitted to the Result Viewing Portal is to give the public at large the opportunity to view the polling unit results on the election day..."

The Learned Senior Counsel submitted therefore that uploaded results are only a backup and that it is for use of the Collation Officer if need arises. That the Petitioners witnesses admitted the presumed correctness of the actual results. See **section 149 (1) of the Electoral Act, 2022;** *NYESOM V. PETERSIDE. (2016) 7 NWLR (Pt. 1512) 452 @ 532- 533.* That the Petitioners who fielded these witnesses must be held bound by their testimonies, as they never sought to convert them to hostile witnesses, seeing that their evidence confirmed the correctness of the results, notwithstanding non-transmission of the results real time. See *NWOBODO V. ONOH (1984) 1 SCNLR 1; IPIGANSI & ANOR V. INEC & ORS (2019) LPELR – 48907.* That the Petitioners must necessarily show by cogent evidence that their witnesses were wrong; and that there was substantial non-compliance which substantially affected the result of the election to their detriment. He relied on **section 135 (1) of the Electoral Act, 2022;** *ABUBAKAR ATIKU V. INEC (2020) 12 NWLR (Pt. 1737) PG.37 @ 125, Paras. A – C; 127 – 128, Paras. B – A; 154 – 155, paras F – A; ANDREW V. INEC (2018) 9 NWLR (Pt. 1625) 507 @ 574.* He finally on this

CERTIFIED TRUE COPY

issue submitted that the provisions of sections 47 (2), 60 (1) (2) (5), 64 (4) (5) (6) (7) (8) of the Electoral Act, 2022 becomes apparent that the collation of the results as stated earlier shall be (manual and where the manually collated results is suspected to be incorrect, same shall be subjected to verification and confirmation by using number of accredited voters and the results recorded and transmitted directly from the polling units in to IREV portal). He urged the Court to resolve this issue in favour of the 3rd Respondent.

**RESOLUTION**

This issue of non-compliance is directly standing on the first ground of this petition. By Paragraph 16(a) of the Petition, the Petitioners stated that the election of the 2nd Respondent is invalid by reason of non-compliance with the provisions of the Electoral Act, 2022. By section 134(1) (b) of the Electoral Act, non-compliance with the Act is a ground for questioning or challenging an election.

Primarily, the law is well settled that the results declared by INEC (1st Respondent) in an election enjoy a presumption of regularity. In other words, they are prima facie correct. See Section 168(1) of the Evidence Act 2011, recently applied by the Supreme Court in ***ATUMA V. APC & ORS (2023) LPELR-60352 (SC) where JAURO, JSC held at PP 40-41*** as follows:

CERTIFIED TRUE COPY

> *"By virtue of Section 168(1) of the Evidence Act, 2011, presumption of regularity inures in favour of judicial or official acts, including those carried out by INEC. The exact words of the subsection are thus:*
>
> *"When any judicial or official act is shown to have been done in a manner substantially regular, it is presumed that formal requisites for its validity were complied with."*
>
> *See P.D.P. V. I.N.E.C. (2022) 18 NWLR (PT. 1863) 653, UDOM V. UMANA (NO. 1)(2016) 12 NWLR (PT. 1526) 179.*
>
> *Fortunately for the Appellant and 1st Respondent, it is only a presumption, which implies that it is rebuttable. Any person who questions the validity of an act in favour of which there is a presumption of regularity, has a duty to rebut the presumption with cogent and credible evidence. A flimsy or half-hearted rebuttal will not suffice."*

Any Petitioner who complains that the result as declared is either wrong or not in compliance with the Electoral Act has the onus of proving the contrary: see *NYESOM V. PETERSIDE (2016) LPELR-40036 (SC)*. This case was relied upon by the Supreme Court in the case of *ANDREW & ANOR V. INEC (2017) LPELR 48518 (SC)* where the Supreme Court held per Onnoghen, J.S.C. (as he then was) as follows:

> *"...Secondly, one of the main planks on which the petition is based is non-compliance with the provisions of the Electoral Act, 2010 (as amended). For one to succeed on that ground, it is now settled law that where a petitioner alleges non-*



CERTIFIED TRUE COPY

> ***compliance with the provisions of the Electoral Act, he has
> the onus of presenting credible evidence from eye witnesses
> at the various polling units who can testify directly in proof
> of the alleged non-compliance - See Buhari v. Obasanjo
> (2005) 13 NWLR (Pt. 941) 1 at 315 - 316: Buhari v. INEC
> (2008) 18 NWLR (Pt.1120) 246 at 391 - 392: Okereke v.
> Umahi (2016) 11 NWLR (Pt.1524) 438 at 473. Nyesom v.
> Peterside (2016) 7 NWLR (Pt. 1512) 452, etc."***

Generally, it is the law that he who alleges must offer the requisite proof. The Petitioners have the burden of proof and they must succeed on the strength of their case as per their pleadings. The level of proof required is two-fold. The first level is that there is non-compliance. The second level is to prove that the non-compliance substantially affected the result of the election.

The learned senior Counsel for the Petitioners had in this Petition laboriously argued that the burden of proof is on the person asserting the positive and not on the person asserting the negative. The Petitioners, it appears from their position, tend to cross the line of misconception as to who has the burden of proof in our adversarial system of justice in civil cases when the primary onus of proof is on the Petitioner who makes all the claims against the Respondents in this Petition. The position was explained further by this Court in the case of



*DASHE & ORS V DURVEN & ORS (2019) LPELR-48887* where my learned brother Ugo, JCA held:

> *"While it is true that the burden of proof is generally on the person who substantially asserts the positive of an issue, and not on the person who makes a negative assertion, there is a caveat to that principle to the effect that where a negative assertion forms an essential part of a plaintiff's case (as it evidently is in the case of the appellants) the burden of proof of such allegation rests on him. The law on this point was lucidly stated by Bowen L.J. in Abrath v. N.E. Railway. Co 11 QBD 440 at 457 when he said that: "Now in an action for malicious prosecution, the plaintiff has the burden throughout of establishing that the circumstances of the prosecution were such that the Judge can see no reasonable and probable cause for instituting it. In one sense that is the assertion of a negative, and we have been pressed with the proposition that, when a negative is made out, the onus of proof shifts. That is not so. If the assertion of a negative is an essential part of a plaintiff's case, the proof of the assertion still rests upon the plaintiff. The terms 'negative and affirmative' are after all, relative, and not absolute." ?See also Phipson on Evidence, 15th Edition, Paragraph 4.03 at page 56; The Article Burden and Standard of Proof, by Justice Niki Tobi in Chief Afe Babalola's Law & Practice of Evidence in Nigeria, and Muraina & Ors v. Omolade & Ors (1968) 359 @ 362. See also Sections 131, ?132 and 133 of the Evidence Act 2010 stating that whoever desires any Court to give judgment as to any legal right or liability dependent on the existence of facts which he*



CERTIFIED TRUE COPY

*asserts shall prove that those facts exist; that the burden of proof in a suit or proceeding lies on that person who would fail if no evidence at all were given, and that in civil cases, the burden of first proving existence or non-existence of fact lies is on the party against whom judgment would be given if no evidence were produced on either side."*

Usually, the burden of proof is the debt owed by the Petitioners to the success of their Petition. The burden of proof rests upon the party who substantially asserts the affirmative of the issue. It is fixed at the beginning of the trial by the state of the pleadings. If the party with the burden fails or could not discharge the burden, the decision must be against him. The case of ***ADEGOKE V. ADIBI (SUPRA)*** relied upon by the Petitioners was cited in the recent case of ***FOLARIN V. AGUSTO (2023) LPELR-59945(SC)*** where the Supreme Court Per Okoro, JSC held as follows:

*"in all civil cases, the burden of proof lies on whoever desires the Court to give judgment as to any legal right or liability dependent on the existence of facts which he asserts to have existed. Indeed the burden of proof lies on the party who would fail if no evidence at all were given on either side. See Sections 131 and 132 of the Evidence Act, 2011. Akinbade v Babatunde (2018) 7 NWLR (pt 1618) 366, Adegoke v Adibi (1992) 5 NWLR (pt. 242) 410 at 423. Section 133 of the*



*Evidence Act, 2011 makes the position very clear that the burden of proof in civil cases is not static as in criminal cases where the prosecution has a duty to proof the defence beyond reasonable doubt. In civil cases, the burden of proof shifts from one side to the other until all the issues in the pleadings have been dealt with. In other words, where a plaintiff has discharged the evidential burden put on him, the burden would shift to the defendant to call evidence either in proof or rebuttal of some evidence made by the plaintiff. And the standard of proof in all civil proceedings is on the balance of probability. See Orji v Orji Textile Mills (Nig) Ltd (2009) 18 NWLR (pt. 1173) 467; (2010) All FWLR (pt. 519) 999, Maihaja v Gaidam (2018) 4 NWLR (pt 1610) 454 at 502, Eleme v Akenzua (2000) 6 SCNJ 226 at 238, First African Trust Bank Limited v Partnership Investment Co. Ltd. (2003) 18 NWLR (pt. 851) 35 at 57; (2003) 12 SC (part 1) 90"*

It is therefore settled that the terms "Negative" and "Affirmative" are relative and not absolute. The burden of first proving existence or non-existence of an assertion or fact whether positive or negative lies on the party against whom judgment would be given if no evidence were produced on either side.



In the instant case, it is fundamental to point out that, from the pleadings, the allegation of non-compliance is generated by the Petitioners. Under Sections 134(1) and 135 of the Electoral Act, the level of proof required for the success of the Petition is doubled. There must be proof of non-compliance and the further proof that the non-compliance affected substantially the result of the election.

In the face of such an allegation of non-compliance, the court is enjoined by the law not to invalidate an election if it appears that the election was conducted substantially in accordance with the principles of the Electoral Act.

All said and done, the Petitioners have the primary burden of proving that there was non-compliance and that the non-compliance affects substantially the result of the election before the burden can shift to the Respondents to establish that there was no substantial non-compliance with the Electoral Act in the conduct of the election.

The Petitioners have in their petition pleaded some of the facts relating to their complaint of non-compliance to the Electoral Act, 2022. The key paragraphs of their Petition in that regard are Paragraphs *18, 22, 23, 25, 28, 29, 35, 36, 37, 38, 39, 40, 41, 43, 44, 46* and *48* of the Petition.

CERTIFIED TRUE COPY

The Respondents joined issues with the Petitioners in respect of this issue and they all denied the facts pleaded by the Petitioners. The denials of the 1st Respondent, in its reply are very significant. In Paragraphs **17, 18, 19, 31, 32, 33, 34, 35, 36** and **37** of the 1st Respondent Reply to the Petition, the 1st Respondent in a great measure denied all the allegations of the Petition. Since these paragraphs are direct and straight denial by the 1st respondent, the burden of proof remains on the Petitioners to establish their claim as required by the law.

Apart from the 1st Respondent who is the primary Respondent due to the fact that it is its acts that are challenged in this Petition, the 2nd and 3rd Respondents who are the beneficiaries of the declaration of results also joined issues with the Petitioners. The 2nd Respondent in its Reply to the Petition countered all that the Petitioners pleaded in respect of this issue one with Paragraphs 6, 33, 56 and 57 thereof. The 3rd Respondent countered the Petitioners allegations with paragraphs 26, 37 and 40 of its Reply to the Petition.

Non-compliance in ordinary parlance means failure or refusal to do something that you are officially or statutorily supposed to do. See **SHULUWA & ANOR V. TOR J. AYE (2015) LPELR- 40476 (CA)** citing **OJUKWU V. YAR'ADUA (2009) 12 NWLR (PT. 1154) 50 AT 40 and AKEREDOLU V. MIMIKO (2013) LPELR- 20889 (CA)**.

CERTIFIED TRUE COPY

The Electoral Act, 2022 in an explicit manner, has laid out clearly grounds upon which an election can be questioned in Section 134 thereof. Then there is Section 135 of the said Act which looks like a proviso to Section 134. For a proper appreciation of the intendment of the law, Section 134 and 135 of the Electoral Act must be considered together. Sections 134(1) (b) and 135 (1) read:

> **134.(1) An election may be questioned on any of the following grounds-**
>
> **(b) the election was invalid by reason of corrupt practices or noncompliance with the provisions of this Act; or**
>
> **135.(1) An election shall not be liable to be invalidated by reason of noncompliance with the provisions of this Act if it appears to the Election Tribunal or Court that the election was conducted substantially in accordance with the principles of this Act and that the non-compliance did not affect substantially the result of the election.**

This ground of non-compliance to the Electoral Act has been in all our Electoral Laws even from when we had parliamentary system of government. The Courts have over the years shed a lot of light on the requirement of the law in proving the allegation of non-compliance. A short chronicle of the decisions of our Courts will throw more light on the evidential burden of proving non-compliance.

CA/PEPC/03/2023; CA/PEPC/04/2023; CA/PEPC/05/2023.



In *BASSEY V. YOUNG (1963) LPELR-15465 (SC), BRETT JSC* in the then Federal Supreme Court held as follows:

> *"...Akinfosile v. Ijose (1960) 5 F.S.C. 192, where the Court held that a petitioner who alleges in his petition a particular non-compliance and avers in his prayer that the non-compliance was substantial must so satisfy the Court. If there should be any inconsistency between the two decisions, it is the decision of this Court that binds us, and it would appear to me that we are bound by the authority of Akinfosile v. Ijose to hold that the petitioner must show both that irregularities took place and that they might have affected the result of the election."*

In *AWOLOWO V. SHAGARI & ORS (1979) LPELR- 653 (SC)*, the Supreme Court of Nigeria in the 1979 election contest held per Obaseki JSC as follows:

> *"Once a petitioner alleges a particular non-compliance and averred in his prayer that it was substantial it is his duty so to satisfy the Court or Tribunal having cognisance of the question. See AKINFOSILE v. IJOSE 5 FSC 92 AT 99 (a case dealing with Regulation 7 of the Elections (House of Representatives) Regulations 1958 which is in pari materia with Section 111 of the Electoral Decree 1977 as .........................to vitiate an election, the non-compliance must be proved to have affected the results of the election. See SORUNKE v. ODEBUNMI (1960) 5 FSC AT PP 177 AND 178, where Ademola, C.J.N, delivering the judgment of the Federal Supreme Court said: "Finally, in considering*


CERTIFIED TRUE COPY

*whether the election was void under the Ballot Act, Lord Coleridge said at page 751 of the judgment: 'If this proposition be closely examined it will be found to be equivalent to this, that the non-observance of the rules or forms which is to render the election invalid, must be so great as to amount to a conducting of the election in a manner contrary to the principle of an election by ballot, and must be so great as to satisfy the tribunal that it did affect or might have affected the majority of the voters, or in other words, the result of the election. When Lord Coleridge refers to a majority of voters, he cannot mean to say that non-compliance may be overlooked unless it affects over half of the votes cast. He referred to a non-compliance, which "affected the majority of voters, or in other words, the result of the election." It cannot be doubted that here Lord Coleridge means that those electors wishing to vote who formed a majority in favour of a particular candidate must have been prevented from casting a majority of votes in his favour with effect. This does not require that all their votes must have been disallowed; it will be sufficient if enough of their votes are disallowed to give another candidate a majority of valid votes."*

See also the cases of ***BUHARI & ANOR V. OBASANJO & ORS (2005) LPELR-815 (SC) and CPC V. INEC & ORS (2011) LPELR-8257 (SC)***.


CERTIFIED TRUE COPY

In all these decisions, the evidential burden of proof of non-compliance lies on the Petitioner who must first prove that there was non-compliance, and secondly that the non-compliance has substantially affected the results being contested. Let me say at the risk of sounding repetitive, that it is after the onus on the Petitioner is discharged to the satisfaction of the court that the onus would shift to the Respondents to establish that the results were not affected.

It follows, therefore, from the authorities referred to that for the Petitioners to succeed in their allegation of non-compliance, they must plead clearly in their Petition the non-compliance and call witnesses or place before the court cogent and credible evidence of such non-compliance. The Petitioners need to place before this Court evidence based on their pleadings indicating that the non-compliance has affected the votes cast at the election and that the impact is substantial enough to invalidate the election.

The Petitioners, it must be underlined, pleaded in Paragraph 4 of the Petition that the Petitioners had "agents in all the Polling Units, ward Collation Centres, Local Government Collation Centres and State Collation centres in all the states of the Federation and the Federal Capital Territory as well as the National Collation Centre". Of this crowd of agents, the Petitioners did not call any of their agents at the Polling

CERTIFIED TRUE COPY

Unit. The said agents at the Polling Units were the ones who were meant to sign and collect duplicate results in Form EC8A. The few agents called were State and National collation agents. Largely, their testimonies were hearsay. Let us now examine their evidence before the Court.

The PW1 is Captain Joe Agada (rtd.). His statement on oath is at pages **198** to **200** of the Petition. He was the Petitioners Collation agent for Kogi State. In Paras 7, 8 and 11 of his statement, he deposed that from his "analysis", he discovered various forms of non-compliance and corrupt practices such as suppression of votes, manipulation of BVAS machines, manipulation of accreditation, intimidation and harassment of voters, massive thumb-printing of ballot papers, etc.

This witness did not give particulars of these malpractices. There was no forensic report to support allegation of multiple thumb printing at the Polling Units. In *PDP & ANOR V INEC & ORS (2019) LPELR-48101(CA)*, this Court Per Agim, JCA (as he then was) held that it is only a Polling Unit agent or a person who was present at a Polling Unit during polls that can give admissible evidence of what transpired during the poll in that unit. See also **GOYOL & ANOR V. INEC & ORS** (2012) 11 NWLR (PT. 1311) 207, 218 and *BUHARI V. INEC & ORS* (PT.1120) 246, 424. In the instant case, PW1 was not a Polling Agent. He was a Collation Agent. When cross-examined, he said he would be wrong to say that he was

CERTIFIED TRUE COPY

present when all the ballot papers and boxes were manipulated; that he visited only 20 Polling Units out of the over 3,000 Polling Units in Kogi State. He admitted that his party had Polling Unit Agents in all the Polling Units and that they are still alive.

The PW2 is also a Collation Agent. His witness statement on oath is at pages 213-215 of the Petition. His statement is similar to that of the PW1. He is Dr Solarin Sunday Adekunle. He was the Collation Agent of the Petitioner for Ogun State on the election day. Under cross-examination, he said he only visited 19 Polling Units out of the 5,040 of the Polling Units in Ogun State.

PW3, PW4, PW5, PW6, PW7, PW8, PW9, PW10 and PW11 are all Collation agents. The evidence of these witnesses centred around the events and the duties carried out by the Polling Unit Agents of the petitioners. They agreed under cross-examination that the Polling Unit Agents functioned very well in their units.

Under our law, specifically in Section 43 of the Electoral Act, 2022, Polling Agents are permitted to be appointed by Political Parties for each Polling Unit and collation centre. The wisdom in this is for each of the political parties involved in an election to be represented by its own agents. The duties of an agent are to represent the interest of his/her

CA/PEPC/03/2023; CA/PEPC/04/2023; CA/PEPC/05/2023.

655

CERTIFIED TRUE COPY

principal. Having regard to the fact that no mortal man can be in all the places at the same time, the law allows political parties to have their agents at all polling units and collation centres. It is therefore not anticipated by the law for any political party to appoint an octopus agent with his tentacles in all the polling units and collation centres. This is humanly not practicable. When, therefore, evidence is required to prove what happened in any polling unit or a collation centre, it is only the agent who witnessed the anomaly or the malfeasance that can legally and credibly testify. See *BUHARI V. OBASANJO (SUPRA); OKE & ANOR V. MIMIKO (SUPRA) AND ANDREW V. PDP (SUPRA)*.

It follows, therefore, that **PW1, PW2, PW3, PW4, PW5, PW6, PW7, PW8, PW9, PW10, PW11, PW19, PW20, PW22,** who were State and National Collation agents of the petitioners can only testify of the events in their units or Collation centres where they voted or acted as agents and not all over the states of the Federation. The Polling agents as presented in this petition, it must be noted, are not shown to be experts. The issue of their analysing results of the election at the Ward, Local Government, State and National Level without calling Polling Unit agents who witnessed the real casting of votes and events at the voting units cannot therefore arise. They cannot validly testify of non-compliance at the Polling Unit level. Their evidence can only count as to what they saw, not what they were told by their field agents. What they

CERTIFIED TRUE COPY

were told is hearsay evidence. Section 38 of the Evidence Act 2011 specifically states that hearsay evidence is not admissible except as provided for in the law. This Court and the Supreme Court in several cases have explained the intendment of this Legislation. In *JAMB V. ORJI (2008) 2 NWLR (PT. 1072) 552*, the Court held:

> *"What then is hearsay? Evidence of a statement made to a witness by a person who is not himself called as a witness may or may not be hearsay. It is hearsay and inadmissible when the object of the evidence is to establish the truth of what is contained in the statement. It is not hearsay and admissible when it is proposed to establish by evidence not the truth of the statement but the fact that it was made."*

See also *UTTEH V. STATE (1992) LPELR- 6239; UKUT V. STATE (1995) LPELR-3357(SC); KASA V. STATE (1994) LPELR-1671 (SC), BUHARI V. OBASANJO (2005) LPELR-815 (SC)*. It is therefore settled law that hearsay evidence is not admissible to prove a fact of non-compliance with the Act.

It follows that the evidence of the collation agents in this instant case who are **PW1, PW2, PW3, PW5,** and **PW7** relating to suppression of votes, multiple thumb printing of ballot papers, entering of wrong scores/results, disruption of voting, are inadmissible hearsay and are hereby discountenanced.


CERTIFIED TRUE COPY

In the instant Petition, the Petitioners called 27 witnesses and tendered documents and exhibits. The main and crucial complaint of the Petitioners from the evidence placed before the court was the inability of the presiding officers employed and used by the 1st Respondent to upload and transmit the polling unit results to the 1st Respondent's Result Viewing Portal (I-ReV) and the electronic collation system. Of the 27 witnesses called by Petitioners, ten of them were presiding officers who manned some Polling Units on the election day. A look at their evidence will bring out the facts of how the presidential election was conducted in some of the Polling Units on 25th of February 2023. These witnesses are **PW12, PW13, PW14, PW15, PW16, PW17, PW18, PW23, PW24** and **PW25**.

The PW12 is **Egwumah Omachukwu**. The witness was on subpoena. He was the presiding officer in Polling Unit 017, Ward 03, Aba North of Abia State. His evidence is that the election was conducted at his Polling Unit and that at the end of the election, the results were recorded on the result sheet and duplicate copies given to the party agents at the Polling Unit. He stated that he had challenges in uploading the presidential election results from his Polling Unit to the IReV portal and electronic collation portal. When cross-examined, the PW12 testified that the election was peaceful and that it was the image of the result on Form EC8A that was supposed to be uploaded to the IReV portal. He further

CERTIFIED TRUE COPY

testified that the result sheets were delivered at the ward collation centre to the INEC Ward Collation Officer. He said he was happy with the conduct of the election.

The PW13, **Grace Timothy,** who was the presiding officer for a Polling Unit in Bauchi State, corroborated the testimony of the PW12. She could not upload the result of the election to the IRev but that the party agents signed Form EC8A and that she took the original result to the Ward collation centre.

The PW14, **Grace Ajagbonna,** whose station was Polling Unit 6 Ward 1 Yagba West Local Government Area of Kogi State, equally testified that the election result from her unit (Form EC8A) was signed by her and all the party agents before she took the result to the Ward Collation Centre.

The PW15 **Abidemi Joseph** was the presiding officer in charge of Polling Unit 047, Ward 09 Maje of Babanbola Community in Maje, Suleja, Niger State. She gave the evidence also that election was conducted in her Unit and that the results were signed by her and the Party agents before she took it to the Ward Collation Centre. She also could not upload the result to the I-ReV viewing portal of INEC.

The PW16, **Edosa Obosa** was the presiding officer at Polling Unit 09 Uwelu Health Centre, Egor Ward 05, Edo State. She equally testified that

CERTIFIED TRUE COPY

even though voting went well in the election at her Polling Unit, she was unable to upload the result of her unit to the I-ReV using the BVAS. She did the manual recording of the results into form EC8A and signed the result along with the party agents. The result was equally taken by her to the Ward Collation Centre.

The same story was told by the PW17, **Alheri Ayuba** who presided at the Polling Unit 085, Garki Ward 02, F.C.T., Abuja. She used BVAS for accreditation of voters but could not upload the results through BVAS to I-ReV. She and the party agents signed the results and she took the results to the Ward Collation Centre.

Even the testimony of **Muhammed Haruna Sadiya,** the PW18, is in the same order. She was the presiding officer for Unit 085, AMAC City Centre, Ward 06 in FCT, Abuja. She testified she could not also upload the results to the I-ReV. She entered the results manually to Form EC8A and took it to the Ward Collation Centre. She testified that she gave copies of the result to the party agents before taking the original to the Ward Collation Centre.

**Janet Nuhu Turaki**, the PW23 who was the Presiding Officer for Bolari West Ward 04, AB Bomala Danladi Jalo Polling Unit 03, Gombe State, could not upload the results to I-ReV after using BVAS to snap the result as recorded in Form EC8A. She however testified that the Party Agents

CERTIFIED TRUE COPY

signed the results with her before she took the result to the Ward Collation centre.

The same run of evidence was given by PW24 **Christopher Bulus Ardo,** presiding officer in Maru Ward 04 Polling Unit 012 Tsohuwar Kasuwa Maru, Zamfara State. In Paragraph 9 of his deposition on Oath, he said the election was successful except for failure to upload the results to the I-ReV.

The PW25, **Victoria Sanni,** who was the presiding at Polling Unit 020, Ward 01, Batagarawa Local Government Area of Katsina State, had the same testimony and experience with the BVAS and the issue of uploading results to I-ReV.

The testimonies of these witnesses were so clear and cogent that the election went well. The only difficulty was in uploading the results to the I-ReV portal. These highlighted witnesses were all called by the Petitioners. The witnesses here were emphatic that the voting and the election in their respective units went well, the votes were collated and results announced at the Polling Units. Party agents signed the result Form EC8As.

The witnesses called to establish the fact of non-upload of results emphatically and directly testified that the election went well and votes

CERTIFIED TRUE COPY

were accounted for and sent to the Ward Collation Centre for collation of the results. These ten witnesses were all presiding officers engaged by the 1st Respondent for the election of 25/2/2023.

There is no gainsaying the fact that under the Electoral Act, 2022, election is not just a process, it is a well-regulated process. In fact, in the case of **OKE & ANOR V. MIMIKO & ORS (2013) LPELR - 21368(SC)**, the Supreme Court, Per Peter-Odili, JSC scripting out the meaning of Election, held as follows:

> *"On this vexed issue, I would want to hang for support on the case of Abubakar v. Yar'Adua (2008) 19 NWLR (Pt.1120) 1 at 70 in which "election" was defined thus: 'Election is a process spanning a period of time and comprises a series of actions from registration of voters to polling."*
>
> *Then in Bille v. State (2016) LPELR -40832(SC), the court per Per NGWUTA, JSC (P. 30, paras. C-E) explained further that "Election is defined as, inter alia, the act of choosing or selecting one or more from a greater number of persons, things, courses or rights." See Black's Law Dictionary Special Deluxe Fifth Edition page 464. The Oxford Advanced Learner's Dictionary page 372 defines it as "the action or an instance of choosing by vote one or more of the candidates for a position especially a political office."*


CERTIFIED TRUE COPY

The process of election commences with the nomination of candidates through political party primaries. Then it moves into the election proper which entails the voting, the collation and announcement of results. To make these processes tidy, clearer and credible, the Electoral Act devotes time into making provisions for specificity of actions and steps at each stage. It will not be out of place, my lords, considering the strategic and fundamental nature of our election to survey some of the provisions of the law in this respect. The law made provision for accreditation of voters and voting in Section 47 of the Act. The Section provides:

> *"47. (1) A person intending to vote in an election shall present himself with his voter's card to a Presiding officer for accreditation at the polling unit in the constituency in which his name is registered.*
>
> *(2) To vote, the presiding officer shall use a smart card reader or any other technological device that may be prescribed by the Commission, for the accreditation of voters, to verify, confirm or authenticate the particulars of the intending voter in the manner prescribed by the Commission.*
>
> *(3) Where a smart card reader or any other technological device deployed for accreditation of voters fails to function in any unit and a fresh card reader or technological device is not deployed, the election in that unit shall be cancelled and another election shall*

CA/PEPC/03/2023; CA/PEPC/04/2023; CA/PEPC/05/2023.                    663


CERTIFIED TRUE COPY

> *be scheduled within 24 hours if the Commission is satisfied that the result of the election in that polling unit will substantially affect the final result of the whole election and declaration of a winner in the constituency concerned."*

This law has made it mandatory for accreditation of voters for the election to be done with the aid of a smart card reader or any other technological device that may be prescribed by the 1st Respondent. The 1st Respondent exercised the discretion given by the law to prescribe the use of Bimodal Voter Accreditation System for short and popularly known as "BVAS" or "BVAS Machine". As the name indicates, BVAS is primarily a technological device for accreditation. By paragraph 18(a) of the Regulations and Guidelines for the conduct of Elections, 2022, the use of BVAS for accreditation is mandatory and all the poll officers who fail to use it for accreditation shall be accused of dereliction of duties and penalised. It is after a voter passes accreditation that he will be allowed to vote.

The bottom line of every election exercise is to choose one out of many or to show affirmation of the approval of a candidate who wins the election to lead the country in the instant case as the President of the country. To achieve this goal, election must be result oriented and successful. A successful election must produce a winner who is expected

CERTIFIED TRUE COPY

to emerge by popular vote and as specified in Section 134 of the 1999 Constitution. It is in this respect that all votes cast at an election must be duly secured, collated and counted.

The Electoral Act is so clear and explicit on the issue of the votes cast and the results at the Election. Let me start with Section 25 of the Electoral Act which provides thus:

> *" 25 (1) The results of all the elections shall be announced by the-*
>
> *(a) Presiding officer at the polling unit;*
> *(b) Ward Collation Officer at the registration area or Ward Collation Centre;*
> *(c) Local Government or Area Council Collation Officer at the Local Government or Area Council Collation Centre; and*
> *(d) State Collation Officer at the State Collation Centre.*
> *(2) The returning officer shall announce the result and declare the winner of the election at -*
>
> *(g) State Collation Centre in the case of a Presidential election; and*
>
> *(h) National Collation Centre in the case of election of the President.*
>
> *(3) The Chief Electoral Commissioner shall be the returning officer at the Presidential election. "*




CERTIFIED TRUE COPY

This provision makes it clear and straight forward that voting for all elections takes place at the Polling Units and that is where election is won or lost. The law requires that since the Presidential Election, unlike others, is not done in one location but throughout the country, collation of votes commences at the Registration Area/Ward Level after voting then, it moves to the Local Government Level, and then to the State Collation Centre and finally to the National Collation centre. It is after this that the winner of the election shall be announced.

Furthermore, Sections 60 and 62 of the Electoral Act deal with the counting and collation of votes cast. These Sections provide thus:

> *"60. (1) The Presiding officer shall, after counting the votes at the polling unit, enter the votes scored by each candidate in a form to be prescribed by the Commission as the case may be.*
>
> *(2) The form shall be signed and stamped by the presiding officer and counter signed by the candidates or their polling agents where available at the polling unit.*
>
> *(3) The presiding officer shall give to the polling agents and the police officer where available a copy each of the completed forms after it has been duly signed as provided under subsection (2).*
>
> *(4) The presiding officer shall count and announce the result at the polling unit.*



*(5) The presiding officer shall transfer the results including total number of accredited voters and the results of the ballot in a manner as prescribed by the Commission.*

*(6) --------------------------------------------------"*

*"62. (1) After the recording and announcement of the result, the presiding officer shall deliver same along with election materials under security and accompanied by the candidates or their polling agents, where available, to such person as may be prescribed by the Commission.*

*(2)    The Commission shall compile, maintain and update, on a continuous basis, a register of election results to be known as the National Electronic Register of Election Results which shall be a distinct database or repository of polling unit by polling unit results, including collated election results, of each election conducted by the Commission in the Federation, and the Register of Election Results shall be kept in electronic format by the Commission at its national headquarters.*

*(3)    Any person or political party may obtain from the Commission, on payment of such fees as may be determined by the Commission, a certified true copy of any election result kept in the National Electronic Register of Election Results for a State, Local Government, Area Council, registration area or Electoral Ward or Polling Unit, as the*



CERTIFIED TRUE COPY

*case may be, and the certified true copy may be in printed
or electronic format."*

These provisions of the Electoral Act are very simple, plain and straight
forward and do not require any technical rule of construction. The law is
trite that where words used in a statute are clear and unambiguous the
Courts are enjoined to interpret the words in their ordinary and natural
meanings. Words used are to be interpreted in a way that will not clash
with and defeat the manifest intention of the legislation. Every legislation
is scripted by the law makers with a purpose. The Court must be careful
not to interpret the law so as to create absurdity or make nonsense of
the law. See ***UMEANO & ORS V. ANAEKWE & ANOR (2022) LPELR-56855
(SC), JEGEDE & ANOR V. INEC & ORS (2021) LPELR-5548 (SC); AGUMA V
APC & ORS (2021) LPELR-55927 (SC); LADO & ANOR V. MASARI & ORS
(2019) LPELR-55596 (SC).***

The law as prescribed in Sections 60 and 62 of the Electoral Act 2022 does
not in any form or sense make any provision or pretension as to any form
of counting and collation of Election results other than manual collation.
In ***OYETOLA V. INEC (SUPRA)***, the Supreme Court, per Agim J.S.C. held on
the transmission of results, the essence and status of the collation system
and the INEC I-ReV portal as follows:

> "As I had held herein, there is no part of the Electoral Act
> requiring the Presiding Officer to transmit the accredited



voters in a polling unit or the polling unit result during election to the INEC data base as part of the election process. As stated in S.62(1) of the Electoral Act, 2022 "After the recording and announcement of the result, the presiding officer shall deliver same along with election materials under security and accompanied by the candidates or their polling agents, where available, to such person as may be prescribed by the Commission. This is to enable the Commission compile, maintain and update, on a continuous basis, a register of election results. This intention is clear from Subsection (2) of S.62 which provides that "the Commission shall compile, maintain and update, on a continuous basis, a register of election results to be known as the National Electronic Register of Election Results which shall be a distinct database or repository of polling unit by polling unit results, including collated election results, of each election conducted by the Commission in the Federation, and the Register of Election Results shall be kept in electronic format by the Commission at its national headquarters………..

As their names depict, the Collation System and the INEC Result Viewing Portal are part of the election process and play particular roles in that process. The Collation System is made of the centres where results are collated at various stages of the election. So the polling units results transmitted to the collation system provides the relevant collation officer the means to verify a polling unit result as the need arises for the purpose of collation. The results transmitted to the Result Viewing Portal is to give the public at large the opportunity to

CERTIFIED TRUE COPY

view the polling unit results on the election day. It is clear from the provisions of Regulation 38(i) and (ii) that the Collation System and Result Viewing Portal are different from the National Electronic Register of Election Results. The Collation System and Result Viewing Portal are operational during the election as part of the process, the National Electronic Register of Election Results is a post-election record and is not part of the election process."

See **PAGES 22-23** of the report.

With this state of the law, let us now assess the case of the Petitioners in this petition. The Petitioners, as earlier mentioned in this judgement, are claiming that the failure of the 1st Respondent to upload the election results constitutes non-compliance to the Electoral Act. They pleaded thus in Paragraphs 14 and 15 of their Petition:

"13. The Petitioners hereby plead and shall rely on Form EC8D(A) (being the summary of final collation of results) and Form EC8E (being the final declaration of result) issued by the 1st Respondent, not only to show the purported scores as recorded by the 1st Respondent, but also to show the invalidity of the scores as recorded therein. Notice is hereby given to the 1st Respondent to produce the original copies of these documents at the hearing of this Petition. The Petitioners further state that on the face of the Form

CERTIFIED TRUE COPY

EC8D(A), there are calculation errors as shown and contained in the Report of the Statisticians which the Petitioners shall rely upon, and which is herein pleaded.

14. The Petitioners plead and also rely on the Reports and evidence by their Experts, including Statisticians, Forensic Examiners and other Experts pursuant to the Orders for Inspection, Examination and Production of election materials granted to the Petitioners by this Honourable Court."

The Petitioners by this pleading are relying on the summary of final collation and declaration of results which are in Forms EC8D(A) and EC8E as issued by the 1st Respondent. The issues generated on this were not about the scores but the alleged invalidity of the scores and the error of calculation of the scores.

This pleading was not admitted by the 1st Respondent. In reply, the 1st Respondent joined issues with the Petitioners in Paragraphs 9, 10 and 11 of their reply filed on 11/4/2023 thus:

*"9. The 1st Respondent denies paragraph 12 of the Petition. It states further that it did not wrongly return the 2nd Respondent as the winner of the Presidential Election held on Saturday, February 25, 2023. The 1st Respondent did not*



*allocate or ascribe any vote to any of the candidates at the said election.*

*The 1st Respondent only tallied and recorded the votes scored by the respective candidates as prescribed by the Electoral Act. The 1st Respondent pleads and shall at the hearing of this Petition rely on the relevant result sheets as diligently collated and declared by it.*

*10. In specific response to paragraph 14 of the Petition, the 1st Respondent states that the results contained in Forms EC8D(A) and EC8E constitute a true reflection of the valid votes scored by the respective candidates at the election and further avers that there are no calculation errors on the face of the Forms.*

*11.  In further answer to paragraph 14 of the Petition, the 1st Respondent shall contend at the trial that the alleged calculation or report of Statisticians hired and retained by Petitioners which was not front-loaded at the time of filing this Petition are wrong and unreliable."*

It is settled law that issues for trial by the Court are joined in the pleadings and that parties and indeed the Court are bound by the pleadings of the parties. The Petitioners' case stands to collapse if no evidence is called on the issue. See ***ORUWARI V. OSLER (2012) LPELR-19764 (SC) and KUBOR***

CERTIFIED TRUE COPY

*& ANOR V. DICKSON & ORS (2012) LPELR-9817 (SC).* In the instant case, the Petitioners anchored their case in this issue on the report of the statistician, forensic examiner and other experts. The Statistician's Report referenced by Paragraphs 14 and 15 of the Petition was tendered in Court through PW21, Mr. Samuel Oduntan. He testified on 14/6/2023. The Statistician's Reports were tendered, admitted and marked Exhibit PAH1, PAH2, PAH3 AND PAH4 respectively. This Report was challenged by the Respondents, and in our earlier ruling we came to the conclusion that it was incompetent and liable to be struck out and was in fact struck out. Without prejudice to that ruling, I wish to assess its value nevertheless. P.W.21, the maker of the said Reports, was cross-examined in Court by all the respondents and he showed clearly that he is an unreliable witness. He was contradicting himself on issues around his report. Apart from the fact that this witness is a subpoenaed witness whose witness statement on oath was not frontloaded, he did not present himself as a credible witness. Hear him under his cross-examination by Mahmoud, SAN, for the 1ST Respondent:

> "I have formal training in Information Technology (IT). I stated so in my written statement.
>
> I was commissioned by the Petitioners. I was compensated by the Petitioners for my work. I am an expert in Statistics. Apart from what I stated in paragraph 5 of my witness statement. I



have enough experience in my work and election Petitions. One does not need to be an expert to read INEC Form EC8As.

I commenced my work sometimes in April. It took me about a month to complete my assignment. I

cannot recall any proceeding where I admitted that I am not an expert. I agree that if my primary data is defective or incomplete, my conclusions could be wrong or incorrect. I also agree that if my methodology is wrong my conclusion will be wrong. I have seen page 4 of Exhibit PAH1. That page refers to the methodology I used. I was referring to Forms EC8As.

I inspected the Forms EC8As at the INEC Headquarters.

I do not know if those Forms EC8As are before the Court. I am aware that the Form EC8As are stored in the various State Headquarters.

If what I stated in paragraph 2 at page 4 of Exhibit PAH1 is wrong my conclusion will be wrong.

I have seen column 1 of Vol.3 (Exhibit PAH4) at page 1 line 1. It refers to polling unit 009 Ward 6 of Anambra State."

When cross-examined by Chief Wole Olanipekun, S.A.N., for the 2nd Respondent, the PW21 said:

> **"I have seen paragraph 5(a) of my Written Statement on Oath. It is true that I did not present the Report in Khalil v. Yaradua. I agree that no pictorial images of the Electoral Documents I referred to in my statement are attached to my statement…."**

CA/PEPC/03/2023; CA/PEPC/04/2023; CA/PEPC/05/2023.                                    674



*"I am aware that PDP won the election in Adamawa State. By my Report, we are not satisfied by the votes returned by INEC in Adamawa State including the votes scored by the 1st Petitioner. I say so because I am not satisfied by irregular votes recorded in Adamawa State that is why I sought the deduction of those votes. By my Report, the Petitioners won the election in 12 States. By my figures, I am not satisfied with the score for PDP in those States because they are printed with irregularities. I am also aware that Labour Party also won the election in 12 States. In all the States won by Labour Party, I have also called for the deduction of those votes.*

*I was in the situation room of the PDP on the day of the election. I have seen the Report for Kano State in Exhibit PAH2."*

Furthermore, in response to the cross-examination of the learned Senior Counsel for the 3rd Respondent, Fagbemi, SAN, the P.W.21 said:

*"It is true that I have been following INEC activities since 1999. There was a time that INEC Chairman said the Results for the 2023 elections will be transmitted electronically and real time. I did not hear the INEC Chairman announce two days to the election that due to security and cash crunch challenges it will not be possible to transmit the results as promised. The inspection of the Electoral Documents was carried out in the presence of the agents of PDP. I did not make copies of those documents. I was assisted in my*




CERTIFIED TRUE COPY

*assignment by a number of people. Each of these people played a role. I stated the role played by each of those persons. I have seen volume 3 of my Report.*

*The said vol.3 of my report deals with INEC documents which were not signed/or stamped. I did not indicate which of them were not signed or stamped.*

*I have seen the table in paragraph 11.2 of my witness statement. Only 26 states are mentioned therein. In my Report on the electoral documents not signed or stamped I mentioned 28 states. I stated that I analysed the electoral documents from 36 states. It is true that a candidate's votes cannot be deducted more than once in a unit.*

*I did not conduct extraction of the BVAS Report.*

*I am aware that BVAS machine was used for accreditation. I am the only one who signed the Report because I was the team lead. I worked in all the States where alteration took place including States where PDP won."*

It is trite in our law that cross-examination is a formidable tool for the demolition of the case of the opponent. The purpose of cross-examination is to discredit the witness called by the adversary. In the recent case of **PDP & Ors V. Muhammad & Anor (supra)**, the Supreme Court held that the primary object of Cross-examination is to contradict the evidence of the opponent's witness in order to weaken his case. It is best resorted to in order to test the veracity of the witness.




It has in the instant case been clearly established that by cross examination the PW21's testimony has lost its steam and value.

A closer look at the Reports, **EXHIBITS PAH1- PAH3,** will indicate that the witness was talking of 5,270 Polling Units wherein he claimed that Form EC8A series were altered and or not signed. It also talked of 15,002 Polling Units where Form EC8A's were not stamped and signed, yet all that is contained in the report are figures and data of these forms. None of the physical forms was exhibited in the Report or tendered separately by any of the witnesses. In that situation, it is very difficult for the court to ascertain the truth of the allegation that several Forms EC8A series had a lot of alterations and that they were not signed by the presiding officers. The law particularly requires that the presiding officers must sign the results. Signing form EC8A is subscribing to the authenticity of the results. Where there is allegation that the Forms were not signed, it must be clearly proved by the Petitioners. The result Forms must be presented in Court for the Court to verify lack of signature/stamp and any alteration on the forms. Since PW21 who authored **Exhibits PAH3** and **PAH4** did not place in his report, and the Petitioners did not call any of the Polling Unit agents to testify and place the Forms before the court to give vent to the allegation of alteration and non-signing of the Form EC8As for the 5,270 Polling Units listed in **EXHIBIT PAH2** and the form EC8As not signed and



CERTIFIED TRUE COPY

stamped for the 15,002 Polling Units in **Exhibit PAH3**, that allegation is unfounded and not proved as required by the law.

On Petitioners' allegation that 1st Respondent failed to collate the election result using the Electronic Collation System, the Petitioners have not been able to prove that the Electoral Act or the Guidelines made it mandatory for electronic collation system. I have carefully considered the submissions of the parties on this issue of non-compliance with the provisions of the Electoral Act and the Paragraphs of the Regulations and Guidelines for the Conduct of the Election, 2022. The Independent National Electoral Commission (INEC), the 1st Respondent herein, is established by Section 153(1)(f) of the Constitution of the Federal Republic of Nigeria, 1999, and part of its functions as stated in Paragraph 15, Item F, Part I of the Third Schedule to the said Constitution, is to organize, undertake and supervise elections, including election to the offices of the President and Vice President, among other political offices listed. Being a creation of the Constitution, INEC is empowered by Section 160(1) of the Constitution to make its own rules or otherwise regulate its own procedure; and in so doing it shall not be under the control of the President. Indeed, by Section 158(1) of the Constitution, INEC shall not be subject to direction or control of any authority or person.

CERTIFIED TRUE COPY

By Section 4 of the 1999 Constitution, the legislative powers of the Federal Republic of Nigeria is vested in the National Assembly, which in the exercise of that power has enacted the Electoral Act, 2022 to regulate the conduct of elections in the Federal, State and Area Councils of the Federal Capital Territory. Section 47(2) of the Electoral Act, relied upon by the Petitioners mandates every Presiding Officer to use a smart card reader or any other technological device that may be prescribed by the Commission, for the accreditation of voters to verify, confirm or authenticate the particulars of the intending voter in the manner prescribed by the Commission. Also, under Section 60(5) of the Act, the Presiding Officer shall transfer the results of the election, including the total number of accredited voters and the results of the ballot in a manner as prescribed by the Commission. Section 62(1) of the Act specifically provides that after the recording and announcement of the result, the Presiding Officer shall <u>deliver</u> same along with election materials under security and accompanied by the candidates or their agents where available to such person as may be prescribed by the Commission. Further, Section 64(4) states that a Collation Officer or returning Officer at an election shall collate and announce the results of an election subject to his/her verification and confirmation that – (a) number of accredited voters stated on the collated result are correct and consistent with the number of accredited voters recorded and

CERTIFIED TRUE COPY

transmitted directly from polling units under Section 47(2) of the Act; and (b) the votes stated on the collated result are correct and consistent with the votes or results recorded and transmitted directly from the polling units under Section 60(4) of the Act.

At this stage, it should be noted that Section 47(2) referred to in Section 64(4)(a) relates to procedure for accreditation of voters by the Presiding Officer using the technological device prescribed by the Commission. As for Section 60(4) referred to in Section 64(4)(b) of the Act, it only mandates the Presiding Officer to count and announce the result at the polling unit. In fact, subsection (5) of Section 60 goes ahead to mandate the Presiding Officer to transfer the result including total number of accredited voters and the results of the ballot in a manner as prescribed by the Commission.

The Act also provides in Section 64(5) that the Collation Officer or returning Officer shall use the number of accredited voters recorded and transmitted directly from polling units under Section 47(2) of the Act and the votes or results recorded and transmitted directly from polling units under Section 60(4) of the Act to collate and announce the result of an election if a collated result at his or a lower level of collation is not correct.

CA/PEPC/03/2023; CA/PEPC/04/2023; CA/PEPC/05/2023.

680



From the aforementioned Sections, it is clear that while subsection (4) of Section 64 provides for what the collation or returning officer will use to verify and collate the results, subsection (5) also provides for what the collation or returning officer will use to collate the results. Subsection (6) of the same Section provides for what the collation or returning officer will use to determine the correctness of disputed result where there is a dispute. These are: (a) the original of the disputed collated result for each polling unit where the election is disputed (which in our view means the physical or hard copy of the disputed collated result); (b) the technological device used for accreditation of voters in each polling unit where the election is disputed; (c) the data of accreditation recorded and <u>transmitted directly</u> from each polling unit where the election is disputed as prescribed under Section 47(2) of this Act; and (d) the votes and result of the election recorded and <u>transmitted directly</u> from each polling unit where the election is disputed as prescribed under Section 60(4) of the Act (which requires only the counting and announcement of the result at the polling unit).

A careful examination of the above Sections relied upon by the Petitioners shows that the Electoral Act had used the words "deliver" in Section 62(1), "transfer" in Section 60(5) and "transmitted directly" in Sections 50(2), 64(4), (5) and (6), of the Electoral Act, 2022, in stating how results of elections should be handled under those provisions. A



look at the definitions of those words in the Blacks' Law Dictionary, Sixth Edition shows that the word "transfer" is defined at page 1497 as "to convey or remove from one place, person, etc., to another;" or to "pass or hand over from one to another"; or to "specifically to change over the possession or control." The word "transmit" on the other hand is defined by the same Law Dictionary to mean "to send or transfer from one person or place to another or to communicate."

In my view, the Electoral Act, 2022 has used the words "deliver", "transfer" and "transmitted directly" interchangeably to describe how the results of the election shall be moved from one stage to another until the results are finally collated and declared. In all these, the Electoral Act, 2022 has not specifically provided that the results of the election shall be electronically transmitted.

It is in the exercise of its powers under Section 160(1) of the 1999 Constitution and Section 148 of the Electoral Act, 2022, INEC, that the 1st Respondent herein, made the Regulations and Guidelines for the Conduct of Elections, 2022 as well as INEC Manual for Election Officials, 2023. In paragraphs 14(a) and 18(a) of the Regulations, the 1st Respondent prescribed the Bimodal Voter Accreditation System (BVAS) as the technological device for the purpose of accreditation and verification of voters in the 2023 general Elections.

CA/PEPC/03/2023; CA/PEPC/04/2023; CA/PEPC/05/2023.

682

CERTIFIED TRUE COPY

The Petitioners have also hinged their allegation of non-compliance on Paragraphs 38(i) and (ii), 48(a), (b) and (c), 50(v), (vii) and (xx), 51(ii), 54(xii), 55(xii) and 93 of the Regulations and Guidelines. Paragraph 38 of the Regulations provides:

"**38. On completion of all the Polling Units voting and results procedures, the Presiding Officer shall:**

(i) **Electronically transmit or transfer the result of the polling unit, direct to the collation system as prescribed by the Commission.**

(ii) **Use the BVAS to upload a scanned copy of the EC8A to the INEC Result Viewing Portal (IReV), as prescribed by the Commission.**

(iii) **Take the BVAS and the original copy of each of the Forms in tamperevident envelope to the Registration Area/Ward Collation Officer, in the company of Security Agents. The Polling Agents may accompany the Presiding Officer to the RA/Ward Collation Centre.**"

"**48 (a) An election result shall only be collated if the Collation Officer ascertains that the number of accredited voters**



agrees with the number recorded in the BVAS and votes scored by Political Parties on the result sheet is correct and agrees with the result electronically transmitted or transferred directly from the Polling Unit as prescribed in these Regulations.

(b)   If a Collation or returning Officer determines that a result from a lower level of collation is not correct, he/she shall use the result electronically transmitted or transferred directly from that lower level to collate and announce the result.

(c)   If no such result has been directly transmitted electronically for a polling unit or any level of collation, the provision of Clause 93 of these Regulations shall be applied."

"50.  The Registration Area/Ward Collation Officer shall:

(v)   Compare the number of voters verified by the BVAS with the number of accredited voters and total votes cast for the Polling Unit as contained in Form EC8A series for each Polling Unit.



(vii) Validate the scanned copy of Form EC8A and upload same to the IReV Portal with the assistance of the Registration Area Technical Support Staff (RATECHs);

(xx) Electronically transmit or transfer the result directly to the next level of Collation as prescribed by the Commission.

51. Where there is any discrepancy in a result submitted by a Presiding Officer to the RA/Ward Collation Officer as verified from result transmitted or transferred directly from the Polling Unit, the RA/Ward Collation Officer shall:

(i) Request explanation from the Presiding Officer(s) concerned about the circumstances of the discrepancy;

(ii) Locate the point of discrepancy, resolve the discrepancy using the electronic result and request the Presiding Officer to endorse the resolution; and

(iii) Make a report of the discrepancy to the next level of collation."

"93. Where the INEC hardcopy of collated results from the immediate lower level of collation does not exist, the Collation Officer shall use electronically transmitted results or results from the IReV portal to continue collation. Where

CA/PEPC/03/2023; CA/PEPC/04/2023; CA/PEPC/05/2023.

685



CERTIFIED TRUE COPY

> **none of these exist, the Collation Officer shall ask for duplicate hardcopies issued by the Commission to the following bodies in the order below:**
>
> **(i)     The Nigeria Police Force; and**
>
> **(ii)    Agents of Political Parties."**

From the foregoing provisions of the Regulations and Guidelines relied upon by the Petitioners, it is clearly evident to me that although the Electoral Act has provided in Section 62(1) for the delivery by the Presiding Officer of the result along with other election materials under security and accompanied by candidates or their polling agents, where available, to such person as may be prescribed by the 1st Respondent, the 1st Respondent has by Paragraph 38 of the Regulations and Guidelines quoted above, introduced electronic transmission to a collation system in addition to the physical transfer of the election results to the Registration Area/Ward Collation Officer.

As stated earlier, the technological device prescribed by INEC in the conduct of the 2023 election is the Bimodal Voter Accreditation System (BVAS). The functions of the BVAS as stated in paragraphs 14(a) and 18(a) is for verifying the voter, through a positive identification of the voter and authentication of the voter, by matching his or her fingerprints or face (facial recognition), thus accrediting the voter to vote at the election

CERTIFIED TRUE COPY

and storing the data and number of such accredited voters. By Paragraph 38(ii) and (iii) of the Regulations, the BVAS is also to be used by the Presiding Officer to upload a scanned copy of the EC8A to the INEC Result Viewing Portal (iReV), after which the Presiding Officer shall take the BVAS and the original copy of each of the forms to the Registration Area/Ward Collation Officer.

From the above functions of the BVAS, it is clear to me that, apart from using the BVAS to scan the physical copy of the polling unit result and upload same to the Result Viewing Portal (iReV), there is nothing in the Regulations to show that the BVAS was meant to be used to electronically transmit or transfer the results of the Polling Unit direct to the collation system. It should be noted that INEC Results Viewing Portal (IReV) is not a collation system. The Supreme Court in **OYETOLA v INEC (2023) LPELR-60392(SC)** has explained the difference between the Collation System and the IReV. In that case, Agim, JSC held as follows:

> "As their names depict, the Collation System and the INEC Result Viewing Portal are part of the election process and play particular roles in that process. The Collation System is made of the centres where results are collated at various stages of the election. So, the polling units results transmitted to the collation system provides the relevant collation officer the means to verify a polling unit

 CERTIFIED TRUE COPY

> result as the need arises for the purpose of collation. The results transmitted to the Result Viewing Portal is to give the public at large the opportunity to view the polling unit results on the election day."

A community reading of the relevant provisions of the Electoral Act, 2022, the Regulations and Guidelines for the Conduct of Elections, 2022 and the INEC Manual for Election Officials, 2023, shows the Electoral Act expressly provides in Section 62(1) that after recording and announcement of the result, the Presiding Officer shall deliver same along with election materials under security and accompanied by the candidates or their polling agents to such persons as may be prescribed by the Commission. The Regulations and Guidelines as well as the INEC Manual also state that hardcopies of election results shall be used for collation and it is only where no such hardcopies of the election results exist that electronically transmitted results or results from the IReV will be used to collate the results.

I had earlier said that the non-compliance that can significantly affect the result of an election must be such that is substantial enough to cause the Court to invalidate it as prescribed by Section 135(1) of the Electoral Act. The burden and standard of proof is primarily on the petitioners to

CERTIFIED TRUE COPY

establish the existence of those facts or allegations asserted by them. Section 131(1) of the Evidence Act, 2011 provides expressly that:

> *"(1) Whoever desires any court to give judgment as to any legal right or disability dependent on the existence of facts which he asserts must prove that those facts exist."*

It is important to note here that although Election petitions are sui generis, they are governed by the Evidence Act. See ***BUHARI V. OBASANJO (2005) 2 NWLR (PT. 910) 241; APC V PDP & ORS (2015) LPELR-24587(SC).***

Where, therefore, an election petition is founded on allegations of non-compliance as in the instant case, from the myriad of decisions, the onus is directly on the Petitioners not only to establish such through credible and compelling evidence, they have to go further and demonstrate through credible evidence that the non-compliance was substantial and that the non-compliance truly affected the results of the election to warrant their being annulled. See ***AKINLADE & ANOR V. INEC (2019) LPELR-55090 (SC); AUDU V. INEC & ORS (NO.2) (2010) 13 NWLR (PT.1212) 456, 519; OKE V. MIMIKO (NO2) (2014) 1 NWLR (PT. 1388) 332; KENTE V ISHAKU & ORS (2017) LPELR-42077 (SC); NDAKENE V. ADAMU & ORS (2023) LPELR-59972 (SC).***



CERTIFIED TRUE COPY

The Electoral Act made provision for declaration of results and the posting of results of the election. The law makes provision in Sections 66 and 68 of the Act as follows:

> *"66. In an election to the office of the President or Governor whether or not contested and in any contested election to any other elective office, the result shall be ascertained by counting the votes cast for each candidate and subjected to the provisions of sections 133, 134 and 179 of the Constitution, the candidate that receives the highest number of votes shall be declared elected by the appropriate returning officer.*
>
> *68. The Commission shall cause to be posted on its notice board and website, a notice showing the candidates at the election and their scores, and the person declared as elected or returned at the election."*

By the law, results are declared by the counting of votes cast in the election, and in accordance with the Constitutional provision for the election of the President as in Sections 133 and 134 of the Constitution. The votes so counted and collated are the votes cast at the Polling Units.

CERTIFIED TRUE COPY

Let me underline here that in the conduct of an election, certain processes must have been walked over to conclude and confirm that the election was conclusive. The steps outlined by the law must not be broken. These steps are:

(a)   Accreditation

(b)   Conduct of polls

(c)   Counting of votes

(d)   Collation and announcement of results

(e)   Signing of result forms

(f)   Publication of results.

The reliefs sought by the petitioners are declaratory in nature. It is trite law that where a party seeks declaratory reliefs the burden is on him to establish his claim. His success is on the strength of his own case and not on the weakness of the defence of the Respondents or the Defendants: See **OMISORE V. AREGBESOLA (2015) 15 NWLR (PT. 1482) 205, 297; OGAH V. IKPEAZU (2017) 17 NWLR (PT.1594) 299**.

It is also the law that the pleading and the claim of the Petitioners determine the burden and the standard of proof that is required. By section 135(1) of the Evidence Act, 2011, if the commission of a crime by a party to any proceeding is directly in issue in any proceeding civil or criminal it must be proved beyond reasonable doubt. See the application

CERTIFIED TRUE COPY

of this provision in ***PDP V. INEC & ORS (2014) LPELR-23808 (SC) 40; AGI V. PDP & ORS (2016) LPELR-42578 (SC); APC & ANOR V. OBASEKI & ORS (2021) LPELR- 55004 (SC); and SULAIMAN & ORS V. APC & ORS (2022) LPELR- 58846 (SC)***. In all these cases, the position of our law is that whenever crime is alleged, even if the case in a civil case, its proof must be that of proof beyond reasonable doubt.

In the instant case, the Petitioners have grounds of non-compliance with the Electoral Act 2022 and allegation of corrupt practices. Section 134(1) (b) refers to the ground of corrupt practices or non-compliance. If the ground pursued in any petition is simply non-compliance with the Act and there is no tincture of allegation of crime, the proof required would be on the balance of probabilities. But the standard of proof in any ground that is primarily on corrupt practices would require proof beyond reasonable doubt, that allegation being criminal in nature.

In the instant case and on the issues being resolved here, the petitioners tendered some documentary evidence directly from the Bar. The objections to the admissibility of most of the documents had earlier been dealt with by this court in the earlier ruling on the objections as to the admissibility of the documents and some of them have been held inadmissible in evidence.



The Petitioners called two star-witnesses alongside other witnesses. Their star witnesses are P.W.19, Dr Alex Adum Ter and the P.W.22, Senator Dino Melaye.

The sworn evidence on oath of P.W.19 is at Pages 131 to 160 of the Petition. In Paragraph 23 and 30 of his sworn deposition, Dr Ter (P.W.19) said as follows:

> 23. *I know that on the face of the Form EC8D(A), there are calculation errors as shown and contained in the Report of the Statisticians which the Petitioners shall rely upon.*
>
> 30. *The non-compliance consists of refusal to authenticate all the intending voters in the election using the technological/electronic device prescribed by the 1st Respondent in addition to failure of the 1st Respondent to transfer the outcome of the election directly into the portal of the 1st Respondent created for the viewing of the public as a means to ensure the integrity of the elections at the polling unit and the electronical collation system before the declaration as to who is the winner of the election.*

There are no particulars supplied in his statement on oath. All that can be read from this statement are projections without substance. When he was cross-examined by A.B. Mahmoud, SAN, for INEC, he stated thus:

CERTIFIED TRUE COPY

"It is true that I am a Lawyer and Politician. I am the National Coordinator for the Petitioners. I was not at the National Collation Centre. I was throughout at the National Situation Room of the Petitioner. That Situation Room was in Abuja. I remained in Abuja until the declaration of the Results. I voted in my Polling Unit. I was accredited in my polling unit and I cast my ballot without any hitch.

"My political party had agents in all the polling units in the county. We had agents at the Wards, Local Governments and State Collation Centres. "While some agents signed the result sheets, some did not sign. In places where election took place, our agents signed. I am not an ICT Expert.

"It is true that I made statements in my depositions dealing with ICT. At Paragraph 23 of my first witness statement, I referred to certain calculations. We did our calculations together with the statisticians.

"I stated that INEC did not transmit results into the

IREV and the Electronic Collation System for the Presidential Election.

"There were two transmission systems. I did not use the Device Management System I referred in Paragraph 59 of my first deposition. In my view there was no technical hitch.

"The information contained in respect of other states were received from other sources. There were over 176,000



polling units. By Exhibit PAF4 (c) about 9,403 polling units were affected out of the over 176,000 polling units. It is not correct that in view of Exhibit PAF4 (c) my statement in Paragraph 98 is wrong.

"I know Samuel Oduntan. He was in our situation room.

"I know that the polling unit is the primary source of votes cast in an election. It is in the units that Forms EC8As are issued. It is also in the units that the BVAS Machines are used. As National Coordinator I did not work in any of the polling units during the election. I did not work in any of the levels of collation of results.

In my witness statement I did not demarcate from facts known to me personally and those relieved from other sources. I have seen paragraph 120 of my witness statement. The allegations of corrupt practice listed in paragraph 120 were related to me. The same thing with the statement in paragraphs 121 - 150. The statements were related to me by the State Collation Agents. The facts I stated in paragraph 134 of my statement were also related to me by my Local Government and State Collation Agents. The same with the allegation at paragraph 136 of my statement which I got from video.

I know that Festus Okoye featured in one of the videos played today. I have not heard that Festus Okoye is dead. Prof. Mahmoud, the INEC Chairman also featured in one of the videos. I cannot confirm whether the INEC Chairman is



dead or alive. Before I came today to give evidence, I did not hear that the INEC Chairman has died.

It is true that I stated in paragraph 139 of my statement that the results as tabulated and as declared by INEC are wrong. It is true that I did not furnish any other result other than that I tabulated in paragraph 139 of my statement.

Upon cross-examination by Umoh, S.A.N., for 3rd Respondent, the witness stated thus:

"Before Paragraph 3 of my Statement, I did not separate the information I received from the ones I know personally. My complaint is that there was no real time transmission of results. It is the result declared at the polling unit that is transmitted. It is true that BVAS is deployed at the commencement of the voting and transmission of result after the result has been announced at the polling unit.

I want my candidate to be declared the winner. I also want the election to be declared a nullity."

The sworn deposition on oath of the next star witness of the petitioners, P.W.22, Senator Dino Melaye, is almost a rehash of the entire petition. What he said on cross-examination *by A.B. MAHMOUD, SAN, for INEC* is as follows:

*"On the election day, I was in Kogi State and in Abuja. After voting in my polling unit in Kogi State, I moved to Abuja for*



my assignment as the National Collation Agent for the Petitioners. I was accredited and voted. My party had agents in all the polling units in the Country. Not all our polling agents signed the Result of the election. I cannot remember how many that did not sign.

"As National Collation Agent for my party, I know the procedure for collation of election results across the country. Results declared at the polling units are taken to the ward collation level, Local Government level, State collation level and then the National Collation Centre. Before it is taken to the Ward Collation level, it is transmitted to the INEC portal. I was at the National Collation Centre. The normal procedure is that the

Returning Officers from the States bring Results to the National Collation Centre.

"One of my complaints is that INEC failed to transmit the Results to the IREV portal. As a National Collation Agent, I depended on information from my agents across the Country. I can see paragraphs 51, 52, 53, 54, 55, 56, 57 and 58 of my Statement on Oath. I made mention of Device Management System. _I did not see the Device Management System. The Statement that the Device was used came from INEC._

"I made mention of a device called collation support and Result Verification System (CSRVS). I did not see the device but relied on what INEC said. I was not in Borno State physically on the day of the election.




**Upon further cross-examination by Olujinmi, SAN, for 2nd Respondent):**

"I confirm that votes are cast at the polling units. At the close of voting, the Presiding Officer will sort, count and record the Results in Form EC8A. It is the Result in the Form EC8A that is supposed to be transmitted to the IREV portal. The Result in the Form EC8A is taken the Ward Collation Centre. The failure to transmit the Result into the IREV portal will not change the Result already recorded in the Form EC8A.

I have seen my deposition in paragraph 3 of my statement. The facts I know were separated from those I do not know personally by the context of the statements. I have also seen paragraph 23 of my witness statement. I know the facts stated therein. I have seen paragraph 145 of my statement wherein I set out the results as declared by INEC. Those Results are wrong. I did not set out the correct result in my statement but I briefed my statistician.

I stated that not all PDP Agents signed the Results.

I did not set out the names of the agents but I stated that agents refused to sign. IREV is in the line of collation of Results since Results are transmitted to it.

It is true that there is the ward, Local Government and State Collation Centres. IREV is not a Collation Centre but is a process in the election.



I have seen paragraph 159 of my statement. I do not know the names of those polling agents."

When cross-examined by Fashanu, SAN, for 3rd Respondent, he stated as follows:

"It is true that I voted on the election day. INEC used the BVAS machines. I have seen paragraphs 36 and 37 of my Statement. Therein I stated that votes were wrongly allocated to the 2nd Respondent. The votes wrongly allocated are in paragraph 145 of my Written Statement. I did not state the votes that were massively deducted from the votes of the Petitioners. I have seen paragraph 55 of my statement. I was not physically present at emperor Technology China. I have certificate in Information Technology.

"I voted in Kogi. I only voted but did not visit any polling unit, but interacted with my agents. I did not mention life video but I mentioned video. All the interactions I mentioned in my statement were communicated to me by my agents. I have seen paragraph 23 of my statement. I submitted all the list of infraction made therein to my statistician and it forms part of his Report.

I am not a staff of INEC.

The testimonies of these star witnesses under cross-examination aggregated the same account given by other witnesses that the election went well. Accreditation with the BVAS device was alright. The Agents of



the Petitioners were on ground at the Polling Units and that the results were entered on Form EC8As and duplicate copies given to the Agents.

The facts elicited from the cross-examination of these witnesses have belied much of the strands of their written statements on oath. This, of course, is a challenge to the credibility of the evidence of the P.W.19 and P.W/22. While cross-examination has the capacity to tarnish the credibility of a witness, it also has the corresponding capacity of strengthening the case of the opponent. In the instant case, the evidence elicited from the P.W.19 and P.W.22 on cross-examination has fortified, in my opinion, the case of the respondents that there was nothing wrong with the results of the 2023 Presidential Election and that there was substantial compliance with the Electoral Act 2022.

That also played out in the cross-examination of PW20, Olatunji O. Shelle. His deposition on oath is at Pages 204 to 207 of the Petition. At Paragraphs 10 to 11 of the statement, he, P.W.20, said:

> *"10. The presidential election was compromised and set up to fail even before the election began on 25 February 2023 as the contract for the distribution of electoral material was given to an entity headed by a chieftain of the All Progressives Congress (APC) by name M. C. Oluomo.*



*11. Since the contract for the distribution of electoral materials was given to an entity headed by a chieftain of the All Progressives Congress, the said chieftain deliberately failed to supply electoral materials to the stronghold of the Petitioners in Lagos State or places he knew the and 3rd Respondents are likely not to get much votes."*

When P.W.20 was cross-examined by Mahmoud, SAN, for 1st Respondent, he said:

*" I am a strong member of the PDP. I am not happy with the process. On the election day, I went to my polling unit at Eti Osa to vote. There are about 14 thousand polling units in Lagos.*

*"Apart from my polling unit, I visited about 40 other polling units. The polling units are very close to each other. I was able to cast my vote without any problem. The result in my polling unit was entered in the polling unit Result Sheet.*

*"I left the polling unit around 2.30pm when the result in my polling unit was announced. I do not know the result in my polling unit. I do know the winner of the election in my polling unit. I have seen paragraph 10 of my statement. I have not seen the contract I mentioned in Paragraph 10 of the statement.*



CERTIFIED TRUE COPY

> *"I also have no personal knowledge of the secret and hidden polling units I mentioned in Paragraph 14 of my statement but I have an idea. I did not report to idea. I did not visit any of the secret polling units."*

Upon further cross-examination by Yusuf Ali, SAN, for the 2nd Respondent, he said:

> *"I know that Labour Party won the Presidential Election in Lagos State as declared by INC. I seen Paragraph 8 of my statement. It was not part of my duty to fill any of the Forms I mentioned in Paragraph 8 of my Statement.*
>
> *"The Baale of Gbara I mentioned in Paragraph 13 of my statement has not been joined in the Petition. I was not at the meeting called by the Baale.*
>
> *"Apart from the INEC officials and the policemen, none of the voters wore any uniform in the polling station. I have seen Paragraph 16 of my statement. I do not know how many ballot boxes were snatched. I only know of the ones in my constituency.*
>
> *"I mentioned violence in about 15 polling units at paragraph 18 of my statement. The 15-polling unit I mentioned in Paragraph 18 and in the same school premises. I personally witnessed the violence. I did not do anything as it was not my duty. I did not personally fill any of the Forms in paragraph 24 of my statement."*



In response to the cross-examination of the learned Senior Counsel for the 3rd Respondent, Mr Umoh, SAN, P.W.20 said:

> *"It is true that the election was contested by 18 political parties including PDP. As announced by INEC, Labour Party won the election in Lagos State. I have seen paragraph 2 of my Statement.*
>
> *"I have also seen paragraph 22 of my Statement. Apart from the result announced by INEC, I have no other result."*

This is the same trend in the account of these witnesses. They were majorly giving account of not only the polling stations they voted but other places not within their reach. The significant tone is that they testified of casting their votes without any problem. The results, by their admission, were properly declared and taken to the ward collation centres.

The irony, though, is that the witnesses did testify to a peaceful and valid election in their polling units where they voted and then turned around to give evidence of alleged infractions in polling units where they were not present. Their testimonies in that respect are hearsay. Hearsay evidence is not admissible and has no value in proving the petition filed by the Petitioners.

Furthermore, in the instant petition, 1st Respondent consistently maintained that the "technical glitch" that occurred on the election day

CERTIFIED TRUE COPY

was the failure of the "e-transmission" server to upload Polling Unit results for the presidential election into the **IREV** portal. It claimed that the glitch only prevented the members of the public from viewing or accessing the results that were already uploaded and listed on the 1st Respondent's e-transmission system. On their part, the Petitioners asserted in their Petition that the "glitch" claimed by 1st Respondent was actually a bypass by 1st Respondent to tilt and switch the results of the Presidential Election in favour of the 2nd and 3rd Respondents (See Paragraph 40). In furtherance of that assertion, they pleaded in Paragraphs 41 and 42 of their Petition as follows:

***41.*** The Petitioners shall subpoena Pricewater house Coopers (PWC) to produce Quality Assurance Report and to testify; subpoena Activate Technologies Limited - BVAS Supplier and Emperor Technology Limited (also known as Shenzhen Emperor Technology Company Limited) - the BVAS Manufacturers to produce relevant supply documents and to testify. The Petitioners shall also subpoena Sulfman Consulting Ltd to produce the Vulnerability Assessment & Penetration Testing (VAT) Report and to testify. The Petitioners shall also subpoena expert witnesses in respect of the electronic collation system and the IReV portal.

CERTIFIED TRUE COPY

42. The Petitioners shall also subpoena Kaspersky Endpoint Security (of Thurhill Office Park, Bekker Road, Midrand, South Africa) that provided the system security for the VAS and -transmission system deployed by the 1st Respondent to produce relevant documents and data as well as testify on the system security. *The Petitioners shall also subpoena Globacom Nigeria Limited, the internet provider for the system deployed by the 1st Respondent* **which internet was disconnected from the BVAS machines before transmission**. The Petitioners shall further subpoena Infrastructure Concession Regulatory Commission (ICRC), with office at FDA, Area 11, Abuja, which conducted due diligence on the e-transmission system deployed by the 1st Respondent using full business case that had inputs from Emperor Technology Limited and issued "Certificate of No Objection" for the system to be deployed. The Petitioners shall further subpoena National Institute of Technology Development Agency (NITDA), with office at Gimibiya Street, Area 11, Abuja, the government agency which tested the technology in issue before deployment in Nigeria and issued relevant permits, certifications, and licences for its deployment."

CA/PEPC/03/2023; CA/PEPC/04/2023; CA/PEPC/05/2023.



CERTIFIED TRUE COPY

The Petitioners applied to the Court for subpoena to issue to the witness listed in Paragraphs 41 and 42 of the Petition on 26/5/2023. These witnesses were not called by the Petitioners and no reason was given as to why they backed down from calling the witnesses they pleaded to call in proof of their petition. It is trite that litigation, particularly election dispute litigation, is fought on pleadings. Parties swim or sink with their pleadings. In the case of *ANYAFULU & ORS V. MEKA & ORS (2014) LPELR-22336 (SC)*, the Supreme Court Per Kekere Ekun, JSC held that:

> "Litigation is fought on pleadings. They are the pillars upon which a party's case is founded. Not only do they give the other side notice of the case they are to meet at the trial, they also define the parameters of the case. In other words, parties are bound by their pleadings. Any evidence led on facts not pleaded goes to no issue while any pleadings in respect of which no evidence is led are deemed abandoned. In effect, where the pleadings are deficient no matter how cogent the evidence led, the case would fail. See: Nwokorobia Vs Nwogu (2009) 10 NWLR (1150) 553; Shell B. P. Vs. Abedi (1974) 1 SC 23; Ebosie Vs. Phil-Ebosie (1976) 7 SC 119; George Vs Dominion Flour Mill Ltd. (1963) 1 ALL NLR 71."


CERTIFIED TRUE COPY

See also **IFEANYICHUKWU OSONDU CO. LTD & ANOR V. AKHIGBE (1999) LPELR (SC).** Those pleadings in Paragraphs 41-42 of the Petition having been abandoned are discountenanced.

In the same vein Paragraph 96 of the petition averred that Agents of the 2nd and 3rd Respondents disrupted the election, votes scored were not accurately recorded and that ballot papers were torn. The Petitioners averred that video recording shall be tendered. However, the video recording was not tendered in that regard. In this respect, the presumption in Section 167(d) of the Evidence Act, 2011, that they withheld the said video recording because it would be against them if tendered, shall also apply.

From the foregoing therefore, it is very clear and certain that the Petitioners have failed to prove that the 2023 Presidential election and the return of the 2nd Respondent was invalidated by reason of corrupt practices or non-compliance with the Electoral Act 2022.

Issue one is therefore resolved in favour of the Respondents and against the Petitioners.

CERTIFIED TRUE COPY

## ISSUE TWO

**Whether 2nd Respondent was lawfully declared and returned as the winner of the Presidential election held on 25th day of February 2023, he having not secured one-quarter of the total valid votes cast in the Federal Capital Territory, Abuja.**

The petitioners commenced their argument of this issue by first making the trite point that the 1999 Constitution of the Federal Republic of Nigeria is the organic and supreme Law of this country. They then submitted that the relevant provision of that Constitution that requires interpretation here is Section 134(2) stating that:

> **"A candidate for an election to the office of the President shall be deemed to have been duly elected where there being more than two candidates for the election -**
>
> **(a)  he has the highest number of votes cast at the election; and**
> **(b)  he has not less than one-quarter of the votes cast at the election in each of at least two-thirds of all the States in the Federation and the Federal Capital Territory, Abuja."**

They submitted, correctly, that there are two limbs to this provision - the first limb (A) stating that a Presidential Candidate must have majority or highest votes cast at the election, and limb (B) stating that such candidate must have not less than one-quarter of the votes cast at the

CA/PEPC/03/2023; CA/PEPC/04/2023; CA/PEPC/05/2023.                    708





election in each of at least two-thirds of all the States of the Federation and the Federal Capital Territory, Abuja.

The word 'AND' in limb (B), they argued, is conjunctive and not disjunctive, so, to be validly returned, a presidential candidate must, in addition to scoring majority or highest votes in the election and scoring a quarter of the votes in at least 2/3 or 24 States of the Federation, also, compulsorily, poll at least a quarter (or 25%) of the total votes cast in the election in the Federal Capital Territory, Abuja. They placed a lot of emphasis on the word 'and' appearing in section 134(2)(b) before the "Federal Capital Territory, Abuja" and strongly recommended to us the *Blacks' Law Dictionary*'s definition of that word as well as dicta of Tobi, J.S.C. in ***Buhari v. INEC*** (2008) 19 NWLR (Pt. 1120) 246, where the word 'and' appearing in the 2006 Electoral Act equivalent of section 135(1) of the Electoral Act 2022 was construed as disjunctive. They further buttressed their argument by referencing section 2(2) of the same 1999 Constitution stating that "Nigeria shall be a Federation consisting of States and the Federal Capital Territory, Abuja." They said that provision gave the Federal Capital Territory of Abuja a special status different from the States.

They next pointed to section 3(1) of the 1999 Constitution where the 36 States of the Federation are specifically listed and submitted that the

 CERTIFIED TRUE COPY

Constitution by that provision left no one in doubt by what it means by States.

They argued that it is because the Federal Capital Territory, Abuja is not a State hence the Constitution in its Section 299 made provisions for its application to three named areas of structures of government, to wit the Legislature, the Executive and the Judiciary. Reproducing the said Section 299 of the Constitution and relying on the Webster's Dictionary's definition of the phrase 'as if' appearing in it, they argued that those two words indicate that the Federal Capital Territory Abuja merely resembles a State but is not a State. Subsection (c) of section 299, they submitted, clearly states and is limited to exercise of legislative, executive and judicial powers by the Federal Capital Territory, and not matters of procedure for Presidential election exclusively dealt with by section 134(2)(b) of the Constitution. They argued, with verve, that the word 'and' in section 134(2)(b) of the Constitution making polling of one-quarter of the votes of the Federal Capital Territory, Abuja, mandatory for return of a president has nothing to do with any special status of the citizens or voters in Abuja but rather with the special status of the Federal Capital Territory (FCT), Abuja, as the cosmopolitan convergence of all federating units, tribes, religions and people of variegated backgrounds of the country as well as its being the seat of power of the nation's leadership. They said the mandatory 25% vote poll in the Federal

CERTIFIED TRUE COPY

Capital Territory for return of a president is intended as a reflection of the President's wide acceptability by the majority of the Nigerian people, as he is not expected to be a tenant or an unpopular President in the nation's seat of power where he is supposed to reside to provide leadership to the country. They rounded off by citing *Ojokolobo v. Alamu* **(1987) 3 NWLR (Pt. 61) 377** among other cases to say that where the language used by a statute is clear, as they reasoned section 134(2)(b) of the Constitution and its 'and' is, the court must give such provision its literal meaning. Since it is common ground, as further evidenced by Exhibit PB and Exhibits PC 1-37 (Declaration of Result and Summary of Results of the Election respectively), that 2nd Respondent polled only 90,902 votes in the Federal Capital Territory Abuja of Abuja, which is just 18.99% of the total votes of 478, 652 cast in the F.C.T., Abuja in the presidential election, he did not meet the Constitutional threshold to be returned, so 1st Respondent (I.N.E.C.) was wrong in declaring him elected.

All three respondents were opposed to this interpretation of section 134(2)(b) of the Constitution by petitioners. Since their arguments followed the same course, we can conveniently state them arguments together without diminishing from the weight and cogency of individual submissions. All of them argued that to accept the interpretation put on section 134(2)(b) of the 1999 Constitution by petitioners will result in

CERTIFIED TRUE COPY

absurdity, as it will mean that even if a presidential candidate scores 100% votes in all the 36 States of the Federation but fails to poll 25% of the votes cast in the F.C.T., he would still not be returned. That argument, they submitted, will confer a veto power on and make the voters of the F.C.T. super voters. Such construction, it was submitted by them, will in effect defeat the true intention and objective of the Constitution that makes all votes in all parts of the country equal.

To get at the true intentions of the draftsmen of the Constitution in section 134(2)(b), they argued, the Court needs to first take a close look at Section 17(1) & (2) (a) of the 1999 Constitution stating that "every citizen shall have equality of rights, obligations and opportunities before the law" and consider it alongside section 299 of the same Constitution. They said the objective of section 134(2)(b) of the Constitution is to ensure that no particular segment of the country alone is able to determine who becomes President of this country; that a person elected President must have widespread acceptance across the country. Section 299 of the same Constitution stating that "The provisions of this Constitution shall apply to the Federal Capital Territory, Abuja, as if it were one of the States of the Federation," minces no words in stipulating that the Federal Capital Territory maintains equal status with other States of the Federation, especially in terms of the application of the Constitution, they submitted. In further support of that contention, all



three Respondents referenced the Supreme Court's decision of **BAKARI V. OGUNDIPE** (2021) 5 NWLR (Pt. 1768) 1, @ 38 where it was said that "By virtue of the provisions of section 299 of the Constitution it is so clear that the Federal Capital of Nigeria has the same status of a State. It is as if it is one of the States of the Federation." They also referenced the earlier decision of this court in **IBORI V. OGBORU** (2009) 6 NWLR (Pt. 920) 102 @ 138, where it was confirmed that "The Federal Capital Territory, Abuja is to be treated like a State by virtue of section 299 of the 1999 Constitution.... If the Federal Capital Territory, Abuja, is to be treated like any other State, then it is not superior to or inferior to any other State in Nigeria."

Respondents argued that what can be gathered from section 134(2)(b) of the 1999 Constitution read together with Section 299 and decided cases, is that the provisions of the Constitution apply to the Federal Capital Territory (FCT) as if it were one of the States of the Federation. They said that the use of the word 'AND' in Section 134(2) of the Constitution indicates nothing more than that the F.C.T. Abuja is considered as one of the States of the Federation in construing the two-thirds of the States of the Federation in which a candidate is required to score one-quarter of the votes cast. This point, INEC in particular submitted, is very critical, because there is no way the draftsman of the Constitution would have referred to the F.C.T. in Section 134(2)(b) of the

CERTIFIED TRUE COPY

Constitution without the use of the word 'and', seeing that the FCT is not actually a State but deemed to be a State. Besides being the capital of the country, it argued, the F.C.T. has no special status over and above the other 36 States of the Federation. Any interpretation to the contrary, it was submitted by INEC, will only result in an absurdity and against the spirit of equality and fairness that is well entrenched in the Constitution. To further buttress its argument, INEC particularly drew our attention to section 179(2)(b) of the Constitution in respect of Governorship elections in the State. Counsel on its behalf pointed out that in section 179(2)(b) of the Constitution the draftsman did not give the State Capitals special status in respect of elections into the office of the Governor in the 36 States of the Federation. It urged us to take note of the fact that the 36 State Capitals were not in any way ascribed special status in a manner that a person to be elected Governor must have at least 25% of the votes cast in the respective State capitals. I.N.E.C. rounded off by submitting that if the draftsman of the Constitution had wanted to give the voters of the FCT a special status, separate from other States, or if it was their intention to make obtaining 25% of the votes of F.C.T. a requirement for election as President they would have expressly stated so in section 134(2). Counsel urged us to resolve this issue against the petitioners.

Second Respondent on his part added that elections in any part of the world is about votes and voters and that there is no superiority of vote


CERTIFIED TRUE COPY

and voters. Zeroing down specifically on Section 134(2)(b) of the Constitution, 2ⁿᵈ Respondent's counsel pointed out that there is no comma in the entire section 134(2) (b) of the Constitution, particularly immediately after the word 'States' and the succeeding 'and' connecting the Federal Capital Territory with the States. That deliberate omission, it was submitted by counsel on his behalf, suggests that the reading of that subsection has to be conjunctive and not disjunctive. Learned counsel to 2ⁿᵈ Respondent also argued that by virtue of Section 299 of the Constitution, the Federal Capital Territory, Abuja, is taken 'as if' it is the 37ᵗʰ State of the Federation. Any contrary interpretation, learned counsel also submitted, would lead to absurdity, chaos, anarchy and alteration of the very intention of the legislature. Counsel cited among others the cases of *Nafiu Rabiu v. State* (1980) 12 NSCC 291 @ 300 – 301, *Marwa v. Nyako* (2012) 6 NWLR (Pt. 1296) 199 @ 306 – 307; *ADH Ltd v. AT Ltd* (2006) 10 NWLR (Pt. 986) 635 @ 649; *Awolowo v. Shagari* (1979) NSCC 87 @ 102; *Abraham Adesanya v. President, Federal Republic of Nigeria* (1981) 12 NSCC 146 @ 167-168 and *A.G. Abia State v. A.G. Federation* (Pt. 2002) 6 NWLR (Pt. 763) 265 @ 365 in support of their argument of the true intention of the Constitution in its provisions including section 134(2)(b). Learned counsel said even petitioners also admitted that the FCT is the 37ᵗʰ State of the Federation, going by paragraph 107 of their petition where they listed the F.C.T. as the 37ᵗʰ


CERTIFIED TRUE COPY

State, after listing the States mentioned in Section 3(1) of the Constitution as numbers 1-36.

Second Respondent in his Reply address made the further alternative argument that going by the decision of the apex court in **Awolowo v. Shagari** (1979) LPELR-653 (SC); (1979) ALL NLR 120; (1979) 6-9 S.C. 37 as regards the calculation of one-quarter of the total votes in Kano State that was the last State the President-elect in that election needed to make the Constitutional threshold, he met the Constitutional provision to be returned elected, even going by the Petitioners' interpretation to the provisions of section 134(2)(b) of the 1999 Constitution, he having polled 90,902 of the total 460,071 votes cast in the FCT. By the decision in **Awolowo v. Shagari** (supra), its learned senior counsel Chief Wole Olanipekun, SAN, argued, 2nd Respondent by polling 90,902 of the total 460,071 votes cast in the F.C.T., even surpassed the one quarter of 2/3 votes of the FCT which, according to learned counsel, is just 76,678.5 of 306,714.

On their part, counsel to 3rd Respondent, aside reasoning along the same lines as 1st and 3rd Respondents albeit without taking sides with this new alternative argument of 2nd Respondent introduced by 2nd Respondent only in his Reply, submitted, in addition, that if the intention of the drafters of the 1999 Constitution was to make 25% score in the Federal



CERTIFIED TRUE COPY

Capital Territory (FCT), Abuja, a mandatory requirement, they would have included in section 134(2)(b) of the Constitution the preposition 'in' after the word 'and', to make 134(2)(b read "he has not less than one-quarter of the votes cast at the election in each of at least two-thirds of all the States in the Federation and the Federal Capital Territory, Abuja." At the very least, the Constitution would have provided for similar language to indicate that the requirement extends to the FCT Abuja as a separate unit from the 36 States of the Federation.

### RESOLUTION OF ISSUE

This issue basically borders on the interpretation of Section 134(2)(b) of the 1999 Constitution. The appropriate starting point for the resolution of this issue, therefore, is to reproduce, for ease of reference, Section 134(2)(a) & (b) of the Constitution of the Federal Republic of Nigeria, 1999 (as amended), the interpretation of which is in contention. It reads:

> **"134(2)    A candidate for an election to the office of President shall be deemed to have been duly elected, where, thereby being more than two candidates for the election –**
>
> > **(a)    he has the highest number of votes cast at the election; and**
>
> > **(b)    he has not less than one-quarter of the votes cast at the election in each of at least two-thirds of all the**




**States in the Federation and the Federal Capital Territory, Abuja."**

The contention is as to the interpretation to be accorded to paragraph (b) of subsection (2) of Section 134 quoted above. In particular, the contention is whether or not by the wordings in that paragraph a candidate must, in addition to scoring not less than one-quarter of the votes cast in at least two-thirds of the States in the Federation, also score one-quarter of the votes cast in the Federal Capital Territory Abuja (FCT) before he can be deemed to have been duly elected. In other words, whether in determining two-thirds of the States of the Federation the Federal Capital Territory is to be included and regarded as one of the States of the Federation, or its status is to be regarded as distinct from the other States of the Federation, such that scoring one-quarter of votes in the FCT is a mandatory requirement for a candidate to be deemed duly elected as President.

It is pertinent to state that unlike interpretation of statutes, the interpretation of Constitution has its own guiding principles. In **FRN V NGANJIWA,** which was cited by the Petitioners as **SC/794/2019,** but which is reported as **FRN v NGANJIWA (2022) LPELR-58066(SC),** the Supreme Court has succinctly reviewed decided cases on interpretation of the Constitution and outlined these guiding principles:



(a) In interpreting the Constitution, which is the supreme law of the land, mere technical rules of interpretation of statutes should be avoided, so as not to defeat the principles of government enshrined therein. Hence a broader interpretation should be preferred, unless there is something in the text or in the rest of the Constitution to indicate that a narrower interpretation will best carry out the objects and purpose of the Constitution.

(b) All Sections of the Constitution are to be construed together and not in isolation.

(c) Where the words are clear and unambiguous, a literal interpretation will be applied, thus according the words their plain and grammatical meaning.

(d) Where there is ambiguity in any Section, a holistic interpretation would be resorted to in order to arrive at the intention of its framers.

(e) Since the draftsperson is not known to be extravagant with words or provisions, every section should be construed in such a manner as not to render other sections redundant or superfluous.

CA/PEPC/03/2023; CA/PEPC/04/2023; CA/PEPC/05/2023.



(f) If the words are ambiguous, the law maker's intention must be sought, first, in the Constitution itself, then in other legislation and contemporary circumstances and by resort to the mischief rule.

(g) The proper approach to the construction of the Constitution should be one of liberalism and it is improper to construe any of the provisions of the Constitution as to defeat the obvious ends which the Constitution was designed to achieve.

See also on this: **NAFIU RABIU v STATE (1980) 8 - 11 S.C. 130 at 148; A.G. BENDEL STATE v A.G. FEDERATION & ORS (1981) N.S.C.C. 314 at 372 – 373; BUHARI v OBASANJO (2005) 13 NWLR (Pt. 941) 1 at 281; SAVANNAH BANK LTD v AJILO (1989) 1 NWLR (Pt. 97) 305 at 326; and A.G., ABIA STATE v A.G. FEDERATION (2005) All FWLR (Pt. 275) 414 at 450,** which were also referred to by the Apex Court.

In finding appropriate answer to this issue, I wish to observe, first, that with all due respect to Counsel to the Petitioners, their interpretation of Section 134(2)(b) of the 1999 Constitution founded principally on a fixation with the word "and" appearing between the phrases "he has not less than one-quarter of the votes cast at the election in each of at least two-thirds of all the States in the Federation," and "the Federal Capital

CERTIFIED TRUE COPY

Territory, Abuja," is completely fallacious, if not outrightly ludicrous. Even their recourse to the case of **ABUBAKAR v YAR'ADUA (2008) 19 NWLR (Pt. 1120) 7**, does not help their argument because Tobi, JSC made it clear that a purposive rule of interpretation will not be appropriate "…where the intention of the lawmaker is clear, precise and unequivocal, so much so that a person can say "Yes this is what the lawmaker has in his mind."

Thus, in the interpretation of the Constitution, the principles upon which the Constitution was established rather than the direct operation or literal meaning of the words used, measure the purpose and scope of its provisions. See: **GLOBAL EXCELLENCE COMMUNICATIONS LTD v DONALD DUKE (2007) 6 NWLR (Pt. 1059) 22 at 41 – 41 (SC); (2007) LPELR-1323 (SC) at pages 18 – 19; A.G. OF BENDEL STATE v A.G. FEDERATION (1982) 3 NCLR 1; SARAKI v FRN (2016) 3 NWLR (Pt. 1500) 531; SKYE BANK PLC v IWU (2017) 16 NWLR (Pt. 1590) 124; SHELIM v GOBANG (2009) All FWLR (Pt. 496) 1866 at 1878 (SC).**

That, this is the position is not at all open to doubt. In **BRONIK MOTORS LTD v WEMA BANK LTD (1983) LPELR-808 (SC),** Nnamani, JSC, of blessed memory, speaking for the Apex Court, confirmed it when, after a painstaking analysis of the cases on the point, said at pages 30 - 32 that:

CERTIFIED TRUE COPY

"A Constitution is a living document (not just a statute) providing a framework for the governance of a country not only for now but for generations yet unborn. In construing it, undue regard must not be paid to merely technical rules otherwise the objects of its provisions as well as the intention of the framers of the Constitution would be frustrated.

As was stated in Minister of Home Affairs v. Fisher (1979) 2 W.L.R. 899, (1980) A.C. 319 @ 323, a Constitutional requirement should not necessarily be construed in a manner according to rules which apply to Acts of Parliament. Although the manner of interpretation of a constitutional instrument should give effect to the language used, recognition should also be given to the character and origins of the instrument. Such an instrument should be treated as sui generis calling for principles of interpretation of its own suitable to its character without necessary acceptance of all the presumptions that are relevant to legislation of private law.

"It has also been accepted by all our courts that a broad and liberal interpretation should prevail in interpreting the provisions of our Constitution although one has constantly to bear in mind the object which such provisions were intended to serve. Sir Udo Udoma, J.S.C, very aptly stated this in *Nafiu Rabiu v. The State* (1980) 8-11 S.C. 130 @ 148 where the learned Justice said:

> 'My Lords, it is my view that the approach of this Court to the construction of the Constitution should be, and so it has been, one of liberalism, probably a


CERTIFIED TRUE COPY

variation of the theme of the general maxim *ut magis valeat quam pereat*. I do not conceive it to be the duty of this Court so to construe any of the provisions of the Constitution as to defeat the obvious ends the Constitution was designed to serve where another construction equally in accordance with the words and sense of such provisions will serve to enforce and protect such ends."

Some years down the line in **GLOBAL EXCELLENCE COMMUNICATION LTD v DONALD DUKE (2007) LPELR-1323 (SC),** Onnoghen, JSC, later CJN, reiterated the relevant principles for interpretation of the Constitution, with His lordship saying, among others, at page 19, that:

"The principles upon which the Constitution was established, rather than the direct operation or literal meaning of the words used measure the scope and purpose of its provisions. The words of the Constitution are therefore not to be read with stultifying narrowness."

All these were further followed by this Court recently in **FEDERAL REPUBLIC OF NIGERIA v MUHAMMADU MAIGARI DINGYADI (2018) LPELR-4606 (CA),** in the following way at page 33:

"One main guiding post is that the principles upon which the Constitution was established rather than the direct operation or literal meaning of the words used measure the purpose and scope of its provisions: See Global Excellence Communications



Ltd v. Donald Duke (2007) 6 NWLR (Pt. 1059) 22 @ 41-41 (SC); Attorney-General of Bendel State v. Attorney General of the Federation (1982) 3 NCLR 1; Saraki v. F.R.N. (2016) 3 NWLR (Pt. 1500) 531; Skye Bank Plc v. Iwu (2017) 16 NWLR (Pt. 1590) 124. There is always a need for the fulfilment of the object and true intent of the Constitution. Therefore, the Constitution must always be construed in such a way that it protects what it sets out to protect and guide what it is meant to guide – Adeleke v. Oyo State House of Assembly (2006) 6 NWLR (Pt. 1006) 608. In interpreting the Constitution of a nation, it is the duty of the Court to ensure the words of the Constitution preserve the intendment of the Constitution – Okogie v. A.G. Lagos State (1989) 2 NCLR 337, Abaribe v. Speaker, Abia State House of Assembly (2002) 14 NWLR (Pt. 788) 466, Marwa v. Nyako (2012) LPELR-7837 (SC). Every Constitution has a life and moving spirit within it and it is this spirit that forms the raison de' entre of the Constitution without which the Constitution will be a dead piece of document. The life and moving spirit of the Constitution of this country is captured in the Preamble. It has been held that when a Constitutional provision is interpreted, the cardinal rule is to look to the Preamble to the Constitution as guiding star, and the directive principles of State Policy as the '**book of interpretation**', and that while the Preamble embodies the hopes and aspirations of the people, the Directive Principles set out the proximate grounds in the governance of the country – Thakur v. Union of India (2008) 6 SCC 1.

CERTIFIED TRUE COPY

"In other words, in interpreting the wordings of section 212(1)(a) of the 1999 Constitution (as amended), the Court should be guided by principles upon which the Constitution was established rather than by the direct operation or literal meaning of the words used in the provision, and where the literal meaning of the words used are not in consonance with the guiding principles, literal interpretation must be jettisoned for another approach that accords with the guiding principles of the Constitution - Abaribe v. Speaker, Abia State House of Assembly (supra) (2002) 14 NWLR (Pt. 788) 466; Global Excellence Communications Ltd v. Donald Duke (2007) 6 NWLR (Pt. 1059) 22. The interpretation that would serve the interest of the Constitution and best carries out its objects and purpose must always be preferred – Kalu v. State (1988) 13 NWLR (Pt. 583) 531."

Following these well-settled guidelines, our first port of call in unlocking the argument of the Petitioners is the Preamble to the 1999 Constitution and the Directive Principles of State Policy contained therein all of which embody the principles of the Constitution. The Preamble to the 1999 Constitution loudly proclaims equality between citizens as its cornerstone among others, thus:

"WE the people of the Federal Republic of Nigeria;

Having firmly and solemnly resolved;

………………………………………………..

CA/PEPC/03/2023; CA/PEPC/04/2023; CA/PEPC/05/2023.

725




CERTIFIED TRUE COPY

> AND TO PROVIDE a constitution for the purpose of promoting the good government and welfare of all persons in our country on the principles of freedom, *EQUALITY* and Justice, and for the purpose of consolidating the Unity of our people:
>
> DO HEREBY MAKE AND GIVE TO OURSELVES the following Constitution:"

For those who are not used to reading preambles, the Constitution still in its Fundamental Objectives and Directive Principles of State Policy contained in Chapter II of the Constitution, which this Court aptly described as the 'road to construction' in **FRN v DINGYADI (supra)**, repeats this equality principle. Under its *Social Objectives* provision of that Chapter in Section 17 thereof, it again proclaims that:

> "(1)  The State Social order is founded on ideals of Freedom, Equality and Justice.
>
> (2)  In furtherance of the social order –
>
>   (a)  Every citizen shall have equality of rights, obligations and opportunities before the law; "

Equality of rights in every citizen as stated in this provision cannot by any means be read to exclude equality of the weight and value of their votes. No, it includes it. Even more so, when the issue here is the right of every such citizen to elect with their votes their President whose policies are


CERTIFIED TRUE COPY

supposed to and will affect all of them equally regardless of which part of the country they reside or live.

So even stopping here, the futility and hollowness in the argument of the Petitioners that the votes of the voters in the FCT, Abuja have more weight than other voters in the country, to the extent of their votes purportedly have a veto effect on other votes, is rendered bare. That notwithstanding, let us still proceed to consider, for whatever it is worth, their interpretation of Section 134(2)(b) of the same 1999 Constitution, which incidentally centres around the word 'and' in that provision.

In the first place, the settled position of the law is that in interpreting a constitutional provisions the Court should be guided by the principles upon which the Constitution was established, rather than by the direct operation or literal meaning of the words used in the provisions, and where the literal meaning of the words used are not in consonance with the guiding principles, literal interpretation must be jettisoned for another approach that accords with the guiding principles of the Constitution. It is quite clear that a calm reading of Section 134(2)(b) of the Constitution will leave no one in doubt that the use of the word 'and' by the framers, between the words *"all the States in the Federation"* and *"the Federal Capital Territory, Abuja"* indicates nothing more than the framers' understandable desire for consistency in referring to the Federal

CA/PEPC/03/2023; CA/PEPC/04/2023; CA/PEPC/05/2023.

727



Capital Territory by that name, as it is done all through the Constitution whenever reference is made to the Federal Capital Territory. The word 'and' and 'Federal Capital Territory, Abuja' do not by any means imply the meaning imputed to it by the Petitioners.

In any event, Section 299 of the Constitution dispels any lingering doubt that may still be existing in anyone's mind by stating clearly that:

> "The provisions of this Constitution shall apply to the Federal Capital Territory, Abuja, as if it were one of the States of the Federation; **and accordingly –**
>
> **(a)    all the legislative powers, the executive powers and the judicial powers vested in the House of Assembly, the Governor of a State and in the courts of a State shall, respectively, vest in the National Assembly, the President of the Federation and in the courts which by virtue of the foregoing provisions are courts established for the Federal Capital Territory, Abuja;**
>
> **(b)    all the powers referred to in paragraph (a) of this section shall be exercised in accordance with the provisions of this Constitution.**
>
> **(c)    the provisions of this Constitution pertaining to the matters aforesaid shall be read with such modifications and adaptations as may be necessary to bring them into conformity with the provisions of this section."**

(Emphasis mine)


CERTIFIED TRUE COPY

This provision states most unequivocally that the entire provisions of the Constitution shall apply to the Federal Capital Territory as if it were one of the States of the Federation. It is noteworthy that the punctuation mark employed by the framers immediately after the part of that provision ending with "Federation" emphasized by me, is a semicolon whose function in a sentence is to separate independent clauses of a compound sentence: See **Meriam Webster's Online Dictionary** which defines 'semicolon' as "a punctuation mark used chiefly in a coordinating function between major sentence elements (such as independent clauses of a compound sentence)." **WIKIPEDIA** also explains its use thus: "In the English Language, a semicolon is most commonly used to link two independent clauses that are closely related in thought, such as when restating the preceding idea with a different expression."

The point being made here is that, contrary to the position of the Petitioners, by the express provisions of Section 299 above, the provisions of the entire Constitution shall apply to the Federal Capital Territory as if it were one of the States of the Federation. This means that Section 134(2)(b) of the same Constitution, requiring a presidential candidate to poll at least one quarter of the votes cast in two-thirds of the States of the Federation in order to be returned elected, means nothing more than that the Federal Capital Territory shall be taken into account in calculating the said two-third of the States of the Federation.

CA/PEPC/03/2023; CA/PEPC/04/2023; CA/PEPC/05/2023.

CERTIFIED TRUE COPY

In other words, the FCT is no more than one of the States of the Federation for the purpose of that calculation. Nothing more than that can be implied or inferable from Section 134(2)(b) of the Constitution.

If anything, this position is confirmed in the cases of **BAKARI v OGUNDIPE (2021) 5 NWLR (Pt. 1768) 1 at 38,** where it was said by the Apex Court that "By virtue of the provisions of the Section 299 of the Constitution it is so clear that the Federal Capital of Nigeria has the same status of a State; it is as if it is one of the States of the Federation."; and **IBORI v. OGBORU (2009) 6 NWLR (Pt. 920) 102 at 138,** where it was confirmed by this Court that "The Federal Capital Territory, Abuja is to be treated like a State by virtue of Section 299 of the 1999 Constitution…. If the Federal Capital Territory, Abuja, is to be treated like any other State, then it is not superior to or inferior to any other State in Nigeria."

It is also my considered view that if the framers had wanted to make scoring one-quarter of votes cast in the Federal Capital Territory, Abuja, a specific requirement for the return of a Presidential candidate, they would have made that intention plain by using words that clearly separate the scoring of one-quarter of votes in the Federal Capital Territory as a distinct requirement.

As expressly stated in Section 299 of the Constitution, for the purposes of fulfilling the requirements of Section 134(2)(b) of the Constitution for



the return of a Presidential candidate as duly elected, the Federal Capital Territory, Abuja, is to be treated as one of the States in the calculation of two-third of the States of the Federation. Such that if the candidate polls 25% or one-quarter of the votes in two-thirds of 37 States of the Federation (FCT Abuja inclusive), the Presidential Candidate shall be deemed to have been duly elected, even if he fails to secure 25% of the votes cast in the Federal Capital Territory, Abuja, as the 2nd Respondent did.

In conclusion, I hold without any equivocation that in a Presidential election, polling one quarter or 25% of total votes cast in the Federal Capital Territory of Abuja is not a separate precondition for a candidate to be deemed as duly elected under Section 134 of the Constitution. In consequence, issue 4 is also resolved against the Petitioners and in favour of the Respondents.

## ISSUE 3

**Whether 2nd Respondent was not disqualified under the provisions of the Constitution of the Federal Republic of Nigeria, 1999 (As Amended) to contest the Presidential election held on 25th day of February 2023, having regard to the alleged order of forfeiture arising from drug-related offence, his acquisition of the citizenship of a country other than Nigeria, and presenting a forged certificate to the 1st Respondent?**

CA/PEPC/03/2023; CA/PEPC/04/2023; CA/PEPC/05/2023.                                          731



I do not intend to reopen this issue, having already ruled on it while considering the preliminary objections of Respondents. I held therein that the petitioners did not plead facts in support of non-qualification or disqualification of 2nd Respondent in their petition and their efforts to remedy it through their replies to respondents' replies were belated and of no avail. That ruling constitutes issue estoppel, binding not only on the parties but on this court, meaning, that this court cannot depart from it: see *Uwemedimo v. Mobil Producing (Nig.) Unltd* (2022) 2 NWLR (Pt. 1813) 53 @ 78 paragraph E-F (SC); *Francis Shanu & Anor v. Afribank (Nig.) Plc* (2002) LPELR-3036 (SC) p. 25 paragraph D-E, (2002) 17 NWLR (Pt. 795) 185; *Fadiora v. Gbadebo* (1978) 3 S.C. 219; *Lawal v. Dawodu & Ors.* (1972) 1 ALL N.L.R. (Pt. 2) 270; *Cardoso v. Daniel* (1986) LPELR-830 (SC) p. 27-28; *Ladega v. Durosinmi* (1978) 3 SC 82.

This issue is therefore discountenanced.

## ISSUE FOUR

This issue is whether 2nd Respondent was elected by majority of lawful votes cast in the election and 1st Respondent was right in declaring him elected.

In addressing this issue, Chief Chris Uche, SAN, for the petitioners argued that 1st Respondent admitted that the Petitioners won the election in 21 States, which States he listed as Adamawa, Akwa Ibom, Bauchi, Bayelsa,



Borno, Delta, Ekiti, Gombe, Jigawa, Kaduna, Katsina, Kebbi, Kogi, Kwara, Nasarawa, Niger, Osun, Sokoto, Taraba, Yobe, and Zamfara. He contended that that is an admission against interest. He relied on the cases of *DR. JEREMIAH O. ABALAKA V. PROF. IBIRONKE AKINSETE & ORS* **(2023) LPELR-60349** (SC) and *DR. SHETTIMA BUKAR ABBA V. ALHAJI MUSA ABBA AJI & ORS* (2022) LPELR-56592 (SC).

Counsel next picked on the evidence of P.W.21 (Mr Samuel Oduntan) and *EXHIBITS PAH1, PAH2, PAH3* and *PAH4* tendered by the said P.W21 to contend that he produced evidence of the expert to prove the Petition. Counsel submitted that where a party testifies on a material fact the adversary must offer counter evidence either to cross-examine the witness or to offer counter evidence, else the court should accept the evidence as true. He said that when a team of experts jointly undertake a project and produce a Report, the Report could be tendered by one of them in court as P.W.21 did. He relied on **SPDC V. ADAMKWE (2003) 11 NWR (PT. 832) 532; SPDC V. FARAH (1995)**. Counsel said that since 1st Respondent failed to adduce evidence to contradict *EXHIBIT PAH1,* the court should accept, believe and act on it. He relied on the case of *MIA & SONS V. FHA (1991) 8 NWLR (PT.209) 295* and contended further that the 2nd Respondent failed to explain the owner of the name 'Adekunle' on the NYSC discharge certificate presented by the 2nd Respondent to the 1st Respondent; that the 2nd Respondent failed to Cross-examine the



PW27 on that document. He urged the court to resolve this issue in favour of the Petitioners.

### RESOLUTION OF ISSUE 4

This issue covers ground 3 of the Petition. The facts in support of this ground 3 were pleaded to by the Petitioners from Paragraphs 105 to 145 of the Petition. The petitioners specifically pleaded in Paragraphs 106 to 107 as follows:

> "106.  The Petitioners shall lead evidence at the hearing to show that: -
>
> (a) the result of the Election as announced by the 1* Respondent and especially the votes allocated to the 2n Respondent do not represent the lawful valid votes cast at the Election; and
>
> (b) the lawful votes cast at the Election were deliberately and massively deducted from the 1st Petitioner's scores by the 1st Respondent in order to return the 2nd Respondent.
>
> 107. The Petitioners shall give evidence to show the Election results as purportedly declared by the 1st Respondent in respect of each State of the Federation, including the



*Federal Capital Territory, the details of which are contained in the Table following, are wrong:"*

The table referred to by the Petitioners is the table of results declared by the 1st Respondent. There is no other set of results placed before this court by the Petitioners to form the basis of our finding of fact as to whether the declared result is wrong or not. Success or failure in an election depends on figures, which is in turn dependent on votes garnered by each candidate. So, where the complaint in an election petition is that the candidate returned did not poll majority or highest votes in the election to be returned, as contended here by the petitioners, not only must the figures disputed be pleaded, the figures or votes the petitioner perceives as the correct figures of the election ought to and must also be pleaded. That is not only logical, support for it can be found in several decisions, among them ***NADABO V. DABAI (2011) 7 NWLR (Pt. 1254) 155 @ 177*** where Okoro, J.C.A., as he then was, said:

> **"When a petitioner is alleging that the respondent was not elected by majority of lawful votes, *he ought to plead and prove the votes cast at the various polling stations*, the votes illegally credited to the 'winner' and the votes which ought to have been deducted from the supposed winner, in order to see if it will affect the result of the election. Where this is not**

CERTIFIED TRUE COPY

**done, it will be difficult for the court to address the issue. See Awolowo v. Shagari (1979) 6-9 S.C 51." (Italics mine)**

See also **Ojo v. Esohe & 2 Ors (1999) 5 NWLR (Pt. 603) 444 @ 450-451** (per Tabai, J.C.A. as he then was). The averments of petitioners in paragraph 107 of the petition only showed the votes declared by INEC, which the petitioners are disputing as manipulated. Nowhere in the petition did petitioners plead what they considered the authentic votes of the election to guide the court in the inquiry suggested by them in this allegation that 2nd Respondent did not poll majority of lawful votes in the election. Their petition therefore did not meet the legal threshold to ignite a proper inquiry by this court, and so lame even on the pleadings.

Going further, if we must at all, the Petitioners' claim is that 19,702 Polling Units results contain various forms of infractions. They asserted that results from a total of 4,307 Polling Units are without stamp on the respective Forms EC8A from the States and details are said to be in the Statistician's Report, which Report we have repeatedly held incompetent and inadmissible.

They also contended that results from 1,300 Polling Units do not have signatures of the Presiding officers on the respective Forms EC8A.

It was also alleged that results from 6,418 Polling Units have and indicate zero accreditation.



It was further alleged that 9,463 Polling Units across 30 states showed that the votes returned are in excess of accredited voters. Furthermore, that the presiding officers failed to properly fill and countersign alterations in election forms, including Forms EC8A, EC8B, EC8C AND EC8D in over 40,000 Polling Units which they claimed were in the Statistician's Report.

It is clear from the averments in the Petition as captured above that neither the particulars of the Polling Units in issue nor those involved in the irregularities were given by the Petitioners. In any case, our law is well settled that before a party can legally rely on fraud or forgery or any form of malpractice as alleged in this Petition, the facts must not only be pleaded but particulars thereof must be provided in the pleadings: See *OMODELE ASHABI EYA & ORS V. ALHAJA RISIKATU OLOPADE & ANOR (2011) 11 NWLR (PT. 1259) 505*.

The Petitioners in the pleadings from Paragraphs 128 to 142, averred to issues of violence and disruptive activities. These allegations are criminal in nature. The standard of proof, where an allegation of crime is made in an election petition, is beyond reasonable doubt and not on the balance of probabilities: see *EMMANUEL V. UMANA & ORS. (2016) LPELR-40037(SC)*. A complaint of massive suppression, deduction and allocation of votes connotes forgery or fraud, particulars of which must be pleaded

CERTIFIED TRUE COPY

and proved beyond reasonable doubt. **KAKIH V. PDP & ORS** (2014) LPELR-23277 (SC) p.51-52; **NWOBODO V. ONOH** (1984) LPELR-2120 (SC).

First Respondent joined issues with the Petitioners' allegations in Paragraphs 92 to 142 of the Petition.

The 2nd Respondent and the 3rd Respondents in a similar manner joined issues with the Petitioners in calling on them to prove their claims as required by the law.

What this entails is that, the Petitioners who made all these allegations have the burden to prove all their allegations as required by law.

The Petitioners have placed reliance on the evidence of their Statistician and forensic expert evidence, who are P.W.21 and P.W. 26 respectively. I have had time to look at the evidence of these witnesses and had ruled that their evidence, apart from being improperly before the Court, is also hearsay. The Statistician's Report rolled out figures of Forms which he claimed were either not signed or stamped, but none of the Forms referred to was attached to the Report. The Polling Unit Agents of the Petitioners who were present in all the Polling Units round the country were not called to testify to any problem or difficulties in their Polling Units on the 25th day of February 2023 Presidential election. That is fatal to the petitioners' case.



In **Belgore v. Ahmed** (2013) 8 NWLR (Pt. 1355) 60 @ 100, it was said by Tabai, J.S.C., in lead judgment as follows:

> "With respect to the volume of documentary evidence, I wish to state at the risk of repetition, that they were merely tendered across the bar by learned counsel for the petitioners at the trial. He did not, and was not in a position, to answer questions or otherwise speak on any of them. Their makers were not called. In such circumstances was the trial tribunal bound to ascribe probative value to them? I shall answer this question in the negative. The trial tribunal had no duty to accord probative value to the mass of documents, their status as certified public documents notwithstanding.
>
> "There is no doubt that the petitioners' decision to tender the mass of documentary evidence at the trial was prompted by the urgency dictated by section 285(6) of the 1999 Constitution (as amended). That, however, does not diminish the petitioners/appellants' burden and standard of proof of the petition. They had a duty to prove their petition according to law."

This position of the law may have been fairly watered down under the current electoral regime by section 137 of the Electoral Act 2022 stating that:

> **It shall not be necessary for a party who alleges non-compliance with the provisions of this Act for the conduct of**



CERTIFIED TRUE COPY

> **elections to call oral evidence if originals or certified true**
> **copies manifestly disclose the non-compliance alleged.**

But even at that, it cannot be gainsaid that oral evidence is necessary to explain discrepancies in original or certified true copies of election documents where the complaint verges on whether an alteration or amendment in an original or certified true copy of a polling unit Result was made with intent to falsifying it or whether it was simply made to correct an apparent human error in the course of making entries in the Result. Such situation would surely need a witness to explain or speak to the documents in order to prove falsification of election documents when it is so alleged, as pointed out in *Belgore v. Ahmed* (supra). See also *Waziri Ibrahim v. Shagari* (2007) 3 EPR 99 @ 131 where it was again said by the apex court that:

> "An amended document by itself does not speak of motive behind the amendment. Without more, an altered or amended document is as genuine as an unamended one. Therefore, the admission of *Exhibits C to V*, the returns from States from which Exhibits B and B1 were collated without any evidence to add a sting to the innocent amendment appearing on some of them offers no help to the case of the appellant. I find myself therefore unable to accept the submission of the learned counsel for the appellant that because returning officers amended and altered the returns in exhibits C to V from 15 States, that fact *ipso facto* means that the returning officers



> have not complied with the Sections 65(5), 66, 70 and 119 of
> the Electoral Act 1982. There must be evidence of indictment
> or of immoral, unlawful and illegal motive."

See also ***Buhari v. Obasanjo*** 23 NSQR 442 @ 727 where it was again said by the apex court that:

> "The position of law regarding the type of evidence which must
> be led in support of allegations in which figures or scores of
> candidates at an election are being challenged should come
> direct from the officers who were on the field where the votes
> were counted and/or collated."

All the above, in my humble view, also explain the rationale for the employment of the adverb 'manifestly' by the draftsman in Section 137 of the Electoral Act 2022. What that word suggests is that the non-compliance complained of must be apparent on the face of the electoral document. It must not be something that can be explained away by oral evidence.

I have in this judgment explained the issue of evidence of witnesses who were not Polling Unit agents.

The Collation Agents of the parties who testified were giving accounts of stories related to them by people who were not called as witnesses in this Petition.



The Petitioners, through their counsel, strenuously argued in this petition that:

> *"The true and current position of the Electoral Law in Nigeria now is that a party who alleges noncompliance with the provisions of the Electoral Act, 2022 for the conduct of elections need not call oral evidence if the originals or certified true copies of election documents used in the conduct of the election manifestly discloses the infractions alleged. This is Section 137 of the Electoral Act, 2022. They contended that careful and dispassionate examination of all the Exhibits tendered and supported by the uncontroverted Reports of PW21 and PW26 manifestly discloses large scale 'irregularities' never before witnessed in Nigeria."*

This interpretation of Section 137 of the Electoral Act 2022 by the Petitioners has generously and swiftly silenced the otherwise potent adverbial word "manifestly" used by the legislature in that section of the law. "Manifestly" is defined by online dictionary: www.dictionary.com to mean: "in a way that can be readily seen by the eye or the understanding; plainly or obviously; evidently." This means for the Petitioners to throw up their arms and say we need not call oral evidence in proving non-compliance as they are canvassing, the certified copies of documents presented must be manifestly or readily seen to convey the fact of non-compliance.



In *OYETOLA & ANOR V. INEC (SUPRA)*, the Supreme Court Per Jauro, JSC at PP58 to 59 held as follows:

> "The Appellants have also argued that by virtue of Section 137 of the Electoral Act, they were relieved of the burden or duty of calling witnesses to prove allegations of non-compliance with the Electoral Act. The said Section 137 provides thus: "It shall not be necessary for a party who alleges non-compliance with the provisions of this Act for the conduct of elections to call oral evidence if originals or certified true copies manifestly disclose the non-compliance alleged." The above provision is drafted in simple, clear and unambiguous words. The duty of this Court is therefore to apply a literal interpretation thereto by giving the words their natural, literal and ordinary meanings, devoid of any embellishment. See KASSIM V. ADESEMOWO (2021) 18 NWLR (PT. 1807) 67, AGUMA V. A.P.C. (2021) 14 NWLR (PT. 1796) 351, F.B.N. PLC V. MAIWADA (2013) 6 NWLR (PT. 1348) 444, MIL. ADM., BENUE STATE V. ULEGEDE (2001) 17 NWLR (PT. 741) 194. It is indubitable that Section 137 of the Electoral Act only applies where the non-compliance alleged is manifest from the originals or certified true copies of documents relied on. In the instant case, neither Exhibit BVR nor any other document relied on by the Appellants remotely disclosed, non-compliance with the provisions of the Electoral Act. Hence, the section cannot be of any assistance to them. In the circumstance, they still had a duty to call witnesses who witnessed the alleged acts of non-compliance to testify."

CA/PEPC/03/2023; CA/PEPC/04/2023; CA/PEPC/05/2023.



From this authority it is the law that where the documents tendered and relied upon by the Petitioners do not manifestly disclose the non-compliance alleged, the Petitioners would still need to call witnesses who witnessed the alleged acts of non-compliance to testify.

In the instant case the Petitioners tendered loads of certified copies of documents. The Petitioners filed five (5) schedules of documents, the first schedule was filed on 30th May, 2023; the second was filed 31st May, 2023; the third was filed 2nd June, 2023; the fourth was filed 7th June 2023 and the fifth Schedule was filed 21st June, 2023. From these schedules of documents, a lot of exhibits were generated and tendered. These Exhibits were objected to by the Respondents. I had earlier on in this judgment dealt with these documents and objections. However, I want to have a look at these documents to see if they manifestly show any lack of compliance. These exhibits include the following:

1. **EXHIBITS: PG, PG1, to PG3** which were The print outs of Bimodal Voter Accreditation System (BVAS) for Abia State, Adamawa State, Akwa-Ibom State, Anambra State, Bauchi, Bayelsa, Benue, Borno, Cross-River, Delta, Ebony, Edo, Ekiti, Enugu, F.C.T, Abuja, Gombe, Imo, Jigawa, Kaduna, Kano, Katsina, Kebbi, Kogi, Kwara, Lagos, Nasarawa, Niger, Ogun, Ondo, Osun, Oyo, Plateau, Rivers, Sokoto, Taraba, Yobe and Zamfara, were admitted though objected to.

2. **EXHIBITS PH, PH1 to PH36** which were The INEC Data on Number of Registered Voters and Collected PVCS for the 2023 General



Election for the States listed on the First Schedule of Documents as Numbers 46 – 82 were admitted.

The second schedule of documents was filed on 31/5/2023. From this schedule the Exhibits are:

3. **EXHIBITS PJ, PJ1** to **PJ17** which were the bundles of Forms EC8As for 17 Local Government Areas of Abia State and the INEC Authentication, Certificate dated 19/3/2023 were admitted.

4. **EXHIBITS PK1 to PK9; PL1 to PL23; PM1 to PM2** which were the bundles of Forms EC8As for 8 Local Governments of Bayelsa State, 23 Local Governments of Kaduna were State, and 20 Local Governments Oyo State were admitted along with the Authentication Certificate for Kaduna State and for Ogun state respectively.

5. **EXHIBITS PN1** to **PN29**; and **PP1** to **PP21** which were the bundles of Forms EC8Bs for Kaduna and Kogi States- Bundles of Forms EC8Bs for 23 Local Governments of Kaduna State Bundles of Forms EC8BS for 21 Local Government Areas for Kogi State.

6. **EXHIBITS PQ1** to **PQ20** which were the bundles of Forms EC8Cs for the 20 Local Government Areas of Kaduna State were admitted.

7. **EXHIBITS PR1** to **PR3; PS1 to PS10** which were copies of Forms EC40GS for Giwa Local Government Area and for five Local Government Areas of ogun State were admitted.

8. **EXHIBITS PT1** to **PT33** which were the bundle of print outs of Bimodal Voters Accreditation System (BVAS) and accreditation Data for Abia; Adamawa; Akwaibom; Anambra, Bauchi; Bayelesa;



Benue; Borno; Cross-River; Delta; Ebonyi; Edo; Ekiti; Enugu; Gombe; Imo; Jigawa; Kaduna; Kano; Kebbi; Kogi; Katsina; Kwara; Lagos; Nassarawa; Niger; Ogun; Ondo; Osun; Oyo; Plateau; Rivers State and the FCT.

9. **EXHIBITS PAW1** to **PAW25**; bundles of CTCs of forms EC8As from Delta State.

10. **EXHIBITS PAX1** to **PAX13**, copies of EC8As from Ebonyi State.

11. **EXHIBITS PAY1** to **PAY18** copies of form EC8As from Edo State.

12. **EXHIBITS PAZ1** to **PAZ17**- Copies of forms EC8As from Enugu State.

13. **EXHIBITS PBA1** to **PBA27**- Copies of Form EC8As from Imo State.

14. **EXHIBITS PBB1** to **PBB21**- Copies of Form EC8A5 from 21 Local Government Areas of Kogi State.

Surprisingly the documents were dumped on the Court without any witness linking them up documents with the specific complaints of non-compliance. It is settled law that despite the tendering of exhibits in proof of a Petition/case, the onus of proving the case pleaded and for which the documents were tendered in evidence, lies on the Petitioner. In the instant Petition, a lot of documents were tendered from the Bar. When a party decides to rely on documents to prove his case, there must be a link between the documents and the specific areas of the Petition. The party must relate each document to the specific areas of his case for which the



documents were tendered. Failure to link the documents is fatal and catastrophic as it is in this case.

The Supreme Court in the recent case of **_TUMBIDO V. INEC & ORS. (2023) LPELR-60004 (SC)_** held Per Jauro, JSC (at **P.43, Paras C-F**) as follows:

> *"The practice of dumping documents on the Court without speaking to them has been deprecated by this Court on numerous occasions. No Court is entitled to conduct inquisitorial investigations into the contents of a document or purport thereof in its chambers. The Appellant ought to have called a witness to speak to the photographs and video recording before the Court. See MAKINDE V. ADEKOLA (2022) 9 NWLR (PT. 1834) 13; MAKU V. AL-MAKURA (2016) 5 NWLR (PT. 1505) 201; A.C.N. V. NYAKO (2015) 18 NWLR (PT. 1491) 352."*

Further contributions in the Judgment made by Nweze, JSC at **PP.48-49, Paras E-F** are as follows:

> *" As it were, the Appellant merely dumped exhibits 1 - 22 and M on the trial Court. That approach was, clearly, at variance with the position which this Court had taken in several cases, old and recent, that a party who produces an exhibit, so that the Court could utilise it in the process of adjudication, must not dump it on the Court, but must tie it to the relevant aspects of his case. In this case, the Appellant failed to do so. In one word, the said exhibits were, simply, dumped on the trial Tribunal. That was not good enough, Ivienagbor v. Bazuaye [1999] 9 NWLR (pt 620) 552; (1999) 6 SCNJ 235, 243; Owe v. Oshinbanjo (1965) 1 All NLR 72 at 75; Bornu Holding*

CA/PEPC/03/2023; CA/PEPC/04/2023; CA/PEPC/05/2023.



> *Co. Ltd. v. Alhaji Hassan Bogoco (1971) 1 All NLR 324 at 333;*
> *Alhaji Onibudo & Ors v Alhaji Akibu & Ors [1982] 7 SC 60, 62;*
> *Nwaga v Registered Trustees Recreation Club (2004) FWLR (pt*
> *190) 1360, 1380-1381; Jalingo v Nyame (1992) 3 NWLR (pt*
> *231) 538; Ugochukwu v Co-operative Bank [1996] 7 SCNJ 22.*
> *Others include: WAB v Savanah Ventures [2002] FWLR (pt Pt*
> *112) 53, 72; Obasi Brothers Ltd v MBA Securities Ltd [2005] 2*
> *SC (pt 1) 51, 68; ANPP v INEC [2010] 13 NWLR (pt 1212) 549;*
> *Ucha v Elechi [2012] 13 NWLR (pt 1317) 330, 360; Omisore v*
> *Aregbesola [2015] 15 NWLR (pt 1482) 202, 323 -324."*

In this situation, it is invariably correct that all the allegations raised in this Petition have not been proved as required by our law. See ***BUHARI v. INEC (2008) LPER-814 (SC) p.172-173 paragraphs E-D***, where it was held by Tobi, JSC, that:

> *"A petitioner who contests the legality or lawfulness of*
> *votes cast in an election and the subsequent result must*
> *tender in evidence all the necessary documents by way of*
> *forms and other documents used at the election. He should*
> *not stop there. He must call witnesses to testify to the*
> *illegality or unlawfulness of the votes cast and prove that*
> *the illegality or unlawfulness substantially affected the*
> *result of the election. The documents are amongst those in*
> *which the results of the votes are recorded. The witnesses*
> *are those who saw it all on the day of the election; not*
> *those who picked the evidence from an eye witness. No.*
> *They must be eye witnesses too. Both forms and witnesses*
> *are vital for contesting the legality or lawfulness of the*


CERTIFIED TRUE COPY

> *votes cast and the subsequent result of the election. One cannot be a substitute for the other. It is not enough for the petitioner to tender only the documents. It is incumbent on him to lead evidence in respect of the wrong doings or irregularities both in the conduct of the election and the recording of the votes; wrong doings and irregularities which affected substantially the result of the election. Proving an Election Petition or proof of an Election Petition is not as easy as the Englishman finding coffee on his breakfast table and seeping it with pleasure; particularly in the light of Section 146(1) of the Electoral Act. A petitioner has a difficult though not impossible task."*

It is also important to draw our minds to the fact that criminal allegations are usually and directly made personal. For allegations of crime to be proved against the Respondents it must be proved that they committed the corrupt acts or aided, abetted, consented to, or procured their commission. Furthermore, it must be proved that the corrupt practices substantially affected the outcome of the election. See ***OMISORE V. AREGBESOLA (2015) (SUPRA)***.

The law also places the onus on the Petitioners to demonstrate by credible evidence that the alleged corrupt practice indeed occurred and that it affected substantially the outcome of the election. In that quest, the Petitioners pleaded some States where the malpractices allegedly

CA/PEPC/03/2023; CA/PEPC/04/2023; CA/PEPC/05/2023.



CERTIFIED TRUE COPY

occurred. One of such States is Sokoto State. They called P.W.19, P.W.21 and P.W.22 to prove their allegations that the 1st Respondent cancelled results from 241 Polling Units in Sokoto State in respect of National Assembly elections in the State but went ahead to declare result for the presidential election. The three witnesses (P.W.19, P.W.21 and P.W.22) were not in Sokoto during the election. There is also no evidence tendered of the cancellation of results in any of the units alleged. P.W.19 and P.W.22, when cross-examined, said they were in Kogi State where they voted and later came to Abuja. The P.W.21 is the Statistician who testified of over-voting, non-signing and cancellation on Forms used. But he did not tender or show those compromised forms. The same occurred in their testimonies in Kano State, Kogi State, Lagos State and Rivers State.

From the foregoing consideration, it is very clear that there was no credible evidence by the Petitioners to prove the allegations of corrupt practices. Under this issue raised, the Petitioners were asking if the 1st Respondent was not wrong in returning the 2nd Respondent when he was not duly elected by majority of the lawful votes cast in the election. From the facts placed before the Court, the 1st Respondent declared the results of the election by which the 2nd Respondent was returned.



CERTIFIED TRUE COPY

Section 134(2) of the 1999 Constitution talks of the highest number of votes cast at the election if the contest was among more than two candidates, as in the instant case, not majority of votes cast as propounded by the Petitioners. The 1st Respondent was therefore right from the results declared by her, in the absence of any rival or alternative result placed before this Court by the Petitioners, that the 2nd Respondent who scored 8,794,726 votes, as against 6,984,520 votes scored by the Petitioners in the Election, scored the highest number of lawful votes cast in the election. Issue 4 is accordingly resolved against the Petitioners and in favour of the Respondents.

Having resolved all the four issues against the Petitioners, I find that the Petitioners have not successfully proved any of the grounds as laid out in Paragraph 16 of their Petition. It is my conclusion that this Petition also lacks merit.

**FINAL ORDERS**

Having considered and decided that the three Petitions Nos. CA/PEPC/03/2023; CA/PEPC/04/2023 and CA/PEPC/05/2023 are all devoid of merit, the three Petition are hereby dismissed. Accordingly, I affirm the declaration and return of Bola Ahmed Tinubu by the Independent National Electoral Commission (INEC) as the duly elected

CA/PEPC/03/2023; CA/PEPC/04/2023; CA/PEPC/05/2023.                                           751



President of the Federal Republic of Nigeria. The parties in the three Petitions are to bear their respective costs.

**HARUNA SIMON TSAMMANI, JCA**

JUSTICE COURT OF APPEAL


CERTIFIED TRUE COPY

**PETITION NOS:**
**CA/PEPC/03/2023**
**CA/PEPC/04/2023**
**CA/PEPC/05/2023**

## <u>STEPHEN JONAH ADAH, JCA</u>

I am in full agreement with the lead judgment delivered by my learned brother **Haruna Simon Tsammani, JCA** in this three consolidated Petitions which are petitions **No: CA/PEPC/03/2023; CA/PEPC/04/2023; CA/PEPC/05/2023.** These Petitions were filed against the election into the office of the President of the Federal Republic of Nigeria, which election was conducted in Nigeria on 25th February, 2023.

I agree also with the consolidated rulings on the various objections and other interlocutory applications relating to the competence of witnesses and the documents tendered in the three Petitions.

I also agree with the reasoning and the conclusions arrived at the rulings on the preliminary objections and the substantial issues raised therein.

In any concluded Election, there are bound to be a winner and losers. While the winner celebrates victory, an aggrieved loser may come before the Court to ventilate his grievances. This is made possible by the Constitution of the Federal Republic of Nigeria 1999 (as amended) which in Section 6 empowers Courts to determine disputes, including election disputes.



1

It is well settled that an election Petition by nature is **sui generis,** of its own kind or class. It is not like going to Court to make a claim of debt, contract or tort. It has its own character and it is unique by its nature. The slightest non-compliance with a procedural step which otherwise could either be cured or waived in ordinary civil proceedings could result in a fatal consequence to the Petition.

See ***BUHARI V. YUSUF (2003) LPELR- 812(SC); HASSAN V. ALIYU (2010) 17 NWLR (PT. 1223) 547; PEREWORINIMI V. LOKPOBIRI & ORS (2020) LPELR49, 505; OKE & ANOR V. MIMIKO & ORS (2013); EZE V. UMAHI & ORS (2002) LPELR-59157 (SC); NYESOM V. PETERSIDE & ORS (2016) LPELR-40036 (SC).***

Election Petition as a special proceeding is specifically regulated by the constitution of the Federal Republic of Nigeria 1999, the Electoral Act and other Rules of procedure such as the Federal High Court Civil Procedure Rules and Practice Direction of the Honourable President of the Court of Appeal for the hearing of the Election Petition and the Election Petition Appeals.

By Section 285(5) of the Constitution, an Election Petition shall be filed within 21 days after the date of the declaration of result of the Election; and by Section 285(6) thereof an Election Tribunal shall deliver its judgment in writing within 180 days. These time lines are sacrosanct and cannot be extended by the Court.

It is trite that under the 1st Schedule of the Electoral Act, the election petition to be filed is well regulated. See Paragraph 4(5), (6) of the Electoral Act, 2022 which provides as follows:



CERTIFIED TRUE COPY

2

*"(5) The election petition shall be accompanied by-*
  *(a)  a list of the witnesses that the petitioner intends to call in proof of the petition;*
  *(b)  written statements on oath of the witnesses; and*
  *(c)  copies or list of every document to be relied on at the hearing of the petition.*
*(6)  A petition which fails to comply with subparagraph (5) shall not be accepted for filing by the Secretary.*
*(7)  An election petition, which does not comply with subparagraph (1) or any provision of that subparagraph is defective and may be struck out by the Tribunal or Court. "*

The word '**Shall**' used in this Legislation makes it mandatory for a Petitioner to comply with that provision of the law. Failure to comply is fatal.

Election Petitions are fought on pleadings, competent and credible witnesses. Where a Petition is deficient in pleadings and evidence, it is difficult to prove the Petition. In the instant Petitions, the Petitioners' pleadings were deficient. While they complained of non-compliance with the Electoral Act against 1st respondent, their own Petitions were massively deficient in compliance with the Act.

The lead judgment has elaborately dealt with these issues. When a Court is called upon to determine an election dispute, he is called upon to do justice. Our notion of doing justice is not that of doing justice according to the whims and caprices of the judges or the parties. It must be justice according to law. Justice according to law is also that which is neither based on technicality nor justice according to the suggestive clout of pressure groups, but such as substantially meets the demands



3

of justice. This with all respect, is what we have done in the lead judgment.

I therefore concur with the leading judgment that these three consolidated Petitions having not been proved are hereby dismissed.

I abide by the consequential orders as made in the lead judgment.

**STEPHEN JONAH ADAH, JCA**
**JUSTICE OF THE COURT APPEAL**

CERTIFIED TRUE COPY

4

**CA/PEPC/03/2023**

**CA/PEPC/04/2023**

**CA/PEPC/05/2023**

**MISITURA OMODERE BOLAJI-YUSUFF**

I have read the lead the rulings and the judgments of my learned brother, HARUNA SIMON TSAMMANI, JCA in the above consolidated petitions. I agree with his reasoning and conclusion in the ruling and judgment in each petition and adopt same as mine. I add a few words for emphasis.

**CA/PEPC/03/2023**

Ground 1 of the petition is that the 2nd respondent was, at time of the election, not qualified to contest the election. The 1st complaint under this ground is that "the purported sponsorship of the 2nd and 3rd Respondents by the 4th Respondent was rendered invalid by reason of the 3rd Respondent knowingly allowing himself to be nominated as the Vice-Presidential Candidate whilst he was still a Senatorial Candidate for the Borno Central Constituency." The controversy about the 3rd Respondent knowingly allowing himself to be nominated in more than one constituency was the subject matter in P.D.P V. INEC & ORS (2023) LPELR-60457(SC). The Supreme Court per OKORO, JSC, AUGIE, JSC, OGUNWUMIJU, JSC and AGIM, JSC in their concurring opinions held that the 3rd respondent having withdrawn his nomination and personally delivered the notice of the withdrawal to his party (4th respondent in this petition) on 6th July, 2022, he was no longer a candidate for the Borno Central Constituency Senatorial election and



CERTIFIED TRUE COPY

1

his subsequent nomination as the Vice-Presidential Candidate for the presidential election was not multiple nomination.

The opinion of the Supreme Court per OKORO, JSC, AUGIE, JSC, OGUNWUMIJU, JSC and AGIM, JSC is not a comment or observation made in passing. It is an exposition of the law on withdrawal of a candidate from an election and the allegation that the 3rd respondent knowingly allowed himself to be nominated as the Vice-Presidential Candidate whilst he was still a Senatorial Candidate for the Borno Central Constituency. Concurring opinion forms part of the lead judgment and it is meant to complete same by way of addition or an improvement on the issues resolved in the lead judgment. See NWANA v. FCDA (2004) 13 NWLR (PT. 889) 128 AT(B-C), OLORUNTOBA-OJU & ORS. V. ABDUL-RAHEEM & ORS. (2009) LPELR-2596 AT 59-60(F-B). BOT& ORS. V. JOS ELECTRICITY DISTRIBUTION PLC (2021) LPELR-55327(SC) AT 19- 20 (B-A). The Supreme Court having rendered its considered and definite opinion on the validity of the nomination of the 2nd respondent as a Vice Presidential Candidate of the 4th respondent, attempt to re-open the issue in this court is a misadventure.

The 2nd complaint is that the 2nd respondent was at the time of the election not qualified to contest for the office of the president as he was fined the sum of $460,000.00 (Four Hundred and Sixty Thousand Dollars) for an offence involving dishonesty, namely narcotics trafficking by the United States District Court, Northern District of Illinois, Eastern Division, in Case no. 93C 4483 on 4/10/1993. The contention of the learned counsel for the petitioners is that the order of

2


CERTIFIED TRUE COPY

forfeiture made by the court is a fine under Section 137(1) (d) of the 1999 Constitution of the Federal Republic of Nigeria.

It is a settled principle of interpretation that where the words used in the provisions of the Constitution are clear and unambiguous, same must be given their plain and ordinary meaning unless to do so will lead to absurdity. See ABEGUNDE v. THE ONDO STATE HOUSE OF ASSEMBLY & ORS. (2015) LPELR-24588(SC) AT 28-29 (D-B). SARAKI v. FEDERAL REPUBLIC OF NIGERIA (2016) LPELR-40013(SC) AT 108 B-E). The context in which the word "SENTENCE" is used in Section 137(1) (d) of the Constitution connotes a formal pronouncement awarding punishment after conviction for an offence. Conviction is a finding of guilt after an indictment, arraignment and trial. *See* KOLEOSHO v. F.R.N (2014) LPELR-22929 (CA). MOHAMMED V. OLAWUNMI (1990) NWLR (PT. 133). ALI MOHAMMED MODU v. FEDERAL REPUBLIC OF NIGERIA (2016) LPELR-40471(CA) at 11(C-E). Therefore, the words "sentence", "imprisonment" and "fine" used in Section 137(1) (d) of the Constitution definitely connotes only a punishment imposed on a defendant following an indictment, trial and conviction for an offence. See BABANGIDA USMAN v. STATE (2015) LPELR- 40855 (C)(A) at 40-41. SHARRIF v. F.R.N. (2016) LPELR- 41632(CA) at 17-19(C-E).

In civil forfeiture or a non-conviction-based forfeiture proceeding, the Government only needs to show by preponderance of evidence that the property is a proceed of crime or was used to facilitate a crime. Criminal forfeiture on the other hand is seizure of a property connected with a crime after obtaining conviction and as part of sentence or punishment for the crime. Civil forfeiture is not a conviction or

3



verdict of guilt after an indictment, trial and conviction. See *JONATHAN V. F.R.N (2019) LPELR- 46944(SC)* where the Supreme Court per AKAAHS. JSC considered the provisions of Section 17 of the Advance Fee Fraud and Other Related Offences Act and persuaded by the decisions of the various courts across the world held that civil forfeiture is an action in rem embarked upon when the interest of the Government is merely to recover the proceeds of unlawful activity. The Court also held that an application for interim forfeiture of property that is not predicated on conviction of the owner of the property would necessarily be an action in rem because it is the recovery of the property that the law aims at.

A forfeiture order by a foreign court can only be accepted and recognized by a court in Nigeria for the purpose of Section 137(1) (d) of the Constitution if it is made after an indictment, trial and conviction and properly proved as required by Section 249 of the Evidence Act. In addition, the conviction and sentence must be shown to have been a product of due process of law. Compliance with due process of law has to be determine by the procedure and standard set by Section 36 (5) and (6) of our Constitution. The forfeiture order being relied on by the petitioners has not been shown to be a result of a process similar to the one set by our Constitution for trial of a defendant for an offence.

The appellant's counsel relied on AUSTIN v. UNITED STATES, 509 U. S 602 (1993) and TIMBS V. INDIANA decided on 20th February, 2019. The forfeiture proceedings in the two cases were instituted as part of criminal proceedings after the conviction of the defendants. Secondly, forfeiture was regarded as punishment for the purpose of protecting the constitutional right of the defendants



4

against imposition or infliction of excessive bail or excessive fines or cruel and unusual punishments for an offence. Eight Amendment provides that "excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted". In UNITED STATES v. URSERY (1996) 518 U.S.267, the United States Supreme Court considered the relationship between punishment and civil forfeiture. The court held that in rem civil property forfeiture did not constitute a "punishment" such as fines for purposes of double jeopardy clause of the Fifth Amendment. In ABACHA V. F.R.N (2014) LPELR-2201(SC) forfeiture was also defined in the context of the doctrine of double jeopardy. The appellant contended that the State could not indict and prosecute him for the offences of conspiracy, receiving stolen property dishonestly and concealing stolen money after forfeiting the properties listed under Forfeiture of Assets ETC (Certain Persons) Decree No.53 OF 1999. The rejection of the plea of double jeopardy means that the Court did not consider the forfeiture under Forfeiture of Assets ETC (Certain Persons) Decree No.53 of 1999 as punishment.

From all the above, it is clear that a non-conviction-based forfeiture being civil in nature and an action in rem, can in no way be equated with a sentence of imprisonment or fine imposed for an offence involving dishonesty or fraud or for any other offence to disqualify a person from contesting for election to the office of the President of Nigeria. An indictment, arraignment, trial and conviction are necessary preconditions for the disqualification of a person under Section 137 (1) (d) of the Constitution.



CERTIFIED TRUE COPY



Ground 2 of the petition is that the election of the 2nd Respondent was invalid by reason of corrupt practices or non- compliance with the provisions of the Electoral Act. The allegations are basically predicated upon electronic transmission of the results of the election.

A global reading of the Electoral Act,2022 particularly Sections 47(2), 60 (1-5),62(1) and 65 (1-8) would show that what the Act provide for is manual transfer and manual collation of results by Collation Officers at various physical collation centres. There is no provision for electronic transmission or Irev or electronic collation of results in the Act. By Paragraphs 38 and 48(a) of the INEC Regulations and Guidelines for the Conduct of Elections, 2022, the 1st respondent made provision for electronic transmission and physical/manual transfer of election results from the polling units. However, Paragraph 48(c) provides that if no result has been electronically transmitted from the polling unit, the provision of Paragraph 93 shall be applied. Paragraph 92 categorically provide that at every level of collation, where the INEC copy of collated results from the immediate lower level of collation exists, it shall be adopted for collation. By Paragraph 93, where INEC hard copy and electronically transmitted results from the immediate lower level of collation do not exist, the Collation Officer shall use duplicate hard copies issued to the Nigeria Police Force and Agents of Political Parties to collate results. It is therefore not correct that it shall not be possible to collate results of the election where results have not been electronically transmitted.

By law, the INEC Regulations and Guidelines for the conduct of elections, 2022 is subordinate to the Electoral Act. Where a provision of the Guidelines conflicts

6


CERTIFIED TRUE COPY

with Act, the Act prevails. See ODENEYE v. EFUNUGA (1990) LPELR-2208(SC) at 21(A-C). NYESOM v, PETERSIDE (2016) LPELR- 40036(SC). By Section 134 (2) of the Act, any circular, press release, promise or stated intention of INEC that is in conflict with or expand the provisions of the Electoral Act cannot prevail over the Act. INEC Guidelines cannot be elevated above the provisions of the Electoral Act so as to elevate electronic transmission of results over and above manual or physical transmission of hard copies and manual collation of results as provided for by the Act to the extent that non-compliance with the Regulation automatically invalidates an election.

PW4, the Professor of Mathematics presented to this court as an expert witness confirmed under cross examination that Irev is not a collation system. He also confirmed that whether or not transmission to Irev failed or the image of result on the Irev is blurred will not change the result entered on the form EC8A at the polling unit level. Under cross examination, PW 12 stated that the petitioners had 133, 000 agents. He was not a party agent at any of the INEC's designation polling units or collation centres. None of the 133, 000 party agents was called to testify that there was a dispute regarding any collated result at the polling units, Registration/ ward, Local Government, State or National Collation Centres so as to enable the Collation Officers at the various levels of collation to activate the process prescribed under Section 64(6) of the ACT.

PW12 stated that the petitioners believed they would have won the election if the results had been uploaded. When asked about the score of the petitioners by which they claimed to have won the election, he answered rhetorically that how


CERTIFIED TRUE COPY

7

are they supposed to know the score when the results were still being uploaded on the Irev. So, this petition is about the believe of the petitioners that they would have won the election if results had been uploaded on the Irev. Election petition is a serious issue. A petitioner is not permitted to engage in fishing expedition or a roving enquiry as the petitioners herein did. It is clear from the pleadings and the evidence of PW 12 that the petitioners were from the onset engaged in a wild goose chase and inquisitorial adventure. By Paragraph 9 of the Regulation, a political party has a right to appoint one person as its polling agent for each polling unit, collation center and one representative at each point of distribution of electoral materials in the constituency where it is sponsoring candidate(s) for an election. According to PW12, the petitioners exercised that right and had 133,000 party agents in the election. I stated earlier that none of those 133,000 polling agents was called and not a single one of the result forms collected by any of the agents was tendered in evidence. Electoral Act provided a candidate who wishes to challenge any result declared by INEC with a potent material which are the Forms on which results are entered, signed by the 1st respondent' officials and party agents and a duplicate copy of which is given to a party agent. Any serious candidate ought not to depend on INEC for materials to prosecute his petition. By Section 167 (d) of the Evidence Act, the failure of the petitioners to produce election result forms collected by their agents raises a presumption that if those forms had been produced, would have been unfavourable to the petitioners.

The 1st respondent in their pleadings and evidence through RW1 stated that the delay in uploading the results from the polling units to the Irev was due to a

8



technical glitch which occurred on its transmission system and which was rectified within a few hours. All that the petitioners could do was to bring PW7, a member of their party who claimed to be a soft ware engineer and an employee of Amazon Web services, Inc. She had the temerity and the audacity to claim authorship of a document, a word of which does not belong to her. The 1st respondent never claimed that the glitch which occasioned the delay in uploading the results to the Irev occurred on the AMAZON Server. It is obvious from PW4's evidence that the petitioners did not understand the explanation of the 1st respondent or they were just fixated on their believe that they won the election. They did not bother to place any cogent and credible evidence before the court. They expected the court to collect evidence from the market or be persuaded or intimidated by threat on social media. That is not the way of the court. See Tobi, JSC's admonition in BUHARI v. INEC (2008) LPELR-814(SC) at 174-178 (D-B) in a situation like the instant case.

Thus, the petitioners not only failed to prove non-compliance with the Electoral Act, they failed to prove that the non-compliance substantially affected the result of the election declared by the 1st respondent. It is settled that even if non-compliance with the Electoral Act is established, if there is evidence that despite the non- compliance, the result of the election was not affected substantially, the petition must as a matter of law be dismissed. See ABUBAKAR & ORS v. YAR'ADUA & ORS (2008) LPELR- 51 (SC) at 120 (C-D), 177 (F-A).



9

The 3rd ground of the petition is that the 2nd respondent was not duly elected by majority of lawful votes cast at the election having not obtained 25% of the votes in FCT.

The provisions of the Constitution must be read together to discover the intention of the framers of the Constitution. A Court of law has no power to take away or limit the words of the Constitution or import into it what it does not say. See ELELU- HABEEB & ANOR. V. THE HON. ATT.GEN. OF THE FEDERATION 7 ORS. (20120 LPELR- 15515(SC) AT 119-122(B-E). A narrow interpretation that would do violence to the provisions of the Constitution and fail to achieve the goal set by it must be avoided.

Our Constitution is based on the principles of Freedom, Equality and Justice in all ramifications, and is for the purpose of consolidating the unity of our people. Section 14(1) and (2) states that the Federal Republic of Nigeria shall be a State based on the principles of democracy and social justice. The participation by the people in their government shall be ensured in accordance with the provisions of the Constitution. The right to vote is at the foundation of our democracy. It is the most potent and priceless opportunity a citizen has to have a say in who governs. Every citizen who is qualified to vote must be afforded equal opportunity to cast his or her vote to elect leaders who governs. Our constitutional principles of freedom, equality and justice, democracy and social justice means that the vote of each citizen shall count. Each and every vote should count equally. No vote should weigh more than the other. The principles of equality of votes must protected by the Court.

10



The interpretation of Section 134 (2) (b) of the Constitution being urged on us by the petitioners is an unjust manipulation of the Constitution to create inequality of votes. It negates the principles of Equality and Justice, democracy and social justice and participation of the people in their government enshrined in our Constitution. It strikes at the very foundation of our Constitution. It is capable of further dividing the citizens of this country. The politicians are good at using all sorts of means and sentiments to divide the citizens of this country. The interpretation being urged on us is their latest invention in that regard and unfortunately, they found a ready alliance in those who should know better. The interpretation being urged on us is squarely against the letters and sprit of Our Constitution and it is hereby rejected.

Based on the above and the fuller reasons lucidly explained in the lead judgment, I too dismiss the petition.

## CA/PEPC/04/2023

I have had a preview of the reasons given in the lead judgment of my learned brother, HARUNA SIMON TSAMMANI, JCA. I agree with his reasoning and conclusions. I adopt same as mine. I abide by the others made therein.



CERTIFIED TRUE COPY

11

**CA/PEPC/05 /2023**

I have had a preview of the lead judgment of my learned brother, HARUNA SIMON TSAMMANI, JCA. I agree with his reasoning and conclusion therein. In addition, I state that the interpretation of Section 134 (2) of the Constitution being urged on us is against all settled principles guiding interpretation of the provisions of the Constitution. The provisions of the Constitution must be read together to discover the intention of the framers of the Constitution A Court of law has no power to take away or limit the words of the Constitution or import into it what it does not say. See ELELU- HABEEB 7 ANOR. V. THE HON. ATT.GEN. OF THE FEDERATION 7 0RS. (20120 LPELR- 15515(SC) AT 119-122(B-E). A narrow interpretation that would do violence to the provisions of the Constitution and fail to achieve the goal set by it must be avoided.

Our Constitution is based on the principles of Freedom, Equality and Justice in all ramifications, and is for the purpose of consolidating the unity of our people. Section 14(1) and (2) states that the Federal Republic of Nigeria shall be a state based on the principles of democracy and social justice. The participation by the people in their government shall be ensured in accordance the provisions of the Constitution. The right to vote is at the foundation of our democracy. It is the most potent and priceless opportunity a citizen has to have a say in who governs. Every citizen who is qualified to vote must be afforded equal opportunity to cast his or her vote to elect leaders who governs. Our constitutional principles of freedom, equality and justice, democracy and social justice means that the vote of each citizen shall count in the election of leaders who governs. Each and every vote

12



should count equally. No vote should weigh more than the other. The principles of equality of votes must protected by the Court. The interpretation of Section 134 (2) (b) of the Constitution being urged on us by the petitioners is an unjust manipulation of the Constitution to create inequality of votes. It negates the principles of Equality and Justice, democracy and social justice and participation of the people in their government enshrined in our Constitution. It is capable of further dividing the citizens of this country. The politicians are good at using all sorts of means and sentiments to divide the citizens of this country. The interpretation being urged on us is their latest invention in that regard. Unfortunately, they found a ready alliance in those who should know better. The interpretation being urged on us is squarely against the letters and sprit of our Constitution and it is hereby rejected.

Based on the above and the fuller reasons lucidly explained in the lead judgment, I too dismiss the petition.

On the whole, I too dismiss each of the three consolidated petitions. I abide by the final orders made in the lead petition in respect of the petitions.

MISITURA OMODERE BOLAJI-YUSUFF

JUSTICE COURT OF APPEAL.

CERTIFIED TRUE COPY

13

## CONSOLIDATED Petition Nos: CA/PEPC/03/2023, CA/PEPC/04/2023 and CA/PEPC/05/2023.

## BOLOUKUROMO MOSES UGO, J.C.A.

I had earlier read in draft the Rulings and Judgments of my learned brother **Haruna Simon Tsammani, J.C.A**. in this Consolidated Petition Numbers CA/PEPC/03/2023, CA/PEPC/04/2023 and CA/PEPC/05/2023. I am in complete agreement with His Lordship's reasoning and conclusions on all of them.

First, for Petition No CA/PEPC/04/2023, I am of the very fixed view that the issues agitated by the petitioner therein concerning 3rd Respondent's alleged disqualification for the 2023 Presidential election by reason of matters connected to and surrounding his running mate's (4th Respondent's) nomination and relinquishing of his earlier nomination by his party, the APC, for the Borno Central Senatorial District, having been settled on their merit by the Supreme Court in its judgment in Appeal No: *SC/CV/501/2023: Peoples Democratic Party v. INEC & Ors* in 3rd and 4th Respondent's favour herein, with the apex court even holding that the said issues did not disqualify them, that decision constitutes issue estoppel. Being status-defining and so *judgment in rem,* it binds every person, including non-parties to the suit like the petitioner in Petition No: CA/PEPC/04/2023. See *Ikotun v. Oyekanmi* (2009) 10 NWLR (Pt.1094) 100 @ 115, 119-120 (SC); *Sosan & Ors v. Odemuyiwa & Ors* (1986) 1 NSCC 673 @ 681. Furthermore, by the doctrine of stare decisis, it also binds this court. In

CERTIFIED TRUE COPY

fact, it will in my humble opinion amount to judicial heresy for this court to involve itself in inquiring, by whatever guise, into that same issue already settled by the apex court.

Coming to Petition Nos: **CA/PEPC/03/2023 of Peter Obi & Anor v. INEC & Others** and **CA/PEPC/05/2023 of Atiku Abubakar & Anor v. INEC & Others**, again I am of the very fixed view that the two sets of petitioners did not by any means discharge the burden on them of proving that the results of the presidential election of 25th February 2023 as declared by 1st Respondent (INEC) are incorrect. Incidentally, their burden is even made heavier by the legal presumption that the results of an election declared by the official election organising body (INEC in this case) are correct and it is for the person asserting the contrary to prove it is not: see *Buhari v. INEC* (2008) 19 NWLR (Pt. 1120) 246 @ 354).

Even their resort to 1st Respondent's failure to keep to its initial promise to upload polling unit results of that election to its Result viewing portal IreV real time, which failure they alleged evidences election 'manipulation' does not help them. And specifically on this allegation of manipulation of election results, the point must be made that, since it is their case in their petitions from the word go that the election results in issue were manipulated by 1st Respondent (INEC) in favour of 2nd Respondent, and specifically that the manipulation took the form (i) of 'programmed failure of the technological device (BVAS machines)" by 1st Respondent (INEC) by intercepting the results, quarantining, warehousing and filtering such results before releasing them to the

CERTIFIED TRUE COPY

IREV portal, (ii) INEC replacing its in-house I.T. expert at the eleventh hour with a rogue staff all in a bid to remotely control, monitor and filter data transmitted from the BVAS devices to the electronic system and the IRev Platform and (iii) that Globacom, the Internet provider for the BVAS and electronic system, was also disconnected by 1st Respondent to enable it manipulate the results, with the petitioners in CA/PEPC/05/2023 even going further to undertake to call evidence to prove all those allegations (see paragraphs 33, 36, 42 of Petition No CA/PEPC/05/2023 and paragraphs 53 and 60 of Petition No CA/PEPC/03/2023), the burden of proof was on petitioners to prove those assertions and that is regardless of whether they are positive or negative. After all it is they who would have failed in the case if no evidence at all was adduced in their petitions. See on that Section 131 of the Evidence Act 2011 and the cases of *Buhari v. INEC* (2008) LPELR-814 (SC) 80 (Tobi, JSC); *Aladegbemi v. Fasanmade* (1988) 1 NSCC 1087 @ 1105; *Elias v. Disu & Ors* (1961) 1 ALL NLR 214 @ 218; my judgment in *Dashe & Ors v. Durven & Ors* (2019) LPELR-48887 (CA) 14-17; *Abrath v. N.E. Railway Co.* 11 QBD 440 @ 457. I have taken all this time in making this point because of the argument of both sets of petitioners that they only made negative assertions in their petitions when they alleged there that there was nothing wrong with 1st Respondent's e-transmission system and Irev, so they had no burden to prove it; that the burden of proof was on the respondents who they said positively asserted glitch in real-time transmission of their results. Petitioners who directly made manipulation of its e-



transmission system by 1st Respondent to favour 2nd Respondent a pillar of their case cannot be heard to say it is Respondents and not them that had the burden of proof in the case.

Incidentally, that assertion of petitioners - that INEC simply closed down or blocked its IREV and e-transmission system from the public to enable it manipulate the presidential election results in favour of 2nd Respondent - also takes me directly to the more important question in the petition, namely, whether that allegation is even worthy of belief given the results declared by INEC for them and the 2nd Respondent in the election. To answer that million-Dollar question, I deem it necessary to resort to the probabilities arising from the facts of the case, otherwise called the 'probability test', which test highly celebrated Judge, Chukwudifu Akunne Oputa, J.S.C., always maintained is "*the surest road to the shrine of truth and justice.*" See *Dibiamaka & Ors v. Osakwe & Ors* (1989) 2 NSCC 253 @ 260 lines 46-50 (per Oputa, JSC) and *Ojegele v. The State* (1988) 1 NWLR (PT 71) 404 @ 420 paragraph G-H. Here, the assertion of petitioners is that 1st Respondent, INEC, merely used the excuse of glitch in its IREV portal to block the public from seeing its Polling Units Results real time so that it could manipulate, and in fact did actually manipulate, the 25th February 2023 presidential election results in favour of 2nd Respondent. It is their further contention that the manipulation of IREV by INEC with the said phantom glitch in favour of 2nd Respondent was nationwide. The question is, do the results declared nationwide by INEC support that hypothesis? They say the taste of the pudding is in the eating. I shall

CERTIFIED TRUE COPY

therefore now try to walk us through some of these election results to see if that assertion of petitioners is supported by the results declared by INEC and so probable and worthy of belief. In doing that, I shall randomly pick on the results of some States of the Federation and the Federal Capital Territory. I shall be relying on the State Summary of Results (Form EC8D) declared by INEC and as also attached to their petition by the petitioners in CA/PEPC/05/2023, which Result was also tendered by both sets of petitioners and Respondents.

So, I take on, first, Abia State. There, 2nd Respondent, the alleged favoured candidate of INEC, for which it was said to have shut down its IREV to manipulate results, only garnered a miserly **8, 914** votes. That is as against the Labour Party which, by INEC's declaration, polled as many as **327, 095** votes. Even the other set of petitioners, the PDP and its candidate, scored more votes in Abia than INEC's purported favoured candidate. They also scored **22,676** votes in Abia State and was so recorded by INEC. Those votes alone are close to three times the votes of 2nd Respondent for whom INEC was said to have manipulated results by closing down its IREv so that the public would not witness its manipulative activities in favour of 2nd Respondent.

In Enugu State, the same 'favoured' candidate, 2nd Respondent, was again declared/credited by INEC to have polled only **4, 772** votes in the entire State. Meanwhile, the Labour Party and its candidate were again declared by 'manipulative and unfriendly' INEC to have scored as much as **428, 690** votes in that State. In the same Enugu State, PDP and its candidate also was declared by INEC to have polled **15, 745** votes: a

CERTIFIED TRUE COPY

number that is also nearly three times the votes of the so-called favoured 2nd Respondent.

In Anambra State, the same purported favoured candidate (2nd Respondent) was declared by its alleged friend, INEC, to have scored only **5, 111** votes. Meanwhile, the Labour Party, whose candidate, 1st Petitioner in CA/PEPC/03/2023, I must take judicial notice of vide section 124 of the Evidence Act 2011, is from that State, again was declared to have polled as much as **584, 621** votes. Again, like Enugu State, the PDP and its candidate was declared by INEC to have polled **9,036** votes, a number that is also nearly double the votes of 'INEC-favoured' 2nd Respondent.

In neighbouring Delta State, the same INEC-favoured candidate, 2nd Respondent, was declared by INEC to have scored **90,180**. That is as against the Labour Party and its candidate which is credited by the same 'biased' INEC to have scored as much as **179, 917** votes. In that same Delta State, the PDP and its candidate scored **161, 600** votes, again nearly double the votes of 2nd Respondent.

In Adamawa State of the PDP and its candidate, the same 'favoured' 2nd Respondent was declared by INEC to have scored only **105, 648** votes while the PDP and its candidate were declared by the 'biased' INEC to have scored as much as **214, 012** votes.

In Imo State, the same purported INEC-favoured candidate (2nd Respondent) was declared by INEC to have scored only **66, 406** votes



while the Labour Party and its candidate is declared by the same INEC to have polled as much as **360, 495**.

In Ebonyi State the Labour Party again scored as much as **259, 738** votes. That is as against alleged INEC-favoured 2nd Respondent, who, by INEC's declaration, again polled a relatively miserly **42,402** votes. The PDP is said to have scored **13,503** votes there too.

Even in Lagos State where 2nd Respondent once held sway as elected Governor, the Labour Party and its candidate was again declared by 'biased' INEC to have beaten 2nd Respondent with almost **10,000 votes.** Labour Party was declared by INEC to have polled **582, 455** votes, as against **572, 606** polled by 2nd Respondent and so declared by INEC.

It is a similar story in the Federal Capital Territory of Abuja where INEC has its headquarters and supposedly carried out/directed all its manipulative and biased activities in favour of 2nd Respondent that petitioners claim it did in the election. Second Respondent and his political party still lost there. In fact, by the result '2nd Respondent-friendly' INEC declared in the Federal Capital Territory of Abuja, 2nd Respondent could not even make 25% of the total votes cast there. He was said to have only polled **90,902** votes. That amounts to just 18.991% of the total votes cast in the F.C.T., yet INEC declared that result. That is as against **281, 717** votes, amounting to **58.856%** of the total votes, the same INEC declared for Labour Party and its candidate.

There are also other States, including Katsina State of the immediate past President of this country, a member of 2nd Respondent who was



still in office at the time of the elections, a fact I shall again take judicial notice vide section 124 of the Evidence Act 2011. There again, 2nd Respondent and his Party, the A.P.C., which he shares of the then-sitting President, was declared by the same INEC to have lost to the petitioners in CA/PEPC/05/2023.

If all these results declared by INEC for each of these States for the two sets of petitioners and 2nd Respondent is anything to go by, then INEC must be an abysmally poor manipulator, if not even an imbecilic one. Surely, it would not go through all the trouble of closing down its IREV and blocking the public from seeing its manipulative efforts in favour of 2nd Respondent, as alleged by the Petitioners, only to still end up favouring the petitioners with jumbo votes and posting miserly figures for its favoured 2nd Respondent. It is said that "All men stamp as probable that which they would have said or done under similar circumstances and as improbable that which they themselves would not have said or done under the same set of similar circumstances. Things inconsistent with human knowledge and experience are properly rated as improbable." See Oputa, J.S.C. in *Onuoha v. The State* (1989) 1 N.S.C.C. 411´@ 418 and *Bozin v. The State* (1985) LPELR-799 (SC) p. 9; (1985)2 NWLR (PT 8) 465.

At any rate, why did any of the two sets of petitioners not tender even a single polling unit result issued by INEC to their polling unit agents to support their claim of manipulation of election results by INEC, even as they all agreed that they had agents in the polling units? I had thought that is the best and most effective way of proving the manipulation of

CERTIFIED TRUE COPY

election results alleged by them. After all, the polling unit is the only place where voting takes place and so also constitutes the building block of election results. See Paragraph 91 of INEC Regulations and Guidelines for the Conduct of Elections, 2022 and the cases of *Nwobodo v. Onoh* (1984) 1 SCNLR 1 and *Awuse v. Odili* (2005) 16 NWLR (Pt. 952) 416 @ 448.

In short, the allegation of the petitioners that INEC shut down its IREV to manipulate votes for 2nd Respondent just does not add up for me. If anything, the probabilities arising from the results INEC declared nationwide as X-rayed above rather seem to me to eloquently support INEC's position that its inability to upload the polling unit results real-time as earlier promised was not deliberate but caused by technical issues outside its control that afflicted its e-transmission system, which issues it claims made it impossible for its e-transmission system to map the uploaded polling units results for the Presidential election to any specific State. That it claimed, is unlike the much smaller National Assembly elections that were conducted simultaneously with the Presidential election. It is that phenomena it describes as glitch that was giving it an 'HTTP 500' Error which resultantly delayed real time public viewing of the said polling unit results.

That conclusion also takes me to another big issue in this case, namely the evidential value of the European Union Election Observer Mission Report on the 2023 Presidential Election over which quite a mountain has been made of by both sets of Petitioners. That Report was tendered


CERTIFIED TRUE COPY

by the petitioners in Petition No. CA/PEPC/03/2023 as Exhibit X2 and by the petitioners in Petition No: CA/PEPC/05/2023 as Exhibit RA27. The impression given by both sets of petitioners is that the said Report, which in any case has even been ruled inadmissible by us in Petition No: CA/PEPC/03/2023, is like gospel truth of what transpired in the election and so it must be accepted by this court and the conduct of the presidential election declared corrupt or at the very least below par, regardless of whether or not its authors presented themselves in court to defend their opinions. That stance, I am afraid, is a complete *non sequitur*. Without the makers of that Report presenting themselves in court to face cross-examination to authenticate their opinions, that Report, and I dare to even add the ECOWAS Report of the same elections tendered by 2nd and 3rd Respondents in Petition Nos: CA/PEPC/03/2023 and CA/PEPC/05/2023, are completely valueless and inadmissible for the purposes of authenticating the opinions expressed in them by their makers. See first on that the cases of *Nyesom v. Peterside* (2016) 7 NWLR (Pt. 1512) 452 @ 526 paragraph E and *Sa'eed v. Yakowa* (2013) ALL FWLR (Pt. 692) 1650 @ 1672. It also makes no difference that the said Reports have been put in the form of print. Books, it must be noted, cannot be cross-examined. On this, I find support in the celebrated case of ***Idundun & Ors v. Okumagba & Ors*** (1976) NSCC 443 @ 453; (1976) LPELR-1431 (SC) p. 23 and 24 where the Supreme Court had this to say:

> **"As for the law involved, we would like to point out that it is now well settled that there are five ways in which ownership of land may be proved. ......**

CERTIFIED TRUE COPY

**"In our view, not only was the evidence of the witnesses called by the appellants rightly rejected by the learned trial Judge for good and sufficient reasons, we also think that he was right in not attaching any weight to the views expressed in the books cited in support of such traditional evidence. As Lionel Brett, J.S.C., (as he then was), rightly in our view, once pointed out in a learned address given by him at the University of Lagos to the Nigerian Association of Law Teachers:**

> **'The courts are not to be hypnotized by the authority of print. The crucial fact is that books cannot be cross-examined, either as to the opinion expressed, or as to the claims of the author to have special knowledge. If the author is living, there is no reason why he should not be tendered as an expert witness, when this difficulty would varnish.'**

**"…………………………………………………………..**

**"Moreover, none of the authors of these books testified in support of the views stated therein and no explanation was given for the omission. For all these reasons, we share the apprehensions of the learned trial Judge about the value or weight of the traditional history as narrated by each of these authors, particularly as the authenticity and impartiality of the sources of their narratives cannot, for obvious reasons, be easily ascertained."**

That is the exact same situation we are confronted with here as regards both the European Observer Mission Report and the its sister ECOWAS Election Observer Report. For purposes of proving the opinions expressed in them by their makers, neither of them is of any higher value than the mere sheets of paper on which it is recorded.

And for those who like the petitioners are enamoured by the now very familiar patronising judgments passed on our elections by European Election Observer Missions every four years, even as the same



Europeans have maintained a deafening silence on the never-ending complaints of former President Donald Trump that the year 2020 Presidential election of the United States of America that saw him out of office was also a fraud, it may interest them to know that Sir (Justice) Lionel Brett, J.S.C., who made the comments cited approvingly by the Supreme Court in *Okumagba's case* was also a European.

I intend to stop here. I think I have said enough.

It is for these few additions but much more for the far more illuminating reasons advanced by my brother Haruna Simon Tsammani, J.C.A., in his rulings and judgments, which reasons I concur with without reservation, that I also hold all three consolidated petitions not proved and hereby enter an order dismissing all of them and affirm the declaration of the 2nd Respondent, Bola Ahmed Tinubu, by 1st Respondent as the person duly and properly returned winner of the 25th February 2023 Presidential election of this country and duly elected President of the Federal Republic of Nigeria.

I also abide by all the other consequential orders, including that as to costs, contained in the leading judgment.

**BOLOUKUROMO MOSES UGO,**
**JUSTICE, COURT OF APPEAL.**

CERTIFIED TRUE COPY

**CA/PEPC/03/2023**

**CA/PEPC/04/2023**

**CA/PEPC/05/2023**

**ABBA BELLO MOHAMMED, JCA**

I have read before now the draft of the lead judgment just delivered by my learned brother, HARUNA SIMON TSAMMANI, JCA in the three consolidated Petitions Nos. CA/PEPC/03/2023, CA/PEPC/04/2023 and CA/PEPC/05/2023. I am in agreement with and I adopt all the reasons and conclusions stated therein, both in respect of the rulings on the objections and the merits of the three consolidated Petitions.

**PETITIONS NOS. CA/PEPC/03/2023 AND CA/PEPC/05/2023**

Although all the issues in Petitions Nos. CA/PEPC/03/2023 and CA/PEPC/05/2023, have been exhaustively resolved in the lead judgment, I deem it only pertinent to highlight a fundamental vice which has ab initio affected those two Petitions, especially as it relates to the Petitioners' essential contention or premise upon which they predicated those two Petitions. In Petitions Nos. CA/PEPC/03/2023 and CA/PEPC/05/2023, the Petitioners have premised their ground that the Presidential Election conducted on 25th February, 2023 by Independent National Electoral Commission (INEC) is invalid by reason of corrupt

CERTIFIED TRUE COPY

practices and non-compliance, on their contention that by the provisions of the Electoral Act, 2022 and the Regulations and Guidelines for Conduct of Elections, 2022, INEC is mandatorily required to electronically transmit election results to the collation system and to the INEC Results Viewing Portal (IReV). They contended that the 1st Respondent had deliberately refused to comply with those mandatory provisions and had manipulated the results of the election through various corrupt practices which they alleged in those Petitions.

However, in both Petitions Nos. PEPC/03/2023 and PEPC/05/2023, Exhibits X1 and X2 were tendered, respectively, to show that the Labour Party, which is the 2nd Petitioner in Petition No. PEPC/03/2023, had before the elections approached the Federal High Court, Abuja by way of Originating Summons in Suit No. No. FHC/ABJ/CS/1454/2022: LABOUR PARTY v INEC, for a determination that "by the provisions of the Electoral Act, 2022, INEC, the 1st Respondent  has no power to opt for manual method other than the electronic method provided for by the relevant provisions of the Electoral Act" and for "AN ORDER of this Honourable Court directing/compelling the Respondent to comply with the Electoral Act, 2022 on electronic transmission of result in the forthcoming general election."



In its judgment, the Federal High Court, Abuja Division had dismissed the suit and held that "...there is nowhere in the above cited sections where the Commission or any of its agents is mandated to use an electronic means of collating or transferring of election result. If any, the Commission is only mandated to collate and transfer election results and number of accredited voters in a way or manner deemed by it."

Additionally, this Court's attention was referred to the judgment of this Court in **Appeal No. CA/LAG/CV/332/2023: APC v LABOUR PARTY & 42 ORS, delivered on the 19th of June, 2023,** in which this Court set aside the judgment of the Federal High Court, Lagos Division in another **Suit No. FHC/L/CS/370/2023: LABOUR PARTY & ORS v INEC,** again filed by the Labour Party (the 2nd Petitioner in PEPC/03/2023) before the Lagos Division of the Federal High Court to obtain an order of mandamus compelling INEC to electronically transmit or transfer election results as provided in its Regulations, after losing in the Abuja Division of the same Court.

In the judgment of this Court of 19/07/2023 in **Appeal No. CA/LAG/CV/332/2023**, this Court particularly held at pages 23 – 24 thereof that:

> "It is difficult for Suit No. FHC/L/CS/370/2023 which gave rise to this appeal to escape the label of abuse of court process. I said so



CERTIFIED TRUE COPY

because the objective of the suit is to compel the 43th Respondent to adopt a particular way of transmitting or transferring the result of the election in Lagos State. This objective is not in any way different from what the objective the 1st Respondent wanted to achieve in Suit No. FHC/ABJ/CS/1454/2022. Similar parties are the same in the two suits; the 2nd – 42nd Respondents are members of the 1st Respondent which litigated Suit No. FHC/ABJ/CS/1454/2022, the 2nd – 42nd Respondents' interest is the same with that of the 1st Respondent so they are the 1st Respondent's privies. Both suits are against the same defendant i.e. the 43rd Respondent herein and filed in the same court albeit different divisions of the court. The decision of EMEKA NWITE J of Abuja Division of the lower court which dismissed the 1st Respondent's suit holding that on the interpretation of the provisions of Sections 60(5) and 62(2) of the Electoral Act, 2022, INEC the 43rd Respondent herein is at liberty to prescribe or choose the manner in which election result shall be transmitted finally settles the issue. I therefore find in Suit No. FHC/L/CS/370/2023 which is herein being appealed against all the trademarks of a cause that is an abuse of judicial process."

Exhibits X1 and X2 tendered in Petitions Nos. PEPC/03/2023 and PEPC/05/2023, respectively, as well as the decision of this Court in



**Appeal No. CA/LAG/CV/332/2023 (supra),** are subsisting judgments of court which are not only binding on the parties, but which constitute issue estoppel in relation to the Petitioners' essential contention in the these two Petitions, which is, that the 1st Respondent is by the Electoral Act, 2022 and the Regulations and Guidelines for Conduct of Elections, 2022 the 1st Respondent is mandatorily required to electronically transmit and collate results of the Presidential election.

The doctrine of issue estoppel is that once an issue has been finally decided by a competent court, the issue will not be allowed to be relitigated by the same or even by different parties. See: **IKOTUN v OYEKANMI & ANOR (2008) LPELR-1485(SC) at page 25, paras. A – B; and APC v PDP & ORS (2015) LPELR-24587(SC) at 116.** Specifically, in **EZEWANI v ONWORDI & ORS (1986) LPELR-1214(SC),** the Supreme Court, per *Oputa, JSC* held at page 47 paras. B – E, that:

> "Strictly speaking therefore, the concept and value of an estoppel is to bar a person from denying or asserting anything to the contrary of that which has, in the contemplation of law, been established as the truth either by the acts of judicial or legislative officers or by his own deed or representation, express or implied."

It is clearly evident that the decisions of the Federal High Court in Exhibits X1 and X2 tendered in Petitions Nos PEPC/03/2023 and PEPC/05/2023,



CERTIFIED TRUE COPY

respectively, as well as the decision of this Court in **Appeal No. CA/LAG/CV/332/2023: APC v LABOUR PARTY & 42 ORS (supra),** have dealt a death knell to the Petitioners' in the two Petitions, having finally decided the issue around which the Petitioners have built their claim of non-compliance and corrupt practices in those two Petitions, namely - that the 1st Respondent is by the provisions of the Electoral Act, 2022 and the Regulations and Guidelines for Conduct of Elections, 2022, mandatorily required to electronically transmit election results to the collation system and the INEC Result Viewing Portal (IReV).

In addition to this obviously fundamental deficiency which I have highlighted above, the lead judgment just delivered had exhaustively considered all the other issues and rightly concluded that the Petitioners in Petitions Nos. CA/PEPC/03/2023 and CA/PEPC/05/2023 have failed to establish all the allegations contained in their Petitions. I adopt all those reasons and conclusions stated therein in also finding the two Petitions devoid of merit.

## PETITION NO. CA/PEPC/04/2023

As regards Petition No. CA/PEPC/04/2023, the Petitioner has under the guise of challenging the qualification of the 3rd Respondent to contest the Presidential Election on the ground that he had violated the provisions of Section 142(1) of the Constitution of the Federal Republic



of Nigeria, 1999, basically challenged the validity of the nomination of the 4th Respondent by the 3rd Respondent as his running mate in the 25th February, 2023 Presidential elections.

In concurring with the lead judgment just delivered, I am also of the considered view that the status of the nomination of the 4th Respondent as the running mate of the 3rd Respondent and Vice-Presidential Candidate of the 2nd Respondent had been finally decided by the Supreme Court in **Appeal No. SC/CV/501/2023: PDP v INEC, delivered on 26th May, 2023**, now reported as **PDP v INEC & 3 ORS (2023) LPELR-60457(SC),** the CTC of which was tendered as Exhibit X1.

In the concurring judgements of their Lordships *Okoro, Augie, Ogunwumiju* and *Agim,* JJSC, they have all determined as proper the nomination of the 4th Respondent as Vice Presidential Candidate of the 2nd Respondent. As for the Petitioner's argument that the pronouncement of the Supreme Court in those concurring judgments is an obiter dictum, the clear statement of *Ogunwumiju,* JSC has left no one in doubt that the Apex Court decided the merit of that case. My Lord *Ogunwumiju,* JSC clearly stated at page 74, para. C, that "It is apt in this type of political case of public interest to look into the merits of this case."


CERTIFIED TRUE COPY

It is settled law that once the issue relating to the status of a person or thing is finally and substantively determined by a competent court such determination constitutes estoppel to any subsequent proceedings on the same issue. See: **APC v PDP & ORS (2015) LPELR-24587(SC) at page 106, paras. A – E; 116, paras. B – D; and INAKOJU & ORS v ADELEKE & ORS (2007) LPELR-1510(SC) at pages 120 – 121, paras. E – B.**

For this and all the detailed reasons succinctly stated in the lead judgment, I also hold that Petition No. CA/PEPC/04/2023 lacks merit.

Having also found no merit in all three Petitions Nos. CA/PEPC/03/2023, CA/PEPC/04/2023 and CA/PEPC/05/2023, I join my learned brother *Tsammani, JCA* in dismissing all three Petitions. I abide by the consequential orders made in the lead judgment.

**ABBA BELLO MOHAMMED**

JUSTICE, COURT OF APPEAL.

CERTIFIED TRUE COPY

## **APPEARANCES FOR PETITION NO: CA/PEPC/03/2023**

Dr. Livy Uzoukwu; SAN, Awa Kalu; SAN, Dr. Onyechi Ikpeazu; SAN, Chief Ben. Anachebe; SAN, Ikechukwu Ezechukwu; SAN, J.S. Okutepa; SAN, Prof. Paul Ananaba; SAN, Dr. Mrs. Valerie – Janette Azinge; SAN, Emeka Okpoko; SAN, Alex Ejesieme; SAN, Peter Afuba; SAN with Emenike Mbanugo; Esq, Chike A. Obi; Esq and Vincent Ottaokpukpu; Esq for the Petitioners.

A.B. Mahmoud; SAN, Miannaya Essien; SAN, Sir Stephen Adehi; SAN, T.M. Inuwa; SAN, Alhassan A. Umar; SAN, Abdulaziz Sani and S.O. Ibrahim, SAN with Nasara H. Auta; Esq, Aminu Sadauki; Esq and Dr. Patricia Obi; Esq for the 1st Respondent.

Chief Wole Olanipekun; SAN, Chief Akin Olujinmi; SAN, Yusuf Ali; SAN, Emmanuel Ukala; SAN, Prof. Taiwo Osipitan; SAN, Dele Adesina; SAN, Dr. Hassan Liman; SAN, Olatunde Busari; SAN, A.U. Mustapha; SAN, Kehinde Ogunwumiju; SAN, Bode Olanipekun; SAN, A.A. Malik; SAN, Funmilayo Quadri; SAN, Babatunde Ogala; SAN, Dr. Remi Olatubora; SAN, and M.O. Adebayo; SAN with Emmanuel Uwadoka; Esq, Yinka Ajenifuja; Esq and Akintola Makinde; Esq for the 2nd & 3rd Respondents.

L.O. Fagbemi; SAN, Chief Dr. Charles U. Edosomwan; SAN, Chief Adeniyi Akintola; SAN, Afolabi Fashanu; SAN, Chukwuma Ekomani; SAN, Abiodun J. Owonikoko; SAN, Solomon Umoh; SAN, Hakeem O. Afolabi; SAN, Y.H.A.

CERTIFIED TRUE COPY

Ruba; SAN, Chief Anthony Adeniyi; SAN, Mumuni Hanafi; SAN with Japhat

Opawale; Esq, Olanrewaju Akinshola; Esq and Huwaila M. Ibrahim; Esq

for the 4th Respondent.

**SGD**
**H. S. TSAMMANI**
**CHAIRMAN**

**SGD**                                              **SGD**
**M. O. BOLAJI-YUSUFF**                              **S. J. ADAH**
**MEMBER 2**                                         **MEMBER 1**

**SGD**                                              **SGD**
**A.B. MOHAMMED**                                    **M. B. UGO**
**MEMBER 4**                                         **MEMBER 3**

8th|9|2023

CERTIFIED TRUE COPY

SECRETARY
PRESIDENTIAL ELECTION PETITION
COURT 2023

J.J EKPEROBE Esq

## APPEARANCES FOR PETITION NO: CA/PEPC/04/2023

Andrew Nwajim Malgwi; SAN with G.A. Idiagbonya; Esq, J.O. Olotu; Esq, Joyce Torkula; Esq, Ndidi Naku; Esq and L.J. Ashaku; Esq for the Petitioner.

Sir. Stephen Adehi; SAN, T.M. Inuwa; SAN, Alhassan A. Umar; SAN with Dr. Patricia Obi; Esq, Wendy Kuku; Esq and M.A. Attah; Esq for the 1st Respondent.

Prince L.O. Fagbemi; SAN, Chief Adeniyi Akintola; SAN, Aliyu O. Saiki; SAN and A.M. Rafindadi; SAN with Ahmad El-Marzuq; Esq Omosanya Popoola; Esq and Folake Abiodun; Esq for the 2nd Respondent.

Chief Wole Olanipekun; SAN, Chief Akin Olujinmi; SAN, Yusuf Ali; SAN, Babatunde Ogala; SAN, Funmilayo Quadri; SAN with A.R. Arobo; Esq, Akintola makinde; Esq and Yinka Ajenifuja; Esq for the 3rd & 4th Respondent.

Dr. Rowland Otaru; SAN, A.A. Malik; SAN with Chris E. Agbiti; Esq, Gabriel M. Ishom; Esq, O.R.Chief Yomi Aliyu; SAN with G.M. Ishom; Esq, O.R. Iyere; Esq and Edeji Adaeze; Esq for the 5th Respondent.

SGD
**H. S. TSAMMANI**
**CHAIRMAN**

SGD
**M. O. BOLAJI-YUSUFF**
**MEMBER 2**

SGD
**S. J. ADAH**
**MEMBER 1**

SGD
**A.B. MOHAMMED**
**MEMBER 4**

SGD
**M. B. UGO**
**MEMBER 3**

8th 9 2023

CERTIFIED TRUE COPY

............................

SECRETARY
PRESIDENTIAL ELECTION PETITION
COURT 2023

J.J EKPEROBE Esq

## APPEARANCES FOR PETITION NO: CA/PEPC/05/2023

Chief Chris Uche; SAN, Eyitayo Jegede; SAN, Prof. Mike Ozekhome; SAN, Nella Andem-Ewa Rabana; SAN, Dr. Garba Tetengi; SAN, Mahmoud Magaji; SAN, Joe Abraham; SAN, Chukwuma-Machukwu Ume; SAN, Emeka Etiaba; SAN, Prof. Maxwel M. Gidado; SAN, Gondy Uche; SAN, Edward Ashiekaa: SAN, A.K. Ajibade; SAN, Abdul A. Ibrahim; SAN, Paul Harris Ogbole; SAN, Kemasuode Wodu; SN, Andrew M. Malgwi; SAN with Prof. Yusuf Dankofa; Esq, M.S. Atolagbe; Esq and Olabode Makinde; Esq for the Petitioners.

A.B. Mahmoud; SAN, Miannaya Essien; SAN, Abdullahi Aliyu; SAN, Sir Stephen Adehi; SAN, T.M. Inuwa; SAN, Alhassan A. Umar; SAN, Abdulaziz Sani; SAN and S.O. Ibrahim; SAN with Nasara H. Auta; Esq, Aminu Sadauki; Esq and Dr. Patricia Obi; Esq for the 1st Respondent.

Chief Wole Olanipekun; SAN, Chief Akin Olujinmi; SAN, Yusuf Ali; SAN, Emmanuel Ukala; SAN, Prof. Taiwo Osipitan; SAN, Adebayo Adelodun; SAN, Oladele Adesina; SAN, Dr. Hassan Liman; SAN, Olatunde Busari; SAN, Kehinde Ogunwumiju; SAN, Bode Olanipekun; SAN, Mrs. Funmilayo Quadri; SAN, Babatunde Ogala; SAN, Dr. Remi Olatubora; SAN M.O. Adebayo; SAN and A.A. Malik; SAN with Yinka Ajenifuja; Esq, Akintola Makinde; Esq and Julius Ishola; Esq for the 2nd Respondents.



Prince L.O. Fagbemi; SAN, Dr. Charles U. Edosomwan; SAN, Chief Adeniyi Akintola; SAN, Chief A. Fashanu; SAN, Chukwuma Ekoneani; SAN, Abiodun J. Owonikoko; SAN, Sam T. Ologunorisha; SAN, Solomon Umoh; SAN, Hakeem O. Afolabi; SAN, Olusola Oke; SAN, Aliyu O. Saiki; SAN Y.H.A. Ruba; SAN, Chief Anthony Adeniyi; SAN, Mumuni Hanafi; SAN with Ahmad El-Marzuq; Esq, Seun Ajayi; Esq and Omosanya Popoola; Esq for the 3rd Respondent.  [Adeniji Kazeem; SAN is also in Court].

**SGD**
**H. S. TSAMMANI**
**CHAIRMAN**

| | |
|---|---|
| **SGD**<br>**M. O. BOLAJI-YUSUFF**<br>**MEMBER 2** | **SGD**<br>**S. J. ADAH**<br>**MEMBER 1** |
| **SGD**<br>**A.B. MOHAMMED**<br>**MEMBER 4** | **SGD**<br>**M. B. UGO**<br>**MEMBER 3** |

8th/9/2023

CERTIFIED TRUE COPY

.......................

SECRETARY
PRESIDENTIAL ELECTION PETITION
COURT 2023

J.J EKPEROBE Esq